GORDON SILVER
GERALD M. GORDON, ESQ.
Nevada Bar No. 229
E-mail: ggordon@gordonsilver.com
BRIGID M. HIGGINS, ESQ.
Nevada Bar No. 5990
E-mail: bhiggins@gordonsilver.com
CANDACE C. CLARK, ESQ.
Nevada Bar No. 11539
E-mail: cclark@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Telephone (702) 796-5555
Facsimile (702) 369-2666
[Proposed] Attorneys for Debtor

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEVADA**

In re

155 EAST TROPICANA, LLC,
a Nevada limited liability company,

Debtor.

Case No.: 11-22216-BAM
Chapter 11

Date:   OST Pending
Time:   OST Pending

**EMERGENCY MOTION FOR ORDER DIRECTING JOINT ADMINISTRATION
OF DEBTORS' CHAPTER 11 CASES UNDER FEDERAL RULE OF
BANKRUPTCY PROCEDURE 1015(b)**

155 East Tropicana, LLC, a Nevada limited liability company ("Company"), by and through its proposed attorneys, the law firm of Gordon Silver, hereby submits its Emergency Motion for Order Directing Joint Administration of Debtors' Chapter 11 Cases Under Federal Rule of Bankruptcy Procedure 1015(b) ("Motion") in the above-referenced case. A substantially similar motion has been filed in the bankruptcy case of 155 East Tropicana Finance Corporation, a Nevada corporation ("Finance Corp." and together with Company, "Debtors").

Through their respective motions, Debtors each request that this Court enter an order (the "Order"), substantially in the form attached hereto as **Exhibit "1,"** providing for joint administration of Debtors' above-referenced Chapter[1] 11 cases (the "Chapter 11 Cases"). This

---

[1] All references to "Chapter" and "Section" herein shall be to the Bankruptcy Code appearing in Title 11 of the U.S. Code; all references to a "Bankruptcy Rule" shall refer to the Federal Rules of Bankruptcy Procedure; and all references to a "Local Rule" shall refer to the Local Rules of Bankruptcy Practice of the U.S. District Court for the District of Nevada.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/1101328_3

Motion is made and based on the points and authorities herein, the <u>Omnibus Declaration Of Deborah J. Pierce In Support Of Debtors' First Day Motions</u> (the "Omnibus Declaration"),[2] which Declaration is incorporated herein in its entirety by this reference, the papers and pleadings on file herein, judicial notice of which is hereby respectfully requested, and the argument of counsel entertained by the Court at the time of the hearing of the Motion.

## I.
## INTRODUCTION

1.  On August 1, 2011 (the "Petition Date"), Debtors filed their respective voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, thereby commencing these Chapter 11 Cases.

2.  Debtors continue to operate their businesses and manage their financial affairs and properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3.  No request has been made for the appointment of a trustee or examiner, and no official committees have been appointed or designated.

## II.
## JURISDICTION AND VENUE

4.  This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. The statutory basis for the relief sought herein arises from Bankruptcy Rule 1015(b).

5.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

6.  Venue in this judicial district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.
## BACKGROUND

**A.    Debtors' Business.**

1.  Company is a limited liability company organized on June 17, 2004, to acquire the real and personal property of the Hotel San Remo Casino and Resort located at 115 and 155 Tropicana Avenue in Las Vegas, Nevada (the "Property") with the intention of renovating the

---

[2] All capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Omnibus Declaration.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/1101328_3

2

then existing casino and hotel facility with a "Hooters" entertainment concept and theme. See Omnibus Declaration ¶ 8.

  2. Finance Corp. is a wholly-owned subsidiary of Company that neither holds assets nor conducts operations of its own. Finance Corp. was formed for the sole purpose of facilitating the financing related to the renovations of the Property, which were completed on February 3, 2006. See id. ¶ 10.

**155 East Tropicana, LLC and 155 Tropicana Finance Corporation Organizational Chart**



  1. **Casino/Hotel Business Operations.**

  3. Company's business, from which all of its revenue is generated, is concentrated at the Property in Las Vegas, Nevada, where Company owns and operates a casino/hotel operation under the name of Hooters Casino Hotel (the "Casino Hotel"),[3] which opened for business on February 3, 2006.[4] See id. ¶ 11.

  4. Currently, the Casino Hotel consists of approximately 29,000 square feet of casino floor space with 590 slot and video poker machines and 20 table games; 696 hotel rooms, including 17 suites; a tropical pool area and pool bar; a number of restaurants, bars, and clubs; retail stores selling Hooters-branded merchandise; and a gym facility. In addition, the Company

---

[3] Although Company uses the Hooters brand, it is not the owners of the "Hooters" trademark, nor does it have any affiliation with the holder of the trademark, HI Limited Partnership, or its general partner, Hooters of America, Inc. (collectively with HI Limited Partnership, "Hooters of America") other than the contractual right to use the trademark. An explanation of Company's intellectual property rights is provided in more detail in the Omnibus Declaration.

[4] As previously stated, Finance Corp. neither holds assets nor conducts operations of its own.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/1101328_3

3

1  owns a six-level, 556-space parking garage located adjacent to the Casino Hotel (the "Parking
2  Garage") and an approximately two-acre site consisting of a one-level, 17,472 square-foot
3  executive office building and a 183-space parking lot (collectively, the "Executive Offices").
4  See id. ¶ 12.

5    5.    Company's business focuses on attracting and fostering repeat business from out-
6  of-town visitors to the Las Vegas Strip. Company relies on three types of customers: (1) in-
7  house hotel guests, which Company draws largely from the "free independent travelers," who
8  provide additional revenue to the casino, restaurants, bars, and retail stores; (2) walk-in
9  customers, who are staying at other area hotel/casinos, but are attracted to the Casino Hotel by
10 food specials, $1.50 beer promotions, free slot play promotions, entertainers in our mini-
11 showrooms, and the world-famous Hooters Restaurant; and (3) a small contingency of local
12 customers.[5] See id. ¶ 13.

13    **2.    Debtors' Prepetition Management Structure.**

14    6.    Neil G. Kiefer ("Mr. Kiefer") was appointed Chief Executive Officer ("CEO") of
15 Company in August 2004. Mr. Kiefer also serves as President of Finance Corp. See id. ¶ 15.

16    7.    Michael J. Hessling ("Mr. Hessling") is the President and member of the
17 Management Board of Company. Mr. Hessling also serves as Vice President, Secretary, and
18 Director of Finance Corp. See id. ¶ 16.

19    8.    Deborah Pierce is the CFO and Chief Accounting Officer for Debtors. See id. ¶
20 17.

21    9.    In addition to the foregoing officers of Finance Corp., Finance Corp.'s Board of
22 Directors consists of Michael Hessling, Neil Kiefer, Sukeaki Izumi, and Toyoroku Izumi.
23 Members of Finance Corp.'s Board of Directors do not receive compensation other than expense
24 reimbursement. Finance Corp.'s Board of Directors has no committees. See id. ¶ 19.

25 ///

---

[5] To promote customer loyalty, Debtors utilize a player's club program (the "Owl Rewards Club") at the Casino Hotel, which permits players to earn points based on gaming play, which can be redeemed for slot bonus play, food, beverages, and various other complimentary items. The Owl Rewards Club is Debtors' primary tool for building customer loyalty.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/1101328_3

4

B.  **Debtors' Prepetition Capital Structure**

   1.  **The Credit Agreement and Credit Facility.**

   10. On March 29, 2005, Debtors, as borrowers, entered into that certain Credit Agreement (the "Credit Agreement")[6] with Wells Fargo Capital Finance, Inc., (formerly known as Foothill, Inc.) ("Wells Fargo"), as arranger and administrative agent (the "Agent") for various lenders (collectively, the "Original Credit Facility Lenders"), whereby Wells Fargo provided a credit facility in an aggregate principal amount of up to $15,000,000 (the "Credit Facility"). The original maturity date of the Credit Facility was March 30, 2009, and was subsequently extended to September 30, 2011, which date was accelerated by that certain Notice of Acceleration and Reservation of Rights dated January 6, 2011 (the "Credit Facility Acceleration"). See Omnibus Declaration ¶ 34. True and correct copies of the Credit Agreement and Credit Facility Acceleration are attached as Exhibits "6" and "7," respectively, to the Omnibus Declaration.

   11. As of the Petition Date, Debtors' principal obligations outstanding under the Credit Facility were approximately $14,488,991.04 plus accrued and unpaid interest for the current month to the Petition Date (Debtors have been paying the interest accrual at the default rate on a current basis) plus fees, costs and expenses allowed under the Credit Facility Loan Documents (collectively, the "Credit Facility Obligations"). Debtors believe that the indebtedness under the Credit Facility is fully secured. See id. ¶ 37.

   12. The indebtedness under the Credit Facility is secured by security interests and liens granted (collectively, the "Credit Facility Collateral") pursuant to the Credit Facility Loan Documents as defined and explained in more detail in the Omnibus Declaration. See id. ¶ 38.

   2.  **Senior Secured Indenture.**

   13. Pursuant to that certain Indenture ("Indenture") dated as of March 29, 2005, Debtors issued 8-3/4% Senior Secured Notes due 2012 (the "Old Senior Secured Notes") in the aggregate principal amount of $130,000,000. The Bank of New York Trust Company, N.A. (the "Initial Senior Secured Indenture Trustee") was the indenture trustee under the Old Senior

---

[6] The Wells Fargo Credit Agreement has been amended four times, dated January 30, 2006, June 2, 2006, December 15, 2006, and August 13, 2008 (collectively, the "Credit Agreement Amendments").

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/1101328_3

5

Secured Notes. On August 5, 2005, Debtors successfully exchanged all of the Old Senior Secured Notes for new notes (the "Senior Secured Notes" and holders of Senior Secured Notes, the "Senior Secured Noteholders") with substantially identical terms except that the Senior Secured Notes were registered under the Securities Act of 1933. The Senior Secured Notes and the obligations thereto were accelerated by that certain Notice of Acceleration and Reservation of Rights dated February 1, 2011 (the "Indenture Acceleration"). See id. ¶ 39. True and correct copies of the Indenture and the Indenture Acceleration are attached as Exhibits "14" and "15," respectively, to the Omnibus Declaration.

14. U.S. Bank, National Association ("Successor Senior Secured Indenture Trustee" or "US Bank," and together with the Initial Senior Secured Indenture Trustee, the "Trustee") was appointed the successor to the Initial Senior Secured Indenture Trustee. See id. ¶ 41.

15. As of the Petition Date, Debtors' principal obligations outstanding under the Senior Secured Notes were $130,000,000, plus accrued and unpaid interest under the Indenture to the Petition Date in the amount of $32,229,177 (the "Senior Secured Notes Obligations"). See id. ¶ 42.

16. The indebtedness due under the Senior Secured Notes is secured by security interests and liens granted (the "Senior Secured Notes Collateral," and together with the Credit Facility Collateral, the "Collateral") pursuant to the Loan Documents as defined and explained in more detail in the Omnibus Declaration. See id. ¶ 43.

### 3. Intercreditor Agreement.

17. Contemporaneously with the execution of the Credit Facility Agreement and the Indenture, Debtors, the Agent, and the Trustee (in its capacity as Collateral Agent for the Senior Secured Noteholders) (collectively, the "Intercreditor Parties") entered into that certain Intercreditor and Lien Subordination Agreement (the "Intercreditor Agreement"). See id. ¶ 44. A true and correct copy of the Intercreditor Agreement is attached as Exhibit "21 to the Omnibus Declaration.

18. The Intercreditor Agreement, among other things, provides that the liens securing the Senior Secured Notes are subordinate to the liens securing the principal amount of the Credit

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/1101328_3

6

Facility of up to $15,000,000, plus interest, fees, and other amounts accrued thereon. The Intercreditor Parties continue to be bound by and subject to the terms, provisions and restrictions of the Intercreditor Agreement, and the Intercreditor Agreement applies and governs the Intercreditor Parties in these Chapter 11 Cases. See id. ¶ 45.

### C.      Events Leading To These Chapter 11 Cases

#### 1.      Economic Pressures

19.     Debtors entered into both the Credit Facility and the Indenture during the first half of 2005. With the proceeds of such used to retire the existing debt, and to refurnish and rehabilitate the Property as the Casino Hotel, Debtors were highly, but not unreasonably, leveraged. Under the business circumstances prevailing at the time of these transactions, such leverage would not have hindered Company's business operations or precipitated their filing of these Chapter 11 Cases. However, after these transactions, but prior to their repayment, the economy in the United States sharply declined, devastating the hotel and gaming industry. Subsequently, the United States economy went into a severe recession, with gaming revenues falling dramatically and sources of financing for the hotel and gaming industry becoming limited, if not disappearing altogether. Most significantly, the recession has deeply affected Clark County, Nevada, due to its reliance on tourism and construction, by dramatically decreasing tourism, convention, and gaming revenues in recent years. See Omnibus Declaration ¶ 46.

20.     The Casino Hotel, with less than 700 rooms, represents less than 0.5% of the total room inventory in Las Vegas, which means Debtors' ADR is subject to the discounting of any of its large competitors, who appear to have discounted rooms as deeply as necessary to increase their occupancy rates, or used their other property offerings to cross market during the current economic turndown. See id. ¶ 50.

21.     In sum, Company has been faced with declining hotel and casino revenues based on increased price and promotional competition, additional properties opening on the Las Vegas Strip, reduced consumer spending, a tightened credit market, and an overall weakened economy. These market-driven challenges manifested after Company leveraged itself with the Credit

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/1101328_3

7

Facility and the Indenture, thus leaving Company in a highly precarious position at a time when they most needed robust financial performance. See id. ¶ 51.

### 2. Financial Performance

22. Company was unable to make the interest payments (the "Interest Payments") on the Senior Secured Notes due April 1, 2009, October 1, 2009, April 1, 2010, October 1, 2010, and April 1, 2011. Company's inability to make such Interest Payments caused an event of default to occur under the Indenture, as well as under the Credit Facility Agreement (the "Interest Payment Default"). See id. ¶ 59..

23. Additionally, Debtors have not provided control agreements for one or more deposit accounts that they established and maintained as required under the Credit Facility Agreement. Debtors' failure to provide such control agreements caused a second event of default to occur under the Credit Facility Agreement (the "Control Agreement Default," and together with the Interest Payments Default, the "Events of Default"). See id. ¶ 60.

24. As the Events of Default remained uncured and outstanding, on January 6, 2011, Canpartners, in its capacity as Credit Facility Lender, issued to Debtors the Credit Facility Acceleration (as previously defined). See id. ¶ 64.

25. Additionally, also due to the uncured and outstanding Events of Default, on February 1, 2011, US Bank, in its capacity as Successor Senior Secured Indenture Trustee, issued to Debtors the Indenture Acceleration (as previously defined). See id. ¶ 65.

26. Thereafter, on February 2, 2011, a Notice of Breach and Default and of Election to Cause Sale of Real Property under Deed of Trust was recorded with the Clark County Recorder at the behest of the Trustee ("Deed of Trust Default Notice"). See id. ¶ 66. A true and correct copy of the Deed of Trust Default Notice is attached as Exhibit "22" to the Omnibus Declaration.

27. Subsequently, on July 14, 2011, a Notice of Trustee's Sale was recorded with the Clark County Recorder, thereby providing notice that the sale of the Property by public auction would be conducted on August 8, 2011 ("Notice of Sale"). See id. ¶ 67. A true and correct copy of the Notice of Sale is attached as Exhibit "23" to the Omnibus Declaration.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/1101328_3

8

## IV. BASIS FOR RELIEF

Pursuant to Bankruptcy Rule 1015(b), this Court may order the joint administration of estates when two or more petitions are pending in the same court by a debtor and an affiliate. See Fed. R. Bankr. P. 1015(b) ("If a joint petition or two or more petitions are pending in the same court by or against . . . . (4) a debtor and an affiliate, the court may order a joint administration of the estates."). Affiliate means a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . . ." 11 U.S.C. § 101(2)(B).

A bankruptcy court can avoid any potential prejudice to creditors created by joint administration of affiliated cases by entering orders as may tend to avoid unnecessary costs and delay. See Fed. R. Bankr. P. 1015(c). The efficiency and utility of permitting joint administration of related cases is widely recognized. See, e.g., In re American Wagering, Inc., 493 F.3d 1067, 1070 (9th Cir. 2007); In re Reider, 31 F.3d 1102, 1109 (11th Cir. 1994); In re Geneva Steel, LLC, 389 B.R. 231, 236 (Bankr. D. Utah 2008); In re PL Liquidation Corp., 305 B.R. 629, 632 (Bankr. D. Del. 2004).

As set forth in the Omnibus Declaration submitted on the Petition Date, the relationship between Debtors is such that Finance Corp. is an "affiliate" of Company, as that term is defined in Section 101(2)(B) of the Bankruptcy Code, of Company. Specifically, Finance Corp. is a wholly-owned subsidiary of Company that neither holds assets nor conducts operations of its own. It is totally dependent upon Company for payment of any obligations it may incur. Furthermore, Debtors share the same management, maintain consolidated books and records, and are generally viewed as one business enterprise. See Omnibus Declaration ¶ 75. Thus, Finance Corp. is an affiliate of Company pursuant to Section 101(2)(B) of the Bankruptcy Code.

Due to the affiliated nature of Debtors' interdependent financial and operational relationship, the joint administration of these Chapter 11 Cases will provide significant administrative convenience. Specifically, the joint administration of these Chapter 11 Cases will

9

benefit Debtors' estates by obviating the necessity of filing duplicate motions and applications, entering duplicate orders, and preparing and providing duplicate notices to creditors and parties-in-interest, thus avoiding unnecessary time and expense. Additionally, given the joint and several liability of Debtors under the Credit Facility and the Indenture, any reorganization of these Debtors will require a joint and coordinated approach including, in all probability, a jointly proposed plan of reorganization. See id. ¶ 76.

The rights of Debtors' respective creditors will not be adversely affected by joint administration of these Chapter 11 Cases because the relief sought herein is purely procedural and is not intended to affect substantive rights. Indeed, this Motion does not request substantive consolidation of the Chapter 11 Cases. Thus, the rights of all creditors will be enhanced by the reduction in cost resulting from joint administration, including avoiding multiple unsecured creditors committees and a multiplicity of professionals being retained by each Debtor. Finally, supervision of the administrative aspects of the Chapter 11 Cases by the Office of the United States Trustee will be simplified.

Although conflict between the estates is not anticipated, the Court can avoid any prejudice to creditors created by joint administration of Debtors' Chapter 11 Cases by limiting joint administration to the extent necessary pursuant to Bankruptcy Rule 1015(c). Therefore, if creditors are later adversely affected by joint administration, the Court has a mechanism available to protect such creditors. However, there is no reason why the Court should not authorize joint administration at this time.

Therefore, joint administration of the Chapter 11 Cases is in the best interest of Debtors, their creditors, this Court, and all other interested parties. Accordingly, Debtors request that the Court maintain one file and one docket for all of the Chapter 11 Cases under the case number assigned to Company.

## IV.
## NOTICE

Debtors shall serve notice of this Motion on the following: the Office of the United States Trustee for the District of Nevada; the holders of the thirty (30) largest unsecured claims

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/1101328_3

10

against Debtors (on a consolidated basis), or any official committee of unsecured creditors, if one is appointed pursuant to Section 1102 of the Bankruptcy Code; any other committee that is appointed pursuant to Section 1102 of the Bankruptcy Code; the Internal Revenue Service; the Securities and Exchange Commission; the Nevada Attorney Generals' Offices; the Nevada Gaming Control Board; and any entity which files and serves on Debtors a request for special notice prior to the filing of this Motion. Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

## V.
## CONCLUSION

WHEREFORE, Debtors respectfully request that the Court enter an Order, substantially in the form attached hereto as **Exhibit "1,"** providing for the joint administration of Debtors' Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b), and granting Debtors such other and further relief as is just and proper.

DATED this 1st day of August, 2011.

GORDON SILVER

By /s/ 
GERALD M. GORDON, ESQ.
BRIGID M. HIGGINS, ESQ.
CANDACE C. CLARK, ESQ.
3960 Howard Hughes Pkwy, 9th Floor
Las Vegas, Nevada 89169
[Proposed] Attorneys for Debtor

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/1101328_3

11