GORDON SILVER
GERALD M. GORDON, ESQ.
Nevada Bar No. 229
E-mail: ggordon@gordonsilver.com
BRIGID M. HIGGINS, ESQ.
Nevada Bar No. 5990
E-mail: bhiggins@gordonsilver.com
CANDACE C. CLARK, ESQ.
Nevada Bar No. 11539
E-mail: cclark@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Telephone (702) 796-5555
Facsimile (702) 369-2666
[Proposed] Attorneys for Debtors

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>155 EAST TROPICANA, LLC,<br>a Nevada limited liability company,<br><br>    Debtor. | Case No.: 11-22216-BAM<br>Chapter 11<br><br>[JOINTLY ADMINISTERED PENDING] |
| In re<br><br>155 EAST TROPICANA FINANCE CORP.,<br>a Nevada corporation,<br><br>    Debtor. | Case No.: 11-22217-BAM<br>Chapter 11<br><br>Date:  OST Pending<br>Time:  OST Pending |

**EMERGENCY MOTION FOR ENTRY OF AN INTERIM ORDER PURSUANT TO
FED. R. BANKR. P. 4001(b) AND LR 4001(b): (1) INITIALLY DETERMINING
EXTENT OF CASH COLLATERAL AND AUTHORIZING INTERIM USE OF CASH
COLLATERAL BY DEBTORS; AND (2) SCHEDULING A FINAL HEARING TO
DETERMINE EXTENT OF CASH COLLATERAL AND AUTHORIZING USE OF
<u>CASH COLLATERAL BY DEBTORS</u>**

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

# TABLE OF CONTENTS

Page

I. INTRODUCTION .................................................................................................. 2
II. JURISDICTION AND VENUE ............................................................................ 2
III. SUMMARY OF RELIEF SOUGHT .................................................................. 2
IV. BACKGROUND ................................................................................................. 7

    A.    Corporate Structure. ...................................................................... 7
    B.    Casino/Hotel Business Operations. ............................................... 8
    C.    Debtors' Capital Structure. ............................................................ 9
    D.    The Disputed Cash Collateral. ..................................................... 14

V. LEGAL ARGUMENT ....................................................................................... 15

    A.    Legal Authorities. ....................................................................... 15
    B.    The Agent's and the Trustee's Perfected Interests in Company's Cash and Cash Equivalents Are Limited. .......................................................... 20

        1.    The Agent Would Have Held a Perfected Interest in the Wells Fargo Account. .............................................................. 20
        2.    The Agent and the Trustee Lack Perfected Interests in Company's Cash on Hand and the Deposit Accounts. .......................... 21
        3.    The Agent and the Trustee Lack a Security Interest in Any Proceeds Constituting Cash on Hand or in the Deposit Accounts as of the Petition Date. ..................................................... 23

    C.    Hotel Room Revenues Represent the Only Post-Petition Cash That May Be Deemed Cash Collateral. .................................................... 25

        1.    Hotel Room Revenues. ...................................................... 25
        2.    Gaming Revenues. ............................................................. 27

            a.    Gaming Revenues Are Not Proceeds of Collateral. ............... 27
            b.    Even Assuming, *Arguendo*, That Gaming Revenues Are Proceeds of Collateral, They Are Not Identifiable. ............ 31
            c.    Under Nevada Law, Gaming Revenues May Not Serve As Collateral. ................................................................... 31

        3.    Other Business Revenues. ................................................... 32

    D.    The Equities of the Case Allow for Debtors' Use of Cash Collateral. .................. 34

        1.    Application of Cash Collateral and Adequate Protection. ......................... 36

    E.    The Bankruptcy Code's Policy of Favoring Reorganization Calls for Granting the Motion. ........................................................... 38

VI. CONCLUSION .................................................................................................. 39

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

i

# TABLE OF AUTHORITIES

***Cases***

Arkison v. Frontier Asset Mgmt., LLC (In re Skagit Pac. Corp.),
    316 B.R. 330, 335-338  (B.A.P. 9th Cir. 2004) ................................................................. passim

Business Bank v. White (In re Timothy Dean Restaurant & Bar),
    342 B.R. 1, 23-25 (Bankr. D.D.C. 2006) ..........................................................................33

Chequers Inv. Assocs. v. Hotel Sierra Vista Ltd. P'ship (In re Hotel Sierra Vista Ltd. P'ship),
    112 F.3d 429, 434 (9th Cir. 1997) ...................................................................... 17

CLC Equip. Co. v. Brewer (Matter of Value-Added Communications, Inc.),
    139 F.3d 543, 544 (5th Cir. 1998) ...................................................................... 29

Confederation Life Ins. Co. v. Beau Rivage Ltd.,
    126 B.R. 632 (N.D. Ga. 1991) ............................................................................ 37

County of Orange v. Merrill Lynch  & Co. (In re County of Orange),
    191 B.R. 1005, 1019 (Bankr. C.D. Cal. 1996)...................................................... 26

Days Cal. Riverside, 27 F.3d at 377 ........................................................ 26, 27, 33

Ellinos, Inc. v. Austintown Twp.,
    203 F. Supp. 2d 875, 883 (N.D. Ohio 2002)........................................................ 31

Fin. Sec. Assurance, Inc. v. Days Cal. Riverside Ltd. P'ship (In re Days Cal. Riverside Ltd. P'ship),
    27 F.3d 374, 376, 377 (9th Cir. 1994) ...................................................... 19, 26, 27, 33

Franklin Pembroke Venture,
    105 B.R. at 278 .................................................................................................. 38

Hartsgan v. Pine Lake Village Apt. Co. (In re Pine Lake Village Apt. Co.),
    16 B.R. 750 (Bankr. S.D.N.Y. 1982)................................................................. 35

Hotel Sierra Vista,
    112 F.3d at 434 (citing Days Cal. Riverside, 27 F.3d at 377) ....................... 26, 27,33

In re 354 East 66th Street Realty Corp.,
    177 B.R. 776, 781, 782 (Bankr. E.D.N.Y. 1995)............................................ 37, 38

In re Bering Trader,
    944 F.2d at 502 ...................................................................... 18, 23, 27, 28

In re Cafeteria Operators, L.P.,
    299 B.R. 400 (Bankr. N.D. Tex. 2003)........................................ 16, 18, 30, 33

In re Corner Pockets of the Southwest, Inc.,
    85 B.R. 559, 563 (Bankr. D. Mont. 1988) ...................................................... 19

In re Fairview-Takoma Ltd. P'ship,
    206 B.R. 792, 799 (Bankr. D. Md. 1997) ...................................................... 20, 23

In re Franklin Pembroke Venture II,
    105 B.R. 276, 278 (Bankr. E.D. Pa. 1989) .................................................... 35

In re Gen. Associated Investors Ltd. P'ship, 150 B.R. 756, 762 (Bankr. D. Ariz. 1993)............. 33

In re Heatron, Inc.,
    6 B.R. 493, 496 (Bankr. W.D. Mo. 1980) .................................................... 39

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

ii

In re Inman,
    95 B.R. 479 (Bankr. W.D. Ky. 1988) ................................................................. 33

In re Kalian,
    169 B.R. 503 (Bankr. D.R.I. 1994).................................................................... 37

In re Las Vegas Monorail Co.,
    429 B.R. 317, 328, 334, 341  (Bankr. D. Nev. 2010) ........................... 16, 31, 35, 38

In re Maun,
    95 B.R. 94 (Bankr. S.D. Ill. 1989) ................................................................... 37

In re O'Connor,
    808 F.2d 1393, 1397 (10th Cir. 1987) .............................................................. 39

In re Package Design & Supply Co.,
    217 B.R. 422, 426 (Bankr. W.D.N.Y. 1998) ..................................................... 18

In re Reddington/Sunarrow Ltd. P'ship,
    119 B.R. 809, 813 (Bankr. D.N.M. 1990) ..................................................... 37, 38

In re S & J Holding Corp.,
    42 B.R. 249 (Bankr. S.D. Fla. 1984) ................................................................ 28

In re Skagit Pac. Corp., 988 F.2d at 957 .............................................................. 25

In re Stallings,
    290 B.R. 777, 783 (Bankr. D. Idaho 2003)........................................................ 18

Indian Motorcycle Assocs. III Ltd. P'ship v. Mass. Housing Fin. Agency,
    66 F.3d 1246, 1252 (1st Cir. 1995)................................................................... 19

J. Catton Farms, Inc. v. First Nat. Bank of Chicago,
    779 F.2d 1242, 1246 (7th Cir. 1985) ................................................................ 34

Kingsley v. First Am. Bank of Casselton (In re Kingsley),
    865 F.2d 975, 980-981 (8th Cir. 1989) ............................................................. 29

McCombs Props. VI, Ltd. v. First Texas Sav. Ass'n (In re McCombs Props. VI, Ltd.),
    88 B.R. 261, 267 (Bankr. C.D. Cal. 1988) ................................................... 36, 38

NLRB v. Bildisco & Bildisco,
    465 U.S. 513, 528 (1984)................................................................................ 38

Philip Morris Capital Corp. v. Bering Trader, Inc. (In re Bering Trader, Inc.),
    944 F.2d 500, 502 (9th Cir. 1991) .................................................................... 17

Pine Lake Village, 16 B.R. at 750 ........................................................................ 38

Qmect, Inc. v. Burlingame Capital Partners II, L.P.,
    373 B.R. 682, 686-687 (N.D. Cal. 2007)........................................................... 19

Saline State Bank v. Mahloch,
    834 F.2d 690, 693 n.7 (8th Cir. 1987) .......................................................... 35, 38

Stoumbos v. Kilimnik,
    988 F.2d 949, 957 (9th Cir. 1993) ............................................................... 24, 32

U.S. v. Whiting Pools, Inc., 462 U.S. 198, 203 (1983)............................................. 38

United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,
    484 U.S. 365, 368-369 (1988) ......................................................................... 37

Waldron v. Northwest Acceptance Corp. (In re Johnson),
    62 B.R. 24, 28-29 (B.A.P. 9th Cir. 1986) .......................................................... 20

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

Wolters Village, Ltd. v. Village Props., Ltd. (In re Village Props., Ltd.),
  723 F.2d 441, 444 (5th Cir. 1984) ........................................................................ 35

Zeeway Corp. v. Rio Salado Bank (In re Zeeway Corp.),
  71 B.R. 210, 211-212 (B.A.P. 9th Cir. 1987) ..................................................... 33

### *Statutes*

11 U.S.C. § 315(b) ..................................................................................................... 24

11 U.S.C. § 363 ..................................................................................................... 16, 27

11 U.S.C. § 363(a) ................................................................................................ passim

11 U.S.C. § 363(c)(1) ................................................................................................ 23

11 U.S.C. § 363(c)(2) ............................................................................................. passim

11 U.S.C. § 363(e) ..................................................................................................... 16

11 U.S.C. § 363(p) ..................................................................................................... 16

11 U.S.C. § 506(a) ..................................................................................................... 37

11 U.S.C. § 506(a)(1) ................................................................................................. 37

11 U.S.C. § 506(b) ........................................................................................................ 5

11 U.S.C. § 544(a) ..................................................................................................... 27

11 U.S.C. § 544(a)(1) ................................................................................................. 20

11 U.S.C. § 544(a)(3) ................................................................................................. 20

11 U.S.C. § 552(a) ................................................................................. 17, 18, 27, 33

11 U.S.C. § 552(b) ................................................................................................ passim

11 U.S.C. § 552(b)(1) ........................................................................................... passim

11 U.S.C. § 552(b) (2) ......................................................................................... 26, 35

28 U.S.C. § 157 ............................................................................................................. 2

28 U.S.C. § 157(b)(2) ................................................................................................... 2

28 U.S.C. § 1408 ........................................................................................................... 2

28 U.S.C. § 1409 ........................................................................................................... 2

28 U.S.C. § 1333 ........................................................................................................... 2

28 U.S.C. § 1930(a)(6) ................................................................................................. 5

Article 9 of the Uniform Commercial Code ............................................................. 19

NRS § 463.160(1) ....................................................................................................... 32

N.Y. U.C.C. § 2-A-103(1)(j) ....................................................................................... 30

N.Y. U.C.C. § 9-102(a)(64) ........................................................................................ 19

N.Y. U.C.C. § 9-102(a)(64)(B) ................................................................................... 31

N.Y. U.C.C. § 9-102(a)(64)(C) ................................................................................... 31

N.Y. U.C.C. § 9-104(a) ............................................................................................... 22

N.Y. U.C.C. § 9-312(b)(1) ..................................................................................... 27, 33

N.Y. U.C.C. § 9-312(b)(3) ................................................................................. 22, 27, 33

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

iv

N.Y. U.C.C. § 9-312(b)...................................................................................................... 20, 21

N.Y. U.C.C. § 9-312(b)(1).................................................................................................... 22

N.Y. U.C.C. § 9-313(d)........................................................................................................ 22

N.Y. U.C.C. § 9-314 ............................................................................................................ 21

N.Y. U.C.C. § 9-315 ...................................................................................................... 23, 24

N.Y. U.C.C. § 9-315(a)(2).................................................................................................... 32

UCC § 9-102(a)(64) cmt. 13 ................................................................................................ 31

UCC § 9-102(a)(64)(A). ....................................................................................................... 28

UCC § 9-306(1). ................................................................................................................... 28

UCC Section 9-102(a)(64) .................................................................................................... 31

*Other Authorities*

John M. Czarnetzky, <u>When the Dealer Goes Bust: Issues in Casino Bankruptcies</u>,
   18 Miss. C. L. Rev. 459, 477 (1998) ........................................................................... 29, 33

*Rules*

Local Rule of Bankruptcy Practice for the District of Nevada 4001(b) ....................................... 39

Federal Rule of Bankruptcy Procedure 4001(b) ...................................................................... 1, 39

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

v

155 East Tropicana, LLC, a Nevada limited liability company (the "Company"), and 155 East Tropicana Finance Corp., a Nevada corporation ("Finance Corp." and collectively with Company, the "Debtors"), debtors and debtors-in-possession, by and through their proposed attorneys, the law firm of Gordon Silver, hereby submit their motion (the "Motion") requesting that this Court: (1) conduct an emergency hearing ("Emergency Hearing") to enter an order ("Interim Order"), a copy of which is attached hereto as **Exhibit "1,"** pursuant to Rule 4001(b) and Local Rule 4001(b) initially determining the extent of cash collateral ("Cash Collateral"), as defined by Section 363(a) of the Bankruptcy Code,[1] and authorizing the interim use of Cash Collateral to pay costs of administration and operate Company's business in the ordinary course pending a final hearing ("Final Hearing"); and (2) set the Final Hearing pursuant to Rule 4001(b) to determine the extent of Cash Collateral and authorize Debtors to use Cash Collateral during the pendency of the above-captioned bankruptcy cases (the "Chapter 11 Cases").

This Motion is made and based upon the Omnibus Declaration of Deborah J. Pierce in Support of Debtors' First Day Motions ("Omnibus Declaration"),[2] filed herewith, the Declaration of Deborah J. Pierce in Support of Emergency Motion for Entry of an Interim Order Pursuant to Fed. R. Bankr. P. 4001(b) and LR 4001(b): (1) Initially Determining Extent of Cash Collateral and Authorizing Interim Use of Cash Collateral by Debtors; and (2) Scheduling a Final Hearing to Determine Extent of Cash Collateral and Authorizing Use of Cash Collateral by Debtors ("Cash Collateral Declaration"), filed herewith, and the points and authorities which follow, the pleadings and papers and other records contained in this Court's file, and any evidence or oral argument presented at the time of the hearing on this Motion.

/ / /

/ / /

---

[1] Unless otherwise expressly stated, all Chapter and Section references are to 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), all Rule references are to the Federal Rules of Bankruptcy Procedure, 1001-9037, and all Local Rule references are to the Local Rules of the United States Bankruptcy Court for the District of Nevada.

[2] All capitalized terms not otherwise defined herein shall have those meanings ascribed to them in the Omnibus Declaration, Cash Collateral Declaration, Credit Agreement, or Indenture (as defined below).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

1

# POINTS AND AUTHORITIES

## I.
## INTRODUCTION

1.    On August 1, 2011 (the "Petition Date"), Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned Chapter 11 Cases.

2.    Debtors continue operating their businesses and managing their property as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3.    The basis for the relief sought herein is Sections 361 and 363 of the Bankruptcy Code, Rule 4001(b), and Local Rule 4001(b).

## II.
## JURISDICTION AND VENUE

4.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

5.    This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

6.    Venue in this judicial district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.
## SUMMARY OF RELIEF SOUGHT

7.    Canpartners Realty Holding Company IV LLC ("Canpartners") is the successor administrative agent (the "Agent") and sole lender under that certain Credit Agreement dated as of March 29, 2005 (as amended, the "Credit Agreement"), providing Debtors with a $15,000,000 revolving credit facility (the "Credit Facility") as more fully described below. Obligations under the Credit Facility are secured by a Security Agreement dated March 29, 2005 (the "Credit Facility Security Agreement"), a Deed of Trust, Fixture Filing with Assignment of Rents and Leases, and Security Agreement dated March 29, 2005 (the "Credit Facility Deed of Trust"), and a Securities Account Control Agreement dated March 29, 2005 (the "Securities Account Control Agreement"), among other documents, as more fully described below. By notice dated January 6, 2011, the maturity date of the Credit Facility was accelerated.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

2

8.      U.S. Bank National Association is the successor trustee (the "Trustee") under that certain Indenture dated as of March 29, 2005 (the "Indenture"), pursuant to which $130,000,000 8-3/4% Senior Secured Notes due 2012 (the "Senior Secured Notes") were issued to various lenders, as more fully described below.[3]  Payment of the Senior Secured Notes is partially secured by a Senior Secured Note Security Agreement dated March 29, 2005 (the "Senior Secured Notes Security Agreement" and together with the Credit Facility Security Agreement, the "Security Agreements") and a Deed of Trust, Fixture Filing with Assignment of Rents and Leases, and Security Agreement dated March 29, 2005 (the "Senior Secured Notes Deed of Trust" and together with the Credit Facility Deed of Trust, the "Deeds of Trust"), among other documents, as more fully described below.

9.      The Senior Secured Notes and the obligations thereto were accelerated by that certain Notice of Acceleration and Reservation of Rights dated February 1, 2011.  On February 2, 2011, a Notice of Breach and Default and of Election to Cause Sale of Real Property under Deed of Trust was recorded with the Clark County Recorder at the behest of the Trustee.

10.     As more fully explained below, explicitly excluded as collateral for both the Credit Facility and the Senior Secured Notes are "Excluded Assets", which include: (i) assets securing FF&E financing, purchase money debt, or capitalized lease obligations; (ii) leasehold estates in real property; (iii) cash required to satisfy casino bankroll requirements, reserves, and allowances as required by Nevada gaming laws and regulations; (iv) an interest reserve account for the Senior Secured Notes (as defined below)[4]; (v) stock in any controlled foreign subsidiary of Debtors; and (vi) any leases, permits, licenses, or agreements where a lien on such agreement is prohibited by law, would require a third-party consent that has not been obtained after commercially reasonable efforts, or would result in breach of such agreement under applicable law ((i) through (vi), collectively, the "Excluded Assets").

11.     The Agent and the Trustee are the only entities with an interest in the Cash Collateral, with the interest of the Agent being senior to the interest of the Trustee as provided

---

[3] Canpartners has acquired approximately 98% in aggregate principal amount of the Senior Secured Notes.

[4] No such interest reserve account existed as of the Petition Date.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

3

1    for in the Intercreditor Agreement (as defined below).

2        12.    Debtors assert that the extent of the Agent's Cash Collateral is limited to: (1) post-

3    petition cash proceeds that are or subsequently become identifiable and traceable from the sale of

4    Encumbered Personal Property (as defined below) or Proceeds (as defined under section

5    552(b)(1) of the Bankruptcy Code) thereof; and (2) post-petition cash proceeds identifiable

6    solely as rents and hotel revenues of Company.

7        13.    Debtors assert that the extent of the Trustee's Cash Collateral is limited to a junior

8    lien and interest in the post-petition: (1) cash proceeds that are or subsequently become

9    identifiable and traceable from the sale of Encumbered Personal Property or Proceeds (as defined

10   under section 552(b)(1) of the Bankruptcy Code) thereof, or (2) cash proceeds identifiable solely

11   as rents and hotel revenues of Company.

12       14.    As more fully explained below, Debtors believe that the Agent and Trustee claim

13   that Cash Collateral includes Cash on Hand, all deposit accounts in the name and under the

14   control of Debtors as of the Petition Date (the "Deposit Accounts")  and Post-Petition Cash

15   (collectively, the "Disputed Cash Collateral")[5].

16       15.    Debtors seek an order of the Court: (a) allowing for the use of Cash Collateral and

17   Disputed Cash Collateral (to the extent determined to be Cash Collateral) and (b) determining

18   whether and to what extent Disputed Cash Collateral constitutes Cash Collateral.

19       16.    As adequate protection of the Agent's and the Trustee's interests in the Cash

20   Collateral and Disputed Cash Collateral (to the extent determined to be Cash Collateral); Debtors

21   offer the following:

22           (a)    Against any diminution in value as a result of the use, sale, or lease

23       thereof, and/or the imposition of the automatic stay, the Agent and the Trustee shall each

24       receive adequate protection pursuant to Sections 361, 363(c)(2), and 363(e) of the

25       Bankruptcy Code in the form of additional, replacement, continuing, valid, binding,

26   _____

27   [5]  To the extent the Agent and the Trustee assert that, under the Deeds of Trust (as defined herein), the existing Café 125 Account and 401k Account maintained at Nevada State Bank by Company into which are deposited all employee authorized deductions which are withheld from employee paychecks for 401K contributions and for pretax health care deductions, or Post-Petition Cash constitute Cash Collateral, Debtors dispute these claims.

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

4

enforceable, and automatically and properly perfected security interests in and liens (collectively, the "Replacement Liens") on all collateral set forth as collateral under the Credit Facility Loan Documents and Senior Secured Loan Documents, respectively, and, except for causes of action under Chapter 5 of the Bankruptcy Code, the Cash on Hand, Deposit Accounts, and Post-Petition Cash (collectively, the "Postpetition Collateral"). The Replacement Liens shall be senior and prior to all other interests or liens whatsoever in or on the Postpetition Collateral, and the Replacement Lien granted to the Agent shall be senior and prior to the Replacement Lien granted to the Trustee except that the Replacement Liens granted to the Agent and Trustee and all Cash Collateral shall be subject to a carve out (the "Carve Out") for: (i) the payment of all allowed and unpaid professional fees and disbursements of Debtors incurred from the Petition Date in an aggregate amount not to exceed $1,000,000.00, to the extent that such fees and disbursements are allowed by the Court; (ii) payment of all administrative claims and charges incurred  pursuant to the Budget referenced below, including all taxes, including but not limited to withholding taxes,  room occupancy taxes, gaming taxes and sales taxes incurred and accrued from and after the Petition Date and (iii) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Court; and

(b)    As additional adequate protection of the Trustee, Debtors shall pay the Agent interest on the outstanding principal obligation under the Credit Facility at the non-default rate as provided for in the Credit Facility plus reasonable fees, costs and charges as shall be allowed pursuant to 11 U.S.C. § 506(b).

17.    Attached as Exhibit "1" to the Cash Collateral Declaration is a summary of projected income and expenses for the 13-week period starting August 2, 2011 (the "Budget"). Within four (4) weeks of the end of the first 13-week budget period (and each 13-week budget period thereafter), Company will prepare a similar Budget for the next 13-week budget period, which proposed Budget shall be provided to the Agent, the Trustee, and the Court. Debtors will require additional court approval for future Budgets to the extent:

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

5

(a)     Company's actual cumulative "Net Operating Cash Flows"[6]   (as such amount is identified and computed in the Budget) for each Budget period then in effect tested every thirteenth week by reference to the applicable variance report to be prepared by Company and delivered to the Agent and Trustee is lower than the projected cumulative Net Operating Cash Flows for the period covered by such Budget by 20% or more, but only if greater than $100,000;   provided, however, that in the event that Company's actual cumulative Net Operating Cash Flows for the cumulative-to-date period covered by any given Budget then in effect is greater than the projected cumulative Net Operating Cash Flows for the corresponding Budget period, Company may carryover and include any such favorable variance as a pro forma adjustment to the actual Net Operating Cash Flows for any subsequent period covered by such Budget; or

(b)     Company's actual cumulative "Total Other Disbursements"[7]   (as such amount is identified and computed in the Budget) for each Budget period then in effect tested every thirteenth week by reference to the applicable variance report to be prepared by Company and delivered to the Agent and Trustee is greater than the projected cumulative Total Other Disbursements for any such corresponding  period covered by such Budget by 20% or more;   provided, however, that in the event that Company's actual cumulative Total Other Disbursements for the cumulative-to-date period covered by any given Budget then in effect is less than the projected cumulative Total Other Disbursements for the corresponding Budget period, Company may carryover and include any such favorable variance as a pro forma adjustment to the actual Total Other Disbursements for any subsequent Budget period.

18.     Company cannot meet its ongoing post-petition obligations or finance its operations without the immediate use of Cash Collateral, as well as the Disputed Cash Collateral

---

[6] "Net Operating Cash Flows" shall be defined as net cash flows prior to cash disbursements for: (i) restructuring fees; (ii) US Trustee fees; (iii) capital expenditures; (iv) interest expense and debt service; (v) adequate protection payments as provided for herein and as ordered by the Court; and (vi) capital lease payments.

[7] "Total Other Disbursements" shall exclude: (i) gaming taxes; (ii) room taxes; (iii) sales taxes; (iv) restructuring fees; (v) US Trustee fees; (vi) real and personal property taxes; (vii) adequate protection payments provided for herein and as ordered by the Court; (viii) interest expense and debt service; and (ix) capital expenditures.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

6

1  (to the extent determined to be Cash Collateral). In the absence of such use, immediate and

2  irreparable harm will result to Debtors, the Estates, and their creditors, and the inability to use

3  such Cash Collateral and the Disputed Cash Collateral (to the extent determined to be Cash

4  Collateral) will render impossible an effective and orderly reorganization of Company's

5  business. As such, the relief requested in this Motion is therefore necessary, essential, and

6  appropriate for the continued operation of Company's business and the preservation of the

7  Estates.

8       19.    The emergency nature of this Motion results from the fact that the use of Cash

9  Collateral and Disputed Cash Collateral (to the extent it is determined to be Cash Collateral) is

10  essential to the operation of Company's business. The Agent does not agree with Debtors

11  regarding the characterization and extent of Cash Collateral and proposed expenditures by

12  Company and has made demands upon Debtors in this regard and with regard to the extent of

13  adequate protection which could not be resolved by the Petition Date.[8] As such, the Agent will

14  not consent to the use of Cash Collateral and Disputed Cash Collateral. This lack of consent and

15  uncertainty regarding the extent of Cash Collateral merits the relief sought by Debtors at the

16  Emergency Hearing as set forth in the proposed Interim Order pending the Final Hearing on this

17  Motion and the relief sought herein. See Cash Collateral Declaration ¶ 19.

## IV.
## BACKGROUND

18

19  **A.**    **Corporate Structure.**

20       20.    Company is a limited liability company organized on June 17, 2004, to acquire

21  the real and personal property of the Hotel San Remo Casino and Resort located at 115 and 155

22  Tropicana Avenue in Las Vegas, Nevada (the "Property") with the intention of renovating the

23  then existing casino and hotel facility with a "Hooters" entertainment concept and theme. See

24  Omnibus Declaration ¶ 8.

25

26  [8] Debtors have not received any input in this regard from the Trustee, but given that Canpartners holds
approximately 98% of the Senior Secured Notes, Debtors assume that the Trustee will not consent to the use of Cash

27  Collateral and Disputed Cash Collateral (to the extent determined to be Cash Collateral).

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

7

21.    Company's membership interests are held two-thirds by Florida Hooters, LLC ("Florida Hooters"), and one-third by EW Common, LLC ("EW Common" and together with Florida Hooters, the "Members"). See Omnibus Declaration ¶ 9.

22.    Finance Corp. is a wholly-owned subsidiary of Company that neither holds assets nor conducts operations of its own. Finance Corp. was formed for the sole purpose of facilitating the financing related to the renovations of the Property, which were completed on February 3, 2006. See Omnibus Declaration ¶ 10.

**B.    Casino/Hotel Business Operations.**

23.    Company's business, from which all of its revenue is generated, is concentrated at the Property in Las Vegas, Nevada, where Company owns and operates a hotel casino operation under the name of Hooters Casino Hotel (the "Casino Hotel"), which opened for business on February 3, 2006. See Omnibus Declaration ¶ 11.

24.    Currently, the Hotel Casino consists of approximately 29,000 square feet of casino floor space with 590 slot and video poker machines and 20 table games; 696 hotel rooms, including 17 suites; a tropical pool area and pool bar; a number of restaurants, bars, and clubs; retail stores selling Hooters-branded merchandise; and gym facility. In addition, Company owns a six-level, 556-space parking garage located adjacent to the Casino Hotel (the "Parking Garage") and an approximately two-acre site consisting of a one-level, 17,472 square-foot executive office building and an 183-space parking lot (collectively, the "Executive Offices"). See Omnibus Declaration ¶ 12.

25.    Company's business focuses on attracting and fostering repeat business from out-of-town visitors to the Las Vegas Strip. Company relies on three types of customers: (1) in-house hotel guests, which Company draws largely from the "free independent travelers," who provide additional revenue to the casino, restaurants, bars, and retail stores; (2) walk-in customers, who are staying at other area hotel/casinos, but are attracted to the Casino Hotel by food specials, $1.50 beer promotions, free slot play promotions, entertainers in our mini-showrooms, and the world-famous Hooters Restaurant; and (3) a small contingency of local customers. See Omnibus Declaration ¶ 13.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

8

26.     Through Company's gaming operations and other sources of revenue, a substantial amount of money in coin and currency is generated. This money is maintained at Company's property and is deposited into a cashier's main cage (the "Main Cage"). Once deposited, the money is commingled with all other monies maintained in the Main Cage and related cash vaults ("Cage Monies") and used in operations, which includes slot device fills, table game bankrolls, floor banks, change booths, and ancillary cages. Monies not required to be retained as Cash on Hand are then deposited into Company's Deposit Accounts, where the funds are again commingled with other funds that have been previously deposited as well as with funds that are regularly deposited into such accounts by Company. See Cash Collateral Declaration ¶ 10.

27.     Company derives its operating revenue from a variety of sources, primarily hotel rooms, gaming, entertainment, restaurants, bars and retail. A substantial majority of the revenues generated by Company is attributable to Company's gaming operations (the "Gaming Revenues"). The Gaming Revenues are in the form of money that is either deposited in the Main Cage or temporarily located within Company's slot machines or table games (the "Gaming Equipment") until such money is deposited into the Main Cage. See Cash Collateral Declaration ¶¶ 11 and 12.

**C.      Debtors' Capital Structure.**

28.     On March 29, 2005, Debtors, as borrowers, entered into that certain Credit Agreement (the "Credit Agreement")[9] with Wells Fargo Capital Finance, Inc. (formerly known as Foothill, Inc.) ("Wells Fargo"), as arranger and Agent for various lenders, whereby Wells Fargo provided the Credit Facility. The original maturity of the Credit Facility was March 30, 2009, and was subsequently extended to September 30, 2011. The Credit Facility was accelerated by notice dated January 6, 2011. See Omnibus Declaration ¶ 34.

29.     Canpartners (in its capacity as the lender under the Credit Facility, the "Credit Facility Lender") acquired the Credit Facility from Wells Fargo and is the successor-in-interest

---

[9] The Wells Fargo Credit Agreement has been amended four times, dated January 30, 2006, June 2, 2006, December 15, 2006, and August 13, 2008 (collectively, the "Credit Agreement Amendments").

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

to Wells Fargo's interest in and to the Credit Facility Loan Documents.[10]    See Omnibus Declaration ¶ 36.

30.    As of the Petition Date, Debtors' principal obligations outstanding under the Credit Facility were approximately $14,488,991.04 in respect of the revolving loans made under the Credit Facility, plus accrued and unpaid interest for the current month to the Petition Date (Debtors have been paying the interest accrual at the default rate on a current basis) plus fees, costs and expenses allowed under the Credit Facility Loan Documents (collectively, the "Credit Facility Obligations").    Debtors believe that the indebtedness under the Credit Facility is fully secured.    See Omnibus Declaration ¶ 37.

31.    The indebtedness under the Credit Facility is secured by security interests and liens granted pursuant to the following: (together with all other documents executed pursuant to the Credit Facility, the "Credit Facility Loan Documents"):

(a)    The Credit Facility Security Agreement, which grants a security interest to the Agent in substantially all personal property of Debtors, whether now owned or hereafter acquired or arising, including: (i) all accounts, books and records; (ii) chattel paper; (iii) deposit accounts; (iv) equipment and fixtures; (v) general intangibles; (vi) inventory; (vii) investment related property; (viii) negotiable collateral; (ix) commercial tort claims; (x) money and cash equivalents in control of the Agent; and (xi) proceeds (collectively, the "Credit Facility Encumbered Personal Property").    Explicitly excluded from this definition are "Excluded Assets", which include:  (i) assets securing FF&E financing, purchase money debt, or capitalized lease obligations; (ii) leasehold estates in real property; (iii) cash required to satisfy casino bankroll requirements, reserves, and allowances as required by Nevada gaming laws and regulations; (iv) an interest reserve account for the Senior Secured Notes[11]; (v) stock in any controlled foreign subsidiary of Debtors; and (vi) any leases, permits, licenses, or agreements where a lien on such

---

[10] In conjunction with the transfer and assignment to of the Credit Facility to the Credit Facility Lender, Wells Fargo resigned as Agent of the Credit Facility. Canpartners currently is the Agent under the Credit Facility.

[11]The interest reserve account no longer existed as of the Petition Date.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

agreement is prohibited by law, would require third-party consent that has not been obtained after commercially reasonable efforts, or would result in breach of such agreement under applicable law.  UCC financing statements were filed with the Nevada Secretary of State and the Office of the Recorder in Clark County Nevada (the "Clark County Recorder") with respect to the Credit Facility Encumbered Personal Property;

(b)    The Credit Facility Deed of Trust, recorded as document 20050329-0002524 in the records of the Clark County Recorder, which granted the Agent a first priority security interest in and lien on all of Debtors' real property and provided for an absolute and irrevocable assignment of all rents and leasehold revenues;

(c)    That certain Assignment of Entitlements, Contracts, Rents and Revenues dated March 29, 2005, for the benefit of the Agent, recorded as document 20050329-0002526 in the records of the Clark County Recorder;

(d)    The Securities Account Control Agreement, between the Agent, the Debtor, and Wells Fargo Brokerage, in which Wells Fargo Brokerage recognized the Agent's security interest in the Debtor's deposit account (# 11552783) (the "Wells Fargo Account")[12]; and

(e)    That certain Parent Pledge Agreement, dated March 29, 2005, among the Members and the Agent, whereby the Members pledged to the Agent all right, title, and interest to the Members' membership interests in Company, and books, records, and proceeds relating to such membership interests.  In relation to the Agent-Parent Pledge Agreement, the Members, Debtors, and the Agent also entered into a Control Agreement (Investment Property) dated March 29, 2005.

See Omnibus Declaration ¶ 38.

32.    Pursuant to the Indenture, Debtors issued 8-3/4% Senior Secured Notes due 2012 (the "Old Senior Secured Notes") in the aggregate principal amount of $130,000,000. The Bank

---

[12] Debtors ceased using the Wells Fargo Account shortly after the Credit Facility was obtained.  Additional operating accounts were maintained with Wells Fargo until 2009 when all accounts and deposits were transferred to Nevada State Bank.  At this time no depository accounts are maintained at Wells Fargo nor are there any accounts maintained by Debtors subject to depository account control agreements in favor of the Agent or the Trustee.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

11

of New York Trust Company, N.A. was the indenture Trustee under the Old Senior Secured Notes. On August 5, 2005, Debtors successfully exchanged all of the Old Senior Secured Notes for the Senior Secured Notes, with substantially identical terms with the exception that the Senior Secured Notes were registered under the Securities Act of 1933, with the Bank of New York Trust Company, N.A. remaining as Trustee.[13] U.S. Bank National Association has since been appointed as successor Trustee. See Omnibus Declaration ¶ 39, 41.

33.    As of the Petition Date, Debtors' principal obligations outstanding under the Senior Secured Notes were $130,000,000, plus accrued and unpaid interest, fees, costs and expenses under the Indenture to the Petition Date in the total amount of approximately $32,229,177.    Canpartners represents that in October 2010 it acquired and currently holds approximately 98.4% of the aggregate principal amount of the Senior Secured Notes for the approximate sum of $28,000,000, a significant discount from the face amount of approximately $127,500,000 which substantiates that the Senior Secured Notes are significantly undersecured. See Omnibus Declaration ¶ 42.

34.    The indebtedness due under the Senior Secured Notes is secured by security interests and liens granted pursuant to the following (together with the Indenture, the Senior Secured Notes, and all other documents executed pursuant to the Senior Secured Notes, the "Senior Secured Loan Documents"):

(a)    The Senior Secured Notes Security Agreement, which grants a security interest to the Trustee for the benefit of the Senior Secured Noteholders in: (i) accounts; (ii) chattel paper; (iii) commercial tort claims: (iv) deposit accounts; (v) documents; (vi) general intangibles; (vii) goods, including equipment, inventory and fixtures; (viii) insurance; (ix) investment property; (x) intellectual property; (xi) letter-of-credit rights; and (xii) all other personal property, including supporting obligations and proceeds ("Senior Secured Encumbered Personal Property" and, together with the Credit Facility Encumbered Personal Property, the "Encumbered Personal Property").    Excluded from

---

[13] Holders of Senior Secured Notes are hereinafter defined as the "Senior Secured Noteholders." Canpartners is currently the holder of approximately 98.4% of the Senior Secured Notes.

Gordon Silver
Attorneys At Law
Ninth Floor
l960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

the security interest are Excluded Assets, which are given substantially the same definition as used in the Credit Facility Security Agreement. UCC financing statements were filed with the Nevada Secretary of State and the Clark County Recorder;

(b)    The Senior Secured Notes Deed of Trust, recorded as document 20050329-0002531 in the records of the Clark County Recorder, containing an absolute and irrevocable assignment of rents and leasehold revenues;

(c)    That certain Assignment of Entitlements and Contracts executed in favor of the Trustee for the benefit of the Senior Secured Noteholders, recorded as document 20050329-0002533 in the records of the Clark County Recorder;

(d)    That certain Trademark Security Assignment dated March 29, 2005, in favor of the Trustee for the benefit of the Senior Secured Noteholders, assigning Company's trademarks, trade names, goodwill, and proceeds to the Trustee.; and

(e)    That certain Parent Pledge Agreement dated March 29, 2005, among the Members and the Trustee, whereby the Members pledged to the Trustee all right, title, and interest to the Members' membership interests in Company, and books, records, and proceeds relating to such membership interests.

See Omnibus Declaration ¶ 43.

35.    Contemporaneously with the execution of the Credit Agreement and the Indenture, Debtors, the Agent, and the Trustee (in its capacity as collateral agent for the Senior Secured Noteholders) (collectively, the "Intercreditor Parties") entered into that certain Intercreditor and Lien Subordination Agreement (the "Intercreditor Agreement").    The Intercreditor Agreement, among other things, provides that the liens securing the Senior Secured Notes are subordinate to the liens securing the principal amount of the Credit Facility of up to $15,000,000, plus interest, fees, and other amounts accrued thereon.  The Intercreditor Parties continue to be bound by and subject to the terms, provisions and restrictions of the Intercreditor Agreement, and the Intercreditor Agreement applies to and governs the Intercreditor Parties in the Chapter 11 Cases. See Omnibus Declaration ¶¶ 44 and 45.

/ / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

13

## D.    The Disputed Cash Collateral.

36.    Debtors believe that the Agent and the Trustee assert that the following represents Cash Collateral as Encumbered Personal Property: Company's cash and cash equivalents located on the premises of the various Debtors (including cash and cash equivalents in casino cages, premises depositories, or vaults except for cash required to satisfy casino bankroll requirements, reserves, and allowances as required by Nevada gaming laws and regulations) as of the Petition Date (collectively, the "Cash on Hand"), Company's bank accounts as of the Petition Date (collectively, the "Deposit Accounts"), and cash generated or received by Company from and after the Petition Date (including from wagers, gaming devices, room, restaurant, and bar revenue) (collectively, the "Post-Petition Cash"). [14] See Cash Collateral Declaration ¶ 5.

37.    Debtors dispute any claim of the Agent and the Trustee to Cash on Hand, the Deposit Accounts, Post-Petition Cash and Excluded Assets (to the extent of cash and cash equivalents) as Cash Collateral other than (a) cash proceeds that are or subsequently become identifiable and traceable from the sale of Encumbered Personal Property or Proceeds (as defined under section 552(b)(1) of the Bankruptcy Code) thereof, and (b) cash proceeds identifiable and traceable solely from rents and hotel revenues of Company. See Cash Collateral Declaration ¶ 6.

38.    To the extent the Agent and the Trustee assert that, under the Deeds of Trust, the Cash on Hand, Deposit Accounts, the existing Café 125 Account and 401k Account maintained at Nevada State Bank by Company into which are deposited all employee authorized deductions which are withheld from employee paychecks for 401K contributions and for pretax health care deductions, or Post-Petition Cash constitute Cash Collateral, Debtors dispute these claims on the grounds and to the same extent as set forth in the preceding paragraphs.    See Cash Collateral Declaration ¶ 7.

39.    Debtors also dispute any claims of the Agent and the Trustee to the enforcement of the assignments in the Deeds of Trust pursuant to Chapter 107A of the Nevada Revised

---

[14] As stated previously, Debtors have not received any input in this regard from the Trustee, but given that Canpartners holds approximately 98% of the Senior Secured Notes, Debtors assume that the Trustee would make these assertions.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

14

Statutes which provides that an absolute assignment of rents, income, receipts, revenues, royalties, issues and profits solely provides a security interest and not the enhanced rights that an absolute assignment would have compelled. See Cash Collateral Declaration ¶ 8.

40.    As of the Petition Date, the balance of the Deposit Accounts was $4,245,964, and Cash on Hand was $4,722,558. The Cash on Hand includes Company's casino bankroll of $2,500,000, which is specifically included in the definition of "Excluded Assets" and cannot serve as Cash Collateral. See Cash Collateral Declaration ¶ 9.

41.    Debtors were unable to make the interest payments (the "Interest Payments") on the Senior Secured Notes due April 1, 2009, October 1, 2009, April 1, 2010, October 1, 2010, and April 1, 2011. Debtors' inability to make such Interest Payments caused an event of default to occur under the Indenture, as well as under the Credit Facility Agreement (the "Interest Payment Default"). See Omnibus Declaration ¶ 59.

42.    Additionally, Debtors have not provided control agreements for one or more deposit accounts that they established and maintained as required under the Credit Facility Agreement. Debtors' failure to obtain such control agreements caused a second event of default to occur under the Credit Facility Agreement (the "Control Agreement Default," and together with the Interest Payments Default, the "Events of Default"). See Omnibus Declaration ¶ 60.

43.    Thereafter, on February 2, 2012, a Notice of Breach and Default and of Election to Cause Sale of Real Property under Deed of Trust was recorded with the Clark County Recorder at the behest of the Trustee ("Deed of Trust Default Notice"). See Omnibus Declaration ¶ 66.

## V.
## LEGAL ARGUMENT

### A.    Legal Authorities.

Section 363 of the Bankruptcy Code provides that a debtor in possession may not use, sell or lease cash collateral unless: 1) each entity with an interest in such cash collateral consents; or 2) the court, after notice and hearing, authorizes the use, sale, or lease of such cash collateral in accordance with the provisions of Section 363. See 11 U.S.C. § 363(c)(2). The term "cash

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

15

1  collateral" is defined as:

> [C]ash, negotiable instruments, documents of title, securities, deposit
> accounts, or other cash equivalents whenever acquired in which the estate
> and an entity other than the estate have an *interest* and includes the
> proceeds, products, offspring, rents, or profits of property and the fees,
> charges, accounts or other payments for the use or occupancy of rooms
> and other public facilities in hotels, motels, or other lodging properties
> subject to a security interest as provided in section 552(b) of this title,
> whether existing before or after the commencement of a case under this
> title.

7  11 U.S.C. § 363(a) (emphasis added).

8      If, pursuant to Section 363(c)(2) of the Bankruptcy Code, an entity with an interest in
9  cash collateral consents to that collateral's use, sale or lease - or the court, after notice and
10  hearing, authorizes such use, sale, or lease - a debtor in possession may still be required to
11  provide adequate protection to an entity with an interest in the cash collateral. Section 363(e)
12  provides, in relevant part, that "at any time, on request of an entity that has an interest in property
13  used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or
14  without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide
15  adequate protection of such interest." 11 U.S.C. § 363(e).

16      Section 363(p) of the Bankruptcy Code further provides that while the debtor-in-
17  possession has the burden of proof on the issue of adequate protection, the entity claiming an
18  interest in the alleged cash collateral has the burden of proof on the issue of validity, priority
19  and/or extent of its interest in the property. 11 U.S.C. § 363(p). Thus, to establish the extent of
20  its interest, a secured creditor must prove that it holds a perfected security interest in post-
21  petition revenues to which its liens still rightly attach, and then must prove the amount of money
22  to which its liens attach. In re Las Vegas Monorail Co., 429 B.R. 317, 328 (Bankr. D. Nev.
23  2010) (citing Chequers Inv. Assocs. v. Hotel Sierra Vista Ltd. P'ship (In re Hotel Sierra Vista
24  Ltd. P'ship), 112 F.3d 429, 434 (9th Cir. 1997)).

25      Additionally, the definition of cash collateral in Section 363(a) of the Bankruptcy Code
26  refers to Section 552(b), which is discussed below and provides a narrow exception to the rule
27  set forth in Section 552(a). Section 552(a) "limits a secured creditor's interest in post-petition
28  property of the estate." See In re Cafeteria Operators, L.P., 299 B.R. 400, 403-04 (Bankr. N.D.

Gordon Silver
Attorneys At Law
Ninth Floor
1960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

16

Tex. 2003). Section 552(a) of the Bankruptcy Code provides:

> Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

11 U.S.C. § 552(a).

Thus, Section 552(a) of the Bankruptcy Code states the general rule that property acquired after the commencement of bankruptcy is not subject to pre-petition liens. See Arkison v. Frontier Asset Mgmt., LLC (In re Skagit Pac. Corp.), 316 B.R. 330, 335-337 (B.A.P. 9th Cir. 2004). Moreover, even if a security agreement contains an "after-acquired" property clause, Section 552(a) nonetheless cuts off security interests on property acquired by the debtor after the petition date. See id. at 335. Such security interests are cut off because the purpose of Section 552(a) is "to allow a debtor to gather into the estate as much money as possible to satisfy the claims of all creditors." Id. (quoting Philip Morris Capital Corp. v. Bering Trader, Inc. (In re Bering Trader, Inc.), 944 F.2d 500, 502 (9th Cir. 1991)).

Section 552(b)(1) of the Bankruptcy Code provides:[15]

> (b)(1) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 552(b)(1). This is "a *narrow* exception to the general rule of 552(a)." Bering Trader, 944 F.2d at 502 (emphasis in original).

Section 552(b) of the Bankruptcy Code provides "that if a pre-petition security interest encumbers collateral and its proceeds, any proceeds of that pre-petition collateral remain subject to the security interest even if they are received post-petition." Skagit, 316 B.R. at 335. Although Section 552(b) creates an exception to Section 552(a)'s general rule with regard to

---

[15] Section 552(b)(2) is discussed below in this Motion's discussion of hotel room and lodging revenues.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

1    proceeds, product, offspring or profits generated by *pre-petition* collateral, it does not create such

2    an exception for "after-acquired" property obtained by the debtor or the estate post-petition. See

3    In re Stallings, 290 B.R. 777, 783 (Bankr. D. Idaho 2003) (finding that a creditor's floating lien

4    on such after-acquired property was "scuttled" by Debtors' bankruptcy filing).    Therefore,

5    Section 552(a) cuts off security interests on property acquired by the debtor after the petition

6    date even if such property was encumbered pre-petition by an "after-acquired" property clause.

7        Revenue that a debtor earns post-petition through the operation of its business does not

8    constitute "proceeds" of pre-petition collateral if such revenue represents compensation for

9    goods or services rendered by the debtor during the course of its everyday business. See Skagit,

10    316 B.R. at 336.  Such post-petition revenue that is generated solely from the debtor's labor is

11    not subject to a creditor's pre-petition interest.  See id. (citing Cafeteria Operators, 299 B.R. at

12    405).  Moreover, any post-petition value that is added to a debtor's goods or services stemming

13    from the debtor's labor during its reorganization effort is also not subject to a creditor's pre-

14    petition interest.  Id. (citing In re Package Design & Supply Co., 217 B.R. 422, 426 (Bankr.

15    W.D.N.Y. 1998)).

16        Additionally, the types of property excepted by Section 552(b) of the Bankruptcy Code -

17    proceeds, product, offspring, and profits - are "derivative," or they "necessarily derive from the

18    sale, exchange or other dispensation of other encumbered property." Bering Trader, 944 F.2d at

19    502.    Specifically, the term "proceeds" and whether property constitutes "proceeds" are

20    determined by state law, as is the general question of whether an entity has a security interest in a

21    particular item of property. See Skagit, 316 B.R. at 337 (citing Fin. Sec. Assurance, Inc. v. Days

22    Cal. Riverside Ltd. P'ship (In re Days Cal. Riverside Ltd. P'ship), 27 F.3d 374, 376 (9th Cir.

23    1994); Qmect, Inc. v. Burlingame Capital Partners II, L.P., 373 B.R. 682, 686-687 (N.D. Cal.

24    2007) ("State law governs whether or not a particular item of collateral constitutes proceeds of

25    the lien.").    Whether the relevant state law herein is New York's, per the governing law

26    provisions of the Credit Facility Loan Documents and the Senior Secured Loan Documents, or

27    Nevada's, the term "proceeds" is defined in a substantively identical manner under each state's

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

18

respective version of Article 9 of the Uniform Commercial Code (the "UCC").[16] See Skagit, 316 B.R. at 337 ("A state's Uniform Commercial Code is a determinative factor of whether a security interest in proceeds survives the filing of bankruptcy."). Under the UCC, "proceeds" are defined as:

(A)    whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;

(B)    whatever is collected on, or distributed on account of, collateral;

(C)    rights arising out of collateral;

(D)    to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; or

(E)    to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral.

N.Y. U.C.C. § 9-102(a)(64).

The "interest" set forth in Section 363(a) of the Bankruptcy Code refers to a valid and *perfected* security interest between the parties that secures the cash collateral. See In re Corner Pockets of the Southwest, Inc., 85 B.R. 559, 563 (Bankr. D. Mont. 1988) (stating that only perfected security interests give rise to "cash collateral" as defined by Section 363 of the Bankruptcy Code) (citing Waldron v. Northwest Acceptance Corp. (In re Johnson), 62 B.R. 24, 28-29 (B.A.P. 9th Cir. 1986)); In re Fairview-Takoma Ltd. P'ship, 206 B.R. 792, 796-800 (Bankr. D. Md. 1997). Only a creditor with a perfected security interest in property "will be entitled to the protection of the cash collateral provisions of [Section] 363(a)" because such interests are not avoidable under the "strong arm" provisions of Section 544(a)(1) and (3) of the Bankruptcy Code. Fairview-Takoma, 206 B.R. at 799; see also Indian Motorcycle Assocs. III Ltd. P'ship v. Mass. Housing Fin. Agency, 66 F.3d 1246, 1252 (1st Cir. 1995) (holding that the secured creditor therein "would have to demonstrate that it held a perfected lien or security

---

[16] Any substantive differences between New York's Uniform Commercial Code ("NYUCC") and Nevada's Uniform Commercial Code ("NVUCC") will be noted herein. Otherwise, this Motion will refer to the NYUCC based on the governing law provisions of the Credit Facility Loan Documents and the Senior Secured Loan Documents.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

19

interest" in certain collateral, "otherwise, as property of the chapter 11 estate, any unperfected lien . . . would be subject to avoidance by the debtor in possession pursuant to its 'strong arm' powers.").

Based upon the foregoing authority, this Motion first identifies and discusses the extent of any valid and perfected security interest in Company's cash and cash equivalents. Included in this analysis is a discussion of: 1) which property constitutes proceeds, and 2) which proceeds may be considered collateral subject to a pre-petition lien and which proceeds may not pursuant to Section 552(b) of the Bankruptcy Code. It must then be determined whether Debtors may use such Cash Collateral, and if so, under what conditions.

**B.   The Agent's and the Trustee's Perfected Interests in Company's Cash and Cash Equivalents Are Limited.**

The only Cash Collateral which may have arguably been secured and perfected by the Credit Facility Loan Documents and Senior Secured Loan Documents is post-petition cash proceeds identifiable as Hotel Room Revenues (as defined below) of Company. This section of the Motion explains that for the reasons set forth below, the Agent and the Trustee lack perfected, enforceable security interests in all cash of Debtors as of the Petition Date. The following section of the Motion will show that the Agent and the Trustee's sole perfected interest in post-petition cash proceeds is in those proceeds identifiable as Hotel Room Revenues of Company.

**1.   The Agent Would Have Held a Perfected Interest in the Wells Fargo Account.**

NYUCC Section 9-312(b) governs perfection of a security interest in a deposit account, and provides, in pertinent part that "a security interest in a deposit account may be perfected only by control under Section 9-314."[17]  N.Y. U.C.C. § 9-312(b).  Thus, if the Wells Fargo Account

---

[17] NYUCC Section 9-314 provides, in pertinent part:

> (a) A security interest in . . . deposit accounts . . . may be perfected by control of the collateral under Section 9-104 . . . .

> (b) A security interest in deposit accounts . . . is perfected by control under Section 9-104 . . . when the secured party obtains control and remains perfected by control only while the secured party retains control.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

existed, it appears the Agent would have had a perfected security interest in the Wells Fargo Account by virtue of its control of the account through the Securities Account Control Agreement.

### 2. The Agent and the Trustee Lack Perfected Interests in Company's Cash on Hand and the Deposit Accounts.

Despite the all-encompassing language in the Security Agreements and Deeds of Trust, the Agent and Trustee do not have perfected security interests in Company's Cash on Hand or Deposit Accounts as discussed above. As of the Petition Date, Company had $2,222,558 Cash on Hand and $4,245,964 in the Deposit Accounts.[18] In order to perfect an interest in such Cash on Hand and the Deposit Accounts, the Agent and Trustee would have had to comply with the applicable provisions of the NYUCC, but neither the Agent nor the Trustee has done so.

Through Company's gaming operations and other sources of revenue, a substantial amount of money in coin and currency is generated. This money is maintained at Company's property and is deposited into a cashier's main cage (the "Main Cage"). Once deposited, the money is commingled with all other monies maintained in the Main Cage and related cash vaults ("Cage Monies") and used in operations, which includes slot device fills, table game bankrolls, floor banks, change booths, and ancillary cages. Monies not required to be retained as Cash on Hand are then deposited into the Deposit Accounts, where the funds are again commingled with other funds that have been previously deposited as well as with funds that are regularly deposited into such accounts by Company. See Cash Collateral Declaration ¶ 10.

Regarding the Cash on Hand, it is undisputed that neither the Agent or the Trustee, nor any other party, had taken possession of such cash as of the Petition Date, whether by appointment of a receiver or otherwise. As such, regardless of whether the Agent or the Trustee was granted a security interest in the Cash on Hand, such security interest was not perfected because neither party had possession of the Cash on Hand. See N.Y. U.C.C. § 9-312(b)(3) (requiring possession of money to perfect a security interest in money); see also Rus, Miliband &
——————————————— (continued)
N.Y. U.C.C. § 9-314. The meaning of "control" under Section 9-104 is discussed further below.

[18] As discussed above, Debtors' casino bankroll of $2,500,000 is an Excluded Asset and must be deducted from the amount of Cash on Hand, as it cannot serve as Cash Collateral.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

1    Smith, APC v. Yoo (In re Dick Cepek, Inc.), 339 B.R. 730, 740 (B.A.P. 9th Cir. 2006) (noting

2    that a creditor "perfects a security interest in money by taking possession of the funds as

3    permitted by the UCC"). Also, the NYUCC provides that where perfection of a security interest

4    depends upon possession of the collateral by a secured party, as with money, perfection occurs

5    no earlier than the time the secured party takes possession and continues only while the secured

6    party retains possession. N.Y. U.C.C. § 9-313(d). Thus, because neither the Agent nor the

7    Trustee ever possessed the Cash on Hand or any of Debtors' other cash assets as of the Petition

8    Date, neither the Agent nor the Trustee has or has ever had a perfected security interest in such

9    monies.

10        Similarly, the Agent and the Trustee lack perfected security interests in the Deposit

11   Accounts. NYUCC Section 9-312(b)(1) provides that a security interest in a deposit account

12   may be perfected only by "control." Control of a deposit account is only achieved if:

13           (1) the secured party is the bank with which the deposit account is
             maintained; (2) the debtor, secured party, and bank have agreed in
14           an authenticated record that the bank will comply with instructions
             originated by the secured party directing disposition of the funds in
15           the deposit account without further consent by the debtor; or (3)
             the secured party becomes the bank's customer with respect to the
16           deposit account.

17   N.Y. U.C.C. § 9-104(a).

18        Neither the Agent nor the Trustee is a bank that has maintained any of the Deposit

19   Accounts. Nor are there any control agreements that have been entered into related to the

20   Deposit Accounts. Lastly, neither the Agent nor the Trustee is a banking customer with respect

21   to the Deposit Accounts. Therefore, any interests in the Deposit Accounts are unperfected

22   because the Agent and the Trustee have not established control of such accounts.

23        The consequence of the Agent and the Trustee lacking perfected interests in the Cash on

24   Hand and the Deposit Accounts is that these assets are not Cash Collateral; thus, they are not

25   subject to the cash collateral rules of Section 363(c)(2) of the Bankruptcy Code. Again, cash

26   collateral includes cash and deposit accounts in which a debtor-in-possession and a creditor have

27   an "interest," as well as the proceeds of such property. See 11 U.S.C. § 363(a). This "interest"

28   refers to a valid and *perfected* security interest between the parties that secures the cash

Gordon Silver
Attorneys At Law
Ninth Floor
1960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc                                      22

collateral.  See Fairview-Takoma, 206 B.R. at 799.  As the Agent and Trustee are unperfected in the Cash on Hand and the Deposit Accounts, such property is not Cash Collateral, and Company may use its Cash on Hand and the Deposit Accounts without the Agent or the Trustee's consent and without the necessity of this Court's approval.  See 11 U.S.C. §§ 363(c)(1) and (2).

**3.    The Agent and the Trustee Lack a Security Interest in Any Proceeds Constituting Cash on Hand or in the Deposit Accounts as of the Petition Date.**

As set forth above, proceeds "necessarily derive from the sale, exchange or other dispensation of other encumbered property."  Bering Trader, 944 F.2d at 502.  As such, proceeds are generally in the form of money that is paid to a debtor upon the sale of collateral.  The debtor then has numerous options regarding the use of such proceeds because of the nature and transferability of money.  NYUCC Section 9-315  governs the continuation of a security interest in proceeds generated from the sale of collateral.  It provides, in pertinent part:

> (a)    (1)    a security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien; and
>
> (2)    a security interest attaches to any identifiable proceeds of collateral.
>
> (b)    Proceeds that are commingled with other property are identifiable proceeds:
>
> (1)    if the proceeds are goods ...; and
>
> (2)    if the proceeds are not goods, to the extent that the secured party identifies the proceeds by a method of tracing, including application of equitable principles, that is permitted under law other than this article with respect to commingled property of the type involved.
>
> (c)    A security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected.

N.Y. U.C.C. § 9-315.

The Ninth Circuit Bankruptcy Appellate Panel has explained:

> Section 315(b) provides that when proceeds are commingled with other property, they are identifiable only (1) if the proceeds are "goods" ... or (2) "to the extent that the secured party identifies the proceeds by a method of tracing, including application of equitable principles, that is permitted under law." *Thus, once a debtor deposits cash proceeds into an account and commingles it with other money, the identifiability of a*

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

23

1

> *secured creditor's proceeds is destroyed unless the secured creditor can*
> *prove the money currently in the debtor's account corresponds to its*
> *collateral.*

2

3    Skagit, 316 B.R. at 338 (emphasis added).

4        Thus, a creditor's right to proceeds when a debtor files for bankruptcy is limited "to any

5    *identifiable* proceeds of collateral." Id. at 337-338 (emphasis in original).  Money collected from

6    pre-petition accounts can only be considered proceeds if there is competent evidence tracing it

7    into the new receivable.  See id. at 337.

8        If the proceeds of pre-petition collateral are commingled with funds obtained from other

9    sources, a secured creditor must present detailed evidence tracing the funds claimed as proceeds.

10   See id. at 338 (citing Stoumbos v. Kilimnik, 988 F.2d 949, 957 (9th Cir. 1993) (stating that the

11   burden of tracing proceeds of collateral is on the party claiming the security interest in the

12   proceeds)).   The lowest intermediate balance rule ("LIBR"), which assumes that the traced

13   proceeds are the last funds withdrawn from the commingled account, may be used to trace

14   proceeds in accounts.[19]  See id.

15       In the instant Chapter 11 Cases, assuming that there are proceeds placed in the Main

16   Cage, the nature of the Cage Monies is such that it would be impossible for the Agent or the

17   Trustee to identify any such monies as proceeds.  This stems from the fact that money delivered

18   to the Main Cage is commingled with funds from most of Company's various revenue sources.

19   Indeed, the Cage Monies largely consist of gaming earnings, in which the Agent and the Trustee

20   lack a security interest for reasons discussed below.

21       As has been mentioned, most of the revenue Company generates from its business

22   operations results in money in the form of coins and currency, which is routinely deposited

23   and/or swept into on-premises cash vaults, including the Main Cage.  Proceeds commingled in

24   Company's Main Cage or other vaults will not be identifiable because of the constant and

25

26   _____

     [19] This rule assumes that the traced proceeds are the last funds withdrawn from the commingled account and once
27   the traced proceeds are withdrawn and spent, the security interest disappears - thus, the security interest is limited to
     the lowest balance in the account during the period in question.  See id. at 338-40.  A secured creditor that cannot
     provide documentation following the LIBR will result in the creditor's failure to meet its burden in tracing proceeds.
28   See id.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

24

1    extensive commingling of the Cage Monies.  Under these circumstances, the Agent and the

2    Trustee would not be able to meet their burden to trace any such commingled proceeds held

3    within the Main Cage or as other Cash on Hand.  See Skagit, 988 F.2d at 957.

4          The same holds true with the Deposit Accounts.  Monies not required to be kept in the

5    Main Cage are then deposited into the Deposit Accounts, where the funds are again commingled

6    with other funds that have been previously deposited or with additional funds that are regularly

7    deposited into such accounts by Company.  These proceeds would not be segregated when they

8    are deposited, and they would have already been first commingled in the Main Cage prior to

9    their delivery to those accounts.  Accordingly, the LIBR cannot be used to trace proceeds in the

10   Deposit Accounts because such proceeds were already commingled in the Main Cage and other

11   vaults.  As with the Cash on Hand, the Agent and the Trustee would not be able to meet their

12   burden to trace any commingled proceeds held within the Deposit Accounts.

13         Because there are no identifiable proceeds traceable to the Cash on Hand or Deposit

14   Accounts, the Agent and the Trustee lack an "interest" in any such proceeds.  Therefore, these

15   proceeds cannot be deemed cash collateral pursuant to Section 363(a), and Company may use

16   whatever proceeds may have been deposited in the Main Cage or held as Cash on Hand and

17   Deposit Accounts without consent of this Court, the Agent, or the Trustee.

18   **C.**   **Hotel Room Revenues Represent the Only Post-Petition Cash That May Be Deemed**
          **Cash Collateral.**

19
     Company derives its operating revenue from a variety of sources, primarily hotel rooms,

20
     gaming, entertainment, restaurants, and retail.  See Cash Collateral Declaration ¶ 11.  The only

21
     such revenues which are Cash Collateral are Hotel Room Revenues.

22
23         **1.**   **Hotel Room Revenues.**

24   Section 552(b)(2) of the Bankruptcy Code provides the following, in pertinent part:

25              . . . if the debtor and an entity entered into a security agreement before the
                commencement of the case and if the security interest created by such
26              security agreement extends to property of the debtor acquired before the
                commencement of the case and to amounts paid as rents of such property
27              or the fees, charges, accounts, or other payments for the use or occupancy
                of rooms and other public facilities in hotels, motels, or other lodging
28              properties, then such security interest extends to such rents and such fees,
                charges, accounts, or other payments acquired by the estate after the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc                              25

1    commencement of the case to the extent provided in such security
2    agreement, except to any extent that the court, after notice and a hearing
     and based on the equities of the case, orders otherwise.

3    11 U.S.C. § 552(b)(2).

4        In short, Section 552(b)(2) of the Bankruptcy Code provides that a pre-petition security

5    interest may extend to post-petition rents and hotel room revenues to the extent provided in the

6    security agreement.  Unlike Section 552(b)(1), Section 552(b)(2) does not limit its reach to the

7    extent of "applicable nonbankruptcy law" and thus the post-petition interest remains valid

8    notwithstanding a creditor's failure to perfect its security interests under applicable state law as

9    long as the parties' security agreement properly encumbers such rents.  See County of Orange v.

10   Merrill Lynch & Co. (In re County of Orange), 191 B.R. 1005, 1019 (Bankr. C.D. Cal. 1996).

11       Pursuant to Section 552(b)(2) of the Bankruptcy Code, the Agent's and the Trustee's

12   security interests would encompass post-petition Hotel Room Revenues earned by Company.

13   Any such revenues may therefore be deemed Cash Collateral and subject to the restrictions of

14   Section 363(c)(2) of the Bankruptcy Code.  However, the Ninth Circuit has stated that within the

15   context of hotel room and lodging revenues, a secured party "must prove that it holds a perfected

16   security interest in post-petition revenues to which its liens still rightly attach.  Second, a party

17   must prove the amount of money to which its liens attach." Hotel Sierra Vista, 112 F.3d at 434

18   (citing Days Cal. Riverside, 27 F.3d at 377).

19       Not all of a hotel's revenues are rent. Days Cal. Riverside, 27 F.3d at 377.  "[R]evenues

20   derived from the sale of food and drink and from other services provided by the hotel generate

21   'accounts' that cannot be classified as rent.  The equitable purposes of bankruptcy and the

22   balancing purpose of [Section] 552 require us to distinguish the two types of revenues." Id.

23   (citing In re Bering Trader, 944 F.2d at 502; 11 U.S.C. § 552(b) (permitting court to rule "based

24   on the equities of the case")).  Therefore, while the Agent and the Trustee have a valid post-

25   petition security interest in the Hotel Room Revenues, they lack an interest in other revenues

26   generated in Company's hotel that are unrelated to lodging.  See Hotel Sierra Vista, 112 F.3d at

27   434; Days Cal. Riverside, 27 F.3d at 377.  Finally, although any traceable Hotel Room Revenues

28   are Cash Collateral, for reasons discussed below, this Court should authorize Debtors to use such

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc                    26

1    revenues in order to protect the value of the Estates for all creditors.

2    **2.    Gaming Revenues.**

3    A substantial majority of the revenues generated by Company are attributable to

4    Company's gaming operations (the "Gaming Revenues"). See Cash Collateral Declaration ¶ 12.

5    Such revenues, whether existing as of the Petition Date or generated thereafter, are not Cash

6    Collateral subject to the provisions of Section 363 of the Bankruptcy Code because the Agent

7    and the Trustee lack an interest, perfected or otherwise, in such revenues. As the Gaming

8    Revenues are collectively unsecured and unperfected assets, no proceeds of Gaming Revenues

9    can be Cash Collateral either (although there are no such proceeds in any event).

10    The Gaming Revenues are in the form of money that is either deposited in the Main Cage

11    or temporarily located within Company's slot machines or table games (the "Gaming

12    Equipment") until such money is deposited into the Main Cage. See Cash Collateral Declaration

13    ¶ 12. As discussed above, the Agent and the Trustee cannot have a perfected interest in the

14    Gaming Revenues because a security interest in money may only be perfected by a secured party

15    taking possession of such money. See N.Y. U.C.C. § 9-312(b)(3). Gaming Revenues deposited

16    in the Deposit Accounts are not under the control of the Agent or the Trustee and likewise are

17    unperfected. See N.Y. U.C.C. § 9-312(b)(1). Because neither the Agent nor the Trustee

18    possesses or controls any of the Gaming Revenues, neither has a *perfected* interest in those

19    revenues as of the Petition Date. Because unperfected interests are avoidable under Section

20    544(a) of the Bankruptcy Code, the Gaming Revenues cannot serve as Cash Collateral.

21    **a.    Gaming Revenues Are Not Proceeds of Collateral.**

22    Nor do Gaming Revenues constitute proceeds of collateral which may be treated as Cash

23    Collateral, either as pre-petition proceeds or post-petition proceeds subject to Section 552(b) of

24    the Bankruptcy Code. The Gaming Revenues are comprised of money generated by customers'

25    use of the Gaming Equipment. In this regard, the Gaming Equipment, as with every other slot

26    machine and table game in use today, does not generate proceeds. Proceeds are "derivative" in

27    that they must derive "from the sale, exchange or other dispensation of other encumbered

28    property." Bering Trader, 944 F.2d at 502. It is without question that monies arising from the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

27

Gaming Equipment are not derived from the sale, exchange or other dispensation of Gaming Equipment. Instead, such monies represent Company's Gaming Revenues that are earned through customers' *use* of such Gaming Equipment.

Although there are no published cases directly discussing this issue, several analogous cases are useful in illustrating that the Gaming Revenues do not in any manner stem from the proceeds of collateral. In In re S & J Holding Corp., 42 B.R. 249 (Bankr. S.D. Fla. 1984), a debtor in the business of operating video games executed a security agreement covering all assets, including products and proceeds of collateral. See id. at 249-250.

The court held that the cash obtained through the debtor's video game machines were not proceeds of other collateral under the definition of proceeds in the UCC.[20] The court explained as follows:

> The video game equipment is collateral under the security agreement in question. But the cash which is generated through that equipment is not received from the sale of the collateral, but rather, through the use of it. It is more analogous to income generated through the use of, for example, construction equipment, which is given as collateral. *The fact that the money was earned through the use of the collateral does not make it "proceeds" subject to the protection [of the UCC].*

Id at 250 (emphasis added).

Because the money generated from the video game machines was not proceeds and was not subject to a perfected security interest in its own right because the secured creditor did not possess such money, the debtor was entitled to the money free from any claims of the secured creditor.

Likewise, in CLC Equip. Co. v. Brewer (Matter of Value-Added Communications, Inc.), 139 F.3d 543, 544 (5th Cir. 1998), a security agreement granted a creditor a security interest in an inmate telephone system for the Minnesota prison system as well as all "proceeds" arising from the use of that telephone system. Funds collected from the coin-operated pay phone system

---

[20] The former, pre-2001, version of the UCC (the "Pre-2001 UCC") that was the authority for S & J Holding defined proceeds as "whatever is received upon the sale, exchange, collection, or other disposition of collateral or proceeds." See Pre-2001 UCC § 9-306(1). The analogous provision in the current definition of proceeds states that proceeds are "[w]hatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral." See UCC § 9-102(a)(64)(A).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

28

were the source of dispute between the debtor and the secured creditor.  See id at 545.

The court found that the money generated from the pay phones was inadequately described in the filed financing statement and therefore unperfected collateral.  It also found that such funds were not proceeds of the collateral encumbered under the governing security agreement.  After noting that the UCC definition of proceeds includes whatever is received upon the sale or other disposition of collateral or proceeds, the court stated that:

> [t]he funds collected from the prisoners were the product of the use of the equipment.  Use is not a disposition of the collateral within the meaning of the definition of "proceeds".  If fruits and products from the use of collateral were treated as proceeds, every creditor with a security interest in equipment would have a security interest in all items produced from the equipment as well as the revenues earned by the equipment.

Id. (citing Kingsley v. First Am. Bank of Casselton (In re Kingsley), 865 F.2d 975, 980-981 (8th Cir. 1989)).

In other words, the use of the coin-operated telephones did not amount to a sale or other full or partial disposition of those telephones as provided in the definition of "proceeds."

The reasoning the foregoing cases is equally applicable with respect to the money generated from the Gaming Equipment that comprises the Gaming Revenues.[21]  It is common sense that a casino does not in any manner sell, lease, license, exchange, or otherwise disposes of any portion of its Gaming Equipment in exchange for a gambler's money.  Instead, the gambler is using such equipment with the hopes of winning more money than the amount wagered, and the Gaming Revenues derived from the Gaming Equipment are realized through the effort and services of Company.  Company operates a predominantly service-based business, selling an experience and the excitement of possibly winning more than what was wagered.  When a gambler puts money into a slot machine or on a table game, he knows he is not buying inventory, equipment, or other tangible collateral; instead, he is essentially buying the experience and entertainment that is associated with gambling.  Moreover, Company, like other gaming businesses, offers its customers ancillary goods and services to attract these customers and

---

[21] Indeed, "[t]he line between video games and gaming devices is blurring as 'video poker' machines and other electronic gaming devices that resemble video games in many respects are introduced at casinos."  See John M. Czarnetzky, When the Dealer Goes Bust: Issues in Casino Bankruptcies, 18 Miss. C. L. Rev. 459 (1998).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

29

1    enhance their gaming experiences, including the provision of a pleasant and unique gaming

2    atmosphere and beverage, restaurant, and hotel room comps and promotions.    Therefore,

3    Company earns its Gaming Revenues through the sale of services rather than through the sale of

4    inventory, equipment, or other tangible goods. See Cash Collateral Declaration ¶ 13.

5        More generally, the definition of "proceeds" under the UCC "does not include revenues

6    generated by a service-oriented business since services are not tangible collateral." See Cafeteria

7    Operators, 299 B.R. at 406.  Revenue that a debtor earns post-petition through the operation of

8    its business does not constitute "proceeds" of pre-petition collateral if such revenue represents

9    compensation for goods or services rendered by the debtor during the course of its everyday

10   business. See Skagit, 316 B.R. at 336. Because the Gaming Revenues arise from customers' use

11   of the Gaming Equipment and related services, the Gaming Revenues are not attributable to any

12   disposition of tangible collateral.  Accordingly, the Gaming Revenues are not proceeds and may

13   not serve as cash collateral.

14       The Gaming Revenues are also not proceeds of the "lease" or "license" of the Gaming

15   Equipment within the definition of "proceeds" under the UCC.  The term "lease" is defined in

16   the UCC, in pertinent part, as "a transfer of the right to possession and use of goods for a term in

17   return for consideration."  See N.Y. U.C.C. § 2-A-103(1)(j).  Customers do not have an

18   agreement with Company concerning the right to possess and use the Gaming Equipment, and no

19   such right otherwise exists.  Thus, the Gaming Revenues are not proceeds that arise from a lease

20   transaction between Company and its customers.

21       "License" is not defined under the UCC; however, it is commonly understood as "[a]

22   revocable permission to commit some act that would otherwise be unlawful." See, e.g., Ellinos,

23   Inc. v. Austintown Twp., 203 F. Supp. 2d 875, 883 (N.D. Ohio 2002) (citing BLACK'S LAW

24   DICTIONARY 113 (7th ed. 1999)).  Certainly, Company possesses various licenses issued from

25   gaming authorities to own and operate its casino business.  However, no such license exists

26   between Company and its customers for the use of the Gaming Equipment.  Therefore, the

27   Gaming Revenues cannot be proceeds of a license of collateral.

28       The definition of proceeds also includes "(B) whatever is collected on, or distributed on

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

30

account of, collateral" and "(C) rights arising out of collateral." N.Y. U.C.C. § 9-102(a)(64)(B) and (C). The official comments to UCC Section 9-102(a)(64) explain that subparagraph (B) includes as proceeds "cash or stock dividends distributed on account of securities or other investment property that is original collateral," as well as various credit-support arrangements. See UCC § 9-102(a)(64) cmt. 13. These types of collections and distributions are clearly not similar in kind to the proceeds resulting from the operation of Gaming Equipment, which result from the provision of services, not the issuance of securities or supporting obligations. It is also apparent that the Gaming Revenues are not the sort of "rights" envisioned by the UCC. See Las Vegas Monorail, 429 B.R. at 334 (distinguishing between fully-earned receivables and intangible rights to operate collateral).

Based upon the foregoing, because the Gaming Revenues are not proceeds of any existing collateral, the Agent and the Trustee cannot have an interest in the Gaming Revenues and the Gaming Revenues are not cash collateral as defined in Section 363(a) of the Bankruptcy Code.

<strong>b.     <u>Even Assuming, <em>Arguendo</em>, That Gaming Revenues Are Proceeds of Collateral, They Are Not Identifiable.</u></strong>

As previously discussed, even assuming, *arguendo*, that Gaming Revenues might normally constitute proceeds of collateral, the Cage Monies are so commingled from deposits between various revenue sources that identifying and segregating Gaming Revenues from the other Cage Monies is impossible. The continuation of a security interest in proceeds generated from the sale of collateral requires that such proceeds be "identifiable." See N.Y. U.C.C. § 9-315(a)(2). Because the Agent and the Trustee would not be able meet their burden to identify the Gaming Revenues commingled within the Main Cage or as other Cash on Hand, a security interest could not extend to any proceeds within, or that form part of, the Gaming Revenues, and such proceeds could not be deemed cash collateral pursuant to Section 363(a) of the Bankruptcy Code. See Skagit, 316 B.R. at 338; Stoumbos, 988 F.2d at 957.

<strong>c.     <u>Under Nevada Law, Gaming Revenues May Not Serve As Collateral.</u></strong>

Finally, unlike other collateral secured under the Deeds of Trust and Security

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

31

1  Agreements, the Gaming Revenues cannot serve as collateral under Nevada law pursuant to

2  Section 463.160(1) of the Nevada Revised Statutes ("NRS"), which states:

3   1.  Except as otherwise provided in subsection 4 and NRS 463.172, it
    is unlawful for any person, either as owner, lessee or employee, whether
4    for hire or not, either solely or in conjunction with others:

5   . . .

6   (d)  To receive, directly or indirectly, any compensation or
    reward or any percentage or share of the money or property played, for
7    keeping, running or carrying on any gambling game, slot machine,
    gaming device, mobile gaming system, race book or sports pool,

8
    - without having first procured, and thereafter maintaining in
9    effect, all federal, state, county and municipal gaming licenses as required
    by statute, regulation or ordinance or by the governing board of any
10    unincorporated town.

11  NRS § 463.160(1).

12  In other words, the Agent and the Trustee are prohibited from sharing in any gaming

13  revenue without first obtaining all appropriate gaming licenses.  The Agent and the Trustee lack

14  the requisite gaming licenses; therefore, they are prohibited from sharing in any pre- or post-

15  petition Gaming Revenues.  Accordingly, the Agent and the Trustee do not have a security

16  interest in any Gaming Revenues and do not have any "interest" in Gaming Revenues under

17  Section 363(a) for cash collateral purposes.

18  The inevitable conclusion from all of the foregoing is that as of the Petition Date, the

19  Agent and the Trustee, like other secured creditors in the gaming context, have "little recourse

20  with respect to cash in the casino's possession that was generated by gaming operations." John

21  M. Czarnetzky, When the Dealer Goes Bust: Issues in Casino Bankruptcies, 18 Miss. C.L. Rev.

22  459, 477 (1998).

23  **3.**  **Other Business Revenues.**

24  Company's remaining revenue is generated from entertainment, restaurants, bars and

25  retail sales. As with Gaming Revenues, even if a security interest attached to these revenues pre-

26  petition pursuant to the Security Agreements and Deeds of Trust, these revenues are again in the

27  form of money or deposit accounts.  As discussed above, the Agent and the Trustee lack a

28  perfected interest in any of the Cash on Hand because they have not taken possession of these

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

32

1    assets. See N.Y. U.C.C. § 9-312(b)(3). Furthermore, the Agent and the Trustee lack a perfected

2    interest in any of the Deposit Accounts because they do not control those assets. See N.Y.

3    U.C.C. § 9-312(b)(1).    Therefore, such revenues are not Cash Collateral.

4          As discussed above, courts have also uniformly held that revenues derived from a

5    debtor's services are not "proceeds" as defined under the UCC and are therefore are not cash

6    collateral under Section 363(a) and (c)(2).    See Cafeteria Operators, 299 B.R. at 406; Hotel

7    Sierra Vista, 112 F.3d at 434; Days Cal. Riverside, 27 F.3d at 377; see also Zeeway Corp. v. Rio

8    Salado Bank (In re Zeeway Corp.), 71 B.R. 210, 211-212 (B.A.P. 9th Cir. 1987) (holding that

9    gate receipts generated by post-petition races held at the debtor's racetrack were not cash

10   collateral under Section 363(a) of the Bankruptcy Code because such income was not proceeds

11   of collateral but instead the result of the services provided by the debtor's business); In re Gen.

12   Associated Investors Ltd. P'ship, 150 B.R. 756, 762 (Bankr. D. Ariz. 1993) (finding that the

13   debtor's resort generated revenues from food, beverages and tennis and other services, and that

14   such services could not properly be considered proceeds, rents or profits).

15         In Business Bank v. White (In re Timothy Dean Restaurant & Bar), 342 B.R. 1, 23-25

16   (Bankr. D.D.C. 2006), a secured creditor argued that Section 552(a) did not extinguish its post-

17   petition security interest in guest charges (room service, restaurant services, etc.), arguing that

18   the guest charges at issue were post-petition "proceeds" of the food served by the debtor.    The

19   court responded that this was a "strained interpretation of the term 'proceeds'" as the  restaurant

20   was engaged primarily in the service industry and that cash earned from operations was not a

21   proceed from the sale of inventory.    The degree of service was not the significant factor for

22   consideration, as the restaurant industry, in general, is a service-oriented industry.    Id. at 24

23   (citing In re Inman, 95 B.R. 479 (Bankr. W.D. Ky. 1988)).

24         The court further disagreed with the assertion that guest charges might fall within the

25   Section 552(b)(2) hotel rent revenue exception to Section 552(a) of the Bankruptcy Code.    It

26   stated that nothing in the text or legislative history of the Bankruptcy Code suggested that

27   Congress intended for that Section to apply to the food service charges of restaurants at all.    The

28   court noted that the bank's reading of Section 552(b)(2) would require the court to conclude that

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

33

Congress intended to benefit the secured creditors of restaurants located in hotels, but not restaurants located anywhere else, "by treating post-petition food service charges owed to such restaurants as 'rents' of property of the debtor . . . or as charges for room occupancy." Id .

Likewise, in these Chapter 11 Cases, the Agent and the Trustee cannot meet their burden in showing that Company's miscellaneous sources of revenue constitute proceeds of collateral. Company's entertainment, restaurant, and retail operations, like its gaming operations, are highly service-oriented - even where such operations involve the purchase and sale of products, Company's business requires that it provide associated services designed to enhance the customers' experience and enjoyment. See Cash Collateral Declaration ¶ 14. Nor can the Agent or the Trustee specify which revenues constitute proceeds stemming from the sale of tangible collateral, and which represent compensation for services rendered.

Moreover, as with Gaming Revenues, proceeds generated from the sale of pre-petition collateral must be traceable for a security interest to continue in those proceeds post-petition. See 11 U.S.C. § 552(b)(1)  The Agent or the Trustee cannot identify which revenues constitute proceeds due to the extensive commingling of monies in the Main Cage and the Deposit Accounts. See Skagit, 316 B.R. at 337-338.  Accordingly, the Agent and the Trustee cannot have an "interest" in the miscellaneous proceeds generated by Company and such proceeds cannot be deemed cash collateral pursuant to Section 363(a) of the Bankruptcy Code.  To the extent Cash Collateral beyond the Hotel Room Revenues can be identified, Company respectfully requests that this Court grants the use of such Cash Collateral in light of the arguments and under the terms provided below.

**D.    The Equities of the Case Allow for Debtors' Use of Cash Collateral.**

Sections 552(b)(1) and (2) of the Bankruptcy Code provide that pre-petition security interests, in certain circumstances, may extend to revenues generated post-petition by collateral, but allows the Court to order otherwise "based on the equities of the case." 11 U.S.C. §§ 552(b)(1) and (2). The purpose of this equitable exception is to cover circumstances where an expenditure of estate funds increases the value of the collateral subject to the security interest in question. See H. Rep. No. 595, 95th Cong., 1st Sess. 376-77 (1977); see also J. Catton Farms,

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

34

1 | Inc. v. First Nat. Bank of Chicago, 779 F.2d 1242, 1246 (7th Cir. 1985); Wolters Village, Ltd. v.

2 | Village Props., Ltd. (In re Village Props., Ltd.), 723 F.2d 441, 444 (5th Cir. 1984).

3 |      Normally, a bankruptcy court should allow the debtor to use cash collateral to maintain or

4 | operate properties especially where the debtor's proposed use of cash collateral increases or

5 | maintains the value of the real property collateral. Las Vegas Monorail, 429 B.R. at 341 (noting

6 | that a debtor's use of cash collateral to maintain properties from which rents are being generated

7 | is a sufficient form of adequate protection); Hartsgan v. Pine Lake Village Apt. Co. (In re Pine

8 | Lake Village Apt. Co.), 16 B.R. 750 (Bankr. S.D.N.Y. 1982) (holding that despite the absence of

9 | a creditor's consent to the debtor's use of post-petition cash collateral, the debtor was authorized

10 | to use cash collateral to maintain its apartment property, and that this would ensure that the

11 | creditor was adequately protected).    Indeed, "[w]hen the secured creditor has undertaken

12 | affirmative action to protect its right to post-bankruptcy rents, . . . the courts have tended to limit

13 | the use to which the rents might be put. For the most part, the debtor in possession or trustee is

14 | permitted to use the rents for purposes of maintaining the property, for making real estate tax

15 | payments and, if there is a surplus, to make mortgage amortization payments. *These holdings*

16 | *comport with the requirement of adequate protection*." Saline State Bank v. Mahloch, 834 F.2d

17 | 690, 693 n.7 (8th Cir. 1987) (emphasis added).

18 |      In In re Franklin Pembroke Venture II, 105 B.R. 276, 278 (Bankr. E.D. Pa. 1989), a

19 | secured creditor opposed the debtor's motion to use cash collateral.  The debtor was a single

20 | asset real estate partnership that desired to increase the occupancy rate of its office building by

21 | making capital investments with cash collateral. Id. The court measured adequate protection in

22 | terms of whether the collateral was increasing or decreasing in value, and held that the debtor

23 | met this adequate protection standard because the increased occupancy (from 69 percent to 79

24 | percent) in the office building enhanced the long-term appreciation of the secured creditor's

25 | collateral. Id.

26 |      Similarly, in McCombs Props. VI, Ltd. v. First Texas Sav. Ass'n (In re McCombs Props.

27 | VI, Ltd.), 88 B.R. 261 (Bankr. C.D. Cal. 1988), the court also authorized the debtor's use of cash

28 | collateral to improve a building.  The court emphasized that the proposed renovation was likely

Gordon Silver
Attorneys At Law
Ninth Floor
1960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

35

to maintain or even increase the value of the secured creditor's collateral:

> Use of the cash collateral for needed repairs and renovations should actually result in increased rentals. Debtor has committed to use the cash collateral to pay operating expenses and improve and maintain the Property with an excess income going to First Texas. By dedicating cash collateral for these purposes, debtor has substantially eliminated the risk of diminution of First Texas' interest in cash collateral. The more likely scenario is that cash collateral will increase.

McCombs Props. VI, Ltd., 88 B.R. at 267.

Because the debtor's renovations maintained and enhanced the value of the bank's collateral, McCombs held that the bank was adequately protected, and that Section 363 authorized the debtor's use of the bank's cash collateral. Id. at 268.

In these Chapter 11 Cases, Company should similarly be granted authority by this Court to use the Hotel Room Revenues and other Cash Collateral, if any, that the Agent or the Trustee may sufficiently identify.

### 1.    **Application of Cash Collateral and Adequate Protection.**

As detailed above, Debtors' obligation to the Agent under the Credit Agreement as of the Petition Date is approximately $14,488,919, and Debtors' obligation to the Trustee under the Senior Secured Notes as of the Petition Date is approximately $162,229,177. As of the Petition Date, Debtors believe the value of the collateral securing payment of the Credit Facility and the Senior Secured Notes exceeds the amount due under the Credit Facility but is less than the amount due under the Senior Secured Notes. In addition, Debtors believe that the enterprise value of Company's business and the Collateral will not diminish during these Chapter 11 Cases. See Cash Collateral Declaration ¶ 15 and Omnibus Declaration ¶¶ 34, 39, 70 and 71.

Thus, pursuant to Section 506(a) of the Bankruptcy Code,[22] the Trustee is an undersecured creditor. See 11 U.S.C. § 506(a)(1); see also United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 368-369 (1988); In re

---

[22] Section 506(a) provides, in relevant part: "(a)(1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a)(1).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

1  Reddington/Sunarrow Ltd. P'ship, 119 B.R. 809, 813 (Bankr. D.N.M. 1990) (citing Timbers as

2  authority for its holding that an allowed secured claim must be determined as of the date of filing

3  of the bankruptcy petition).

4      In Timbers, the Supreme Court held that an undersecured creditor whose collateral is not

5  depreciating in value is not entitled adequate protection payments due to its lost right to take

6  immediate possession of the collateral, or its "lost opportunity costs." Id. at 369-76. Therefore,

7  unless cash collateral payments received by the secured creditor during the course of the

8  bankruptcy are subtracted from the value of the lender's secured claim, they would constitute

9  adequate protection payments in favor of an undersecured claim, which payments are in

10  contravention of Timbers. See, e.g., In re 354 East 66th Street Realty Corp., 177 B.R. 776, 781

11  (Bankr. E.D.N.Y. 1995); In re Kalian, 169 B.R. 503 (Bankr. D.R.I. 1994); Confederation Life

12  Ins. Co. v. Beau Rivage Ltd., 126 B.R. 632 (N.D. Ga. 1991); Reddington/Sunarrow, 119 B.R. at

13  813 ; In re Maun, 95 B.R. 94 (Bankr. S.D. Ill. 1989). Thus, when cash collateral from rents or

14  hotel room fees are surrendered to a secured creditor post-petition, all such rents and fees should

15  be subtracted from the secured portion of the undersecured creditor's claim as measured by the

16  value of the collateral as of the petition date.

17      As such, as adequate protection for the Senior Secured Notes, Debtors are willing to pay

18  the Agent interest under the Credit Facility at the non-default rate of interest. This will not only

19  provide the Agent with interest payments under the Credit Facility, but will also adequately

20  protect the Trustee from any accrual of interest under the Credit Facility that further lessens the

21  extent of the Trustee's security. In addition, rather than make Cash Collateral payments to the

22  Trustee, Company requests authority from this Court to use revenues to pay expenses related to

23  operations and maintenance, as well as capital expenditures for property improvements and

24  renovations as proved for in the Budget, within the allotted variances. Again, such authority is

25  routinely granted by courts that are faced with similar debtors and circumstances as the ones

26  presented herein. See, e.g., Saline State Bank, 834 F.2d at 693; Franklin Pembroke Venture, 105

27  B.R. at 278; McCombs Props., 88 B.R. at 261; Pine Lake Village, 16 B.R. at 750. Debtors

28  propose that the Replacement Liens offered will also serve as adequate protection, with the

Gordon Silver
Attorneys At Law
Ninth Floor
1960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

37

1    Agent receiving a Replacement Lien senior in priority to the Trustee's, subject to the Carve Out.

2    The Cash Collateral that Company uses toward business operations and improvements

3    essentially serve as adequate protection payments because they are expended to maintain and

4    improve the collateral and counteract the effect of depreciation.  See Las Vegas Monorail, 429

5    B.R. at 341.  This, in turn, improves the Trustee's position and the extent of recovery on its

6    claim.  See 354 East 66th Street, 177 B.R. at 782; Reddington/Sunarrow, 119 B.R. at 813.

7    Accordingly, Company respectfully requests that this Court authorize Company to use

8    Cash Collateral (including Disputed Cash Collateral, to the extent determined to be Cash

9    Collateral) to maintain and improve its various property interests.  Debtors further request the

10   use of the Cash Collateral, to the extent needed, to cover the administrative costs necessary for

11   their successful reorganizations in their Chapter 11 Cases, and for such other expenses necessary

12   to preserve the value of the Estates for their creditors.

13   **E.    The Bankruptcy Code's Policy of Favoring Reorganization Calls for Granting the Motion.**

14

15   A bankruptcy court, where possible, should resolve issues presented in favor of

16   reorganization.  See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984) ("The fundamental

17   purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant

18   loss of jobs and possible misuse of economic resources."); U.S. v. Whiting Pools, Inc., 462 U.S.

19   198, 203 (1983) ("By permitting reorganization, Congress anticipated that the business would

20   continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owner . . . .

21   Congress presumed that the assets of the debtor would be more valuable if used in a rehabilitated

22   business than if 'sold for scrap.'").  "At the beginning of the reorganization process, the Court

23   must work with less evidence than might be desirable and should resolve issues in favor of the

24   reorganization, where the evidence is conflicting."  In re Heatron, Inc., 6 B.R. 493, 496 (Bankr.

25   W.D. Mo. 1980) (granting debtor's motion to use cash collateral).

26   The U.S. Court of Appeals for the Tenth Circuit summarized the foregoing principle as

27   follows:

28   Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

38

Debtors to achieve that end. Thus, while interests of the secured creditor . . . are of concern to the court, the interests of all the creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration.

The first effort of the court must be to insure that the value of the collateral will be preserved. Yet, prior to confirmation of a plan of reorganization, the test of that protection is not to be the same measurements applied to the treatment of a secured creditor in a proposed plan. In order to encourage Debtors' efforts in a formative period prior to the proposal of reorganization, the court must be flexible in approving the adequate protection standard.

In re O'Connor, 808 F.2d 1393, 1397 (10th Cir. 1987).

As such, granting Debtors' request to use Cash Collateral is in keeping with the Bankruptcy Code's general policy favoring reorganizations, even to the extent the Agent or the Trustee has a properly perfected security interest in any of Debtors' property.

## VI.
## CONCLUSION

WHEREFORE, Debtors request that this Court grant this Motion in its entirety and (1) issue an order pursuant to Rule 4001(b) and Local Rule 4001(b) initially determining the extent of Cash Collateral, as defined by Section 363(a) of the Bankruptcy Code, and authorizing the interim use of Cash Collateral to pay costs of administration and operate Company' s business in the ordinary course pending a Final Hearing, and (2) set the Final Hearing  pursuant to Rule 4001(b) to determine the extent of Cash Collateral and authorize Debtors  to use Cash Collateral during the pendency of these Chapter 11 Cases to pay all costs of administration of the Chapter 11 proceedings of Debtors and for such other and further relief as this Court deems just and proper.

DATED this 1st day of August, 2011.

GORDON SILVER

By:
GERALD M GORDON, ESQ.
BRIGID M. HIGGINS, ESQ.
CANDACE C. CLARK, ESQ.
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
[Proposed] Attorneys for Debtors

Gordon Silver
Attorneys At Law
Ninth Floor
1960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001\1090682_7.doc

39