GORDON SILVER
GERALD M. GORDON, ESQ.
Nevada Bar No. 229
E-mail:  ggordon@gordonsilver.com
BRIGID M. HIGGINS, ESQ.
Nevada Bar No. 5990
E-mail:  bhiggins@gordonsilver.com
CANDACE C. CLARK, ESQ.
Nevada Bar No. 11539
E-mail:  cclark@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Telephone (702) 796-5555
Facsimile (702) 369-2666
[Proposed] Attorneys for Debtors

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>155 EAST TROPICANA, LLC,<br>a Nevada limited liability company,<br><br>     Debtor. | Case No: 11- 22216-BAM<br>Chapter 11<br><br>JOINTLY ADMINISTERED |
| In re<br><br>155 EAST TROPICANA FINANCE CORP.,<br>a Nevada corporation,<br><br>     Debtor. | Case No. 11- 22217-BAM<br>Chapter 11<br><br>Date:   OST Pending<br>Time:   OST Pending |

## OMNIBUS DECLARATION OF DEBORAH J. PIERCE
## IN SUPPORT OF DEBTORS' FIRST DAY MOTIONS

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

1    I, Deborah J. Pierce, hereby declare as follows:

2    1.    I am over the age of 18 and am mentally competent. I make this Omnibus

3    Declaration (the "Omnibus Declaration") in support of the motions and applications requesting

4    various types of immediate relief (collectively, the "First Day Motions") filed by Debtors (as

5    hereinafter defined) in the above-captioned cases (the "Chapter 11 Cases").[1]

6    2.    Debtors in these Chapter 11 Cases are as follows: 155 East Tropicana LLC, a

7    Nevada limited liability company ("Company"), and 155 East Tropicana Finance, LLC, a

8    Nevada corporation ("Finance Corp." and together with Company, "Debtors").

9    3.    I am the Chief Financial Officer ("CFO") and Chief Accounting Officer of the

10    Company, and have served in those capacities since February 2005.[2] Additionally, I serve as the

11    Treasurer for Finance Corp. I am responsible for the financing of the property and equipment

12    purchases, which included the issuance of public bond financing of $130,000,000 (which is more

13    fully described below) and a $15,000,000 line of credit (also more fully described below). I am

14    licensed by the Nevada Gaming Commission as an officer and licensee of the Company. My

15    duties include investor communications, gaming control board communications, oversight of

16    financial filings, financial analysis, management of employee benefits plans, approval of all

17    contracts, budgeting, review of corporate tax filings cash management of corporate funds,

18    insurance risk management, and Sarbanes Oxley compliance. I supervise 65 employees; and I

19    am responsible for management of the following departments: purchasing, receiving,

20    accounting, finance, cage, surveillance, information technology, and internal control compliance.

21    4.    As such, in my capacities as CFO and Chief Accounting Officer of Company and

22    the Treasurer and CFO for Finance Corp., I am familiar with Debtors' daily business, operations,

23    and financial affairs.

24    5.    Except as otherwise indicated, all facts set forth in this Omnibus Declaration are

25    based upon my personal knowledge of Debtors' operations and finances, information learned

26    _____

[1] All capitalized terms not otherwise defined herein shall have those meanings ascribed to them in the relevant First Day Motions (defined herein), all of which are being filed contemporaneously herewith.

27    [2] At most hotel/casinos the positions of CFO and Chief Accounting Officer are held by separate individuals. In our case, I hold both positions.

28

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

from my review of relevant documents, and information supplied to me by other members of Debtors' management and Debtors' various business and legal advisors.  If called upon to testify as to the content of this Omnibus Declaration, I could and would do so.

6.    This Omnibus Declaration is filed on the same date (the "Petition Date") that Debtors have filed voluntary petitions for relief under Chapter 11, Title 11 of the U.S. Code (the "Bankruptcy Code").  Debtors have filed their various First Day Motions (as hereinafter defined) to allow them to operate effectively in these Chapter 11 Cases.  The relief sought in the First Day Motions is critical to Debtors' business operations, will allow for a comprehensive and smooth transition into Chapter 11, and will ensure that Debtors are provided the opportunity to reorganize successfully.

7.    This Omnibus Declaration is intended to provide the Court with background information regarding Debtors, as well as the context for the initial relief sought by Debtors. Accordingly, the Omnibus Declaration is organized into two parts: (a) an overview of Debtors' businesses and their estates ("Estates"), their capital structure, and the events leading up to these Chapter 11 Cases; and (b) an explanation of the relief sought in the First Day Motions.

# I.
## BACKGROUND

A.    **Debtors' Business.**

1.    **Corporate Structure.**

8.    Company is a limited liability company organized on June 17, 2004, to acquire the real and personal property of the Hotel San Remo Casino and Resort located at 115 and 155 Tropicana Avenue in Las Vegas, Nevada (the "Property") with the intention of renovating the then existing casino and hotel facility with a "Hooters" entertainment concept and theme.

9.    Company's membership interests are held two-thirds by Florida Hooters, LLC ("Florida Hooters"),[3] and one-third by EW Common, LLC ("EW Common," and together with

---

[3] Florida Hooters is a joint venture between Hooters Gaming, LLC ("Hooters Gaming") and Lags Ventures, LLC ("Lags Ventures").  Hooters Gaming is owned by the holders of licenses to operate "Hooters" restaurants in the Tampa Bay, Chicago and Manhattan areas, sell wholesale foods and calendars, and conduct business in the Nevada hotel and gaming industry.  Hooters Gaming includes most of the original founders of the Hooters brand.  Lags Ventures is owned by a holder of the license rights to Hooters restaurants in south Florida.  Pursuant to these license

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

3

Florida Hooters, the "Members").[4]

10.    Finance Corp. is a wholly-owned subsidiary of Company that neither holds assets nor conducts operations of its own. Finance Corp. was formed for the sole purpose of facilitating the financing related to the renovations of the Property, which were completed on February 3, 2006.

**155 East Tropicana, LLC and 155 Tropicana Finance Corporation Organizational Chart**



2.    **Casino/Hotel Business Operations.**

11.    Company's business, from which all of its revenue is generated, is concentrated at the Property in Las Vegas, Nevada, where Company owns and operates a casino/hotel operation under the name of Hooters Casino Hotel (the "Casino Hotel"),[5] which opened for business on

———————————————— (continued)

rights, the owners of Florida Hooters operate thirty-nine (39) Hooters restaurants, publish Hooters calendars, and operate a Hooters food business.

[4] EW Common was formed for the purpose of holding a membership interest in Company. EW Common is owned by Eastern & Western Hotel Corporation ("Eastern & Western"), which holds a 90% interest, and by Michael Hessling, President of Company, who owns a 10% interest. Eastern & Western and its affiliates owned the Property (prior to its rebranding) from November 1988 until its acquisition by Company in August 2004. Eastern & Western also continued to operate the Property pursuant to a hotel lease and a casino lease (collectively, the "Leases") until November 2005, when Company obtained all requisite approvals to operate the Property on its own.

[5] Although Company uses the Hooters brand, it is not the owner of the "Hooters" trademark, nor does it have any affiliation with the holder of the trademark, HI Limited Partnership, or its general partner, Hooters of America, Inc. (collectively with HI Limited Partnership, "Hooters of America") other than the contractual right to use the trademark. An explanation of Company's intellectual property rights is provided herein.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

February 3, 2006.[6]

12.    Currently, the Casino Hotel consists of approximately 29,000 square feet of casino floor space with 590 slot and video poker machines and 20 table games; 696 hotel rooms, including 17 suites; a tropical pool area and pool bar; a number of restaurants, bars, and clubs; retail stores selling Hooters-branded merchandise; and a gym facility.  In addition, Company owns a six-level, 556-space parking garage located adjacent to the Casino Hotel (the "Parking Garage") and an approximately two-acre site consisting of a one-level, 17,472 square-foot executive office building and a 183-space parking lot (collectively, the "Executive Offices").

13.    Company's business focuses on attracting and fostering repeat business from out-of-town visitors to the Las Vegas Strip.  Company relies on three types of customers:  (1) in-house hotel guests, which Company draws largely from the "free independent travelers," who provide additional revenue to the casino, restaurants, bars, and retail stores; (2) walk-in customers, who are staying at other area hotel/casinos, but are attracted to the Casino Hotel by food specials, $1.50 beer promotions, free slot play promotions, entertainers in our mini-showrooms, and the world-famous Hooters Restaurant; and (3) a small contingency of local customers.

**3.    Debtors' Prepetition Management Structure.**

14.    As previously stated, the members of Company are Florida Hooters, owning two-thirds membership interest, and EW Common, owning one-third membership interest.  Company is managed by a management board (the "Management Board") comprised of four (4) representatives of its Members.  One member of the Management Board (representing six votes) is selected by Florida Hooters and three are selected by EW Common.  The Management Board consists of Michael Hessling, Neil Kiefer, Sukeaki Izumi, and Toyoroku Izumi.  The Management Board does not receive compensation other than expense reimbursement.  The Management Board has a Compliance Committee comprised of two members of the Management Board, the CFO, the COO (as hereinafter defined), and an outside consultant with

---

[6] As previously stated, Finance Corp. neither holds assets nor conducts operations of its own.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

5

1    experience in gaming compliance.

2         15.    Neil G. Kiefer ("Mr. Kiefer") was appointed Chief Executive Officer ("CEO") of

3    Company in August 2004.  Mr. Kiefer has been involved in the Hooters organization since its

4    inception in 1983, when he incorporated the original Hooters entity, Hooters, Inc.  From 1983 to

5    1992, Mr. Kiefer served as general outside counsel to Hooters, Inc. and its related Hooters

6    entities.  From May 1992 to June 1994, Mr. Kiefer served as President and Chief Executive

7    Officer of Hooters Management Corporation, the managing entity for Hooters, Inc. and its

8    affiliated companies.  Since June 1994, Mr. Kiefer has served as President and Chief Executive

9    Officer of Hooters, Inc. and all other Hooters corporations affiliated with Hooters, Inc.  Mr.

10   Kiefer was elected to the Hooters, Inc. Board of Directors in 1994 and continues to serve on the

11   Board.  Mr. Kiefer has no employment agreement with Company and receives an annual base

12   compensation of $100,000.  Mr. Keifer also serves as President of Finance Corp.

13        16.    Michael J. Hessling ("Mr. Hessling") is the President and member of the

14   Management Board of Company.  Mr. Hessling was appointed to the Management Board in July

15   2004 and was appointed President of Company in June 2006.  Pursuant to his Employment

16   Agreement (the "Hessling Employment Agreement"), which commenced on October 31, 2006

17   for an initial term of one (1) year, Mr. Hessling was paid an annual base compensation of

18   $275,000, and was entitled to participate in a bonus program, if a bonus program had been

19   established.  Subsequent to October 31, 2007, Mr. Hessling has continued to serve as President

20   without an employment contract, at the same annual base salary of $275,000.  Mr. Hessling also

21   serves as Vice President, Secretary, and Director of Finance Corp.

22        17.    Pursuant to my Employment Agreement (the "Pierce Employment Agreement"), I

23   commenced my "at will" employment on February 1, 2005, as CFO and Chief Accounting

24   Officer for Debtors.  As of July 1, 2011, my annual base compensation was $191,406, and I was

25   entitled to participate in a bonus program, if established, for up to $50,000.  Further, if the

26   Company terminated my employment without cause, I was entitled to receive separation pay

27   equal to my monthly gross salary for six months after termination.   Last month I received an

28   offer from another gaming company to be its CFO at a significantly higher salary and benefits.  I

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc                                           6

1   agreed to turn down the offer and remain with Debtors at an annual base compensation of

2   $307,406, and will be entitled to participate in a bonus program, if one is established, and to the

3   extent allowed under the bankruptcy code.[7]

4   18.   Gary A. Gregg ("Mr. Gregg") was appointed as Chief Operating Officer ("COO")

5   of Company in October 2006.  Pursuant to his Employment Agreement (the "Gregg Employment

6   Agreement"), which commenced October 30, 2006, for an initial term of three (3) years, Mr.

7   Gregg was initially paid an annual base salary of $250,000.  On June 9, 2008, Mr. Gregg

8   received a raise and was paid $300,000 annual base salary thereafter.  Under the Gregg

9   Employment Agreement, Mr. Gregg was entitled to participate in a bonus program and if his

10  employment was terminated without cause, he was further entitled to receive separation pay

11  equal to six months' base salary.  Subsequent to November 1, 2009, Mr. Gregg has continued to

12  serve as COO without an employment contract, at the same annual base salary of $300,000.

13  19.   In addition to the foregoing officers of Finance Corp., Finance Corp.'s Board of

14  Directors consists of Michael Hessling, Neil Kiefer, Sukeaki Izumi, and Toyoroku Izumi.

15  Members of Finance Corp.'s Board of Directors do not receive compensation other than expense

16  reimbursement.  Finance Corp.'s Board of Directors has no committees.

17  20.   Neither Debtor has a compensation committee.  Executive compensation is

18  determined by the Management Board of Company.  Neither Debtor maintains a stock option

19  plan or other similar executive benefits.

20  **4.     Intellectual Property and Related Party Agreements.**

21  **a.     The Hooters License.**

22  21.   The Hooters trademark and logo insignia are the exclusive property of Hooters of

23  America.  Through a series of assignment agreements, Company holds an exclusive license to

24  use the Hooters brand in connection with gaming, casino or combined hotel, gaming and casino

---

[7] Most hotel/casinos have a director of financial analysis/budgeting, a director of compliance and a director of treasury management responsible for cash management.  As Company does not employ any of these positions, I perform these duties as described in paragraph 3 above.  In addition, usually the director of information technology reports to the chief operating officer, but, in our case, it is reported to me.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

7

operations solely at the Casino Hotel (the "Hooters License").[8] True and correct copies of the documents that collectively provide the Hooters License are attached hereto as **Exhibit "1."**

22.    Combined hotel, gaming and casino operations contemplated under the Hooters License include, but are not limited to, the right to provide the following within the facility:  (i) room operations; (ii) restaurant operations; (iii) retail sales facilities in which third parties are permitted to conduct retail sales of all kinds; (iv) entertainment facilities; and (v) gaming operations.  In connection with such operations, Company has the right to (i) sell approved merchandise bearing some or all of the licensed intellectual property, (ii) use the licensed intellectual property and Hooters Girls to promote, market, and advertise such facilities worldwide, and (iii) include Hooters Girls as part of any facility staff.

23.    In relation to the Hooters License, Company pays Hooters of America an annual fee equal to $500, plus monthly royalties in an amount equal to 2% of all net revenues generated in connection with licensed activities.  The amount of fees accrued as of the Petition Date totaled approximately $68,890.  Company is also required under the Hooters License to maintain certain quality standards for the use of the Hooters brand.

24.    Pursuant to the HGC Assignment Agreement, Company accrues a consent fee of three percent (3%) of all net profits directly related to gaming activities at the Casino Hotel, which at the Petition Date totaled $3,412,193.

25.    As previously set forth, HGC is a related party and the payment of these royalty fees is restricted under the Indenture (as hereinafter defined).

/ / /

---

[8] On or about March 21, 2001, HI Limited Partnership ("Licensor") entered into that certain License Agreement (the "License Agreement") with Hooters Gaming Corporation ("HGC"), which provided HGC an exclusive license to use all of the intellectual property described therein.  Additionally, subject to express consent of Las Vegas Wings, Inc. ("LV Wings"), the franchisee holding the right to operate Hooters restaurant in Nevada, HGC also obtained the right to operate a Hooters themed restaurant within the hotel and casino facility.  On or about July 30, 2004, HGC and Florida Hooters entered into that certain assignment agreement (the "HGC Assignment"), whereby HGC assigned its rights under the License Agreement to Florida Hooters.  In connection with the organization of the Company, on or about July 30, 2004, Florida Hooters and Company entered into that certain Assignment Agreement (the "Florida Hooters Assignment"), thereby granting Company the rights under the License Agreement.  The collective group of documents, including the License Agreement, the HGC Assignment, and the Florida Hooters Assignment, comprise the Hooters License.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

b.      **Hooters Restaurant Concept.**

26.      Company also has the right to use, promote, and advertise the Hooters restaurant concept (the "Hooters Restaurant License") at the Casino Hotel.[9]  A true and correct copy of the Consent Agreement is attached hereto as **Exhibit "2."**

27.      The Hooters Restaurant License provides a consent fee of four percent (4%) of cash restaurant sales and three percent (3%) of merchandise revenues, which, as of the Petition Date, totaled $2,225,326 accrued.

28.      LV Wings is a related party and the payment of these royalty fees is restricted under the Indenture.

c.      **Pete & Shorty's License.**

29.      Company has a nonexclusive, royalty-free license to use the Pete & Shorty's mark (the "Pete & Shorty's License") in connection with a restaurant, bar, and lounge at the Casino Hotel.  Pursuant to the Pete & Shorty's License, Company may also use the mark in connection with affiliated merchandise, entertainment, and casino services.  A true and correct copy of the Pete & Shorty's License is attached hereto as **Exhibit "3."**

d.      **Dan Marino's Fine Food & Spirits Concept.**

30.      Pursuant to that certain Mark License Agreement ("Mark License Agreement"), as amended on March 9, 2005, and again on February 2, 2006, between Lags Ventures and Florida Hooters, Lags Vegas licensed to Florida Hooters the right to operate and promote restaurants, taverns, lounges and bars using the marks "Dan Marino's Fine Food & Spirits" and "Martini Bar" (the "Dan Marino's License").  The Mark License Agreement was later assigned by Florida Hooters to Company pursuant to the terms of the Florida Hooters Assignment.  On or about November 5, 2009, Company entered into that Termination of Mark License and Release

---

[9] Through the License Agreement, subject to express consent of LV Wings, HGC also obtained the right to operate a Hooters themed restaurant within the hotel and casino facility.  Thereby, in July, 2004, HGC and LV Wings entered into that certain Consent Agreement (the "Consent Agreement"), thereby providing its consent for HGC to use the Hooters restaurant concept at a hotel and casino facility.  Thus, through the subsequent HGC Assignment and Florida Hooters Assignment, Company obtained the right to operate a Hooters themed restaurant at the Casino Hotel.  For the License Agreement, the HGC Assignment and the Florida Hooters Assignment, please refer to Exhibit "1" attached hereto.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

9

Agreement with Florida Hooters and Lags Ventures (the "Termination Agreement"), which terminated Company's right to use the Dan Marino's License. True and correct copies of the Mark License Agreement and the Termination Agreement are attached hereto as **Exhibit "4."**

31.    In connection with the Dan Marino's License, Company accrued a royalty fee of six percent (6%) of gross sales generated from such establishments payable to Lags Ventures (previously defined). The amount accrued as of the Petition Date totaled $917,639 for these royalties. The payment of these royalties is restricted under the Indenture.

### e.    Advertising Agreement

32.    The majority shareholder of Provident Advertising & Marketing, Inc. ("Provident") is Edward C. Droste, an indirect beneficial owner of 5.65% of Company. Provident was engaged by Company to provide services related to the planning and development of an initial advertising and marketing plan and for the continued development and implementation of a strategic marketing plan for the Casino Hotel (the "Provident Advertising Agreement"). A true and correct copy of the Provident Advertising Agreement is attached hereto as **Exhibit "5."**

33.    Provident continues to act as Company's advertising firm. In addition, Company purchases Hooters logo items from Provident for uniforms and resale in the Casino Hotel's gift shops. The advertising fees and inventory purchased in 2011 through the Petition Date totaled approximately $254,777. The fees paid to Provident and inventory purchased during the years ended December 31, 2010, 2009, and 2008 totaled approximately $0.9 million, $0.9 million, and $1.1 million, respectively.

## B.    Debtors' Prepetition Capital Structure

### 1.    The Credit Agreement and Credit Facility.

34.    On March 29, 2005, Debtors, as borrowers, entered into that certain Credit Agreement (the "Credit Agreement")[10] with Wells Fargo Capital Finance, Inc., (formerly known as Foothill, Inc.) ("Wells Fargo"), as arranger and administrative agent (the "Agent") for various

---

[10] The Wells Fargo Credit Agreement has been amended four times, dated January 30, 2006, June 2, 2006, December 15, 2006, and August 13, 2008 (collectively, the "Credit Agreement Amendments").

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

10

lenders (collectively, the "Original Credit Facility Lenders"), whereby Wells Fargo provided a credit facility in an aggregate principal amount of up to $15,000,000 (the "Credit Facility"). The original maturity date of the Credit Facility was March 30, 2009, and was subsequently extended to September 30, 2011, which date was accelerated by that certain Notice of Acceleration and Reservation of Rights dated January 6, 2011 (the "Credit Facility Acceleration"). True and correct copies of the Credit Agreement and the Credit Facility Acceleration are attached hereto as **Exhibits "6,"** and **"7,"** respectively.

35.    Additionally, Company and Wells Fargo entered into that certain Letter of Credit No. NZS619294 dated April 22, 2008, in favor of Chase Paymentech, LLC ("Chase") in the amount of $500,000 (the "Letter of Credit") to provide Chase the security necessary to continue to provide services for credit card processing for Company. The Letter of Credit was not renewed in March 2011.[11]

36.    Canpartners Realty Holding Company IV LLC, a Delaware limited liability company ("Canpartners", and in its capacity as the lender under the Credit Facility, the "Credit Facility Lender"), acquired the Credit Facility from Wells Fargo and is the successor-in-interest to Wells Fargo's interest in and to the Credit Facility Loan Documents.[12]

37.    As of the Petition Date, Debtors' principal obligations outstanding under the Credit Facility were approximately $14,488,991.04 plus accrued and unpaid interest for the current month to the Petition Date (Debtors have been paying the interest accrual at the default rate on a current basis) plus fees, costs and expenses allowed under the Credit Facility Loan Documents (collectively, the "Credit Facility Obligations"). Debtors believe that the indebtedness under the Credit Facility is fully secured.

38.    The indebtedness under the Credit Facility is secured by security interests and

---

[11] As also described in Debtors' Emergency Motion for Order Authorizing Maintenance of Prepetition Cash Management System and Maintenance of Prepetition Bank Accounts, filed contemporaneously herewith, having acquired such account from Chase, Bank of America Merchant Services ("BAMS"), in conjunction with First Data Services, LLC ("First Data"), provides a merchant account to Company to facilitate Company's consumer credit card transactions. It should be noted upon the expiration of the Letter of Credit, BAMS unilaterally withheld funds belonging to Company in the amount of $450,000.

[12] In conjunction with the transfer and assignment to of the Credit Facility to the Credit Facility Lender, Wells Fargo resigned as Agent of the Credit Facility.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc                    11

liens granted (collectively, the "Credit Facility Collateral") pursuant to the following: (together with all other documents executed pursuant to the Credit Facility, the "Credit Facility Loan Documents"):

(a)    That certain Security Agreement (the "Credit Facility Security Agreement") by and between Debtors and the Agent, dated March 29, 2005. The Credit Facility Security Agreement grants a security interest to the Agent in substantially all personal property of Debtors, whether now owned or hereafter acquired or arising, including: (i) all accounts, books and records; (ii) chattel paper; (iii) deposit accounts; (iv) equipment and fixtures; (v) general intangibles; (vi) inventory; (vii) investment related property; (viii) negotiable collateral; (ix) commercial tort claims; (x) money and cash equivalents in control of the Agent; and (xi) proceeds (the "Credit Facility Encumbered Personal Property"). Explicitly excluded from this definition are "Excluded Assets," which include: (i) assets securing FF&E financing, purchase money debt, or capitalized lease obligations; (ii) leasehold estates in real property; (iii) cash required to satisfy casino bankroll requirements, reserves, and allowances as required by Nevada gaming laws and regulations; (iv) an interest reserve account for the Senior Secured Notes;[13] (v) stock in any controlled foreign subsidiary of Debtors; and (vi) any leases, permits, licenses, or agreements where a lien on such agreement is prohibited by law, would require third-party consent that has not been obtained after commercially reasonable efforts, or would result in breach of such agreement under applicable law. A true and correct copy of the Credit Facility Security Agreement is attached hereto as **Exhibit "8."**  UCC Financing Statements (the "Credit Facility UCC Financing Statements") were filed with the Nevada Secretary of State and the Office of the Recorder in Clark County Nevada (the "Clark County Recorder").

(b)    That certain Deed of Trust, Fixture Filing with Assignment of Rents and Leases, and Security Agreement (the "Credit Facility Deed of Trust") executed on March

---

[13] The interest reserve account no longer existed as of the Petition Date.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

12

29, 2005, by Company for the benefit of the Agent, and recorded as document 20050329-0002524 in the records of the Clark County Recorder. A true and correct copy of the Credit Facility Deed of Trust is attached hereto as **Exhibit "9."** The Credit Facility Deed of Trust provides for an absolute and irrevocable assignment of all rents and leasehold revenues.

(c)    That certain Assignment of Entitlements, Contracts, Rents and Revenues (the "Credit Facility Assignment of Rents/Revenues") on March 29, 2005, for the benefit of the Agent, recorded as document 20050329-0002526 in the records of the Clark County Recorder. A true and correct copy of the Credit Facility Assignment of Rents/Revenues is attached hereto as **Exhibit "10."**

(d)    That certain Securities Account Control Agreement ("Securities Account Control Agreement") dated March 29, 2005, between the Agent, Debtors, and Wells Fargo Brokerage, in which Wells Fargo Brokerage recognized the Agent's security interest in Debtors' deposit account (# 11552783) (the "Wells Fargo Account").[14] A true and correct copy of the Securities Account Control Agreement is attached hereto as **Exhibit "11."**

(e)    That certain Parent Pledge Agreement, dated as of March 29, 2005, among the Members and the Agent (the "Agent-Parent Pledge Agreement"), whereby the Members pledged to the Agent all right, title, and interest to the Members' membership interests in Company, and books, records, and proceeds relating to such membership interests. A true and correct copy of the Agent-Parent Pledge Agreement is attached hereto as **Exhibit "12."** In relation to the Agent-Parent Pledge Agreement, the Members, Debtors, and the Agent also entered into a Control Agreement (Investment Property) ("Control Agreement Investment Property") dated March 29, 2005. A true and correct

---

[14]  Debtors ceased using the Wells Fargo Account shortly after the Credit Facility was obtained. Additional operating accounts were maintained by Company with Wells Fargo until 2009 when all accounts and deposits were transferred to Nevada State Bank. At this time no depository accounts are maintained at Wells Fargo nor are there any accounts maintained by Debtors subject to depository account control agreements in favor of the Agent or the Trustee (defined herein).

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

13

1    copy of the Control Agreement Investment Property is attached hereto as **Exhibit "13."**

2    **2.    Senior Secured Indenture.**

3    39.    Pursuant to that certain Indenture ("Indenture") dated as of March 29, 2005,

4    Debtors issued 8-3/4% Senior Secured Notes due 2012 (the "Old Senior Secured Notes") in the

5    aggregate principal amount of $130,000,000.  The Bank of New York Trust Company, N.A. (the

6    "Initial Senior Secured Indenture Trustee") was the indenture trustee under the Old Senior

7    Secured Notes.  On August 5, 2005, Debtors successfully exchanged all of the Old Senior

8    Secured Notes for new notes (the "Senior Secured Notes" and holders of Senior Secured Notes,

9    the "Senior Secured Noteholders") with substantially identical terms except that the Senior

10   Secured Notes were registered under the Securities Act of 1933.  The Senior Secured Notes and

11   the obligations thereto were accelerated by that certain Notice of Acceleration and Reservation

12   of Rights dated February 1, 2011 (the "Indenture Acceleration").  True and correct copies of the

13   Indenture and the Indenture Acceleration are attached hereto as **Exhibits "14"**and **"15,"**

14   respectively.

15   40.    Canpartners (Canpartners in its capacity as a Senior Secured Noteholder) also

16   acquired approximately 98.4% in aggregate principal amount of the Senior Secured Notes.

17   41.    U.S. Bank, National Association ("Successor Senior Secured Indenture Trustee"

18   or "US Bank," and together with the Initial Senior Secured Indenture Trustee, the "Trustee") was

19   appointed the successor to the Initial Senior Secured Indenture Trustee.

20   42.    As of the Petition Date, Debtors' principal obligations outstanding under the

21   Senior Secured Notes were $130,000,000, plus accrued and unpaid interest under the Indenture

22   to the Petition Date in the amount of $32,229,177 (the "Senior Secured Notes Obligations").

23   Canpartners represents that in October 2010 it acquired and currently holds approximately 98.4%

24   of the aggregate principal amount of the Senior Secured Notes for the approximate sum of

25   $28,000,000, a significant discount from the face amount of approximately $127,500,000 which

26   substantiates that the Senior Secured Notes are significantly undersecured.

27   43.    The indebtedness due under the Senior Secured Notes is secured by security

28   interests and liens granted (the "Senior Secured Notes Collateral," and together with the Credit

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

14

Facility Collateral, the "Collateral") pursuant to the following (together with the Indenture, the Senior Secured Notes, and all other documents executed pursuant to the Senior Secured Notes, the "Senior Secured Loan Documents," and together with the Credit Facility Documents, the "Loan Documents"):

(a)    That certain Senior Secured Notes Security Agreement (the "Senior Secured Notes Security Agreement" and together with the Credit Facility Security Agreement, the "Security Agreements") dated March 29, 2005.    The Senior Secured Notes Security Agreement grants a security interest to the Trustee in: (i) accounts; (ii) chattel paper; (iii) commercial tort claims: (iv) deposit accounts; (v) documents; (vi) general intangibles; (vii) goods, including equipment, inventory and fixtures; (viii) insurance; (ix) investment property; (x) intellectual property; (xi) letter-of-credit rights; and (xii) all other personal property, including supporting obligations and proceeds (the "Senior Secured Encumbered Personal Property" and, together with the Credit Facility Encumbered Personal Property, the "Encumbered Personal Property").    Excluded from the security interest are Excluded Assets, which are given substantially the same definition as used in the Credit Facility Security Agreement.    A true and correct copy of the Senior Secured Notes Security Agreement is attached hereto as **Exhibit "16."**    UCC Financing Statements (the "Senior Secured UCC Financing Statements" and together with the Credit Facility Financing Statements, the "UCC Financing Statements") were filed with the Nevada Secretary of State and the Clark County Recorder.

(b)    That certain Deed of Trust, Fixture Filing with Assignment of Rents and Leases, and Security Agreement (the "Senior Secured Notes Deed of Trust," and together with the Credit Facility Deed of Trust, the "Deeds of Trust"), executed on March 29, 2005, by Debtors for the benefit of the Trustee, and recorded as document 20050329-0002531 in the records of the Clark County Recorder.    A true and correct copy of the Senior Secured Notes Deed of Trust is attached hereto as **Exhibit "17."**

(c)    That certain Assignment of Entitlements and Contracts ("Senior Secured Assignment of Entitlements/Contracts") executed in favor of the Trustee for the benefit

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc                    15

of the Senior Secured Noteholders, recorded as document 20050329-0002533 in the records of the Clark County Recorder. A true and correct copy of the Senior Secured Assignment of Entitlements/Contracts is attached hereto as **Exhibit "18."**

(d)     That certain Trademark Security Assignment dated March 29, 2005 ("Trademark Security Assignment") in favor of the Trustee for the benefit of the Senior Secured Noteholders, assigning Company's trademarks, trade names, goodwill, and proceeds to the Trustee. A true and correct copy of the Trademark Security Assignment is attached hereto as **Exhibit "19."**

(e)     That certain Parent Pledge Agreement with the Trustee dated March 29, 2005, among the Members and the Trustee (the "Trustee-Parent Pledge Agreement"), whereby the Members of Company pledged to the Trustee all right, title, and interest to the Members' membership interests in Company, and books, records, and proceeds relating to such membership interests. A true and correct copy of the Trustee-Parent Pledge Agreement is attached hereto as **Exhibit "20."**

**3.     Intercreditor Agreement.**

44.     Contemporaneously with the execution of the Credit Facility Agreement and the Indenture, Debtors, the Agent, and the Trustee (in its capacity as Collateral Agent for the Senior Secured Noteholders) (collectively, the "Intercreditor Parties") entered into that certain Intercreditor and Lien Subordination Agreement (the "Intercreditor Agreement"). A true and correct copy of the Intercreditor Agreement is attached hereto as **Exhibit "21."**

45.     The Intercreditor Agreement, among other things, provides that the liens securing the Senior Secured Notes are subordinate to the liens securing the principal amount of the Credit Facility of up to $15,000,000, plus interest, fees, and other amounts accrued thereon. The Intercreditor Parties continue to be bound by and subject to the terms, provisions and restrictions of the Intercreditor Agreement, and the Intercreditor Agreement applies and governs the Intercreditor Parties in these Chapter 11 Cases.

/ / /

/ / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

16

## C.    Events Leading To These Chapter 11 Cases

### 1.    Economic Pressures

46.    Debtors entered into both the Credit Facility and the Indenture during the first half of 2005. With the proceeds of such used to retire the existing debt, and to refurnish and rehabilitate the Property as the Casino Hotel, Debtors were highly, but not unreasonably, leveraged. Under the business circumstances prevailing at the time of these transactions, such leverage would not have hindered Company's business operations or precipitated the filing of these Chapter 11 Cases. However, after these transactions, but prior to their repayment, the economy in the United States sharply declined, devastating the hotel and gaming industry. Subsequently, the United States economy went into a severe recession, with gaming revenues falling dramatically and sources of financing for the hotel and gaming industry becoming limited, if not disappearing altogether. Most significantly, the recession has deeply affected Clark County, Nevada, due to its reliance on tourism and construction, by dramatically decreasing tourism, convention, and gaming revenues in recent years.

47.    According to the Gaming Revenue Report from the State of Nevada, Gaming Control Board, Tax and License Division (the "Gaming Revenue Report") for year ended December 31, 2010, after three consecutive years of decline, Clark County, Nevada showed an improvement over 2009 of 0.8% in gaming revenue. A review of the Gaming Revenue Report for the twelve months ended May 31, 2011 at $9,034,885,000 reveals a 2.05% increase over the $8,886,229,000 in the same period last year. Such figures, however, remain substantially lower, by 16.9%, than the $10,868,554,000 in reported gaming revenue for the same period in 2007 at the onset of the recession. See Gaming Revenue Reports, State of Nevada Gaming Control Board, available at: http://gaming.nv.gov/documents/gaming_revenue_rpt.htm.

48.    According to the Las Vegas Convention and Visitors' Authority (the "LVCVA"), the December year-to-date visitor statistics for 2010 report the volume of visitors to Las Vegas at 37,335,436, reflecting a slight increase of 2.7% over the same period in 2009. See LVCVA 2010 Las Vegas Year-To-Date Executive Summary, available at: http://www.lvcva.com/getfile/624/ES-YTD2010. For the five months ended May 31, 2011, the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

17

volume of visitors to Las Vegas reported by the LVCVA is up an additional 4.7%. See LVCVA 2011 Las Vegas Year-To-Date Executive Summary, *available at*: http://www.lvcva.com/getfile/37/ES-May2011.pdf. Albeit hopeful signs of recovery, the 2010 visitor volume was still less than the visitor volume reported for the same period in 2007, at the onset of the recession, at 39,196,761 visitors, nearly 7% greater visitor volume than that experienced in 2010. See LVCVA 2007 Las Vegas Year-To-Date Executive Summary, http://www.lvcva.com/getfile/350/ES-YTD2007%20Final.pdf.

49.    In addition to the decline in visitor volume from 2007, the room inventory has increased from 132,947 rooms in December 2007, to 147,611 in May 2011, an increase of 14,664 rooms (or an increase of 11.1%). See id.; see also LVCVA 2011 Las Vegas Year-To-Date Executive Summary, *available at*: http://www.lvcva.com/getfile/37/ES-May2011.pdf. This increase in competition coupled with the decline in visitor count caused a decline in the average daily room rate ("ADR") from $132.09 in 2007 to $94.91 in 2010, a decrease of $37, or 28.1%. The ADR has averaged $106.44 year-to-date through May 2011, during the traditionally strong convention season, when the ADR averaged $140 for that period in 2007. See id.

50.    The Casino Hotel, with less than 700 rooms, represents less than 0.5% of the total room inventory in Las Vegas, which means Company's ADR is subject to the discounting of any of its large competitors, who appear to have discounted rooms as deeply as necessary to increase their occupancy rates, or used their other property offerings to cross market during the current economic turndown.

51.    In sum, Company has been faced with declining hotel and casino revenues based on increased price and promotional competition, additional properties opening on the Las Vegas Strip, reduced consumer spending, a tightened credit market, and an overall weakened economy. These market-driven challenges manifested after Company leveraged itself with the Credit Facility and the Indenture, thus leaving Company in a highly precarious position at a time when it most needed robust financial performance.

/ / /

/ / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

18

## 2.   **Financial Performance**

52.     Company's net revenues in 2010 were $43.6 million, a decrease of $3.2 million, or 6.8%, from $46.8 million in 2009.  This is consistent with the steady declines in revenues Company has experienced since 2007.  In 2007, the net revenues were $66.5 million, declining in 2008 to $60.1 million, a decline of $6.4 million, or by 9.6%.  In 2009, the net revenues fell to $46.8 million, an additional decline of $13.3 million, or 22.1%.  Company has been able to partially offset these revenue declines by cutting operating costs to $47.7 million in 2010, a savings of $19.7 million, or 29.2%, from operating costs of $67.4 million in 2007.

53.     Company has been particularly affected by declines in its casino business.  Company's casino revenues in 2010 were $15.6 million, a decrease of $2.5 million, or 13.6%, from $18.1 million in 2009, and a decrease of $9.4 million, or 37.6%, from $25 million in 2008.  Casino revenues are comprised primarily of slot machine and table game revenues.  Slot machine and table game revenues decreased primarily due to less wagering as a result of the slower economy, reduced hotel occupancy and less walk-in business.  Slot machine win per unit per day in 2010 was $43, a decrease of $6, or 12.2%, from $49 in 2009, and a decrease of $24, or 35.8% from $67 in 2008.

54.     Company's hotel and other revenues in 2010 were $14.9 million, a decrease of $0.1 million, or 1.0%, from $15.0 million in 2009, and a decrease of $5.8 million, or 28.0%, from $20.7 million in 2008.  The decrease in room rental revenues was primarily due to a decrease in average daily room rates.  The ADR was $46 in 2010, a decrease of $3, or 6.1%, from $49 in 2009, and a decrease of $20, or 30.2%, from $66 in 2008.  Hotel room occupancy per available room at the Casino Hotel in 2010 was 86.7% as compared to 87% in 2009 and 91.6% in 2008.

55.     Food, beverage, and entertainment revenues in 2010 were $17.5 million, a decrease of $1.2 million, or 6.4%, from $18.7 million in 2009, and a decrease of $4.6 million, or 20.8%, from $22.1 million in 2008.  The decline is due to a reduced number of food covers by 4.0% and fewer drinks being served.

/ / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

19

a.    **Consolidated Financial Results**

56.    Debtors' recent financial performance on a consolidated basis has been as follows:

| | Year to Date 06/30/2011 | Year to Date 06/30/2010 | Year Ended 12/31/2010 | Year Ended 12/31/2009 |
|---|---|---|---|---|
| **Revenues** | | | | |
| Casino | $7,665,393 | $8,257,254 | $15,636,511 | $18,089,346 |
| Hotel and other | $7,928,643 | $7,568,086 | $14,918,360 | $15,048,351 |
| Food, Beverage & Entertainment | $8,761,365 | $9,057,981 | $17,491,137 | $18,680,330 |
| **Total Revenues** | **$24,355,401** | **$24,833,321** | **$48,046,008** | **$51,818,027** |
| **Net Revenues** | **$22,394,920** | **$22,616,285** | **$43,659,488** | **$46,809,056** |
| | | | | |
| Related Party Royalties | $403,305 | $420,382 | $807,421 | $1,062,017 |
| Restructuring Expenses | $402,177 | $198,905 | $479,031 | $1,646,804 |
| Depreciation & Amortization | $1,365,582 | $3,319,394 | $6,623,005 | $6,612,073 |
| Property & Equipment Impairment Charge | $------ | $----- | $55,209,000 | $600,000 |
| **Total Costs and Expenses** | **$20,505,537** | **$23,731,749** | **$102,929,668** | **$51,995,280** |
| Income (Loss) From Operations | $1,889,384 | $(1,115,465) | $(59,270,180) | $(5,186,224) |
| Total Interest Expenses, net | $6,833,964 | $6,876,047 | $13,743,840 | $13,659,035 |
| **Net Loss** | **$(4,944,580)** | **$(7,991,512)** | **$(73,014,020)** | **$(18,845,259)** |
| | | | | |
| **Adjusted EBITDA** | **$4,060,447** | **$2,823,217** | **$3,848,277** | **$4,734,670** |

57.    Though financial results from the first six months ended June 30, 2011 reflect a decrease in revenue from the same months in the prior year, the steep downward trend seen in prior years appears to have lessened. Specifically, net revenue for the six months ended June 30, 2011 was $22.4 million as compared to $22.6 million for the same period in 2010, a decline of $0.2 million or 1.0%. However, Company has experienced an increase of $1.2 million or 43.8% in Adjusted EBITDA, for the same period because of Company's reduction in operating expenses by $1.4 million.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

20

58.    As of the Petition Date, Company's cash and cash equivalents located on the premises of Company (including cash and cash equivalents in premises depositories, or vaults, including the cash required to satisfy casino bankroll requirements, reserves, and allowances as required by Nevada gaming laws and regulations) (collectively, the "Cash on Hand") totals $4,722,558. In addition, Company holds cash in the amount of $4,245,964 in bank accounts.

**3.    Defaults on Agreements.**

59.    Debtors were unable to make the interest payments (the "Interest Payments") on the Senior Secured Notes due April 1, 2009, October 1, 2009, April 1, 2010, October 1, 2010, and April 1, 2011. Debtors' inability to make such Interest Payments caused an event of default to occur under the Indenture, as well as under the Credit Facility Agreement (the "Interest Payment Default").

60.    Additionally, Company has not provided control agreements for one or more deposit accounts that it established and maintained as required under the Credit Facility Agreement. This failure to provide such control agreements caused a second event of default to occur under the Credit Facility Agreement (the "Control Agreement Default," and together with the Interest Payments Default, the "Events of Default").

61.    As a result, on April 7, 2009, Agent on behalf of Original Credit Facility Lenders issued to Debtors that certain Notice of Default and Reservation of Rights (the "Initial Notice"), as such notice was supplemented by that certain Notice of Default, Imposition of Default Rate of Interest, and Reservation of Rights issued to Debtors on April 29, 2009, by Agent on behalf Original Credit Facility Lenders (the "April 2009 Notice"), as such notice was further supplemented by that certain Notice of Default and Reservation of Rights Letter, issued to Debtors on June 11, 2009, by Agent on behalf of Original Credit Facility Lenders (the "June 2009 Notice"), as such notice was further supplemented by that certain Notice of Default and Reservation of Rights Letter, issued to Debtors on December 11, 2009, by Agent on behalf of Original Credit Facility Lenders (the "December 2009 Notice," collectively with the Initial Notice, the April 2009 Notice, and the June 2009 Notice, the "Default Letters").

62.    The Default Letters state that (i) an event of default exists under the Credit

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

21

Facility as a result of Debtors' failure to obtain control agreements for one or more deposit accounts established and maintained by Debtors and also as a result of failure to pay interest on the Senior Secured Notes, (ii) as a result of the event of default, the Original Credit Facility Lenders are under no further obligation to extend further credit under the Credit Facility, (iii) the Original Credit Facility Lenders will continue to evaluate their responses to the events of default, and (iv) Debtors no longer have an option of paying the LIBOR interest rate plus 3.5 percentage points, but must pay the Original Credit Facility Lenders' prime rate, plus the default rate of 4 percentage points.

63.    Following the Default Letters, Debtors entered into discussions with the Senior Secured Note Holders and the Original Credit Facility Lenders to attempt to negotiate forbearance agreements pursuant to which they would agree not to exercise, for a specified period of time, their respective remedies under the Indenture or the Credit Facility Agreement. Such discussions continued with Canpartners, in its capacities as both the Credit Facility Lender and a Senior Secured Noteholder, following Canpartners' acquisition of the Credit Facility and the Senior Secured Notes.

64.    However, as the Events of Default remained uncured and outstanding, on January 6, 2011, Canpartners, in its capacity as Credit Facility Lender, issued to Debtors the Credit Facility Acceleration (as previously defined).

65.    Additionally, also due to the uncured and outstanding Events of Default, on February 1, 2011, US Bank, in its capacity as Successor Senior Secured Indenture Trustee, issued to Debtors the Indenture Acceleration (as previously defined).

66.    Thereafter, on February 2, 2011, a Notice of Breach and Default and of Election to Cause Sale of Real Property under Deed of Trust was recorded with the Clark County Recorder at the behest of the Trustee ("Deed of Trust Default Notice"). A true and correct copy of the Deed of Trust Default Notice is attached hereto as **Exhibit "22."**

67.    Subsequently, on July 14, 2011, a Notice of Trustee's Sale was recorded with the Clark County Recorder, thereby providing notice that the sale of the Property by public auction would be conducted on August 8, 2011 ("Notice of Sale"). A true and correct copy of the Notice

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

22

of Sale is attached hereto as **Exhibit "23."**

      **4.**    **Efforts at Financial Restructuring.**

      68.    As a result of Debtors' inability to service the obligations owing under the Credit Facility and the Senior Secured Notes, in 2010, Debtors retained the services of Gordon Silver as their restructuring counsel and Alvarez & Marsal as their financial advisors.

      69.    Since their retention, Gordon Silver and Alvarez & Marsal have been providing the following services to Debtors:

      a.    Analyzing the various strategic alternatives available to Debtors (e.g. debt restructuring, debt refinancing, divestitures, reorganization, etc.)

      b.    Reviewing and analyzing the business operations, liquidity situation, assets and liabilities, financial condition, and prospects of Company;

      c.    Reviewing and analyzing Company's business plan, operating and capital expenditures budgets, loan agreements and bond indentures and multi-year financial projections under various operating scenarios;

      d.    Preparing for the filing of these Chapter 11 Cases; and

      e.    Assisting and advising Debtors in connection with Debtors' efforts with respect to structuring, negotiating and affecting any potential restructuring of Debtors' outstanding indebtedness or obligation (including, without limitation, the Credit Facility and the Senior Secured Notes).

      70.    As a result of these efforts and analysis, Debtors believe that the enterprise value of Company's business as of the Petition Date is such that the value of the Collateral securing the Credit Facility and the Senior Secured Notes exceeds the Credit Facility Obligations, but is less than the Senior Secured Notes Obligations.

      71.    In addition, (i) as a result of these efforts and analysis, (ii) the performance of the Company's business up to the Petition Date, and (iii) the projected performance of Company's business in the ordinary course during these Chapter 11 Cases and the expenditure of capital expenditures as proposed in the Budget attached to the Cash Collateral Stipulation, Debtors conclude that the enterprise value of Company's business and the Collateral will not diminish.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

23

## II.
## FIRST DAY MOTIONS

72.     Debtors have commenced their Chapter 11 Cases in response to their debt obligations and the aforementioned market challenges.  Debtors' transition into Chapter 11 proceedings must be comprehensively and effectively organized to ensure that they will be able to operate smoothly in bankruptcy and be afforded the opportunity to successfully emerge from their Chapter 11 Cases.  Accordingly, it is critical that Company maintains strong relationships with its customers, employees, partners, vendors, creditors, gaming regulators and other governmental entities, and such other parties that enable Company to conduct its business.  To maintain and foster these relationships, it is important to minimize the distractions to Company's business operations that could result from Debtors petitioning for Chapter 11 relief.

73.     I have reviewed and am generally familiar with the contents of each of the First Day Motions.  Based on that familiarity and information supplied to me by other members of Debtors' management and Debtors' various business and legal advisors, I believe that the relief sought in each of the First Day Motions is necessary to enable Debtors to operate in their Chapter 11 Cases with minimal disruption or loss of productivity or value.  I also believe that the First Day Motions are vital to Debtors' successful reorganization and are in the best interests of Debtors and their creditors.

74.     The First Day Motions include the following pleadings filed by Debtors in their respective Chapter 11 Cases:

(a) Company's Emergency Motion For Order Directing Joint Administration Of Debtors' Chapter 11 Cases Under Federal Rule Of Bankruptcy Procedure 1015(b) ("Company's Joint Administration Motion"); and Finance Corp.'s Emergency Motion For Order Directing Joint Administration Of Debtors' Chapter 11 Cases Under Federal Rule Of Bankruptcy Procedure 1015(b) ("Finance Corp.'s Joint Administration Motion" and together with Company's Joint Administration Motion, the "Joint Administration Motions");

(b) Debtors' Application For Order Approving Employment Of The Garden City

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

Group, Inc. As Claims And Noticing Agent (the "GCG Employment Application");

(c) Debtors' Emergency Application For Order Permitting Debtor 155 East Tropicana LLC, To Honor Hotel Room And Other Customer Deposits And To Honor Travel Agent Commissions (the "Customer Deposits Motion");

(d) Debtors' Emergency Motion For Order Authorizing Debtor 155 East Tropicana LLC To Honor Casino Chips And Other Gaming Liabilities (the "Casino Chips Motion");

(e) Debtors' Emergency Motion For Order (I) Authorizing Debtor 155 East Tropicana LLC To Pay Wages, Salaries, Benefits, Reimbursable Expenses, And Employee Obligations, And (II) Authorizing And Directing Financial Institutions To Honor And Process Checks And Transfers Related To Such Obligations (the "Wages and Employee Obligations Motion");

(f) Debtors' Emergency Motion Pursuant To 11 U.S.C. §§ 105(a) And 366 For An Order Determining That Adequate Assurance Has Been Provided To The Utility Companies (the "Utilities Motion");

(g) Debtors' Emergency Motion For Order Authorizing Maintenance Of Prepetition Cash Management System And Maintenance Of Prepetition Bank Accounts (the "Cash Management Motion");

(h) Debtors' Emergency Motion For Order Authorizing Debtor 155 East Tropicana LLC To Pay Pre-Petition Taxes And Fees Pursuant To 11 U.S.C. §§ 105(a), 363(b), 507(a)(8), And 541(d) (the "Taxes Motion"); and

(i) Debtors' Emergency Motion For An Order: (I) Allowing Administrative Expense Status For Goods Received Within The Twenty Day Period Before The Petition Date, And (II) Authorizing, But Not Directing, Debtor 155 East Tropicana LLC, To Pay Such Obligations (the "20 Day Administrative Expense Motion," collectively with the foregoing, the "First Day Motions").

/ / /

/ / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

25

## A.    Joint Administration Motions.

75.    The relationship between Debtors is such that Finance Corp. is an "affiliate" of Company,  as that term is defined in Section 101(2)(B) of the Bankruptcy Code, of Company. Specifically, Finance Corp. is a wholly-owned subsidiary of Company that neither holds assets nor conducts operations of its own.  Furthermore, Debtors share the same management, maintain consolidated books and records, and are generally viewed as one business enterprise.

76.    Due to the affiliated nature of Debtors' interdependent financial and operational relationship, the joint administration of these Chapter 11 Cases will provide significant administrative convenience.  Specifically, the joint administration of these Chapter 11 Cases will benefit Debtors' Estates by obviating the necessity of filing duplicate motions and applications, entering duplicate orders, and preparing and providing duplicate notices to creditors and parties-in-interest, thus avoiding unnecessary time and expense.  Additionally, given the joint and several liability of Debtors under the Credit Facility and the Indenture, any reorganization of these Debtors will require a joint and coordinated approach including, in all probability, a jointly proposed plan of reorganization.

## B.    GCG Employment Application.

77.    Debtors have determined that in order to carry out their duties as provided for under Sections 1107 and 1108 of the Bankruptcy Code, it is necessary and in the best interest of the Estates to employ an experienced claims and noticing agent.  Debtors desire to employ GCG as their claims and notice agent.

78.    Debtors' engagement of GCG as claims and noticing agent is therefore expressly authorized under 28 U.S.C. § 156(c) and Bankruptcy Rule 2002, and Debtors believe that engaging GCG in such capacity will expedite the service of Rule 2002 notices, streamline the claims administration process, and permit Debtors to focus on their reorganization efforts.

79.    Furthermore, Debtors respectfully submit that the fees and expenses that would be incurred by GCG under the proposed engagement would be administrative in nature and, therefore, should not be subject to standard fee application procedures of professionals.

80.    The fees to be charged by GCG in connection with these Chapter 11 Cases are set

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

26

forth in the Engagement Agreement.  GCG has received a $25,000 retainer from Debtors. Debtors respectfully submit that GCG's rates for its services in connection with the notice, claims processing and solicitation services are competitive and comparable to the rates charged by their competitors for similar services.

## C.    **Customer Deposits Motion.**

81.    As of the Petition Date, Company had hotel room reservation deposits for post-petition dates.  Numerous prospective guests and other customers had placed deposits for hotel rooms they intended to occupy or facilities they intended to use (the "Customer Deposits").  In addition, some of these hotel room reservations had been placed by travel agencies, which pursuant to commission agreements, are entitled to receive commissions when such sites are occupied and the customers pay their bills (the "Travel Agent Commissions").

82.    Also, as of the Petition Date, Company held proceeds from tickets for live entertainment shows purchased by numerous customers prior to the Petition Date for performances to be held at the Casino Hotel on post-petition dates (the "Show Tickets").  In addition, Company held proceeds received for live entertainment performances that occurred on dates prior to the Petition Date (the "Ticket Proceeds").  Pursuant to their contracts with Company, the live entertainers are entitled to receive a portion of the Ticket Proceeds.

83.    Company requests that the Court enter an order authorizing it without further order of this Court to honor all prepetition Customer Deposits, Travel Agent Commissions, Show Tickets, and Ticket Proceeds.

84.    Maintaining the satisfaction and goodwill of prospective guests and other customers is imperative to the success of any reorganization by Debtors.  If Company is unable to honor advance deposits for hotel room reservations, its operations will be severely affected.

85.    Likewise, travel agents will be unlikely to direct their future customers to Company if prepetition deposits and commission agreements are not honored.  This would have a substantial chilling effect on the operation of Company's business.  Consequently, maintaining the satisfaction and confidence of travel agents is imperative to Company's on-going business operations and the success of any reorganization by Debtors.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

27

86.    Similarly, if Company is unable to honor pre-petition show ticket purchases, Company faces the prospect of many dissatisfied customers and the loss of goodwill, both of which will severely affect Company's operations.

87.    Furthermore, if Company is prohibited from fulfilling its obligations to transfer ticket proceeds to its contracted entertainers, Company's relationships with them will be jeopardized, which in turn could disrupt Company's operations.

88.    Thus, maintaining the satisfaction and confidence of Company's patrons and its contracted entertainers by honoring the pre-petition show ticket purchases and fulfilling its obligations to transfer ticket proceeds to its entertainers is imperative to Company's on-going business operations and the success of any reorganization by Debtors.

89.    As of the Petition Date, Company estimates that it is holding Customer Deposits, Travel Agent Commissions, Show Tickets, and Ticket Proceeds payable by Company in the amount of $353,671.  With respect to Finance Corp., which operation does not include a hotel, Company hold no Customer Deposits, Travel Agent Commissions, Show Tickets, or Ticket Proceeds.

90.    Company has sufficient cash on hand to honor all of the foregoing obligations for Customer Deposits, Show Tickets, Travel Agent Commissions, and Ticket Proceeds.

91.    The relief requested herein is in the best interests of Debtors' Estates, as it will have little, if any, economic impact on Company's creditors, while preserving for the creditors invaluable customer goodwill and travel agent and contracted entertainer confidence.  It is necessary that this Court grant the relief requested herein to facilitate continued operation of Company's business.  The importance of Company's customer and entertainer loyalty and the need to encourage travel agents to continue booking business for customer is critical.

**D.    Casino Chips Motion.**

92.    To promote customer loyalty, Company utilizes a player's club program (the "Owl Rewards Club") at the Casino Hotel, which permits players to earn points based on gaming play, which can be redeemed for slot bonus play, food, beverages, and various other complimentary items.  The Owl Rewards Club is Company's primary tool for building customer

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

28

loyalty.

93.    It would be extremely detrimental to Company's casino operations and customer loyalty if its customer programs (the "Customer Programs") were interrupted or discontinued. Such Customer Programs include, but are not limited to, player cards and slot machine player cards such as the Owl Rewards Club.

94.    It would be extremely harmful to Company's casino operations if they were required to distinguish between pre-petition and post-petition casino chips, EZ Pay Tickets, wagers, promotions, and progressive liability. In addition to the expenses that would arise from devising and implementing a system for making such distinctions, there undoubtedly would be a chilling effect on casino operations if each such claim had to be examined for the purpose of ascertaining whether the claim arose pre or post-petition.

95.    Finally, Company's failure to honor Gaming Liabilities would also likely cause substantial regulatory compliance issues with applicable gaming authorities. Company's failure to honor its Gaming Liabilities would jeopardize Debtors' gaming licenses, without which Company's casino operations would cease entirely depriving Company of any potential revenue generating opportunity from that aspect of its business.

96.    Additionally, the importance of Company's customer loyalty cannot be underestimated. Company operates in a competitive environment where there are many casinos and slot machines available for customers to patronize. As such, if Company does not honor immediately its Gaming Liabilities incurred in the ordinary course of its business and continue its Customer Programs, Company's customers will simply turn to Company's numerous competitors to gamble. Those customers will gamble where collecting on casino chips or otherwise redeeming assets owing to them from gaming activity does not present an issue. Any such customer defection and losses in customer loyalty would be disastrous to Debtors' prospects to successfully reorganize.

97.    Company's failure to honor its Gaming Liabilities and its Customer Programs would devastate customer confidence in Company's business also presenting Company with the possibility of revenues losses that far exceed the cost associated with honoring and continuing

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

29

1    such practices.

2        98.    Indeed, in order to operate effectively in its Chapter 11 Case, Company must be

3    able to exchange its casino customers' cash for casino chips and EZ Pay Tickets, and vice versa,

4    redeem its casino customers' points for prizes, and disburse to its casino customers' slot machine

5    payouts and jackpots to which they are entitled.

6    **E.    Wages and Employee Obligations Motion.**

7        99.    As of the Petition Date, Company employed approximately 701 full and part-time

8    employees ("Employees") in the ordinary course of its business.   Continued service by the

9    Employees is vital to Company's ongoing operations.

10       100.    As of the Petition Date, the Employees were owed or had accrued in their favor,

11   various sums from Company for wages and salaries incurred in the ordinary course of

12   Company's business, including any prepetition compensation (collectively, the "Wage

13   Obligations").   The total estimated amount of Wage Obligations that will have accrued, but

14   remain unpaid, as of the Petition Date is approximately $495,326.  Company pays its Employees

15   on a bi-weekly payroll cycle.  The last payroll was made on July 26, 2011.

16       101.    Company is required by law to withhold from its Employees' wages amounts

17   related to federal, state, and local income taxes, as well as social security and Medicare taxes and

18   to remit the same to the appropriate taxing authorities.  To the extent Company has deducted

19   funds from the Employees' paychecks sufficient to pay prepetition taxes, withholding taxes and

20   FICA contributions attributable to Wage Obligations, which are due but have not been paid yet

21   to any governmental entity, Company seeks authorization to continue to deduct these funds and

22   pay them to such governmental entities in the ordinary course of business.

23       102.    In addition, Company is required to make matching payments from its own funds

24   on account of social security and Medicare taxes, and to pay, based on a percentage of gross

25   payroll (and subject to state-imposed limits), additional amounts to the taxing authorities for,

26   among other things, state and federal unemployment insurance.  Company seeks authorization to

27   continue to pay these funds in the ordinary course of business.

28       103.    In the ordinary course of processing payroll checks for its Employees, Company

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

30

also withholds certain amounts for various garnishments (such as tax levies, child support, payments to bankruptcy trustees, and student loans) (collectively, the "Garnishments"), which amounts have not been forwarded yet to the respective law firms and government agencies who are tasked with collecting the funds.  As of the Petition Date, Company estimates the total Garnishments withheld at approximately $1,464.  Company requests permission to pay over any such withholdings in the ordinary course of business.

104.    In addition, in the ordinary course of its business, Company has accrued amounts for contributions to 401(k) retirement plans, health and benefit programs and voluntary insurance plans, pertaining to services rendered by the Employees prior to the Petition Date (collectively, the "Employee Benefit Plans").  These benefits include health plans (i.e. medical, dental, vision, and life insurance), flexible spending accounts for healthcare and dependent care, various welfare plans (i.e. life insurance, disability insurances, accidental death and dismemberment insurance, long-term care and critical illness insurance), and other employee assistance programs. These employee benefit contributions (the "Employee Benefit Contributions") are an integral part of the compensation to which the Employees are entitled.  The amount of Employee Benefit Contributions which will have accrued, but will remain unpaid, prior to the Petition Date are estimated to be $27,688.19.

105.    Company also permits Employees to accrue various paid time off, pursuant to which Employees are eligible, in certain circumstances, to receive their full wages for, among other things, vacation and/or personal days, among other matters (the "Vacation & PTO Accruals").  If an Employee does not use the Vacation & PTO Accruals and subsequently leaves Company's employment, he or she may receive payment for such unused Vacation & PTO Accruals.  The amount of Vacation & PTO Accruals that will have accrued but will remain unpaid prior to the Petition Date is estimated to be $191,555.

106.    In the ordinary course of their employment, certain authorized Employees may have used their own personal credit cards or expended their own personal funds on behalf of and for the benefit of Company ("Reimbursable Business Expenses").  The Chapter 11 Cases were filed during Company's normal payroll periods for hourly and salaried Employees and during

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

31

their normal reimbursement cycle for Reimbursable Business Expenses. Employees rendered services and incurred Reimbursable Business Expenses in anticipation of receiving their standard compensation and reimbursements; however, as of the Petition Date, such obligations may remain unpaid and unreimbursed. Company cannot provide a definitive amount of Reimbursable Business Expenses as of the Petition Date, but based upon prior business practices, would estimate that amount does not exceed $10,000. Company seeks authorization to pay such Reimbursable Business Expenses in the ordinary course of business.

107.   If Company is unable to take the necessary steps to ensure that wages and taxes are paid for the pay period commencing immediately prior to the Petition Date and concluding post-petition, there is a significant risk that large numbers of essential Employees will resign and that those Employees that remain will be discontented and demoralized.

108.   Company has sufficient cash on hand to honor all of the foregoing employee related obligations as set forth herein.

109.   Continued payment of Wage Obligations, Employee Benefit Contributions, and Reimbursable Business Expenses, as well as the honoring of Vacation and PTO Accrual, and maintaining their workers' compensation system, are essential to preserve the morale and to maintain positive relations between Company and its Employees. If the relief requested in the Motion is not granted, the success of Debtors' reorganization will be placed in substantial jeopardy.

## F.   **Utilities Motion**

110.   In the ordinary course of its business, Company incurs utility expenses for water, sewer service, electricity, gas, telephone service, internet service, cable television, and waste management. These utility services are provided by the utilities (as such term is used in Section 366, collectively, the "Utility Providers") limited to those listed on the Utility Service List attached as Exhibit "2" to the Utilities Motion.

111.   On average, Company collectively expends approximately $148,800 each month on utility costs. As of the Petition Date, Company owes payments to several of the Utility

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

32

1    Providers in the total amount of $152,994.99.[15]

2    112.    Preserving utility services on an uninterrupted basis is essential to Company's

3    ongoing operations and, therefore, to the success of its reorganization.  Any interruption of utility

4    services, even for a brief period of time, would disrupt Company's ability to continue servicing

5    its customers, thereby negatively affecting customer relationships, revenues and profits.  Such a

6    result could jeopardize Debtors' reorganizations efforts and, ultimately, value and creditor

7    recoveries.    It is therefore critical that utility services continue uninterrupted during these

8    Chapter 11 Cases.

9    113.    Company intends to pay the Invoices and the postpetition obligations owed to the

10    Utility Providers in a timely manner.  Company expects that it will have ample liquidity, based

11    upon Cash on Hand and cash flow from operations, to pay the Invoices and its postpetition

12    obligations to Utility Providers.

13    114.    One of Company's Utility Providers, namely Las Vegas Valley Water District

14    ("LVVW") held a sizeable deposit from as of the Petition Date.  Specifically, LVVW held a

15    deposit in the amount of $9,000.00 (the "LVVW Deposit"), which amount reflects nearly sixty

16    (60%) percent of the cost Company incurred for water with LVVW for the month of July 2010,

17    the month typically reporting Company's highest rate of water consumption.

18    115.    To provide additional assurance of payment for future services to the Utility

19    Providers, that did not hold deposits from Company on the Petition Date (collectively, the "Other

20    Utility Providers"), Company has deposited $74,400 (a sum equal to 50% of Company's

21    estimated cost of its monthly utility consumption (the "Proposed Adequate Assurance") into a

22    separate, interest-bearing account (the "Utility Deposit Account").  The Utility Deposit Account

23    will provide still further assurance of future payment, over and above Company's ability to pay

24    for future utility services in the ordinary course of business based upon its existing cash on hand

25    and cash flow from operations.

26
---
[15] On the Friday prior to the Petition Date, Company received invoices (collectively, the "Invoices") from NV

27    Energy in the amount of $128,555.26, LVVW in the amount of $13,767.27, CenturyLink in the amount of
$4,698.42, Sprint in the amount of $1,375.99, and T-Mobile in the amount of $3,598.05.  Due to the timing of the

28    receipt of the Invoices, such balances remain outstanding.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc                                                33

116.    Company submits that the LVVW Deposit and Proposed Adequate Assurance provide protection well in excess of that required to grant sufficient adequate assurance to the Utility Providers.

117.    Company has sufficient resources to pay, and intend to pay, all valid postpetition obligations for utility services in a timely manner, especially considering that the aggregate amount of Company's utility obligations is not overwhelming.

118.    In addition, Company has a powerful incentive to stay current on its utility obligations because of Company's reliance on utility services for the operation of its business.

119.    The proposed Procedures are necessary for Debtors to carry out their reorganization efforts.

120.    If they are not approved, Company could be forced to address a host of requests by its Utility Providers in a disorganized manner during the critical first weeks of their reorganization.

121.    Moreover, Company could be blindsided by a Utility Provider unilaterally deciding--on or after the thirtieth day following the Petition Date--that it is not adequately protected and discontinuing service or making an exorbitant demand for payment to continue service.    Discontinuation of utility service, particularly electricity at the Property, could essentially shut down operations, and any significant disruption of operations could put Debtors' reorganization efforts in jeopardy.

122.    Under the circumstances of these Chapter 11 Cases, Debtors assert that the establishment of a cash reserve, in an amount that is substantial relative to Company's estimated monthly utilities consumption, especially in light of the fact that LVVW already holds a sizeable deposit, constitutes adequate assurance of payment under Section 366(c).

123.    Prior to the Petition Date, Company used its best efforts to contact all of its Utility Providers and get specific and personal contact information (i.e., not just the general Post Office box where payments are remitted) where notices of bankruptcy and this Motion could be sent, including but not limited to fax and e-mail addresses to allow for immediate delivery when such information was available.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

34

## G.    **Cash Management Motion.**

124.    To manage its business efficiently and seamlessly, Company utilizes a centralized cash management system (the "Cash Management System") to collect and transfer funds generated by its operations and disburse those funds to satisfy the obligations required to operate its business.

125.    As part of the Cash Management System, Company proposes to maintain its existing bank accounts (collectively, the "Bank Accounts") post-petition which are maintained by Company's banks (the "Banks"). The Bank Accounts are essential for Company's continued operations.

126.    The Bank Accounts generally include as follows: (i) a main depository account ("Operating Account"); (ii) an account for payment of payroll and payroll related charges ("Payroll Account"); (iii) an account for the deposit and disbursement of travel agent commissions ("Travel Account"); (iv) an account for the deposit and disbursement of employee payroll deductions for 401k contributions to John Hancock, the third-party 401k investment company ("401k Account"); (v) an account for the deposit and disbursement of employee payroll deductions for Cafeteria 125 Plan contributions ("Café 125 Account"); and (vi) an account for the deposit of credit card payments ("Credit Card Account").

127.    Company's primary source of revenue is gaming and hotel revenues. Many of Company's customers pay its bills by means of credit cards. Thus, Company also has a merchant account (the "Merchant Account," together with the Bank Accounts, the "Accounts") through which payments made through credit card companies, such as Visa, MasterCard, and Discover, are processed. After processing the credit card customer drafts, the proceeds are deposited into the Credit Card Account. A summary detailing the Bank Accounts and the Merchant Account is attached hereto as **Exhibit "24."**

128.    Company has been advised that it would take a substantial amount of time to obtain a new Merchant Account. Hence, if the Company is not permitted to continue to use the Merchant Account as Debtor-in-possession, it could not offer its customers the service of allowing them to pay its bills by credit card for whatever period of time it would take for the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

35

1  Company to obtain new a Merchant Account.  The absence of credit card services would

2  materially and adversely affect Company's business.

3        129.  As of the Petition Date, customer drafts relating to such credit cards were in

4  various stages of collection.  To obviate the disruption that might otherwise occur in the

5  collection process, it is in the best interest of the Estates to be authorized to continue to its

6  ordinary course credit card transactions, rather than to close this account and then open a new

7  account.

8        130.  Company's Cash Management System is an ordinary, usual and important

9  business practice.  The Cash Management System enables Company to maintain control over the

10  receipt and disbursement of cash, and to generate timely and accurate financial information

11  critical to operations during the pendency of these Chapter 11 Cases.  If these practices and

12  procedures are disrupted, Debtors' effort to reorganize may be jeopardized.

13        131.  Company's Cash Management System is similar to those commonly employed by

14  corporate enterprises of comparable size and complexity.  Many corporate enterprises use these

15  cash management systems because such systems provide numerous benefits.  Among the most

16  important of these benefits is the ability to control corporate funds and ensure cash availability,

17  to reduce administrative expenses, and to have easy access to timely and accurate financial

18  information.

19        132.  Establishing a new cash management system would entail significant delay and

20  cost.  At a minimum, substantial disruptions to Company's business would occur by, among

21  other things, delaying the payments to vendors, lessees, employees, and customers.  This would

22  in turn harm trade creditors, consumer confidence, and employee loyalty, and would hinder

23  Debtors' chance to successfully reorganize.

24        133.  Further, maintaining the existing Cash Management System would not prejudice

25  any party.  Company will maintain strict records with respect to all transfers of cash so that they

26  are able to readily account for all transactions.  Company's maintenance of its existing Cash

27  Management System is not only of critical importance to Company's business operations, but is

28  also in the best interest of the Estates and Debtors' creditors.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

36

134.   To require Company to close the Accounts and to open new bank accounts and a new merchant account would cause substantial disruption and delay in Company's ongoing operations and would materially and adversely affect Company's business.

135.   To avoid such problems and to ensure as smooth a transition into Chapter 11 as possible, it is imperative that Company be permitted to continue using the Accounts.

136.   Because Company processes large amounts of cash on a daily basis to facilitate the unique needs of its business, any disruption to the Cash Management System or the Accounts would seriously harm Debtors and the Estates.

137.   If the Cash Management System Accounts are disrupted, Debtors will experience immediate and irreparable harm.

**H.     Taxes Motion.**

138.   In the ordinary course of business, Company collects and incurs various Taxes and Fees, which are payable to the appropriate Authorities. Taxes and Fees are paid at different times depending on the frequency of when each Tax and Fee must be remitted, and are paid to the relevant Authority in accordance with each Authority's requirements, including payments made by check or by electronic fund transfer. These Taxes and Fees include the following:

        **a.**    Real and Personal Property Taxes.

Company owns real and personal property located in Nevada that is subject to state and local property taxes (collectively, "Property Taxes"). Failure to pay Property Taxes in the ordinary course of business may result in the imposition of statutory liens on Company's real and personal property. Debtors estimate that as of the Petition Date, approximately $170,765 in Property Taxes are accrued but unpaid.

        **b.**    Sales Taxes.

Company collects from customers or incur an assortment of state and local sales taxes (collectively, the "Sales Taxes"), and remit the Sales Taxes to the appropriate Authorities. Sales Taxes accrue as tangible goods and services are invoiced to customers and are calculated based on a statutory percentage of the sale price invoiced to the customer. If such taxes are not remitted to the Authorities on a timely basis, the

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc                                      37

Authorities often impose personal liability on officers of a corporation.  Company remits Sales Taxes on a monthly basis.  Company estimates that as of the Petition Date, approximately $121,648 in Sales Taxes are accrued but unpaid.

        **c.**    <u>Use Taxes.</u>

Company may be responsible for payment of use taxes ("<u>Use Taxes</u>") when it purchases certain tangible personal property for use in a jurisdiction where the acquisition of such property is taxable, but Sales Tax was not charged by the vendor.  In such instances, Company is responsible for assessing upon themselves and paying the Use Taxes when applicable.  If such taxes are not remitted to the Authorities on a timely basis, the Authorities often impose personal liability on officers of a corporation.  Company estimates that as of the Petition Date, approximately $6,725 in Use Taxes are accrued but unpaid.

        **d.**    <u>Business Taxes.</u>

Company may be responsible for payment of business and room occupation taxes (collectively, "<u>Business Taxes</u>") which are levied against the seller of goods or provider of services.  Company estimates that as of the Petition Date, approximately $137,887 in Business Taxes are accrued but unpaid, which sum is comprised of approximately $18,500 in business taxes and $119,387 in room occupation taxes.

        **e.**    <u>Business License Fees and Gaming Taxes</u>

Company is required to obtain business licensing and pay corresponding business license fees to remain in good standing for the purposes of conducting Company's business. Additionally, taxes are assessed to Company or to Company's customers for services provided in Company's business, including but not limited to gaming, and similar taxes. In accordance with applicable authority, these gaming tax obligations are prepaid in three month rolling estimates.  Provided such requirements, Company estimates that, as of the Petition Date, it has accrued pre-petition business license fees of approximately $0 and gaming taxes (including entertain tax) of approximately $93,354.

/ / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

1        **f.**    Miscellaneous Taxes and Fees.

2        Various state and local laws may require Debtors to obtain and pay fees for a wide range

3    of licenses and permits from a number of local, state, and federal regulatory agencies.

4    The amount owed, if any, for these taxes and fees is *de minimis*. To the extent there are

5    pre-petition amounts outstanding with respect to these taxes and fees, Company requests

6    the authority to pay such amounts.

7        139.    Paying the Taxes and Fees will benefit Company and its creditors by allowing

8    business operations to continue without interference or distraction, and to allow Debtors to

9    operate their respective Chapter 11 Cases without interference from the Authorities.

10       140.    Payment of the Taxes and Fees is integral to the continuing operation of

11    Company's business and Debtors' successful reorganization, and is appropriate and consistent

12    with the provisions of the Bankruptcy Code

13    **I.**    **20 Day Administrative Expense Motion.**

14        141.    Company depends on a normal and regular supply of goods from various vendors

15    in the ordinary course operations of its business, and any interruption of such supply would

16    severely impact Company's business and its ability to serve its customers. Moreover, with

17    respect to certain kinds of trade relationships, Company may be unable to obtain the necessary

18    goods elsewhere in the marketplace and/or on competitive terms.

19        142.    To minimize the impact and need for this Motion, Company has attempted to pay

20    in full all trade creditors prior to the Petition Date. Notwithstanding this effort, Company

21    anticipates that there may be some creditors who delivered goods that were received by

22    Company within twenty (20) days before the Petition Date, which goods were sold to Company

23    in the ordinary course of Company's business, all within the meaning of Section 503(b)(9) of the

24    Bankruptcy Code (such alleged claims, the "Priority Goods Claims" and the alleged holders, the

25    "Priority Goods Claimants"). Company estimates that they may still owe approximately

26    $480,000 to potential Priority Goods Claimants.

27    / / /

28    / / /

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc

39

143.   Company proposes the payment of the Priority Goods Claims held by those Priority Goods Claimants with whom Company wish to continue doing business and who agree to continue to supply goods to Company on ordinary and acceptable trade terms to Company. If a particular Priority Goods Claimant refuses to continue doing business with Company and/or refuses to do so on the same or better terms as allowed prepetition, Company request that they be given the discretion not to pay that Priority Goods Claimant pursuant to terms of this Motion.

144.   First, this approach preserves Company's valuable trade relationships with its vendors, and allows Company uninterrupted operations and a seamless transition through the Chapter 11 Cases. Second, by making the payment of trade creditors discretionary, it provides Company with leverage to maintain its ordinary course trade terms and deter trade creditors from attempting to discriminate against Company with alternative trade terms going forward during these Chapter 11 Cases.

145.   Company believes that this relief is in the best interests of the Estates because: (i) favorable trade terms will prevent the contraction of Company's liquidity; and (ii) this Court's time and resources will not be burdened with numerous motions from individual Priority Goods Claimants requesting payment of such administrative expenses.

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

DATED this 1st day of August, 2011.

DEBORAH J. PIERCE

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

101535-001/684085_10.doc