# EXHIBIT 6

Execution Version

CREDIT AGREEMENT

by and among

155 EAST TROPICANA, LLC

and

EACH OF ITS SUBSIDIARIES THAT ARE SIGNATORIES HERETO

as Borrowers,

THE LENDERS THAT ARE SIGNATORIES HERETO

as the Lenders,

and

WELLS FARGO FOOTHILL, INC.

as the Arranger and Administrative Agent

Dated as of March 29, 2005

LA/1099295.7

TABLE OF CONTENTS

Page

1.    DEFINITIONS AND CONSTRUCTION .................................................................. 1
      1.1    Definitions.............................................................................................. 1
      1.2    Accounting Terms................................................................................... 1
      1.3    Code ....................................................................................................... 1
      1.4    Construction............................................................................................ 1
      1.5    Schedules and Exhibits .......................................................................... 2
2.    LOAN AND TERMS OF PAYMENT ....................................................................... 2
      2.1    Revolver Advances ................................................................................. 2
      2.2    [Intentionally Omitted]........................................................................... 2
      2.3    Borrowing Procedures and Settlements ................................................. 2
      2.4    Payments ................................................................................................ 7
      2.5    Overadvances ......................................................................................... 8
      2.6    Interest Rates and Letter of Credit Fee:  Rates, Payments, and Calculations........................ 9
      2.7    Cash Management................................................................................... 10
      2.8    Crediting Payments ................................................................................ 10
      2.9    Designated Account ............................................................................... 11
      2.10   Maintenance of Loan Account; Statements of Obligations..................... 11
      2.11   Fees ....................................................................................................... 11
      2.12   Letters of Credit ..................................................................................... 11
      2.13   LIBOR Option........................................................................................ 14
      2.14   Capital Requirements ............................................................................. 16
      2.15   Joint and Several Liability of Borrowers ............................................... 16
3.    CONDITIONS; TERM OF AGREEMENT ............................................................... 18
      3.1    Conditions Precedent to the Initial Extension of Credit......................... 18
      3.2    Conditions Precedent to all Extensions of Credit.................................. 18
      3.3    Conditions Subsequent to Extensions of Credit .................................... 19
      3.4    Term....................................................................................................... 19
      3.5    Effect of Termination ............................................................................. 19
      3.6    Early Termination by Borrowers............................................................ 19
4.    REPRESENTATIONS AND WARRANTIES............................................................. 20
      4.1    No Encumbrances ................................................................................... 20
      4.2    [Intentionally Omitted]........................................................................... 20
      4.3    [Intentionally Omitted]........................................................................... 20

TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 4.4 | Equipment | 20 |
| 4.5 | Location of Inventory and Equipment | 20 |
| 4.6 | Inventory Records | 20 |
| 4.7 | State of Incorporation; Location of Chief Executive Office; Organizational Identification Number; Commercial Tort Claims | 20 |
| 4.8 | Due Organization and Qualification; Subsidiaries | 21 |
| 4.9 | Due Authorization; No Conflict | 21 |
| 4.10 | Litigation | 23 |
| 4.11 | No Material Adverse Change | 23 |
| 4.12 | Fraudulent Transfer | 23 |
| 4.13 | Employee Benefits | 23 |
| 4.14 | Environmental Condition | 23 |
| 4.15 | Intellectual Property | 23 |
| 4.16 | Leases | 24 |
| 4.17 | Deposit Accounts and Securities Accounts | 24 |
| 4.18 | Complete Disclosure | 24 |
| 4.19 | Indebtedness | 24 |
| 4.20 | Licenses and Permits | 24 |
| 4.21 | Obligations Included in Renovation Financing | 25 |
| 5. | AFFIRMATIVE COVENANTS | 25 |
| 5.1 | Accounting System | 25 |
| 5.2 | Collateral Reporting | 25 |
| 5.3 | Financial Statements, Reports, Certificates | 25 |
| 5.4 | Guarantor Reports | 25 |
| 5.5 | Inspection | 25 |
| 5.6 | Maintenance of Properties | 25 |
| 5.7 | Taxes | 25 |
| 5.8 | Insurance | 26 |
| 5.9 | Location of Inventory and Equipment | 26 |
| 5.10 | Compliance with Laws | 27 |
| 5.11 | Leases | 27 |
| 5.12 | Existence | 27 |
| 5.13 | Environmental | 27 |
| 5.14 | Disclosure Updates | 27 |

TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| 5.15 | Control Agreements; Senior Note Collateral Accounts | 27 |
| 5.16 | Formation of Subsidiaries | 28 |
| 5.17 | Governmental Authorization | 28 |
| 5.18 | License Renewals | 28 |
| 5.19 | Licenses and Permits | 28 |
| 6. | NEGATIVE COVENANTS | 29 |
| 6.1 | Indebtedness | 29 |
| 6.2 | Liens | 30 |
| 6.3 | Restrictions on Fundamental Changes | 30 |
| 6.4 | Disposal of Assets | 30 |
| 6.5 | Change Name | 30 |
| 6.6 | Nature of Business | 31 |
| 6.7 | Prepayments and Amendments | 31 |
| 6.8 | Change of Control | 31 |
| 6.9 | Consignments | 31 |
| 6.10 | Distributions | 31 |
| 6.11 | Accounting Methods | 31 |
| 6.12 | Investments | 31 |
| 6.13 | Transactions with Affiliates | 31 |
| 6.14 | Use of Proceeds | 32 |
| 6.15 | Inventory and Equipment with Bailees | 32 |
| 6.16 | Financial Covenants | 32 |
| 6.17 | Finance Corp Business Activities | 33 |
| 7. | EVENTS OF DEFAULT | 34 |
| 8. | THE LENDER GROUP'S RIGHTS AND REMEDIES | 36 |
| 8.1 | Rights and Remedies | 36 |
| 8.2 | Remedies Cumulative | 37 |
| 9. | TAXES AND EXPENSES | 37 |
| 10. | WAIVERS; INDEMNIFICATION | 38 |
| 10.1 | Demand; Protest; etc | 38 |
| 10.2 | The Lender Group's Liability for Collateral | 38 |
| 10.3 | Indemnification | 38 |

TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 11. | NOTICES | 38 |
| 12. | CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER | 39 |
| 13. | ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS | 40 |
| | 13.1 Assignments and Participations | 40 |
| | 13.2 Successors | 42 |
| 14. | AMENDMENTS; WAIVERS | 42 |
| | 14.1 Amendments and Waivers | 42 |
| | 14.2 Replacement of Holdout Lender | 43 |
| | 14.3 No Waivers; Cumulative Remedies | 43 |
| 15. | AGENT; THE LENDER GROUP | 43 |
| | 15.1 Appointment and Authorization of Agent | 43 |
| | 15.2 Delegation of Duties | 44 |
| | 15.3 Liability of Agent | 44 |
| | 15.4 Reliance by Agent | 45 |
| | 15.5 Notice of Default or Event of Default | 45 |
| | 15.6 Credit Decision | 45 |
| | 15.7 Costs and Expenses; Indemnification | 45 |
| | 15.8 Agent in Individual Capacity | 46 |
| | 15.9 Successor Agent | 46 |
| | 15.10 Lender in Individual Capacity | 47 |
| | 15.11 Withholding Taxes | 47 |
| | 15.12 Collateral Matters | 49 |
| | 15.13 Restrictions on Actions by Lenders; Sharing of Payments | 50 |
| | 15.14 Agency for Perfection | 50 |
| | 15.15 Payments by Agent to the Lenders | 50 |
| | 15.16 Concerning the Collateral and Related Loan Documents | 50 |
| | 15.17 Field Audits and Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information | 50 |
| | 15.18 Several Obligations; No Liability | 51 |
| | 15.19 Bank Product Providers | 52 |
| 16. | GENERAL PROVISIONS | 52 |
| | 16.1 Effectiveness | 52 |
| | 16.2 Section Headings | 52 |
| | 16.3 Interpretation | 52 |

LA/1099295.7                    -iv-

## TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| 16.4 | Severability of Provisions | 52 |
| 16.5 | Counterparts; Electronic Execution | 52 |
| 16.6 | Revival and Reinstatement of Obligations | 52 |
| 16.7 | Confidentiality | 52 |
| 16.8 | Integration | 53 |
| 16.9 | Parent as Agent for Borrowers | 53 |
| 16.10 | Gaming Laws and Liquor Laws | 53 |

## TABLE OF CONTENTS

Page

### EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A-1 | Form of Assignment and Acceptance |
| Exhibit B-1 | Form of Borrowing Base Certificate |
| Exhibit C-1 | Form of Compliance Certificate |
| Exhibit I-1 | Form of Intercreditor Agreement |
| Exhibit L-1 | Form of LIBOR Notice |
| | |
| Schedule A-1 | Agent's Account |
| Schedule B-1 | EBITDA for Select Months |
| Schedule C-1 | Commitments |
| Schedule D-1 | Designated Account |
| Schedule P-1 | Permitted Holders |
| Schedule P-2 | Permitted Liens |
| Schedule P-3 | Existing Investments |
| Schedule R-1 | Real Property Collateral |
| Schedule 1.1 | Definitions |
| Schedule 2.7(a) | Cash Management Banks |
| Schedule 3.1 | Conditions Precedent |
| Schedule 3.3 | Financing Statements to be Terminated |
| Schedule 4.5 | Locations of Inventory and Equipment |
| Schedule 4.7(a) | States of Organization |
| Schedule 4.7(b) | Chief Executive Offices |
| Schedule 4.7(c) | Organizational Identification Numbers |
| Schedule 4.7(d) | Commercial Tort Claims |
| Schedule 4.8(b) | Capitalization of Borrowers |
| Schedule 4.8(c) | Capitalization of Borrowers' Subsidiaries |
| Schedule 4.10 | Litigation |
| Schedule 4.14 | Environmental Matters |
| Schedule 4.15 | Intellectual Property |
| Schedule 4.17 | Deposit Accounts and Securities Accounts |
| Schedule 4.19 | Permitted Indebtedness |
| Schedule 4.20 | Licenses and Permits |
| Schedule 5.2 | Collateral Reporting |
| Schedule 5.3 | Financial Statements, Reports, Certificates |

Execution Version

# CREDIT AGREEMENT

THIS CREDIT AGREEMENT (this "Agreement"), is entered into as of March 29, 2005, by and among the lenders identified on the signature pages hereof (such lenders, together with their respective successors and permitted assigns, are referred to hereinafter each individually as a "Lender" and collectively as the "Lenders"), and WELLS FARGO FOOTHILL, INC., a California corporation, as the arranger and administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, "Agent"), and 155 EAST TROPICANA, LLC, a Nevada limited liability company ("Parent") and each of Parent's Subsidiaries identified on the signature pages hereof (such Subsidiaries, together with Parent, are referred to hereinafter each individually as a "Borrower", and individually and collectively, jointly and severally, as the "Borrowers").

WHEREAS, Parent and Finance Corp (collectively the "Senior Secured Note Issuers") and the Trustee have entered into the that certain Indenture pursuant to which, *inter alia*, the Senior Secured Note Issuers will issue certain Senior Secured Notes which are secured by a continuing security interest in certain assets of the Senior Secured Note Issuers; and

WHEREAS, the Borrowers have requested the Lenders to provide them with a credit facility in an aggregate principal amount of up to $15,000,000, which the Lenders are willing to do on the terms and conditions set forth herein and in the other Loan Documents;

NOW, THEREFORE, in consideration of the foregoing and of the agreements contained herein, and other good and valid consideration, the receipt and adequacy of which are hereby expressly acknowledged, the parties hereby agree as follows:

1. **DEFINITIONS AND CONSTRUCTION.**

    1.1   **Definitions.** Capitalized terms used in this Agreement shall have the meanings specified therefor on Schedule 1.1. Any terms defined in any of the Indenture, the Operating Agreement or the Joint Venture Agreement that are incorporated herein by reference shall be construed and defined as set forth in the Indenture, the Operating Agreement or the Joint Venture Agreement, as applicable, as in effect on the Closing Date and, if such terms use additional defined terms from the Indenture, the Operating Agreement or the Joint Venture Agreement, as applicable, such additional defined terms (as set forth in the Indenture, the Operating Agreement or the Joint Venture Agreement, as applicable, on the Closing Date) shall automatically be deemed incorporated into the defined term used in this Agreement.

    1.2   **Accounting Terms.** All accounting terms not specifically defined herein shall be construed in accordance with GAAP. When used herein, the term "financial statements" shall include the notes and schedules thereto. Whenever the term "Borrowers" or the term "Parent" is used in respect of a financial covenant or a related definition, it shall be understood to mean Parent and its Subsidiaries on a consolidated basis, unless the context clearly requires otherwise.

    1.3   **Code.** Any terms used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein, provided, however, that to the extent that the Code is used to define any term herein and such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 of the Code shall govern.

    1.4   **Construction.** Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or

such other Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). Any reference herein or in any other Loan Document to the satisfaction or repayment in full of the Obligations shall mean the repayment in full in cash (or cash collateralization in accordance with the terms hereof) of all Obligations other than unasserted contingent indemnification Obligations and other than any Bank Product Obligations that, at such time, are allowed by the applicable Bank Product Provider to remain outstanding and that are not required by the provisions of this Agreement to be repaid or cash collateralized. Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record and any Record so transmitted shall constitute a representation and warranty as to the accuracy and completeness of the information contained therein.

     1.5    **Schedules and Exhibits.** All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

2.    **LOAN AND TERMS OF PAYMENT.**

    2.1    **Revolver Advances.**

        (a)    Subject to the terms and conditions of this Agreement, and during the term of this Agreement, each Lender with a Revolver Commitment agrees (severally, not jointly or jointly and severally) to make advances ("Advances") to Borrowers in an amount at any one time outstanding not to exceed such Lender's Pro Rata Share of an amount equal *to the lesser of* (i) the Maximum Revolver Amount *less* the Letter of Credit Usage at such time and *less* the Bank Product Reserve, or (ii) the Borrowing Base at such time *less* the Letter of Credit Usage at such time.

        (b)    Anything to the contrary in this <u>Section 2.1</u> notwithstanding, Agent shall have the right to establish reserves against the Borrowing Base in such amounts, and with respect to such matters, as Agent in its Permitted Discretion shall deem necessary or appropriate, including reserves with respect to (i) sums that Borrowers are required to pay by any Section of this Agreement or any other Loan Document (such as taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and have failed to pay, and (ii) amounts owing by Borrowers or their Subsidiaries to any Person to the extent secured by a Lien on, or trust over, any of the Collateral (other than a Permitted Lien), which Lien or trust, in the Permitted Discretion of Agent likely would have a priority superior to the Agent's Liens (such as Liens or trusts in favor of landlords, warehousemen, carriers, mechanics, materialmen, laborers, or suppliers, or Liens or trusts for *ad valorem*, excise, sales, or other taxes where given priority under applicable law) in and to such item of the Collateral.

        (c)    Amounts borrowed pursuant to this <u>Section 2.1</u> may be repaid and, subject to the terms and conditions of this Agreement, reborrowed at any time during the term of this Agreement.

    2.2    **[Intentionally Omitted].**

    2.3    **Borrowing Procedures and Settlements.**

        (a)    **Procedure for Borrowing.** Each Borrowing shall be made by an irrevocable written request by an Authorized Person delivered to Agent. Unless Swing Lender is not obligated to make a Swing Loan pursuant to <u>Section 2.3(b)</u> below, such notice must be received by Agent no later than 10:00 a.m. (California time) on the Business Day that is the requested Funding Date specifying (i) the amount of such

Borrowing, and (ii) the requested Funding Date, which shall be a Business Day; provided, however, that if Swing Lender is not obligated to make a Swing Loan as to a requested Borrowing, such notice must be received by Agent no later than 10:00 a.m. (California time) on the Business Day prior to the date that is the requested Funding Date. At Agent's election, in lieu of delivering the above-described written request, any Authorized Person may give Agent telephonic notice of such request by the required time. In such circumstances, Borrowers agree that any such telephonic notice will be confirmed in writing within 24 hours of the giving of such telephonic notice, but the failure to provide such written confirmation shall not affect the validity of the request.

(b)    **Making of Swing Loans.**  In the case of a request for an Advance and so long as either (i) the aggregate amount of Swing Loans made since the last Settlement Date plus the amount of the requested Advance does not exceed $1,500,000, or (ii) Swing Lender, in its sole discretion, shall agree to make a Swing Loan notwithstanding the foregoing limitation, Swing Lender shall make an Advance in the amount of such Borrowing (any such Advance made solely by Swing Lender pursuant to this Section 2.3(b) being referred to as a "Swing Loan" and such Advances being referred to collectively as "Swing Loans") available to Borrowers on the Funding Date applicable thereto by transferring immediately available funds to Borrowers' Designated Account. Each Swing Loan shall be deemed to be an Advance hereunder and shall be subject to all the terms and conditions applicable to other Advances, except that all payments on any Swing Loan shall be payable to Swing Lender solely for its own account. Subject to the provisions of Section 2.3(d)(ii), Swing Lender shall not make and shall not be obligated to make any Swing Loan if Swing Lender has actual knowledge that (i) one or more of the applicable conditions precedent set forth in Section 3 will not be satisfied on the requested Funding Date for the applicable Borrowing, or (ii) the requested Borrowing would exceed the Availability on such Funding Date. Swing Lender shall not otherwise be required to determine whether the applicable conditions precedent set forth in Section 3 have been satisfied on the Funding Date applicable thereto prior to making any Swing Loan. The Swing Loans shall be secured by the Agent's Liens, constitute Obligations hereunder, and bear interest at the rate applicable from time to time to Advances that are Base Rate Loans.

(c)    **Making of Loans.**

(i)    In the event that Swing Lender is not obligated to make a Swing Loan, then promptly after receipt of a request for a Borrowing pursuant to Section 2.3(a), Agent shall notify the Lenders, not later than 1:00 p.m. (California time) on the Business Day immediately preceding the Funding Date applicable thereto, by telecopy, telephone, or other similar form of transmission, of the requested Borrowing. Each Lender shall make the amount of such Lender's Pro Rata Share of the requested Borrowing available to Agent in immediately available funds, to Agent's Account, not later than 10:00 a.m. (California time) on the Funding Date applicable thereto. After Agent's receipt of the proceeds of such Advances, Agent shall make the proceeds thereof available to Administrative Borrower on the applicable Funding Date by transferring immediately available funds equal to such proceeds received by Agent to Administrative Borrower's Designated Account; provided, however, that, subject to the provisions of Section 2.3(d)(ii), Agent shall not request any Lender to make, and no Lender shall have the obligation to make, any Advance if Agent shall have actual knowledge that (1) one or more of the applicable conditions precedent set forth in Section 3 will not be satisfied on the requested Funding Date for the applicable Borrowing unless such condition has been waived, or (2) the requested Borrowing would exceed the Availability on such Funding Date.

(ii)    Unless Agent receives notice from a Lender prior to 9:00 a.m. (California time) on the date of a Borrowing, that such Lender will not make available as and when required hereunder to Agent for the account of Borrowers the amount of that Lender's Pro Rata Share of the Borrowing, Agent may assume that each Lender has made or will make such amount available to Agent in immediately available funds on the Funding Date and Agent may (but shall not be so required), in reliance upon such assumption, make available to Borrowers on such date a corresponding amount. If and to the extent any Lender shall not have made its full amount available to Agent in immediately available funds and Agent in such circumstances has made available to Borrowers such amount, that Lender shall on the Business Day following such Funding

3

Date make such amount available to Agent, together with interest at the Defaulting Lender Rate for each day during such period. A notice submitted by Agent to any Lender with respect to amounts owing under this subsection shall be conclusive, absent manifest error. If such amount is so made available, such payment to Agent shall constitute such Lender's Advance on the date of Borrowing for all purposes of this Agreement. If such amount is not made available to Agent on the Business Day following the Funding Date, Agent will notify Administrative Borrower of such failure to fund and, upon demand by Agent, Borrowers shall pay such amount to Agent for Agent's account, together with interest thereon for each day elapsed since the date of such Borrowing, at a rate per annum equal to the interest rate applicable at the time to the Advances composing such Borrowing. The failure of any Lender to make any Advance on any Funding Date shall not relieve any other Lender of any obligation hereunder to make an Advance on such Funding Date, but no Lender shall be responsible for the failure of any other Lender to make the Advance to be made by such other Lender on any Funding Date.

(iii)    Agent shall not be obligated to transfer to a Defaulting Lender any payments made by Borrowers to Agent for the Defaulting Lender's benefit, and, in the absence of such transfer to the Defaulting Lender, Agent shall transfer any such payments to each other non-Defaulting Lender member of the Lender Group ratably in accordance with their Commitments (but only to the extent that such Defaulting Lender's Advance was funded by the other members of the Lender Group) or, if so directed by Administrative Borrower and if no Default or Event of Default had occurred and is continuing (and to the extent such Defaulting Lender's Advance was not funded by the Lender Group), retain same to be re-advanced to Borrowers as if such Defaulting Lender had made Advances to Borrowers. Subject to the foregoing, Agent may hold and, in its Permitted Discretion, re-lend to Borrowers for the account of such Defaulting Lender the amount of all such payments received and retained by Agent for the account of such Defaulting Lender. Solely for the purposes of voting or consenting to matters with respect to the Loan Documents, such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Commitment shall be deemed to be zero. This Section shall remain effective with respect to such Lender until (x) the Obligations under this Agreement shall have been declared or shall have become immediately due and payable, (y) the non-Defaulting Lenders, Agent, and Administrative Borrower shall have waived such Defaulting Lender's default in writing, or (z) the Defaulting Lender makes its Pro Rata Share of the applicable Advance and pays to Agent all amounts owing by Defaulting Lender in respect thereof. The operation of this Section shall not be construed to increase or otherwise affect the Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by Borrowers of their duties and obligations hereunder to Agent or to the Lenders other than such Defaulting Lender. Any such failure to fund by any Defaulting Lender shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle Administrative Borrower at its option, upon written notice to Agent, to arrange for a substitute Lender to assume the Commitment of such Defaulting Lender, such substitute Lender to be acceptable to Agent. In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Acceptance in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being repaid its share of the outstanding Obligations (other than Bank Product Obligations, but including an assumption of its Pro Rata Share of the Risk Participation Liability) without any premium or penalty of any kind whatsoever; provided however, that any such assumption of the Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Lender Groups' or Borrowers' rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund.

(d)    **Protective Advances and Optional Overadvances.**

(i)    Agent hereby is authorized by Borrowers and the Lenders, from time to time in Agent's sole discretion, (A) after the occurrence and during the continuance of a Default or an Event of Default, or (B) at any time that any of the other applicable conditions precedent set forth in Section 3 are not satisfied, to make Advances to Borrowers on behalf of the Lenders that Agent, in its Permitted Discretion deems necessary or desirable (1) to preserve or protect the Collateral, or any portion thereof, (2) to enhance the

likelihood of repayment of the Obligations (other than the Bank Product Obligations), or (3) to pay any other amount chargeable to Borrowers pursuant to the terms of this Agreement, including Lender Group Expenses and the costs, fees, and expenses described in <u>Section 9</u> (any of the Advances described in this <u>Section 2.3(d)(i)</u> shall be referred to as "<u>Protective Advances</u>").

(ii)     Any contrary provision of this Agreement notwithstanding, the Lenders hereby authorize Agent or Swing Lender, as applicable, and either Agent or Swing Lender, as applicable, may, but is not obligated to, knowingly and intentionally, continue to make Advances (including Swing Loans) to Borrowers notwithstanding that an Overadvance exists or thereby would be created, so long as (A) after giving effect to such Advances, the outstanding Revolver Usage does not exceed the Borrowing Base by more than $1,500,000, and (B) after giving effect to such Advances, the outstanding Revolver Usage (except for and excluding amounts charged to the Loan Account for interest, fees, or Lender Group Expenses) does not exceed the Maximum Revolver Amount. In the event Agent obtains actual knowledge that the Revolver Usage exceeds the amounts permitted by the immediately foregoing provisions, regardless of the amount of, or reason for, such excess, Agent shall notify the Lenders as soon as practicable (and prior to making any (or any additional) intentional Overadvances (except for and excluding amounts charged to the Loan Account for interest, fees, or Lender Group Expenses) unless Agent determines that prior notice would result in imminent harm to the Collateral or its value), and the Lenders with Revolver Commitments thereupon shall, together with Agent, jointly determine the terms of arrangements that shall be implemented with Borrowers intended to reduce, within a reasonable time, the outstanding principal amount of the Advances to Borrowers to an amount permitted by the preceding paragraph. In such circumstances, if any Lender with a Revolver Commitment objects to the proposed terms of reduction or repayment of any Overadvance, the terms of reduction or repayment thereof shall be implemented according to the determination of the Required Lenders. Each Lender with a Revolver Commitment shall be obligated to settle with Agent as provided in <u>Section 2.3(e)</u> for the amount of such Lender's Pro Rata Share of any unintentional Overadvances by Agent reported to such Lender, any intentional Overadvances made as permitted under this <u>Section 2.3(d)(ii)</u>, and any Overadvances resulting from the charging to the Loan Account of interest, fees, or Lender Group Expenses.

(iii)     Each Protective Advance and each Overadvance shall be deemed to be an Advance hereunder, except that no Protective Advance or Overadvance shall be eligible to be a LIBOR Rate Loan and all payments on the Protective Advances shall be payable to Agent solely for its own account. The Protective Advances and Overadvances shall be repayable on demand, secured by the Agent's Liens, constitute Obligations hereunder, and bear interest at the rate applicable from time to time to Advances that are Base Rate Loans. The provisions of this <u>Section 2.3(d)</u> are for the exclusive benefit of Agent, Swing Lender, and the Lenders and are not intended to benefit any Borrower in any way.

(e)     **Settlement.** It is agreed that each Lender's funded portion of the Advances is intended by the Lenders to equal, at all times, such Lender's Pro Rata Share of the outstanding Advances. Such agreement notwithstanding, Agent, Swing Lender, and the other Lenders agree (which agreement shall not be for the benefit of any Borrower) that in order to facilitate the administration of this Agreement and the other Loan Documents, settlement among the Lenders as to the Advances, the Swing Loans, and the Protective Advances shall take place on a periodic basis in accordance with the following provisions:

(i)     Agent shall request settlement ("<u>Settlement</u>") with the Lenders on a weekly basis, or on a more frequent basis if so determined by Agent, (1) on behalf of Swing Lender, with respect to each outstanding Swing Loan, (2) for itself, with respect to the outstanding Protective Advances, and (3) with respect to Borrowers' or their Subsidiaries' Collections received, as to each by notifying the Lenders by telecopy, telephone, or other similar form of transmission, of such requested Settlement, no later than 2:00 p.m. (California time) on the Business Day immediately prior to the date of such requested Settlement (the date of such requested Settlement being the "<u>Settlement Date</u>"). Such notice of a Settlement Date shall include a summary statement of the amount of outstanding Advances, Swing Loans, and Protective Advances for the period since the prior Settlement Date. Subject to the terms and conditions contained herein (including <u>Section 2.3(e)(iii)</u>): (y) if a Lender's balance of the Advances (including Swing Loans and Protective

Advances) exceeds such Lender's Pro Rata Share of the Advances (including Swing Loans and Protective Advances) as of a Settlement Date, then Agent shall, by no later than 12:00 p.m. (California time) on the Settlement Date, transfer in immediately available funds to a Deposit Account of such Lender (as such Lender may designate), an amount such that each such Lender shall, upon receipt of such amount, have as of the Settlement Date, its Pro Rata Share of the Advances (including Swing Loans and Protective Advances), and (z) if a Lender's balance of the Advances (including Swing Loans and Protective Advances) is less than such Lender's Pro Rata Share of the Advances (including Swing Loans and Protective Advances) as of a Settlement Date, such Lender shall no later than 12:00 p.m. (California time) on the Settlement Date transfer in immediately available funds to the Agent's Account, an amount such that each such Lender shall, upon transfer of such amount, have as of the Settlement Date, its Pro Rata Share of the Advances (including Swing Loans and Protective Advances). Such amounts made available to Agent under clause (z) of the immediately preceding sentence shall be applied against the amounts of the applicable Swing Loans or Protective Advances and, together with the portion of such Swing Loans or Protective Advances representing Swing Lender's Pro Rata Share thereof, shall constitute Advances of such Lenders. If any such amount is not made available to Agent by any Lender on the Settlement Date applicable thereto to the extent required by the terms hereof, Agent shall be entitled to recover for its account such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate.

(ii)    In determining whether a Lender's balance of the Advances, Swing Loans, and Protective Advances is less than, equal to, or greater than such Lender's Pro Rata Share of the Advances, Swing Loans, and Protective Advances as of a Settlement Date, Agent shall, as part of the relevant Settlement, apply to such balance the portion of payments actually received in good funds by Agent with respect to principal, interest, fees payable by Borrowers and allocable to the Lenders hereunder, and proceeds of Collateral. To the extent that a net amount is owed to any such Lender after such application, such net amount shall be distributed by Agent to that Lender as part of such next Settlement.

(iii)    Between Settlement Dates, Agent, to the extent no Protective Advances or Swing Loans are outstanding, may pay over to Swing Lender any payments received by Agent, that in accordance with the terms of this Agreement would be applied to the reduction of the Advances, for application to Swing Lender's Pro Rata Share of the Advances. If, as of any Settlement Date, Collections of Borrowers or their Subsidiaries received since the then immediately preceding Settlement Date have been applied to Swing Lender's Pro Rata Share of the Advances other than to Swing Loans, as provided for in the previous sentence, Swing Lender shall pay to Agent for the accounts of the Lenders, and Agent shall pay to the Lenders, to be applied to the outstanding Advances of such Lenders, an amount such that each Lender shall, upon receipt of such amount, have, as of such Settlement Date, its Pro Rata Share of the Advances. During the period between Settlement Dates, Swing Lender with respect to Swing Loans, Agent with respect to Protective Advances, and each Lender (subject to the effect of agreements between Agent and individual Lenders) with respect to the Advances other than Swing Loans and Protective Advances, shall be entitled to interest at the applicable rate or rates payable under this Agreement on the daily amount of funds employed by Swing Lender, Agent, or the Lenders, as applicable.

(f)    **Notation.** Agent shall record on its books the principal amount of the Advances owing to each Lender, including the Swing Loans owing to Swing Lender, and Protective Advances owing to Agent, and the interests therein of each Lender, from time to time and such records shall, absent manifest error, conclusively be presumed to be correct and accurate.

(g)    **Lenders' Failure to Perform.** All Advances (other than Swing Loans and Protective Advances) shall be made by the Lenders contemporaneously and in accordance with their Pro Rata Shares. It is understood that (i) no Lender shall be responsible for any failure by any other Lender to perform its obligation to make any Advance (or other extension of credit) hereunder, nor shall any Commitment of any Lender be increased or decreased as a result of any failure by any other Lender to perform its obligations hereunder, and (ii) no failure by any Lender to perform its obligations hereunder shall excuse any other Lender from its obligations hereunder.

2.4    **Payments.**

(a)    **Payments by Borrowers.**

(i)    Except as otherwise expressly provided herein, all payments by Borrowers shall be made to Agent's Account for the account of the Lender Group and shall be made in immediately available funds, no later than 11:00 a.m. (California time) on the date specified herein. Any payment received by Agent later than 11:00 a.m. (California time), shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(ii)    Unless Agent receives notice from Administrative Borrower prior to the date on which any payment is due to the Lenders that Borrowers will not make such payment in full as and when required, Agent may assume that Borrowers have made (or will make) such payment in full to Agent on such date in immediately available funds and Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Lender on such due date an amount equal to the amount then due such Lender. If and to the extent Borrowers do not make such payment in full to Agent on the date when due, each Lender severally shall repay to Agent on demand such amount distributed to such Lender, together with interest thereon at the Defaulting Lender Rate for each day from the date such amount is distributed to such Lender until the date repaid.

(b)    **Apportionment and Application.**

(i)    Except as otherwise provided with respect to Defaulting Lenders and except as otherwise provided in the Loan Documents (including agreements between Agent and individual Lenders), aggregate principal and interest payments shall be apportioned ratably among the Lenders (according to the unpaid principal balance of the Obligations to which such payments relate held by each Lender) and payments of fees and expenses (other than fees or expenses that are for Agent's separate account, after giving effect to any agreements between Agent and individual Lenders) shall be apportioned ratably among the Lenders having a Pro Rata Share of the type of Commitment or Obligation to which a particular fee relates. All payments shall be remitted to Agent and all such payments, and all proceeds of Collateral received by Agent, shall be applied as follows (provided that so long as no Event of Default has occurred and is continuing, Agent shall be entitled to apply the proceeds of Collections to reduce the balance of the Advances outstanding):

(A)    first, ratably to pay any Lender Group Expenses then due to Agent or any of the Lenders under the Loan Documents, until paid in full,

(B)    second, ratably to pay any fees or premiums then due to Agent (for its separate account, after giving effect to any agreements between Agent and individual Lenders) or any of the Lenders under the Loan Documents until paid in full,

(C)    third, to pay interest due in respect of all Protective Advances until paid in full,

(D)    fourth, to pay the principal of all Protective Advances until paid in full,

(E)    fifth, ratably to pay interest due in respect of the Advances (other than Protective Advances), and the Swing Loans until paid in full,

(F)    sixth, to pay the principal of all Swing Loans until paid in full,

(G)    seventh, so long as no Event of Default has occurred and is continuing, and at Agent's election (which election Agent agrees will not be made if an Overadvance would be

created thereby), to pay amounts then due and owing by Administrative Borrower or its Subsidiaries in respect of Bank Products, until paid in full,

(H)    eighth, so long as no Event of Default has occurred and is continuing, to pay the principal of all Advances (other than Protective Advances) until paid in full,

(I)    ninth, if an Event of Default has occurred and is continuing, ratably (i) to pay the principal of all Advances (other than Protective Advances) until paid in full, (ii) to Agent, to be held by Agent, for the ratable benefit of Issuing Lender and those Lenders having a Revolver Commitment, as cash collateral in an amount up to 105% of the Letter of Credit Usage until paid in full, and (iii) to Agent, to be held by Agent, for the benefit of the Bank Product Providers, as cash collateral in an amount up to the amount of the Bank Product Reserve established prior to the occurrence of, and not in contemplation of, the subject Event of Default until Borrowers' and its Subsidiaries' obligations in respect of Bank Products have been paid in full or the cash collateral amount has been exhausted,

(J)    tenth, if an Event of Default has occurred and is continuing, to pay any other Obligations (including the provision of amounts to Agent, to be held by Agent, for the benefit of the Bank Product Providers, as cash collateral in an amount up to the amount determined by Agent in its Permitted Discretion as the amount necessary to secure Borrowers' and its Subsidiaries' obligations in respect of Bank Products), and

(K)    eleventh, to Borrowers (to be wired to the Designated Account) or such other Person entitled thereto under applicable law.

(ii)    Agent promptly shall distribute to each Lender, pursuant to the applicable wire instructions received from each Lender in writing, such funds as it may be entitled to receive, subject to a Settlement delay as provided in Section 2.3(e).

(iii)    In each instance, so long as no Event of Default has occurred and is continuing, Section 2.4(b)(i) shall not apply to any payment made by Borrowers to Agent and specified by Borrowers to be for the payment of specific Obligations then due and payable (or prepayable) under any provision of this Agreement.

(iv)    For purposes of Section 2.4(b)(i), "paid in full" means payment of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest (and specifically including interest accrued after the commencement of any Insolvency Proceeding), default interest, interest on interest, and expense reimbursements, whether or not any of the foregoing would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

(v)    In the event of a direct conflict between the priority provisions of this Section 2.4 and any other provision contained in any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.4 shall control and govern.

2.5    **Overadvances.**  If, at any time or for any reason, the amount of Obligations owed by Borrowers to the Lender Group pursuant to Section 2.1 or Section 2.12 is greater than any of the limitations set forth in Section 2.1 or Section 2.12, as applicable (an "Overadvance"), Borrowers immediately shall pay to Agent, in cash, the amount of such excess, which amount shall be used by Agent to reduce the Obligations in accordance with the priorities set forth in Section 2.4(b).  In addition, Borrowers hereby promise to pay the Obligations (including principal, interest, fees, costs, and expenses) in Dollars in full as and when due and payable under the terms of this Agreement and the other Loan Documents.

### 2.6    Interest Rates and Letter of Credit Fee:  Rates, Payments, and Calculations.

(a)    **Interest Rates.**  Except as provided in clause (c) below, all Obligations (except for undrawn Letters of Credit and except for Bank Product Obligations) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest on the Daily Balance thereof as follows (i) if the relevant Obligation is an Advance that is a LIBOR Rate Loan, at a per annum rate equal to the LIBOR Rate plus the LIBOR Rate Margin, and (ii) otherwise, at a per annum rate equal to the Base Rate plus the Base Rate Margin.

(b)    **Letter of Credit Fee.**  Borrowers shall pay Agent (for the ratable benefit of the Lenders with a Revolver Commitment, subject to any agreements between Agent and individual Lenders), a Letter of Credit fee (in addition to the charges, commissions, fees, and costs set forth in Section 2.12(e)) which shall accrue at a rate equal to 3.00% per annum times the Daily Balance of the undrawn amount of all outstanding Letters of Credit.

(c)    **Default Rate.**  Upon the occurrence and during the continuation of an Event of Default (and at the election of Agent or the Required Lenders),

(i)    all Obligations (except for undrawn Letters of Credit and except for Bank Product Obligations) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest on the Daily Balance thereof at a per annum rate equal to 2 percentage points above the per annum rate otherwise applicable hereunder, and

(ii)    the Letter of Credit fee provided for in Section 2.6(b) shall be increased to 2 percentage points above the per annum rate otherwise applicable hereunder.

(d)    **Payment.**  Except as provided to the contrary in Section 2.11 or Section 2.13(a), interest, Letter of Credit fees, and all other fees payable hereunder shall be due and payable, in arrears, on the first day of each month at any time that Obligations or Commitments are outstanding.  Borrowers hereby authorize Agent, from time to time, without prior notice to Borrowers, to charge all interest and fees (when due and payable), all Lender Group Expenses (as and when incurred), all charges, commissions, fees, and costs provided for in Section 2.12(e) (as and when accrued or incurred), all fees and costs provided for in Section 2.11 (as and when accrued or incurred), and all other payments as and when due and payable under any Loan Document (including any amounts due and payable to the Bank Product Providers in respect of Bank Products up to the amount of the Bank Product Reserve) to the Loan Account, which amounts thereafter shall constitute Advances hereunder and shall accrue interest at the rate then applicable to Advances that are Base Rate Loans.  Any interest not paid when due shall be compounded by being charged to the Loan Account and shall thereafter constitute Advances hereunder and shall accrue interest at the rate then applicable to Advances that are Base Rate Loans.

(e)    **Computation.**  All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360 day year for the actual number of days elapsed.  In the event the Base Rate is changed from time to time hereafter, the rates of interest hereunder based upon the Base Rate automatically and immediately shall be increased or decreased by an amount equal to such change in the Base Rate.

(f)    **Intent to Limit Charges to Maximum Lawful Rate.**  In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.  Borrowers and the Lender Group, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, however, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, *ipso facto*, as of the date of this Agreement, Borrowers are and shall be liable only for the payment of such maximum as allowed by law, and payment

received from Borrowers in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

2.7     **Cash Management.**

(a)     Within 60 days after the Closing Date, Borrowers shall and shall cause each of their Subsidiaries to (i) establish and maintain cash management services of a type and on terms satisfactory to Agent at one or more of the banks set forth on Schedule 2.7(a) (each a "Cash Management Bank"), and shall request in writing and otherwise take such reasonable steps to ensure that all of their and their Subsidiaries' Account Debtors forward payment of the amounts owed by them directly to such Cash Management Bank, and (ii) deposit or cause to be deposited promptly, and in any event no later than the first Business Day after the date of receipt thereof, all of their Collections (including those sent directly by their Account Debtors to Borrowers or their Subsidiaries, but excluding the funds deposited into the Senior Note Collateral Accounts on the Closing Date) into a bank account in Agent's name (a "Cash Management Account") at one of the Cash Management Banks; provided, however, that Collections consisting of casino floor revenue shall be so deposited as collected from the casino floor (on a regular basis consistent with industry practice), and only to the extent not maintained in the casino cage in accordance with applicable Gaming Laws (in amounts not in excess of amounts maintained in accordance with industry practice).

(b)     Each Cash Management Bank shall establish and maintain Cash Management Agreements with Agent and Borrowers. Each such Cash Management Agreement shall provide, among other things, that (i) the Cash Management Bank will comply with any instructions originated by Agent directing the disposition of the funds in such Cash Management Account without further consent by Borrowers or their Subsidiaries, as applicable, (ii) the Cash Management Bank has no rights of setoff or recoupment or any other claim against the applicable Cash Management Account, other than for payment of its service fees and other charges directly related to the administration of such Cash Management Account and for returned checks or other items of payment, and (iii) from and after the date that it receives written notification from Agent, it will forward by daily sweep all amounts in the applicable Cash Management Account to the Agent's Account. Anything contained herein to the contrary notwithstanding, Agent agrees that it shall not provide the above described instruction to any Cash Management Bank, unless and until an Event of Default has occurred and is continuing. Once an Event of Default has occurred and is continuing, Agent shall be free to exercise its right to issue such instruction and the subsequent elimination of the subject Event of Default shall not eliminate the effectiveness of such instruction.

(c)     So long as no Default or Event of Default has occurred and is continuing, Administrative Borrower may amend Schedule 2.7(a) to add or replace a Cash Management Bank or Cash Management Account; provided, however, that (i) such prospective Cash Management Bank shall be reasonably satisfactory to Agent, and (ii) prior to the time of the opening of such Cash Management Account, a Borrower or its Subsidiary, as applicable, and such prospective Cash Management Bank shall have executed and delivered to Agent a Cash Management Agreement. Borrowers (or their Subsidiaries, as applicable) shall close any of their Cash Management Accounts (and establish replacement cash management accounts in accordance with the foregoing sentence) promptly and in any event within 30 days of notice from Agent that the creditworthiness of any Cash Management Bank is no longer acceptable in Agent's reasonable judgment, or as promptly as practicable and in any event within 60 days of notice from Agent that the operating performance, funds transfer, or availability procedures or performance of the Cash Management Bank with respect to Cash Management Accounts or Agent's liability under any Cash Management Agreement with such Cash Management Bank is no longer acceptable in Agent's reasonable judgment.

(d)     Each Cash Management Account shall be a cash collateral account subject to a Control Agreement.

2.8     **Crediting Payments.** The receipt of any payment item by Agent (whether from transfers to Agent by the Cash Management Banks pursuant to the Cash Management Agreements or otherwise) shall not

be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to the Agent's Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment and interest shall be calculated accordingly. Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Agent only if it is received into the Agent's Account on a Business Day on or before 11:00 a.m. (California time). If any payment item is received into the Agent's Account on a non-Business Day or after 11:00 a.m. (California time) on a Business Day, it shall be deemed to have been received by Agent as of the opening of business on the immediately following Business Day.

2.9    **Designated Account.** Agent is authorized to make the Advances, and Issuing Lender is authorized to issue the Letters of Credit, under this Agreement based upon telephonic or other instructions received from anyone purporting to be an Authorized Person or, without instructions, if pursuant to Section 2.6(d). Administrative Borrower agrees to establish and maintain the Designated Account with the Designated Account Bank for the purpose of receiving the proceeds of the Advances requested by Borrowers and made by Agent or the Lenders hereunder. Unless otherwise agreed by Agent and Administrative Borrower, any Advance, Protective Advance, or Swing Loan requested by Borrowers and made by Agent or the Lenders hereunder shall be made to the Designated Account.

2.10    **Maintenance of Loan Account; Statements of Obligations.** Agent shall maintain an account on its books in the name of Borrowers (the "Loan Account") on which Borrowers will be charged with all Advances (including Protective Advances and Swing Loans) made by Agent, Swing Lender, or the Lenders to Borrowers or for Borrowers' account, the Letters of Credit issued by Issuing Lender for Borrowers' account, and with all other payment Obligations hereunder or under the other Loan Documents (except for Bank Product Obligations), including, accrued interest, fees and expenses, and Lender Group Expenses. In accordance with Section 2.8, the Loan Account will be credited with all payments received by Agent from Borrowers or for Borrowers' account, including all amounts received in the Agent's Account from any Cash Management Bank. Agent shall render statements regarding the Loan Account to Administrative Borrower, including principal, interest, fees, and including an itemization of all charges and expenses constituting Lender Group Expenses owing, and such statements, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and the Lender Group unless, within 30 days after receipt thereof by Administrative Borrower, Administrative Borrower shall deliver to Agent written objection thereto describing the error or errors contained in any such statements.

2.11    **Fees.** Borrowers shall pay to Agent, as and when due and payable under the terms of the Fee Letter, the fees set forth in the Fee Letter.

2.12    **Letters of Credit.**

(a)    Subject to the terms and conditions of this Agreement, the Issuing Lender agrees to issue letters of credit for the account of Borrowers (each, an "L/C") or to purchase participations or execute indemnities or reimbursement obligations (each such undertaking, an "L/C Undertaking") with respect to letters of credit issued by an Underlying Issuer (as of the Closing Date, the prospective Underlying Issuer is to be Wells Fargo) for the account of Borrowers. Each request for the issuance of a Letter of Credit or the amendment, renewal, or extension of any outstanding Letter of Credit shall be made in writing by an Authorized Person and delivered to the Issuing Lender and Agent via hand delivery, telefacsimile, or other electronic method of transmission reasonably in advance of the requested date of issuance, amendment, renewal, or extension. Each such request shall be in form and substance satisfactory to the Issuing Lender in its Permitted Discretion and shall specify (i) the amount of such Letter of Credit, (ii) the date of issuance, amendment, renewal, or extension of such Letter of Credit, (iii) the expiration date of such Letter of Credit, (iv) the name and address of the beneficiary thereof (or the beneficiary of the Underlying Letter of Credit, as applicable), and (v) such other information (including, in the case of an amendment, renewal, or extension, identification of the outstanding Letter of Credit to be so amended, renewed, or extended) as shall be necessary

to prepare, amend, renew, or extend such Letter of Credit. If requested by the Issuing Lender, Borrowers also shall be an applicant under the application with respect to any Underlying Letter of Credit that is to be the subject of an L/C Undertaking. The Issuing Lender shall have no obligation to issue a Letter of Credit if any of the following would result after giving effect to the issuance of such requested Letter of Credit:

> (i)    the Letter of Credit Usage would exceed the Borrowing Base *less* the outstanding amount of Advances, or

> (ii)    the Letter of Credit Usage would exceed $5,000,000, or

> (iii)    *the Letter of Credit Usage would exceed the Maximum Revolver Amount less* the outstanding amount of Advances and *less* the Bank Product Reserve.

Borrowers and the Lender Group acknowledge and agree that certain Underlying Letters of Credit may be issued to support letters of credit that already are outstanding as of the Closing Date. Each Letter of Credit (and corresponding Underlying Letter of Credit) shall be in form and substance acceptable to the Issuing Lender (in the exercise of its Permitted Discretion), including the requirement that the amounts payable thereunder must be payable in Dollars. If Issuing Lender is obligated to advance funds under a Letter of Credit, Borrowers immediately shall reimburse such L/C Disbursement to Issuing Lender by paying to Agent an amount equal to such L/C Disbursement not later than 11:00 a.m., California time, on the date that such L/C Disbursement is made, if Administrative Borrower shall have received written or telephonic notice of such L/C Disbursement prior to 10:00 a.m., California time, on such date, or, if such notice has not been received by Administrative Borrower prior to such time on such date, then not later than 11:00 a.m., California time, on the Business Day that Administrative Borrower receives such notice, if such notice is received prior to 10:00 a.m., California time, on the date of receipt, and, in the absence of such reimbursement, the L/C Disbursement immediately and automatically shall be deemed to be an Advance hereunder and, thereafter, shall bear interest at the rate then applicable to Advances that are Base Rate Loans. To the extent an L/C Disbursement is deemed to be an Advance hereunder, Borrowers' obligation to reimburse such L/C Disbursement shall be discharged and replaced by the resulting Advance. Promptly *following* receipt by Agent of any payment from Borrowers pursuant to this paragraph, Agent shall distribute such payment to the Issuing Lender or, *to the extent that* Lenders have made payments pursuant to Section 2.12(c) to reimburse the Issuing Lender, then to such Lenders and the Issuing Lender as their interests may appear.

(b)    Promptly following receipt of a notice of L/C Disbursement pursuant to Section 2.12(a), each Lender with a Revolver Commitment agrees to fund its Pro Rata Share of any Advance deemed made pursuant to the foregoing subsection on the same terms and conditions as if Borrowers had requested such Advance and Agent shall promptly pay to Issuing Lender the amounts so received by it from the Lenders. By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the Issuing Lender or the Lenders with Revolver Commitments, the Issuing Lender shall be deemed to have granted to each Lender with a Revolver Commitment, and each Lender with a Revolver Commitment shall be deemed to have purchased, a participation in each Letter of Credit, in an amount equal to its Pro Rata Share of the Risk Participation Liability of such Letter of Credit, and each such Lender agrees to pay to Agent, for the account of the Issuing Lender, such Lender's Pro Rata Share of any payments made by the Issuing Lender under such Letter of Credit. In consideration and in furtherance of the foregoing, each Lender with a Revolver Commitment hereby absolutely and unconditionally agrees to pay to Agent, for the account of the Issuing Lender, such Lender's Pro Rata Share of each L/C Disbursement made by the Issuing Lender and not reimbursed by Borrowers on the date due as provided in Section 2.12(a), or of any reimbursement payment required to be refunded to Borrowers for any reason. Each Lender with a Revolver Commitment acknowledges and agrees that its obligation to deliver to Agent, for the account of the Issuing Lender, an amount equal to its respective Pro Rata Share of each L/C Disbursement made by the Issuing Lender pursuant to this Section 2.12(b) shall be absolute and unconditional and such remittance shall be made notwithstanding the occurrence or continuation of an Event of Default or Default or the failure to satisfy any condition set forth in Section 3. If any such Lender

fails to make available to Agent the amount of such Lender's Pro Rata Share of each L/C Disbursement made by the Issuing Lender in respect of such Letter of Credit as provided in this Section, such Lender shall be deemed to be a Defaulting Lender and Agent (for the account of the Issuing Lender) shall be entitled to recover such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate until paid in full.

(c)     Each Borrower hereby agrees to indemnify, save, defend, and hold the Lender Group harmless from any loss, cost, expense, or liability, and reasonable attorneys fees incurred by the Lender Group arising out of or in connection with any Letter of Credit; provided, however, that no Borrower shall be obligated hereunder to indemnify for any loss, cost, expense, or liability to the extent that it is caused by the gross negligence or willful misconduct of the Issuing Lender or any other member of the Lender Group. Each Borrower agrees to be bound by the Underlying Issuer's regulations and interpretations of any Underlying Letter of Credit or by Issuing Lender's interpretations of any L/C issued by Issuing Lender to or for such Borrower's account, even though this interpretation may be different from such Borrower's own, and each Borrower understands and agrees that the Lender Group shall not be liable for any error, negligence, or mistake, whether of omission or commission, in following Borrowers' instructions or those contained in the Letter of Credit or any modifications, amendments, or supplements thereto. Each Borrower understands that the L/C Undertakings may require Issuing Lender to indemnify the Underlying Issuer for certain costs or liabilities arising out of claims by Borrowers against such Underlying Issuer. Each Borrower hereby agrees to indemnify, save, defend, and hold the Lender Group harmless with respect to any loss, cost, expense (including reasonable attorneys fees), or liability incurred by the Lender Group under any L/C Undertaking as a result of the Lender Group's indemnification of any Underlying Issuer; provided, however, that no Borrower shall be obligated hereunder to indemnify for any loss, cost, expense, or liability to the extent that it is caused by the gross negligence or willful misconduct of the Issuing Lender or any other member of the Lender Group. Each Borrower hereby acknowledges and agrees that neither the Lender Group nor the Issuing Lender shall be responsible for delays, errors, or omissions resulting from the malfunction of equipment in connection with any Letter of Credit.

(d)     Each Borrower hereby authorizes and directs any Underlying Issuer to deliver to the Issuing Lender all instruments, documents, and other writings and property received by such Underlying Issuer pursuant to such Underlying Letter of Credit and to accept and rely upon the Issuing Lender's instructions with respect to all matters arising in connection with such Underlying Letter of Credit and the related application.

(e)     Any and all issuance charges, commissions, fees, and costs incurred by the Issuing Lender relating to Underlying Letters of Credit shall be Lender Group Expenses for purposes of this Agreement and immediately shall be reimbursable by Borrowers to Agent for the account of the Issuing Lender; it being acknowledged and agreed by each Borrower that, as of the Closing Date, the issuance charge imposed by the prospective Underlying Issuer is .850% per annum times the undrawn amount of each Underlying Letter of Credit, that such issuance charge may be changed from time to time, and that the Underlying Issuer also imposes a schedule of charges for amendments, extensions, drawings, and renewals.

(f)     If by reason of (i) any change after the Closing Date in any applicable law, treaty, rule, or regulation or any change in the interpretation or application thereof by any Governmental Authority, or (ii) compliance by the Underlying Issuer or the Lender Group with any direction, request, or requirement (irrespective of whether having the force of law) of any Governmental Authority or monetary authority including, Regulation D of the Federal Reserve Board as from time to time in effect (and any successor thereto):

(i)     any reserve, deposit, or similar requirement is or shall be imposed or modified in respect of any Letter of Credit issued hereunder, or

(ii)     there shall be imposed on the Underlying Issuer or the Lender Group any other condition regarding any Underlying Letter of Credit or any Letter of Credit issued pursuant hereto;

and the result of the foregoing is to increase, directly or indirectly, the cost to the Lender Group of issuing, making, guaranteeing, or maintaining any Letter of Credit or to reduce the amount receivable in respect thereof by the Lender Group, then, and in any such case, Agent may, at any time within a reasonable period after the additional cost is incurred or the amount received is reduced, notify Administrative Borrower, and Borrowers shall pay on demand such amounts as Agent may specify to be necessary to compensate the Lender Group for such additional cost or reduced receipt, together with interest on such amount from the date of such demand until payment in full thereof at the rate then applicable to Base Rate Loans hereunder. The determination by Agent of any amount due pursuant to this Section, as set forth in a certificate setting forth the calculation thereof in reasonable detail, shall, in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto.

2.13    **LIBOR Option.**

(a)    **Interest and Interest Payment Dates.** In lieu of having interest charged at the rate based upon the Base Rate, Borrowers shall have the option (the "LIBOR Option") to have interest on all or a portion of the Advances be charged at a rate of interest based upon the LIBOR Rate. Interest on LIBOR Rate Loans shall be payable on the earliest of (i) the last day of the Interest Period applicable thereto, (ii) the date on which an Event of Default occurs, or (iii) the date on which this Agreement is terminated pursuant to the terms hereof. On the last day of each applicable Interest Period, unless Administrative Borrower properly has exercised the LIBOR Option with respect thereto, the interest rate applicable to such LIBOR Rate Loan automatically shall convert to the rate of interest then applicable to Base Rate Loans of the same type hereunder. At any time that an Event of Default has occurred and is continuing, Borrowers no longer shall have the option to request that Advances bear interest at a rate based upon the LIBOR Rate and Agent shall have the right to convert the interest rate on all outstanding LIBOR Rate Loans to the rate then applicable to Base Rate Loans hereunder.

(b)    **LIBOR Election.**

(i)    Administrative Borrower may, at any time and from time to time, so long as no Event of Default has occurred and is continuing, elect to exercise the LIBOR Option by notifying Agent prior to 11:00 a.m. (California time) at least 3 Business Days prior to the commencement of the proposed Interest Period (the "LIBOR Deadline"). Notice of Administrative Borrower's election of the LIBOR Option for a permitted portion of the Advances and an Interest Period pursuant to this Section shall be made by delivery to Agent of a LIBOR Notice received by Agent before the LIBOR Deadline, or by telephonic notice received by Agent before the LIBOR Deadline (to be confirmed by delivery to Agent of a LIBOR Notice received by Agent prior to 5:00 p.m. (California time) on the same day). Promptly upon its receipt of each such LIBOR Notice, Agent shall provide a copy thereof to each of the Lenders having a Revolver Commitment.

(ii)    Each LIBOR Notice shall be irrevocable and binding on Borrowers. In connection with each LIBOR Rate Loan, each Borrower shall indemnify, defend, and hold Agent and the Lenders harmless against any loss, cost, or expense incurred by Agent or any Lender as a result of (a) the payment of any principal of any LIBOR Rate Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any LIBOR Rate Loan other than on the last day of the Interest Period applicable thereto, or (c) the failure to borrow, convert, continue or prepay any LIBOR Rate Loan on the date specified in any LIBOR Notice delivered pursuant hereto (such losses, costs, or expenses, "Funding Losses"). Funding Losses shall, with respect to Agent or any Lender, be deemed to equal the amount determined by Agent or such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such LIBOR Rate Loan had such event not occurred, at the LIBOR Rate that would have been applicable thereto, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period therefor), *minus* (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate which Agent or such Lender would be offered

were it to be offered, at the commencement of such period, Dollar deposits of a comparable amount and period in the London interbank market. A certificate of Agent or a Lender delivered to Administrative Borrower setting forth any amount or amounts that Agent or such Lender is entitled to receive pursuant to this Section 2.13 shall be conclusive absent manifest error.

(iii)    Borrowers shall have not more than 5 LIBOR Rate Loans in effect at any given time. Borrowers only may exercise the LIBOR Option for LIBOR Rate Loans of at least $1,000,000 and integral multiples of $500,000 in excess thereof.

(c)    **Prepayments.**  Borrowers may prepay LIBOR Rate Loans at any time; provided, however, that in the event that LIBOR Rate Loans are prepaid on any date that is not the last day of the Interest Period applicable thereto, including as a result of any automatic prepayment through the required application by Agent of proceeds of Borrowers' and their Subsidiaries' Collections in accordance with Section 2.4(b) or for any other reason, including early termination of the term of this Agreement or acceleration of all or any portion of the Obligations pursuant to the terms hereof, each Borrower shall indemnify, defend, and hold Agent and the Lenders and their Participants harmless against any and all Funding Losses in accordance with clause (b)(ii) above.

(d)    **Special Provisions Applicable to LIBOR Rate.**

(i)    The LIBOR Rate may be adjusted by Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender of maintaining or obtaining any eurodollar deposits or increased costs, in each case, due to changes in applicable law occurring subsequent to the commencement of the then applicable Interest Period, including changes in tax laws (except changes of general applicability in corporate income tax laws) and changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), excluding the Reserve Percentage, which additional or increased costs would increase the cost of funding loans bearing interest at the LIBOR Rate. In any such event, the affected Lender shall give Administrative Borrower and Agent notice of such a determination and adjustment and Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, Administrative Borrower may, by notice to such affected Lender (y) require such Lender to furnish to Administrative Borrower a statement setting forth the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment, or (z) repay the LIBOR Rate Loans with respect to which such adjustment is made (together with any amounts due under Section 2.13(b)(ii)).

(ii)    In the event that any change in market conditions or any law, regulation, treaty, or directive, or any change therein or in the interpretation of application thereof, shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain LIBOR Advances or to continue such funding or maintaining, or to determine or charge interest rates at the LIBOR Rate, such Lender shall give notice of such changed circumstances to Agent and Administrative Borrower and Agent promptly shall transmit the notice to each other Lender and (y) in the case of any LIBOR Rate Loans of such Lender that are outstanding, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such LIBOR Rate Loans, and interest upon the LIBOR Rate Loans of such Lender thereafter shall accrue interest at the rate then applicable to Base Rate Loans, and (z) Borrowers shall not be entitled to elect the LIBOR Option until such Lender determines that it would no longer be unlawful or impractical to do so.

(e)    **No Requirement of Matched Funding.**  Anything to the contrary contained herein notwithstanding, neither Agent, nor any Lender, nor any of their Participants, is required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues at the LIBOR Rate. The provisions of this Section shall apply as if each Lender or its Participants had match funded any Obligation as to which interest is accruing at the LIBOR Rate by acquiring eurodollar deposits for each Interest Period in the amount of the LIBOR Rate Loans.

2.14   **Capital Requirements**. If, after the date hereof, any Lender determines that (i) the adoption of or change in any law, rule, regulation or guideline regarding capital requirements for banks or bank holding companies, or any change in the interpretation or application thereof by any Governmental Authority charged with the administration thereof, or (ii) compliance by such Lender or its parent bank holding company with any guideline, request or directive of any such entity regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on such Lender's or such holding company's capital as a consequence of such Lender's Commitments hereunder to a level below that which such Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration such Lender's or such holding company's then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount deemed by such Lender to be material, then such Lender may notify Administrative Borrower and Agent thereof. Following receipt of such notice, Borrowers agree to pay such Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable within 90 days after presentation by such Lender of a statement in the amount and setting forth in reasonable detail such Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error). In determining such amount, such Lender may use any reasonable averaging and attribution methods.

2.15   **Joint and Several Liability of Borrowers**.

(a)      Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Lender Group under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.

(b)      Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including any Obligations arising under this Section 2.15), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.

(c)      If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation.

(d)      The Obligations of each Borrower under the provisions of this Section 2.15 constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstances whatsoever.

(e)      Except as otherwise expressly provided in this Agreement, each Borrower hereby waives notice of acceptance of its joint and several liability, notice of any Advances or Letters of Credit issued under or pursuant to this Agreement, notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Agent or Lenders under or in respect of any of the Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement). Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Agent or Lenders at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Agent or Lenders in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of

any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Borrower. Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of any Agent or Lender with respect to the failure by any Borrower to comply with any of its respective Obligations, including any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this Section 2.15 afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this Section 2.15, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of each Borrower under this Section 2.15 shall not be discharged except by performance and then only to the extent of such performance. The Obligations of each Borrower under this Section 2.15 shall not be diminished or rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any Borrower or any Agent or Lender.

(f)       Each Borrower represents and warrants to Agent and Lenders that such Borrower is currently informed of the financial condition of Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations. Each Borrower further represents and warrants to Agent and Lenders that such Borrower has read and understands the terms and conditions of the Loan Documents. Each Borrower hereby covenants that such Borrower will continue to keep informed of Borrowers' financial condition, the financial condition of other guarantors, if any, and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(g)       Each Borrower waives all rights and defenses arising out of an election of remedies by Agent or any Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Agent's or such Lender's rights of subrogation and reimbursement against such Borrower.

(h)       Each Borrower waives all rights and defenses that such Borrower may have because the Obligations are secured by Real Property. This means, among other things:

(i)       Agent and Lenders may collect from such Borrower without first foreclosing on any real or personal property Collateral pledged by Borrowers.

(ii)       If Agent or any Lender forecloses on any Real Property Collateral pledged by Borrowers:

(A)       The amount of the Obligations may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price.

(B)       Agent and Lenders may collect from such Borrower even if Agent or Lenders, by foreclosing on the Real Property Collateral, has destroyed any right such Borrower may have to collect from the other Borrowers.

This is an unconditional and irrevocable waiver of any rights and defenses such Borrower may have because the Obligations are secured by Real Property.

(i)       The provisions of this Section 2.15 are made for the benefit of Agent, Lenders and their respective successors and assigns, and may be enforced by it or them from time to time against any or all Borrowers as often as occasion therefor may arise and without requirement on the part of any such Agent, Lender, successor or assign first to marshal any of its or their claims or to exercise any of its or their rights against any Borrower or to exhaust any remedies available to it or them against any Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy. The provisions of this Section 2.15 shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied. If at any time, any payment, or any part thereof, made in respect of any

of the Obligations, is rescinded or must otherwise be restored or returned by any Agent or Lender upon the insolvency, bankruptcy or reorganization of any Borrower, or otherwise, the provisions of this Section 2.15 will forthwith be reinstated in effect, as though such payment had not been made.

(j)    Each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Borrower with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to Agent or Lenders with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been paid in full in cash. Any claim which any Borrower may have against any other Borrower with respect to any payments to any Agent or Lender hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor.

(k)    Each Borrower hereby agrees that, after the occurrence and during the continuance of any Default or Event of Default, the payment of any amounts due with respect to the indebtedness owing by any Borrower to any other Borrower is hereby subordinated to the prior payment in full in cash of the Obligations. Each Borrower hereby agrees that after the occurrence and during the continuance of any Default or Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any indebtedness of any other Borrower owing to such Borrower until the Obligations shall have been paid in full in cash. If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower as trustee for Agent, and such Borrower shall deliver any such amounts to Agent for application to the Obligations in accordance with Section 2.4(b).

3.    **CONDITIONS; TERM OF AGREEMENT.**

3.1    **Conditions Precedent to the Initial Extension of Credit.** The obligation of each Lender to make its initial extension of credit provided for hereunder, is subject to the fulfillment, to the satisfaction of Agent and each Lender of each of the conditions precedent set forth on Schedule 3.1 (the making of such initial extension of credit by a Lender being conclusively deemed to be its satisfaction or waiver of the conditions precedent).

3.2    **Conditions Precedent to all Extensions of Credit.** The obligation of the Lender Group (or any member thereof) to make any Advances hereunder (or to extend any other credit hereunder) at any time shall be subject to the following conditions precedent:

(a)    the representations and warranties of Borrowers contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date);

(b)    no Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof;

(c)    no injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority against any Borrower, Agent, or any Lender; and

(d)    no Material Adverse Change shall have occurred.

3.3    **Conditions Subsequent to Extensions of Credit.** The obligation of the Lender Group (or any member thereof) to continue to make Advances (or otherwise extend credit hereunder) is subject to the fulfillment, on or before the date applicable thereto, of each of the conditions subsequent set forth below (the failure by Borrowers to so perform or cause to be performed constituting an Event of Default):

(a)    Within 60 days after the Closing Date, Agent shall have received Cash Management Agreements with respect to all Cash Management Accounts, each duly executed by the applicable Borrower and the applicable Cash Management Bank.

(b)    Within 3 days after the Closing Date, Agent shall have received revised loss payee endorsements, in form and substance satisfactory to Agent, for the insurance certificates delivered to Agent on the Closing Date.

(c)    Within 3 days after the Closing Date, Agent shall have received all original stock certificates for the Stock of Finance Corp pledged pursuant to the Security Agreement, together with Stock powers with respect thereto endorsed in blank, in form and substance satisfactory to Agent.

(d)    Within 30 days after the Closing Date, Agent shall have received evidence satisfactory to Agent showing the termination of the financing statements listed in Schedule 3.3 hereto.

3.4    **Term.** This Agreement shall continue in full force and effect for a term ending on March 30, 2009 (the "Maturity Date"). The foregoing notwithstanding, the Lender Group, upon the election of the Required Lenders, shall have the right to terminate its obligations under this Agreement immediately and without notice upon the occurrence and during the continuation of an Event of Default.

3.5    **Effect of Termination.** On the date of termination of this Agreement, all Obligations (including contingent reimbursement obligations of Borrowers with respect to outstanding Letters of Credit and including all Bank Product Obligations) immediately shall become due and payable without notice or demand (including (a) either (i) providing cash collateral to be held by Agent for the benefit of those Lenders with a Revolver Commitment in an amount equal to 105% of the Letter of Credit Usage, or (ii) causing the original Letters of Credit to be returned to the Issuing Lender, and (b) providing cash collateral (in an amount determined by Agent as sufficient to satisfy the reasonably estimated credit exposure) to be held by Agent for the benefit of the Bank Product Providers with respect to the Bank Product Obligations). No termination of this Agreement, however, shall relieve or discharge Borrowers or their Subsidiaries of their duties, Obligations, or covenants hereunder or under any other Loan Document and the Agent's Liens in the Collateral shall remain in effect until all Obligations have been paid in full and the Lender Group's obligations to provide additional credit hereunder have been terminated. When this Agreement has been terminated and all of the Obligations have been paid in full and the Lender Group's obligations to provide additional credit under the Loan Documents have been terminated irrevocably, Agent will, at Borrowers' sole expense, execute and deliver any termination statements, lien releases, mortgage releases, re-assignments of trademarks, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, the Agent's Liens and all notices of security interests and liens previously filed by Agent with respect to the Obligations.

3.6    **Early Termination by Borrowers.** Borrowers have the option, at any time upon 90 days prior written notice by Administrative Borrower to Agent, to terminate this Agreement and terminate the Commitments hereunder by paying to Agent, in cash, the Obligations (including (a) either (i) providing cash collateral to be held by Agent for the benefit of those Lenders with a Revolver Commitment in an amount equal to 105% of the Letter of Credit Usage, or (ii) causing the original Letters of Credit to be returned to the Issuing Lender, and (b) providing cash collateral (in an amount determined by Agent as sufficient to satisfy the reasonably estimated credit exposure) to be held by Agent for the benefit of the Bank Product Providers with

respect to the Bank Products Obligations), in full. If Administrative Borrower has sent a notice of termination pursuant to the provisions of this Section, then the Commitments shall terminate and Borrowers shall be obligated to repay the Obligations (including (a) either (i) providing cash collateral to be held by Agent for the benefit of those Lenders with a Revolver Commitment in an amount equal to 105% of the Letter of Credit Usage, or (ii) causing the original Letters of Credit to be returned to the Issuing Lender, and (b) providing cash collateral (in an amount determined by Agent as sufficient to satisfy the reasonably estimated credit exposure) to be held by Agent for the benefit of the Bank Product Providers with respect to the Bank Products Obligations), in full, on the date set forth as the date of termination of this Agreement in such notice.

4.    **REPRESENTATIONS AND WARRANTIES.**

In order to induce the Lender Group to enter into this Agreement, each Borrower makes the following representations and warranties to the Lender Group which shall be true, correct, and complete, in all material respects, as of the date hereof, and shall be true, correct, and complete, in all material respects, as of the Closing Date, and at and as of the date of the making of each Advance (or other extension of credit) made thereafter, as though made on and as of the date of such Advance (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement:

4.1    **No Encumbrances.**

(a)    Each Borrower and its Subsidiaries has good and indefeasible title to, or a valid leasehold interest in, their personal property assets and good and marketable title to, or a valid leasehold interest in, their Real Property, in each case, free and clear of Liens except for Permitted Liens and no rights in favor of any party are outstanding that could give rise to any Liens.

(b)    On the Closing Date, (i) there will be no outstanding contracts made, or authorized by any Borrower to be made, with respect to the Real Property, including professionals such as architects, engineers and planners, for which payment for work performed (and for which an invoice has been received by Borrowers or, to Borrower's knowledge, E&W (in its role as Operator)) as of the Closing Date has not been fully satisfied and lien waivers obtained, and (ii) there are no waivers, extensions or subordination of payment with respect to such contracts which could result in an encumbrance upon the Real Property. As of the Closing Date, no ongoing work of any variety has been performed by any contractor, subcontractor or materialmen with respect to the Renovation and the Real Property.

4.2    **[Intentionally Omitted].**

4.3    **[Intentionally Omitted].**

4.4    **Equipment.** Each material item of Equipment of Borrowers and their Subsidiaries is used or held for use in their business and is in good working order, ordinary wear and tear and damage by casualty excepted.

4.5    **Location of Inventory and Equipment.** The Inventory and Equipment (other than vehicles or Equipment out for repair) of Borrowers and their Subsidiaries are not stored with a bailee, warehouseman, or similar party and are located only at, or in-transit between, the locations identified on Schedule 4.5 (as such Schedule may be updated pursuant to Section 5.9).

4.6    **Inventory Records.** Each Borrower keeps correct and accurate records itemizing and describing the type, quality, and quantity of its and its Subsidiaries' Inventory and the book value thereof.

4.7    **State of Incorporation; Location of Chief Executive Office; Organizational Identification Number; Commercial Tort Claims.**

(a)     The name of (within the meaning of Section 9-503 of the Code) and jurisdiction of organization of each Borrower and each of its Subsidiaries is set forth on Schedule 4.7(a) (as such Schedule may be updated from time to time to reflect changes permitted to be made under Section 6.5).

(b)     The chief executive office of each Borrower and each of its Subsidiaries is located at the address indicated on Schedule 4.7(b) (as such Schedule may be updated from time to time to reflect changes permitted to be made under Section 5.9).

(c)     Each Borrower's and each of its Subsidiaries' organizational identification number, if any, are identified on Schedule 4.7(c) (as such Schedule may be updated from time to time to reflect changes permitted to be made under Section 6.5).

(d)     As of the Closing Date, Borrowers and their Subsidiaries do not hold any commercial tort claims, except as set forth on Schedule 4.7(d).

4.8     <u>Due Organization and Qualification; Subsidiaries.</u>

(a)     Each Borrower is duly organized and existing and in good standing under the laws of the jurisdiction of its organization and qualified to do business in any state where the failure to be so qualified reasonably could be expected to result in a Material Adverse Change.

(b)     Set forth on Schedule 4.8(b) (as such Schedule may be updated from time to time to reflect changes permitted to be made under Section 5.16), is a complete and accurate description of the authorized capital Stock of each Borrower, by class, and, as of the Closing Date, a description of the number of shares of each such class that are issued and outstanding.  Other than as described on Schedule 4.8(b), there are no subscriptions, options, warrants, or calls relating to any shares of each Borrower's capital Stock, including any right of conversion or exchange under any outstanding security or other instrument.  No Borrower is subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its capital Stock or any security convertible into or exchangeable for any of its capital Stock.

(c)     Set forth on Schedule 4.8(c) (as such Schedule may be updated from time to time to reflect changes permitted to be made under Section 5.16), is a complete and accurate list of each Borrower's direct and indirect Subsidiaries, showing: (i) the jurisdiction of their organization, (ii) the number of shares of each class of common and preferred Stock authorized for each of such Subsidiaries, and (iii) the number and the percentage of the outstanding shares of each such class owned directly or indirectly by the applicable Borrower.  All of the outstanding capital Stock of each such Subsidiary has been validly issued and is fully paid and non-assessable.

(d)     Except as set forth on Schedule 4.8(c), there are no subscriptions, options, warrants, or calls relating to any shares of any Borrower's Subsidiaries' capital Stock, including any right of conversion or exchange under any outstanding security or other instrument.  No Borrower or any of its respective Subsidiaries is subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of any Borrower's Subsidiaries' capital Stock or any security convertible into or exchangeable for any such capital Stock.

4.9     <u>Due Authorization; No Conflict.</u>

(a)     As to each Borrower, the execution, delivery, and performance by such Borrower of this Agreement and the other Loan Documents to which it is a party have been duly authorized by all necessary action on the part of such Borrower.

(b)     As to each Borrower, the execution, delivery, and performance by such Borrower of this Agreement and the other Loan Documents to which it is a party do not and will not (i) violate any

provision of federal, state, or local law or regulation applicable to any Borrower, the Governing Documents of any Borrower, or any order, judgment, or decree of any court or other Governmental Authority binding on any Borrower, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation of any Borrower, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any properties or assets of such Borrower, other than Permitted Liens, or (iv) require any approval of any Borrower's interestholders or any approval or consent of any Person under any material contractual obligation of any Borrower, other than consents or approvals that have been obtained and that are still in force and effect, and any required approvals under the Gaming Laws for the continued effect of the pledge of the Stock of any Borrower as contemplated by the Security Agreement and Parent Pledge Agreement.

(c)       Other than the filing of financing statements, the recordation of the Mortgages and the fixture filings, and other filings or actions necessary to perfect Liens granted to Agent in the Collateral, the execution, delivery, and performance by each Borrower of this Agreement and the other Loan Documents to which such Borrower is a party do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority, other than consents or approvals that have been obtained and that are still in force and effect, and any required approvals under the Gaming Laws for the continued effect of the pledge of the Stock of any Borrower as contemplated by the Security Agreement and Parent Pledge Agreement.

(d)       As to each Borrower, this Agreement and the other Loan Documents to which such Borrower is a party, and all other documents contemplated hereby and thereby, when executed and delivered by such Borrower will be the legally valid and binding obligations of such Borrower, enforceable against such Borrower in accordance with their respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

(e)       The Agent's Liens are validly created, perfected, and first priority Liens, subject only to Permitted Liens.

(f)       The execution, delivery, and performance by each Guarantor of the Loan Documents to which it is a party have been duly authorized by all necessary action on the part of such Guarantor.

(g)       The execution, delivery, and performance by each Guarantor of the Loan Documents to which it is a party do not and will not (i) violate any provision of federal, state, or local law or regulation applicable to such Guarantor, the Governing Documents of such Guarantor, or any order, judgment, or decree of any court or other Governmental Authority binding on such Guarantor, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation of such Guarantor, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any properties or assets of such Guarantor, other than Permitted Liens, or (iv) require any approval of such Guarantor's interestholders or any approval or consent of any Person under any material contractual obligation of such Guarantor, other than consents or approvals that have been obtained and that are still in force and effect, and any required approvals under the Gaming Laws for the continued effect of the pledge of the Stock of any Borrower as contemplated by the Security Agreement and Parent Pledge Agreement.

(h)       Other than the filing of financing statements, the recordation of the Mortgages and the fixture filings, and other filings or actions necessary to perfect Liens granted to Agent in the Collateral, the execution, delivery, and performance by each Guarantor of the Loan Documents to which such Guarantor is a party do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority, other than consents or approvals that have been obtained and that are still in force and effect, and any required approvals under the Gaming Laws for the continued effect of the pledge of the Stock of any Borrower as contemplated by the Security Agreement and Parent Pledge Agreement.

(i)      The Loan Documents to which each Guarantor is a party, and all other documents contemplated hereby and thereby, when executed and delivered by such Guarantor will be the legally valid and binding obligations of such Guarantor, enforceable against such Guarantor in accordance with their respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

4.10      **Litigation.**  Other than those matters disclosed on Schedule 4.10, and other than matters arising after the Closing Date that reasonably could not be expected to result in a Material Adverse Change, there are no actions, suits, or proceedings pending or, to the best knowledge of each Borrower, threatened against any Borrower or any of its Subsidiaries.

4.11      **No Material Adverse Change.**  All financial statements relating to Borrowers and their Subsidiaries or Guarantors that have been delivered by Borrowers to the Lender Group have been prepared in accordance with GAAP (except, in the case of unaudited financial statements, for the lack of footnotes and being subject to year-end audit adjustments) and present fairly in all material respects, Borrowers' and their Subsidiaries' (or any Guarantor's, as applicable) financial condition as of the date thereof and results of operations for the period then ended.  There has not been a Material Adverse Change with respect to Borrowers and their Subsidiaries (or any Guarantor, as applicable) since the date of the latest financial statements submitted to Agent on or before the Closing Date.

4.12      **Fraudulent Transfer.**

(a)      Parent is, and Borrowers (on a consolidated basis) are, Solvent.

(b)      No transfer of property is being made by any Borrower or any Subsidiary of a Borrower and no obligation is being incurred by any Borrower or any Subsidiary of a Borrower in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of Borrowers or their Subsidiaries.

4.13      **Employee Benefits.**  None of Borrowers, any of their Subsidiaries, or any of their ERISA Affiliates maintains or contributes to any Benefit Plan.

4.14      **Environmental Condition.**  Except as set forth on Schedule 4.14, (a) to Borrowers' knowledge, none of Borrowers' or their Subsidiaries' properties or assets has ever been used by Borrowers, their Subsidiaries, or by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials, where such use, production, storage, handling, treatment, release or transport was in violation, in any material respect, of any applicable Environmental Law, (b) to Borrowers' knowledge, none of Borrowers' nor their Subsidiaries' properties or assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a Hazardous Materials disposal site, (c) none of Borrowers nor any of their Subsidiaries have received notice that a Lien arising under any Environmental Law has attached to any revenues or to any Real Property owned or operated by Borrowers or their Subsidiaries, and (d) none of Borrowers nor any of their Subsidiaries have received a summons, citation, notice, or directive from the United States Environmental Protection Agency or any other federal or state governmental agency concerning any action or omission by any Borrower or any Subsidiary of a Borrower resulting in the releasing or disposing of Hazardous Materials into the environment.

4.15      **Intellectual Property.**  Each Borrower and each Subsidiary of a Borrower owns, or holds licenses in, all trademarks, trade names, copyrights, patents, patent rights, and licenses that are necessary to the conduct of its business as currently conducted, and attached hereto as Schedule 4.15 is a true, correct, and complete listing of all material patents, patent applications, trademarks, trademark applications, copyrights, and copyright registrations as to which each Borrower or one of its Subsidiaries is the owner or is an exclusive licensee; provided, however, that Borrowers may amend Schedule 4.15 so long as such amendment occurs by

written notice to Agent not less than 10 days before the date on which any Borrower or any Subsidiary of a Borrower acquires any such property after the Closing Date.

4.16    **Leases.** Borrowers and their Subsidiaries enjoy peaceful and undisturbed possession under all leases material to their business and to which they are parties as lessee or under which they are operating and all of such material leases are valid and subsisting and no material default by Borrowers or their Subsidiaries exists under any of them.

4.17    **Deposit Accounts and Securities Accounts.** Set forth on Schedule 4.17 is a listing of all of Borrowers' and their Subsidiaries' Deposit Accounts and Securities Accounts, including, with respect to each bank or securities intermediary (a) the name and address of such Person, and (b) the account numbers of the Deposit Accounts or Securities Accounts maintained with such Person.

4.18    **Complete Disclosure.** All factual information (taken as a whole) furnished by or on behalf of Borrowers or their Subsidiaries in writing to Agent or any Lender (including all information contained in the Schedules hereto or in the other Loan Documents) for purposes of or in connection with this Agreement, the other Loan Documents, or any transaction contemplated herein or therein is, and all other such factual information (taken as a whole) hereafter furnished by or on behalf of Borrowers or their Subsidiaries in writing to Agent or any Lender will be, true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided. On the Closing Date, the Closing Date Projections represent, and as of the date on which any other Projections are delivered to Agent, such additional Projections represent Borrowers' good faith estimate of their and their Subsidiaries' future performance for the periods covered thereby based upon assumptions believed by Borrowers to be reasonable at the time of the delivery thereof.

4.19    **Indebtedness.** Set forth on Schedule 4.19 is a true and complete list of all Indebtedness of each Borrower and each Subsidiary of a Borrower outstanding immediately prior to the Closing Date that is to remain outstanding after the Closing Date and such Schedule accurately sets forth the aggregate principal amount of such Indebtedness and the principal terms thereof. All obligations secured by Liens referenced in the financing statements listed in Schedule 3.3 have been indefeasibly paid in full.

4.20    **Licenses and Permits.**

(a)    (i) All material licenses (including all necessary Gaming Licenses and Liquor Licenses), permits, and consents and similar rights required (as of each date this representation and warranty is made or deemed made) from any Governmental Authority for the ownership, use, or operation of the businesses or properties now owned or operated by any Borrower or any of their Subsidiaries (including the operation of the Business by E&W prior to the Operator Licensing Event and the Renovation), have been validly issued and are in full force and effect; (ii) each Borrower and their Subsidiaries (and E&W, as applicable, for all periods prior to the Operator Licensing Event) is in compliance, in all material respects, with all of the provisions thereof applicable to it; and (iii) none of such licenses, permits, or consents is the subject of any pending or, to the best of any Borrower's, knowledge, threatened proceeding for the revocation, cancellation, suspension, or non-renewal thereof. As of the Closing Date (and as of each subsequent date on which any Borrower delivers to Agent an updated schedule pursuant to Section 5 below), set forth on Schedule 4.20 is a complete and accurate list of all such licenses, permits, and consents that are necessary and appropriate for the operation of such Borrower's businesses, and the businesses of its Subsidiaries (including the operation of the Business by E&W prior to the Operator Licensing Event and the Renovation), and such schedule identifies the date by which an application for the renewal of such license, permit, or consent must be filed and describes the status of each such pending application.

(b)    Each Borrower and each of their Subsidiaries (or, with respect to any period prior to the Operator Licensing Event, E&W), have obtained (i) all material licenses, permits, and consents necessary

or appropriate to conduct their businesses and operations and (ii) as of the Closing Date, all required approvals from the Nevada Gaming Authorities and Liquor Authorities of the transactions contemplated hereby and by the other Loan Documents, other than approvals to be obtained by Parent in connection with the Operator Licensing Event (and any required approvals as a result thereof or in connection therewith for the continued effect of the pledge of the Stock of any Borrower or any Subsidiary as contemplated by the Security Agreement and Parent Pledge Agreement).

4.21   **Obligations Included in Renovation Financing.**   This Agreement and the Obligations qualify as and are part of the "Renovation Financing" as defined in each of the Operating Agreement and the Joint Venture Agreement for all purposes under each such agreement.

5.    **AFFIRMATIVE COVENANTS.**

*Each Borrower covenants and agrees that,* until termination of all of the Commitments and payment in full of the Obligations, Borrowers shall and shall cause each of their respective Subsidiaries to do all of the following:

5.1   **Accounting System.**   Maintain a system of accounting that enables Borrowers to produce financial statements in accordance with GAAP and maintain records pertaining to the Collateral that contain information as from time to time reasonably may be requested by Agent. Borrowers also shall keep a reporting system *that shows all additions, sales, claims, returns, and allowances with respect to their and their Subsidiaries' sales.*

5.2   **Collateral Reporting.**   Provide Agent (and if so requested by Agent, with copies for each Lender) with each of the reports set forth on Schedule 5.2 at the times specified therein.

5.3   **Financial Statements, Reports, Certificates.**   Deliver to Agent, with copies to each Lender, *each of the financial statements, reports, or other items set forth on* Schedule 5.3 at the time specified herein. In addition, Parent agrees that no Subsidiary of Parent will have a fiscal year different from that of Parent.

5.4   **Guarantor Reports.**   (x) Cause each Guarantor other than E&W to deliver its annual financial statements at the time when Parent provides its audited financial statements to Agent, but only to the extent such Guarantor's financial statements are not consolidated with Parent's financial statements, and (y) use reasonable best efforts to cause E&W to deliver to Agent (or to Parent, and to the extent so delivered to Parent, *Parent shall deliver to Agent*) monthly financial statements covering E&W's business division (or operations) relating to the Resort and Casino (for so long as E&W shall be operating all or any part of the Resort or Casino pursuant to the Lease-Related Documents).

5.5   **Inspection.**   Permit Agent, each Lender, and each of their duly authorized representatives or agents to visit any of its properties and inspect any of its assets or books and records, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees at such reasonable times and intervals as Agent or any such Lender may designate and, so long as no Default or Event of Default exists, with reasonable prior notice to Administrative Borrower.

5.6   **Maintenance of Properties.**   Maintain and preserve (taking into account the demolition and construction activities anticipated in connection with the Renovation) all of their properties which are necessary or useful in the proper conduct to their business in good working order and condition, ordinary wear, tear, and casualty excepted (and except where the failure to do so could not be expected to result in a Material Adverse Change); and comply at all times with the provisions of all material leases to which it is a party as lessee, so as to prevent any loss or forfeiture thereof or thereunder.

5.7    **Taxes**. Cause all assessments and taxes, whether real, personal, or otherwise, due or payable by, or imposed, levied, or assessed against Borrowers, their Subsidiaries, or any of their respective assets to be paid in full, before delinquency or before the expiration of any extension period, except to the extent that the validity of such assessment or tax shall be the subject of a Permitted Protest or where the failure to do so could not reasonably be expected to result in a Material Adverse Change. Borrowers will and will cause their Subsidiaries to make timely payment or deposit of all tax payments and withholding taxes required of them by applicable laws, including those laws concerning F.I.C.A., F.U.T.A., state disability, and local, state, and federal income taxes, and will, upon request, furnish Agent with proof satisfactory to Agent indicating that the applicable Borrower or Subsidiary of a Borrower has made such payments or deposits.

5.8    **Insurance**.

(a)    At Borrowers' expense, maintain insurance respecting their and their Subsidiaries' assets wherever located, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses. Borrowers also shall maintain business interruption, public liability, and product liability insurance, as well as insurance against larceny, embezzlement, and criminal misappropriation. All such policies of insurance shall be in such amounts and with such insurance companies as are reasonably satisfactory to Agent. Borrowers shall deliver copies of all such policies to Agent with an endorsement naming Agent as the sole loss payee (under a satisfactory lender's loss payable endorsement) or additional insured, as appropriate. Borrowers shall use best efforts to cause each policy of insurance or endorsement to contain a clause requiring the insurer to give not less than 30 days prior written notice to Agent in the event of cancellation of the policy for any reason whatsoever.

(b)    Administrative Borrower shall give Agent prompt notice of any loss exceeding $1,000,000 covered by such insurance. So long as no Event of Default has occurred and is continuing, Borrowers shall have the exclusive right to adjust any losses payable under any such insurance policies which are less than $2,000,000. Following the occurrence and during the continuation of an Event of Default, or in the case of any losses payable under such insurance exceeding $2,000,000, Agent shall have the exclusive right to adjust any losses payable under any such insurance policies, without any liability to Borrowers whatsoever in respect of such adjustments. Any monies received as payment for any loss under any insurance policy mentioned above (other than liability insurance policies) or as payment of any award or compensation for condemnation or taking by eminent domain, shall be paid over to Agent to be applied at the option of the Required Lenders either to the prepayment of the Obligations or to be disbursed to Administrative Borrower under staged payment terms reasonably satisfactory to the Required Lenders for application to the cost of repairs, replacements, or restorations; provided, however, that, with respect to any such monies in an aggregate amount during any 12 consecutive month period not in excess of $2,000,000, so long as (A) no Default or Event of Default shall have occurred and is continuing, (B) Borrowers' Excess Availability is greater than $2,000,000, (C) Administrative Borrower shall have given Agent prior written notice of the Borrowers or their respective Subsidiaries' intention to apply such monies to the costs of repairs, replacement, or restoration of the property which is the subject of the loss, destruction, or taking by condemnation, (D) the monies are held in a cash collateral account in which Agent has a perfected first-priority security interest, and (E) Borrowers or their Subsidiaries complete such repairs, replacements, or restoration within 360 days after the initial receipt of such monies, Borrowers shall have the option to apply such monies to the costs of repairs, replacement, or restoration of the property which is the subject of the loss, destruction, or taking by condemnation unless and to the extent that such applicable period shall have expired without such repairs, replacements, or restoration being made, in which case, any amounts remaining in the cash collateral account shall be paid to Agent and applied as set forth above.

5.9    **Location of Inventory and Equipment**. Keep Borrowers' and their Subsidiaries' Inventory and Equipment (other than vehicles and Equipment out for repair) only at the locations identified on Schedule 4.5 and their chief executive offices only at the locations identified on Schedule 4.7(b); provided, however, that Administrative Borrower may amend Schedule 4.5 or Schedule 4.7 so long as such amendment occurs by written notice to Agent not less than 30 days prior to the date on which such Inventory or Equipment

is moved to such new location or such chief executive office is relocated, so long as such new location is within the continental United States, and so long as, at the time of such written notification, the applicable Borrower provides Agent a Collateral Access Agreement with respect thereto.

5.10    **Compliance with Laws.**  Comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change.

5.11    **Leases.**  Comply at all times with the provisions of the Lease Related Agreements (and cause the same to remain in full force and effect until the Operator Licensing Event), and of all other material leases to which any Borrower or any Subsidiary of a Borrower is a party or by which any Borrower's or any of its Subsidiaries' properties and assets are bound, including payment obligations, so as to prevent any material loss or forfeiture thereof or thereunder (unless, with respect to payment obligations, the same are the subject of a Permitted Protest).

5.12    **Existence.**  At all times preserve and keep in full force and effect each Borrower's and each of its Subsidiaries' valid existence and good standing and any rights and franchises material to their businesses.

5.13    **Environmental.**

(a)    Keep any property either owned or operated by any Borrower or any Subsidiary of a Borrower free of any Environmental Liens or post bonds or other financial assurances sufficient to satisfy the obligations or liability evidenced by such Environmental Liens, (b) comply, in all material respects, with Environmental Laws and provide to Agent documentation of such compliance which Agent reasonably requests, (c) promptly notify Agent of any release of a Hazardous Material in any reportable quantity from or onto property owned or operated by any Borrower or any Subsidiary of a Borrower and take any Remedial Actions required to abate said release or otherwise to come into compliance with applicable Environmental Law, and (d) promptly, but in any event within 5 days of its receipt thereof, provide Agent with written notice of any of the following:  (i) notice that an Environmental Lien has been filed against any of the real or personal property of any Borrower or any Subsidiary of a Borrower, (ii) commencement of any Environmental Action or notice that an Environmental Action will be filed against any Borrower or any Subsidiary of a Borrower, and (iii) notice of a violation, citation, or other administrative order which reasonably could be expected to result in a Material Adverse Change.

5.14    **Disclosure Updates.**  Promptly and in no event later than 5 Business Days after obtaining knowledge thereof, notify Agent if any written information, exhibit, or report furnished to the Lender Group contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made.  The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules hereto.

5.15    **Control Agreements; Senior Note Collateral Accounts.**

(a)    Take all reasonable steps in order for Agent to obtain control in accordance with Sections 8-106, 9-104, 9-105, 9-106, and 9-107 of the Code with respect to (subject to the proviso contained in Section 6.12) all of its Securities Accounts, Deposit Accounts (other than the Senior Note Interest Reserve Account), electronic chattel paper, investment property, and letter of credit rights.

(b)    Cause the Senior Note Collateral Accounts to be fully funded on or before the Closing Date with proceeds of the Senior Secured Notes, and thereafter (a) invest such funds in the Senior Note Collateral Accounts only in Cash Equivalents, (b) use the funds in the Senior Note Interest Reserve Account to pay the first two interest payments on the Senior Secured Notes (with the excess thereof to be disbursed as set forth in the Cash Collateral and Disbursement Agreement), (c) use or disburse the funds in the Renovation Disbursement Account in accordance with the Cash Collateral and Disbursement Agreement, and (d) not deposit or permit the deposit of any additional funds in any such Senior Note Collateral Account (other than proceeds of investments pursuant to clause (a) above).

5.16    **Formation of Subsidiaries.**  At the time that any Borrower or any Guarantor forms any direct or indirect Subsidiary or acquires any direct or indirect Subsidiary after the Closing Date, such Borrower or such Guarantor shall (a) cause such new Subsidiary to provide to Agent a joinder to the Guaranty and the Security Agreement, together with such other security documents (including Mortgages with respect to any Real Property of such new Subsidiary), as well as appropriate financing statements (and with respect to all property subject to a Mortgage, fixture filings), all in form and substance satisfactory to Agent (including being sufficient to grant Agent a first priority Lien (subject to Permitted Liens) in and to the assets of such newly formed or acquired Subsidiary), (b) subject to compliance with applicable Gaming Laws (which Borrowers shall use commercially reasonable efforts to comply with and obtain any necessary authorization, approval or waiver), provide to Agent a pledge agreement and appropriate certificates and powers or financing statements, hypothecating all of the direct or beneficial ownership interest in such new Subsidiary, in form and substance satisfactory to Agent, and (c) provide to Agent all other documentation, including one or more opinions of counsel satisfactory to Agent, which in its opinion is appropriate with respect to the execution and delivery of the applicable documentation referred to above (including policies of title insurance or other documentation with respect to all property subject to a Mortgage). Any document, agreement, or instrument executed or issued pursuant to this Section 5.16 shall be a Loan Document.

5.17    **Governmental Authorization.**  Deliver to Agent as soon as practicable, and in any event within 2 Business Days after the receipt by any Borrower or its Subsidiaries (or E&W, as applicable), from any Nevada Gaming Authority or other Governmental Authority having jurisdiction over the operations of such Borrower or its Subsidiaries or the Business (i) copies of any order or notice of such Nevada Gaming Authority or such other Governmental Authority which designates any Gaming License or other material franchise, permit, or other governmental operating authorization of such Borrower or its Subsidiaries or E&W with respect to the Business, or any application therefor, for a hearing or which refuses renewal or extension of, or revokes or suspends the authority of such Borrower, its Subsidiaries or E&W, as applicable, to construct, own, manage, or operate its businesses (or portion thereof), and (ii) a copy of any citation or notice of violation (other than citations or notices that, individually and in the aggregate, could not reasonably be expected to adversely affect the status of any such applicable Gaming License, Liquor License or other franchise, permit or authorization), or order to show cause, issued by any Nevada Gaming Authority, any Liquor Authority or other Governmental Authority or any complaint filed by any Nevada Gaming Authority or other Governmental Authority which is applicable to such Borrower or its Subsidiaries, or to E&W with respect to the Business.

5.18    **License Renewals.**  Deliver to Agent on each anniversary of the Closing Date an updated Schedule 4.20 reflecting thereon, as of the date of such delivery, the information described in Section 4.20.

5.19    **Licenses and Permits.**  (a) Ensure that all material licenses (including all necessary Gaming Licenses and Liquor Licenses), permits, and consents and similar rights required from any Governmental Authority or other Person for the ownership, use, or operation (including, for all periods prior to the Operator Licensing Event, operation thereof by E&W pursuant to the Leases) of the Resort and Casino (including the Renovation) and all businesses or properties now owned or operated by each Borrower and its Subsidiaries have been validly issued and are in full force and effect, and (b) comply (and use reasonable best efforts to cause E&W to comply, as applicable), in all material respects, with all of the provisions thereof applicable to it.  Without limiting the foregoing, Borrowers shall (i) use reasonable best efforts to cause the Operator Licensing Event to occur on or before February 28, 2006, and (ii) in connection with such Operator Licensing

Event, obtain all necessary consents or approvals of the Nevada Gaming Authorities for the continued effect of the pledge of Stock to Agent pursuant to the Parent Pledge Agreement (or, to the extent any such consent is required by applicable Gaming Laws to be obtained prior to the initial effectiveness of such pledge on the Closing Date, shall use reasonable best efforts to obtain all such consents for the initial effectiveness of such pledge on or before the occurrence of the Operator Licensing Event).

6.    **NEGATIVE COVENANTS.**

Each Borrower covenants and agrees that, until termination of all of the Commitments and payment in full of the Obligations, Borrowers will not and will not permit any of their respective Subsidiaries to do any of the following:

6.1    <u>Indebtedness</u>.    Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except:

(a)    Indebtedness evidenced by this Agreement and the other Loan Documents, together with Indebtedness owed to Underlying Issuers with respect to Underlying Letters of Credit;

(b)    Indebtedness set forth on <u>Schedule 4.19</u> and any Refinancing Indebtedness in respect of such Indebtedness;

(c)    Indebtedness consisting of FF&E Financings or Purchase Money Indebtedness (and any Refinancing Indebtedness in respect of such Indebtedness); <u>provided, that</u> (1) no Indebtedness incurred under this Agreement is utilized for the purchase or lease of assets financed with any such FF&E Financing or Purchase Money Indebtedness, and (2) the aggregate principal amount of such Indebtedness (including any such Refinancing Indebtedness in respect thereof) outstanding at any time pursuant to this clause (c), does not exceed $2,500,000 with respect to all FF&E Financings and Purchase Money Indebtedness, in each case other than Gaming FF&E Financings;

(d)    endorsement of instruments or other payment items for deposit;

(e)    Indebtedness composing Permitted Investments;

(f)    Indebtedness outstanding under the Senior Secured Notes in an aggregate principal amount not to exceed $130,000,000, and any Refinancing Indebtedness in respect of such Indebtedness;

(g)    Indebtedness under Hedge Agreements that are incurred in the ordinary course of business, not for speculative purposes, and for the purpose of fixing or hedging interest rate or currency risk with respect to any fixed or floating rate Indebtedness that is permitted by the Agreement to be outstanding or any receivable or liability the payment of which is determined by reference to a foreign currency; provided, that the notional amount of any such Indebtedness under Hedge Agreements does not exceed the principal amount of Indebtedness or other obligations to which such Hedge Agreement relates;

(h)    Indebtedness not otherwise permitted by clauses (a) through (g) above in an aggregate principal amount (or accreted value, as applicable) at any time outstanding pursuant to this clause (h) (including any Refinancing Indebtedness in respect of such Indebtedness under this clause (h)) not to exceed $2,500,000;

(i)    the EW Preferred Note Loan; and

(j)    unsecured Indebtedness (including Disqualified Capital Stock and unsecured Acquired Indebtedness), not otherwise permitted pursuant to clauses (a) through (h) above, if:

(1)      no Default or Event of Default shall have occurred and be continuing at the time of, or would occur after giving effect on a pro forma basis to, such incurrence of such Indebtedness,

(2)      on the date of such incurrence (the "Incurrence Date"), the Borrowers' Consolidated Coverage Ratio for the Reference Period immediately preceding the Incurrence Date, after giving effect on a pro forma basis to such incurrence of such Indebtedness and, to the extent set forth in the definition of Consolidated Coverage Ratio, including the use of proceeds thereof, would be at least 2.0 to 1.0 (the "Debt Incurrence Ratio"),

(3)      the Incurrence Date is on or after the first day of the second full fiscal quarter commencing after the Re-opening has occurred, and

(4)      Borrowers have Excess Availability of at least $5,000,000 at the time of and after giving effect on a pro forma basis to such incurrence of such Indebtedness.

Upon each incurrence of Indebtedness, (i) the Administrative Borrower may designate pursuant to which provision of this Section 6.1 such Indebtedness is being incurred, (ii) the Borrowers may subdivide an amount of Indebtedness and designate more than one provision pursuant to which such amount of Indebtedness is being incurred, and (iii) such Indebtedness shall not be deemed to have been incurred or outstanding under any other provision of this Section 6.1.

6.2    **Liens.**

(a)      Create, incur, assume, or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.

(b)      With respect to Real Property (and without limitation of clause (a) above), allow nor permit (and shall promptly cause to be paid and discharged) any Lien, or charge whatsoever other than the Permitted Liens which may be or become a Lien, unless (i) Borrower notifies Lender that it intends to contest the applicable claim or demand, and (ii) such Lien or charge is the subject of a Permitted Protest. Borrowers shall not allow the Real Property to be, at any time, encumbered by any Lien which is not provided for herein or is otherwise a Permitted Lien, and Borrowers will maintain and preserve the first priority lien of the Mortgages (subject to the Permitted Liens) until the Obligations are indefeasibly repaid in full.

This Section 6.2 shall not be effective to prohibit Liens with respect to Stock of any holder of a Gaming License to the extent that any approvals required of this covenant by the Nevada Gaming Authorities have not been obtained under applicable Gaming Laws; provided, that in connection with the Operator Licensing Event, Borrowers shall obtain all such approvals, if any, required for the continued effectiveness of this covenant.

6.3    **Restrictions on Fundamental Changes.**

(a)      Enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its Stock,

(b)      Liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution),

(c)      Convey, sell, lease, license, assign, transfer, or otherwise dispose of, in one transaction or a series of transactions, all or any substantial part of its assets, or

(d)      Suspend or go out of a substantial portion of its or their business.

6.4     **Disposal of Assets.**  Other than Permitted Dispositions, convey, sell, lease, license, assign, transfer, or otherwise dispose of any of the assets of any Borrower or any Subsidiary of a Borrower.

6.5     **Change Name.**  Change any Borrower's or any of its Subsidiaries' name, organizational identification number, state of organization, or organizational identity; provided, however, that a Borrower or a Subsidiary of a Borrower may change its name upon at least 30 days prior written notice by Administrative Borrower to Agent of such change and so long as, at the time of such written notification, such Borrower or such Subsidiary provides any financing statements necessary to perfect and continue perfected the Agent's Liens.

6.6     **Nature of Business.**  Make any change in the principal nature of their business.

6.7     **Prepayments and Amendments.**  Except in connection with Refinancing Indebtedness permitted by Section 6.1,

(a)     optionally prepay, redeem, defease, purchase, or otherwise acquire any Indebtedness of any Borrower or any Subsidiary of a Borrower, other than the Obligations in accordance with this Agreement,

(b)     make any payment on account of Indebtedness that has been contractually subordinated in right of payment if such payment is not permitted at such time under the subordination terms and conditions, or

(c)     directly or indirectly, amend, modify, alter, increase, or change any of the terms or conditions of any agreement, instrument, document, indenture, or other writing evidencing or concerning (1) Indebtedness permitted under Section 6.1(b), (f) or (i); (2) Indebtedness permitted under Section 6.1(c), (h) or (j) in each case other than any such amendment, alteration or change that would be permitted in connection with Refinancing Indebtedness in respect thereof; (3) the Lease Related Agreements; (4) the License Agreements; or (5) the Material Renovation Documents.

6.8     **Change of Control.**  Cause, permit, or suffer, directly or indirectly, any Change of Control.

6.9     **Consignments.**  Consign any of their Inventory or sell any of their Inventory on bill and hold, sale or return, sale on approval, or other conditional terms of sale.

6.10     **Distributions.**  Other than Permitted Distributions, make any distribution or declare or pay any dividends (in cash or other property, other than common Stock) on, or purchase, acquire, redeem, or retire any of any Borrower's Stock, of any class, whether now or hereafter outstanding.

6.11     **Accounting Methods.**  Modify or change their fiscal year or their method of accounting (other than as may be required to conform to GAAP) or enter into, modify, or terminate any agreement currently existing, or at any time hereafter entered into with any third party accounting firm or service bureau for the preparation or storage of Borrowers' or their Subsidiaries' accounting records without said accounting firm or service bureau agreeing to provide Agent information regarding Borrowers' and their Subsidiaries' financial condition.

6.12     **Investments.**  Except for Permitted Investments, directly or indirectly, make or acquire any Investment, or incur any liabilities (including contingent obligations) for or in connection with any Investment; provided, however, that Administrative Borrower and its Subsidiaries shall not have Permitted Investments (other than in the Cash Management Accounts and in the Senior Note Interest Reserve Account) in Deposit Accounts or Securities Accounts in an aggregate amount in excess of $1,000,000 at any one time unless Administrative Borrower or its Subsidiary, as applicable, and the applicable securities intermediary or bank have entered into Control Agreements governing such Permitted Investments in order to perfect (and further

establish) the Agent's Liens in such Permitted Investments.  Subject to the foregoing proviso, Borrowers shall not and shall not permit their Subsidiaries to establish or maintain any Deposit Account or Securities Account (other than the Senior Note Interest Reserve Account) unless Agent shall have received a Control Agreement in respect of such Deposit Account or Securities Account.

6.13    **Transactions with Affiliates.**  Except for Exempted Affiliate Transactions, directly or indirectly enter into or permit to exist any transaction with any Affiliate of any Borrower except for transactions that (a) are in the ordinary course of Borrowers' business, (b) are upon fair and reasonable terms, (c) if they involve one or more payments by any Borrower or any of its Subsidiaries in excess of $500,000, are fully disclosed to Agent, and (d) are no less favorable to Borrowers or their respective Subsidiaries, as applicable, than would be obtained in an arm's length transaction with a non-Affiliate.

6.14    **Use of Proceeds.**  Use the proceeds of the Advances for any purpose other than (a) on the Closing Date, to pay transactional fees, costs, and expenses incurred in connection with this Agreement, the other Loan Documents, and the transactions contemplated hereby and thereby, and (b) thereafter, consistent with the terms and conditions hereof, to finance the Renovation and for any other lawful and permitted purposes.

6.15    **Inventory and Equipment with Bailees.**  Store the Inventory or Equipment of Borrowers or their Subsidiaries at any time now or hereafter with a bailee, warehouseman, or similar party.

6.16    **Financial Covenants.**

(a)    Fail to maintain or achieve:

(i)    **Minimum EBITDA.**  EBITDA, measured on a quarter-end basis, of at least the required amount set forth in the following table for the applicable period set forth opposite thereto:

| Applicable Amount | Applicable Period |
|---|---|
| $1,000,000 | For the 4 fiscal quarter period ending March 31, 2005, and for each 4 fiscal quarter period ending on each fiscal quarter end thereafter through and including March 31, 2006 |
| $2,000,000 | For the 4 fiscal quarter period ending June 30, 2006 |
| $6,000,000 | For the 4 fiscal quarter period ending September 30, 2006 |
| $15,000,000 | For the 4 fiscal quarter period ending December 31, 2006 |
| $17,500,000 | For the 4 fiscal quarter period ending March 31, 2007 |
| $20,000,000 | For the 4 fiscal quarter period ending June 30, 2007, and for each 4 fiscal quarter period ending on each fiscal quarter end thereafter |

(ii)    **Maximum Senior Leverage.**  Senior Leverage Ratio, measured on a quarter-end basis, of not more than the maximum ratio set forth in the following table for the applicable measurement dates set forth opposite thereto:

| Applicable Senior Leverage Ratio | Applicable Measurement Date |
|---|---|
| 21.00:1.00 | March 31, 2005, and each fiscal quarter end thereafter up to and including March 31, 2006 |
| 11.00:1.00 | June 30, 2006 |
| 3.75:1.00 | September 30, 2006 |
| 1.75:1.00 | December 31, 2006 |
| 1.25:1.00 | March 31, 2007 and each fiscal quarter end thereafter |

(b)    Make:

(i)    **Capital Expenditures.**  Capital Expenditures (other than any such Capital Expenditures (x) consisting of Gaming Equipment purchases pursuant to Gaming FF&E Financings or (y) renovation costs funded directly (or indirectly through the Disbursed Funds Account) and entirely from funds in the Renovation Disbursement Account) in any fiscal year set forth in the following table in excess of the maximum amount, or less than the minimum amount, in each case as set forth in the following table for the applicable period:

| | Minimum Amount | Maximum Amount |
|---|---|---|
| Fiscal Year 2006 | $-0- | $4,000,000 |
| Fiscal Year 2007 | $1,750,000 | $4,000,000 |
| Fiscal Year 2008 | $1,750,000 | $4,000,000 |
| Fiscal Year 2009 | $1,750,000 | $4,000,000 |

; provided, however, that if during any fiscal year the amount of all Capital Expenditures permitted to be made is not so made (the "Unused Amount"), such Unused Amount may be used in the immediately succeeding fiscal year in an amount equal to the Unused Amount (such amount, the "Carry-Over Amount"); provided further that (A) in such succeeding fiscal year, Capital Expenditures shall be deemed to have been made first from the amount permitted to be made for such fiscal year and, second, from the Carry-Over Amount, and (B) no Carry-Over Amount may be carried forward to any fiscal year other than the immediately succeeding fiscal year.

6.17    **Finance Corp Business Activities.**  With respect to Finance Corp, hold any material assets, become liable for any obligations (other than the Obligations and the Indebtedness permitted pursuant to Section 6.1(f)) or engage in any business activities.

7.    **EVENTS OF DEFAULT.**

Any one or more of the following events shall constitute an event of default (each, an "Event of Default") under this Agreement:

7.1    If Borrowers fail to pay when due and payable, or when declared due and payable, (a) all or any portion of the Obligations consisting of interest, fees, or charges due the Lender Group, reimbursement of Lender Group Expenses, or other amounts (other than any portion thereof constituting principal) constituting Obligations (including any portion thereof that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), and such failure continues for a period of 3 Business Days, or (b) all or any portion of the principal of the Obligations);

7.2    If Borrowers or any Subsidiary of any Borrower:

(a)    fail to perform or observe any covenant or other agreement contained in any of Sections 2.7, 5.5, 5.8, 5.12, 5.14, 5.15(b), 5.16 and 6.1 through 6.17 of this Agreement;

(b)    fail to perform or observe any covenant or other agreement contained in any of Sections 5.2, 5.3, 5.4, 5.17 and 5.19 of this Agreement and such failure continues for a period of 3 Business Days after the earlier of (i) the date on which such failure shall first become known to any officer of any Borrower or (ii) written notice thereof is given to Administrative Borrower by Agent; or

(c)    fail to perform or observe any covenant or other agreement contained in any of Sections 5.6, 5.7, 5.9, 5.10, 5.11, 5.15, and 5.18, of this Agreement and such failure continues for a period of 10 Business Days after the earlier of (i) the date on which such failure shall first become known to any officer of any Borrower or (ii) written notice thereof is given to Administrative Borrower by Agent; or

(d)    fail to perform or observe any covenant or other agreement contained in this Agreement, or in any of the other Loan Documents; in each case, other than any such covenant or agreement that is the subject of another provision of this Section 7 (in which event such other provision of this Section 7 shall govern), and such failure continues for a period of 30 days after the earlier of (i) the date on which such failure shall first become known to any officer of any Borrower or (ii) written notice thereof is given to Administrative Borrower by Agent;

7.3    If any material portion of any Borrower's or any of its Subsidiaries' assets is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any third Person and the same is not discharged before the earlier of 30 days after the date it first arises or 5 days prior to the date on which such property or asset is subject to forfeiture by such Borrower or the applicable Subsidiary;

7.4    If an Insolvency Proceeding is commenced by any Borrower or any Subsidiary of a Borrower;

7.5    If an Insolvency Proceeding is commenced against any Borrower or any Subsidiary of a Borrower, and any of the following events occur:  (a) the applicable Borrower or Subsidiary consents to the institution of such Insolvency Proceeding against it, (b) the petition commencing the Insolvency Proceeding is not timely controverted, (c) the petition commencing the Insolvency Proceeding is not dismissed within 60 calendar days of the date of the filing thereof; (d) an interim trustee is appointed to take possession of all or any substantial portion of the properties or assets of, or to operate all or any substantial portion of the business of, any Borrower or any Subsidiary of a Borrower, or (e) an order for relief shall have been issued or entered therein;

7.6     If any Borrower or any Subsidiary of a Borrower (or, prior to the occurrence of the Operator Licensing Event, E&W) is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs;

7.7     If one or more judgments, orders, or awards involving an aggregate amount of $2,500,000, or more (except to the extent covered by insurance pursuant to which the insurer has accepted liability therefor in writing) shall be entered or filed against any Borrower or any Subsidiary of any Borrower or with respect to any of their respective assets, and the same is not released, discharged, bonded against, or stayed pending appeal before the earlier of 30 days after the date it first arises or 5 days prior to the date on which such asset is subject to being forfeited by the applicable Borrower or the applicable Subsidiary;

7.8     If there is a default in one or more agreements to which any Borrower or any Subsidiary of a Borrower is a party with one or more third Persons relative to Indebtedness of any Borrower or any Subsidiary of any Borrower involving an aggregate amount of $2,500,000 or more, and such default (i) occurs at the final maturity of the obligations thereunder, or (ii) results in a right by such third Person(s), irrespective of whether exercised, to accelerate the maturity of the applicable Borrower's or Subsidiary's obligations thereunder;

7.9     If any warranty, representation, statement, or Record made herein or in any other Loan Document or delivered to Lender in connection with this Agreement or any other Loan Document proves to be untrue in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date of issuance or making or deemed making thereof;

7.10     If the obligation of any Guarantor under the Guaranty is limited or terminated by operation of law or by such Guarantor (other than a termination of the E&W Guaranty pursuant to its terms after the Operator Licensing Event) or any such Guarantor becomes the subject of an Insolvency Proceeding;

7.11     If the Security Agreement or any other Loan Document that purports to create a Lien, shall, for any reason, fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien on or security interest in the Collateral covered hereby or thereby, except as a result of a disposition of the applicable Collateral in a transaction permitted under this Agreement;

7.12     Any provision of any Loan Document shall at any time for any reason be declared to be null and void, or the validity or enforceability thereof shall be contested by any Borrower or any Subsidiary of a Borrower, or a proceeding shall be commenced by any Borrower or any Subsidiary of a Borrower, or by any Governmental Authority having jurisdiction over any Borrower or any Subsidiary of a Borrower, seeking to establish the invalidity or unenforceability thereof, or any Borrower or any Subsidiary of a Borrower shall deny that it has any liability or obligation purported to be created under any Loan Document;

7.13     If there is an "Event of Default" under, and as defined in, the Indenture;

7.14     If there is a Tenant Event of Default (as defined in the Leases) or a Landlord Event of Default (as defined in the Leases), or the termination of either of the Leases (other than in accordance with their terms upon the occurrence of the Operator Licensing Event);

7.15     If Borrowers shall abandon the Renovation;

7.16     If any of the Material Renovation Documents shall have terminated, become invalid or illegal, or otherwise ceased to be in full force and effect (except in accordance with its terms upon completion of the respective work or delivery of the respective materials); provided that with respect to any Material Renovation Document other than the Renovation Contract and the Architect Agreement, no Event of Default shall be deemed to have occurred as a result of such termination so long as (a) Parent provides written notice to Agent (immediately upon, but in no event more than two (2) Business Days

after, Parent's becoming aware of such Renovation Document's ceasing to be in full force or effect) that Parent intends to replace the Contractor under such Renovation Document (or that replacement is not necessary), and (b) in each case if, in the reasonable judgment of Parent, a replacement is necessary, the Parent (i) obtains a replacement Contractor for the affected Contractor and (ii) enters into a replacement Renovation Document in form and substance reasonably satisfactory to Agent (and on terms no less beneficial to Parent than then current market terms), within sixty (60) days of such termination;

7.17    If E&W (for the period prior to the Operator Licensing Event), any Guarantor or any Borrower, or any of their Subsidiaries, as applicable, fails to keep in full force and effect, suffers the termination, revocation, forfeiture, nonrenewal or suspension of, or suffers a material adverse amendment to, any Gaming License, franchise, registration, qualification, finding of suitability or other approval or authorization required to enable E&W, such Guarantor or Borrower, or any such Subsidiary, as applicable, to own, operate, or otherwise conduct or manage the Business;

7.18    If any Governmental Authority terminates, suspends, amends, revokes, repeals or fails to renew any law, license, franchise, registration, qualification, finding of suitability or other approval or authorization required to enable E&W (for the period prior to the Operator Licensing Event), any Guarantor or any Borrower, or any of their Subsidiaries, as applicable, to own, operate, or otherwise conduct or manage the Business;

7.19    If the Re-opening shall not have occurred on or before June 1, 2006; or

7.20    If any Governmental Authority terminates, suspends, amends, revokes, repeals, fails to issue or fails to renew any Gaming License held by any Parent Pledgor or finding of suitability or other approval or authorization required to enable any such Parent Pledgor to own the Stock of Parent, or to own, operate, participate or associate in the business of Borrowers and their Subsidiaries.

## 8.    THE LENDER GROUP'S RIGHTS AND REMEDIES.

8.1    **Rights and Remedies.**  Upon the occurrence, and during the continuation, of an Event of Default, the Required Lenders (at their election but without notice of their election and without demand) may authorize and instruct Agent to do any one or more of the following on behalf of the Lender Group (and Agent, acting upon the instructions of the Required Lenders, shall do the same on behalf of the Lender Group), all of which are authorized by Borrowers:

(a)    Declare all or any portion of the Obligations, whether evidenced by this Agreement, by any of the other Loan Documents, or otherwise, immediately due and payable;

(b)    Cease advancing money or extending credit to or for the benefit of Borrowers under this Agreement, under any of the Loan Documents, or under any other agreement between Borrowers and the Lender Group;

(c)    Terminate this Agreement and any of the other Loan Documents as to any future liability or obligation of the Lender Group, but without affecting any of the Agent's Liens in the Collateral and without affecting the Obligations;

(d)    Borrowers, and each of their Subsidiaries, agree that, upon the occurrence of and during the continuance of an Event of Default and at Agent's request, Borrowers will, and will cause each of their Subsidiaries to immediately file such applications for approval and shall take all other and further actions required by Agent to obtain such approvals or consents of regulatory authorities as are necessary to transfer ownership and control to Agent, of the Gaming Licenses held by it, or its interest in any Person holding any such Gaming License.  To enforce the provisions of this Section 8.1(d), Agent is empowered to request the appointment of a receiver from any court of competent jurisdiction.  Such receiver shall be instructed to seek

from the applicable Nevada Gaming Authority an involuntary transfer of control of any Gaming License for the purpose of seeking a bona fide purchaser to whom control will ultimately be transferred. Borrowers hereby agree to authorize, and to cause each of their Subsidiaries to authorize such an involuntary transfer of control upon the request of the receiver so appointed and, if Borrowers or any such Subsidiary shall refuse to authorize the transfer, its approval may be required by the court. Upon the occurrence and continuance of an Event of Default, Borrowers shall further use, and shall cause their Subsidiaries to use, their reasonable best efforts to assist in obtaining approval of the applicable Nevada Gaming Authority, if required, for any action or transactions contemplated by this Agreement or the Loan Documents, including, preparation, execution, and filing with the applicable Nevada Gaming Authority of the assignor's or transferor's portion of any application or applications for consent to the assignment of any Gaming License or transfer of control necessary or appropriate under the applicable Nevada Gaming Authority's rules and regulations for approval of the transfer or assignment of any portion of the Collateral, together with any Gaming License or other authorization. Borrowers acknowledge that the assignment or transfer of Gaming Licenses is integral to Agent's realization of the value of the Collateral, that there is no adequate remedy at law for failure by Borrowers to comply with the provisions of this Section 8.1(d) and that such failure would not be adequately compensable in damages, and therefore agree that the agreements contained in this Section 8.1(d) may be specifically enforced; and

(e)    The Lender Group shall have all other rights and remedies available at law or in equity or pursuant to any other Loan Document.

The foregoing to the contrary notwithstanding, upon the occurrence of any Event of Default described in Section 7.4 or Section 7.5, in addition to the remedies set forth above, without any notice to Borrowers or any other Person or any act by the Lender Group, the Commitments shall automatically terminate and the Obligations then outstanding, together with all accrued and unpaid interest thereon and all fees and all other amounts due under this Agreement and the other Loan Documents, shall automatically and immediately become due and payable, without presentment, demand, protest, or notice of any kind, all of which are expressly waived by Borrowers.

8.2    **Remedies Cumulative.** The rights and remedies of the Lender Group under this Agreement, the other Loan Documents, and all other agreements shall be cumulative. The Lender Group shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity. No exercise by the Lender Group of one right or remedy shall be deemed an election, and no waiver by the Lender Group of any Event of Default shall be deemed a continuing waiver. No delay by the Lender Group shall constitute a waiver, election, or acquiescence by it.

9.    **TAXES AND EXPENSES.**

If any Borrower fails to pay any monies (whether taxes, assessments, insurance premiums, or, in the case of leased properties or assets, rents or other amounts payable under such leases) due to third Persons, or fails to make any deposits or furnish any required proof of payment or deposit, all as required under the terms of this Agreement, then, Agent, in its sole discretion and without prior notice to any Borrower, may do any or all of the following: (a) make payment of the same or any part thereof, (b) set up such reserves against the Borrowing Base or the Maximum Revolver Amount as Agent deems necessary to protect the Lender Group from the exposure created by such failure, or (c) in the case of the failure to comply with Section 5.8 hereof, obtain and maintain insurance policies of the type described in Section 5.8 and take any action with respect to such policies as Agent deems prudent. Any such amounts paid by Agent shall constitute Lender Group Expenses and any such payments shall not constitute an agreement by the Lender Group to make similar payments in the future or a waiver by the Lender Group of any Event of Default under this Agreement. Agent need not inquire as to, or contest the validity of, any such expense, tax, or Lien and the receipt of the usual official notice for the payment thereof shall be conclusive evidence that the same was validly due and owing.