10.    **WAIVERS; INDEMNIFICATION.**

10.1    **Demand; Protest; etc.** Each Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by the Lender Group on which any such Borrower may in any way be liable.

10.2    **The Lender Group's Liability for Collateral.** Each Borrower hereby agrees that: (a) so long as Agent complies with its obligations, if any, under the Code, the Lender Group shall not in any way or manner be liable or responsible for: (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by Borrowers.

10.3    **Indemnification.** Each Borrower shall pay, indemnify, defend, and hold the Agent-Related Persons, the Lender-Related Persons, and each Participant (each, an "<u>Indemnified Person</u>") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, and damages, and all reasonable attorneys fees and disbursements and other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution, delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of Borrowers' and their Subsidiaries' compliance with the terms of the Loan Documents, and (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto (each and all of the foregoing, the "<u>Indemnified Liabilities</u>"). The foregoing to the contrary notwithstanding, Borrowers shall have no obligation to any Indemnified Person under this <u>Section 10.3</u> with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence or willful misconduct of such Indemnified Person. This provision shall survive the termination of this Agreement and the repayment of the Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which Borrowers were required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by Borrowers with respect thereto. **WITHOUT LIMITATION, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON.**

11.    **NOTICES.**

Unless otherwise provided in this Agreement, all notices or demands by Borrowers or Agent to the other relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as Administrative Borrower or Agent, as applicable, may designate to each other in accordance herewith), or telefacsimile to Borrowers in care of Administrative Borrower or to Agent, as the case may be, at its address set forth below:

| | |
|---|---|
| If to Administrative Borrower: | **155 EAST TROPICANA, LLC**<br>115 East Tropicana Avenue<br>Las Vegas, Nevada 89109<br>Attn: Michael Hessling<br>Fax No.: (702) 739-7783 |
| with copies to: | Kummer Kaempfer Bonner & Renshaw<br>3800 Howard Hughes Parkway<br>Seventh Floor<br>Las Vegas, Nevada 89109<br>Attn: Michael Bonner, Esq.<br>Fax No.: 702-796-7181 |
| If to Agent: | **WELLS FARGO FOOTHILL, INC.**<br>2450 Colorado Avenue<br>Suite 3000 West<br>Santa Monica, California 90404<br>Attn: Specialty Finance Manager<br>Fax No.: 310-453-7442 |
| with copies to: | Paul, Hastings, Janofsky & Walker LLP<br>515 S. Flower Street<br>Twenty-fifth Floor<br>Los Angeles, California 90071<br>Attn: John Francis Hilson, Esq.<br>Fax No.: 213-627-0705 |

Agent and Borrowers may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party. All notices or demands sent in accordance with this Section 11, other than notices by Agent in connection with enforcement rights against the Collateral under the provisions of the Code, shall be deemed received on the earlier of the date of actual receipt or 3 Business Days after the deposit thereof in the mail. Each Borrower acknowledges and agrees that notices sent by the Lender Group in connection with the exercise of enforcement rights against Collateral under the provisions of the Code shall be deemed sent when deposited in the mail or personally delivered, or, where permitted by law, transmitted by telefacsimile or any other method set forth above.

12.    **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.**

(a)    THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(b)    THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK, <u>PROVIDED, HOWEVER</u>, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT AGENT'S

OPTION, IN THE COURTS OF ANY JURISDICTION WHERE AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. BORROWERS AND EACH MEMBER OF THE LENDER GROUP WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 12(b).

(c)      BORROWERS AND EACH MEMBER OF THE LENDER GROUP HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. BORROWERS AND EACH MEMBER OF THE LENDER GROUP REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

13.      ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS.

13.1      Assignments and Participations.

(a)      Any Lender may assign and delegate to one or more assignees (each an "Assignee") that are Eligible Transferees all, or any ratable portion of all, of the Obligations, the Commitments and the other rights and obligations of such Lender hereunder and under the other Loan Documents, in a minimum amount (unless waived by the Agent) of $5,000,000; provided, however, that Borrowers and Agent may continue to deal solely and directly with such Lender in connection with the interest so assigned to an Assignee until (i) written notice of such assignment, together with payment instructions, addresses, and related information with respect to the Assignee, have been given to Administrative Borrower and Agent by such Lender and the Assignee, (ii) such Lender and its Assignee have delivered to Administrative Borrower and Agent an Assignment and Acceptance and Agent has notified the assigning Lender of its receipt thereof in accordance with Section 13.1(b), and (iii) unless waived by the Agent, the assigning Lender or Assignee has paid to Agent for Agent's separate account a processing fee in the amount of $3,500. Anything contained herein to the contrary notwithstanding, the payment of any fees shall not be required and the Assignee need not be an Eligible Transferee if such assignment is in connection with any merger, consolidation, sale, transfer, or other disposition of all or any substantial portion of the business or loan portfolio of the assigning Lender.

(b)      From and after the date that Agent notifies the assigning Lender (with a copy to Administrative Borrower) that it has received an executed Assignment and Acceptance and, if applicable, payment of the required processing fee, (i) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, shall have the rights and obligations of a Lender under the Loan Documents, and (ii) the assigning Lender shall, to the extent that rights and obligations hereunder and under the other Loan Documents have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (except with respect to Section 10.3 hereof) and be released from any future obligations under this Agreement (and in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement and the other Loan Documents, such Lender shall cease to be a party hereto and thereto), and such assignment shall effect a novation among Borrowers, the assigning Lender, and the Assignee; provided, however, that nothing contained herein shall release any assigning Lender from obligations that survive the termination of this Agreement, including such assigning Lender's obligations under Article 15 and Section 16.7 of this Agreement.

(c)    By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the Assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (1) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto, (2) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrowers or the performance or observance by Borrowers of any of their obligations under this Agreement or any other Loan Document furnished pursuant hereto, (3) such Assignee confirms that it has received a copy of this Agreement, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance, (4) such Assignee will, independently and without reliance upon Agent, such assigning Lender or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement, (5) such Assignee appoints and authorizes Agent to take such actions and to exercise such powers under this Agreement as are delegated to Agent, by the terms hereof, together with such powers as are reasonably incidental thereto, and (6) such Assignee agrees that it will perform all of the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)    Immediately upon Agent's receipt of the required processing fee, if applicable, and delivery of notice to the assigning Lender pursuant to Section 13.1(b), this Agreement shall be deemed to be amended to the extent, but only to the extent, necessary to reflect the addition of the Assignee and the resulting adjustment of the Commitments arising therefrom. The Commitment allocated to each Assignee shall reduce such Commitments of the assigning Lender *pro tanto*.

(e)    Any Lender may at any time sell to one or more commercial banks, financial institutions, or other Persons (a "Participant") participating interests in its Obligations, the Commitment, and the other rights and interests of that Lender (the "Originating Lender") hereunder and under the other Loan Documents; provided, however, that (i) the Originating Lender shall remain a "Lender" for all purposes of this Agreement and the other Loan Documents and the Participant receiving the participating interest in the Obligations, the Commitments, and the other rights and interests of the Originating Lender hereunder shall not constitute a "Lender" hereunder or under the other Loan Documents and the Originating Lender's obligations under this Agreement shall remain unchanged, (ii) the Originating Lender shall remain solely responsible for the performance of such obligations, (iii) Borrowers, Agent, and the Lenders shall continue to deal solely and directly with the Originating Lender in connection with the Originating Lender's rights and obligations under this Agreement and the other Loan Documents, (iv) no Lender shall transfer or grant any participating interest under which the Participant has the right to approve any amendment to, or any consent or waiver with respect to, this Agreement or any other Loan Document, except to the extent such amendment to, or consent or waiver with respect to this Agreement or of any other Loan Document would (A) extend the final maturity date of the Obligations hereunder in which such Participant is participating, (B) reduce the interest rate applicable to the Obligations hereunder in which such Participant is participating, (C) release all or substantially all of the Collateral or guaranties (except to the extent expressly provided herein or in any of the Loan Documents) supporting the Obligations hereunder in which such Participant is participating, (D) postpone the payment of, or reduce the amount of, the interest or fees payable to such Participant through such Lender, or (E) change the amount or due dates of scheduled principal repayments or prepayments or premiums, and (v) all amounts payable by Borrowers hereunder shall be determined as if such Lender had not sold such participation, except that, if amounts outstanding under this Agreement are due and unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall be deemed to have the right of set off in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement. The rights of any Participant only shall be derivative through the Originating Lender with whom such Participant participates and no Participant shall have any rights under this Agreement or the other Loan Documents or any direct rights as to the other Lenders, Agent, Borrowers, the Collections of Borrowers or

their Subsidiaries, the Collateral, or otherwise in respect of the Obligations. No Participant shall have the right to participate directly in the making of decisions by the Lenders among themselves.

(f)    In connection with any such assignment or participation or proposed assignment or participation, a Lender may, subject to the provisions of <u>Section 16.7,</u> disclose all documents and information which it now or hereafter may have relating to Borrowers and their Subsidiaries and their respective businesses.

(g)    Any other provision in this Agreement notwithstanding, any Lender may at any time create a security interest in, or pledge, all or any portion of its rights under and interest in this Agreement in favor of any Federal Reserve Bank in accordance with Regulation A of the Federal Reserve Bank or U.S. Treasury Regulation 31 CFR § 203.24, and such Federal Reserve Bank may enforce such pledge or security interest in any manner permitted under applicable law.

13.2    <u>Successors.</u>  This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; <u>provided, however,</u> that Borrowers may not assign this Agreement or any rights or duties hereunder without the Lenders' prior written consent and any prohibited assignment shall be absolutely void <em>ab initio.</em>  No consent to assignment by the Lenders shall release any Borrower from its Obligations.  A Lender may assign this Agreement and the other Loan Documents and its rights and duties hereunder and thereunder pursuant to <u>Section 13.1</u> hereof and, except as expressly required pursuant to <u>Section 13.1</u> hereof, no consent or approval by any Borrower is required in connection with any such assignment.

14.    **AMENDMENTS; WAIVERS.**

14.1    <u>Amendments and Waivers.</u>  No amendment or waiver of any provision of this Agreement or any other Loan Document (other than Bank Product Agreements), and no consent with respect to any departure by Borrowers therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders (or by Agent at the written request of the Required Lenders) and Administrative Borrower (on behalf of all Borrowers) and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given; <u>provided, however,</u> that no such waiver, amendment, or consent shall, unless in writing and signed by all of the Lenders affected thereby and Administrative Borrower (on behalf of all Borrowers), do any of the following:

(a)    increase or extend any Commitment of any Lender,

(b)    postpone or delay any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, fees, or other amounts due hereunder or under any other Loan Document,

(c)    reduce the principal of, or the rate of interest on, any loan or other extension of credit hereunder, or reduce any fees or other amounts payable hereunder or under any other Loan Document,

(d)    change the Pro Rata Share that is required to take any action hereunder,

(e)    amend or modify this Section or any provision of this Agreement providing for consent or other action by all Lenders,

(f)    other than as permitted by <u>Section 15.12,</u> release Agent's Lien in and to any of the Collateral,

(g)    change the definition of "Required Lenders" or "Pro Rata Share,"

(h)    contractually subordinate any of the Agent's Liens,

(i)    release any Borrower or any Guarantor from any obligation for the payment of money,

(j)    change the definition of Borrowing Base or the definition of Maximum Revolver Amount, or change Section 2.1(b), or

(k)    amend any of the provisions of Section 15.

and, provided further, however, that no amendment, waiver or consent shall, unless in writing and signed by Agent, Issuing Lender, or Swing Lender, as applicable, affect the rights or duties of Agent, Issuing Lender, or Swing Lender, as applicable, under this Agreement or any other Loan Document. The foregoing notwithstanding, any amendment, modification, waiver, consent, termination, or release of, or with respect to, any provision of this Agreement or any other Loan Document that relates only to the relationship of the Lender Group among themselves, and that does not affect the rights or obligations of Borrowers, shall not require consent by or the agreement of Borrowers.

### 14.2    Replacement of Holdout Lender.

(a)    If any action to be taken by the Lender Group or Agent hereunder requires the unanimous consent, authorization, or agreement of all Lenders, and a Lender ("Holdout Lender") fails to give its consent, authorization, or agreement, then Agent, upon at least 5 Business Days prior irrevocable notice to the Holdout Lender, may permanently replace the Holdout Lender with one or more substitute Lenders (each, a "Replacement Lender"), and the Holdout Lender shall have no right to refuse to be replaced hereunder. Such notice to replace the Holdout Lender shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given.

(b)    Prior to the effective date of such replacement, the Holdout Lender and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Holdout Lender being repaid its share of the outstanding Obligations (including an assumption of its Pro Rata Share of the Risk Participation Liability) without any premium or penalty of any kind whatsoever. If the Holdout Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Holdout Lender shall be deemed to have executed and delivered such Assignment and Acceptance. The replacement of any Holdout Lender shall be made in accordance with the terms of Section 13.1. Until such time as the Replacement Lenders shall have acquired all of the Obligations, the Commitments, and the other rights and obligations of the Holdout Lender hereunder and under the other Loan Documents, the Holdout Lender shall remain obligated to make the Holdout Lender's Pro Rata Share of Advances and to purchase a participation in each Letter of Credit, in an amount equal to its Pro Rata Share of the Risk Participation Liability of such Letter of Credit.

### 14.3    No Waivers; Cumulative Remedies.    No failure by Agent or any Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by Agent or any Lender in exercising the same, will operate as a waiver thereof. No waiver by Agent or any Lender will be effective unless it is in writing, and then only to the extent specifically stated. No waiver by Agent or any Lender on any occasion shall affect or diminish Agent's and each Lender's rights thereafter to require strict performance by Borrowers of any provision of this Agreement. Agent's and each Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Agent or any Lender may have.

## 15.    AGENT; THE LENDER GROUP.

### 15.1    Appointment and Authorization of Agent.    Each Lender hereby designates and appoints WFF as its representative under this Agreement and the other Loan Documents and each Lender hereby irrevocably authorizes Agent to execute and deliver each of the other Loan Documents on its behalf and to take

such other action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to Agent by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto. Agent agrees to act as such on the express conditions contained in this Section 15. The provisions of this Section 15 (other than the proviso to Section 15.11(a)) are solely for the benefit of Agent, and the Lenders, and Borrowers and their Subsidiaries shall have no rights as a third party beneficiary of any of the provisions contained herein. Any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document notwithstanding, Agent shall not have any duties or responsibilities, except those expressly set forth herein, nor shall Agent have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against Agent; it being expressly understood and agreed that the use of the word "Agent" is for convenience only, that WFF is merely the representative of the Lenders, and only has the contractual duties set forth herein. Except as expressly otherwise provided in this Agreement, Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions that Agent expressly is entitled to take or assert under or pursuant to this Agreement and the other Loan Documents. Without limiting the generality of the foregoing, or of any other provision of the Loan Documents that provides rights or powers to Agent, Lenders agree that Agent shall have the right to exercise the following powers as long as this Agreement remains in effect: (a) maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Collateral, the Collections of Borrowers and their Subsidiaries, and related matters, (b) execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to the Loan Documents, (c) make Advances, for itself or on behalf of Lenders as provided in the Loan Documents, (d) exclusively receive, apply, and distribute the Collections of Borrowers and their Subsidiaries as provided in the Loan Documents, (e) open and maintain such bank accounts and cash management arrangements as Agent deems necessary and appropriate in accordance with the Loan Documents for the foregoing purposes with respect to the Collateral and the Collections of Borrowers and their Subsidiaries, (f) perform, exercise, and enforce any and all other rights and remedies of the Lender Group with respect to Borrowers, the Obligations, the Collateral, the Collections of Borrowers and their Subsidiaries, or otherwise related to any of same as provided in the Loan Documents, and (g) incur and pay such Lender Group Expenses as Agent may deem necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to the Loan Documents.

     15.2  **Delegation of Duties.** Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. Agent shall not be responsible for the negligence or misconduct of any agent or attorney in fact that it selects as long as such selection was made without gross negligence or willful misconduct.

     15.3  **Liability of Agent.** None of the Agent Related Persons shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Lenders for any recital, statement, representation or warranty made by any Borrower or any Subsidiary or Affiliate of any Borrower, or any officer or director thereof, contained in this Agreement or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or for any failure of any Borrower or any other party to any Loan Document to perform its obligations hereunder or thereunder. No Agent Related Person shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the books and records or properties of Borrowers or the books or records or properties of any of Borrowers' Subsidiaries or Affiliates.

15.4  **Reliance by Agent.** Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, telefacsimile or other electronic method of transmission, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to Borrowers or counsel to any Lender), independent accountants and other experts selected by Agent. Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless Agent shall first receive such advice or concurrence of the Lenders as it deems appropriate and until such instructions are received, Agent shall act, or refrain from acting, as it deems advisable. If Agent so requests, it shall first be indemnified to its reasonable satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the requisite Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders.

15.5  **Notice of Default or Event of Default.** Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to defaults in the payment of principal, interest, fees, and expenses required to be paid to Agent for the account of the Lenders and, except with respect to Events of Default of which Agent has actual knowledge, unless Agent shall have received written notice from a Lender or Administrative Borrower referring to this Agreement, describing such Default or Event of Default, and stating that such notice is a "notice of default." Agent promptly will notify the Lenders of its receipt of any such notice or of any Event of Default of which Agent has actual knowledge. If any Lender obtains actual knowledge of any Event of Default, such Lender promptly shall notify the other Lenders and Agent of such Event of Default. Each Lender shall be solely responsible for giving any notices to its Participants, if any. Subject to Section 15.4, Agent shall take such action with respect to such Default or Event of Default as may be requested by the Required Lenders in accordance with Section 8; provided, however, that unless and until Agent has received any such request, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable.

15.6  **Credit Decision.** Each Lender acknowledges that none of the Agent Related Persons has made any representation or warranty to it, and that no act by Agent hereinafter taken, including any review of the affairs of Borrowers and their Subsidiaries or Affiliates, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender. Each Lender represents to Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of Borrowers and any other Person party to a Loan Document, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to Borrowers. Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of Borrowers and any other Person party to a Loan Document. Except for notices, reports, and other documents expressly herein required to be furnished to the Lenders by Agent, Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of Borrowers and any other Person party to a Loan Document that may come into the possession of any of the Agent Related Persons.

15.7  **Costs and Expenses; Indemnification.** Agent may incur and pay Lender Group Expenses to the extent Agent reasonably deems necessary or appropriate for the performance and fulfillment of its functions, powers, and obligations pursuant to the Loan Documents, including court costs, attorneys fees and

expenses, fees and expenses of financial accountants, advisors, consultants, and appraisers, costs of collection by outside collection agencies, auctioneer fees and expenses, and costs of security guards or insurance premiums paid to maintain the Collateral, whether or not Borrowers are obligated to reimburse Agent or Lenders for such expenses pursuant to this Agreement or otherwise.  Agent is authorized and directed to deduct and retain sufficient amounts from the Collections of Borrowers and their Subsidiaries received by Agent to reimburse Agent for such out-of-pocket costs and expenses prior to the distribution of any amounts to Lenders.  In the event Agent is not reimbursed for such costs and expenses by Borrowers or their Subsidiaries, each Lender hereby agrees that it is and shall be obligated to pay to Agent such Lender's Pro Rata Share thereof.  Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand the Agent Related Persons (to the extent not reimbursed by or on behalf of Borrowers and without limiting the obligation of Borrowers to do so), according to their Pro Rata Shares, from and against any and all Indemnified Liabilities; provided, however, that no Lender shall be liable for the payment to any Agent Related Person of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct nor shall any Lender be liable for the obligations of any Defaulting Lender in failing to make an Advance or other extension of credit hereunder.  Without limitation of the foregoing, each Lender shall reimburse Agent upon demand for such Lender's Pro Rata Share of any costs or out of pocket expenses (including attorneys, accountants, advisors, and consultants fees and expenses) incurred by Agent in connection with the preparation, execution, delivery, administration, modification, amendment, or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that Agent is not reimbursed for such expenses by or on behalf of Borrowers. The undertaking in this Section shall survive the payment of all Obligations hereunder and the resignation or replacement of Agent.

15.8    **Agent in Individual Capacity**.  WFF and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in, and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with Borrowers and their Subsidiaries and Affiliates and any other Person party to any Loan Documents as though WFF were not Agent hereunder, and, in each case, without notice to or consent of the other members of the Lender Group.  The other members of the Lender Group acknowledge that, pursuant to such activities, WFF or its Affiliates may receive information regarding Borrowers or their Affiliates and any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of Borrowers or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver Agent will use its reasonable best efforts to obtain), Agent shall not be under any obligation to provide such information to them.  The terms "Lender" and "Lenders" include WFF in its individual capacity.

15.9    **Successor Agent**.  Agent may resign as Agent upon 45 days notice to the Lenders.  If Agent resigns under this Agreement, the Required Lenders shall appoint a successor Agent for the Lenders.  If no successor Agent is appointed prior to the effective date of the resignation of Agent, Agent may appoint, after consulting with the Lenders, a successor Agent.  If Agent has materially breached or failed to perform any material provision of this Agreement or of applicable law, the Required Lenders may agree in writing to remove and replace Agent with a successor Agent from among the Lenders.  In any such event, upon the acceptance of its appointment as successor Agent hereunder, such successor Agent shall succeed to all the rights, powers, and duties of the retiring Agent and the term "Agent" shall mean such successor Agent and the retiring Agent's appointment, powers, and duties as Agent shall be terminated.  After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 15 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.  If no successor Agent has accepted appointment as Agent by the date which is 45 days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of Agent hereunder until such time, if any, as the Lenders appoint a successor Agent as provided for above.

15.10 **Lender in Individual Capacity.** Any Lender and its respective Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with Borrowers and their Subsidiaries and Affiliates and any other Person party to any Loan Documents as though such Lender were not a Lender hereunder without notice to or consent of the other members of the Lender Group. The other members of the Lender Group acknowledge that, pursuant to such activities, such Lender and its respective Affiliates may receive information regarding Borrowers or their Affiliates and any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of Borrowers or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver such Lender will use its reasonable best efforts to obtain), such Lender shall not be under any obligation to provide such information to them. With respect to the Swing Loans and Protective Advances, Swing Lender shall have the same rights and powers under this Agreement as any other Lender and may exercise the same as though it were not the sub-agent of Agent.

15.11 **Withholding Taxes.**

(a)    All payments made by any Borrower hereunder or under any note or other Loan Document will be made without setoff, counterclaim, or other defense. In addition, all such payments will be made free and clear of, and without deduction or withholding for, any present or future Taxes, and in the event any deduction or withholding of Taxes is required, each Borrower shall comply with the penultimate sentence of this Section 15.11(a). "Taxes" shall mean, any taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to such payments (but excluding any tax imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein measured by or based on the net income or net profits of each applicable Lender) and all interest, penalties or similar liabilities with respect thereto. If any Taxes are so levied or imposed, each Borrower agrees to pay the full amount of such Taxes and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement, any note, or Loan Document, including any amount paid pursuant to this Section 15.11(a) after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein; provided, however, that Borrowers shall not be required to increase any such amounts if the increase in such amount payable results from Agent's or such Lender's own willful misconduct or gross negligence (as finally determined by a court of competent jurisdiction). Each Borrower will furnish to Lender as promptly as possible after the date the payment of any Tax is due pursuant to applicable law certified copies of tax receipts evidencing such payment by any Borrower.

(b)    If a Lender claims an exemption from United States withholding tax, Lender agrees with and in favor of Agent and any Borrower, to deliver to Agent:

(i)    if such Lender claims an exemption from United States withholding tax pursuant to its portfolio interest exception, (A) a statement of the Lender, signed under penalty of perjury, that it is not a (I) a "bank" as described in Section 881(c)(3)(A) of the IRC, (II) a 10% shareholder of any Borrower (within the meaning of Section 871(h)(3)(B) of the IRC), or (III) a controlled foreign corporation related to any Borrower within the meaning of Section 864(d)(4) of the IRC, and (B) a properly completed and executed IRS Form W-8BEN, before receiving its first payment under this Agreement and at any other time reasonably requested by Agent or any Borrower;

(ii)    if such Lender claims an exemption from, or a reduction of, withholding tax under a United States tax treaty, properly completed and executed IRS Form W-8BEN before receiving its first payment under this Agreement and at any other time reasonably requested by Agent or any Borrower;

(iii)    if such Lender claims that interest paid under this Agreement is exempt from United States withholding tax because it is effectively connected with a United States trade or business of such

Lender, two properly completed and executed copies of IRS Form W-8ECI before receiving its first payment under this Agreement and at any other time reasonably requested by Agent or any Borrower; or

(iv)       such other form or forms, including IRS Form W-9, as may be required under the IRC or other laws of the United States as a condition to exemption from, or reduction of, United States withholding or backup withholding tax before receiving its first payment under this Agreement and at any other time reasonably requested by Agent or any Borrower.

Lender agrees promptly to notify Agent and Administrative Borrower of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(c)       If a Lender claims an exemption from withholding tax in a jurisdiction other than the United States, Lender agrees with and in favor of Agent and Borrowers, to deliver to Agent any such form or forms, as may be required under the laws of such jurisdiction as a condition to exemption from, or reduction of, foreign withholding or backup withholding tax before receiving its first payment under this Agreement and at any other time reasonably requested by Agent or Administrative Borrower.

Lender agrees promptly to notify Agent and Administrative Borrower of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(d)       If any Lender claims exemption from, or reduction of, withholding tax and such Lender sells, assigns, grants a participation in, or otherwise transfers all or part of the Obligations of Borrowers to such Lender, such Lender agrees to notify Agent and Administrative Borrower of the percentage amount in which it is no longer the beneficial owner of Obligations of Borrowers to such Lender.  To the extent of such percentage amount, Agent and Borrowers will treat such Lender's documentation provided pursuant to Sections 15.11(b) or 15.11(c) as no longer valid.  With respect to such percentage amount, Lender may provide new documentation, pursuant to Sections 15.11(b) or 15.11(c), if applicable.

(e)       If any Lender is entitled to a reduction in the applicable withholding tax, Agent may withhold from any interest payment to such Lender an amount equivalent to the applicable withholding tax after taking into account such reduction.  If the forms or other documentation required by subsection (b) or (c) of this Section 15.11 are not delivered to Agent, then Agent may withhold from any interest payment to such Lender not providing such forms or other documentation an amount equivalent to the applicable withholding tax.

(f)       If the IRS or any other Governmental Authority of the United States or other jurisdiction asserts a claim that Agent did not properly withhold tax from amounts paid to or for the account of any Lender due to a failure on the part of the Lender (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify Agent of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason) such Lender shall indemnify and hold Agent harmless for all amounts paid, directly or indirectly, by Agent, as tax or otherwise, including penalties and interest, and including any taxes imposed by any jurisdiction on the amounts payable to Agent under this Section 15.11, together with all costs and expenses (including attorneys fees and expenses).  The obligation of the Lenders under this subsection shall survive the payment of all Obligations and the resignation or replacement of Agent.

(g)       In the event that as a result of an assignment by a Lender (and determined based on applicable laws as in effect on the date of such assignment without taking into account any subsequent changes thereto) of all or any portion of its Obligations and Commitments to a Person organized outside the United States (an  "Increased Costs Foreign Lender"), Borrowers are required to make payments pursuant to this Section 15.11 in an amount in excess of the amounts such assigning Lender would be entitled to receive, then Administrative Borrower may, at its option, exercisable until thirty (30) days after the first date on which Borrowers are required to pay any such excess amount, notify Agent and such

Increased Costs Foreign Lender of its intention to replace such Increased Costs Foreign Lender. So long as no Default or Event of Default has occurred and is continuing, Borrower Representative, with the consent of Agent, may obtain, at Borrowers' expense, a replacement Lender ("Increased Costs Replacement Lender") for the Increased Costs Foreign Lender, which Increased Costs Replacement Lender must be reasonably satisfactory to Agent. If Borrowers obtain an Increased Costs Replacement Lender within sixty (60) days following notice of their intention to do so, the Increased Costs Foreign Lender must promptly sell and assign its Obligations and Commitments to such Increased Costs Replacement Lender, subject only to the Increased Costs Foreign Lender being repaid its share of the outstanding Obligations (including an assumption of its Pro Rata Share of the Risk Participation Liability) without any premium or penalty of any kind whatsoever; provided, that Borrowers shall have reimbursed such Increased Costs Foreign Lender for the additional amounts or increased costs that it is entitled to receive under this Agreement through the date of such sale and assignment. Notwithstanding the foregoing, Borrowers shall not have the right to obtain an Increased Costs Replacement Lender if the Increased Costs Foreign Lender rescinds its demand for additional amounts (in excess of the amounts that would have been payable to the assigning Lender having assigned the applicable Obligations to such Increased Costs Lender) within 15 days following its receipt of Borrowers' notice of intention to replace such Increased Costs Foreign Lender. Furthermore, if Borrowers give a notice of intention to replace and do not so replace such Increased Costs Foreign Lender within sixty (60) days thereafter, Borrowers' replacement rights under this Section 15.11(g) shall terminate with respect to such Increased Costs Foreign Lender and Borrowers shall promptly pay all increased costs or additional amounts demanded by such Increased Costs Foreign Lender pursuant to this Section 15.11.

### 15.12   Collateral Matters.

(a)    The Lenders hereby irrevocably authorize Agent, at its option and in its sole discretion, to release any Lien on any Collateral (i) upon the termination of the Commitments and payment and satisfaction in full by Borrowers of all Obligations, (ii) constituting property being sold or disposed of if a release is required or desirable in connection therewith and if Administrative Borrower certifies to Agent that the sale or disposition is permitted under Section 6.4 of this Agreement or the other Loan Documents (and Agent may rely conclusively on any such certificate, without further inquiry), (iii) constituting property in which no Borrower or its Subsidiaries owned any interest at the time the Agent's Lien was granted nor at any time thereafter, or (iv) constituting property leased to a Borrower or its Subsidiaries under a lease that has expired or is terminated in a transaction permitted under this Agreement. Except as provided above, Agent will not execute and deliver a release of any Lien on any Collateral without the prior written authorization of (y) if the release is of all or substantially all of the Collateral, all of the Lenders, or (z) otherwise, the Required Lenders. Upon request by Agent or Administrative Borrower at any time, the Lenders will confirm in writing Agent's authority to release any such Liens on particular types or items of Collateral pursuant to this Section 15.12; provided, however, that (1) Agent shall not be required to execute any document necessary to evidence such release on terms that, in Agent's opinion, would expose Agent to liability or create any obligation or entail any consequence other than the release of such Lien without recourse, representation, or warranty, and (2) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of Borrowers in respect of) all interests retained by Borrowers, including, the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

(b)    Agent shall have no obligation whatsoever to any of the Lenders to assure that the Collateral exists or is owned by Borrowers or is cared for, protected, or insured or has been encumbered, or that the Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to Agent pursuant to any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, subject to the terms and conditions contained

herein, Agent may act in any manner it may deem appropriate, in its sole discretion given Agent's own interest in the Collateral in its capacity as one of the Lenders and that Agent shall have no other duty or liability whatsoever to any Lender as to any of the foregoing, except as otherwise provided herein.

15.13    **Restrictions on Actions by Lenders; Sharing of Payments.**

(a)    Each of the Lenders agrees that it shall not, without the express written consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the written request of Agent, set off against the Obligations, any amounts owing by such Lender to Borrowers or any deposit accounts of Borrowers now or hereafter maintained with such Lender. Each of the Lenders further agrees that it shall not, unless specifically requested to do so in writing by Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings, to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

(b)    If, at any time or times any Lender shall receive (i) by payment, foreclosure, setoff, or otherwise, any proceeds of Collateral or any payments with respect to the Obligations, except for any such proceeds or payments received by such Lender from Agent pursuant to the terms of this Agreement, or (ii) payments from Agent in excess of such Lender's ratable portion of all such distributions by Agent, such Lender promptly shall (1) turn the same over to Agent, in kind, and with such endorsements as may be required to negotiate the same to Agent, or in immediately available funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (2) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Lenders so that such excess payment received shall be applied ratably as among the Lenders in accordance with their Pro Rata Shares; provided, however, that to the extent that such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

15.14    **Agency for Perfection.** Agent hereby appoints each other Lender as its agent (and each Lender hereby accepts such appointment) for the purpose of perfecting the Agent's Liens in assets which, in accordance with Article 8 or Article 9, as applicable, of the Code can be perfected only by possession or control. Should any Lender obtain possession or control of any such Collateral, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor shall deliver possession or control of such Collateral to Agent or in accordance with Agent's instructions.

15.15    **Payments by Agent to the Lenders.** All payments to be made by Agent to the Lenders shall be made by bank wire transfer of immediately available funds pursuant to such wire transfer instructions as each party may designate for itself by written notice to Agent. Concurrently with each such payment, Agent shall identify whether such payment (or any portion thereof) represents principal, premium, fees, or interest of the Obligations.

15.16    **Concerning the Collateral and Related Loan Documents.** Each member of the Lender Group authorizes and directs Agent to enter into this Agreement and the other Loan Documents. Each member of the Lender Group agrees that any action taken by Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

15.17    **Field Audits and Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information.** By becoming a party to this Agreement, each Lender:

(a)    is deemed to have requested that Agent furnish such Lender, promptly after it becomes available, a copy of each field audit or examination report (each a "Report" and collectively, "Reports") prepared by or at the request of Agent, and Agent shall so furnish each Lender with such Reports,

(b)    expressly agrees and acknowledges that Agent does not (i) make any representation or warranty as to the accuracy of any Report, and (ii) shall not be liable for any information contained in any Report,

(c)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that Agent or other party performing any audit or examination will inspect only specific information regarding Borrowers and will rely significantly upon the books and records of Borrowers and their Subsidiaries, as well as on representations of Borrowers' personnel,

(d)    agrees to keep all Reports and other material, non-public information regarding Borrowers and their Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with Section 16.7, and

(e)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of Borrowers; and (ii) to pay and protect, and indemnify, defend and hold Agent, and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including, attorneys fees and costs) incurred by Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

In addition to the foregoing: (x) any Lender may from time to time request of Agent in writing that Agent provide to such Lender a copy of any report or document provided by Borrowers to Agent that has not been contemporaneously provided by Borrowers to such Lender, and, upon receipt of such request, Agent promptly shall provide a copy of same to such Lender, (y) to the extent that Agent is entitled, under any provision of the Loan Documents, to request additional reports or information from Borrowers, any Lender may, from time to time, reasonably request Agent to exercise such right as specified in such Lender's notice to Agent, whereupon Agent promptly shall request of Administrative Borrower the additional reports or information reasonably specified by such Lender, and, upon receipt thereof from Administrative Borrower, Agent promptly shall provide a copy of same to such Lender, and (z) any time that Agent renders to Administrative Borrower a statement regarding the Loan Account, Agent shall send a copy of such statement to each Lender.

15.18    **Several Obligations; No Liability.**  Notwithstanding that certain of the Loan Documents now or hereafter may have been or will be executed only by or in favor of Agent in its capacity as such, and not by or in favor of the Lenders, any and all obligations on the part of Agent (if any) to make any credit available hereunder shall constitute the several (and not joint) obligations of the respective Lenders on a ratable basis, according to their respective Commitments, to make an amount of such credit not to exceed, in principal amount, at any one time outstanding, the amount of their respective Commitments.  Nothing contained herein shall confer upon any Lender any interest in, or subject any Lender to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of any other Lender.  Each Lender shall be solely responsible for notifying its Participants of any matters relating to the Loan Documents to the extent any such notice may be required, and no Lender shall have any obligation, duty, or liability to any Participant of any other Lender.  Except as provided in Section 16.7, no member of the Lender Group shall have any liability for the acts of any other member of the Lender Group.  No Lender shall be responsible to any Borrower or any other Person for any failure by any other Lender to fulfill its obligations to make credit available hereunder,

nor to advance for it or on its behalf in connection with its Commitment, nor to take any other action on its behalf hereunder or in connection with the financing contemplated herein.

15.19    **Bank Product Providers.**  Each Bank Product Provider shall be deemed a party hereto for purposes of any reference in a Loan Document to the parties for whom Agent is acting; it being understood and agreed that the rights and benefits of such Bank Product Provider under the Loan Documents consist exclusively of such Bank Product Provider's right to share in payments and collections out of the Collateral as more fully set forth herein.  In connection with any such distribution of payments and collections, Agent shall be entitled to assume no amounts are due to any Bank Product Provider unless such Bank Product Provider has notified Agent in writing of the amount of any such liability owed to it prior to such distribution.

16.    **GENERAL PROVISIONS.**

16.1    **Effectiveness.**  This Agreement shall be binding and deemed effective when executed by Borrowers, Agent, and each Lender whose signature is provided for on the signature pages hereof.

16.2    **Section Headings.**  Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

16.3    **Interpretation.**  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against the Lender Group or Borrowers, whether under any rule of construction or otherwise.  On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

16.4    **Severability of Provisions.**  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

16.5    **Counterparts; Electronic Execution.**  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*.

16.6    **Revival and Reinstatement of Obligations.**  If the incurrence or payment of the Obligations by any Borrower or Guarantor or the transfer to the Lender Group of any property should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "Voidable Transfer"), and if the Lender Group is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that the Lender Group is required or elects to repay or restore, and as to all reasonable costs, expenses, and attorneys fees of the Lender Group related thereto, the liability of Borrowers or Guarantor automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

16.7    **Confidentiality.**  Agent and Lenders each individually (and not jointly or jointly and severally) agree that material, non-public information regarding Borrowers and their Subsidiaries, their

operations, assets, and existing and contemplated business plans shall be treated by Agent and the Lenders in a confidential manner, and shall not be disclosed by Agent and the Lenders to Persons who are not parties to this Agreement, except: (a) to attorneys for and other advisors, accountants, auditors, and consultants to any member of the Lender Group, (b) to Subsidiaries and Affiliates of any member of the Lender Group (including the Bank Product Providers), provided that any such Subsidiary or Affiliate shall have agreed to receive such information hereunder subject to the terms of this Section 16.7, (c) as may be required by statute, decision, or judicial or administrative order, rule, or regulation, (d) as may be agreed to in advance by Administrative Borrower or its Subsidiaries or as requested or required by any Governmental Authority pursuant to any subpoena or other legal process, (e) as to any such information that is or becomes generally available to the public (other than as a result of prohibited disclosure by Agent or the Lenders), (f) in connection with any assignment, prospective assignment, sale, prospective sale, participation or prospective participations, or pledge or prospective pledge of any Lender's interest under this Agreement, provided that any such assignee, prospective assignee, purchaser, prospective purchaser, participant, prospective participant, pledgee, or prospective pledgee shall have agreed in writing to receive such information hereunder subject to the terms of this Section, and (g) in connection with any litigation or other adversary proceeding involving parties hereto which such litigation or adversary proceeding involves claims related to the rights or duties of such parties under this Agreement or the other Loan Documents. The provisions of this Section 16.7 shall survive for 2 years after the payment in full of the Obligations.

16.8     **Integration.** This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

16.9     **Parent as Agent for Borrowers.** Each Borrower hereby irrevocably appoints Parent as the borrowing agent and attorney-in-fact for all Borrowers (the "Administrative Borrower") which appointment shall remain in full force and effect unless and until Agent shall have received prior written notice signed by each Borrower that such appointment has been revoked and that another Borrower has been appointed Administrative Borrower. Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower (i) to provide Agent with all notices with respect to Advances and Letters of Credit obtained for the benefit of any Borrower and all other notices and instructions under this Agreement and (ii) to take such action as the Administrative Borrower deems appropriate on its behalf to obtain Advances and Letters of Credit and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement. It is understood that the handling of the Loan Account and Collateral of Borrowers in a combined fashion, as more fully set forth herein, is done solely as an accommodation to Borrowers in order to utilize the collective borrowing powers of Borrowers in the most efficient and economical manner and at their request, and that Lender Group shall not incur liability to any Borrower as a result hereof. Each Borrower expects to derive benefit, directly or indirectly, from the handling of the Loan Account and the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful performance of the integrated group. To induce the Lender Group to do so, and in consideration thereof, each Borrower hereby jointly and severally agrees to indemnify each member of the Lender Group and hold each member of the Lender Group harmless against any and all liability, expense, loss or claim of damage or injury, made against the Lender Group by any Borrower or by any third party whosoever, arising from or incurred by reason of (a) the handling of the Loan Account and Collateral of Borrowers as herein provided, (b) the Lender Group's relying on any instructions of the Administrative Borrower, or (c) any other action taken by the Lender Group hereunder or under the other Loan Documents, except that Borrowers will have no liability to the relevant Agent-Related Person or Lender-Related Person under this Section 16.9 with respect to any liability that has been finally determined by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of such Agent-Related Person or Lender-Related Person, as the case may be.

16.10     **Gaming Laws and Liquor Laws.** Notwithstanding any provision of this Agreement to the contrary, all rights, remedies, and powers provided in this Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable mandatory provision of the Gaming Laws or the Liquor Laws and all provisions of this Agreement are intended to be subject to all applicable mandatory provisions of

LA/1099295.7                                                    53

the   Gaming Laws and Liquor Laws and to be limited solely to the extent necessary to not render the provisions of this Agreement invalid or unenforceable, in whole or in part.


[Signature pages to follow.]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**155 EAST TROPICANA, LLC,**
a Nevada limited liability company, as a Borrower

By:  _____
Name:    Neil G. Kiefer
Its:        Chief Executive Officer

[SIGNATURE PAGE TO CREDIT AGREEMENT]

S-1

**155 EAST TROPICANA FINANCE CORP.**
a Nevada corporation, as a Borrower

By:
Name:    Neil G. Kiefer
Its:      President

[SIGNATURE PAGE TO CREDIT AGREEMENT]

S-2

**WELLS FARGO FOOTHILL, INC.,**
a California corporation, as Agent and as a Lender

By:

Name:    Jim Farner

Title:    Senior Vice President

[SIGNATURE PAGE TO CREDIT AGREEMENT]

S-3

## EXHIBIT A-1

## FORM OF ASSIGNMENT AND ACCEPTANCE AGREEMENT

This **ASSIGNMENT AND ACCEPTANCE AGREEMENT** ("Assignment Agreement") is entered into as of _____ between _____ ("Assignor") and _____ _____ ("Assignee"). Reference is made to the Agreement described in <u>Annex I</u> hereto (as amended, restated, supplemented or otherwise modified from time to time, including all schedules thereto, the "<u>Credit Agreement</u>"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Credit Agreement.

       1.    In accordance with the terms and conditions of <u>Section 13</u> of the Credit Agreement, the Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, that interest in and to the Assignor's rights and obligations under the Loan Documents as of the date hereof with respect to the Obligations owing to the Assignor, and Assignor's portion of the Commitments, all to the extent specified on <u>Annex I</u>.

       2.    The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim and (ii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment Agreement and to consummate the transactions contemplated hereby; (b) makes no representation or warranty and assumes no responsibility with respect to (i) any statements, representations or warranties made in or in connection with the Loan Documents, or (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any other instrument or document furnished pursuant thereto; (c) makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Borrower or the performance or observance by any Borrower of any of its respective obligations under the Loan Documents or any other instrument or document furnished pursuant thereto, and (d) represents and warrants that the amount set forth as the Purchase Price on <u>Annex I</u> represents the amount owed by Borrowers to Assignor with respect to Assignor's share of the Advances assigned hereunder, as reflected on Assignor's books and records.

       3.    The Assignee (a) confirms that it has received copies of the Credit Agreement and the other Loan Documents, together with copies of the financial statements referred to therein and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment Agreement; (b) agrees that it will, independently and without reliance upon Agent, Assignor, or any other Lender, based upon such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking any action under the Loan Documents; (c) confirms that it is an Eligible Transferee; (d) appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under the Loan Documents as are delegated to Agent by the terms thereof, together with such powers as are reasonably incidental thereto; (e) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender; [and (f) attaches the forms prescribed by the Internal Revenue Service of the United States certifying as to the Assignee's status for purposes of determining exemption from United States withholding taxes with respect to all payments to be made to the Assignee under the Credit Agreement or such other documents as are necessary to indicate that all such payments are subject to such rates at a rate reduced by an applicable tax treaty.]

       4.    Following the execution of this Assignment Agreement by the Assignor and Assignee, the Assignor will deliver this Assignment Agreement to the Agent for recording by the Agent. The effective date of this Assignment (the "Settlement Date") shall be the latest to occur of (a) the date of the execution and delivery hereof by the Assignor and the Assignee, (b) the receipt by Agent for its sole and

separate account a processing fee in the amount of $3,500 (if required by the Credit Agreement), (c) the receipt of any required consent of the Agent, and (d) the date specified in Annex I.

5.      As of the Settlement Date (a) the Assignee shall be a party to the Credit Agreement and, to the extent of the interest assigned pursuant to this Assignment Agreement, have the rights and obligations of a Lender thereunder and under the other Loan Documents, and (b) the Assignor shall, to the extent of the interest assigned pursuant to this Assignment Agreement, relinquish its rights and be released from its obligations under the Credit Agreement and the other Loan Documents, provided, however, that nothing contained herein shall release any assigning Lender from obligations that survive the termination of this Agreement, including such assigning Lender's obligations under Article 15 and Section 16.7 of the Credit Agreement.

6.      Upon the Settlement Date, Assignee shall pay to Assignor the Purchase Price (as set forth in Annex I). From and after the Settlement Date, Agent shall make all payments that are due and payable to the holder of the interest assigned hereunder (including payments of principal, interest, fees and other amounts) to Assignor for amounts which have accrued up to but excluding the Settlement Date and to Assignee for amounts which have accrued from and after the Settlement Date. On the Settlement Date, Assignor shall pay to Assignee an amount equal to the portion of any interest, fee, or any other charge that was paid to Assignor prior to the Settlement Date on account of the interest assigned hereunder and that are due and payable to Assignee with respect thereto, to the extent that such interest, fee or other charge relates to the period of time from and after the Settlement Date.

7.      This Assignment Agreement may be executed in counterparts and by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. This Assignment Agreement may be executed and delivered by telecopier or other facsimile transmission all with the same force and effect as if the same were a fully executed and delivered original manual counterpart.

8.      THIS ASSIGNMENT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

[Signature Page Follows.]

LA/1105408.2

IN WITNESS WHEREOF, the parties hereto have caused this Assignment Agreement and Annex I hereto to be executed by their respective officers, as of the first date written above.

[NAME OF ASSIGNOR]

as Assignor

By _____
Name:
Title:

[NAME OF ASSIGNEE]

as Assignee

By _____
Name:
Title:

ACCEPTED THIS ____ DAY OF

_____

**WELLS FARGO FOOTHILL, INC.,**
a California corporation, as Agent

By _____
Name:
Title:

LA/1105408.2

ANNEX FOR ASSIGNMENT AND ACCEPTANCE

ANNEX I

1.    Borrowers: 155 East Tropicana, LLC, a Nevada limited liability company, and 155 East Tropicana
      Finance Corp., a Nevada corporation

2.    Name and Date of Credit Agreement:

              Credit Agreement, dated as of March 29, 2005, by and among the Borrowers, the
              lenders from time to time a party thereto (the "Lenders"), Wells Fargo Foothill, Inc.,
              a California corporation, as the arranger and administrative agent for the Lenders

3.    Date of Assignment Agreement:                          _____

4.    Amounts:

      a.      Assigned Amount of Revolver Commitment         $_____

      b.      Assigned Amount of Advances                    $_____

5.    Settlement Date:                                       _____

6.    Purchase Price:                                        $_____

7.    Notice and Payment Instructions, etc.

      Assignee: _____            Assignor: _____
               _____                      _____
               _____                      _____
               _____                      _____

8.      Agreed and Accepted:

        [ASSIGNOR]                          [ASSIGNEE]


        Name:_____                Name:_____
        By: _____                 By: _____
        Title: _____              Title: _____

Accepted:
**WELLS FARGO FOOTHILL, INC.,**
a California corporation, as Agent


By      _____
        Name:
        Title:

LA/1105408.2

## EXHIBIT B-1

## FORM OF BORROWING BASE CERTIFICATE

Wells Fargo Foothill, Inc.
2450 Colorado Avenue
Suite 3000 West
Santa Monica, California 90404
Attn: Specialty Finance Manager

The undersigned, 155 EAST TROPICANA, LLC, a Nevada limited liability company ("Parent"), pursuant to Schedule 5.2 of that certain Credit Agreement dated as of March 29, 2005 (as amended, restated, supplemented or otherwise modified from time to time, including all schedules thereto, the "Credit Agreement"), entered into among Parent and 155 EAST TROPICANA FINANCE CORP., a Nevada corporation ("Finance Corp."; Parent and Finance Corp. are referred to hereinafter each individually as a "Borrower", and individually and collectively, jointly and severally, as the "Borrowers"), the lenders signatory thereto from time to time, and Wells Fargo Foothill, Inc., a California corporation as the arranger and administrative agent (in such capacity, together with its successors and assigns, if any, in such capacity, "Agent"), hereby certifies to Agent that the following items, calculated in accordance with the terms and definitions set forth in the Credit Agreement for such items are true and correct, and that Borrowers are in compliance with and, after giving effect to any currently requested Advances, will be in compliance with, the terms, conditions, and provisions of the Credit Agreement.

All capitalized terms used in this Borrowing Base Certificate have the meanings set forth in the Credit Agreement unless specifically defined herein.

[Remainder of page intentionally left blank.]

LA/1105428.3

A.    **Borrowing Base Calculation**

1.    The product of (i) the TTM EBITDA for the most
      recently ended 12 month period for which financial
      statements have been delivered pursuant to Section
      5.3 (provided, however that for purposes of
      determination of the Borrowing Base EBITDA for
      each month from and including January 2004 through
      and including December 2004 shall be as set forth on
      Schedule B-1) *multiplied by* (ii)(x) for any date of
      determination on or before September 30, 2006, 3.0,
      and (y) for any date of determination after September
      30, 2006, 2.0                                                      $ _____

2.    $7,500,000                                                         $ _____

3.    Greater of Item 1. and 2.                                                        $ _____

4.    Reserves

      a.    Bank Products Reserve                                        $ _____

      b.    the sum of the aggregate amount of reserves,
            if any, established by Agent under Section
            2.1(b) of the Credit Agreement                              $ _____

      c.    Sum of Items 4.a. and 4.b.                                                 $ _____

5.    Borrowing Base (*Item 3. minus Item 4.c.*):                                      $ _____

6.    Availability Calculation

      a.    (i)     Maximum Revolver Amount          $15,000,000

            (ii)    Letter of Credit Usage           $ _____

            (iii)   Bank Products Reserve            $ _____

            (iv)    outstanding Advances             $ _____

            (v)     *Item 6.a.(i) minus Item 6.a.(ii) minus
                    Item 6.a.(iii) minus Item 6.a.(iv)*     $ _____

      b.    (i)     Borrowing Base                   $ _____

            (ii)    Letter of Credit Usage           $ _____

            (iii)   outstanding Advances             $ _____

- 2 -

         *(iv)*     *Item 6.b.(i) minus Item 6.b.(ii) minus*
                   *Item 6.b.(iii)*             $ _____

    c.     lesser of Item 6.a. and 6.b.          $ _____

**B.**    **Letters of Credit Calculation**

    1.     maximum L/C amount         $5,000,000

    2.     L/Cs permitted under Borrowing Base

        a.     Borrowing Base (from <u>Section A</u>, <u>Item 5</u>.)   $_____

        b.     Amount of current outstanding Advances   $_____

        c.     *Item 2.a. minus Item 2.b.*         $_____

    3.     L/Cs permitted under Maximum Revolver Amount

        a.     Maximum Revolver Amount       $15,000,000

        b.     Amount of current outstanding Advances   $_____

        c.     Amount of Bank Product Reserve    $_____

        d.     *Item 3.a. minus Item 3.b minus Item 3.c.*   $_____

    4.     Letter of Credit Usage plus the amount of any
            proposed Letters of Credit           $_____

    5.     No L/C Availability if Item 4 is greater than Item 1.,
            Item 2.c. or Item 3.d.           $_____

Additionally, the undersigned hereby certifies and represents and warrants to the Lender Group on behalf of Borrowers that (i) as of the date hereof, each representation or warranty made by Borrowers and contained in or pursuant to any Loan Document, any agreement, instrument, certificate, document or other writing furnished by any Borrower at any time under or in connection with any Loan Document, and as of the effective date of any advance, continuation or conversion requested above is true and correct in all material respects (except to the extent any representation or warranty expressly related to an earlier date), (ii) each of the covenants and agreements contained in any Loan Document have been performed (to the extent required to be performed on or before the date hereof or each such effective date), (iii) no Default or Event of Default has occurred and is continuing on the date hereof, nor will any thereof occur after giving effect to the request above, and (iv) all of the foregoing is true and correct as of the effective date of the calculations set forth above and that such calculations have been made in accordance with the requirements of the Credit Agreement.

**155 EAST TROPICANA, LLC,**
as Administrative Borrower

By: _____

Title: _____

**EXHIBIT C-1**

**FORM OF COMPLIANCE CERTIFICATE**

[on Administrative Borrower's letterhead]

To:    Wells Fargo Foothill, Inc.
       2450 Colorado Avenue
       Suite 3000 West
       Santa Monica, California  90404
       Attn: Specialty Finance Manager

          Re:    Compliance Certificate dated _____

Ladies and Gentlemen:

          Reference is made to that certain **CREDIT AGREEMENT** dated as of March 29, 2005 (as amended, restated, supplemented or otherwise modified from time to time, including all schedules thereto, the "Credit Agreement"), by and among the lenders identified on the signature pages thereof (such lenders, together with their respective successors and permitted assigns, are referred to hereinafter each individually as a "Lender" and collectively as the "Lenders"), **WELLS FARGO FOOTHILL, INC.**, a California corporation, as the arranger and administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, "Agent"), 155 EAST TROPICANA, LLC, a Nevada limited liability company ("Parent"), and 155 EAST TROPICANA FINANCE CORP., a Nevada corporation ("Finance Corp."; Parent and Finance Corp. are referred to hereinafter each individually as a "Borrower", and individually and collectively, jointly and severally, as the "Borrowers").  Capitalized terms used in this Compliance Certificate have the meanings set forth in the Credit Agreement unless specifically defined herein.

          Pursuant to Schedule 5.3 of the Credit Agreement, the undersigned officer of Administrative Borrower hereby certifies that:

          1.    The financial information of Borrowers and their Subsidiaries furnished in Schedule 1 attached hereto, has been prepared in accordance with GAAP (except for year-end adjustments and the lack of footnotes), and fairly presents in all material respects the financial condition of Borrowers and their Subsidiaries.

          2.    Such officer has reviewed the terms of the Credit Agreement and has made, or caused to be made under his/her supervision, a review in reasonable detail of the transactions and condition of Borrowers and their Subsidiaries during the accounting period covered by the financial statements delivered pursuant to Schedule 5.3 of the Credit Agreement.

          3.    Such review has not disclosed the existence on and as of the date hereof, and the undersigned does not have knowledge of the existence as of the date hereof, of any event or condition that constitutes a Default or Event of Default, except for such conditions or events listed on Schedule 2 attached hereto, specifying the nature and period of existence thereof and what action Borrower and their Subsidiaries have taken, are taking, or propose to take with respect thereto.

          4.    The representations and warranties of Borrowers and their Subsidiaries set forth in the Credit Agreement and the other Loan Documents are true and correct in all material respects on and as of

the date hereof (except to the extent they relate to a specified date), except as set forth on Schedule 3 attached hereto.

        5.        Borrowers and their Subsidiaries are in compliance with the applicable covenants contained in Section 6.16 of the Credit Agreement as demonstrated on Schedule 4 hereof.

[Signature Pages Follow.]

IN WITNESS WHEREOF, this Compliance Certificate is executed by the undersigned this _____ day of _____, _____.

**155 EAST TROPICANA, LLC,**
as Administrative Borrower

By: _____
Name: _____
Title: _____

## SCHEDULE 3

**Representations and Warranties**

## SCHEDULE 4

### Financial Covenants

1. **Minimum EBITDA.**

   Borrowers' and their Subsidiaries' EBITDA, measured on a quarter-end basis, for the 12 month period ending _____, _____ is $_____, which amount **[is/is not]** greater than or equal to the amount set forth in Section 6.16(a)(i) of the Credit Agreement for the corresponding period.

2. **Senior Leverage Ratio.**

   Borrowers' and their Subsidiaries' Senior Leverage Ratio, measured on a quarter-end basis, as of _____, _____ is $_____, which amount **[is/is not]** greater than or equal to the amount set forth in Section 6.16(a)(ii) of the Credit Agreement for the corresponding measurement date.

3. **Capital Expenditures.**

   Borrowers' and their Subsidiaries' Capital Expenditures from the beginning of Borrowers' most recent Fiscal Year to the date hereof is _____, which (i) **[is/is not]** greater than or equal to the minimum amount set forth in Section 6.16(b)(i) of the Credit Agreement for the corresponding period and (ii) **[is/is not]** less than or equal to the maximum amount set forth in Section 6.16(b)(i) of the Credit Agreement for the corresponding period.

## EXHIBIT I-1

### FORM OF INTERCREDITOR AGREEMENT

### INTERCREDITOR AND LIEN SUBORDINATION AGREEMENT

THIS INTERCREDITOR AND LIEN SUBORDINATION AGREEMENT dated as of _____ ____, 20__ (this "Agreement") is made by and among WELLS FARGO FOOTHILL, INC., in its capacity as the arranger and administrative agent (in such capacity, together with it successors and assigns (if any) in such capacity, the "Original Agent") under and pursuant to the Loan Agreement (as hereinafter defined), THE BANK OF NEW YORK TRUST COMPANY, N.A. ("BNY"), solely in its capacity as collateral agent under the Indenture Loan Documents (as hereinafter defined) (in such capacity, the "Collateral Agent"), 155 EAST TROPICANA, LLC, a Nevada limited liability company ("Tropicana"), and 155 EAST TROPICANA FINANCE CORP., a Nevada corporation ("Tropicana Finance"; Tropicana and Tropicana and Finance, are referred to hereinafter each individually as a "Borrower," and individually and collectively, jointly and severally, as the "Borrowers").

### R E C I T A L S :

A.    Borrowers, Collateral Agent, and BNY, in its capacity as Trustee (in such capacity, the "Trustee"), have entered into an Indenture, dated as of _____ ____, 20__ (the "Indenture"), pursuant to which the Borrowers incurred indebtedness for certain notes (such notes, together with all other notes issued after the date hereof and exchange notes issued in exchange therefore, the "Notes") in an aggregate principal amount at maturity of $130,000,000. The repayment of the Indenture Secured Obligations (as hereinafter defined) is secured by security interests in and liens on the assets and properties described in (i) the Senior Secured Note Security Agreement, dated as of the date hereof (the "Indenture Security Agreement"), made by the Borrowers in favor of the Collateral Agent for the benefit of the Collateral Agent, the Trustee, and the Noteholders, (ii) the Pledge Agreement, dated as of the date hereof (the "Indenture Pledge Agreement"), made by Florida Hooters LLC, a Nevada limited liability company ("Florida Hooters"), and EW Common LLC, a Nevada limited liability company ("EW Common"), in favor of the Collateral Agent for the benefit of the Collateral Agent, the Trustee, and the Noteholders, (iii) the Guarantee and Pledge Agreement, dated as of the date hereof (the "E&W Note Guarantee and Pledge"), made by Eastern & Western Hotel Corporation, a Nevada corporation ("E&W"), in favor of the Collateral Agent for the benefit of the Collateral Agent, the Trustee, and the Noteholders, and (iv) certain real property mortgages, including the (y) Deed of Trust, Security Agreement and Fixture Filing with Assignment of Rents dated as of the date hereof, made by Tropicana to Lawyers Title of Nevada, Inc., as trustee for the benefit of Collateral Agent, as collateral

1

agent for the "Holders" (as defined in the Indenture), and (z) Leasehold Deed of Trust, Security Agreement and Fixture Filing with Assignment of Rents dated as of the date hereof, made by E&W to Lawyers Title of Nevada, Inc., as trustee for the benefit of Collateral Agent, as collateral agent for the Holders, together with such other mortgages, deeds of trust, assignments and other real property Liens as may be made as of the date hereof and from time to time hereafter (each, an "Indenture Mortgage" and, together with the Indenture, the Indenture Security Agreement, the Indenture Pledge Agreement, the E&W Guarantee and Pledge, all Control Agreements (as defined in the Indenture Security Agreement for the benefit of the Collateral Agent, the Trustee, the Noteholders and, as set forth in Section 3.02 hereof, the Agent and the Lenders), and all other collateral or security documents in favor of Collateral Agent or the Trustee now or hereafter executed and delivered in connection with the Indenture or the Indenture Security Agreement, the "Indenture Agreements"), in each case, by a Borrower, Florida Hooters, EW Common or E&W in favor of the Collateral Agent for the benefit of the Collateral Agent, the Trustee, and the Noteholders.

B.     Borrowers and the Original Agent have entered into a Credit Agreement dated as of _____ __, 20__ (the "Original Loan Agreement"), pursuant to which the Original Agent and the lenders from time to time party thereto (the "Original Lenders") agreed, upon the terms and conditions stated therein, to make loans and advances to and to issue letters of credit on account of the Borrower and the Guarantors up to the principal amount of $15,000,000, together with the fees, interest, expenses and other obligations due under the Original Loan Agreement. The repayment of the Loan Agreement Secured Obligations (as hereinafter defined) is secured by security interests in and liens on the assets and properties described in (i) the Security Agreement, dated as of the date hereof (the "Loan Agreement Security Agreement"), made by the Borrowers in favor of the Agent for the benefit of the Lenders, (ii) the Parent Pledge Agreement, dated as of the date hereof (the "Loan Agreement Pledge Agreement"), made by Florida Hooters and EW Common, in favor of the Agent for the benefit of the Lenders, (iii) the Guarantee and Pledge Agreement, dated as of the date hereof (the "E&W Loan Guarantee and Pledge"), made by E&W in favor of the Agent for the benefit of the Agent and the Lenders, and (iv) certain real property mortgages, including the (y) Deed of Trust, Fixture Filing with Assignment of Rents and Leases, and Security Agreement dated as of the date hereof, made by Tropicana to Lawyers Title of Nevada, Inc., as trustee for the benefit of Agent (as defined herein), as agent and arranger under the Original Loan Agreement, and (z) Leasehold Deed of Trust, Fixture Filing with Assignment of Rents and Leases, and Security Agreement dated as of the date hereof, made by E&W to Lawyers Title of Nevada, Inc., as trustee for the benefit of Agent, as agent and arranger under the Credit Agreement, together with such other mortgages, deeds of trust, assignments and other real property Liens as may be made as of the date hereof and from time to time hereafter (each, a "Loan Agreement Mortgage" and, together with the Loan Agreement, Loan Agreement Security Agreement, the Loan Agreement Parent Pledge Agreement, all Control Agreements (as defined in the Loan Agreement), and all other collateral or security documents in favor of Agent now or hereafter executed and delivered in

connection with the Original Loan Agreement or the Loan Agreement Security Agreement, the "Loan Agreements"), in each case, by a Borrower Florida Hooters, EW Common or E&W in favor of the Agent for the benefit of the Lenders.

       C.    One of the conditions of the Original Loan Agreement is that the priority of the security interests in and liens on the Lender Priority Collateral to secure the Loan Agreement Secured Obligations be senior to the security interests in and liens on the Lender Priority Collateral to secure the Indenture Secured Obligations (as hereinafter defined), in the manner and to the extent provided in this Agreement. One of the conditions of the Indenture is that the priority of the security interests and liens on the Indenture Priority Collateral to secure the Indenture Secured Obligations be senior to the security interests in and liens on the Indenture Priority Collateral to secure the Loan Agreement Secured Obligations and that the Interest Reserve Account (as hereinafter defined) be security for the Indenture Secured Obligations but not for the Loan Agreement Secured Obligations.

       D.    The Agent and the Collateral Agent desire to enter into this Agreement concerning the respective rights of the Agent and the Collateral Agent with respect to the priority of their respective security interests in and liens on the Collateral.

       E.    The terms of the Indenture permit the Borrowers to enter into the Original Loan Documents, subject to compliance with certain conditions, and in connection therewith authorize and direct the Collateral Agent to enter into an intercreditor agreement substantially in the form of this Agreement.

       F.    In order to induce the Agent and Lenders to extend credit to the Borrowers and for purposes of certain conditions precedent and covenants of the Original Loan Agreement, the Agent and the Collateral Agent hereby agree as follows:

ARTICLE I.
DEFINITIONS

       Section 1.01   <u>Terms Defined Above and in the Recitals</u>.  As used in this Agreement, the following terms shall have the respective meanings indicated in the opening paragraph hereof and in the above Recitals:

         "Agreement"
         "Borrowers"
         "Collateral Agent"
         "E&W"
         "E&W Loan Guarantee and Pledge"
         "E&W Note Guarantee and Pledge"
         "EW Common"
         "Florida Hooters"
         "Indenture"

"Indenture Agreements"
"Indenture Mortgage"
"Indenture Pledge Agreement"
"Indenture Security Agreement"
"Loan Agreement Mortgage"
"Loan Agreement Pledge Agreement"
"Loan Agreement Security Agreement"
"Loan Agreements"
"Notes"
"Original Agent"
"Original Lenders"
"Original Loan Agreement"
"Original Loan Documents"
"Tropicana"
"Tropicana Finance"
"Trustee"

Section 1.02   Loan Agreement Definitions.  All capitalized terms which are used but not defined herein shall have the same meaning as in the Original Loan Agreement, as in effect on the date hereof.

Section 1.03   Other Definitions.  As used in this Agreement, the following terms shall have the meanings set forth below:

"Agent" means the Original Agent, together with its successors, assigns, transferees, and any Person that has a similar title (such as "Agent" or "Administrative Agent") under any Loan Agreement.

"Bankruptcy Code" means title 11 of the United States Code, as in effect from time to time.

"Capital Stock" means (a) in the case of a corporation, corporate stock, (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock, (c) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited) and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of property of, the issuing Person.

"Cash Collateral" means any Collateral consisting of cash or cash equivalents, any security entitlement (as defined in the New York Commercial Code) and any financial assets (as defined in the New York Commercial Code).

"Casino Lease" means that certain "Amended and Restated Casino Lease" by and between the Borrower and E&W dated as of March 9, 2005, as the same may be

amended from time to time in accordance to the extent permitted under the Loan Agreement and the Indenture.

"Closing Date" means _____ ___, 20__.

"Collateral" means all assets and properties and all interests in assets or properties now owned or hereafter acquired by any Borrower, any Guarantor or any other Person (including the Cash Collateral deposited in Account No. 11553005 maintained at Wells Fargo Brokerage Services, LLC by E&W pursuant to the Casino Lease) in or upon which a Lien is granted or purported to be granted under any of the Loan Documents or the Indenture Loan Documents or to secure the Loan Agreement Secured Obligations or the Indenture Secured Obligations and all products and proceeds of any of the foregoing, provided that the term "Collateral" shall not include the Indenture Exclusive Collateral.

"Control Collateral" means any Collateral consisting of a certificated security (as defined in the New York Commercial Code), investment property (as defined in the New York Commercial Code), a deposit account (as defined in the New York Commercial Code and any other Collateral as to which a Lien may be perfected through possession or control by the secured party, or any agent therefor.

"Default Notice" has the meaning set forth in Section 2.03.

"DIP Financing" has the meaning set forth in Section 6.01.

"Discharge of Loan Agreement Secured Obligations" means payment in full in cash of the Loan Agreement Secured Obligations (other than Loan Agreement Secured Obligations consisting of contingent indemnification obligations under the Lender Loan Documents) up to (but not in excess of) the Maximum Priority Debt Amount including, with respect to amounts available to be drawn under outstanding letters of credit issued thereunder (or indemnities issued pursuant thereto in respect of outstanding letters of credit), delivery of cash collateral or backstop letters of credit in respect thereof in compliance with the terms of the Loan Agreement, in each case, after or concurrently with termination of all commitments to extend credit thereunder.

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"Guarantor" means any Person that guarantees or pledges Collateral to secure the Loan Agreement Secured Obligations or the Indenture Secured Obligations, including E&W.

"Indenture Exclusive Collateral" means the Cash Collateral maintained in the Interest Reserve Account as of the Closing Date, together with interest and earnings thereon.

"Indenture Loan Documents" means the Indenture, the Notes, the Indenture Mortgages, the Indenture Agreements, the Notes, the Guarantees (as defined in the Indenture) of the Notes, the Registration Rights Agreement (as defined in the Indenture) and such other agreements, instruments and certificates as defined or referred to in the Indenture.

"Indenture Priority Collateral" means the Cash Collateral maintained in the Renovation Reserve Account as of the Closing Date, together with interest and earnings thereon; provided that it is understood and agreed that such Cash Collateral is intended to be utilized in the renovation of the real and personal property constituting Lender Priority Collateral and once so utilized and withdrawn from the Renovation Reserve Account, whether before or after the commencement of an Insolvency Proceeding, shall constitute Lender Priority Collateral.

"Indenture Secured Obligations" means all indebtedness represented by the Notes, together with interest, premiums, fees, costs and expenses in respect thereof (including, without limitation, attorneys fees and disbursements and including interest accrued after the initiation of any Insolvency Proceeding, whether or not allowed or allowable in any Insolvency Proceeding), and all other Obligations (as such term is defined in the Indenture) under any of the Indenture Loan Documents.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Interest Reserve Account" means that certain Account No. 171097 maintained at The Bank of New York Trust Company, N.A.

"Lease" and "Leases" means, individually and collectively, that certain Amended and Restated Hotel Lease and that certain Amended and Restated Casino Lease, each by and between the Borrower and E&W and each dated as of March 9, 2005, as either may be amended from time to time with the written consent of the Agent and the Collateral Agent.

"Lender Loan Documents" means any Loan Agreement, the "Loan Documents" as defined in the Original Loan Agreement, the collateral documents and instruments executed and delivered in connection therewith or in connection with any other Loan Agreement hereunder, and such other agreements, instruments and certificates as defined in a Loan Agreement.

"Lender Priority Collateral" means all Collateral other than the Indenture Exclusive Collateral and the Indenture Priority Collateral.

"Lenders" means the Original Lenders, together with all successors, assigns, transferees, participants, replacement or refinancing lenders, of the Original Lenders, including any Person designated as a Lender under any Loan Agreement.

"Lien" means any interest in an asset securing an obligation owed to, or a claim by, any Person other than the owner of the asset, irrespective of whether (a) such interest is based on the common law, statute, or contract, (b) such interest is recorded or perfected, and (c) such interest is contingent upon the occurrence of some future event or events or the existence of some future circumstance or circumstances. Without limiting the generality of the foregoing, the term "Lien" includes the lien or security interest arising from a mortgage, deed of trust, encumbrance, pledge, hypothecation, assignment, deposit arrangement, security agreement, conditional sale or trust receipt, or from a lease, consignment, or bailment for security purposes and also includes reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases, and other title exceptions and encumbrances affecting Real Property.

"Lien Priority" means with respect to any Lien of the Agent or the Collateral Agent in the Collateral, the order of priority of such Lien as specified in Section 2.01.

"Loan Agreement" means the Original Loan Agreement as amended, restated, modified, renewed, refunded, replaced, or refinanced in whole or in part from time to time, including any agreement extending the maturity of, consolidating, otherwise restructuring (including adding Subsidiaries or affiliates of any Borrower or any other Persons as parties thereto) or refinancing all or any portion of the Obligations or Commitments as those terms are defined in the Original Loan Agreement (or in any other agreement that itself is a Loan Agreement hereunder) and whether by the same or any other agent, lender, or group of lenders and whether or not increasing the amount of indebtedness that may be incurred thereunder.

"Loan Agreement Secured Obligations" means all Obligations and all other amounts owing or due under the terms of the Loan Agreement and the other Lender Loan Documents, including any and all amounts payable under or in respect of the Lender Loan Documents, as amended, restated, modified, renewed, refunded, replaced, or refinanced in whole or in part from time to time, including principal, premium, interest, fees, attorneys' fees, costs, charges, expenses, reimbursement obligations, any obligation to post cash collateral in respect of letters of credit or indemnities in respect thereof, indemnities, guarantees, and all other amounts payable thereunder or in respect thereof (including, in each case, all amounts accruing on or after the commencement of any Insolvency Proceeding relating to any Borrower, any other Person irrespective of

whether a claim for all or any portion of such amounts is allowable or allowed in any Insolvency Proceeding).

"Loan Documents" means the Lender Loan Documents and the Indenture Loan Documents.

"Maximum Priority Debt Amount" means, as of any date of determination, (a) the principal amount (including the undrawn amount of Letters of Credit) of Loan Agreement Secured Obligations as of such date up to, but not in excess of, $15,000,000, plus (b) any premium, interest, fees, attorneys' fees, costs, charges, expenses and indemnities, owed under the Loan Agreement or the other Lender Loan Documents or in respect of the Loan Agreement Secured Obligations and including, for each amount specified in clauses (a) and (b), all amounts accruing on or after the commencement of any Insolvency Proceeding relating to any Borrower or any other Person irrespective of whether a claim for all or any portion of such amount is allowable or allowed in any Insolvency Proceeding.

"Noteholders" means each of the holders of the Notes.

"Original Loan Agreement" shall have the meaning assigned to such term in the recitals to this Agreement.

"Party" means Agent and Collateral Agent.

"Person" means any natural person, corporation, limited liability company, limited partnership, general partnership, limited liability partnership, joint venture, trust, land trust, business trust, or other organization, irrespective of whether such organization is a legal entity, and shall include a government and any agency or political subdivision thereof.

"Proceeds" means (i) all "proceeds" as defined in Article 9 of the New York Commercial Code with respect to the Collateral, and (ii) whatever is recoverable or recovered when Collateral is sold, exchanged, collected, or disposed of, whether voluntarily or involuntarily.

"Recovery" has the meaning set forth in Section 5.03.

"Renovation Reserve Account" means that certain Account No. 171098 maintained at The Bank of New York Trust Company, N.A., subject to a control agreement in favor of the Collateral Agent for the benefit of the Noteholders, the Agent and the Lenders as their respective interests may appear.

"Standstill Notice" means a written notice from or on behalf of (a) the Agent to the Collateral Agent regarding the Lender Priority Collateral stating that an Event of Default has occurred under the Loan Agreement and stating that such written

notice is a "Standstill Notice," or (b) the Collateral Agent to the Agent regarding the Indenture Priority Collateral stating that an Event of Default has occurred under the Indenture and stating that such written notice is a "Standstill Notice."

"Standstill Period" has the meaning set forth in Section 2.03.

Rules of Construction.  Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the term "including" is not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement.  Article, section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified.  Any reference in this Agreement to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein).  Any reference herein to any Person shall be construed to include such Person's successors and assigns.

## ARTICLE II.
## LIEN PRIORITY

Section 2.01   Agreement to Subordinate.   Notwithstanding the date, time, method, manner or order of grant, attachment, or perfection of any Liens granted to the Collateral Agent, the Trustee, or the Noteholders in respect of all or any portion of the Collateral or of any Liens granted to the Agent or any Lender in respect of all or any portion of the Collateral, or the order or time of filing or recordation of any document or instrument for perfecting the Liens in favor of Agent or any Lender or the Collateral Agent (or the Trustee or any Noteholder) in any Collateral or any provision of the Uniform Commercial Code, any other applicable law, the Indenture, the Loan Documents or any other circumstance whatsoever:

(a)     the Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, hereby agrees that (i) any Lien in respect of all or any portion of the Lender Priority Collateral now or hereafter held by or on behalf of the Collateral Agent, the Trustee, or any Noteholder that secures all or any portion of the Indenture Secured Obligations, *shall in all respects be junior and subordinate to all Liens granted to the Agent or any Lender in the Lender Priority Collateral to secure all or any portion of the Loan Agreement Secured Obligations up to (but not in excess of) the Maximum Priority Debt Amount*, and (ii) any Lien in respect of all or any portion of the Lender Priority Collateral now or hereafter held by or on behalf of the Agent that secures all or any portion of the Loan Agreement Secured Obligations in excess of the Maximum Priority Debt Amount, shall in all respects be junior and subordinate to all Liens granted to the

Collateral Agent, the Trustee or any Noteholder in the Lender Priority Collateral to secure all or any portion of the Indenture Secured Obligations, and

(b)     the Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, hereby agrees that (i) any Lien in respect of all or any portion of the Lender Priority Collateral now or hereafter held by or on behalf of the Agent or any Lender that secures all or any portion of the Loan Agreement Secured Obligations up to (but not in excess of) the Maximum Priority Debt Amount, shall in all respects be senior and prior to all Liens granted to the Collateral Agent (or the Trustee or any Noteholder) in the Lender Priority Collateral to secure all or any portion of the Indenture Secured Obligations, and (ii) any Lien in respect of all or any portion of the Lender Priority Collateral now or hereafter held by or on behalf of the Collateral Agent, the Trustee, or any Noteholder that secures all or any portion of the Indenture Secured Obligations, shall in all respects be senior and prior to all Liens granted to the Agent in the Lender Priority Collateral to secure all or any portion of the Loan Agreement Secured Obligations in excess of the Maximum Priority Debt Amount,

(c)     the Agent, on behalf of itself and the Lenders, hereby agrees that (i) any Lien in respect of all or any portion of the Indenture Priority Collateral now or hereafter held by or on behalf of the Agent or any Lender that secures all or any portion of the Loan Agreement Secured Obligations, shall in all respects be junior and subordinate to all Liens granted to the Collateral Agent in the Indenture Priority Collateral to secure all or any portion of the Indenture Secured Obligations, and (ii) any Lien in respect of all or any portion of the Indenture Priority Collateral now or hereafter held by or on behalf of the Collateral Agent that secures all or any portion of the Indenture Secured Obligations, shall in all respects be senior and prior to all Liens granted to the Agent in the Indenture Priority Collateral to secure all or any portion of the Loan Agreement Secured Obligations, and

(d)     the Agent, on behalf of itself and the Lenders, hereby agrees that the Indenture Exclusive Collateral does not and shall not secure any Loan Agreement Secured Obligations.

The Collateral Agent, for and on behalf of itself, the Trustee and the Noteholders, acknowledges and agrees that, concurrently herewith, the Agent and the Lenders have been granted Liens upon all of the Collateral in which the Collateral Agent has been granted Liens (other than the Indenture Exclusive Collateral) and the Collateral Agent hereby consents thereto. The Agent, for and on behalf of itself and the Lenders, acknowledges and agrees that the Collateral Agent, for the benefit of itself, the Trustee, and the Noteholders, has been granted Liens upon all of the Collateral in which the Agent has been granted Liens and, in addition, the Indenture Exclusive Collateral and the Agent hereby consents thereto. The subordination of Liens in the Lender Priority Collateral (up to (but not in excess of) the Maximum Priority Debt Amount) by the Collateral Agent, on behalf of itself, the Trustee, and the Noteholders in favor of the Agent herein shall not be

deemed to subordinate the Collateral Agent's Liens to the Liens of any other Person. The subordination of Liens (in excess of the Maximum Priority Debt Amount) and otherwise in the Indenture Priority Collateral in favor of the Collateral Agent, for the benefit of itself, the Trustee and the Noteholders herein shall not be deemed to subordinate such Agent's Liens to the Liens of any other Person.

Section 2.02   Waiver of Right to Contest Liens. The Collateral Agent agrees, on behalf of itself, the Trustee, and the Noteholders, that it and they shall not (and hereby waives, on behalf of itself, the Trustee and the Noteholders any right to) take any action to contest or challenge (or assist or support any other Person in contesting or challenging), directly or indirectly, whether or not in any proceeding (including in any Insolvency Proceeding), the validity, priority, enforceability, or perfection of the Liens of the Agent or Lenders in respect of the Collateral. Prior to Discharge of the Loan Agreement Secured Obligations, the Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, agrees that none of the Collateral Agent, the Trustee, or the Noteholders will take any action that would hinder any exercise of remedies undertaken by the Agent or Lenders under the Lender Loan Documents with respect to the Lender Priority Collateral, including any public or private sale, lease, exchange, transfer, or other disposition of the Lender Priority Collateral, whether by foreclosure or otherwise. Prior to Discharge of the Loan Agreement Secured Obligations, the Collateral Agent, for itself, the Trustee, and on behalf of the Noteholders, hereby waives any and all rights it, the Trustee, or the Noteholders may have as a junior lien creditor or otherwise to contest, protest, object to, interfere with the manner in which the Agent or Lenders seek to enforce the Liens in any portion of the Lender Priority Collateral (it being understood and agreed that the terms of this Agreement shall govern with respect to such Collateral even if any portion of the Liens securing the Loan Agreement Secured Obligations are avoided, disallowed, set aside, or otherwise invalidated in any judicial proceeding or otherwise). The Agent, for and on behalf of itself and the Lenders, agrees that it shall not (and hereby waives any right to) take any action to contest or challenge (or assist or support any other Person in contesting or challenging), directly or indirectly, whether or not in any proceeding (including in any Insolvency Proceeding), the validity, priority, enforceability, or perfection of the Liens of the Collateral Agent in respect of the Collateral. Following the Discharge of Loan Agreement Secured Obligations or solely with respect to the Indenture Priority Collateral at any time prior thereto, the Agent, for and on behalf of itself and the Lenders, agrees that it will not take any action that would hinder any exercise of remedies undertaken by the Collateral Agent, the Trustee, or any Noteholder under the Indenture Loan Documents, including any public or private sale, lease, exchange, transfer, or other disposition of the Collateral, whether by foreclosure or otherwise. Following the Discharge of Loan Agreement Secured Obligations or solely with respect to the Indenture Priority Collateral at any time prior thereto, the Agent hereby waives any and all rights it may have as a junior lien creditor or otherwise to contest, protest, object to, interfere with the manner in which the Collateral Agent, the Trustee or any Noteholder seeks to enforce the Liens in any portion of the Collateral (it being understood and agreed that the terms of this Agreement shall govern with respect to

such Collateral even if any portion of the Liens securing the Indenture Secured Obligations are avoided, disallowed, set aside, or otherwise invalidated in any judicial proceeding or otherwise).

Section 2.03  Remedies Standstill.  At any time after the occurrence and during the continuation of an Event of Default under any of the Loan Documents, the Agent may send a Standstill Notice to the Collateral Agent with respect to the Lender Priority Collateral or the Collateral Agent may send a Standstill Notice to the Agent with respect to the Indenture Priority Collateral.

(a)     The Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, agrees that from and after the date of its receipt of any Standstill Notice, none of the Collateral Agent, the Trustee, or any Noteholder will exercise any of its rights or remedies in respect of the collection on, set off against, marshalling of, or foreclosure on the Lender Priority Collateral or any other right relating to any Lender Priority Collateral (including the exercise of any voting rights relating to any Capital Stock constituting Collateral) under the Loan Documents, applicable law or otherwise as a secured creditor and will not take or receive any Lender Priority Collateral in connection with the exercise of any such right or remedy (including recoupment or set-off), whether under the Indenture Loan Documents, applicable law, in an Insolvency Proceeding or otherwise unless and until (a) the Agent has expressly waived or acknowledged the cure of the applicable Event of Default in writing or the Discharge of the Loan Agreement Secured Obligations shall have occurred, or (b) 90 days shall have elapsed from the date of the Collateral Agent's receipt of such Standstill Notice, except with respect to any Lender Priority Collateral which the Agent is pursuing its rights or remedies as a secured creditor to effect the collection, foreclosure, sale, or other realization upon or disposition of such Lender Priority Collateral.  From and after the earlier to occur of (i) the Collateral Agent's receipt of such waiver or cure notice, or (ii) the elapsing of such 90 day period, any of the Collateral Agent, the Trustee, or any Noteholder may commence to exercise any of its rights and remedies as a secured creditor under the Loan Documents, applicable law or otherwise (subject to the provisions of this Agreement, including Section 4.02 hereof and except with respect to any Lender Priority Collateral as to which the Agent or any Lender is effecting the collection, foreclosure, sale or other realization upon or disposition of).  So long as the Agent has not sent a Standstill Notice to the Collateral Agent, the Collateral Agent may exercise its rights or remedies in respect of the Lender Priority Collateral under the Loan Documents after the 10th Business Day following receipt by the Agent of a Notice of Intent to Exercise (as defined below).  The Agent may only send 3 Standstill Notices following the date hereof (it being understood and agreed as clarification to the foregoing that no more than 3 Standstill Notices may be provided whether delivered hereunder or under any corresponding provision of any other agreement similar hereto that may be delivered pursuant to Section 7.16) and no Event of Default may serve as the basis for any subsequent Standstill Notice unless 90 consecutive days shall have elapsed from the date that such Event of Default was cured or waived by

the Agent, and no more than one Standstill Notice may be given by the Agent in any consecutive 365-day period.

(b)    The Agent, on behalf of itself and the Lenders, agrees that from and after the date of its receipt of any Standstill Notice, neither the Agent nor any Lender will exercise any of its rights or remedies in respect of the collection on, set off against, marshalling of, or foreclosure on the Indenture Priority Collateral or any other right relating to any Indenture Priority Collateral under the Loan Documents, applicable law or otherwise as a secured creditor and will not take or receive any Indenture Priority Collateral in connection with the exercise of any such right or remedy (including recoupment or set-off), whether under the Loan Documents, applicable law, in an Insolvency Proceeding or otherwise unless and until (a) the Collateral Agent has expressly waived or acknowledged the cure of the applicable Event of Default in writing or the Indenture Secured Obligations shall have been paid in full in cash, or (b) 90 days shall have elapsed from the date of the Agent's receipt of such Standstill Notice, except with respect to any Indenture Priority Collateral which the Collateral Agent is pursuing its rights or remedies as a secured creditor to effect the collection, foreclosure, sale, or other realization upon or disposition of such Indenture Priority Collateral. From and after the earlier to occur of (i) the Agent's receipt of such waiver or cure notice, or (ii) the elapsing of such 90 day period, the Agent or any Lender may commence to exercise any of its rights and remedies as a secured creditor under the Loan Documents, applicable law or otherwise (subject to the provisions of this Agreement, including Section 4.02 hereof and except with respect to any Indenture Priority Collateral as to which the Collateral Agent, the Trustee or any Noteholder is effecting the collection, foreclosure, sale or other realization upon or disposition of). So long as the Collateral Agent has not sent a Standstill Notice to the Agent, the Agent may exercise its rights or remedies in respect of the Indenture Priority Collateral under the Loan Documents after the 10th Business Day following receipt by the Collateral Agent of a Notice of Intent to Exercise (as defined below). The Collateral Agent may only send 3 Standstill Notices following the date hereof (it being understood and agreed as clarification to the foregoing that no more than 3 Standstill Notices may be provided whether delivered hereunder or under any corresponding provision of any other agreement similar hereto that may be delivered pursuant to Section 7.16) and no Event of Default may serve as the basis for any subsequent Standstill Notice unless 90 consecutive days shall have elapsed from the date that such Event of Default was cured or waived by the Collateral Agent , and no more than one Standstill Notice may be given by the Collateral Agent in any consecutive 365-day period.

(c)    The time period during which the Collateral Agent with respect to the Lender Priority Collateral or the Agent with respect to the Indenture Priority Collateral is not permitted to exercise rights or remedies under this Section 2.03 is referred to herein as the "Standstill Period." If at any time other than during any Standstill Period an "Event of Default" (as defined in the Indenture or the Loan Agreement as applicable) has occurred and is continuing under the Loan Documents, and

the Collateral Agent with respect to the Lender Priority Collateral or the Agent with respect to the Indenture Priority Collateral intends to exercise its rights or remedies under the Loan Documents, the Collateral Agent with respect to the Lender Priority Collateral or the Agent with respect to the Indenture Priority Collateral may do so only after sending a written notice ("Notice of Intent to Exercise") no less than 10 Business Days and no more than 20 Business Days prior to the exercise of any such rights or remedies to the Agent.

Section 2.04   Exercise of Rights.

(a)   No Other Restrictions.   Except as expressly set forth in this Agreement, each of the Collateral Agent, the Trustee, the Noteholders, the Agent and the Lenders shall have any and all rights and remedies it may have as a creditor under applicable law, including the rights to exercise all rights and remedies in foreclosure or otherwise with respect to any of the Collateral; provided, however, that any such exercise, and any collection or sale of all or any portion of the Collateral, shall be subject to the prior Liens of the Agent on the Lender Priority Collateral and the prior Liens of the Collateral Agent on the Indenture Priority Collateral, in each case to the extent provided in Section 2.01, and to the provisions of this Agreement including Section 4.02 hereof. In exercising rights and remedies with respect to the Collateral, the Agent may enforce the provisions of the Lender Loan Documents and exercise remedies thereunder, all in such order and in such manner as it may determine in the exercise of its sole discretion. Such exercise and enforcement shall include the sale, lease, license, or other disposition of all or any portion of the Collateral by private or public sale or any other means permissible under applicable law; provided, that the Agent agrees to provide copies of any notices that it is required under applicable law to deliver to the Borrowers to the Collateral Agent; provided further, that the failure to provide any such copies to the Collateral Agent shall not impair any of the Agent's rights hereunder.

(b)   Release of Liens.   In the event of any such private or public sale of any Lender Priority Collateral, Collateral Agent agrees, on behalf of itself, the Trustee, and the Noteholders, that such sale will be free and clear of the Liens securing the Indenture Secured Obligations and, if the sale or other disposition includes the Equity Interests in any Borrower, agrees to release the entities whose Equity Interests are sold from all Indenture Secured Obligations so long as Agent also releases the entities whose Equity Interests are sold from all Loan Agreement Secured Obligations, in each case, so long as the proceeds from such sale or other disposition of the Lender Priority Collateral are applied in accordance with the terms of this Agreement. In furtherance thereof, Collateral Agent agrees that it will execute any and all Lien releases or other documents reasonably requested by Agent in connection therewith, so long as the proceeds from such sale or other disposition of the Lender Priority Collateral are applied in accordance with the terms of this Agreement.

(c)      Subject to Section 3.01, the Collateral Agent, the Trustee and the Noteholders may exercise, and nothing herein shall constitute a waiver of, any right it may have at law or equity to receive notice of, or to commence or join with any creditor in commencing any Insolvency Proceeding or to join or participate in, any action or proceeding or other activity described in Section 3.01; provided, however, that exercise of any such right by the Collateral Agent shall be subject to all of the terms and conditions of this Agreement, including the obligation to turn over all Lender Priority Collateral and Proceeds thereof to the Agent for application to the Discharge of the Loan Agreement Secured Obligations as provided in Section 4.02.

(d)      The Collateral Agent may make such demands or file such claims in respect of the Indenture Secured Obligations as may be necessary to prevent the waiver or bar of such claims under applicable statutes of limitations or other statutes, court orders or rules of procedure, but except as provided in this Section 2.04, the Collateral Agent shall not take any actions restricted by this Agreement until the Discharge of Loan Agreement Secured Obligations shall have occurred.

(e)      Following the Discharge of Loan Agreement Secured Obligations, the other provisions of this Section 2.04 shall apply to the Collateral Agent, for the benefit of itself, the Trustee and the Noteholders as if it was the Agent and the Agent was the Collateral Agent, mutatis mutandis.

## ARTICLE III.
## ACTIONS OF THE PARTIES

Section 3.01    Limitation on Certain Actions. Notwithstanding any other provision hereof, during any Standstill Period prior to the date that the Discharge of Loan Agreement Secured Obligations occurs, the Collateral Agent will not:

(a)      commence receivership or foreclosure proceedings against Borrower, any Guarantor, or any Lender Priority Collateral;

(b)      sell, collect, transfer or dispose of any Lender Priority Collateral or Proceeds; or

(c)      notify third party account debtors to make payment directly to it or any of its agents or other Persons acting on its behalf.

Section 3.02    Agent for Perfection. Each of the Agent, for and on behalf of itself and the Lenders, and the Collateral Agent, for and on behalf of itself, the Trustee, and each Noteholder, as applicable, agree to hold all Control Collateral and Cash Collateral that is part of the Collateral in its respective possession, custody, or control (or in the possession, custody, or control of agents or bailees for either, as applicable) as agent for

the other solely for the purpose of perfecting the security interest granted to each in such Control Collateral or Cash Collateral subject to the terms and conditions of this Section 3.02. None of the Agent, the Lenders, the Collateral Agent, the Trustee, or the Noteholders, as applicable, shall have any obligation whatsoever to the others to assure that the Control Collateral is genuine or owned by any Borrower, or any other Person or to preserve rights or benefits of any Person. The duties or responsibilities of the Agent and the Collateral Agent under this Section 3.02 are and shall be limited solely to holding or maintaining control of the Control Collateral and the Cash Collateral as agent for the other for purposes of perfecting the Lien held by the Collateral Agent or the Agent, as applicable. The Agent is not and shall not be deemed to be a fiduciary of any kind for the Collateral Agent, the Trustee, the Noteholders or any other Person. The Collateral Agent is not and shall not be deemed to be a fiduciary of any kind for the Agent or any other Person. In the event that (a) any of the Collateral Agent, the Trustee, or any Noteholder receives any Proceeds or Collateral in contravention of the Lien Priority, or (b) the Agent receives any Proceeds or Collateral in contravention of the Lien Priority, it shall promptly pay over such Proceeds or Collateral to (i) in the case of clause (a), the Agent, or (ii) in the case of clause (b), the Collateral Agent, in the same form as received with any necessary endorsements, for application in accordance with the provisions of Section 4.02 of this Agreement.

ARTICLE IV.<br>NOTICES AND APPLICATION OF PROCEEDS

Section 4.01  Notices of Exercise.  Concurrently with any exercise by the Collateral Agent of any of its rights and remedies under the Indenture Loan Documents following the occurrence of any default under any of the Indenture Loan Documents, the Collateral Agent shall give notice of such exercise to the Agent and shall only exercise such rights or remedies in a manner consistent with the terms of this Agreement. Concurrently with any exercise by the Agent of any of its rights and remedies under the Lender Loan Documents following the occurrence of any default under any of the Lender Loan Documents, the Agent shall give notice of such exercise to the Collateral Agent and shall only exercise such rights or remedies in a manner consistent with the terms of this Agreement.

Section 4.02  Application of Proceeds.

(a)  Revolving Nature of Loan Agreement Secured Obligations.  As long as the Agent is not exercising any of its remedies as a secured creditor under the Lender Loan Documents and including during any Standstill Period, the Agent may apply any and all of the proceeds of the Collateral consisting of accounts receivable, rental payments under the Leases, other rights to payment or Cash Collateral in accordance with the provisions of the Lender Loan Documents, subject to the provisions of this Agreement, including Sections 3.02 and 4.02 hereof. The Collateral Agent, for and on behalf of itself, the Trustee, and the Noteholders, expressly acknowledges and agrees that