(a) any such application of the proceeds of accounts receivable, rental payments under the Leases, other rights to payment or Cash Collateral or the release of any Lien by the Agent upon any portion of the Collateral in connection with a Permitted Disposition (as that term is defined in the Loan Agreement) shall not be considered to be the exercise of remedies under this Agreement; and (b) all Proceeds or Cash Collateral received by Agent in connection therewith may be applied, reversed, reapplied, credited or reborrowed, in whole or in part, as Loan Agreement Secured Obligations without reducing the Maximum Priority Debt Amount, except to the extent that such amounts are applied to permanently reduce the aggregate revolver commitments in accordance with the Loan Agreement, in which case the Maximum Priority Debt Amount shall be automatically reduced by such amount.

(b)    Turnover of Cash Collateral After Payment. Upon the Discharge of the Loan Agreement Secured Obligations, the Agent shall deliver to the Collateral Agent or execute such documents as the Collateral Agent may reasonably request to cause the Collateral Agent to have control over any Cash Collateral or Control Collateral still in Agent's possession, custody or control in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct, to be applied by the Collateral Agent to the Indenture Secured Obligations. In the event that the Indenture Secured Obligations are paid in full and the Loan Agreement Secured Obligations have not been, the Collateral Agent shall deliver to the Agent or execute such documents as the Agent may reasonably request to cause the Agent to have control over any Cash Collateral or Control Collateral still in Collateral Agent's possession, custody or control in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct, to be applied by the Agent to the Loan Agreement Secured Obligations. Proceeds of any exercise by the Agent or the Collateral Agent, as applicable, of any of their respective secured creditor rights or remedies under any of the Loan Documents, under applicable law, or otherwise with respect to any Lender Priority Collateral or Proceeds thereof, shall be (a) until the Discharge of the Loan Agreement Secured Obligations, retained by the Agent or promptly turned over by the Collateral Agent, the Trustee, or any Noteholder, as the case may be, to the Agent in the same form as received, with any necessary endorsements, (b) after the Discharge of the Loan Agreement Secured Obligations and until all Indenture Secured Obligations have been paid in full in cash, retained by the Collateral Agent or promptly turned over by the Agent to the Collateral Agent in the same form as received, with any necessary endorsements, and (c) if there are any amounts still due or any Loan Agreement Priority Obligations outstanding to the Agent or the Lenders under the Lender Loan Documents in excess of the Maximum Priority Debt Amount after the payment in full in cash of all Indenture Secured Obligations, retained by the Agent or promptly turned over by the Collateral Agent to the Agent in the same form as received, with any necessary endorsements. Proceeds of any exercise by the Agent or the Collateral Agent, as applicable, of any of their respective secured creditor rights or remedies under any of the Loan Documents, under applicable law, or otherwise with respect to any Indenture Priority Collateral or Proceeds thereof, shall be (a) until all Indenture Secured

Obligations have been paid in full in cash, retained by the Collateral Agent or promptly turned over by the Agent to the Collateral Agent in the same form as received, with any necessary endorsements for application to the repayment of the Indenture Secured Obligations, and (b) thereafter, retained by the Agent or promptly turned over by the Collateral Agent to the Agent in the same form as received, with any necessary endorsements for application to the repayment of the Loan Agreement Secured Obligations.

(c)    Application of Proceeds.    The Agent and the Collateral Agent hereby agree that all Collateral and all Proceeds received by either of them upon the exercise of any their secured creditor rights or remedies under any of the Loan Documents, applicable law, or otherwise shall be applied,

first, to the payment of costs and expenses of the Agent, the Lenders, or of the Collateral Agent, the Trustee, and the Noteholders, as applicable, in connection with such exercise,

second, in the case of all Lender Priority Collateral or Proceeds thereof, to the payment of the Loan Agreement Secured Obligations up to (but not in excess of) the Maximum Priority Debt Amount and in the case of all Indenture Priority Collateral and Indenture Exclusive Collateral or Proceeds thereof, to the payment of the Indenture Secured Obligations,

third, to the payment of the Indenture Secured Obligations, and

fourth, to the payment of any Loan Agreement Secured Obligations still outstanding.

In exercising remedies, whether as a secured creditor or otherwise, the Agent shall have no obligation or liability to the Collateral Agent, the Trustee, or to any Noteholder and the Collateral Agent shall have no obligation or liability to the Agent or any Lender regarding the adequacy of any Proceeds or for any action or omission save and except solely an action or omission that breaches the express obligations undertaken by each Party under the terms of this Agreement.

Section 4.03    Specific Performance.    Each of the Agent and the Collateral Agent is hereby authorized to demand specific performance of this Agreement, whether or not any Borrower shall have complied with any of the provisions of any of the Loan Documents, at any time when the other shall have failed to comply with any of the provisions of this Agreement applicable to it; provided, however, the remedy of specific performance shall not be available, and the asserting party shall be free to assert any and all legal defenses it may possess, if such remedy would result in, or otherwise constitute, a violation of the Employee Retirement Income Security Act of 1974, as amended. Each of the Agent and the Collateral Agent hereby irrevocably waives any defense based on

the adequacy of a remedy at law, which might be asserted as a bar to such remedy of specific performance.

## ARTICLE V.
## INTERCREDITOR ACKNOWLEDGEMENTS AND WAIVERS

Section 5.01   Notice of Acceptance and Other Waivers.

(a)   All Loan Agreement Secured Obligations at any time made or incurred by any Borrower or any of its Subsidiaries shall be deemed to have been made or incurred in reliance upon this Agreement, and the Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, hereby waives (i) notice of acceptance, or proof of reliance, by the Agent or any Lender of this Agreement, and (ii) notice of the existence, renewal, extension, accrual, creation, or non-payment of all or any part of the Loan Agreement Secured Obligations.   None of the Agent, the Lenders, or any of their respective affiliates, directors, officers, employees, or agents shall be liable for failure to demand, collect, or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral or to take any other action whatsoever with regard to the Collateral or any part thereof, except as specifically provided in this Agreement.   If the Agent or any Lender honors (or fails to honor) a request by any Borrower for an extension of credit pursuant to the Loan Agreement or any of the Lender Loan Documents, whether Agent or such Lender has knowledge that the honoring of (or failure to honor) any such request would constitute a default under the terms of the Indenture or any Indenture Loan Document or an act, condition, or event that, with the giving of notice or the passage of time, or both, would constitute such a default, or if Agent or any Lender otherwise should take or fail to take any action under or exercise any of its contractual rights or remedies under the Lender Loan Documents (subject to the express terms and conditions hereof), neither the Agent nor any Lender shall have any liability whatsoever to the Collateral Agent, the Trustee or any Noteholder as a result of such action, omission, or exercise (so long as any such exercise does not breach the express terms and provisions of this Agreement).   The Agent and the Lenders will be entitled to manage and supervise its loans and extensions of credit under the Loan Agreement and other Lender Loan Documents as the Agent and Lenders may, in their sole discretion, deem appropriate, and the Agent and the Lenders may manage their loans and extensions of credit without regard to any rights or interests that the Collateral Agent, the Trustee, or any of the Noteholders have in the Collateral or otherwise except as otherwise expressly set forth in this Agreement.   The Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, agrees that neither the Agent nor any Lender shall incur any liability as a result of a sale, lease, license, or other disposition of the Collateral, or any part thereof, pursuant to the Lender Loan Documents conducted in accordance with mandatory provisions of applicable law.

(b)   All Indenture Secured Obligations at any time made or incurred by any Borrower or any of its Subsidiaries shall be deemed to have been made or incurred in

reliance upon this Agreement, and the Agent and each Lender hereby waives (i) notice of acceptance, or proof of reliance, by the Collateral Agent, on behalf of itself, the Trustee and the Noteholders, of this Agreement, and (ii) notice of the existence, renewal, extension, accrual, creation, or non-payment of all or any part of the Indenture Secured Obligations. None of Collateral Agent, Trustee, or any of the Noteholders nor any of their affiliates, directors, officers, employees, or agents shall be liable for failure to demand, collect, or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral or to take any other action whatsoever with regard to the Collateral or any part thereof, except as specifically provided in this Agreement. If Collateral Agent, Trustee, or any of the Noteholders should take or fail to take any action under or exercise any of their contractual rights or remedies under the Indenture Agreements (subject to the express terms and conditions hereof), none of Collateral Agent, Trustee, or any of the Noteholders shall have any liability whatsoever to the Agent or the Lenders as a result of such action, omission, or exercise (so long as any such exercise does not breach the express terms and provisions of this Agreement). The Collateral Agent, Trustee, and Noteholders will be entitled to manage and supervise the Indenture Secured Obligations and their rights under the Indenture Loan Documents as they may, in their sole discretion, deem appropriate, and they may manage without regard to any rights or interests that the Agent has in the Collateral or otherwise except as otherwise expressly set forth in this Agreement. Subject to Section 2.03, the Agent on behalf of itself and the Lenders, agrees that none of the Collateral Agent, the Trustee, or the Noteholders shall incur any liability as a result of a sale, lease, license, or other disposition of the Collateral, or any part thereof, pursuant to the Indenture Loan Documents conducted in accordance with mandatory provisions of applicable law.

Section 5.02    Modifications to Lender Loan Documents and Indenture Agreements.

(a)    The Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, hereby agrees that, without affecting the obligations of the Collateral Agent, the Trustee and the Noteholders hereunder, the Agent and the Lenders may, at any time and from time to time, in its sole discretion without the consent of or notice to the Collateral Agent, the Trustee or any Noteholder (except to the extent such notice or consent is required pursuant to the express provisions of this Agreement), and without incurring any liability to the Collateral Agent, the Trustee or any Noteholder or impairing or releasing the subordination provided for herein, amend, restate, supplement, replace, refinance, extend, consolidate, restructure, or otherwise modify the Loan Agreement or any of the Lender Loan Documents in any manner whatsoever, including, to

(i)    change the manner, place, time, or terms of payment or renew or alter, all or any of the Loan Agreement Secured Obligations or otherwise amend, restate, supplement, or otherwise modify in any manner,

or grant any waiver or release with respect to, all or any part of the Loan Agreement Secured Obligations or any of the Lender Loan Documents,

(ii)    retain or obtain a Lien on any property of any Person to secure any of the Loan Agreement Secured Obligations, and in that connection to enter into any additional Lender Loan Documents,

(iii)    amend, or grant any waiver, compromise or release with respect to, or consent to any departure from, any guaranty or other obligations of any Person obligated in any manner under or in respect of the Loan Agreement Secured Obligations,

(iv)    release its Lien on any Collateral or other property,

(v)    exercise or refrain from exercising any rights against any Borrower or any other Person,

(vi)    retain or obtain the primary or secondary obligation of any other Person with respect to any of the Loan Agreement Secured Obligations, and

(vii)    otherwise manage and supervise the Loan Agreement Secured Obligations as the Agent and the Lenders shall deem appropriate.

(b)    The Agent, on behalf of itself and the Lenders, hereby agrees that Collateral Agent, on behalf of itself, the Trustee, and the Noteholders may, at any time and from time to time, in its sole discretion without the consent of or notice to the Agent (except to the extent such notice or consent is required pursuant to the express provisions of this Agreement), and without incurring any liability to the Agent, on behalf of itself and the Lenders, or impairing or releasing the subordination provided for herein, amend, restate, supplement, replace, refinance, extend, consolidate, restructure, or otherwise modify the Indenture Agreements in any manner whatsoever, provided, however, that in no event shall Collateral Agent, the Trustee, or any Noteholder obtain a Lien on any assets of Borrower, any Guarantor or any other Person other than Indenture Exclusive Collateral unless (i) Agent also obtains a Lien on such assets, or (ii) Agent declines in a writing to Collateral Agent to obtain a Lien on such assets.

(c)    Notwithstanding anything to the contrary herein, this Section 5.02 shall not be construed to constitute a waiver by the Collateral Agent, the Trustee, or any Noteholder of Section 4.12 of the Indenture.

(d)    Notwithstanding anything to the contrary herein, until the Discharge of Loan Agreement Secured Obligations shall have occurred, in no event shall the aggregate principal amount of Indebtedness represented by any notes issued pursuant to the Indenture, including any Notes (or represented by any other evidence of

indebtedness for borrowed money under the Notes or the Indenture) at any time exceed an aggregate principal amount equal to $130,000,000.

Section 5.03    Reinstatement and Continuation of Agreement.

(a)    If Agent or any Lender is required in any Insolvency Proceeding or otherwise to turn over or otherwise pay to the estate of any Borrower, any of its Subsidiaries or any other Person any amount (a "Recovery"), then the Loan Agreement Secured Obligations shall be reinstated to the extent of such Recovery. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair, or otherwise affect the obligations of the parties hereto from such date of reinstatement. All rights, interests, agreements, and obligations of the Collateral Agent, the Trustee, the Agent, the Lenders, and the Noteholders under this Agreement shall remain in full force and effect and shall continue irrespective of the commencement of, or any discharge, confirmation, conversion, or dismissal of any Insolvency Proceeding by or against any Borrower, any of its Subsidiaries or any other circumstance which otherwise might constitute a defense available to, or a discharge of any Borrower, or any Subsidiary in respect of the Loan Agreement Secured Obligations. No priority or right of the Agent and the Lenders shall at any time be prejudiced or impaired in any way by any act or failure to act on the part of any Borrower, any of its Subsidiaries or by the noncompliance by any Person with the terms, provisions, or covenants of the Loan Agreement, the Indenture or any of the other Loan Documents or Indenture Loan Documents, regardless of any knowledge thereof which the Agent or any Lender may have.

(b)    If Collateral Agent, the Trustee, or any Noteholder is required in any Insolvency Proceeding or otherwise to turn over or otherwise pay to the estate of any Borrower, any of its Subsidiaries or any other Person a Recovery, then the Indenture Secured Obligations shall be reinstated to the extent of such Recovery. No priority or right of the Collateral Agent, the Trustee, or any Noteholder shall at any time be prejudiced or impaired in any way by any act or failure to act on the part of any Borrower, or any of its Subsidiaries or by the noncompliance by any Person with the terms, provisions, or covenants of the Loan Agreement, the Indenture or any of the other Loan Documents or Indenture Loan Documents, regardless of any knowledge thereof which the Collateral Agent, the Trustee, or any Noteholder may have.

ARTICLE VI.
INSOLVENCY PROCEEDINGS

Section 6.01    DIP Financing. If any Borrower, any of its Subsidiaries or E&W shall be subject to any Insolvency Proceeding and the Agent or any Lender shall desire, prior to the Discharge of Loan Agreement Secured Obligations, to permit the use of cash collateral that constitutes Lender Priority Collateral or to permit any Borrower, any of its Subsidiaries or E&W to obtain financing under Section 363 or Section 364 of Title 11 of the United States Code or any similar provision under the law applicable to any

Insolvency Proceeding ("DIP Financing") to be secured by all or any portion of the Lender Priority Collateral, then the Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, agrees that it will raise no objection to such use of cash collateral or DIP Financing and will not request adequate protection or any other relief in connection with its or their interest in any such Lender Priority Collateral except to the extent specified in this Section 6.01 and in Section 6.02.  To the extent the Liens in the Lender Priority Collateral securing the Loan Agreement Secured Obligations are subordinated or *pari passu* with such DIP Financing, the Collateral Agent, for and on behalf of itself, the Trustee, and the Noteholders, hereby agrees that its Liens in the Lender Priority Collateral shall be subordinated to such DIP Financing (and all obligations relating thereto) upon the terms and conditions specified in this Agreement.  Until the Discharge of Loan Agreement Secured Obligations has occurred, the Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, agrees that none of them shall seek relief from the automatic stay or any other stay in any Insolvency Proceeding in respect of the Lender Priority Collateral and will not provide or offer to provide any DIP Financing secured by a Lien in the Lender Priority Collateral senior to or *pari passu* with the Liens securing the Loan Agreement Secured Obligations, in each case unless the Agent otherwise has provided its express written consent.  Until the Discharge of Loan Agreement Secured Obligations, the Collateral Agent, for and on behalf of itself, the Trustee and the Noteholders, waives any right to seek or obtain a "priming" lien or a lien that would be *pari passu* with the Agent's Liens whether as adequate protection for the use of Collateral or Indenture Exclusive Collateral or otherwise.

Section 6.02    No Contest.  The Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, agrees that, prior to the Discharge of Loan Agreement Secured Obligations, none of them shall contest (or support any other Person contesting) (a) any request by the Agent or any Lender for adequate protection, or (b) any objection by the Agent or any Lender to any motion, relief, action, or proceeding based on Agent or any Lender claiming that their interests in the Lender Priority Collateral are not adequately protected or any other similar request under any law applicable to an Insolvency Proceeding. Notwithstanding the foregoing, in any Insolvency Proceeding, if the Agent or any Lender is granted adequate protection in the form of additional collateral in connection with any DIP Financing or use of cash collateral under Section 363 or Section 364 of Title 11 of the United States Code or any similar provision under the law applicable to any Insolvency Proceeding, then the Collateral Agent, on behalf of itself, the Trustee, or any of the Noteholders, may seek or request adequate protection in the form of a Lien on such additional collateral, which Lien hereby is and shall be deemed to be subordinated to the Liens securing the Loan Agreement Secured Obligations up to (but not in excess of) the Maximum Priority Debt Amount and such DIP Financing (and all obligations relating thereto) on the same basis as the Lien Priority.  The Agent, on behalf of itself and the Lenders, agrees that until the Indenture Secured Obligations are paid in full in cash, none of them shall contest (or support any other Person contesting) (a) any request by the Collateral Agent or any Noteholder for adequate protection in the Indenture Priority Collateral or the Indenture Exclusive Collateral, or (b) any objection

by the Collateral Agent or any Noteholder to any motion, relief, action, or proceeding based on Collateral Agent or any Noteholder claiming that their interests in the Indenture Priority Collateral or Indenture Exclusive Collateral are not adequately protected or any other similar request under any law applicable to an Insolvency Proceeding, but only to the extent that such request is consistent with and subject to the other provisions of this Intercreditor Agreement, including Sections 2.01 and 6.01. In the event the Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, seeks or requests adequate protection and such adequate protection is granted in the form of Liens in respect of additional collateral, then the Collateral Agent, on behalf of itself, the Trustee, and each of the Noteholders, agrees that the Agent and Lenders also shall be granted a senior Lien on such additional collateral as security for the Loan Agreement Secured Obligations (and for any such DIP Financing) and that any Lien on such additional collateral securing the Indenture Secured Obligations shall be subordinated to the Liens in respect of such additional collateral securing the Loan Agreement Secured Obligations up to (but not in excess of) the Maximum Priority Debt Amount and any such DIP Financing and any other Liens granted to the Agent as adequate protection on the same basis as the Lien Priority and subject to the other terms and conditions of this Agreement. Nothing contained herein shall prohibit or in any way limit the Agent and the Lenders, prior to the Discharge of Loan Agreement Secured Obligations, from objecting in any Insolvency Proceeding or otherwise to any action taken by the Collateral Agent, the Trustee or any of the Noteholders, including the seeking by the Collateral Agent, the Trustee or any Noteholder of adequate protection or the asserting by the Collateral Agent, the Trustee or any Noteholder of any of its rights and remedies under the Indenture Loan Documents or otherwise except with respect to the Indenture Exclusive Collateral or the Indenture Priority Collateral.

Section 6.03    Asset Sales. The Collateral Agent agrees, on behalf of itself, the Trustee, and the Noteholders, that prior to the Discharge of Loan Agreement Secured Obligations, it will not oppose any sale consented to by Agent or any Lender of any Lender Priority Collateral pursuant to Section 365(f) of Title 11 of the United States Code (or any similar provision in any other applicable Bankruptcy Law) so long as the proceeds of such sale are applied in accordance with this Agreement.

Section 6.04    Enforceability. The provisions of this Agreement are intended to be and shall be enforceable under Section 510 of Title 11 of the United States Code. The Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, agrees that all distributions that the Collateral Agent, the Trustee, or any Noteholder receives in any Insolvency Proceeding on account of the Lender Priority Collateral or Proceeds thereof shall be held in trust by such Person and turned over to the Agent for application in accordance with Section 4.02 of this Agreement. The Agent, on behalf of itself and the Lenders, agrees that all distributions that the Agent or any Lender receives in any Insolvency Proceeding on account of the Indenture Priority Collateral, the Indenture Exclusive Collateral or Proceeds thereof shall be held in trust by such Person and turned over to the Collateral Agent for application in accordance with Section 4.02 of this

Agreement. To the extent that any amounts received by any Person are paid over in connection with this provision, the obligations owed by any Borrower to such Person will be deemed to be reinstated to the extent of the amounts so paid over.

## ARTICLE VII.
## MISCELLANEOUS

Section 7.01    <u>Rights of Subrogation</u>.    The Collateral Agent agrees that no payment or distribution to the Agent or any Lender on account of Lender Priority Collateral or Proceeds thereof pursuant to the provisions of this Agreement shall entitle the Collateral Agent, the Trustee, or any Noteholder to exercise any rights of subrogation in respect thereof until the Discharge of Loan Agreement Secured Obligations shall have occurred. Following the Discharge of Loan Agreement Secured Obligations, the Agent agrees to execute such documents, agreements, and instruments as the Collateral Agent, the Trustee or any Noteholder may reasonably request to evidence the transfer by subrogation to any such Person of an interest in the Loan Agreement Secured Obligations resulting from payments or distributions to the Agent on account of the Lender Priority Collateral or Proceeds thereof by such Person, so long as all costs and expenses (including all reasonable legal fees and disbursements) incurred in connection therewith by the Agent are paid by such Person upon request for payment thereof.

Section 7.02    <u>Further Assurances</u>.    Each Party will, at its own expense (but subject to such Party's reimbursement rights under the Lender Loan Documents or Indenture Loan Documents, as applicable) and at any time and from time to time, promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that either Party may reasonably request, in order to protect any right or interest granted or purported to be granted hereby or to enable the Agent or the Collateral Agent to exercise and enforce its rights and remedies hereunder; provided, however, that no Party shall be required to pay over any payment or distribution, execute any instruments or documents, or take any other action referred to in this <u>Section 7.02</u> to the extent that such action would contravene any law, order or other legal requirement, and in the event of a controversy or dispute, such Party may interplead any payment or distribution in any court of competent jurisdiction, without further responsibility in respect of such payment or distribution under this <u>Section 7.02</u>.

Section 7.03    <u>Representations.</u>    The Original Agent represents and warrants to the Collateral Agent that it has the requisite power and authority under the Original Loan Agreement to enter into, execute, deliver, and carry out the terms of this Agreement. The Collateral Agent represents and warrants that it has the requisite power and authority under the Indenture to enter into, execute, deliver, and carry out the terms of this Agreement on behalf of itself, the Trustee, and the Noteholders.

Section 7.04    <u>Amendments</u>.    No amendment or waiver of any provision of this Agreement nor consent to any departure by any Party hereto shall be effective unless it is in a written agreement executed by the Collateral Agent and the Agent, and then such

waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 7.05   Addresses for Notices.    All demands, notices and other communications provided for hereunder shall be in writing and, if to the Collateral Agent, mailed or sent by telecopy or delivered to it, addressed to it as follows:

> The Bank of New York Trust Company, N.A.
> 700 South Flower Street, Suite 500
> Los Angeles, CA 90017
> Telephone: (213) 630-6176
> Facsimile: (213) 630-6298

With a copy to:

> The Bank of New York Trust Company, N.A.
> One Wall Street
> New York, New York 10286
> Attention: Corporate Trust Department
> Telephone: (212) 852-1662
> Facsimile: (212) 852-1626

and if to the Agent, mailed, sent or delivered thereto, addressed to it as follows:

> Wells Fargo Foothill, Inc.
> 2450 Colorado Avenue
> Suite 3000 West
> Santa Monica, CA 90404
> Attention: Structured Finance Division Management
> Facsimile: (310) 453-7442

With a copy to:

> Paul, Hastings, Janofsky & Walker LLP
> 515 South Flower Street, 25th Floor
> Los Angeles, California 90071
> Attention: Hydee R. Feldstein, Esq.
> Facsimile: (213) 627-0705

or as to any party at such other address as shall be designated by such party in a written notice to the other parties complying as to delivery with the terms of this Section 7.05. All such demands, notices and other communications shall be effective, when mailed, two business days after deposit in the mails, postage prepaid, when sent by telecopy, when receipt is acknowledged by the receiving telecopy equipment (or at the opening of

the next business day if receipt is after normal business hours), or when delivered, as the case may be, addressed as aforesaid.

Section 7.06    No Waiver, Remedies.    No failure on the part of any Party to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.    The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 7.07    Continuing Agreement, Transfer of Priority Obligations.    This Agreement is a continuing agreement and shall (i) remain in full force and effect until the Discharge of the Loan Agreement Secured Obligations shall have occurred and the Indenture Secured Obligations shall have been paid in full, (ii) be binding upon the Parties and their successors and assigns, and (iii) inure to the benefit of and be enforceable by the Parties and their respective successors, transferees and assigns. Without limiting the generality of the foregoing clause (iii), the Agent or any Lender or the Collateral Agent, the Trustee, or any Noteholder may assign or otherwise transfer all or any portion of the Loan Agreement Secured Obligations or the Indenture Secured Obligations, as applicable, to any other Person (other than Borrower, any Guarantor or any Affiliate of Borrower and any Subsidiary of Borrower or any Guarantor), and such other Person shall thereupon become vested with all the rights and obligations in respect thereof granted to the Agent or any Lender or the Collateral Agent, the Trustee, or any Noteholder, as the case may be, herein or otherwise.

Section 7.08    Governing Law:  Entire Agreement.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed in the State of New York, including, without limitation, Sections 5-1401 and 5-1402 of the New York General Obligations Law and New York Civil Practice Laws and Rules 327(b) except as otherwise preempted by applicable federal law.    This Agreement constitutes the entire agreement and understanding among the Parties with respect to the subject matter hereof and supersedes any prior agreements, written or oral, with respect thereto.

Section 7.09    Counterparts.    This Agreement maybe executed in any number of counterparts (including via facsimile or electronic mail), and it is not necessary that the signatures of all Parties be contained on any one counterpart hereof, each counterpart will be deemed to be an original, and all together shall constitute one and the same document.

Section 7.10    No Third Party Beneficiary.    This Agreement is solely for the benefit of the Parties (and their permitted assignees).    No other Person (including any Borrower, or any Affiliate of Borrower and any Subsidiary of Borrower) shall be deemed to be a third party beneficiary of this Agreement.

Section 7.11   Headings.   The headings of the articles and sections of this Agreement are inserted for purposes of convenience only and shall not be construed to affect the meaning or construction of any of the provisions hereof

Section 7.12   Severability.   If any of the provisions in this Agreement shall, for any reason, be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement and shall not invalidate the Lien Priority or any other priority set forth in this Agreement.

Section 7.13   Collateral Agent Status.   Nothing in this Agreement shall be construed to operate as a waiver by the Collateral Agent, with respect to any Borrower, any of its Subsidiaries, the Trustee, or any Noteholder, of the benefit of any exculpatory rights, privileges, immunities, indemnities, or reliance rights contained in the Indenture or any of the other Indenture Loan Documents.  For all purposes of this Agreement, the Collateral Agent may (a) rely in good faith, as to matters of fact, on any representation of fact believed by the Collateral Agent to be true (without any duty of investigation) and that is contained in a written certificate of any authorized representative of the Borrowers or of the Lenders, and (b) assume in good faith (without any duty of investigation), and rely upon, the genuineness, due authority, validity, and accuracy of any certificate, instrument, notice, or other document believed by it in good faith to be genuine and presented by the proper person.  Each Borrower and Agent expressly acknowledge that the subordination and related agreements set forth herein by the Collateral Agent are made solely in its capacity as Collateral Agent under the Indenture with respect to the Notes issued thereunder and the other Indenture Loan Documents and are not made by the Collateral Agent in its individual commercial capacity.

Section 7.14   Acknowledgment.   Each Borrower hereby acknowledges that it has received a copy of this Agreement and consents thereto, and agrees to recognize all rights granted thereby to the Agent and the Collateral Agent and will not do any act or perform any obligation which is not in accordance with the agreements set forth in this Agreement.  Each Borrower further acknowledges and agrees that it is not an intended beneficiary or third party beneficiary under this Agreement.

Section 7.15   VENUE; JURY TRIAL WAIVER.

(a)   THE PARTIES HERETO AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE CITY OF NEW YORK OR THE SOUTHERN DISTRICT OF NEW YORK, PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.   EACH PARTY HERETO WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW,

ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 7.15.

(b)     EACH PARTY HERETO HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. EACH PARTY HERETO REPRESENTS THAT IT HAS REVIEWED THIS WAIVER AND IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

Section 7.16   Intercreditor Agreement.   This Agreement is the Intercreditor Agreement referred to in the Indenture. If this Agreement or all or any portion of either Party's rights or obligations hereunder are assigned or otherwise transferred to any other Person, such other Person shall execute and deliver an agreement containing terms substantially identical to those contained in this Agreement.

Section 7.17   Gaming Laws.

(a)     Notwithstanding anything in this Agreement to the contrary, the Collateral Agent and the Agent acknowledge, understand and agree that the Gaming Laws may impose certain licensing or transaction approval requirements prior to the exercise of the rights and remedies granted to them under this Agreement and the Loan Documents with respect to the Collateral subject to the Gaming Laws.

(b)     If any consent under the Gaming Laws is required in connection with the taking of any of the actions which may be taken by either the Collateral Agent or the Agent in the exercise of their rights hereunder, then agrees to use its best efforts to secure such consent and to cooperate with the other party in obtaining any such consent. Upon the occurrence and during the continuation of any event of default under any Loan Document, each party shall promptly execute and/or cause the execution of all applications, certificates, instruments, and other documents and papers that the Collateral Agent or the Agent may be required to file in order to obtain any necessary approvals under the Gaming Laws.

[signature pages follow]

IN WITNESS WHEREOF, the Agent, the Collateral Agent, and the Borrowers have caused this Agreement to be duly executed and delivered as of the date first above written.

**AGENT:**                          **WELLS FARGO FOOTHILL, INC.**,
                                    a California corporation


                                    By: _____
                                        Name:
                                        Title:

**COLLATERAL AGENT:**

**THE BANK OF NEW YORK TRUST COMPANY, N.A.,**
solely in its capacity as Collateral Agent (and not individually)

By: _____
    Name:
    Title:

<u>**BORROWERS:**</u>

**155 EAST TROPICANA, LLC,**
a Nevada limited liability company


By: _____
    Name:
    Title:


**155 EAST TROPICANA FINANCE CORP.,**
a Nevada corporation


By: _____
    Name:
    Title:

**EXHIBIT L-1**

**FORM OF LIBOR NOTICE**

Wells Fargo Foothill, Inc., as Agent
under the below referenced Loan Agreement
2450 Colorado Avenue
Suite 3000 West
Santa Monica, California 90404

Ladies and Gentlemen:

Reference hereby is made to that certain Credit Agreement, dated as of March 29, 2005 (as amended, restated, supplemented or otherwise modified from time to time, including all schedules thereto, the "Credit Agreement"), among 155 East Tropicana, LLC ("Parent"), 155 East Tropicana Finance Corp. ("Finance Corp."; Parent and Finance Corp. are referred to hereinafter each individually as a "Borrower", and individually and collectively, jointly and severally, as the "Borrowers"), the lenders signatory thereto (such lenders, together with their respective successors and permitted assigns, are referred to hereinafter each individually as a "Lender" and collectively as the "Lenders"), and Wells Fargo Foothill, Inc., a California corporation, as the arranger and administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, "Agent"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement.

This LIBOR Notice represents Administrative Borrower's request to elect the LIBOR Option with respect to outstanding Advances in the amount of $_____ (the "LIBOR Rate Advance")[, and is a written confirmation of the telephonic notice of such election given to Agent].

Such LIBOR Rate Advance will have an Interest Period of 1, 2, or 3 month(s) commencing on _____.

This LIBOR Notice further confirms Administrative Borrower's acceptance, for purposes of determining the rate of interest based on the LIBOR Rate under the Credit Agreement, of the LIBOR Rate as determined pursuant to the Credit Agreement.

Administrative Borrower represents and warrants that (i) as of the date hereof, each representation or warranty contained in or pursuant to any Loan Document, any agreement, instrument, certificate, document or other writing furnished at any time under or in connection with any Loan Document, and as of the effective date of any advance, continuation or conversion requested above is true and correct in all material respects (except to the extent any representation or warranty expressly relates to an earlier date), (ii) each of the covenants and agreements contained in any Loan Document have been performed (to the extent required to be performed on or before the date hereof or

Wells Fargo Foothill, Inc., as Agent
Page 2

each such effective date), and (iii) no Default or Event of Default has occurred and is continuing on the date hereof, nor will any thereof occur after giving effect to the request above.

Dated: _____

155 EAST TROPICANA, LLC,
a Nevada limited liability company,
as Administrative Borrower

By _____
Name:_____
Title: _____

Acknowledged by:

**WELLS FARGO FOOTHILL, INC.,**
a California corporation, as Agent

By: _____
Name: _____
Title: _____

**Schedule A-1**

**Agent's Account**

An account at a bank designated by Agent from time to time as the account into which Borrowers shall make all payments to Agent under this Agreement and the other Loan Documents; unless and until Agent notifies Borrowers to the contrary, Agent's Account shall be that certain deposit account bearing account number 323-266193 and maintained by Agent with JPMorgan Chase Bank, 4 New York Plaza, 15th Floor, New York, New York 10004, ABA #021000021.

Schedule B-1

| Month | EBITDA |
|---|---|
| January 2004 | $425,000 |
| February 2004 | $425,000 |
| March 2004 | $425,000 |
| April 2004 | $425,000 |
| May 2004 | $425,000 |
| June 2004 | $425,000 |
| July 2004 | $425,000 |
| August 2004 | $401,044 |
| September 2004 | $437,334 |
| October 2004 | $437,334 |
| November 2004 | $437,334 |
| December 2004 | $437,334 |

LA/1106924.1

## Schedule C-1

**Commitments**

| Lender | Revolver Commitment | Total Commitment |
|---|---|---|
| Wells Fargo Foothill, Inc. | $15,000,000 | $15,000,000 |
| All Lenders | $15,000,000 | $15,000,000 |

**Schedule D-1—Designated Account**

Wells Fargo Brokerage Services, LLC

| Account Name | Account Number |
| --- | --- |
| 155 East Tropicana, LLC | 11552783 |

**Schedule P-1**

**Permitted Holders**

Permitted Holders means Florida Hooters LLC, a Nevada limited liability company, and any of its Affiliates.

**Schedule P-2—Permitted Liens**

1. The property described herein is located within the boundaries of the Clark County Sanitation District and is subject to any fees that may be charged against said property by the hereinbefore mentioned district.

2. Water rights, claims or title to water.

3. Reservations in the Patent from the State of Nevada
   Recorded:     July 12, 1930
   Book          16 of Deeds, pages 444 and 445 Doc/Inst. No. 36633 of Official Records

4. An easement for the purpose shown below and rights incidental thereto as set forth in a document
   Granted to:    Southern Nevada Power Company
   Purpose:       power lines
   Recorded:      December 17, 1937
   Book           12 of Miscellaneous, page 13 Doc/Inst. No. 71441 of Official Records

5. An easement for the purpose shown below and rights incidental thereto as set forth in a document
   Granted to:    Southern Nevada Power Company
   Purpose:       power lines
   Recorded:      May 22, 1952
   Book           66, page 454 Doc/Inst. No. 384979 of Official Records

6. An easement for the purpose shown below and rights incidental thereto as set forth in a document
   Granted to:    Clark County
   Purpose:       perpetual avigation
   Recorded:      October 10, 1962
   Book           392 Doc/Inst. No. 316235 of Official Records

7. An easement for the purpose shown below and rights incidental thereto as set forth in a document
   Granted to:    Nevada Power Company
   Purpose:       power lines
   Recorded:      April 29, 1963
   Book           440 Doc/Inst. No. 355176 of Official Records

   A Partial Relinquishment of Right of Way Grant
   Recorded:      October 19, 1973
   Book:          374, Doc/Inst. No. 333038

8. An easement for the purpose shown below and rights incidental thereto as set forth in a document
   Granted to:    Nevada Power Company and Central Telephone Company
   Purpose:       power and communications lines
   Recorded:      September 29, 1969
   Book:          981 Doc/Inst. No. 787746 of Official Records

9. An easement for the purpose shown below and rights incidental thereto as set forth in a document
   Granted to:        Clark County
   Purpose:           perpetual avigation
   Recorded:          December 11, 1972
   Book               285 Doc/Inst. No. 244447 of Official Records

10. An easement for the purpose shown below and rights incidental thereto as set forth in a document
    Granted to:       Las Vegas Valley Water District
    Purpose:          water lines
    Recorded:         December 29, 1972
    Book              289 Doc/Inst. No. 248864 of Official Records

11. An easement for the purpose shown below and rights incidental thereto as set forth in a document
    Granted to:       Nevada Power Company and Central Telephone Company
    Purpose:          power and communications
    Recorded:         May 3, 1973
    Book              324 Doc/Inst. No. 283535 of Official Records

12. An easement for the purpose shown below and rights incidental thereto as set forth in a document
    Granted to:       Nevada Power Company
    Purpose:          power lines
    Recorded:         May 3, 1973
    Book              324 Doc/Inst. No. 283536 of Official Records

13. An easement for the purpose shown below and rights incidental thereto as set forth in a document
    Granted to:       Nevada Power Company and Central Telephone Company
    Purpose:          power and communications
    Recorded:         July 11, 1973
    Book:             345 Doc/Inst. No. 304070 of Official Records

14. An easement for the purpose shown below and rights incidental thereto as set forth in a document
    Granted to:       Nevada Power Company and Central Telephone Company
    Purpose:          power and communications
    Recorded:         September 20, 1973
    Book              365 Doc/Inst. No. 324984 of Official Records

15. An easement for the purpose shown below and rights incidental thereto as set forth in a document
    Granted to:       Nevada Power Company and Central Telephone Company
    Purpose:          power and communications
    Recorded:         July 8, 1976
    Book              638 Doc/Inst. No. 597565 of Official Records

16. Matters contained in the dedication statement or elsewhere on the tract or parcel map shown below,
    which among other things provides:

    Tract/Parcel Map:  Parcel Map on file in File 39, Page 42
    Provisions:        easements for public utilities

    Reference is made to said map for full particulars.

SCHEDULES TO CREDIT AGREEMENT

17. An easement for the purpose shown below and rights incidental thereto as set forth in a document
    Granted to:       Clark County
    Purpose:          perpetual avigation
    Recorded:         December 27, 1982
    Book              1665 Doc/Inst. No. 1624175 of Official Records

18. An easement for the purpose shown below and rights incidental thereto as set forth in a document
    Granted to:       Nevada Power Company
    Purpose:          power lines
    Recorded:         May 28, 1991
    Book              910528 Doc/Inst. No. 00509 of Official Records

19. An easement for the purpose shown below and rights incidental thereto as set forth in a document
    Granted to:       Nevada Power Company
    Purpose:          power
    Recorded:         December 18, 1990
    Book              901218 Doc/Inst. No. 00908 of Official Records

20. An easement for the purpose shown below and rights incidental thereto as set forth in a document
    Granted to:       Las Vegas Valley Water District, a quasi-municipal corporation
    Purpose:          Water Pipe Lines
    Recorded:         November 9, 2004
    Book:             20041109 Doc/Inst. No. 0003408 of Official Records

21. Matters which may be disclosed by an inspection or by a survey of said land that is satisfactory to the
    title company, or by inquiry of the parties in possession thereof.

22. Discrepancies, conflicts in boundary lines, shortage in area, encroachments or any other facts which a
    correct survey would disclose, and which are not shown by the public records.

SCHEDULES TO CREDIT AGREEMENT

**Schedule P-3—Existing Investments**

**155 East Tropicana, LLC**

100 shares in 155 East Tropicana Finance Corp.

**155 East Tropicana Finance Corp.**

None.

———

**Schedule R-1—Real Property Collateral**

The land-based facilities and related amenities comprising the San Remo Las Vegas Casino/Hotel Property (and, after the completion of the renovations, the Hooters Casino Hotel) located at 115 and 155 East Tropicana Avenue, Las Vegas, Nevada.

Such real property collateral consists of the following:

**APN:**

162-28-101-002
162-28-102-001

CREDIT FACILITY - schedules to credit agreement (6).DOC

## Schedule 1.1

As used in the Agreement, the following terms shall have the following definitions:

"Account" means an account (as that term is defined in the Code).

"Account Debtor" means any Person who is obligated on an Account, chattel paper, or a general intangible.

"ACH Transactions" means any cash management or related services (including the Automated Clearing House processing of electronic fund transfers through the direct Federal Reserve Fedline system) provided by a Bank Product Provider for the account of Administrative Borrower or its Subsidiaries.

"Acquired Indebtedness" has the meaning specified therefor in the Indenture.

"Administrative Borrower" has the meaning specified therefor in Section 16.9.

"Advances" has the meaning specified therefor in Section 2.1(a).

"Affiliate" means, as applied to any Person, any other Person who controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" means the possession, directly or indirectly through one or more intermediaries, of the power to direct the management and policies of a Person, whether through the ownership of Stock, by contract, or otherwise; provided, however, that, for purposes of Section 6.13 hereof:  (a) any Person which owns directly or indirectly 10% or more of the Stock having ordinary voting power for the election of directors or other members of the governing body of a Person or 10% or more of the partnership or other ownership interests of a Person (other than as a limited partner of such Person) shall be deemed an Affiliate of such Person, (b) each director (or comparable manager) of a Person shall be deemed to be an Affiliate of such Person, and (c) each partnership or joint venture in which a Person is a partner or joint venturer shall be deemed an Affiliate of such Person.

"Agent" has the meaning specified therefor in the preamble to the Agreement.

"Agent-Related Persons" means Agent, together with its Affiliates, officers, directors, employees, attorneys, and agents.

"Agent's Account" means the Deposit Account of Agent identified on Schedule A-1.

"Agent's Liens" means the Liens granted by Borrowers or their Subsidiaries to Agent under the Loan Documents.

"Agreement" means the Credit Agreement to which this Schedule 1.1 is attached.

"Applicable Capital Gain Tax Rate" means, for any taxable period, the highest effective combined United States federal, Nevada or Florida state and local income tax applicable to net capital gain during such period.

"Applicable Income Tax Rate" means, for any taxable period, the highest effective combined individual United States federal, Nevada or Florida state and local income tax applicable during such period.

"Architect" means C&B Nevada, Inc., and its successors identified by notice from Parent to Agent.

"Architect Agreement" means that certain letter agreement, dated as of December 2, 2004 (as amended, modified or supplemented from time to time in accordance with the Agreement), executed by the Architect and Parent.

"Assignee" has the meaning specified therefor in Section 13.1(a).

"Assignment and Acceptance" means an Assignment and Acceptance Agreement substantially in the form of Exhibit A-1.

"Authorized Person" means any officer or employee of Administrative Borrower.

"Availability" means, as of any date of determination, the amount that Borrowers are entitled to borrow as Advances under Section 2.1 (after giving effect to all then outstanding Obligations (other than Bank Product Obligations) and all sublimits and reserves then applicable hereunder).

"Bank Product" means any financial accommodation extended to Administrative Borrower or its Subsidiaries by a Bank Product Provider (other than pursuant to the Agreement) including: (a) credit cards, (b) credit card processing services, (c) debit cards, (d) purchase cards, (e) ACH Transactions, (f) cash management, including controlled disbursement, accounts or services, or (g) transactions under Hedge Agreements.

"Bank Product Agreements" means those agreements entered into from time to time by Administrative Borrower or its Subsidiaries with a Bank Product Provider in connection with the obtaining of any of the Bank Products.

"Bank Product Obligations" means all obligations, liabilities, contingent reimbursement obligations, fees, and expenses owing by Administrative Borrower or its Subsidiaries to any Bank Product Provider pursuant to or evidenced by the Bank Product Agreements and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all such amounts that Administrative Borrower or its Subsidiaries are obligated to reimburse to Agent or any member of the Lender Group as a result of Agent or such member of the Lender Group purchasing participations from, or executing indemnities or reimbursement obligations to, a Bank Product Provider with respect to the Bank Products provided by such Bank Product Provider to Administrative Borrower or its Subsidiaries.

"Bank Product Provider" means Wells Fargo or any of its Affiliates.

"Bank Product Reserve" means, as of any date of determination, the lesser of (a) $1,500,000, and (b) the amount of reserves that Agent has established (based upon the Bank Product Providers' reasonable determination of the credit exposure of Administrative Borrower and its Subsidiaries in respect of Bank Products) in respect of Bank Products then provided or outstanding.

"Bankruptcy Code" means title 11 of the United States Code, as in effect from time to time.

"Base LIBOR Rate" means the rate per annum, determined by Agent in accordance with its customary procedures, and utilizing such electronic or other quotation sources as it considers appropriate (rounded upwards, if necessary, to the next 1/100%), to be the rate at which Dollar

2

deposits (for delivery on the first day of the requested Interest Period) are offered to major banks in the London interbank market 2 Business Days prior to the commencement of the requested Interest Period, for a term and in an amount comparable to the Interest Period and the amount of the LIBOR Rate Loan requested (whether as an initial LIBOR Rate Loan or as a continuation of a LIBOR Rate Loan or as a conversion of a Base Rate Loan to a LIBOR Rate Loan) by Administrative Borrower in accordance with the Agreement, which determination shall be conclusive in the absence of manifest error.

"Base Rate" means, the rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate", with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate.

"Base Rate Loan" means the portion of the Advances that bears interest at a rate determined by reference to the Base Rate.

"Base Rate Margin" means 2.0 percentage points.

"Benefit Plan" means a "defined benefit plan" (as defined in Section 3(35) of ERISA) for which any Borrower or any Subsidiary or ERISA Affiliate of any Borrower has been an "employer" (as defined in Section 3(5) of ERISA) within the past six years.

"Board of Directors" means the board of directors (or comparable managers or management board) of Parent or any committee thereof duly authorized to act on behalf of the board of directors (or comparable managers or management board).

"Borrower" and "Borrowers" have the respective meanings specified therefor in the preamble to the Agreement.

"Borrowing" means a borrowing hereunder consisting of Advances made on the same day by the Lenders (or Agent on behalf thereof), or by Swing Lender in the case of a Swing Loan, or by Agent in the case of a Protective Advance, in each case, to Administrative Borrower.

"Borrowing Base" means, as of any date of determination, the result of:

(a)    *the greater of*

(i)    the product of the TTM EBITDA for the most recently ended 12 month period for which financial statements have been delivered pursuant to Section 5.3 (provided, however that for purposes of determination of the Borrowing Base, EBITDA for each month from and including January, 2004 through and including December, 2004 shall be as set forth on Schedule B-1), *multiplied by* (x) for any date of determination on or before September 30, 2006, 3.0, and (y) for any date of determination after September 30, 2006, 2.0, and

(ii)    $7,500,000, *minus*

(b)    the sum of (i) the Bank Product Reserve, and (ii) the aggregate amount of reserves, if any, established by Agent under Section 2.1(b).

"Borrowing Base Certificate" means a certificate in the form of Exhibit B-1.

LA/1099296.7

"Business" means the ownership, operation, development, renovation and maintenance of a casino and hotel (presently operated under the name "Hotel San Remo Casino and Resort," and to be operated under the name "Hooters Casino Hotel" (or other similar name using the Hooters Brand) following completion of the Renovation) located on the Real Property Collateral, including the Renovation (and the conduct of any of the foregoing before, during and after such Renovation) and including any of the foregoing conducted by E&W pursuant to any of the Leases.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the state of New York, except that, if a determination of a Business Day shall relate to a LIBOR Rate Loan, the term "Business Day" also shall exclude any day on which banks are closed for dealings in Dollar deposits in the London interbank market.

"Capital Expenditures" means, with respect to any Person for any period, the aggregate of all expenditures by such Person and its Subsidiaries during such period that are capital expenditures as determined in accordance with GAAP, whether such expenditures are paid in cash or financed.

"Capitalized Lease Obligation" means that portion of the obligations under a Capital Lease that is required to be capitalized in accordance with GAAP.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Cash Collateral Account" means that certain deposit account maintained by E&W pursuant to the E&W Guaranty and the Casino Lease, as such account is identified in Schedule 1 to the E&W Guaranty, or any replacement account maintained for purposes of deposit of remaining cash flow pursuant to Section 4.2(d) of the Casino Lease.

"Cash Collateral and Disbursement Agreement" means the Cash Collateral and Disbursement Agreement, dated as of the date of Indenture, among the Borrowers, the Trustee and the Disbursement Agent.

"Cash Equivalents" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within 1 year from the date of acquisition thereof, (b) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within 1 year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("S&P") or Moody's Investors Service, Inc. ("Moody's"), (c) commercial paper maturing no more than 270 days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit or bankers' acceptances maturing within 1 year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof having at the date of acquisition thereof combined capital and surplus of not less than $250,000,000, (e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the amount maintained with any such other bank is less than or equal to $100,000 and is insured by the Federal Deposit Insurance Corporation, and (f) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (e) above.

"Cash Management Account" has the meaning specified therefor in Section 2.7(a).

4

"Cash Management Agreements" means those certain cash management agreements, in form and substance satisfactory to Agent, each of which is among Administrative Borrower or one of its Subsidiaries, Agent, and one of the Cash Management Banks.

"Cash Management Bank" has the meaning specified therefor in Section 2.7(a).

"Casino" means, collectively, those portions of the Resort containing the showroom, gaming and liquor servicing areas of the Resort, including, without limitation, the areas of the Resort containing and immediately adjacent to the slot machines, video machines, all gaming devices, table games, poker room, keno area, baccarat areas, and any other areas which are subject to direct supervision by the Nevada Gaming Authorities, together with all surveillance areas, counting rooms, cashier cages and other areas ancillary to casino gaming.

"Casino Lease" means that certain Amended and Restated Casino Lease, dated as of March 9, 2005, between Parent and E&W.

"Change of Control" means that (a) Permitted Holders fail to own and control directly or indirectly, more than 50% of the Stock of Parent having the right to vote for the election of members of the Board of Directors, (b) any "person" or "group" (within the meaning of Sections 13(d) and 14(d) of the Exchange Act), other than Permitted Holders or Parent Pledgors, becomes the beneficial owner (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of 35%, or more, of the Stock of Parent having the right to vote for the election of members of the Board of Directors, (c) a majority of the members of the Board of Directors do not constitute Continuing Directors, or (d) any "Change of Control" as defined in the Indenture.

"Closing Date" means the date of the making of the initial Advance (or other extension of credit) hereunder or the date on which Agent sends Administrative Borrower a written notice that each of the conditions precedent set forth in Section 3.1 either have been satisfied or have been waived.

"Code" means the New York Uniform Commercial Code, as in effect from time to time.

"Collateral" means all assets and interests in assets and proceeds thereof now owned or hereafter acquired by Administrative Borrower or its Subsidiaries in or upon which a Lien is granted under any of the Loan Documents.

"Collateral Access Agreement" means a landlord waiver, bailee letter, or acknowledgement agreement of any lessor, warehouseman, processor, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in Administrative Borrower's or its Subsidiaries' books and records, Equipment or Inventory, in each case, in form and substance satisfactory to Agent.

"Collateral Agent" means The Bank of New York, in its capacity as collateral agent for the holders of the Senior Secured Notes.

"Collateral Assignment Consents" means those certain consents to collateral assignment of contract (pursuant to the Collateral Assignment executed by Parent) between (i) General Contractor and Agent, and (ii) Architect and Agent, each in form and substance satisfactory to Agent.

"Collateral Assignments" means that certain (i) Assignment of Entitlements, Contracts, Rents and Revenues (Nevada – Fee) dated as of the Closing Date, by and between Parent,

as assignor, and Agent, as assignee; and (ii) Assignment of Entitlements and Contracts (Nevada – Leasehold) dated as of the Closing Date, by and between E&W, as assignor, and Agent, as assignee.

"Collections" means *all* cash, checks, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds, and tax refunds).

"Combined Permitted Tax Distribution" means, with respect to any taxable period or portion thereof in which one or more of the Borrowers is a Flow Through Entity, the amount of the Permitted Tax Distribution that would be permitted to be distributed as determined on the basis as if such Borrower, for the portion of such period that such Borrower continued to be a Flow Through Entity, constituted separate divisions of a single Flow Through Entity.

"Commitment" means, with respect to each Lender, its Revolver Commitment, and, with respect to all Lenders, their Revolver Commitments, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 or in the Assignment and Acceptance pursuant to which such Lender became a Lender hereunder, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 13.1.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C-1 delivered by the chief financial officer of Parent to Agent.

"Consolidated Coverage Ratio" has the meaning specified therefor in the Indenture.

"Continuing Director" means (a) any member of the Board of Directors who was a director (or comparable manager) of Parent on the Closing Date, and (b) any individual who becomes a member of the Board of Directors after the Closing Date if such individual was appointed or nominated for election to the Board of Directors by a majority of the Continuing Directors, but excluding any such individual originally proposed for election in opposition to the Board of Directors in office at the Closing Date in an actual or threatened election contest relating to the election of the directors (or comparable managers) of Parent and whose initial assumption of office resulted from such contest or the settlement thereof.

"Contractor" has the meaning specified therefor in the Cash Collateral and Disbursement Agreement.

"Control Agreement" means a control agreement, in form and substance satisfactory to Agent, executed and delivered by the Administrative Borrower or one of its Subsidiaries, Agent, and the applicable securities intermediary (with respect to a Securities Account) or bank (with respect to a Deposit Account).

"Daily Balance" means, as of any date of determination and with respect to any Obligation, the amount of such Obligation owed at the end of such day.

"Debt Incurrence Ratio" has the meaning specified therefor in Section 6.1(i)(2).

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Defaulting Lender" means any Lender that fails to make any Advance (or other extension of credit) that it is required to make hereunder on the date that it is required to do so hereunder.

LA/1099296.7

"Defaulting Lender Rate" means (a) for the first 3 days from and after the date the relevant payment is due, the Base Rate, and (b) thereafter, the interest rate then applicable to Advances that are Base Rate Loans (inclusive of the Base Rate Margin applicable thereto).

"Deposit Account" means any deposit account (as that term is defined in the Code).

"Designated Account" means the Deposit Account of Administrative Borrower identified on Schedule D-1.

"Designated Account Bank" has the meaning specified therefor in Schedule D-1.

"Disbursed Funds Account" has the meaning specified therefor in the Cash Collateral and Disbursement Agreement.

"Disbursement Agent" means The Bank of New York, or the then acting Disbursement Agent under the Cash Collateral and Disbursement Agreement.

"Disqualified Capital Stock" has the meaning specified therefor in the Indenture.

"Dollars" or "$" means United States dollars.

"E&W" means Eastern & Western Hotel Corporation, a Nevada corporation.

"E&W Additional Contribution Issuance" means the increase in the E&W Preferred Account by up to an additional $5,000,000 upon, and in exchange for, the contribution by E&W of gaming assets to the Parent pursuant to Section 5.1 of the Operating Agreement (as in effect on the Closing Date, without giving effect to any amendment or supplement thereto or modification thereof).

"E&W Preferred Account" has the meaning set forth in the Operating Agreement, as in effect on the Closing Date, without giving effect to any amendment or supplement thereto or modification thereof.

"E&W Guaranty" means that certain non-recourse guaranty and pledge agreement, dated as of the date hereof, delivered by E&W in favor of Agent for the benefit of the Lender Group and the Bank Product Providers, in form and substance satisfactory to Agent.

"E&W Preferred Note Loan" means the unsecured loan into which the E&W Preferred Account is converted, pursuant to Section 12.5c(ii) of the Operating Agreement (as in effect on the Closing Date, without giving effect to any amendment or supplement thereto or modification thereof), in the event that EW Common, LLC fails to obtain the requisite approvals of the Gaming Authorities to own an interest in Parent as a gaming licensee on or prior to January 31, 2006, which loan has the following terms:

        (a)      accrues interest at the rate of the E&W Preferred Return, which interest is payable in the same manner and in the same relative priority as the E&W Preferred Return;

        (b)      matures on the later of (i) the occurrence of a sale of the Resort and Casino, and (ii) the date that is 91 days after the later of the Maturity Date and the maturity date of the Senior Secured Notes; and

        (c)      payments with respect to the E&W Preferred Note Loan shall be subordinated to the Obligations pursuant to a subordination agreement in form and substance satisfactory to Agent, which subordination agreement shall permit such payments only to the extent

LA/1099296.7

the same would be permitted to be made as Permitted Distributions with respect to the E&W Preferred Return (had the same not been so converted into the E&W Preferred Note Loan).

"E&W Preferred Return" means a return to E&W in an amount equal to (x) 4% per annum, determined on the basis of a year of 365 or 366 days, as the case may be, for the actual number of days occurring in the period for which the E&W Preferred Return is being determined, cumulative, but not compounded, of (y) the Maximum Average Daily Balance (as defined below). For purposes of this definition, "Maximum Average Daily Balance" means the lesser of (a) the average daily balance of the E&W Preferred Account from time to time during the period for which the E&W Preferred Return relates and (b) (i) the sum of (x) the balance of the E&W Preferred Account as of the Closing Date, and (y) the increase in the E&W Preferred Account attributable to the E&W Additional Contribution Issuance; less (ii) the amount of any reductions in, or repayments or returns of, the E&W Preferred Account on and after the Closing Date.

"EBITDA" means, with respect to any fiscal period, Parent's and its Subsidiaries' consolidated net earnings (or loss), minus extraordinary gains and interest income, plus interest expense, income taxes, and depreciation and amortization for such period, in each case, as determined in accordance with GAAP, and, in each case without duplication and to the extent incurred in such period and subtracted in the calculation of net earnings (loss) with respect thereto (and not otherwise added back), plus (a) pre-opening costs in connection with and incurred prior to the Re-opening, in an aggregate amount not to exceed $6,000,000, paid entirely out of funds from the Renovation Disbursement Account, (b) non-cash write-downs and write-offs of assets associated with the retirement of assets in the ordinary course of business, (c) costs and expenses in association with the initial closing of the Agreement (including costs with respect to the pay-off of the Existing Lender), in an aggregate amount not in excess of $1,400,000, paid from the initial proceeds of the Senior Secured Notes, (d) initial licensing expenses for obtaining applicable Gaming Licenses and Liquor Licenses in connection with the Operator Licensing Event, in an aggregate amount not in excess of $800,000, and (e) any other non-cash expense.

"Eligible Transferee" means (a) a commercial bank organized under the laws of the United States, or any state thereof, and having total assets in excess of $250,000,000, (b) a commercial bank organized under the laws of any other country which is a member of the Organization for Economic Cooperation and Development or a political subdivision of any such country and which has total assets in excess of $250,000,000, provided that such bank is acting through a branch or agency located in the United States, (c) a finance company, insurance company, or other financial institution or fund that is engaged in making, purchasing, or otherwise investing in commercial loans in the ordinary course of its business and having (together with its Affiliates) total assets in excess of $250,000,000, (d) any Affiliate (other than individuals) of a Lender, (e) so long as no Event of Default has occurred and is continuing, any other Person approved by Agent and Administrative Borrower (which approval of Administrative Borrower shall not be unreasonably withheld, delayed, or conditioned), and (f) during the continuation of an Event of Default, any other Person approved by Agent.

"Environmental Actions" means any complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, or other communication from any Governmental Authority, or any third party involving violations of Environmental Laws or releases of Hazardous Materials from (a) any assets, properties, or businesses of any Borrower, any Subsidiary of a Borrower, or any of their predecessors in interest, (b) from adjoining properties or businesses, or (c) from or onto any facilities which received Hazardous Materials generated by any Borrower, any Subsidiary of a Borrower, or any of their predecessors in interest.

LA/1099296.7

"Environmental Law" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on any Borrower or any Subsidiary of a Borrower, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"Environmental Liabilities" means all liabilities, monetary obligations, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, or Remedial Action required, by any Governmental Authority or any third party, and which relate to any Environmental Action.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities.

"Equipment" means equipment (as that term is defined in the Code).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"ERISA Affiliate" means (a) any Person subject to ERISA whose employees are treated as employed by the same employer as the employees of a Borrower or a Subsidiary of a Borrower under IRC Section 414(b), (b) any trade or business subject to ERISA whose employees are treated as employed by the same employer as the employees of a Borrower or a Subsidiary of a Borrower under IRC Section 414(c), (c) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which a Borrower or a Subsidiary of a Borrower is a member under IRC Section 414(m), or (d) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any Person subject to ERISA that is a party to an arrangement with a Borrower or a Subsidiary of a Borrower and whose employees are aggregated with the employees of a Borrower or a Subsidiary of a Borrower under IRC Section 414(o).

"Estoppel Certificate" means an estoppel certificate consent and agreement, in form and substance satisfactory to Agent, executed and delivered by Borrower and E&W to Agent and Trustee.

"Event of Default" has the meaning specified therefor in Section 7.

"Excess Availability" means, as of any date of determination, the amount equal to Availability *minus* the aggregate amount, if any, of all trade payables of Borrowers and their Subsidiaries aged in excess of their historical levels with respect thereto and all book overdrafts of Borrowers and their Subsidiaries in excess of their historical practices with respect thereto, in each case as determined by Agent in its Permitted Discretion.

"Exchange Act" means the Securities Exchange Act of 1934, as in effect from time to time.

"Excluded Assets" has the meaning specified therefor in the Security Agreement.

"Exempted Affiliate Transaction" means:

LA/1099296.7

(a)     reasonable and customary compensation arrangements provided for the benefit of any director, officer or employee of the Borrowers or any of their Subsidiaries, in each case entered into in the ordinary course of business and for services provided to the Borrower or such Subsidiary, respectively, as determined in good faith by the Board of Directors of the applicable Borrower,

(b)     Permitted Distributions,

(c)     the transactions pursuant to the Lease-Related Agreements and the License Agreements; provided, that with respect to any payment pursuant to any of the foregoing (to the extent not otherwise constituting Permitted Distributions), such payment may be made only so long as (i) both at the time of an after giving effect thereto on a pro forma basis no Default or Event of Default shall have occurred and be continuing, and (ii) for any such payment pursuant to the License Agreements (in addition to the foregoing requirements in clause (i) above), such payment is made after the occurrence of the Re-opening and the Operator Licensing Event.

"Existing Lender" means Canpartners Realty Holding Company IV LLC.

"Fee Letter" means that certain fee letter between Borrowers and Agent, in form and substance satisfactory to Agent.

"FF&E" means furniture, fixtures and equipment (including Gaming Equipment) acquired by the Borrowers and their Subsidiaries in the ordinary course of business for use in their business operations.

"FF&E Financing" means Indebtedness, the proceeds of which are used solely by the Borrowers and their Subsidiaries (and concurrently with the incurrence of such Indebtedness) to acquire or lease or improve or refinance, respectively, FF&E (including FF&E Financings assumed from E&W in connection with the Third JV Closing Date); provided, that (x) the principal amount of such FF&E Financing does not exceed the cost (including sales and excise taxes, installation and delivery charges, capitalized interest and other direct fees, costs and expenses) of the FF&E purchased or leased with the proceeds thereof or the cost of such improvements, as the case may be, and (y) such FF&E Financing is secured only by the assets so financed and assets which, immediately prior to the incurrence of such FF&E Financing, secured other Indebtedness of the Borrowers and their Subsidiaries (to the extent such other Indebtedness and the Liens securing such other Indebtedness are permitted under the Agreement) to the lender of such FF&E Financing.

"Finance Corp" means 155 East Tropicana Finance Corp., a Nevada corporation, and a wholly owned subsidiary of Parent.

"Florida Hooters" means Florida Hooters, LLC, a Nevada limited-liability company.

"Flow Through Entity" means an entity that (a) for United States federal income tax purposes constitutes (i) an "S" corporation (as defined in section 1361(a) of the IRC), (ii) a "qualified subchapter S subsidiary" (as defined in section 1361(b)(3)(B) of the IRC), (iii) a "partnership" (within the meaning of section 7701(a)(2) of the IRC) other than a "publicly traded partnership" (as defined in section 7704 of the IRC), (iv) an entity that is disregarded as an entity separate from its owner under the IRC, the Treasury regulations or any published administrative guidance of the Internal Revenue Service, or (v) a trust, the income of which is includible in the taxable income of the grantor or another person under sections 671 through 679 of the IRC (the entities described in the immediately preceding clauses (i), (ii), (iii), (iv) and (v), a "Federal Flow Through Entity") and (b) for state and local jurisdictions in respect of which Permitted Tax Distributions are being made, is subject to

10

treatment on a basis under applicable state or local income tax law substantially similar to a Federal Flow Through Entity.

"Funding Date" means the date on which a Borrowing occurs.

"Funding Losses" has the meaning specified therefor in Section 2.13(b)(ii).

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied.

"Gaming Equipment" means slot machines, video poker machines, and all other gaming equipment and related signage, accessories and peripheral equipment.

"Gaming FF&E Financing" means FF&E Financing, the proceeds of which are used solely by the Borrowers and their Subsidiaries to acquire or lease FF&E that constitutes Gaming Equipment.

"Gaming Laws" means all applicable federal, state and local laws, rules and regulations pursuant to which the Nevada Gaming Authorities possess regulatory, licensing or permit authority over the ownership or operation of gaming facilities within the State of Nevada, including, the Nevada Gaming Control Act, as codified in Chapter 463 of the Nevada Revised Statutes, as amended from time to time, and the regulations of the NGC promulgated thereunder.

"Gaming License" means any finding of suitability, registration, license, franchise, or other finding of qualification, or other approval or authorization required to own, lease, operate or otherwise conduct or manage riverboat, dockside or land-based gaming activities in any state or jurisdiction in which any Borrower or any of their Subsidiaries conduct business (including, all such licenses granted by the Nevada Gaming Authorities, and the rules and regulations promulgated thereunder), and all applicable Liquor Licenses.

"General Contractor" means The PENTA Building Group, Inc.

"Governing Documents" means, with respect to any Person, the certificate or articles of incorporation or organization, by-laws, operating agreements or other organizational documents of such Person.

"Governmental Authority" means any federal, state, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body, including the Nevada Gaming Authorities and Liquor Authorities.

"Guarantors" means (a) each Subsidiary (other than a Borrower) of each Borrower, and (b) E&W (with respect to the E&W Guaranty) and "Guarantor" means any one of them; provided, that upon termination of the E&W Guaranty pursuant to its terms following the Operator Licensing Event, E&W shall cease to be a Guarantor hereunder.

"Guaranty" means that certain general continuing guaranty (or, with respect to E&W, the E&W Guaranty) executed and delivered by each Guarantor in favor of Agent for the benefit of the Lender Group and the Bank Product Providers, in form and substance satisfactory to Agent.

"HGC" means Hooters Gaming Corporation, a Nevada corporation.

"HI Limited" means HI Limited Partnership, a Florida limited partnership.

11

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Hedge Agreement" means any and all agreements, or documents now existing or hereafter entered into by Administrative Borrower or any of its Subsidiaries that provide for an interest rate, credit, commodity or equity swap, cap, floor, collar, forward foreign exchange transaction, currency swap, cross currency rate swap, currency option, or any combination of, or option with respect to, these or similar transactions, for the purpose of hedging Administrative Borrower's or any of its Subsidiaries' exposure to fluctuations in interest or exchange rates, loan, credit exchange, security or currency valuations or commodity prices.

"Holdout Lender" has the meaning specified therefor in Section 14.2(a).

"Hooters Brand" means the "Hooters" name and mark, as used in connection with the Business.

"Hotel Lease" means that certain Amended and Restated Hotel Lease, dated as of March 9, 2005, between Parent and E&W.

"Indebtedness" means (a) all obligations for borrowed money, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, interest rate swaps, or other financial products, (c) all obligations as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of a Person or its Subsidiaries, irrespective of whether such obligation or liability is assumed, (e) all obligations to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices) (which, for the avoidance of doubt, shall not include the obligation of Parent to increase the EW Preferred Account (as defined in the Operating Agreement) by up to $5,000,000 in accordance with Section 5.1 of the Operating Agreement following occurrence of the Operator Licensing Event), (f) all obligations owing under Hedge Agreements, and (g) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (f) above.

"Indemnified Liabilities" has the meaning specified therefor in Section 10.3.

"Indemnified Person" has the meaning specified therefor in Section 10.3.

"Indenture" means that certain indenture dated as of March 29, 2005, among the Trustee, Borrowers and their Subsidiaries.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions,

LA/1099296.7

extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Intercompany Advances" means loans or advances or the repayment of loans or advances from a Borrower to another Borrower.

"Intercompany Subordination Agreement" means a subordination agreement executed and delivered by Borrowers and each of their Subsidiaries and Agent, the form and substance of which is satisfactory to Agent.

"Intercreditor Agreement" means that certain Intercreditor Agreement between Agent and the Collateral Agent, substantially in the form of Exhibit I-1 to the Agreement.

"Interest Period" means, with respect to each LIBOR Rate Loan, a period commencing on the date of the making of such LIBOR Rate Loan (or the continuation of a LIBOR Rate Loan or the conversion of a Base Rate Loan to a LIBOR Rate Loan) and ending 1, 2, or 3 months thereafter; provided, however, that (a) if any Interest Period would end on a day that is not a Business Day, such Interest Period shall be extended (subject to clauses (c)-(e) below) to the next succeeding Business Day, (b) interest shall accrue at the applicable rate based upon the LIBOR Rate from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (c) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (d) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is 1, 2, or 3 months after the date on which the Interest Period began, as applicable, and (e) Borrowers (or Administrative Borrower on behalf thereof) may not elect an Interest Period which will end after the Maturity Date.

"Inventory" means inventory (as that term is defined in the Code).

"Investment" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, or capital contributions (excluding (a) commission, travel, and similar advances to officers and employees of such Person made in the ordinary course of business, and (b) bona fide Accounts arising in the ordinary course of business consistent with past practice), purchases or other acquisitions of Indebtedness, Stock, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), including the transfer of assets and assumption of liabilities with respect to the Third JV Closing Date pursuant to Section 2.6 of the Joint Venture Agreement, and any other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.

"IRC" means the Internal Revenue Code of 1986, as in effect from time to time.

"Issuing Lender" means WFF or any other Lender that, at the request of Administrative Borrower and with the consent of Agent, agrees, in such Lender's sole discretion, to become an Issuing Lender for the purpose of issuing L/Cs or L/C Undertakings pursuant to Section 2.12.

"Joint Venture Agreement" means that certain Amended and Restated Joint Venture Agreement, dated as of March 9, 2005, between E&W and Florida Hooters.

"L/C" has the meaning specified therefor in Section 2.12(a).

"L/C Disbursement" means a payment made by the Issuing Lender pursuant to a Letter of Credit.

"L/C Undertaking" has the meaning specified therefor in Section 2.12(a).

"LVW" means Las Vegas Wings, Inc., a Nevada corporation.

"Lags" means Lags Ventures, Inc., a Florida corporation.

"Lease Related Agreements" means, collectively, the Leases, the Joint Venture Agreement and the Operating Agreement.

"Leases" mean, together, the Casino Lease and the Hotel Lease.

"Lender" and "Lenders" have the respective meanings set forth in the preamble to the Agreement, and shall include any other Person made a party to the Agreement in accordance with the provisions of Section 13.1.

"Lender Group" means, individually and collectively, each of the Lenders (including the Issuing Lender) and Agent.

"Lender Group Expenses" means all (a) costs or expenses (including taxes, and insurance premiums) required to be paid by a Borrower or its Subsidiaries under any of the Loan Documents that are paid, advanced, or incurred by the Lender Group, (b) fees or charges paid or incurred by Agent in connection with the Lender Group's transactions with Borrowers or their Subsidiaries, including, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and UCC searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, publication, appraisal (including periodic collateral appraisals or business valuations to the extent of the fees and charges (and up to the amount of any limitation) contained in the Agreement, real estate surveys, real estate title policies and endorsements, and environmental audits, (c) costs and expenses incurred by Agent in the disbursement of funds to Borrowers or other members of the Lender Group (by wire transfer or otherwise), (d) charges paid or incurred by Agent resulting from the dishonor of checks, (e) reasonable costs and expenses paid or incurred by the Lender Group to correct any default or enforce any provision of the Loan Documents, or in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (f) audit fees and expenses of Agent related to any inspections or audits to the extent of the fees and charges (and up to the amount of any limitation) contained in the Agreement, (g) reasonable costs and expenses of third party claims or any other suit paid or incurred by the Lender Group in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or the Lender Group's relationship with any Borrower or any Subsidiary of a Borrower, (h) Agent's and each Lender's reasonable costs and expenses (including attorneys fees) incurred in advising, structuring, drafting, reviewing, administering, syndicating, or amending the Loan Documents, and (i) Agent's and each Lender's reasonable costs and expenses (including attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or an Insolvency Proceeding concerning any Borrower or any Subsidiary of a Borrower or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought, or in taking any Remedial Action concerning the Collateral.

14

"Lender-Related Person" means, with respect to any Lender, such Lender, together with such Lender's Affiliates, officers, directors, employees, attorneys, and agents.

"Letter of Credit" means an L/C or an L/C Undertaking, as the context requires.

"Letter of Credit Usage" means, as of any date of determination, the aggregate undrawn amount of all outstanding Letters of Credit.

"LIBOR Deadline" has the meaning specified therefor in Section 2.13(b)(i).

"LIBOR Notice" means a written notice in the form of Exhibit L-1.

"LIBOR Option" has the meaning specified therefor in Section 2.13(a).

"LIBOR Rate" means, for each Interest Period for each LIBOR Rate Loan, the rate per annum determined by Agent (rounded upwards, if necessary, to the next 1/100%) by *dividing* (a) the Base LIBOR Rate for such Interest Period, by (b) 100% *minus* the Reserve Percentage. The LIBOR Rate shall be adjusted on and as of the effective day of any change in the Reserve Percentage.

"LIBOR Rate Loan" means each portion of an Advance that bears interest at a rate determined by reference to the LIBOR Rate.

"LIBOR Rate Margin" means 3.50 percentage points.

"License Agreements" means the following agreements, as in effect on the Closing Date:

(i)    License Agreement, dated March 21, 2001, as amended, between HI Limited, as licensor, and HGC, as licensee, granting an exclusive license to use the Hooters brand in connection with gaming, casino and/or combined hotel, gaming and casino operations, including the right to operate a Hooters restaurant subject to the consent of LVW;

(ii)    Consent Agreement, dated July 30, 2004, between LVW and HGC, providing consent to HGC for operation of a Hooters restaurant at the Resort;

(iii)    Amended and Restated Mark License Agreement, dated March 9, 2005, between Lags, as licensor, and Florida Hooters, as licensee, granting licensee a license to use the Dan Marino's Fine Food & Spirits and/or Martini Bar brands at the Resort;

(iv)    Amended and Restated Assignment Agreement, dated March 9, 2005, between HGC and Florida Hooters, pursuant to which HGC assigned to Florida Hooters all of its rights under the License Agreement (referred to in clause (i) of this definition), and the Consent Agreement (referred to in clause (ii) of this definition) solely for use at the Resort;

(v)    Amended and Restated Assignment Agreement, dated March 9, 2005, between Florida Hooters and Parent, pursuant to which Florida Hooters assigned to Parent all of the rights that it has, pursuant to the Assignment Agreement (referred to in clause (iv) of this definition), under the License Agreement (referred to in clause (i) of this definition) and the Consent Agreement (referred to in clause (ii) of this definition), and the Mark License Agreement (referred to in clause (iii) of this definition);

(vi)    License Agreement dated March 11, 2005, between Pete & Shorty's, Inc., a Florida corporation, as licensor, and Parent, as licensee granting a nonexclusive,

15

nontransferable license to use the Pete & Shorty's mark in connection with a restaurant, bar, and lounge in the Hooters Casino Hotel in Las Vegas and affiliated merchandise, entertainment and casino services; and

(vii)    Affirmation and Acknowledgement, dated March 9, 2005, by HGC to Parent, pursuant to which HGC agreed not to operate, license or assign its rights under the License Agreement (referred to in clause (i) of this definition) to any other person for operation of a casino (x) in Clark County, Nevada, for a period of four (4) years commencing on the date of the Indenture or such earlier time as the both the Senior Subordinated Notes and the Obligations are no longer outstanding or (y) on the Las Vegas Strip from the date thereof until both the Senior Subordinated Notes and the Obligations are no longer outstanding.

"Lien" means any interest in an asset securing an obligation owed to, or a claim by, any Person other than the owner of the asset, irrespective of whether (a) such interest is based on the common law, statute, or contract, (b) such interest is recorded or perfected, and (c) such interest is contingent upon the occurrence of some future event or events or the existence of some future circumstance or circumstances. Without limiting the generality of the foregoing, the term "Lien" includes the lien or security interest arising from a mortgage, deed of trust, encumbrance, notice of Lien, levy or assessment, pledge, hypothecation, assignment, deposit arrangement, security agreement, conditional sale or trust receipt, or from a lease, consignment, or bailment for security purposes and also includes reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases, and other title exceptions and encumbrances affecting Real Property.

"Liquor Authorities" means the Clark County Liquor and Gaming Licensing Board, the Department of the Treasury Bureau of Alcohol, Tobacco and Firearms, and any other agency, authority, board, bureau, commission, department, office or instrumentality or any nature whatsoever of the United States or foreign government, any state, province or any city or other political subdivision, whether now or hereafter existing, or any officer or official thereof, including any other agency with authority to regulate the sale or distribution of alcoholic beverages.

"Liquor Laws" means all applicable state and local laws, statutes or ordinances regarding the sale and distribution of alcoholic beverages enforced by the Liquor Authorities and the rules and regulations of the Liquor Authorities.

"Liquor License" means any license, permit, registration, qualification or other approval required to sell, dispense or distribute alcoholic beverages under the Liquor Laws.

"Loan Account" has the meaning specified therefor in Section 2.10.

"Loan Documents" means the Agreement, the Bank Product Agreements, the Cash Management Agreements, the Collateral Assignments, the Collateral Assignment Consents, the Control Agreements, the Fee Letter, the Guaranty(ies), the Intercompany Subordination Agreement, the Intercreditor Agreement, the Letters of Credit, the Mortgages, the Parent Pledge Agreement, the Pledged Interests Control Agreement, the Security Agreement, any note or notes executed by a Borrower in connection with the Agreement and payable to a member of the Lender Group, and any other agreement entered into, now or in the future, by any Borrower and the Lender Group in connection with the Agreement.

"LVW" means Las Vegas Wings, Inc., a Nevada corporation.

"Manager" means Hawkeye Construction and Millwork, Inc.

16

"Material Adverse Change" means (a) a material adverse change in the business, prospects, operations, results of operations, assets, liabilities or condition (financial or otherwise) of Borrowers and their Subsidiaries, taken as a whole, (b) a material impairment of a Borrower's or any of its Subsidiaries' ability to perform its obligations under the Loan Documents to which it is a party or of the Lender Group's ability to enforce the Obligations or realize upon the Collateral, or (c) a material impairment of the enforceability or priority of the Agent's Liens with respect to the Collateral as a result of an action or failure to act on the part of a Borrower or a Subsidiary of a Borrower.

"Material Renovation Document" means any of the Renovation Contract, the Architect Agreement, and without duplication, any other Contract (as defined in the Cash Collateral and Disbursement Agreement) with a total contract amount in excess of $100,000.

"Maturity Date" has the meaning specified therefor in Section 3.4.

"Maximum Revolver Amount" means $15,000,000.

"Mortgage Policy" has the meaning specified therefor in Schedule 3.1(bb).

"Mortgages" means, individually and collectively, one or more mortgages, deeds of trust, or deeds to secure debt, executed and delivered by a Borrower or a Subsidiary of a Borrower in favor of Agent, in form and substance satisfactory to Agent, that encumber the Real Property Collateral.

"Nevada Gaming Authorities" means the NGC, the NGCB, and the Clark County Liquor and Gaming Licensing Board, and any other State or local agency with jurisdiction over gaming operations in the State of Nevada or Clark County, Nevada.

"NGC" means the Nevada Gaming Commission.

"NGCB" means the Nevada State Gaming Control Board.

"Obligations" means (a) all loans, Advances, debts, principal, interest (including any interest that accrues after the commencement of an Insolvency Proceeding regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), contingent reimbursement obligations with respect to outstanding Letters of Credit, premiums, liabilities (including all amounts charged to Borrowers' Loan Account pursuant hereto), obligations (including indemnification obligations), fees (including the fees provided for in the Fee Letter), charges, costs, Lender Group Expenses (including any fees or expenses that accrue after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), lease payments, guaranties, covenants, and duties of any kind and description owing by Borrowers to the Lender Group pursuant to or evidenced by the Loan Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that Borrowers are required to pay or reimburse by the Loan Documents, by law, or otherwise, and (b) all Bank Product Obligations. Any reference in the Agreement or in the Loan Documents to the Obligations shall include all or any portion thereof and any extensions, modifications, renewals, or alterations thereof, both prior and subsequent to any Insolvency Proceeding.

"Operating Agreement" means the 155 East Tropicana, LLC Amended and Restated Operating Agreement, dated as of March 9, 2005.

LA/1099296.7

"Operator" means the Person(s) engaged, hired or retained by Parent to manage or operate the Casino.

"Operator Licensing Event" means the receipt by Parent of all licenses from the Nevada Gaming Authorities and the Liquor Authorities to conduct gaming and liquor sales at the Resort and the occurrence of the Third JV Closing Date.

"Originating Lender" has the meaning specified therefor in Section 13.1(e).

"Overadvance" has the meaning specified therefor in Section 2.5.

"Parent" has the meaning specified therefor in the preamble to the Agreement.

"Parent Pledge Agreement" means a pledge agreement, in form and substance satisfactory to Agent, executed and delivered by each Parent Pledgor to Agent.

"Parent Pledgors" means each of EW Common LLC and Florida Hooters, LLC, together with any other Person that may from time to time hold Stock of Parent.

"Participant" has the meaning specified therefor in Section 13.1(e).

"Permitted Discretion" means a determination made in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Dispositions" means (a) sales or other dispositions of Equipment that is substantially worn, damaged, or obsolete in the ordinary course of business, (b) sales of Inventory to buyers in the ordinary course of business, (c) the use or transfer of money or Cash Equivalents in a manner that is not prohibited by the terms of the Agreement or the other Loan Documents, (d) the licensing, on a non-exclusive basis, of patents, trademarks, copyrights, and other intellectual property rights in the ordinary course of business, and (e) the sale or other disposition of properties or assets of Borrowers or their Subsidiaries, so long as (i) no Default or Event of Default has occurred and is continuing at the time of the consummation of such sale or disposition, (ii) such sale or disposition does not include Accounts, General Intangibles, Stock, or interests (other than leases entered into in the ordinary course of business consistent with the Mortgage) in Real Property (iii) no such sale or disposition or series of related sales or dispositions involves properties or assets having a fair market value in excess of $1,000,000, and (iv) the aggregate fair market value of all of the properties and assets that are the subject of such sales or dispositions does not exceed $5,000,000 during the term of the Agreement.

"Permitted Distributions" means, in each case so long as both at the time of and after giving effect thereto on a pro forma basis no Default or Event of Default shall have occurred and be continuing, (a) distributions or declaration and payment of dividends by a Borrower to another Borrower, (b) Permitted Tax Distributions, (c) the approximately $1,300,000 cash payment to E&W made on the Closing Date in connection with the repayment of existing debt owing to E&W, (d) the cash payment of the Positive Net Working Capital (as defined in the Joint Venture Agreement) by Parent to E&W in accordance with Section 2.8 of the Joint Venture Agreement, so long as the same is paid entirely from funds in the Renovation Disbursement Account having been set aside for such purpose, and (e) so long as at the time of and after giving effect thereto on a pro forma basis Borrowers have Excess Availability of at least $5,000,000, (i) the balance, if any, of the cash payment of the Positive Net Working Capital (as defined in the Joint Venture Agreement) by Parent to E&W to the extent not paid pursuant to clause (d) above, (ii) at any time after the Operator Licensing Event and the Re-opening shall have occurred, payment of the E&W Preferred Return payable pursuant to

18

the Operating Agreement, and (iii) other dividends or distributions pursuant to the Operating Agreement.

"Permitted Holders" means the Persons identified on Schedule P-1.

"Permitted Intercompany Advance" means Intercompany Advances made by a Borrower to another Borrower so long as no Event of Default has occurred and is continuing or would result therefrom and all parties to such transaction are party to the Intercompany Subordination Agreement.

"Permitted Investments" means (a) Investments in cash and Cash Equivalents, (b) Investments in negotiable instruments for collection, (c) advances made in connection with purchases of goods or services in the ordinary course of business, (d) Investments received in settlement of amounts due to a Borrower or any Subsidiary of a Borrower effected in the ordinary course of business or owing to a Borrower or any Subsidiary of a Borrower as a result of Insolvency Proceedings involving an Account Debtor or upon the foreclosure or enforcement of any Lien in favor of a Borrower or any Subsidiary of a Borrower, (e) credit extensions to gaming customers in the ordinary course of business, consistent with industry practice, (f) loans or advances to employees of the Borrowers and their Subsidiaries made in the ordinary course of business in an aggregate amount not to exceed $500,000 at any one time outstanding, (g) Permitted Intercompany Advances, (h) Investments in existence on the Closing Date set forth on Schedule P-3, and (i) so long as both immediately before and immediately after giving effect thereto on a pro forma basis no Default or Event of Default shall have occurred and be continuing (and subject to any additional limitations set forth in the Agreement), the occurrence of the Third JV Closing Date and consummation of the events set forth with respect thereto in Section 2.6 of the Joint Venture Agreement.

"Permitted Liens" means (a) Liens held by Agent to secure the Obligations, (b) Liens for unpaid taxes, assessments, or other governmental charges or levies that either (i) are not yet delinquent, or (ii) do not have priority over the Agent's Liens and the underlying taxes, assessments, or charges or levies are the subject of Permitted Protests, (c) judgment Liens that do not constitute an Event of Default under Section 7.7 of the Agreement, (d) Liens set forth on Schedule P-2 (provided that any such Lien only secures the Indebtedness that it secures on the Closing Date and any Refinancing Indebtedness in respect thereof), (e) the interests of lessors under operating leases, (f) purchase money Liens or the interests of lessors under Capital Leases to the extent that such Liens or interests secure Permitted Purchase Money Indebtedness and so long as (i) such Lien attaches only to the asset purchased or acquired and the proceeds thereof, and (ii) such Lien only secures the Indebtedness that it secures on the Closing Date and any Refinancing Indebtedness in respect thereof, (g) Liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers, or suppliers, incurred in the ordinary course of Borrowers' business and not in connection with the borrowing of money, and which Liens (i) to the extent relating to the Real Property Collateral, are not prohibited pursuant to the Mortgage, and (ii) either are for sums not yet delinquent, or are the subject of Permitted Protests, (h) Liens on amounts deposited in connection with obtaining worker's compensation or other unemployment insurance, (i) Liens on amounts deposited in connection with the making or entering into of bids, tenders, or leases in the ordinary course of business and not in connection with the borrowing of money, (j) Liens on amounts deposited as security for surety or appeal bonds in connection with obtaining such bonds in the ordinary course of business, (k) with respect to any Real Property, easements, rights of way, and zoning restrictions that do not materially interfere with or impair the use or operation thereof, (l) Liens in favor of the Collateral Agent securing the Senior Secured Notes so long as and to the extent such Liens remain the subject of the Intercreditor Agreement, (m) Liens that secure FF&E Financing, Purchase Money Indebtedness, or Capitalized Lease Obligations permitted to be incurred pursuant to Section 6.1(c) of the Agreement provided such Liens do not extend to or cover any property or assets other than those being acquired, leased or developed with the proceeds of such Indebtedness, (n) leases or subleases

19

granted to other Persons in the ordinary course of business not materially interfering with the conduct of the business of the Borrowers or any of their Subsidiaries (including the Business) or materially detracting from the value of the relative assets of the Borrowers or any of their Subsidiaries, (o) Liens arising from precautionary UCC financing statement filings regarding operating leases entered into by the Borrowers or any of their Subsidiaries in the ordinary course of business, and (p) Liens securing Indebtedness of a Person existing at the time such Person becomes a Subsidiary or is merged with or into one of the Borrowers or one of their Subsidiaries (other than any of the foregoing in connection with the transfers of assets and obligations contemplated with respect to Third JV Closing Date), provided, that such Liens were in existence prior to the date of such acquisition, merger or consolidation, were not incurred in anticipation thereof, do not extend to any other assets.

"Permitted Protest" means the right of Administrative Borrower or any of its Subsidiaries to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment, provided that (a) a reserve with respect to such obligation is established on a Borrower's or any of its Subsidiaries' books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by Administrative Borrower or any of its Subsidiaries, as applicable, in good faith and either by appropriate legal proceedings or as otherwise permitted in accordance with applicable law, and (c) Agent is satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of the Agent's Liens.

"Permitted Tax Distributions" in respect of a Borrower means, with respect to any taxable year or portion thereof in which such Borrower is a Flow Through Entity, the sum of: (i) the product of (a) the excess of (1) all items of taxable income or gain (other than capital gain) of such Borrower for such year or portion thereof over (2) all items of taxable deduction or loss (other than capital loss) of such Borrower for such year or portion thereof and (b) the Applicable Income Tax Rate, plus (ii) the product of (a) the net capital gain (i.e., the excess of net long-term capital gain over net short-term capital loss), if any, of such Borrower for such year or portion thereof and (b) the Applicable Capital Gain Tax Rate, plus (iii) the product of (a) the net short-term capital gain (i.e., the excess of net short-term capital gain over net long-term capital loss), if any, of such Borrower for such year or portion thereof and (b) the Applicable Income Tax Rate, minus (iv) the aggregate Tax Loss Benefit Amount for such Borrower for such year or portion thereof; provided, that in no event shall the Applicable Income Tax Rate or the Applicable Capital Gain Tax Rate exceed the greater of (i) the highest aggregate applicable effective marginal rate of United States federal, state, and local income tax to which a corporation doing business in the State of Nevada would be subject to in the relevant year of determination (as certified to the Agent by a nationally recognized tax accounting firm) plus 5% and (ii) 60%. For purposes of calculating the amount of the Permitted Tax Distributions the items of taxable income, gain, deduction or loss (including capital gain or loss) of any Flow Through Entity that is a subsidiary of which such Borrower is treated for United States federal income tax purposes as a member (but only for periods for which such Flow Through Entity is treated as a Flow Through Entity), which items of income, gain, deduction or loss are allocated to or otherwise treated as items of income, gain, deduction or loss of such Borrower for United States federal income tax purposes, shall be included in determining the taxable income, gain, deduction or loss (including capital gain or loss) of such Borrower.

Estimated tax distributions may be made within thirty days following March 15, May 15, August 15, and December 15 based upon an estimate of the excess of (x) the tax distributions that would be payable for the period beginning on January 1 of such year and ending on March 31, May 31, August 31, and December 31 if such period were a taxable year (computed as provided above) over (y) distributions attributable to all prior periods during such taxable year.

The amount of the Permitted Tax Distribution for a taxable year shall be re-computed promptly after (i) the filing by such Borrower and each Subsidiary of such Borrower that is treated as

LA/1099296.7

a Flow Through Entity of their respective annual income tax returns and (ii) United States federal or state taxing authority finally determines that the amount of the items of taxable income, gain, deduction, or loss of such Borrower or any such Subsidiary that is treated as a Flow Through Entity for such taxable year or the aggregate Tax Loss Benefit Amount carried forward to such taxable year should be adjusted (each of clauses (i) and (ii) a "Tax Calculation Event"). To the extent that the Permitted Tax Distributions previously distributed in respect of any taxable year are either greater than (a "Tax Distribution Overage") or less than (a "Tax Distribution Shortfall") the Permitted Tax Distributions with respect to such taxable year, as determined by reference to the computation of the amount of the items of income, gain, deduction, or loss of such Borrower and each such Subsidiary in connection with a Tax Calculation Event, the amount of the estimated Permitted Tax Distributions that may be made on the estimated tax distribution date immediately following such Tax Calculation Event shall be reduced or increased as appropriate to the extent of the Tax Distribution Overage or the Tax Distribution Shortfall. To the extent that a Tax Distribution Overage remains after the estimated tax distribution date immediately following such Tax Calculation Event, the amount of the estimated Permitted Tax Distribution that may be made on the subsequent estimated tax distribution date shall be reduced to the extent of such Tax Distribution Overage.

Prior to making any Permitted Tax Distributions, such Borrower shall require each Equity Holder to agree that promptly after the second estimated tax distribution date following a Tax Calculation Event, such Equity Holder shall reimburse such Borrower to the extent of its pro rata share (based on the portion of Permitted Tax Distributions distributed to such Equity Holder for the taxable year) of any remaining Tax Distribution Overage.

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Pledged Interests Control Agreement" means a control agreement, in form and substance satisfactory to Agent, executed and delivered by the Parent Pledgors, Parent and Agent, with respect to the Stock pledged pursuant to the Parent Pledge Agreement.

"Projections" means Parent's forecasted (a) balance sheets, (b) profit and loss statements, and (c) cash flow statements, all prepared on a basis consistent with Parent's historical financial statements, together with appropriate supporting details and a statement of underlying assumptions.

"Pro Rata Share" means, as of any date of determination:

(a)    with respect to a Lender's obligation to make Advances and right to receive payments of principal, interest, fees, costs, and expenses with respect thereto, (i) prior to the Revolver Commitments being terminated or reduced to zero, the percentage obtained by dividing (y) such Lender's Revolver Commitment, by (z) the aggregate Revolver Commitments of all Lenders, and (ii) from and after the time that the Revolver Commitments have been terminated or reduced to zero, the percentage obtained by dividing (y) the aggregate outstanding principal amount of such Lender's Advances by (z) the aggregate outstanding principal amount of all Advances,

(b)    with respect to a Lender's obligation to participate in Letters of Credit, to reimburse the Issuing Lender, and right to receive payments of fees with respect thereto, (i) prior to the Revolver Commitments being terminated or reduced to zero, the percentage obtained by dividing (y) such Lender's Revolver Commitment, by (z) the aggregate Revolver Commitments of all Lenders, and (ii) from and after the time that the Revolver Commitments have been terminated or reduced to

zero, the percentage obtained by dividing (y) the aggregate outstanding principal amount of such Lender's Advances by (z) the aggregate outstanding principal amount of all Advances,

        (c)    [intentionally omitted], and

        (d)    with respect to all other matters as to a particular Lender (including the indemnification obligations arising under Section 15.7), the percentage obtained by dividing (i) such Lender's Revolver Commitment, by (ii) the aggregate amount of Revolver Commitments of all Lenders; provided, however, that in the event the Revolver Commitments have been terminated or reduced to zero, Pro Rata Share under this clause shall be the percentage obtained by dividing (A) the outstanding principal amount of such Lender's Advances plus such Lender's ratable portion of the Risk Participation Liability with respect to outstanding Letters of Credit, by (B) the outstanding principal amount of all Advances plus the aggregate amount of the Risk Participation Liability with respect to outstanding Letters of Credit.

"Protective Advances" has the meaning specified therefor in Section 2.3(d)(i).

"Purchase Money Indebtedness" means Indebtedness (other than the Obligations, but including Capitalized Lease Obligations), incurred at the time of, or within 20 days after, the acquisition of any fixed assets for the purpose of financing all or any part of the acquisition cost thereof.

"Qualified Cash" means, as of any date of determination, the amount of unrestricted cash and Cash Equivalents of Borrowers and their Subsidiaries that is in Deposit Accounts or in Securities Accounts, or any combination thereof, and which such Deposit Account or Securities Account is the subject of a Control Agreement and is maintained by a branch office of the bank or securities intermediary located within the United States.

"Real Property" means any estates or interests in real property now owned or hereafter acquired by any Borrower or a Subsidiary of any Borrower and the improvements thereto.

"Real Property Collateral" means the Real Property identified on Schedule R-1 and any Real Property hereafter acquired by a Borrower or any Subsidiary of a Borrower.

"Record" means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

"Re-opening" means the first date on which the Renovation shall have been substantially completed and the facilities of the Hooters Hotel Casino have been opened to the general public, are receiving customers in the ordinary course of business and are operating in accordance with applicable laws in all material respects.

"Reference Period" has the meaning specified therefor in the Indenture.

"Refinancing Indebtedness" means refinancings, renewals, or extensions of Indebtedness so long as: (a) the terms and conditions of such refinancings, renewals, or extensions do not, in Agent's reasonable judgment, materially impair the prospects of repayment of the Obligations by Borrowers or materially impair Borrowers' creditworthiness, (b) such refinancings, renewals, or extensions do not result in an increase in the principal amount of the Indebtedness so refinanced, renewed, or extended, (c) such refinancings, renewals, or extensions do not result in an increase in the interest rate with respect to the Indebtedness so refinanced, renewed, or extended, (d) such refinancings, renewals, or extensions do not result in a shortening of the average weighted maturity of the Indebtedness so refinanced, renewed, or extended, nor are they on terms or conditions that, taken

LA/1099296.7

as a whole, are materially more burdensome or restrictive to Borrowers, (e) if the Indebtedness that is refinanced, renewed, or extended was subordinated in right of payment to the Obligations, then the terms and conditions of the refinancing, renewal, or extension must include subordination terms and conditions that are at least as favorable to the Lender Group as those that were applicable to the refinanced, renewed, or extended Indebtedness, and (f) the Indebtedness that is refinanced, renewed, or extended is not recourse to any Person that is liable on account of the Obligations other than those Persons which were obligated with respect to the Indebtedness that was refinanced, renewed, or extended.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials authorized by Environmental Laws.

"Renovation" means the redesign and renovation of the Hotel San Remo Casino and Resort as a Hooters Casino, Resort and Entertainment Center having and using the Hooters Brand and concept. As part of the Renovation, the Hotel San Remo Casino and Resort shall be re-themed and re-named, shall include a Hooters Restaurant and may include such concepts as a Dan Marino Town Tavern and Martini Bar.

"Renovation Contract" means that certain Standard Form of Agreement Between Owner and Contractor for the Renovation executed by the General Contractor and Parent, dated February 25, 2005 (as amended, modified or supplemented from time to time in accordance with the Agreement).

"Renovation Disbursement Account" has the meaning set forth in the Indenture.

"Renovation Documents" has the meaning specified therefor in the Cash Collateral and Disbursement Agreement.

"Replacement Lender" has the meaning specified therefor in Section 14.2(a).

"Report" has the meaning specified therefor in Section 15.17.

"Required Availability" means that the sum of (a) Excess Availability, *plus* (b) Qualified Cash exceeds $5,000,000.

"Required Lenders" means, at any time, Lenders whose aggregate Pro Rata Shares (calculated under clause (d) of the definition of Pro Rata Shares) equal or exceed 50.1%

"Reserve Percentage" means, on any day, for any Lender, the maximum percentage prescribed by the Board of Governors of the Federal Reserve System (or any successor Governmental Authority) for determining the reserve requirements (including any basic, supplemental, marginal, or emergency reserves) that are in effect on such date with respect to eurocurrency funding (currently referred to as "eurocurrency liabilities") of that Lender, but so long as such Lender is not required or directed under applicable regulations to maintain such reserves, the Reserve Percentage shall be zero.

"Resort" means that certain resort hotel commonly known as the Hotel San Remo Casino and Resort (and, after the completion of the Renovation, the Hooters Casino, Resort and Entertainment Center) and located at 115 and 155 East Tropicana Avenue, Las Vegas, Nevada, and all

restaurants therein and other facilities, parking facilities, retail shops, land, equipment and related assets and real and personal property used or to be used in connection therewith.

"Revolver Commitment" means, with respect to each Lender, its Revolver Commitment, and, with respect to all Lenders, their Revolver Commitments, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 or in the Assignment and Acceptance pursuant to which such Lender became a Lender hereunder, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 13.1.

"Revolver Usage" means, as of any date of determination, the sum of (a) the amount of outstanding Advances, *plus* (b) the amount of the Letter of Credit Usage.

"Risk Participation Liability" means, as to each Letter of Credit, all reimbursement obligations of Borrowers to the Issuing Lender with respect to an L/C Undertaking, consisting of (a) the amount available to be drawn or which may become available to be drawn, (b) all amounts that have been paid by the Issuing Lender to the Underlying Issuer to the extent not reimbursed by Borrowers, whether by the making of an Advance or otherwise, and (c) all accrued and unpaid interest, fees, and expenses payable with respect thereto.

"SEC" means the United States Securities and Exchange Commission and any successor thereto.

"Securities Account" means a "securities account" (as that term is defined in the Code).

"Security Agreement" means a security agreement, in form and substance satisfactory to Agent, executed and delivered by Borrower to Agent.

"Senior Debt" means, as of any date of determination with respect to Parent and its Subsidiaries, determined on a consolidated consisting basis, (i) all Obligations and (ii) without duplication, all Indebtedness consisting of Purchase Money Indebtedness, FF&E Financings or Capitalized Lease Obligations, in each case except to the extent expressly subordinated to the Obligations pursuant to a subordination agreement in form and substance satisfactory to Agent.

"Senior Leverage Ratio" means, as of any date of determination with respect to Parent and its Subsidiaries for the four quarter period then ending, the ratio of (i) Senior Debt on such date, to (ii) TTM EBITDA for such period.

"Senior Note Collateral Accounts" means the Senior Note Interest Reserve Account and the Renovation Disbursement Account.

"Senior Note Documents" means, collectively, the Indenture, the Senior Secured Notes, and the Collateral Agreements (as such term is defined in the Indenture).

"Senior Note Interest Reserve Account" means the interest reserve account to be maintained by the Disbursement Agent and pledged to the Trustee pursuant to the terms of the Cash Collateral and Disbursement Agreement into which an amount, together with interest earned on such amount, sufficient to pay the first two interest payments on the Notes will be deposited on the date of the Indenture.

"Senior Secured Note Issuers" has the meaning specified therefore in the recitals to the Agreement.

24

"Senior Secured Notes" means the 8 3/4% Senior Secured Notes due 2012 issued by Parent and Finance Corp pursuant to the Indenture.

"Settlement" has the meaning specified therefor in Section 2.3(e)(i).

"Settlement Date" has the meaning specified therefor in Section 2.3(e)(i).

"Solvent" means, with respect to any Person on a particular date, that, at fair valuations, the sum of such Person's assets is greater than all of such Person's debts.

"Stock" means all shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in a Person, whether voting or nonvoting, including common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"Subordination Agreement" means a subordination and attornment agreement, in form and substance satisfactory to Agent, executed and delivered by Borrower and E&W to Agent.

"Subsidiary" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the shares of Stock having ordinary voting power to elect a majority of the board of directors (or appoint other comparable managers or members) of such corporation, partnership, limited liability company, or other entity.

"Swing Lender" means WFF or any other Lender that, at the request of Administrative Borrower and with the consent of Agent agrees, in such Lender's sole discretion, to become the Swing Lender under Section 2.3(d).

"Swing Loan" has the meaning specified therefor in Section 2.3(b).

"Tax Loss Benefit Amount" means with respect to any taxable year or portion thereof, the amount by which the Permitted Tax Distributions would be reduced were a net operating loss or net capital loss from a prior taxable year of a Borrower ending subsequent to the Closing Date carried forward to the applicable taxable year or portion thereof; provided, that for such purpose the amount of any such net operating loss or net capital loss shall be used only once and in each case the unused portion of such loss shall be carried forward to the next succeeding taxable year until so used. For purposes of calculating the Tax Loss Benefit Amount, the proportionate part of the items of taxable income, gain, deduction, or loss (including capital gain or loss) of any Subsidiary that is a Flow Through Entity for a taxable year or portion thereof of such Subsidiary ending subsequent to the Closing Date shall be included in determining the amount of net operating loss or net capital loss of such Borrower.

"Taxes" has the meaning specified therefor in Section 15.11.

"Third JV Closing Date" means the "Third Closing Date" as defined in the Joint Venture Agreement.

"Trademark Security Agreement" means a Trademark Security Agreement in the form of Exhibit D to the Security Agreement made by Borrowers in form and substance satisfactory to Agent.

"Trustee" means The Bank of New York, in its capacity as trustee for the holders of the Senior Secured Notes.

"TTM EBITDA" means, as of any determination, EBITDA of Borrowers and their Subsidiaries for the 12 consecutive monthly periods most recently ended.

"Underlying Issuer" means a third Person which is the beneficiary of an L/C Undertaking and which has issued a letter of credit at the request of the Issuing Lender for the benefit of Borrowers.

"Underlying Letter of Credit" means a letter of credit that has been issued by an Underlying Issuer.

"United States" means the United States of America.

"Voidable Transfer" has the meaning specified therefor in Section 16.6.

"Wells Fargo" means Wells Fargo Bank, National Association, a national banking association.

"WFF" means Wells Fargo Foothill, Inc., a California corporation.

26

**Schedule 2.7(a)—Cash Management Banks**

Wells Fargo Brokerage Services, LLC
608 Second Avenue South
Minneapolis, MN 55479

City National Bank
555 South Flower Street
12th Floor
Los Angeles, CA 90071

## Schedule 3.1

The obligation of each Lender to make its initial extension of credit provided for in the Agreement is subject to the fulfillment, to the satisfaction of Agent and each Lender (the making of such initial extension of credit by any Lender being conclusively deemed to be its satisfaction or waiver of the following), of each of the following conditions precedent:

    (a)    the Closing Date shall occur on or before March 29, 2005;

    (b)    Agent shall have received a letter duly executed by each Borrower, EW Common LLC, and Florida Hooters LLC authorizing Agent to file appropriate financing statements in such office or offices as may be necessary or, in the opinion of Agent, desirable to perfect the security interests to be created by the Loan Documents;

    (c)    Agent shall have received evidence that appropriate financing statements have been duly filed in such office or offices as may be necessary or, in the opinion of Agent, desirable to perfect the Agent's Liens in and to the Collateral, and Agent shall have received searches reflecting the filing of all such financing statements;

    (d)    Agent shall have received each of the following documents, in form and substance satisfactory to Agent, duly executed, and each such document shall be in full force and effect:

        (i)    the Collateral Assignments;

        (ii)    the Control Agreements, including, but not limited to, a Control Agreement with E&W regarding the Cash Collateral Account,

        (iii)    a disbursement letter executed and delivered by Borrowers to Agent regarding the extensions of credit to be made on the Closing Date, the form and substance of which is satisfactory to Agent,

        (iv)    the E&W Guaranty,

        (v)    the Estoppel Certificate,

        (vi)    the Fee Letter,

        (vii)    the Intercompany Subordination Agreement,

        (viii)    the Intercreditor Agreement,

        (ix)    the Mortgages,

        (x)    the Parent Pledge Agreement,

        (xi)    the Pledged Interests Control Agreement,

        (xii)    a letter, in form and substance satisfactory to Agent, from Canpartners Realty Holding Company IV LLC ("Existing Lender") to Agent respecting the amount necessary to repay in full all of the obligations of Borrowers and their Subsidiaries owing to Existing Lender and obtain a release of all of the Liens existing in favor of Existing Lender in and to the assets of Borrowers and their Subsidiaries, together with termination statements and other documentation evidencing the termination by Existing Lender of its Liens in and to the properties and assets of Borrowers and their Subsidiaries,

LA/1099297.6

(xiii)    the Security Agreement, and

(xiv)    the Subordination Agreement;

(e)    Agent shall have received a certificate from the appropriate manage and/or officer, as applicable, of each Borrower (i) attesting to the resolutions of such Borrower's management board or board of directors authorizing its execution, delivery, and performance of this Agreement and the other Loan Documents to which such Borrower is a party, (ii) authorizing specific manager or officers, as applicable of such Borrower to execute the same, and (iii) attesting to the incumbency and signatures of such managers or specific officers, as applicable, of such Borrower;

(f)    Agent shall have received copies of each Borrower's Governing Documents, as amended, modified, or supplemented to the Closing Date, certified by the appropriate manager and/or officer, as applicable, of such Borrower;

(g)    Agent shall have received a certificate of status with respect to each Borrower, dated within 10 days of the Closing Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of such Borrower, which certificate shall indicate that such Borrower is in good standing in such jurisdiction;

(h)    Agent shall have received certificates of status with respect to each Borrower, each dated within 30 days of the Closing Date, such certificates to be issued by the appropriate officer of the jurisdictions (other than the jurisdiction of organization of such Borrower) in which its failure to be duly qualified or licensed would constitute a Material Adverse Change, which certificates shall indicate that such Borrower is in good standing in such jurisdictions;

(i)    Agent shall have received a certificate from the appropriate manager and/or officer, as applicable, of each Parent Pledgor (i) attesting to the resolutions of such Parent Pledgor's management board or board of directors authorizing its execution, delivery, and performance of the Loan Documents to which such Parent Pledgor is a party, (ii) authorizing specific managers or officers, as applicable of such Parent Pledgor to execute the same and (iii) attesting to the incumbency and signatures of such specific managers or officers, as applicable of Parent Pledgor;

(j)    Agent shall have received copies of each Parent Pledgor's Governing Documents, as amended, modified, or supplemented to the Closing Date, certified by the appropriate manager and/or officer, as applicable, of such Parent Pledgor;

(k)    Agent shall have received a certificate of status with respect to each Parent Pledgor, dated within 10 days of the Closing Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of such Parent Pledgor, which certificate shall indicate that such Parent Pledgor is in good standing in such jurisdiction;

(l)    Agent shall have received certificates of status with respect to each Parent Pledgor, each dated within 30 days of the Closing Date, such certificates to be issued by the appropriate officer of the jurisdictions (other than the jurisdiction of organization of such Parent Pledgor) in which its failure to be duly qualified or licensed would constitute a Material Adverse Change, which certificates shall indicate that such Parent Pledgor is in good standing in such jurisdictions;

(m)    Agent shall have received a certificate from the Assistant Secretary of E&W (i) attesting to the resolutions of E&W's Board of Directors authorizing its execution, delivery, and performance of the Loan Documents to which E&W is a party, (ii) authorizing specific officers of E&W to execute the same and (iii) attesting to the incumbency and signatures of such specific officers of E&W;

(n)    Agent shall have received copies of E&W's Governing Documents, as amended, modified, or supplemented to the Closing Date, certified by the Assistant Secretary of E&W;

(o)    Agent shall have received a certificate of status with respect to E&W, dated within 10 days of the Closing Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of E&W, which certificate shall indicate that E&W is in good standing in such jurisdiction;

(p)    Agent shall have received certificates of status with respect to E&W, each dated within 30 days of the Closing Date, such certificates to be issued by the appropriate officer of the jurisdictions (other than the jurisdiction of organization of E&W) in which its failure to be duly qualified or licensed would constitute a Material Adverse Change, which certificates shall indicate that E&W is in good standing in such jurisdictions;

(q)    Agent shall have received a closing certificate from (i) Borrowers, (ii) General Contractor and (iii) Manager, each in form and substance satisfactory to Agent;

(r)    Agent shall have received a consent to collateral assignment of contract from (i) General Contractor, and (ii) Architect, each in form and substance satisfactory to Agent;

(s)    Agent shall have received a certificate of insurance, together with the endorsements thereto, as are required by Section 5.8, the form and substance of which shall be satisfactory to Agent;

(t)    Agent shall have received an opinion of (i) Borrowers' Nevada and New York counsel, (ii) Borrowers' Nevada gaming counsel, and (iii) E&W's Nevada gaming counsel, each in form and substance satisfactory to Agent;

(u)    Agent shall have received evidence reasonably satisfactory to it that E&W has all necessary Gaming Licenses and Liquor Licenses;

(v)    Agent shall have received evidence satisfactory to it that Borrowers shall have received cash proceeds from the Senior Secured Notes of not less than $130,000,000;

(w)    Borrowers shall have the Required Availability after giving effect to the initial extensions of credit hereunder and the payment of all fees and expenses required to be paid by Borrowers on the Closing Date under this Agreement or the other Loan Documents;

(x)    Agent shall have completed its business, legal, and collateral due diligence, including (i) a collateral audit and review of Borrowers' and their Subsidiaries' books and records and verification of Borrowers' representations and warranties to the Lender Group, the results of which shall be satisfactory to Agent, and (ii) an inspection of each of the locations where Borrowers' and their Subsidiaries' Inventory is located, the results of which shall be satisfactory to Agent;

(y)    Agent shall have received completed reference checks with respect to Borrowers' senior management, the results of which are satisfactory to Agent in its sole discretion;

(z)    Agent shall have received a set of Projections of Borrowers for the 3 year period following the Closing Date (on a year by year basis, and for the 1 year period following the Closing Date, on a month by month basis), in form and substance (including as to scope and underlying assumptions) satisfactory to Agent;

(aa)    Borrowers shall have paid all Lender Group Expenses incurred in connection with the transactions evidenced by this Agreement;

LA/1099297.6

(bb)    Agent shall have received mortgagee title insurance policy (or marked commitment to issue the same) for the Real Property Collateral issued by a title insurance company satisfactory to Agent ( "Mortgage Policy") in amounts satisfactory to Agent assuring Agent that the Mortgage on such Real Property Collateral are valid and enforceable first priority mortgage Lien on such Real Property Collateral free and clear of all defects and encumbrances except Permitted Liens, and the Mortgage Policy otherwise shall be in form and substance satisfactory to Agent;

(cc)    Agent shall have received a real estate survey with respect to each parcel composing the Real Property Collateral; the surveyor retained for the survey, the scope of the survey, and the results thereof shall be acceptable to Agent;

(dd)    Agent shall have received copies of each of the Senior Note Documents, Casino Lease, Hotel Lease, Joint Venture Agreement, License Agreements and the Material Renovation Documents, together with a certificate of the appropriate manager and/or officer of the Parent certifying (i) with respect to those documents as to which the Parent or Borrowers are a party, each such document as being a true, correct, and complete copy thereof, and (ii) with respect to those documents as to which neither the Parent nor the Borrowers are a party, each such document as being, to the Parent's knowledge, a true, correct, and complete copy thereof;

(ee)    Borrowers and each of their Subsidiaries shall have received all licenses, approvals or evidence of other actions required by any Governmental Authority in connection with the execution and delivery by Borrowers or their Subsidiaries of the Loan Documents or with the consummation of the transactions contemplated thereby, other than any required approvals under the Gaming Laws (to be obtained in connection with the Operator Licensing Event) for the continued effect of the pledge of the Stock of any Borrower (from and after such Operator Licensing Event) as contemplated by the Security Agreement and the Parent Pledge Agreement; and

(ff)    all other documents and legal matters in connection with the transactions contemplated by this Agreement shall have been delivered, executed, or recorded and shall be in form and substance satisfactory to Agent.

## Schedule 3.3

### Financing Statements to be Terminated

| DEBTOR | OFFICE/AGENCY SEARCHED | SECURED PARTY | INITIAL FILING DATE |
|---|---|---|---|
| Eastern & Western Hotel Corporation | Nevada Secretary of State | Sumitomo Mitsui Banking Corporation<br><br>(Initial Filing: Secured Party Name was The Sumitomo Bank, Limited) | Initial Filing 9618937 11/21/96 |
| Eastern & Western Hotel Corporation | Nevada Secretary of State | Sumitomo Mitsui Banking Corporation | In Lieu 2001006063-2 9/19/01 |

**Schedule 4.5—Locations of Inventory and Equipment**

115 East Tropicana Avenue
Las Vegas, NV 89109

155 East Tropicana Avenue
Las Vegas, NV 89109

**Schedule 4.7—States of Organization; Chief Executive Office(s); Organizational Identification Numbers; Commercial Tort Claims; Capitalization of Borrowers; Capitalization of Borrowers' Subsidiaries**

**(a) and (c)**    States of Organization and Organizational Identification Number

| Borrower | State of Organization | Organizational Identification Number |
|---|---|---|
| 155 East Tropicana, LLC | Nevada | LLC13428-2004 |
| 155 East Tropicana Finance Corp. | Nevada | E0079092005-1 |

**(b)**    **Chief Executive Offices**

155 East Tropicana Avenue
Las Vegas, NV 89109

**(d)**    **Commercial Tort Claims**

None.

**Schedule 4.7—States of Organization; Chief Executive Office(s); Organizational Identification Numbers; Commercial Tort Claims; Capitalization of Borrowers; Capitalization of Borrowers' Subsidiaries**

(a) and (c)    States of Organization and Organizational Identification Number

| Borrower | State of Organization | Organizational Identification Number |
|---|---|---|
| 155 East Tropicana, LLC | Nevada | LLC13428-2004 |
| 155 East Tropicana Finance Corp. | Nevada | E0079092005-1 |

**(b)     Chief Executive Offices**

155 East Tropicana Avenue
Las Vegas, NV 89109

**(d)     Commercial Tort Claims**

None.

**Schedule 4.7—States of Organization; Chief Executive Office(s); Organizational Identification Numbers; Commercial Tort Claims; Capitalization of Borrowers; Capitalization of Borrowers' Subsidiaries**

(a) and (c)    States of Organization and Organizational Identification Number

| Borrower | State of Organization | Organizational Identification Number |
|---|---|---|
| 155 East Tropicana, LLC | Nevada | LLC13428-2004 |
| 155 East Tropicana Finance Corp. | Nevada | E0079092005-1 |

**(b)    Chief Executive Offices**

155 East Tropicana Avenue
Las Vegas, NV 89109

**(d)    Commercial Tort Claims**

None.

**Schedule 4.7—States of Organization; Chief Executive Office(s); Organizational Identification Numbers; Commercial Tort Claims; Capitalization of Borrowers; Capitalization of Borrowers' Subsidiaries**

**(a) and (c)    States of Organization and Organizational Identification Number**

| Borrower | State of Organization | Organizational Identification Number |
|---|---|---|
| 155 East Tropicana, LLC | Nevada | LLC13428-2004 |
| 155 East Tropicana Finance Corp. | Nevada | E0079092005-1 |

**(b)    Chief Executive Offices**

155 East Tropicana Avenue
Las Vegas, NV 89109

**(d)    Commercial Tort Claims**

None.

SCHEDULES TO CREDIT AGREEMENT

**Schedule 4.8—Due Organization and Qualification**

(b)    **Authorized and Outstanding capital Stock and Rights to Acquire Shares/Interests**

| Borrower | Authorized capital Stock | Class | Number of Shares/Interests Outstanding | Rights to Acquire Shares/Interests |
|---|---|---|---|---|
| 155 East Tropicana, LLC | 100 | Membership Interests | 100 | None |
| 155 East Tropicana Finance Corp. | 100 | Common | 100 | None |

(c)    **Subsidiaries**

| Borrower | Subsidiaries | Nature of Ownership |
|---|---|---|
| 155 East Tropicana, LLC | 155 East Tropicana Finance Corp. | Direct |
| 155 East Tropicana Finance Corp. | None | None |

SCHEDULES TO CREDIT AGREEMENT

**Schedule 4.8—Due Organization and Qualification**

(b)    Authorized and Outstanding capital Stock and Rights to Acquire Shares/Interests

| Borrower | Authorized capital Stock | Class | Number of Shares/Interests Outstanding | Rights to Acquire Shares/Interests |
|---|---|---|---|---|
| 155 East Tropicana, LLC | 100 | Membership Interests | 100 | None |
| 155 East Tropicana Finance Corp. | 100 | Common | 100 | None |

(c)    Subsidiaries

| Borrower | Subsidiaries | Nature of Ownership |
|---|---|---|
| 155 East Tropicana, LLC | 155 East Tropicana Finance Corp. | Direct |
| 155 East Tropicana Finance Corp. | None | None |

SCHEDULES TO CREDIT AGREEMENT

**Schedule 4.10—Litigation**

| Complaint Filed | Case Number | Parties |
|---|---|---|
| 12/27/2004 | 04-A-49671-C | 155 East Tropicana, LLC, Plaintiff vs. Neal Gaskin dba Gaskin Architectural Group, Defendant |
| 09/27/2004 | 04-A-492691 | Susan Knox, Plaintiff vs. 155 East Tropicana, LLC, a Nevada limited-liability company; Eastern & Western Hotel, Corp., a Nevada corporation, individually and d/b/a Hotel San Remo Casino & Resort; does I through X, inclusive; and Roe Corporations, I through X, inclusive, Defendants [plaintiff claims in excess of $10,000 in general damages, in excess of $10,000 in special damages—$10,000; and reasonable attorney fees and costs of suit]* |

* Company maintains insurance coverage whereby it has no deductible and there is a $1.0 million limit on liability for each occurrence.

**Schedule 4.14—Environmental Matters**

A Phase I Environmental Assessment of the subject site at 115 East Tropicana Avenue, Las Vegas, Nevada has revealed no evidence of recognized environmental conditions in connection with the subject site. The assessment did, however, indicate the following potentially hazardous materials:

<u>**Potentially Hazardous Materials**</u>: The drums of diesel fuel should be stored in such a manner as to contain potential leaks, spills or other discharges. Proper storage could also include container integrity, secondary containment capacity of 10% of the total volume or the largest container, whichever is greater. To reduce the potential for accidental spills, assessor *recommended* that the 55-gallon drums containing diesel fuel be equipped with secondary containment structures/devices.

**Other Issues**

- <u>**Asbestos Containing Materials**</u>: The Asbestos Containing Materials (as defined by federal regulations) include: acoustical ceiling surfacing, floor tile mastic, the joint compound layer of the sheetrock wall system, and roofing tar. The acoustical ceiling surfacing was noted as friable and was found to be in good condition. The floor tile mastic, the joint compound layer of the sheetrock wall system, and roofing tar were noted as nonfriable and were found to be in good condition.

**Schedule 4.15—Intellectual Property**

<u>Amended and Restated Assignment Agreement by and between 155 East Tropicana, LLC and Florida Hooters, LLC dated March 9, 2005</u>. 155 East Tropicana, LLC has entered into an assignment agreement with Florida Hooters LLC which grants 155 East Tropicana, LLC the right to use certain intellectual property in connection with the operation of a Hooters Casino Hotel. The intellectual property covered by this agreement is described as follows:

- *Hooters Trademark.* 155 East Tropicana, LLC has an exclusive license to use the Hooters brand in connection with gaming, casino or combined hotel, gaming and casino operations solely at the property located at 155 East Tropicana Avenue, Las Vegas, Nevada.

- *Hooters Restaurant Concept.* Pursuant to a consent from Las Vegas Wings, Inc., 155 East Tropicana, LLC has the right to use the Hooters *restaurant* concept at the hotel casino located at 155 East Tropicana Avenue, Las Vegas, Nevada. The consent permits worldwide promotion, marketing and advertising of the hotel casino (located at 155 East Tropicana Avenue, Las Vegas, Nevada) and its services.

<u>Amended and Restated License Agreement by and between 155 East Tropicana, LLC and Lags Ventures, Inc. dated March 9, 2005</u>. 155 East Tropicana, LLC has an exclusive license to use certain intellectual property to operate and promote restaurants, taverns, lounges and bars using the marks "Dan Marino's Fine Food & Spirits" and "Martini Bar," which is operated in conjunction with Dan Marino's Fine Food & Spirits, at the hotel casino (located at 155 East Tropicana Avenue, Las Vegas, Nevada).

<u>Trademark License Agreement by and between Pete & Shorty's, Inc. and 155 East Tropicana, LLC dated March 11, 2005</u>. Pete & Shorty's, Inc has granted to 155 East Tropicana, LLC a nonexclusive, royalty-free license to use the Pete & Shorty's mark in connection with a restaurant, bar and lounge at the Hooters Casino Hotel (to be located at 155 East Tropicana Avenue, Las Vegas, Nevada). Pursuant to the license agreement, 155 East Tropicana, LLC can also use the mark in connection with affiliated merchandise, entertainment and casino services. However, Pete & Shorty's, Inc. has maintained the right to obtain federal and/or state registrations for any and all additional services, other than restaurant, bar and cocktail lounge services, which will be provided at the Hooters Casino Hotel (to be located at 155 East Tropicana Avenue, Las Vegas, Nevada).

155 East Tropicana, LLC has filed the following Intent-To-Use Applications with the United States Trademark Office:

| Mark | Class | Serial Number |
|---|---|---|
| Nippers | 43<br>Restaurant, bar and cocktail lounge services | 78/549,527 |
| The Bait Shop | 43<br>Restaurant, bar and cocktail lounge services | 78/569,441 |
| The Bait Shop | 35 | 78/569,446 |

SCHEDULES TO CREDIT AGREEMENT

| Mark | Class | Serial Number |
|------|-------|---------------|
| | Retail store services | |
| Owl's Nest | 43 | 78/569,436 |
| | Restaurant, bar and cocktail lounge services | |

## Domain Names

The following domain names have been reserved by 155 East Tropicana, LLC and are currently in use:

- www.hooterscasinohotel.com
- www.hootershotelcasino.com
- www.hooterslasvegas.com
- www.hooterslv.com

The following domain names have been reserved by 155 East Tropicana, LLC and are not currently in use, but such reservations will expire on August 2, 2005, unless otherwise indicated:

- www.hooterscasinolasvegas.com
- www.hooterscasinolv.com
- www.hootershotelcasinolasvegas.com
- www.hootershotelcasinolv.com
- www.hootershotellasvegas.com
- www.hootershotellv.com
- www.hooterslasvegascasino.com
- www.hootersresortcasino.com
- www.lasvegashooters.com
- www.lasvegashooterscasino.com
- www.lasvegashootershotel.com
- www.playhooters.com
- www.vegashooters.com
- www.hootersresort.com (September 17, 2005)

SCHEDULES TO CREDIT AGREEMENT

**Schedule 4.17—Deposit Accounts and Securities Accounts**

**155 East Tropicana, LLC** currently has accounts at the following banks.

City National Bank
555 South Flower Street
12th Floor
Los Angeles, CA 90071

| Account Name | Account Number |
| --- | --- |
| Cash Collateral | 210-065-113 |
| Debt Service | 210-065-121 |
| Operating Cash Flow | 210-065-148 |
| Tax/Insurance | 210-065-156 |
| Borrower Operating Account | 210-065-164 |

Wells Fargo Brokerage Services, LLC

| Account Name | Account Number |
| --- | --- |
| 155 East Tropicana, LLC | 11552783 |

The Bank of New York

| Account Name | Account Number |
| --- | --- |
| Renovation Disbursement | 171098 |
| Interest Reserve | 171097 |

SCHEDULES TO CREDIT AGREEMENT

**Schedule 4.19—Permitted Indebtedness**

None.

CREDIT FACILITY - schedules to credit agreement (6).DOC

**Schedule 4.20—Licenses, Permits, and Consents**

**155 East Tropicana, LLC**

Nevada State Business License No. 993718530 issued by the Nevada Department of Taxation to 155 East Tropicana, LLC, subject to renewal by 6/1/05.

Approval by the Clark County Commission (reference UC-1658-97) for (i) use permits for the following (a) renovation and explanation of an existing resort hotel (San Remo) with accessory uses; (b) outdoor dining; (c) live entertainment; and deviations to development standards; (ii) deviations for the following (a) alternative landscaping; (b) reduce parking; (c) reduce parking during construction; and (d) all other deviations as depicted per plans on file; and (iii) design review for the redesign and expansion of an existing resort hotel and casino on 7.0 acres in an H-1 (Limited Resort and Apartment) Zone. Generally located on the south side of Tropicana Avenue and the west side of Duke Ellington Way within Paradise.

**Eastern & Western (in connection with operation of the Business)**

Gaming License

Non-Restricted Gaming License No.02807-08 issued by the Nevada Gaming Commission to Eastern & Western Hotel Corporation d/b/a Hotel San Remo, Las Vegas, Casino and Resort.

Local Business Permit/License

Business Permit No. 1000084-866 issued by Clark County to Hotel San Remo Casino & Resort for location at 115 E. Tropicana Ave., Las Vegas, NV 89109 (Type of License: Amusement Machines), subject to renewal by 4/30/05.

Business Permit No. 1002074-930 issued by Clark County to Hotel San Remo Casino & Resort for location at 115 E. Tropicana Ave., Las Vegas, NV 89109 (Type of License: Tobacco Permit), subject to renewal by 10/31/05.

Business License No. 1000084-700-101 issued by Clark County to Hotel San Remo Casino & Resort for location at 115 E. Tropicana Ave., Las Vegas, NV 89109 (Type of License: Restaurant — Category 1 resort (seating for 50 or more), subject to renewal by 3/31/05.

Business License No. 1000084-LIQ-101 930 issued by Clark County to Hotel San Remo Casino & Resort for location at 115 E. Tropicana Ave., Las Vegas, NV 89109 (Type of License: Liquor), subject to renewal by 3/31/05.

Business License No. 1000020-245 930 issued by Clark County to Hotel San Remo Casino & Resort for location at 115 E. Tropicana Ave., Las Vegas, NV 89109 (Type of License: Convention Pavilion), subject to renewal by 12/31/05.

Business License No. 1000084-CON-101 930 issued by Clark County to Hotel San Remo Casino & Resort for location at 115 E. Tropicana Ave., Las Vegas, NV 89109 (Type of License: Convention Authority Gaming), subject to renewal by 3/31/05.

Business License No. 1000084-GEN-102 930 issued by Clark County to Hotel San Remo Casino & Resort for location at 115 E. Tropicana Ave., Las Vegas, NV 89109 (Type of License: General Gaming), subject to renewal by 3/31/05, subject to renewal by 3/31/05.

Business License No. 1000084-GAM-101 930 issued by Clark County to Hotel San Remo Casino & Resort for location at 115 E. Tropicana Ave., Las Vegas, NV 89109 (Type of License: Gaming—Resort Hotel), subject to renewal by 3/31/05.

Business License No. 1000101-430 930 issued by Clark County to Hotel San Remo Casino & Resort for location at 115 E. Tropicana Ave., Las Vegas, NV 89109 (Type of License: Transient Lodging Establishment), subject to renewal by 7/31/05.

Business License No. 1000084-431-101 issued by 930 issued by Clark County to Hotel San Remo Casino & Resort for location at 115 E. Tropicana Ave., Las Vegas, NV 89109 (Type of License: Transient Lodging—Miscellaneous Resort), subject to renewal by 7/31/05.

Business License No. 1002074-405-101 930 issued by Clark County to Hotel San Remo Casino & Resort for location at 115 E. Tropicana Ave., Las Vegas, NV 89109 (Type of License: Gift/Novelty Resort), subject to renewal by 7/31/05.

Waste Management Audit

Account Number G3444-XXX-01 issued by Clark County Health District to Hotel San Remo at 115 East Tropicana Avenue, Las Vegas, NV 89101, subject to renewal by 12/31/05.

Health Permits

Permit number 07390-3H2-00 issued by Clark County Health District to Eastern & Western Hotel Corp. as owner and Hotel San Remo as permittee for hotel establishment, subject to renewal by 6/30/05.

Permit number 07390-3H2-01 issued by Clark County Health District to Eastern & Western Hotel Corp. as owner and Hotel San Remo as permittee for restaurant establishment, subject to renewal by 6/30/05.

Permit number 07390-3H2-02 issued by Clark County Health District to Eastern & Western Hotel Corp. as owner and Hotel San Remo as permittee for drinking establishment, subject to renewal by 6/30/05.

Permit number 07390-3H2-03 issued by Clark County Health District to Eastern & Western Hotel Corp. as owner and Hotel San Remo as permittee for swim pool-living un establishment, subject to renewal by 6/30/05.

Permit number 07390-3H2-04 issued by Clark County Health District to Eastern & Western Hotel Corp. as owner and Hotel San Remo as permittee for buffet establishment, subject to renewal by 6/30/05.

Permit number 07390-3H2-05 issued by Clark County Health District to Eastern & Western Hotel Corp. as owner and Hotel San Remo as permittee for service bar establishment, subject to renewal by 6/30/05.

Permit number 07390-3H2-06 issued by Clark County Health District to Eastern & Western Hotel Corp. as owner and Hotel San Remo as permittee for restaurant establishment, subject to renewal by 6/30/05.

Permit number 07390-3H2-07 issued by Clark County Health District to Eastern & Western Hotel Corp. as owner and Hotel San Remo as permittee for restaurant/take-out establishment, subject to renewal by 6/30/05.

Permit number 07390-3H2-08 issued by Clark County Health District to Eastern & Western Hotel Corp. as owner and Hotel San Remo as permittee for restaurant establishment, subject to renewal by 6/30/05.

Permit number 07390-3H2-12 issued by Clark County Health District to Eastern & Western Hotel Corp. as owner and Hotel San Remo as permittee for drinking establishment, subject to renewal by 6/30/05.

Permit number 07390-3H2-13 issued by Clark County Health District to Eastern & Western Hotel Corp. as owner and Hotel San Remo as permittee for packaged liquor (gift shop liquor), subject to renewal by 6/30/05.

Permit number 07390-3H2-14 issued by Clark County Health District to Eastern & Western Hotel Corp. as owner and Hotel San Remo as permittee for buffet, subject to renewal by 6/30/05.

Permit number 07390-3H2-15 issued by Clark County Health District to Eastern & Western Hotel Corp. as owner and Hotel San Remo as permittee for main kitchen, subject to renewal by 6/30/05.

Permit number 07390-3H2-16 issued by Clark County Health District to Eastern & Western Hotel Corp. for dry storage, subject to renewal by 6/30/05.

SCHEDULES TO CREDIT AGREEMENT

## Schedule 5.2

Provide Agent (and if so requested by Agent, with copies for each Lender) with each of the documents set forth below at the following times in form satisfactory to Agent:

| | |
|---|---|
| Monthly (within 30 days of each month, with a 45 day grace period at quarter end and 60 day grace period at fiscal year end regarding reporting item (c)) | (a)  a detailed report including (i) cage-cash on hand as of the end of the reporting period; (ii) "handle revenues" and "win revenues"; (iii) the number of gaming devices of Borrowers of each type in operation; (iv) the average net win per gaming device unit per day of each type of gaming type of Borrowers in operation; (v) comparisons of such results for the period covered in such report with the corresponding results for such prior periods as Agent may reasonably request; and (vi) such other information relative to gaming operations as Agent may reasonably request, and<br><br>(b)  a detailed calculation of the Borrowing Base, including a schedule of EBITDA for the preceding twelve (12) month period having ended on the last day of such month, accompanied by such reporting detail and documentation as may be requested by Agent. |
| Quarterly (within 30 days of quarter end) | (c)  a quarterly roll-forward of a detailed debt schedule.<br><br>(d)  a report regarding Parent's and its Subsidiaries' accrued, but unpaid, *ad valorem* taxes,<br><br>(e)  a detailed report regarding Borrowers' and their Subsidiaries' cash and Cash Equivalents, including an indication of which amounts constitute Qualified Cash, and<br><br>(f)  the minimum bankroll requirement worksheet in accordance with Nevada Gaming Commission Regulation 6.150 (Minimum Bankroll Requirements for Nonrestricted Licensees) and the Nevada Gaming Control Board's memorandum regarding Regulation 6.150 for the last day of such fiscal quarter of the Borrowers. |
| Within 5 days after any occurrence (or knowledge thereof by any Borrower or Operator) | (g)  copies of each report in respect of (x) any Borrower's and E&W's business issued by a Nevada Gaming Authority (including any 'Exception Report' or other audit finding issued by any Nevada Gaming Authority in respect of any audit of any Borrower performed by such Nevada Gaming Authority) or made by a Borrower to any Nevada Gaming Authority, and (y) any Borrower's failure at any time to maintain the minimum bankroll in accordance with Nevada Gaming Commission Regulation 6.150 (Minimum Bankroll Requirements for Nonrestricted Licensees) and the Nevada Gaming Control Board's memorandum regarding Regulation 6.150. |
| Upon request by Agent | (h)  a summary aging, by vendor, of Borrowers' accounts payable and any book overdraft and an aging, by vendor, of any held checks,<br><br>(i)  such other reports as to the Collateral or the financial condition of the Borrowers as Agent may request from time to time. |

### Schedule 5.3

Deliver to Agent, with copies to each Lender, each of the financial statements, reports, or other items set forth set forth below at the following times in form satisfactory to Agent:

| | |
|---|---|
| as soon as available, but in any event within 30 days (45 days in the case of a month that is the end of the Borrowers' fiscal quarters) after the end of each month during each of Parent's fiscal years | (a) an unaudited consolidated and consolidating balance sheet, income statement, and statement of cash flow covering Borrowers' operations during such period,<br><br>(b) a Compliance Certificate signed by the chief financial officer of Administrative Borrower,<br><br>(c) a certificate signed by the chief financial officer of Administrative Borrower certifying that Borrowers and Guarantors have timely filed all tax returns required to be filed by Borrowers and Guarantors, and have timely paid all taxes on Borrowers and Guarantors and their respective properties, assets, income, and franchises (including Real Property taxes, gaming taxes, and payroll taxes), other than any such taxes that are the subject of a Permitted Protest; and<br><br>(d) a certificate signed by the chief financial officer of Administrative Borrower certifying (or inclusion in the monthly reporting pursuant to (a) above a report setting forth) the total number of rooms, number of available rooms, Revenue Per Available Room (RevPAR) for the current month and a comparison to the same period prior year, and the monthly occupancy rate of the Business. |
| as soon as available, but in any event within 45 days after the end of each fiscal quarter | (e) to the extent not otherwise included and separately itemized in the financial reports to be provided above (as determined by Agent in its Permitted Discretion), a capital expense disbursement report, and a comparison of the budgeted income and expenses and the actual income and expenses for such month and year to date as of the last day of each quarter, including explanations of material variances. |
| as soon as available, but in any event within 90 days after the end of each of Borrowers' fiscal years | (f) consolidated and consolidating financial statements of Borrowers and their Subsidiaries for each such fiscal year, audited by independent certified public accountants reasonably acceptable to Agent and certified, without any qualifications, by such accountants to have been prepared in accordance with GAAP (such audited financial statements to include a balance sheet, income statement, and statement of cash flow and, if prepared, such accountants' letter to management),<br><br>(g) a certificate of such accountants addressed to Agent stating that such accountants do not have knowledge of the existence of any Default or Event of Default under Section 7.20; and<br><br>(h) a Compliance Certificate signed by the chief financial officer of Borrowers. |
| as soon as available, but | (i) copies of Borrowers' Projections, in form and substance (including as to |

| | |
|---|---|
| in any event within 30 days prior to the start of Borrowers' fiscal years | scope and underlying assumptions) satisfactory to Agent, in its Permitted Discretion, for the forthcoming 3 years, year by year, and for the forthcoming fiscal year, month by month, certified by the chief financial officer as being such officer's good faith estimate of the financial performance Borrowers during the period covered thereby, and<br><br>(j) cause each Guarantor (other than E&W) to deliver its annual financial statements at the time when Borrowers provides its audited financial statements to Agent, but only to the extent such Guarantor's financial statements are not consolidated with Borrowers' financial statements, and, if such Guarantor is required to file federal income tax returns, copies of all federal income tax returns as soon as the same are available and in any event no later than 30 days after the same are required to be filed by law. |
| if and when filed by Parent | (k) Form 10-Q quarterly reports, Form 10-K annual reports, and Form 8-K current reports,<br><br>(l) any other filings made by Parent with the SEC,<br><br>(m) copies of all operating and capital budgets, and all other budgets, summaries of sources and uses of funds, projections, and financial information prepared by or on behalf of any Borrower promptly upon the preparation and delivery thereof by the chief financial officer of such Borrower to any third party, but in any event operating and capital budgets shall be delivered to Agent no less frequently than annually,<br><br>(n) copies of each of the Borrowers' future federal income tax returns, and any amendments thereto, within 30 days of the filing thereof with the Internal Revenue Service, and<br><br>(o) any other information that is provided by Borrowers to its shareholders generally. |
| if and when filed by Borrowers and as requested by Agent | (p) satisfactory evidence of payment of applicable excise taxes in each jurisdictions in which (i) such Borrowers conduct business or is required to pay any such excise tax, (ii) where such Borrowers' failure to pay any such applicable excise tax would result in a Lien on the property or assets of such Borrowers, or (iii) where such Borrowers' failure to pay any such applicable excise tax reasonably could be expected to result in a Material Adverse Change. |
| as soon as a Borrower has knowledge thereof | (q) notice of any proposed legislation or administrative action specifically affecting the Borrowers' or Guarantors' gaming activities introduced before any Governmental Authority. |
| as soon as a Borrower has | |

LA/1100196.4

| | |
|---|---|
| knowledge thereof, but in any event bi-annually | (r)  a detailed report regarding the leasing of any portion of the Casino or Real Property, including (i) if a Borrower is the lessee, the name of the lessor, the amount and type of equipment leased, the rental rate, and the lease term, and (ii) if a Borrower is the lessor, the name of the lessee, the amount of space leased, the rental rate, the lease term and the proposed use for the space. |
| promptly, but in any event within 5 days after a Borrower has knowledge of any event or condition that constitutes a Default or an Event of Default | (s)  notice of such event or condition and a statement of the curative action that Borrowers propose to take with respect thereto. |
| promptly after the commencement thereof, but in any event within 5 days after the service of process with respect thereto on any Borrower or any Subsidiary of any Borrower | (t)  notice of all actions, suits, or proceedings brought by or against Parent or any Subsidiary of Parent before any Governmental Authority which reasonably could be expected to result in a Material Adverse Change. |
| upon the request of Agent | (u)  any other information reasonably requested relating to the financial condition of Parent or its Subsidiaries. |

LA/1100196.4