# EXHIBIT 8

Execution Version

## SECURITY AGREEMENT

This SECURITY AGREEMENT (this "Agreement") is made this 29th day of March, 2005, among Grantors listed on the signature pages hereof and those additional entities that hereafter become parties hereto by executing the form of Supplement attached hereto as Annex 1 (collectively, jointly and severally, "Grantors" and each individually "Grantor"), and WELLS FARGO FOOTHILL, INC., in its capacity as administrative agent for the Lender Group and the Bank Product Provider (together with its successors, "Agent").

### W I T N E S S E T H:

WHEREAS, pursuant to that certain Credit Agreement of even date herewith (as amended, restated, supplemented or otherwise modified from time to time, including all schedules thereto, the "Credit Agreement") among 155 East Tropicana, LLC, a Nevada limited liability company ("Parent"), and each of Parent's Subsidiaries identified on the signature pages thereof (such Subsidiaries, together with Parent, are referred to hereinafter each individually as a "Borrower", and individually and collectively, jointly and severally, as the "Borrowers"), the lenders party thereto as "Lenders" ("Lenders"), and Agent, the Lender Group is willing to make certain financial accommodations available to Borrowers from time to time pursuant to the terms and conditions thereof,

WHEREAS, Parent and 155 East Tropicana Finance Corp. ("Finance Corp", and together with Parent collectively, the "Senior Secured Note Issuers"), and The Bank of New York Trust Company, N.A., as trustee (the "Trustee") have entered into that certain Senior Secured Note Indenture pursuant to which, inter alia, the Senior Secured Note Issuers will issue certain Senior Secured Notes which are secured by a continuing security interest in certain assets of the Senior Secured Note Issuers,

WHEREAS, one of the conditions of the Credit Agreement is that the security interest in the Collateral (as defined below) under the Loan Documents (as defined below) be senior in priority to the security interest in the Collateral under the Senior Secured Note Documents (as defined below) in the manner and to the extent provided for in the Intercreditor Agreement (as defined below),

WHEREAS, Agent has agreed to act as agent for the benefit of the Lender Group and the Bank Product Provider in connection with the transactions contemplated by this Agreement, and

WHEREAS, in order to induce the Lender Group to enter into the Credit Agreement and the other Loan Documents and to induce the Lender Group to make financial accommodations to Borrowers as provided for in the Credit Agreement, Grantors have agreed to grant a continuing security interest in and to the Collateral in order to secure the prompt and complete payment, observance and performance of, among other things, (a) the obligations of Grantors arising from this Agreement, the Credit Agreement, and the other Loan Documents, including, without limitation, under any Guaranty to which any such Grantor is a party, (b) all Bank Product Obligations, and (c) all Obligations of Borrowers (including, without limitation, any interest, fees or expenses that accrue after the filing of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any Insolvency Proceeding), plus reasonable attorneys fees and expenses if the obligations represented thereunder are collected by law, through an attorney-at-law, or under advice therefrom (clauses (a), (b), and (c) being hereinafter referred to as the "Secured Obligations"), by the granting of the security interests contemplated by this Agreement,

LA/1101038.4

NOW, THEREFORE, for and in consideration of the recitals made above and other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.    <u>Defined Terms</u>. All capitalized terms used herein (including, without limitation, in the preamble and recitals hereof) without definition shall have the meanings ascribed thereto in the Credit Agreement.  In addition to those terms defined elsewhere in this Agreement, as used in this Agreement, the following terms shall have the following meanings:

(a)    "<u>Agent</u>" has the meaning specified therefor in the preamble to this Agreement.

(b)    "<u>Agreement</u>" has the meaning specified therefor in the preamble to this Agreement.

(c)    "<u>Borrower</u>" and "<u>Borrowers</u>" have the respective meanings specified therefor in the recitals to the Agreement.

(d)    "<u>Casino Bankroll</u>" means only the amount of cash or Cash Equivalents required by the provisions of Section 6.150 of the Regulations of the NGC to satisfy the Casino minimum bankroll requirements, mandatory game security reserves, allowances for redemption of casino chips and tokens, or payment of winning wagers to gaming patrons, or as otherwise may be required by the Gaming Laws or a directive of the Chairman of the NGCB.

(e)    "<u>CFC</u>" means a controlled foreign corporation (as that term is defined in the IRC).

(f)    "<u>Code</u>" means the New York Uniform Commercial Code, as in effect from time to time; provided, however, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, priority, or remedies with respect to Agent's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies.

(g)    "<u>Collateral</u>" has the meaning specified therefor in <u>Section 2</u>.

(h)    "<u>Commercial Tort Claim</u>" has the meaning specified therefor in <u>Section 2(k)</u>.

(i)    "<u>Copyrights</u>" means copyrights and copyright registrations, including, without limitation, the copyright registrations and recordings thereof and all applications in connection therewith listed on <u>Schedule 1</u> attached hereto and made a part hereof, and (i) all reissues, continuations, extensions or renewals thereof, (ii) all income, royalties, damages and payments now and hereafter due and/or payable under and with respect thereto, including, without limitation, payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (iii) the right to sue for past, present and future infringements and dilutions thereof, (iv) the goodwill of each Grantor's business symbolized by the foregoing and connected therewith, and (v) all of each Grantor's rights corresponding thereto throughout the world.

(j)    "<u>Copyright Security Agreement</u>" means each Copyright Security Agreement among Grantors, or any of them, and Agent, for the benefit of the Lender Group and the Bank Product Provider, in substantially the form of <u>Exhibit A</u> attached hereto, pursuant to which Grantors have granted to Agent, for the benefit of the Lender Group and the Bank Product Provider, a security interest in all their respective Copyrights.

(k)    "<u>Credit Agreement</u>" has the meaning specified therefor in the recitals to this Agreement.

(l)    "Excluded Assets" means (i) assets securing FF&E Financing, Purchase Money Indebtedness, or Capitalized Lease Obligations permitted to be incurred under the definition of Permitted Indebtedness and Permitted Liens in the Credit Agreement, (ii) leasehold estates in real property existing on the Closing Date and any additional leasehold estates in real property acquired by the Grantors or their Subsidiaries after the Closing Date, unless the Agent, in its Permitted Discretion, requests that the Grantors provide Agent with a Lien upon and security interest in such leasehold estate, and immediately thereupon, Grantors shall be deemed to have granted as security interest in such leasehold estate and such leasehold estate shall cease to constitute Excluded Assets (iii) the Casino Bankroll, (iv) Senior Note Interest Reserve Account, (v) any Investment Related Property of any Grantor constituting Stock of such Grantor's Subsidiaries that are CFCs, solely to the extent that such Investment Related Property is in excess of 65% of the voting power of the Stock of such CFC, and (iv) any leases, permits, licenses (including Gaming Licenses) or other contracts or agreements or other assets or property to the extent that a grant of a Lien thereon (x) is prohibited by law or would constitute or result in the abandonment, invalidation or unenforceability of any right, title or interest of the grantor therein pursuant to the applicable law, or (y) would require the consent of third parties and such consent has not been obtained after Grantors have used commercially reasonable efforts to try to obtain such consent, or (z) other than as a result of requiring a consent of third parties that has not been obtained, would result in a breach of the provisions thereof, or constitute a default under or result in a termination of, such lease, permit, license, contract or agreement (other than to the extent that any such provisions thereof would be rendered ineffective pursuant to Section 9-406, 9-407 or 9-408 of the Uniform Commercial Code (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law); provided, that, immediately upon the uneffectiveness, lapse or termination of such prohibition, the provisions that would be so breached or such breach, default or termination or immediately upon the obtaining of any such consent, the Excluded Assets shall not include, and Grantors shall be deemed to have granted a security interest in, all such leases, permits, licenses, contracts and agreements and such other assets and property as if such prohibition, the provisions that would be so breached or such breach, default or termination had never been in effect and as if such consent had not been required; provided, however, that Excluded Assets shall not include (and, accordingly, Collateral shall include) any and all proceeds of any of such assets.

(m)    "Finance Corp" has the meaning specified therefor in the recitals to this Agreement.

(n)    "Gaming Laws" means all applicable federal, state and local laws, rules and regulations pursuant to which the Nevada Gaming Authorities possess regulatory, licensing or permit authority over the ownership or operation of gaming facilities within the State of Nevada, including, the Nevada Gaming Control Act, as codified in Chapter 463 of the Nevada Revised Statutes, as amended from time to time, and the regulations of the NGC promulgated thereunder.

(o)    "Gaming License" means any finding of suitability, registration, license, franchise, or other finding of qualification, or other approval or authorization required to own, lease, operate or otherwise conduct or manage riverboat, dockside or land-based gaming activities in any state or jurisdiction in which any Grantor or any of their Subsidiaries conduct business (including, all such licenses granted by the Nevada Gaming Authorities, and the rules and regulations promulgated thereunder), and all applicable Liquor Licenses.

(p)    "General Intangibles" has the meaning specified therefor in Section 2(f).

(q)    "Grantor" and "Grantors" have the respective meanings specified therefor in the preamble to the Agreement.

(r)    "Intellectual Property" means any and all Intellectual Property Licenses, Patents, Copyrights, Trademarks, the goodwill associated with such Trademarks, trade secrets and customer lists.

(s)    "Intellectual Property Licenses" means rights under or interest in any patent, trademark, copyright or other intellectual property, including software license agreements with any other party,

whether the applicable Grantor is a licensee or licensor under any such license agreement, including, without limitation, the license agreements listed on Schedule 2 attached hereto and made a part hereof, and the right to use the foregoing in connection with the enforcement of the Lender Group's rights under the Loan Documents, including, without limitation, the right to prepare for sale and sell any and all Inventory and Equipment now or hereafter owned by any Grantor and now or hereafter covered by such licenses.

(t)     "Intercreditor Agreement" has the meaning specified therefor in the Credit Agreement.

(u)     "Investment Related Property" means (i) investment property (as that term is defined in the Code), and (ii) all of the following regardless of whether classified as investment property under the Code: all Pledged Interests, Pledged Operating Agreements, and Pledged Partnership Agreements.

(v)     "IRC" means the Internal Revenue Code of 1986, as in effect from time to time and any successor statute.

(w)     "Lenders" have the meaning specified therefor in the recitals to this Agreement.

(x)     "Negotiable Collateral" has the meaning specified therefore in Section 2(i).

(y)     "Nevada Gaming Authorities" means the NGC, the NGCB, and the Clark County Liquor and Gaming Licensing Board, and any other State or local agency with jurisdiction over gaming operations in the State of Nevada or Clark County, Nevada.

(z)     "NGC" means the Nevada Gaming Commission.

(aa)    "NGCB" means the Nevada State Gaming Control Board.

(bb)    "Parent" has the meaning specified therefor in the recitals to this Agreement.

(cc)    "Patents" means patents and patent applications, including, without limitation, the patents and patent applications listed on Schedule 3 attached hereto and made a part hereof, and (i) all renewals thereof, (ii) all income, royalties, damages and payments now and hereafter due and/or payable under and with respect thereto, including, without limitation, payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (iii) the right to sue for past, present and future infringements and dilutions thereof, and (iv) all of each Grantor's rights corresponding thereto throughout the world.

(dd)    "Patent Security Agreement" means each Patent Security Agreement among Grantors, or any of them, and Agent, for the benefit of the Lender Group and the Bank Product Provider, in substantially the form of Exhibit B attached hereto, pursuant to which Grantors have granted to Agent, for the benefit of the Lender Group and the Bank Product Provider, a security interest in all their respective Patents.

(ee)    "Permitted Discretion" has the meaning specified therefor in the Credit Agreement.

(ff)    "Pledged Companies" means, each Person listed on Schedule 4 hereto as a "Pledged Company," together with each other Person, all or a portion of whose Stock, is acquired or otherwise owned by a Grantor after the Closing Date.

(gg)    "Pledged Interests" means all of each Grantor's right, title and interest in and to all of the Stock now or hereafter owned by such Grantor, regardless of class or designation, including, without limitation, in each of the Pledged Companies, and all substitutions therefor and replacements thereof, all proceeds thereof and all rights relating thereto, including, without limitation, any certificates representing the

Stock, the right to request after the occurrence and during the continuation of an Event of Default that such Stock be registered in the name of Agent or any of its nominees, the right to receive any certificates representing any of the Stock and the right to require that such certificates be delivered to Agent together with undated powers or assignments of investment securities with respect thereto, duly endorsed in blank by such Grantor, all warrants, options, share appreciation rights and other rights, contractual or otherwise, in respect thereof and of all dividends, distributions of income, profits, surplus, or other compensation by way of income or liquidating distributions, in cash or in kind, and cash, instruments, and other property from time to time received, receivable, or otherwise distributed in respect of or in addition to, in substitution of, on account of, or in exchange for any or all of the foregoing.

(hh)    "Pledged Interests Addendum" means a Pledged Interests Addendum substantially in the form of Exhibit C to this Agreement.

(ii)    "Pledged Operating Agreements" means all of each Grantor's rights, powers, and remedies under the limited liability company operating agreements of each of the Pledged Companies that are limited liability companies.

(jj)    "Pledged Partnership Agreements" means all of each Grantor's rights, powers, and remedies under the partnership agreements of each of the Pledged Companies that are partnerships.

(kk)    "Proceeds" has the meaning specified therefor in Section 2(m).

(ll)    "Purchase Money Indebtedness" has the meaning specified therefor in the Credit Agreement.

(mm)    "Records" means information that is inscribed on a tangible medium or which is stored in an electronic or other medium and is retrievable in perceivable form.

(nn)    "Secured Obligations" has the meaning specified therefor in the recitals to this Agreement.

(oo)    "Security Interest" has the meaning specified therefor in Section 2.

(pp)    "Senior Secured Note Documents" means, collectively, the Senior Secured Note Indenture, the Senior Secured Notes, and [Senior Secured Note Collateral Agreements] (as such term is defined in the Senior Secured Note Indenture).

(qq)    "Senior Secured Note Issuers" has the meaning specified therefor in the recitals to this Agreement.

(rr)    "Senior Secured Notes" means the Senior Secured Notes due 2012 issued by Borrowers pursuant to the Senior Secured Note Indenture.

(ss)    "Senior Secured Note Indenture" means that certain indenture dated as of March 29, 2005, among the Trustee, and Senior Secured Note Issuers.

(tt)    "Supporting Obligations" has the meaning specified therefor in Section 2(j).

(uu)    "Trademarks" means trademarks, trade names, registered trademarks, trademark applications, service marks, registered service marks and service mark applications, including, without limitation, the trade names, registered trademarks, trademark applications, registered service marks and service mark applications listed on Schedule 5 attached hereto and made a part hereof, and (i) all renewals thereof, (ii) all income, royalties, damages and payments now and hereafter due and/or payable under and with respect

thereto, including, without limitation, payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (iii) the right to sue for past, present and future infringements and dilutions thereof, (iv) the goodwill of each Grantor's business symbolized by the foregoing and connected therewith, and (v) all of each Grantor's rights corresponding thereto throughout the world.

    (vv) "Trademark Security Agreement" means each Trademark Security Agreement among Grantors, or any of them, and Agent, for the benefit of the Lender Group and the Bank Product Provider, in substantially the form of Exhibit D attached hereto, pursuant to which Grantors have granted to Agent, for the benefit of the Lender Group and the Bank Product Provider, a security interest in all their respective Trademarks.

    (ww) "Trustee" has the meaning specified therefor in the recitals to this Agreement.

    (xx) "URL" means "uniform resource locator," an internet web address.

    2. Grant of Security. Each Grantor hereby unconditionally grants, assigns and pledges to Agent, for the benefit of the Lender Group and the Bank Product Provider, a continuing security interest in all personal property, of such Grantor whether now owned or hereafter acquired or arising and wherever located (hereinafter referred to as the "Security Interest"), including, without limitation, such Grantor's right, title, and interest in and to the following, whether now owned or hereafter acquired or arising and wherever located (the "Collateral"):

    (a) all of such Grantor's Accounts;

    (b) all of such Grantor's books and records (including all of its Records indicating, summarizing, or evidencing its assets (including the Collateral) or liabilities, all of its Records relating to its business operations or financial condition, and all of its goods or General Intangibles related to such information) ("Books");

    (c) all of such Grantor's chattel paper (as that term is defined in the Code) and, in any event, including, without limitation, tangible chattel paper and electronic chattel paper ("Chattel Paper");

    (d) all of such Grantor's interest with respect to any Deposit Account;

    (e) all of such Grantor's Equipment and fixtures;

    (f) all of such Grantor's general intangibles (as that term is defined in the Code) and, in any event, including, without limitation, payment intangibles, contract rights, rights to payment, rights arising under common law, statutes, or regulations, choses or things in action, goodwill (including the goodwill associated with any Trademark, Patent, or Copyright), Patents, Trademarks, Copyrights, URLs and domain names, industrial designs, other industrial or Intellectual Property or rights therein or applications therefor, whether under license or otherwise, programs, programming materials, blueprints, drawings, purchase orders, customer lists, monies due or recoverable from pension funds, route lists, rights to payment and other rights under any royalty or licensing agreements, including Intellectual Property Licenses, infringement claims, computer programs, information contained on computer disks or tapes, software, literature, reports, catalogs, pension plan refunds, pension plan refund claims, insurance premium rebates, tax refunds, and tax refund claims, uncertificated securities, and any other personal property other than commercial tort claims, money, Accounts, Chattel Paper, Deposit Accounts, goods, Investment Related Property, Negotiable Collateral, and oil, gas, or other minerals before extraction ("General Intangibles");

    (g) all of such Grantor's Inventory;

(h)      all of such Grantor's Investment Related Property;

(i)      all of such Grantor's letters of credit, letter of credit rights, instruments, promissory notes, drafts, and documents (as such terms may be defined in the Code) ("Negotiable Collateral");

(j)      all of such Grantor's rights in respect of supporting obligations (as such term is defined in the Code), including letters of credit and guaranties issued in support of Accounts, Chattel Paper, documents, General Intangibles, instruments, or Investment Related Property ("Supporting Obligations");

(k)      all of such Grantor's interest with respect to any commercial tort claims (as that term is defined in the Code), including, without limitation those commercial tort claims listed on Schedule 6 attached hereto ("Commercial Tort Claims");

(l)      all of such Grantor's money, Cash Equivalents, or other assets of each such Grantor that now or hereafter come into the possession, custody, or control of Agent or any other member of the Lender Group;

(m)      all of the proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance or commercial tort claims covering or relating to any or all of the foregoing, and any and all Accounts, Books, Chattel Paper, Deposit Accounts, Equipment, General Intangibles, Inventory, Investment Related Property, Negotiable Collateral, Supporting Obligations, money, or other tangible or intangible property resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to any of the property of Grantors, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to any of the foregoing Collateral (the "Proceeds"). Without limiting the generality of the foregoing, the term "Proceeds" includes whatever is receivable or received when Investment Related Property or proceeds are sold, exchanged, collected, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, proceeds of any indemnity or guaranty payable to any Grantor or Agent from time to time with respect to any of the Investment Related Property.

The foregoing to the contrary notwithstanding, "Collateral" shall not include the Excluded Assets.

3.      Security for Obligations. This Agreement and the Security Interest created hereby secures the payment and performance of all the Secured Obligations, whether now existing or arising hereafter. Without limiting the generality of the foregoing, this Agreement secures the payment of all amounts which constitute part of the Obligations and would be owed by Grantors, or any of them, to Agent, the Lender Group, the Bank Product Provider or any of them, but for the fact that they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Grantor.

4.      Grantors Remain Liable. Anything herein to the contrary notwithstanding, (a) each of the Grantors shall remain liable under the contracts and agreements included in the Collateral, including, without limitation, the Pledged Operating Agreements and the Pledged Partnership Agreements, to perform all of the duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by Agent or any other member of the Lender Group of any of the rights hereunder shall not release any Grantor from any of its duties or obligations under such contracts and agreements included in the Collateral, and (c) none of the members of the Lender Group shall have any obligation or liability under such contracts and agreements included in the Collateral by reason of this Agreement, nor shall any of the members of the Lender Group be obligated to perform any of the obligations or duties of any Grantors thereunder or to take any action to collect or enforce any claim for payment assigned hereunder. Until an Event of Default shall occur and be continuing, except as otherwise provided in this Agreement, the Credit Agreement, or other

Loan Documents, Grantors shall have the right to possession and enjoyment of the Collateral for the purpose of conducting the ordinary course of their respective businesses, subject to and upon the terms hereof and of the Credit Agreement and the other Loan Documents. Without limiting the generality of the foregoing, it is the intention of the parties hereto that record and beneficial ownership of the Pledged Interests, including, without limitation, all voting, consensual, and dividend rights, shall remain in the applicable Grantor until the occurrence of an Event of Default and until Agent shall notify the applicable Grantor of Agent's exercise of voting, consensual, and/or dividend rights with respect to the Pledged Interests pursuant to Section 15 hereof.

5.      Representations and Warranties. Each Grantor, jointly and severally, hereby represents and warrants as follows:

(a)      The exact legal name of each of the Grantors is set forth on the signature pages of this Agreement or a written notice provided to Agent pursuant to Section 6.5 of the Credit Agreement.

(b)      Schedule 7 attached hereto sets forth all Real Property owned by Grantors as of the Closing Date.

(c)      As of the Closing Date, no Grantor has any interest in, or title to, any Copyrights, Intellectual Property Licenses, Patents, or Trademarks except as set forth on Schedules 1, 2, 3 and 5, respectively, attached hereto. This Agreement is effective to create a valid and continuing Lien on such Copyrights, Intellectual Property Licenses, Patents and Trademarks and, upon filing of the Copyright Security Agreement with the United States Copyright Office and filing of the Patent Security Agreement and the Trademark Security Agreement with the United State Patent and Trademark Office, and the filing of appropriate financing statements in the jurisdictions listed on Schedule 8 hereto, all action necessary or desirable to protect and perfect the Security Interest in and to on each Grantor's Patents, Trademarks, or Copyrights has been taken and such perfected Security Interests are enforceable as such as against any and all creditors of and purchasers from any Grantor.

(d)      This Agreement creates a valid security interest in the Collateral of each of Grantors, to the extent a security interest therein can be created under the Code , securing the payment of the Secured Obligations. Except to the extent a security interest in the Collateral cannot be perfected by the filing of a financing statement under the Code, all filings and other actions necessary or desirable to perfect and protect such security interest have been duly taken or will have been taken upon the filing of financing statements listing each applicable Grantor, as a debtor, and Agent, as secured party, in the jurisdictions listed next to such Grantor's name on Schedule 8 attached hereto. Upon the making of such filings, Agent shall have a first priority perfected security interest in the Collateral of each Grantor to the extent such security interest can be perfected by the filing of a financing statement.

(e)      (i) Except for the Security Interest created hereby, each Grantor is and will at all times be the sole holder of record and the legal and beneficial owner, free and clear of all Liens other than Permitted Liens, of the Pledged Interests indicated on Schedule 4 as being owned by such Grantor and, when acquired by such Grantor, any Pledged Interests acquired after the Closing Date; (ii) all of the Pledged Interests are duly authorized, validly issued, fully paid and nonassessable and the Pledged Interests constitute or will constitute the percentage of the issued and outstanding Equity Interests of the Pledged Companies of such Grantor identified on Schedule 4 hereto as supplemented or modified by any Pledged Interests Addendum or any Supplement to this Agreement; (iii) except as may be required by applicable Gaming Laws, such Grantor has the right and requisite authority to pledge, the Investment Related Property pledged by such Grantor to Agent as provided herein; (iv) all actions necessary or desirable to perfect, establish the first priority of, or otherwise protect, Agent's Liens in the Investment Related Collateral, and the proceeds thereof, have been duly taken, (A) upon the execution and delivery of this Agreement; (B) upon the taking of possession by Agent of any certificates constituting the Pledged Interests, to the extent such Pledged Interests are represented by certificates, together with undated powers endorsed in blank by the applicable Grantor; (C) upon the filing of financing statements in the applicable jurisdiction set forth on Schedule 8 attached hereto for such Grantor

with respect to the Pledged Interests of such Grantor that are not represented by certificates, and (D) with respect to any Securities Accounts, upon the delivery of Control Agreements with respect thereto; and (v) each Grantor has delivered to and deposited with Agent (or, with respect to any Pledged Interests created after the Closing Date, will deliver and deposit in accordance with Sections 6(a) and 8 hereof) all certificates representing the Pledged Interests owned by such Grantor to the extent such Pledged Interests are represented by certificates, and undated powers endorsed in blank with respect to such certificates.

(f)     No consent, approval, authorization, or other order or other action by, and no notice to or filing with, any Governmental Authority or any other Person is required (i) for the grant of a Security Interest by such Grantor in and to the Collateral pursuant to this Agreement or for the execution, delivery, or performance of this Agreement by such Grantor, or (ii) for the exercise by Agent of the voting or other rights provided for in this Agreement with respect to the Investment Related Property or the remedies in respect of the Collateral pursuant to this Agreement, except as may be required by applicable Gaming Laws or except as may be required in connection with such disposition of Investment Related Property by laws affecting the offering and sale of securities generally.

6.     Covenants.  Each Grantor, jointly and severally, covenants and agrees with Agent and the Lender Group that from and after the date of this Agreement and until the date of termination of this Agreement in accordance with Section 23 hereof:

(a)     Possession of Collateral.  In the event that any Collateral, including proceeds, is evidenced by or consists of Negotiable Collateral, Investment Related Property, or Chattel Paper, and if and to the extent that perfection or priority of Agent's Security Interest is dependent on or enhanced by possession, the applicable Grantor, immediately upon the request of Agent and in accordance with Section 8 hereof, shall execute such other documents as shall be requested by Agent or, if applicable, endorse and deliver physical possession of such Negotiable Collateral, Investment Related Property, or Chattel Paper to Agent, together with such undated powers endorsed in blank as shall be requested by Agent;

(b)     Chattel Paper.

(i)     Each Grantor shall take all steps reasonably necessary to grant Agent control of all electronic Chattel Paper in accordance with the Code and all "transferable records" as that term is defined in Section 16 of the Uniform Electronic Transaction Act and Section 201 of the federal Electronic Signatures in Global and National Commerce Act as in effect in any relevant jurisdiction; and

(ii)     If any Grantor retains possession of any Chattel Paper or instruments (which retention of possession shall be subject to the extent permitted hereby and by the Credit Agreement), promptly upon the request of Agent, such Chattel Paper and instruments shall be marked with the following legend: "This writing and the obligations evidenced or secured hereby are subject to the Security Interest of Wells Fargo Foothill, Inc., as Agent for the benefit of the Lender Group and the Bank Product Provider";

(c)     Control Agreements.

(i)     Except to the extent otherwise permitted by the Credit Agreement, each Grantor shall obtain an authenticated Control Agreement, from each bank holding a Deposit Account for such Grantor;

(ii)     Except to the extent otherwise permitted by the Credit Agreement, each Grantor shall obtain authenticated Control Agreements, from each issuer of uncertificated securities, securities intermediary, or commodities intermediary issuing or holding any financial assets or commodities to or for any Grantor;

(d)     Letter of Credit Rights.  Each Grantor that is or becomes the beneficiary of a letter of credit shall promptly (and in any event within 2 Business Days after becoming a beneficiary), notify Agent thereof and, upon the request by Agent, enter into a tri-party agreement with Agent and the issuer and/or confirmation bank with respect to letter-of-credit rights (as that term is defined in the Code) assigning such letter-of-credit rights to Agent and directing all payments thereunder to Agent's Account, all in form and substance satisfactory to Agent;

(e)     Commercial Tort Claims.  Each Grantor shall promptly (and in any event within 2 Business Days of receipt thereof), notify Agent in writing upon incurring or otherwise obtaining a Commercial Tort Claim after the date hereof against any third party and, upon request of Agent, promptly amend Schedule 6 to this Agreement, authorize the filing of additional or amendments to existing financing statements and do such other acts or things deemed necessary or desirable by Agent to give Agent a first priority, perfected security interest in any such Commercial Tort Claim;

(f)     Government Contracts.  If any Account or Chattel Paper arises out of a contract or contracts with the United States of America or any department, agency, or instrumentality thereof, Grantors shall promptly (and in any event within 2 Business Days of the creation thereof) notify Agent thereof in writing and execute any instruments or take any steps reasonably required by Agent in order that all moneys due or to become due under such contract or contracts shall be assigned to Agent, for the benefit of the Lender Group and the Bank Product Provider, and notice thereof given under the Assignment of Claims Act or other applicable law;

(g)     Intellectual Property.

(i)     Upon request of Agent, in order to facilitate filings with the United States Patent and Trademark Office and the United States Copyright Office, each Grantor shall execute and deliver to Agent one or more Copyright Security Agreements, Trademark Security Agreements, and/or Patent Security Agreements to evidence Agent's Lien on such Grantor's Patents, Trademarks, and/or Copyrights, and the General Intangibles of such Grantor relating thereto or represented thereby;

(ii)     Each Grantor shall have the duty, to the extent necessary or economically desirable in the operation of such Grantor's business, (A) to promptly sue for infringement, misappropriation, or dilution and to recover any and all damages for such infringement, misappropriation, or dilution, (B) to prosecute diligently any trademark application or service mark application that is part of the Trademarks pending as of the date hereof or hereafter until the termination of this Agreement, (C) to prosecute diligently any patent application that is part of the Patents pending as of the date hereof or hereafter until the termination of this Agreement, and (D) to take all reasonable and necessary action to preserve and maintain all of such Grantor's Trademarks, Patents, Copyrights, Intellectual Property Licenses, and its rights therein, including the filing of applications for renewal, affidavits of use, affidavits of noncontestability and opposition and interference and cancellation proceedings.  Any expenses incurred in connection with the foregoing shall be borne by the appropriate Grantor.  Each Grantor further agrees not to abandon any Trademark, Patent, Copyright, or Intellectual Property License that is necessary or economically desirable in the operation of such Grantor's business without the prior written consent of Agent;

(iii)     Grantors acknowledge and agree that the Lender Group shall have no duties with respect to the Trademarks, Patents, Copyrights, or Intellectual Property Licenses.  Without limiting the generality of this Section 6(g), Grantors acknowledge and agree that no member of the Lender Group shall be under any obligation to take any steps necessary to preserve rights in the Trademarks, Patents, Copyrights, or Intellectual Property Licenses against any other Person, but any member of the Lender Group may do so at its option from and after the occurrence of an Event of Default, and all expenses incurred in connection therewith (including, without limitation, reasonable fees and expenses of attorneys and other professionals) shall be for the sole account of Borrowers and shall be chargeable to the Loan Account;

(iv)    In no event shall any Grantor, either itself or through any agent, employee, licensee, or designee, file an application for the registration of any Patent, Trademark, or Copyright with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency without giving Agent prior written notice thereof. Promptly upon any such filing, each Grantor shall comply with Section 6(g)(i) hereof;

(h)    Investment Related Property.

(i)    If any Grantor shall receive or become entitled to receive any Pledged Interests after the Closing Date, it shall promptly (and in any event within 2 Business Days of receipt thereof) deliver to Agent a duly executed Pledged Interests Addendum identifying such Pledged Interests;

(ii)    All sums of money and property paid or distributed in respect of the Investment Related Property which are received by any Grantor shall be held by the Grantors in trust for the benefit of Agent segregated from such Grantor's other property, and such Grantor shall deliver it forthwith to Agent's in the exact form received;

(iii)    Each Grantor shall promptly deliver to Agent a copy of each notice or other communication received by it in respect of any Pledged Interests;

(iv)    No Grantor shall make or consent to any amendment or other modification or waiver with respect to any Pledged Interests, Pledged Operating Agreement, or Pledged Partnership Agreement, or enter into any agreement or permit to exist any restriction with respect to any Pledged Interests other than pursuant to the Loan Documents;

(v)    Each Grantor agrees that it will cooperate with Agent in obtaining all necessary approvals and making all necessary filings under federal, state, local, or foreign law in connection with the Security Interest on the Investment Related Property or any sale or transfer thereof;

(vi)    As to all limited liability company or partnership interests issued under any Pledged Operating Agreement or Pledged Partnership Agreement, each Grantor, jointly and severally, hereby represents, warrants and covenants that the Pledged Interests issued pursuant to such agreement (A) are not and shall not be dealt in or traded on securities exchanges or in securities markets, (B) do not and will not constitute investment company securities, and (C) are not and will not be held by such Grantor in a securities account. In addition, none of the Pledged Operating Agreements, the Pledged Partnership Agreements, or any other agreements governing any of the Pledged Interests issued under any Pledged Operating Agreement or Pledged Partnership Agreement, provide or shall provide that such Pledged Interests are securities governed by Article 8 of the Uniform Commercial Code as in effect in any relevant jurisdiction;

(i)    Real Property; Fixtures.    Each Grantor covenants and agrees that upon the acquisition of any fee interest in Real Property it will promptly (and in any event within 2 Business Days of acquisition) notify Agent of the acquisition of such Real Property and will grant to Agent, for the benefit of the Lender Group and the Bank Product Provider, a first priority Mortgage on each fee interest in Real Property now or hereafter owned by such Grantor and shall deliver such other documentation and opinions, in form and substance satisfactory to Agent, in connection with the grant of such Mortgage as Agent shall request in its Permitted Discretion, including, without limitation, title insurance policies, financing statements, fixture filings and environmental audits and such Grantor shall pay all recording costs, intangible taxes and other fees and costs (including reasonable attorneys fees and expenses) incurred in connection therewith. Each Grantor acknowledges and agrees that, to the extent permitted by applicable law, all of the Collateral shall remain personal property regardless of the manner of its attachment or affixation to real property;

(j)    Transfers and Other Liens.    Grantors shall not (i) sell, assign (by operation of law or otherwise) or otherwise dispose of, or grant any option with respect to, any of the Collateral, except expressly

permitted by the Credit Agreement, or (ii) create or permit to exist any Lien upon or with respect to any of the Collateral of any of Grantors, except for Permitted Liens. The inclusion of Proceeds in the Collateral shall not be deemed to constitute Agent's consent to any sale or other disposition of any of the Collateral except as expressly permitted in this Agreement or the other Loan Documents; and

        (k)    <u>Other Actions as to Any and All Collateral</u>. Each Grantor shall promptly (and in any event within 2 Business Days of acquiring or obtaining such Collateral) notify Agent in writing upon acquiring or otherwise obtaining any Collateral after the date hereof consisting of Trademarks, Patents, Copyrights, Intellectual Property Licenses, Investment Related Property, Chattel Paper (electronic, tangible or otherwise), documents (as defined in the Code), or instruments (as defined in the Code) and, upon the request of Agent and in accordance with <u>Section 8</u> hereof, promptly execute such other documents, or if applicable, deliver such Chattel Paper, other documents or certificates evidencing any Investment Related Property in accordance with <u>Section 6</u> hereof and do such other acts or things deemed necessary or desirable by Agent to protect Agent's Security Interest therein.

       7.    <u>Relation to Other Security Documents</u>. The provisions of this Agreement shall be read and construed with the other Loan Documents referred to below in the manner so indicated.

        (a)    <u>Credit Agreement</u>. In the event of any conflict between any provision in this Agreement and a provision in the Credit Agreement, such provision of the Credit Agreement shall control.

        (b)    <u>Patent, Trademark, Copyright Security Agreements</u>. The provisions of the Copyright Security Agreements, Trademark Security Agreements, and Patent Security Agreements are supplemental to the provisions of this Agreement, and nothing contained in the Copyright Security Agreements, Trademark Security Agreements, or the Patent Security Agreements shall limit any of the rights or remedies of Agent hereunder.

       8.    <u>Further Assurances</u>.

        (a)    Each Grantor agrees that from time to time, at its own expense, such Grantor will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or that Agent may reasonably request, in order to perfect and protect any Security Interest granted or purported to be granted hereby or to enable Agent to exercise and enforce its rights and remedies hereunder with respect to any of the Collateral.

        (b)    Each Grantor authorizes the filing of such financing or continuation statements, or amendments thereto, and such Grantor will execute and deliver to Agent such other instruments or notices, as may be necessary or as Agent may reasonably request, in order to perfect and preserve the Security Interest granted or purported to be granted hereby.

        (c)    Each Grantor authorizes Agent to file, transmit, or communicate, as applicable, financing statements and amendments describing the Collateral as "all personal property of debtor" or "all assets of debtor" or words of similar effect, in order to perfect Agent's security interest in the Collateral without such Grantor's signature. Each Grantor also hereby ratifies its authorization for Agent to have filed in any jurisdiction any financing statements filed prior to the date hereof.

        (d)    Each Grantor acknowledges that it is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement filed in connection with this Agreement without the prior written consent of Agent, subject to such Grantor's rights under Section 9-509(d)(2) of the Code.

       9.    <u>Agent's Right to Perform Contracts</u>. Upon the occurrence of an Event of Default, Agent (or its designee) may proceed to perform any and all of the obligations of any Grantor contained in any contract,

lease, or other agreement and exercise any and all rights of any Grantor therein contained as fully as such Grantor itself could.

10.    Agent Appointed Attorney-in-Fact.    Each Grantor hereby irrevocably appoints Agent its attorney-in-fact, with full authority in the place and stead of such Grantor and in the name of such Grantor or otherwise, at such time as an Event of Default has occurred and is continuing under the Credit Agreement, to take any action and to execute any instrument which Agent may reasonably deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

(a)    to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in connection with the Accounts or any other Collateral of such Grantor;

(b)    to receive and open all mail addressed to such Grantor and to notify postal authorities to change the address for the delivery of mail to such Grantor to that of Agent;

(c)    to receive, indorse, and collect any drafts or other instruments, documents, Negotiable Collateral or Chattel Paper;

(d)    to file any claims or take any action or institute any proceedings which Agent may deem necessary or desirable for the collection of any of the Collateral of such Grantor or otherwise to enforce the rights of Agent with respect to any of the Collateral;

(e)    to repair, alter, or supply goods, if any, necessary to fulfill in whole or in part the purchase order of any Person obligated to such Grantor in respect of any Account of such Grantor;

(f)    to use any labels, Patents, Trademarks, trade names, URLs, domain names, industrial designs, Copyrights, advertising matter or other industrial or intellectual property rights, in advertising for sale and selling Inventory and other Collateral and to collect any amounts due under Accounts, contracts or Negotiable Collateral of such Grantor; and

(g)    Agent on behalf of the Lender Group shall have the right, but shall not be obligated, to bring suit in its own name to enforce the Trademarks, Patents, Copyrights and Intellectual Property Licenses and, if Agent shall commence any such suit, the appropriate Grantor shall, at the request of Agent, do any and all lawful acts and execute any and all proper documents reasonably required by Agent in aid of such enforcement.

To the extent permitted by law, each Grantor hereby ratifies all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof.  This power of attorney is coupled with an interest and shall be irrevocable until this Agreement is terminated.

11.    Agent May Perform.    If any of Grantors fails to perform any agreement contained herein, Agent may itself perform, or cause performance of, such agreement, and the reasonable expenses of Agent incurred in connection therewith shall be payable, jointly and severally, by Grantors.

12.    Agent's Duties.    The powers conferred on Agent hereunder are solely to protect Agent's interest in the Collateral, for the benefit of the Lender Group and the Bank Product Provider, and shall not impose any duty upon Agent to exercise any such powers.  Except for the safe custody of any Collateral in its actual possession and the accounting for moneys actually received by it hereunder, Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.  Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its actual possession if such Collateral is accorded treatment substantially equal to that which Agent accords its own property.

13.    Collection of Accounts, General Intangibles and Negotiable Collateral. At any time upon the occurrence and during the continuation of an Event of Default, Agent or Agent's designee may (a) notify Account Debtors of any Grantor that the Accounts, General Intangibles, Chattel Paper or Negotiable Collateral have been assigned to Agent, for the benefit of the Lender Group and the Bank Product Provider, or that Agent has a security interest therein, and (b) collect the Accounts, General Intangibles and Negotiable Collateral directly, and any collection costs and expenses shall constitute part of such Grantor's Secured Obligations under the Loan Documents.

14.    Disposition of Pledged Interests by Agent. None of the Pledged Interests existing as of the date of this Agreement are, and none of the Pledged Interests hereafter acquired on the date of acquisition thereof will be, registered or qualified under the various federal or state securities laws of the United States and disposition thereof after an Event of Default may be restricted to one or more private (instead of public) sales in view of the lack of such registration. Each Grantor understands that in connection with such disposition, Agent may approach only a restricted number of potential purchasers and further understands that a sale under such circumstances may yield a lower price for the Pledged Interests than if the Pledged Interests were registered and qualified pursuant to federal and state securities laws and sold on the open market. Each Grantor, therefore, agrees that: (a) if Agent shall, pursuant to the terms of this Agreement, sell or cause the Pledged Interests or any portion thereof to be sold at a private sale, Agent shall have the right to rely upon the advice and opinion of any nationally recognized brokerage or investment firm (but shall not be obligated to seek such advice and the failure to do so shall not be considered in determining the commercial reasonableness of such action) as to the best manner in which to offer the Pledged Interest for sale and as to the best price reasonably obtainable at the private sale thereof; and (b) such reliance shall be conclusive evidence that Agent has handled the disposition in a commercially reasonable manner.

15.    Voting Rights.

(a)    Upon the occurrence and during the continuation of an Event of Default, (i) Agent may, at its option, and with prior notice to any Grantor, and in addition to all rights and remedies available to Agent under any other agreement, at law, in equity, or otherwise, exercise all voting rights, and all other ownership or consensual rights in respect of the Pledged Interests owned by such Grantor, but under no circumstances is Agent obligated by the terms of this Agreement to exercise such rights, and (ii) if Agent duly exercises its right to vote any of such Pledged Interests, each Grantor hereby appoints Agent, such Grantor's true and lawful attorney-in-fact and IRREVOCABLE PROXY to vote such Pledged Interests in any manner Agent deems advisable for or against all matters submitted or which may be submitted to a vote of shareholders, partners or members, as the case may be. The power-of-attorney granted hereby is coupled with an interest and shall be irrevocable.

(b)    For so long as any Grantor shall have the right to vote the Pledged Interests owned by it, such Grantor covenants and agrees that it will not, without the prior written consent of Agent, vote or take any consensual action with respect to such Pledged Interests which would materially adversely affect the rights of Agent and the other members of the Lender Group or the value of the Pledged Interests.

16.    Remedies. Upon the occurrence and during the continuance of an Event of Default:

(a)    Agent may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein, in the other Loan Documents, or otherwise available to it, all the rights and remedies of a secured party on default under the Code or any other applicable law. Without limiting the generality of the foregoing, each Grantor expressly agrees that, in any such event, Agent without demand of performance or other demand, advertisement or notice of any kind (except a notice specified below of time and place of public or private sale) to or upon any of Grantors or any other Person (all and each of which demands, advertisements and notices are hereby expressly waived to the maximum extent permitted by the Code or any other applicable law), may take immediate possession of all or any portion of the Collateral and (i) require Grantors to, and each Grantor hereby agrees that it will at its own expense and upon request of Agent

forthwith, assemble all or part of the Collateral as directed by Agent and make it available to Agent at one or more locations where Grantor regularly maintains Inventory, and (ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of Agent's offices or elsewhere, for cash, on credit, and upon such other terms as Agent may deem commercially reasonable. Each Grantor agrees that, to the extent notice of sale shall be required by law, at least 10 days notice to any of Grantors of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification and specifically such notice shall constitute a reasonable "authenticated notification of disposition" within the meaning of Section 9-611 of the Code. Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b)     Agent is hereby granted a license or other right to use, without liability for royalties or any other charge, each Grantor's labels, Patents, Copyrights, rights of use of any name, trade secrets, trade names, Trademarks, service marks and advertising matter, URLs, domain names, industrial designs, other industrial or intellectual property or any property of a similar nature, whether owned by any of Grantors or with respect to which any of Grantors have rights under license, sublicense, or other agreements, as it pertains to the Collateral, in preparing for sale, advertising for sale and selling any Collateral, and each Grantor's rights under all licenses and all franchise agreements shall inure to the benefit of Agent.

(c)     Any cash held by Agent as Collateral and all cash proceeds received by Agent in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied against the Secured Obligations in the order set forth in the Credit Agreement.  In the event the proceeds of Collateral are insufficient to satisfy all of the Secured Obligations in full, each Grantor shall remain jointly and severally liable for any such deficiency.

(d)     Each Grantor hereby acknowledges that the Secured Obligations arose out of a commercial transaction, and agrees that if an Event of Default shall occur Agent shall have the right to an immediate writ of possession without notice of a hearing. Agent shall have the right to the appointment of a receiver for the properties and assets of each of Grantors, and each Grantor hereby consents to such rights and such appointment and hereby waives any objection such Grantors may have thereto or the right to have a bond or other security posted by Agent.

17.    Additional Provisions Relating to Gaming Laws and Gaming Licenses.

(a)     Each Grantor agrees that, upon the occurrence of and during the continuance of an Event of Default and at Agent's request, it will, and will cause each of its Subsidiaries to, immediately file such applications for approval and shall use commercially reasonable efforts to take all other and further actions required by Agent to obtain such approvals or consents of the Nevada Gaming Authorities, and any other Governmental Authorities with jurisdiction as are necessary for the Agent, to continue operation of the businesses of Grantors and their Subsidiaries under the Gaming Licenses held by it, or its interest in any Person holding any such Gaming License pursuant to the Gaming Laws.  To enforce the provisions of this Section 17, Agent is empowered to request the appointment of a receiver from any court of competent jurisdiction.  Such receiver shall be instructed to seek from the Nevada Gaming Authority and any other Governmental Authorities with jurisdiction authorization pursuant to the Gaming Laws to continue operation of the businesses of each Grantor and its Subsidiaries under all necessary Gaming Licenses for the purpose of seeking a bona fide purchaser of the businesses of each Grantor and its Subsidiaries. Each Grantor hereby agrees to authorize, and to cause each of its Subsidiaries to authorize such an authorization pursuant to the Gaming Laws to continue the operation of the businesses of such Grantor and its Subsidiaries upon the request of the receiver so appointed and, if any Grantor or any such Subsidiary shall refuse to authorize the transfer, its approval may be required by the court. Upon the occurrence and continuance of an Event of Default, each Grantor shall further use, and shall cause its Subsidiaries to use, commercially reasonable efforts to assist in obtaining approval of the Nevada Gaming Authority and any other Governmental Authorities with jurisdiction,

if required, for any action or transactions contemplated by this Agreement or the Loan Documents, including, preparation, execution, and filing with the Nevada Gaming Authority and any other Governmental Authorities with jurisdiction of any application or applications for authorization pursuant to the Gaming Laws for the receiver to continue the operation of the businesses of any Grantor and its Subsidiaries under any Gaming License or transfer of control necessary or appropriate under the applicable Gaming Laws for approval of the transfer or assignment of any portion of the Collateral. Each Grantor acknowledges that the authorization pursuant to the Gaming Laws for the receiver to continue the operation of the businesses of any Grantor and its Subsidiaries under the Gaming Licenses or for a transfer of control is integral to Agent's realization of the value of the Collateral, that there is no adequate remedy at law for failure by each Grantor to comply with the provisions of this <u>Section 17</u> and that such failure would not be adequately compensable in damages, and therefore agrees that the agreements contained in this <u>Section 17</u> may be specifically enforced.

(b)     All rights, remedies, and powers provided in this Agreement and the other Loan Documents may be exercised only to the extent that the exercise thereof does not violate any applicable mandatory provision of the Gaming Laws and all provisions of this Agreement and the other Loan Documents are intended to be subject to all applicable mandatory provisions of the Gaming Laws and to be limited solely to the extent necessary to not render the provisions of this Agreement or the other Loan Documents invalid or unenforceable, in whole or in part. Agent will timely apply for and receive all required approvals of the Nevada Gaming Authority for the sale or other disposition of gaming equipment regulated by the Gaming Laws (including any such sale or disposition of gaming equipment consisting of slot machines, gaming tables, cards, dice, gaming chips, player tracking systems, and all other "gaming devices" (as such term or words of like import referring thereto are defined in the Gaming Laws), and "associated equipment" (as such term or words of like import referring thereto are defined in the Gaming Laws).

18.     <u>Remedies Cumulative</u>. Each right, power, and remedy of Agent as provided for in this Agreement or in the other Loan Documents or now or hereafter existing at law or in equity or by statute or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power, or remedy provided for in this Agreement or in the other Loan Documents or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by Agent, of any one or more of such rights, powers, or remedies shall not preclude the simultaneous or later exercise by Agent of any or all such other rights, powers, or remedies.

19.     <u>Marshaling</u>. Agent shall not be required to marshal any present or future collateral security (including but not limited to the Collateral) for, or other assurances of payment of, the Secured Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising. To the extent that it lawfully may, each Grantor hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of Agent's rights and remedies under this Agreement or under any other instrument creating or evidencing any of the Secured Obligations or under which any of the Secured Obligations is outstanding or by which any of the Secured Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, each Grantor hereby irrevocably waives the benefits of all such laws.

20.     <u>Indemnity and Expenses</u>.

(a)     Each Grantor agrees to indemnify Agent and the other members of the Lender Group from and against all claims, lawsuits and liabilities (including reasonable attorneys fees) growing out of or resulting from this Agreement (including, without limitation, enforcement of this Agreement) or any other Loan Document to which such Grantor is a party, except claims, losses or liabilities resulting from the gross negligence or willful misconduct of the party seeking indemnification as determined by a final non-appealable order of a court of competent jurisdiction. This provision shall survive the termination of this Agreement and the Credit Agreement and the repayment of the Secured Obligations.

(b)    Grantors, jointly and severally, shall, upon demand, pay to Agent (or Agent, may charge to the Loan Account) all the Lender Group Expenses which Agent may incur in connection with (i) the administration of this Agreement, (ii) the custody, preservation, use or operation of, or, upon an Event of Default, the sale of, collection from, or other realization upon, any of the Collateral in accordance with this Agreement and the other Loan Documents, (iii) the exercise or enforcement of any of the rights of Agent hereunder or (iv) the failure by any of Grantors to perform or observe any of the provisions hereof.

21.    <u>Merger, Amendments; Etc.</u>    THIS WRITTEN AGREEMENT, TOGETHER WITH THE OTHER LOAN DOCUMENTS, REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.    THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.  No waiver of any provision of this Agreement, and no consent to any departure by any of Grantors herefrom, shall in any event be effective unless the same shall be in writing and signed by Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No amendment of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Agent and each of the Grantors to which such amendment applies.

22.    <u>Addresses for Notices</u>.  All notices and other communications provided for hereunder shall be given in the form and manner and delivered to Agent at its address specified in the Credit Agreement, and to any of the Grantors at their respective addresses specified in the Credit Agreement, or, as to any party, at such other address as shall be designated by such party in a written notice to the other party.

23.    <u>Continuing Security Interest; Assignments under Credit Agreement.</u>  This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until the Obligations have been paid in full in cash in accordance with the provisions of the Credit Agreement and the Commitments have expired or have been terminated, (b) be binding upon each of Grantors, and their respective successors and assigns, and (c) inure to the benefit of, and be enforceable by, Agent, and its successors, transferees and assigns. Without limiting the generality of the foregoing clause (c), any the Lender may, in accordance with the provisions of the Credit Agreement, assign or otherwise transfer all or any portion of its rights and obligations under the Credit Agreement to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to such the Lender herein or otherwise.  Upon payment in full in cash of the Obligations in accordance with the provisions of the Credit Agreement and the expiration or termination of the Commitments, the Security Interest granted hereby shall terminate and this Agreement shall terminate (without prejudice to Agent's obligation to fulfill its duties in connection with the termination of the Security Interest, as referenced below, which obligation shall survive the termination of this Agreement), and all rights to the Collateral shall revert to Grantors or any other Person entitled thereto.  At such time, Agent will authorize the filing of appropriate termination statements to terminate such Security Interests.  No transfer or renewal, extension, assignment, or termination of this Agreement or of the Credit Agreement, any other Loan Document, or any other instrument or document executed and delivered by any Grantor to Agent nor any additional Advances or other loans made by any Lender to Borrowers, nor the taking of further security, nor the retaking or re-delivery of the Collateral to Grantors, or any of them, by Agent, nor any other act of the Lender Group or the Bank Product Provider, or any of them, shall release any of Grantors from any obligation, except a release or discharge executed in writing by Agent in accordance with the provisions of the Credit Agreement.  Agent shall not by any act, delay, omission or otherwise, be deemed to have waived any of its rights or remedies hereunder, unless such waiver is in writing and signed by Agent and then only to the extent therein set forth.  A waiver by Agent of any right or remedy on any occasion shall not be construed as a bar to the exercise of any such right or remedy which Agent would otherwise have had on any other occasion.

24.    <u>Governing Law.</u>

(a)    THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(b)    THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH GRANTOR AND EACH MEMBER OF THE LENDER GROUP WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 24(b).

(c)    EACH GRANTOR AND EACH MEMBER OF THE LENDER GROUP HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. EACH GRANTOR AND EACH MEMBER OF THE LENDER GROUP REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

25.    Compliance with Gaming Laws. Notwithstanding anything to the contrary contained herein or in any other Loan Documents, Agent expressly acknowledges and agrees that the exercise of its rights and remedies under this Agreement is subject to the mandatory provisions of the Gaming Laws. Specifically, Agent acknowledges and agrees that once Grantors have been licensed or found suitable by the Nevada Gaming Authorities:

(a)    The pledge of the Investment Related Property of any Pledged Company that is a licensee of or registered with the Nevada Gaming Authorities by Grantors, and any restrictions on the transfer of and agreements not to encumber such Investment Related Property of any corporation or limited liability company that is a holding company contained in this Agreement or in any other Loan Document, shall not be effective without the prior approval of the NGC upon the recommendation of the NGCB. The certificates or instruments representing or evidencing such Investment Related Property may not continue to be held by Agent unless such approval has been obtained. The approval of the pledge of the Investment Related Property may require amendment of this Agreement to include additional references to regulatory requirements under the Gaming Laws. In addition, no amendment of this Agreement shall be effective until applicable approvals of the Nevada Gaming Authorities have been obtained.

(b)    In the event that Agent exercises one or more of the remedies set forth in this Agreement with respect to any Investment Related Property of any gaming licensee or registered company, including without limitation, foreclosure or transfer of any interest in such Investment Related Property (except

back to Grantors), the exercise of voting and consensual rights, and any other resort to or enforcement of the security interest in such Investment Related Property, such action shall require the separate and prior approval of the Nevada Gaming Authorities and the licensing of Agent, unless such licensing requirement is waived by the Nevada Gaming Authorities.

(c)     Agent and any custodial agent of Agent in the State of Nevada shall be required to comply with the conditions, if any, imposed by the Nevada Gaming Authorities in connection with its approval of the pledge granted hereunder by Grantors, including, without limitation, the requirement that Agent or its agent maintain any certificates evidencing the Investment Related Property of gaming licensees and registered companies at a location in Nevada designated to the NGCB, and that Agent or its agent permit agents or employees of the NGCB to inspect such certificates immediately upon request during normal business hours.

(d)     Neither Agent nor any agent of Agent shall surrender possession of any such Investment Related Property to any Person other than Grantors without the prior approval of the Nevada Gaming Authorities or as otherwise permitted by the Gaming Laws.

(e)     The approval by the Nevada Gaming Authorities of this Agreement, or any amendment hereto, is not, and shall not be construed as, the approval, either express or implied, of Agent to take any actions provided for in this Agreement for which approval by the Nevada Gaming Authorities is required, without first obtaining such prior and separate approval, to the extent required by the Gaming Laws.

26.     New Subsidiaries.  Pursuant to Section 5.16 of the Credit Agreement, any new direct or indirect Subsidiary (whether by acquisition or creation) of any Borrower is required to enter into this Agreement by executing and delivering in favor of Agent an instrument in the form of Annex 1 attached hereto.  Upon the execution and delivery of Annex 1 by such new Subsidiary, such Subsidiary shall become a Grantor hereunder with the same force and effect as if originally named as a Grantor herein.  The execution and delivery of any instrument adding an additional Grantor as a party to this Agreement shall not require the consent of any Grantor hereunder.  The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any new Grantor hereunder.

27.     Agent.  Each reference herein to any right granted to, benefit conferred upon or power exercisable by the "Agent" shall be a reference to Agent, for the benefit of the Lender Group and the Bank Product Provider.

28.     Miscellaneous.

(a)     This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document *mutatis mutandis*.

(b)     Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof in that jurisdiction or affecting the validity or enforceability of such provision in any other jurisdiction.

(c)     Headings used in this Agreement are for convenience only and shall not be used in connection with the interpretation of any provision hereof.

(d)     The pronouns used herein shall include, when appropriate, either gender and both singular and plural, and the grammatical construction of sentences shall conform thereto.

[signature pages follow]

IN WITNESS WHEREOF, the undersigned parties hereto have executed this Agreement by and through their duly authorized officers, as of the day and year first above written.

**GRANTORS:**

**155 EAST TROPICANA, LLC,**
a Nevada limited liability company

By: _____
Name:  Neil G. Kiefer
Title:   Chief Executive Officer

[SIGNATURE PAGE TO SECURITY AGREEMENT]

S-1

**155 EAST TROPICANA FINANCE CORP.,**
a Nevada corporation


By: _____
Name:   Neil G. Kiefer
Title:   President

[SIGNATURE PAGE TO SECURITY AGREEMENT]

S-2

**AGENT:**

**WELLS FARGO FOOTHILL, INC.,**
a California corporation,
as Agent

By:

Name: Jim Farner
Title: Senior Vice President

[SIGNATURE PAGE TO SECURITY AGREEMENT]

ANNEX 1 TO SECURITY AGREEMENT
FORM OF SUPPLEMENT

Supplement No. _____ (this "Supplement") dated as of _____, 200_, to the Security Agreement, dated as of March 29, 2005 (as amended, restated, supplemented or otherwise modified from time to time, the "Security Agreement") by each of the parties listed on the signature pages thereto and those additional entities that thereafter become parties thereto (collectively, jointly and severally, "Grantors" and each individually "Grantor") and WELLS FARGO FOOTHILL, INC. in its capacity as Agent for the Lender Group and the Bank Product Provider (together with the successors, "Agent").

W I T N E S S E T H:

WHEREAS, pursuant to that certain Credit Agreement, dated as of March 29, 2005 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") among 155 East Tropicana, LLC, a Nevada limited liability company ("Parent"), and each of Parent's Subsidiaries identified on the signature pages thereof (such Subsidiaries, together with Parent, are referred to hereinafter each individually a "Borrower", and individually and collectively, jointly and severally, as the "Borrowers"), the lenders party thereto as "Lenders" ("Lenders"), and Agent, the Lender Group is willing to make certain financial accommodations available to Borrowers from time to time pursuant to the terms and conditions thereof; and

WHEREAS, capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Security Agreement and/or the Credit Agreement; and

WHEREAS, Grantors have entered into the Security Agreement in order to induce the Lender Group to make certain financial accommodations to Borrowers; and

WHEREAS, pursuant to Section 5.16 of the Credit Agreement, new direct or indirect Subsidiaries of any Borrower, must execute and deliver certain Loan Documents, including the Security Agreement, and the execution of the Security Agreement by the undersigned new Grantor or Grantors (collectively, the "New Grantors") may be accomplished by the execution of this Supplement in favor of Agent, for the benefit of the Lender Group and the Bank Product Provider;

NOW, THEREFORE, for and in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each New Grantor hereby agrees as follows:

1.     In accordance with Section 26 of the Security Agreement, each New Grantor, by its signature below, becomes a "Grantor" under the Security Agreement with the same force and effect as if originally named therein as a "Grantor" and each New Grantor hereby (a) agrees to all of the terms and provisions of the Security Agreement applicable to it as a "Grantor" thereunder and (b) represents and warrants that the representations and warranties made by it as a "Grantor" thereunder are true and correct on and as of the date hereof. In furtherance of the foregoing, each New Grantor, as security for the payment and performance in full of the Secured Obligations, does hereby grant, assign, and pledge to Agent, for the benefit of the Lender Group and the Bank Product Provider, a security interest in and security title to all assets of such New Grantor including, without limitation, all property of the type described in Section 2 of the Security Agreement to secure the full and prompt payment of the Secured Obligations, including, without limitation, any interest thereon, plus reasonable attorneys' fees and expenses if the Secured Obligations represented by the Security Agreement are collected by law, through an attorney-at-law, or under advice therefrom. Schedule 1, "Copyrights", Schedule 2, "Intellectual Property Licenses", Schedule 3, "Patents," Schedule 4, "Pledged Companies", Schedule 5, "Trademarks," Schedule 6, "Commercial Tort Claims," Schedule 7, "Owned Real Property," and Schedule 8, "List of Uniform Commercial Code Filing Jurisdictions" attached hereto supplement Schedule 1, Schedule 2, Schedule 3, Schedule 4, Schedule 5, Schedule 6, Schedule 7, and Schedule 8, respectively, to the Security Agreement and shall be deemed a part thereof for all purposes of the Security Agreement. Each reference to a "Grantor" in the Security Agreement shall be deemed to include each New Grantor. The Security Agreement is incorporated herein by reference.

LA/1101038.4

2.    Each New Grantor represents and warrants to Agent, the Lender Group and the Bank Product Provider that this Supplement has been duly executed and delivered by such New Grantor and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as enforceability thereof may be limited by bankruptcy, insolvency, reorganization, fraudulent transfer, moratorium or other similar laws affecting creditors' rights generally and general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity).

3.    This Supplement shall not be effective with respect to the pledge of any Investment Related Property of a licensee or company registered with the Nevada Gaming Authorities without the prior approval of the Nevada Gaming Authorities.

4.    This Supplement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same instrument.  Delivery of a counterpart hereof by facsimile transmission or by e-mail transmission shall be as effective as delivery of a manually executed counterpart hereof.

5.    Except as expressly supplemented hereby, the Security Agreement shall remain in full force and effect.

6.    This Supplement shall be construed in accordance with and governed by the laws of the State of New York, without regard to the conflict of laws principles thereof.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

LA/1101038.4

IN WITNESS WHEREOF, each New Grantor and Agent have duly executed this Supplement to the Security Agreement as of the day and year first above written.

NEW GRANTORS:

[Name of New Grantor]

By:_____
Name:_____
Title:_____

[Name of New Grantor]

By:_____
Name:_____
Title:_____

AGENT:

WELLS FARGO FOOTHILL, INC.

By:_____
Name:_____
Title:_____



**Schedule 1—Copyrights**

None.

**Schedule 2—Intellectual Property Licenses**

**Amended and Restated Assignment Agreement by and between 155 East Tropicana, LLC and Florida Hooters, LLC dated March 9, 2005.** 155 East Tropicana, LLC has entered into an assignment agreement with Florida Hooters, LLC which grants 155 East Tropicana, LLC the right to use certain intellectual property in connection with the operation of a Hooters Casino Hotel. The intellectual property covered by this agreement is described as follows:

- *Hooters Trademark.* 155 East Tropicana, LLC has an exclusive license to use the Hooters brand in connection with gaming, casino or combined hotel, gaming and casino operations solely at the property located at 155 East Tropicana Avenue, Las Vegas, Nevada.

- *Hooters Restaurant Concept.* Pursuant to a consent from Las Vegas Wings, Inc., 155 East Tropicana, LLC has the right to use the Hooters restaurant concept at the hotel casino located at 155 East Tropicana Avenue, Las Vegas, Nevada. The consent permits worldwide promotion, marketing and advertising of the hotel casino (located at 155 East Tropicana Avenue, Las Vegas, Nevada) and its services.

**Amended and Restated License Agreement by and between 155 East Tropicana, LLC and Lags Ventures, Inc. dated March 9, 2005.** 155 East Tropicana, LLC has an exclusive license to use certain intellectual property to operate and promote restaurants, taverns, lounges and bars using the marks "Dan Marino's Fine Food & Spirits" and "Martini Bar," which is operated in conjunction with Dan Marino's Fine Food & Spirits, at the hotel casino (located at 155 East Tropicana Avenue, Las Vegas, Nevada).

**Trademark License Agreement by and between Pete & Shorty's, Inc. and 155 East Tropicana, LLC dated March 11, 2005.** Pete & Shorty's, Inc has granted to 155 East Tropicana, LLC a nonexclusive, royalty-free license to use the Pete & Shorty's mark in connection with a restaurant, bar and lounge at the Hooters Casino Hotel (to be located at 155 East Tropicana Avenue, Las Vegas, Nevada). Pursuant to the license agreement, 155 East Tropicana, LLC can also use the mark in connection with affiliated merchandise, entertainment and casino services. However, Pete & Shorty's, Inc. has maintained the right to obtain federal and/or state registrations for any and all additional services, other than restaurant, bar and cocktail lounge services, which will be provided at the Hooters Casino Hotel (to be located at 155 East Tropicana Avenue, Las Vegas, Nevada).



**Schedule 3—Patents**

None.

SCHEDULES TO SECURITY AGREEMENT



**Schedule 4—Pledged Companies**

| Name of Pledged Company | Name of Pledgor | Number of Shares/Units | Class of Interests | Percentage of Class Owned | Certificate Nos. |
|---|---|---|---|---|---|
| 155 East Tropicana, LLC | Florida Hooters LLC | 66.67 Units | Membership Interests | 66⅔% | — |
| 155 East Tropicana, LLC | EW Common LLC | 33.33 Units | Membership Interests | 33⅓% | — |
| 155 East Tropicana Finance Corp. | 155 East Tropicana, LLC | 100 | Common | 100% | 1 |

SCHEDULES TO SECURITY AGREEMENT



## Schedule 5—Trademarks

Parent has filed the following Intent-To-Use Applications with the United States Trademark Office:

| Mark | Class | Serial Number |
|---|---|---|
| Nippers | 43<br>Restaurant, bar and cocktail lounge services | 78/549,527 |
| The Bait Shop | 43<br>Restaurant, bar and cocktail lounge services | 78/569,441 |
| The Bait Shop | 35<br>Retail store services | 78/569,446 |
| Owl's Nest | 43<br>Restaurant, bar and cocktail lounge services | 78/569,436 |

## Domain Names

The following domain names have been reserved by 155 East Tropicana, LLC and are currently in use:
- www.hooterscasinohotel.com
- www.hootershotelcasino.com
- www.hooterslasvegas.com
- www.hooterslv.com

The following domain names have been reserved by 155 East Tropicana, LLC and are not currently in use, but such reservations will expire on August 2, 2005, unless otherwise indicated:
- www.hooterscasinolasvegas.com
- www.hooterscasinolv.com
- www.hootershotelcasinolasvegas.com
- www.hootershotelcasinolv.com
- www.hootershotellasvegas.com
- www.hootershotellv.com
- www.hooterslasvegascasino.com
- www.hootersresortcasino.com
- www.lasvegashooters.com
- www.lasvegashooterscasino.com
- www.lasvegashootershotel.com
- www.playhooters.com

SCHEDULES TO SECURITY AGREEMENT

- www.vegashooters.com
- www.hootersresort.com (September 17, 2005)

SCHEDULES TO SECURITY AGREEMENT

**Schedule 6—Commercial Tort Claims**

None.

SCHEDULES TO SECURITY AGREEMENT

**Schedule 7—Owned Real Property**

**155 East Tropicana, LLC**

The land-based facilities and related amenities comprising the San Remo Las Vegas Casino/Hotel Property (and, after the completion of the renovations, the Hooters Casino Hotel) located at 115 and 155 East Tropicana Avenue, Las Vegas, Nevada.

Such real property consists of the following:

162-28-101-002
162-28-102-001

**Schedule 8—List of UCC Filing Jurisdictions**

| Grantor | Jurisdictions |
|---|---|
| 155 East Tropicana, LLC | Nevada Secretary of State<br>Clark County, Nevada |
| 155 East Tropicana Finance Corp. | Nevada Secretary of State<br>Clark County, Nevada |

SCHEDULES TO SECURITY AGREEMENT



## EXHIBIT A

## COPYRIGHT SECURITY AGREEMENT

This COPYRIGHT SECURITY AGREEMENT (this "Copyright Security Agreement") is made this ___ day of _____, 200_, among Grantors listed on the signature pages hereof ( collectively, jointly and severally, "Grantors" and each individually "Grantor"), and WELLS FARGO FOOTHILL, INC., in its capacity as Agent for the Lender Group and the Bank Product Provider (together with its successors, the "Agent").

## W I T N E S S E T H:

WHEREAS, pursuant to that certain Credit Agreement of even date herewith (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") among 155 East Tropicana, LLC, a Nevada limited liability company ("Parent"), and each of Parent's Subsidiaries identified on the signature pages thereof (such Subsidiaries, together with Parent, are referred to hereinafter each individually a "Borrower", and individually and collectively, jointly and severally, as the "Borrowers"), the lenders party thereto as "Lenders" ("Lenders"), and Agent, the Lender Group is willing to make certain financial accommodations available to Borrowers from time to time pursuant to the terms and conditions thereof; and

WHEREAS, the members of the Lender Group are willing to make the financial accommodations to Borrowers as provided for in the Credit Agreement, but only upon the condition, among others, that Grantors shall have executed and delivered to Agent, for the benefit of the Lender Group and the Bank Product Provider, that certain Security Agreement of even date herewith (including all annexes, exhibits or schedules thereto, as from time to time amended, restated, supplemented or otherwise modified, the "Security Agreement");

WHEREAS, pursuant to the Security Agreement, Grantors are required to execute and deliver to Agent, for the benefit of the Lender Group and the Bank Product Provider, this Copyright Security Agreement;

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantors hereby agree as follows:

1.    DEFINED TERMS. All capitalized terms used but not otherwise defined herein have the meanings given to them in the Security Agreement and/or the Credit Agreement.

2.    GRANT OF SECURITY INTEREST IN COPYRIGHT COLLATERAL. Each Grantor hereby grants to Agent, for the benefit of the Lender Group and the Bank Product Provider, a continuing first priority security interest in all of such Grantor's right, title and interest in, to and under the following, whether presently existing or hereafter created or acquired (collectively, the "Copyright Collateral"):

(a)    all of such Grantor's Copyrights and Copyright Intellectual Property Licenses to which it is a party including those referred to on Schedule I hereto;

(b)    all reissues, continuations or extensions of the foregoing; and

(c)    all products and proceeds of the foregoing, including, without limitation, any claim by such Grantor against third parties for past, present or future infringement or dilution of any Copyright or any Copyright licensed under any Intellectual Property License.

3.    SECURITY AGREEMENT. The security interests granted pursuant to this Copyright Security Agreement are granted in conjunction with the security interests granted to Agent, for the benefit of

the Lender Group and the Bank Product Provider, pursuant to the Security Agreement. Each Grantor hereby acknowledges and affirms that the rights and remedies of Agent with respect to the security interest in the Copyright Collateral made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.

4.    AUTHORIZATION TO SUPPLEMENT. If any Grantor shall obtain rights to any new United States copyrights or copyright applications, the provisions of this Copyright Security Agreement shall automatically apply thereto. Grantors shall give prompt notice in writing to Agent with respect to any such new copyright rights. Grantors hereby authorize Agent unilaterally to modify this Agreement by amending Schedule I to include any future United States registered copyrights or applications therefor of Grantors. Notwithstanding the foregoing, no failure to so modify this Copyright Security Agreement or amend Schedule I shall in any way affect, invalidate or detract from Agent's continuing security interest in all Collateral, whether or not listed on Schedule I.

5.    COUNTERPARTS. This Copyright Security Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same instrument. In proving this Copyright Security Agreement or any other Loan Document in any judicial proceedings, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom such enforcement is sought. Any signatures delivered by a party by facsimile transmission or by e-mail transmission shall be deemed an original signature hereto.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, each Grantor has caused this Copyright Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

_____

By:_____
Name:_____
Title:_____


_____

By:_____
Name:_____
Title:_____


**ACCEPTED AND ACKNOWLEDGED BY:**

WELLS FARGO FOOTHILL, INC., as Agent


By:_____
Name:_____
Title:_____


COPYRIGHT SECURITY AGREEMENT

LA/1101038.4

SCHEDULE I
TO
**COPYRIGHT SECURITY AGREEMENT**

**COPYRIGHT REGISTRATIONS**

| Grantor | Country | Copyright | Registration No. | Registration Date |
|---------|---------|-----------|------------------|-------------------|
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |
|         |         |           |                  |                   |

**Copyright Licenses**

COPYRIGHT SECURITY AGREEMENT

LA/1101038.4

**EXHIBIT B**

**PATENT SECURITY AGREEMENT**

This *PATENT SECURITY AGREEMENT* (this "Patent Security Agreement") is made this ___ day of _____, 200_, among the Grantors listed on the signature pages hereof (collectively, jointly and severally, "Grantors" each and individually "Grantor"), and WELLS FARGO FOOTHILL, INC., in its capacity as administrative agent for the Lender Group and the Bank Product Provider (together with its successors, "Agent").

W I T N E S S E T H:

WHEREAS, pursuant to that certain Credit Agreement of even date herewith (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") among 155 East Tropicana, LLC, a Nevada limited liability company ("Parent"), and each of Parent's Subsidiaries identified on the signature pages thereof (such Subsidiaries, together with Parent, are referred to hereinafter each individually a "Borrower", and individually and collectively, jointly and severally, as the "Borrowers"), the lenders party thereto as "Lenders" ("Lenders"), and Agent, the Lender Group is willing to make certain financial accommodations available to Borrowers from time to time pursuant to the terms and conditions thereof; and

WHEREAS, the members of Lender Group are willing to make the financial accommodations to Borrowers as provided for in the Credit Agreement, but only upon the condition, among others, that the Grantors shall have executed and delivered to Agent, for the benefit of the Lender Group and the Bank Product Provider, that certain Security Agreement of even date herewith (including all annexes, exhibits or schedules thereto, as from time to time amended, restated, supplemented or otherwise modified, the "Security Agreement");

WHEREAS, pursuant to the Security Agreement, Grantors are required to execute and deliver to Agent, for the benefit of the Lender Group and the Bank Product Provider, this Patent Security Agreement;

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor hereby agrees as follows:

1.      DEFINED TERMS.  All capitalized terms used but not otherwise defined herein have the meanings given to them in the Security Agreement and/or the Credit Agreement.

2.      GRANT OF SECURITY INTEREST IN PATENT COLLATERAL.  Each Grantor hereby grants to Agent, for the benefit of the Lender Group and the Bank Product Provider, a continuing first priority security interest in all of such Grantor's right, title and interest in, to and under the following, whether presently existing or hereafter created or acquired (collectively, the "Patent Collateral"):

(a)      all of its Patents and Patent Intellectual Property Licenses to which it is a party including those referred to on Schedule I hereto;

(b)      all reissues, continuations or extensions of the foregoing; and

(c)      all products and proceeds of the foregoing, including, without limitation, any claim by such Grantor against third parties for past, present or future infringement or dilution of any Patent or any Patent licensed under any Intellectual Property License.

LA/1101038.4

3.    <u>SECURITY AGREEMENT</u>.  The security interests granted pursuant to this Patent Security Agreement are granted in conjunction with the security interests granted to Agent, for the benefit of the Lender Group and the Bank Product Provider, pursuant to the Security Agreement.  Each Grantor hereby acknowledges and affirms that the rights and remedies of Agent with respect to the security interest in the Patent Collateral made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.

4.    <u>AUTHORIZATION TO SUPPLEMENT</u>.  If any Grantor shall obtain rights to any new patentable inventions or become entitled to the benefit of any patent application or patent for any reissue, division, or continuation, of any patent, the provisions of this Patent Security Agreement shall automatically apply thereto. Grantors shall give prompt notice in writing to Agent with respect to any such new patent rights. Without limiting Grantors' obligations under this <u>Section 4</u>, Grantors hereby authorize Agent unilaterally to modify this Agreement by amending <u>Schedule I</u> to include any such new patent rights of Grantors. Notwithstanding the foregoing, no failure to so modify this Patent Security Agreement or amend <u>Schedule I</u> shall in any way affect, invalidate or detract from Agent's continuing security interest in all Collateral, whether or not listed on <u>Schedule I</u>.

5.    <u>COUNTERPARTS</u>.  This Patent Security Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same instrument.  In proving this Patent Security Agreement or any other Loan Document in any judicial proceedings, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom such enforcement is sought.  Any signatures delivered by a party by facsimile transmission or by e-mail transmission shall be deemed an original signature hereto.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, each Grantor has caused this Patent Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

_____

By:_____

Name:_____

Title:_____

_____

By:_____

Name:_____

Title:_____

**ACCEPTED AND ACKNOWLEDGED BY:**

WELLS FARGO FOOTHILL, INC., as Agent

By:_____

Name:_____

Title:_____

PATENT SECURITY AGREEMENT

LA/1101038.4

SCHEDULE I
TO
**PATENT SECURITY AGREEMENT**

**PATENT REGISTRATIONS**

| Grantor | Country | Patent | Registration No. | Registration Date |
|---------|---------|--------|------------------|-------------------|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**Patent Licenses**

*PATENT SECURITY AGREEMENT*

LA/1101038.4

# EXHIBIT C

## PLEDGED INTERESTS ADDENDUM

      This Pledged Interests Addendum, dated as of _____ ___, 20___, is delivered pursuant to Section 6 of the Security Agreement referred to below. The undersigned hereby agrees that this Pledged Interests Addendum may be attached to that certain Security Agreement, dated of even date herewith (as amended, restated, supplemented or otherwise modified from time to time, the "Security Agreement"), made by the undersigned, together with the other Grantors named therein, to Wells Fargo Foothill, Inc., as Agent. Initially capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Security Agreement and/or the Credit Agreement. The undersigned hereby agrees that, subject to the receipt of any approvals required under applicable Gaming Laws, the additional interests listed on this Pledged Interests Addendum as set forth below shall be and become part of the Pledged Interests pledged by the undersigned to the Agent in the Security Agreement and any pledged company set forth on this Pledged Interests Addendum as set forth below shall be and become a "Pledged Company" under the Security Agreement, each with the same force and effect as if originally named therein.

      The undersigned hereby certifies that the representations and warranties set forth in Section 5 of the Security Agreement of the undersigned are true and correct as to the Pledged Interests listed herein on and as of the date hereof.

[_____]

By: _____

_____

Title _____

| Name of Pledgor | Name of Pledged Company | Number of Shares/Units | Class of Interests | Percentage of Class Owned | Certificate Nos. |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |

PLEDGED INTERESTS ADDENDUM

LA/1101038.4

**EXHIBIT D**

**TRADEMARK SECURITY AGREEMENT**

This TRADEMARK SECURITY AGREEMENT (this "Trademark Security Agreement") is made this ___ day of _____, 200_, among Grantors listed on the signature pages hereof (collectively, jointly and severally, "Grantors" and each individually "Grantor"), and WELLS FARGO FOOTHILL, INC., in its capacity as Agent for the Lender Group and the Bank Product Provider (together with its successors, "Agent").

W I T N E S S E T H:

WHEREAS, pursuant to that certain Credit Agreement of even date herewith (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement") among 155 East Tropicana, LLC, a Nevada limited liability company ("Parent"), and each of Parent's Subsidiaries identified on the signature pages thereof (such Subsidiaries, together with Parent, are referred to hereinafter each individually a "Borrower", and individually and collectively, jointly and severally, as the "Borrowers"), the lenders party thereto as "Lenders" ("Lenders"), and Agent, the Lender Group is willing to make certain financial accommodations available to Borrowers from time to time pursuant to the terms and conditions thereof; and

WHEREAS, the members of the Lender Group are willing to make the financial accommodations to Borrowers as provided for in the Credit Agreement, but only upon the condition, among others, that Grantors shall have executed and delivered to Agent, for the benefit of Lender Group and the Bank Product Provider, that certain Security Agreement dated of even date herewith (including all annexes, exhibits or schedules thereto, as from time to time amended, restated, supplemented or otherwise modified, the "Security Agreement");

WHEREAS, pursuant to the Security Agreement, Grantors are required to execute and deliver to Agent, for the benefit of Lender Group and the Bank Product Provider, this Trademark Security Agreement;

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor hereby agrees as follows:

1.      DEFINED TERMS. All capitalized terms used but not otherwise defined herein have the meanings given to them in the Security Agreement and/or the Credit Agreement.

2.      GRANT OF SECURITY INTEREST IN TRADEMARK COLLATERAL. Each Grantor hereby grants to Agent, for the benefit of the Lender Group and the Bank Product Provider, a continuing first priority security interest in all of such Grantor's right, title and interest in, to and under the following, whether presently existing or hereafter created or acquired (collectively, the "Trademark Collateral"):

        (a)      all of its Trademarks and Trademark Intellectual Property Licenses to which it is a party including those referred to on Schedule I hereto;

        (b)      all reissues, continuations or extensions of the foregoing;

        (c)      all goodwill of the business connected with the use of, and symbolized by, each Trademark and each Trademark Intellectual Property License; and

        (d)      all products and proceeds of the foregoing, including, without limitation, any claim by such Grantor against third parties for past, present or future (i) infringement or dilution of any Trademark or any Trademark licensed under any Intellectual Property License or (ii) injury to the goodwill associated with any Trademark or any Trademark licensed under any Intellectual Property License.

3.     SECURITY AGREEMENT.  The security interests granted pursuant to this Trademark Security Agreement are granted in conjunction with the security interests granted to Agent, for the benefit of the Lender Group and the Bank Product Provider, pursuant to the Security Agreement.  Each Grantor hereby acknowledges and affirms that the rights and remedies of Agent with respect to the security interest in the Trademark Collateral made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.

4.     AUTHORIZATION TO SUPPLEMENT.  If any Grantor shall obtain rights to any new trademarks, the provisions of this Trademark Security Agreement shall automatically apply thereto.  Grantors shall give prompt notice in writing to Agent with respect to any such new trademarks or renewal or extension of any trademark registration.   Without limiting Grantors' obligations under this Section 4, Grantors hereby authorize Agent unilaterally to modify this Agreement by amending Schedule I to include any such new trademark rights of Grantors.  Notwithstanding the foregoing, no failure to so modify this Trademark Security Agreement or amend Schedule I shall in any way affect, invalidate or detract from Agent's continuing security interest in all Collateral, whether or not listed on Schedule I.

5.     COUNTERPARTS.  This Trademark Security Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same instrument.  In proving this Trademark Security Agreement or any other Loan Document in any judicial proceedings, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom such enforcement is sought.  Any signatures delivered by a party by facsimile transmission or by e-mail transmission shall be deemed an original signature hereto.

[signature page follows]

IN WITNESS WHEREOF, each Grantor has caused this Trademark Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

_____

By: _____
Name: _____
Title: _____

_____

By: _____
Name: _____
Title: _____

**ACCEPTED AND ACKNOWLEDGED BY:**

WELLS FARGO FOOTHILL, INC., as Agent

By: _____
Name: _____
Title: _____

*TRADEMARK SECURITY AGREEMENT*

LA/1101038.4

SCHEDULE I
to
**TRADEMARK SECURITY AGREEMENT**

**Trademark Registrations/Applications**

| Grantor | Country | Mark | Application/ Registration No. | App/Reg Date |
|---------|---------|------|-------------------------------|--------------|
|         |         |      |                               |              |
|         |         |      |                               |              |
|         |         |      |                               |              |
|         |         |      |                               |              |
|         |         |      |                               |              |
|         |         |      |                               |              |
|         |         |      |                               |              |
|         |         |      |                               |              |

**Trade Names**

**Common Law Trademarks**

**Trademarks Not Currently In Use**

**Trademark Licenses**

PATENT SECURITY AGREEMENT

LA/1101038.4

INCORPORATED UNDER THE LAWS OF THE
STATE OF NEVADA

| NUMBER | | SHARES |
|---|---|---|
| 1 | | 100 |

## 155 EAST TROPICANA FINANCE CORP.

This Corporation is authorized to issue 75,000 Common Shares at No Par Value

THIS CERTIFIES THAT ___ 155 EAST TROPICANA, LLC ___ *is the owner of*

One Hundred and 00/100 (100) ********************************** *fully paid and nonassessable*

*shares of the above Corporation transferable only on the books of the Corporation by the holder hereof in person or*

*by duly authorized Attorney upon surrender of this Certificate properly endorsed.*

   *In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized*

*officers and its Corporate Seal to be hereunto affixed this* 8th *day of* March *A.D.* 2005

President Neil Kiefer

Secretary/Treasurer Michael Hessling

@002

*For Value Received,* _____ *hereby sell, assign and transfer*

*unto* _____

_____*Shares*

*represented by the within Certificate, and do hereby irrevocably*

*constitute and appoint*

_____*Attorney*

*to transfer the said Shares on the books of the within named*

*Corporation with full power of substitution in the premises.*

*Dated* _____

*In presence of*

_____   _____

NOTICE: THE SIGNATURE OF THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE, IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT, OR ANY CHANGE WHATEVER.



**STOCK POWER**

FOR VALUE RECEIVED, the undersigned hereby sells, assigns, and transfers unto: _____ 100 shares of the no par value common stock of 155 East Tropicana Finance Corp., a Nevada corporation (the "Company"), which is represented by Certificate No. _____ (the "Stock"), and hereby irrevocably constitutes and appoints _____ as its true and lawful attorney-in-fact, with full power of substitution, to transfer the Stock on the books of the Company.

Dated this _____ day of _____, _____.

155 EAST TROPICANA, LLC

By: _____

Michael J. Hessling, Chief Operating Officer