# EXHIBIT 14

EX-2.1 2 a2157764zex-2_1.htm EXHIBIT 2.1

Exhibit 2.1

**155 EAST TROPICANA, LLC**
**155 EAST TROPICANA FINANCE CORP.**

**(as Issuers)**

**$130,000,000 8¾% Senior Secured Notes due 2012**

---

**INDENTURE**

**Dated as of March 29, 2005**

---

**THE BANK OF NEW YORK TRUST COMPANY, N.A.**

**(as Trustee)**

# TABLE OF CONTENTS

### ARTICLE I DEFINITIONS AND INCORPORATION BY REFERENCE

| | |
|---|---|
| Section 1.1 | Definitions |
| Section 1.2 | Other Definitions |
| Section 1.3 | Incorporation by Reference of Trust Indenture Act |
| Section 1.4 | Rules of Construction |

### ARTICLE II THE NOTES

| | |
|---|---|
| Section 2.1 | Form and Dating |
| Section 2.2 | Execution and Authentication |
| Section 2.3 | Registrar, Paying Agent and Depositary |
| Section 2.4 | Paying Agent to Hold Money in Trust |
| Section 2.5 | Holder Lists |
| Section 2.6 | Transfer and Exchange |
| Section 2.7 | Replacement Notes |
| Section 2.8 | Outstanding Notes |
| Section 2.9 | Treasury Notes |
| Section 2.10 | Temporary Notes |
| Section 2.11 | Cancellation |
| Section 2.12 | Defaulted Interest |
| Section 2.13 | CUSIP Numbers |
| Section 2.14 | Issuance of Additional Notes |

### ARTICLE III REDEMPTION

| | |
|---|---|
| Section 3.1 | Notices to Trustee |
| Section 3.2 | Selection of Notes to Be Redeemed |
| Section 3.3 | Notice of Redemption |
| Section 3.4 | Effect of Notice of Redemption |
| Section 3.5 | Deposit of Redemption Price |
| Section 3.6 | Notes Redeemed in Part |
| Section 3.7 | Optional Redemption |
| Section 3.8 | No Mandatory Redemption |
| Section 3.9 | Regulatory Redemption |

i

## ARTICLE IV COVENANTS

| | |
|---|---|
| Section 4.1 | Payment of Notes |
| Section 4.2 | Maintenance of Office or Agency |
| Section 4.3 | Commission Reports and Reports to Holders |
| Section 4.4 | Compliance Certificate |
| Section 4.5 | Taxes |
| Section 4.6 | Stay, Extension and Usury Laws |
| Section 4.7 | Limitation on Incurrence of Additional Indebtedness and Disqualified Capital Stock |
| Section 4.8 | Limitation on Liens Securing Indebtedness |
| Section 4.9 | Limitation on Restricted Payments |
| Section 4.10 | Limitation on Dividend and Other Payment Restrictions Affecting Subsidiaries |
| Section 4.11 | Limitation on Impairment of Security Interests |
| Section 4.12 | Limitation on Transactions with Affiliates |
| Section 4.13 | Limitation on Sale Of Assets And Subsidiary Stock |
| Section 4.14 | Repurchase of Notes at the Option of the Holder Upon a Change of Control |
| Section 4.15 | Subsidiary Guarantors |
| Section 4.16 | Limitation on Status as Investment Company |
| Section 4.17 | Maintenance of Properties and Insurance |
| Section 4.18 | Corporate Existence |
| Section 4.19 | Limitation on Lines of Business |
| Section 4.20 | Rule 144A Information |
| Section 4.21 | Additional Collateral |
| Section 4.22 | Liquidated Damages Notice |
| Section 4.23 | Compliance with Lease-Related Agreements |
| Section 4.24 | Limitation on Use of Proceeds |
| Section 4.25 | Gaming Licenses and Other Permits |
| Section 4.26 | Restrictions on Activities of Finance Corp |

## ARTICLE V MERGER AND SUCCESSORS

| | |
|---|---|
| Section 5.1 | Limitation on Merger, Sale or Consolidation |
| Section 5.2 | Successor Corporation Substituted |

ii

## ARTICLE VI DEFAULTS AND REMEDIES

| | |
|---|---|
| Section 6.1 | Events of Default |
| Section 6.2 | Acceleration |
| Section 6.3 | Other Remedies |
| Section 6.4 | Waiver of Defaults |
| Section 6.5 | Control by Majority |
| Section 6.6 | Limitation on Suits |
| Section 6.7 | Rights of Holders of Notes to Receive Payment |
| Section 6.8 | Collection Suit by Trustee |
| Section 6.9 | Trustee May File Proofs of Claim |
| Section 6.10 | Priorities |
| Section 6.11 | Undertaking for Costs |
| Section 6.12 | Disqualified Holders |

## ARTICLE VII TRUSTEE

| | |
|---|---|
| Section 7.1 | Duties of Trustee |
| Section 7.2 | Rights of Trustee |
| Section 7.3 | Individual Rights of Trustee |
| Section 7.4 | Trustee's Disclaimer |
| Section 7.5 | Notice of Defaults |
| Section 7.6 | Reports by Trustee to Holders of the Notes and to Gaming Authorities |
| Section 7.7 | Compensation and Indemnity |
| Section 7.8 | Replacement of Trustee |
| Section 7.9 | Successor Trustee by Merger, etc. |
| Section 7.10 | Eligibility; Disqualification |
| Section 7.11 | Preferential Collection of Claims Against Issuer |

## ARTICLE VIII LEGAL DEFEASANCE AND COVENANT DEFEASANCE

| | |
|---|---|
| Section 8.1 | Option to Effect Legal Defeasance or Covenant Defeasance |
| Section 8.2 | Legal Defeasance |
| Section 8.3 | Covenant Defeasance |
| Section 8.4 | Conditions to Legal or Covenant Defeasance |
| Section 8.5 | Deposited Money and Government Securities to be Held in Trust; Other Miscellaneous Provisions |

iii

10/15/2007 11:13 AM

| Section 8.6 | Repayment to Issuers |
| Section 8.7 | Reinstatement |
| Section 8.8 | Satisfaction and Discharge |
| | ARTICLE IX AMENDMENT, SUPPLEMENT AND WAIVER |
| Section 9.1 | With Consent of Holders of a Majority |
| Section 9.2 | With Consent of All Affected Holders of Notes or Supermajority |
| Section 9.3 | Without Consent of Holders of Notes |
| Section 9.4 | Consent Payment; Supplemental Indentures |
| Section 9.5 | Revocation and Effect of Consents |
| Section 9.6 | Notation on or Exchange of Notes |
| Section 9.7 | Trustee to Sign Amendments, etc. |
| Section 9.8 | Compliance with Trust Indenture Act |
| | ARTICLE X COLLATERAL AND SECURITY |
| Section 10.1 | Collateral Agreements; Security Interests |
| Section 10.2 | Further Assurances and Security |
| Section 10.3 | Opinions |
| Section 10.4 | Release of Collateral |
| Section 10.5 | Certificates of the Issuer |
| Section 10.6 | Authorization of Actions to be Taken by the Trustee Under the Collateral Agreements |
| Section 10.7 | Authorization of Receipt of Funds by the Trustee Under the Collateral Agreements |
| | ARTICLE XI GUARANTEES |
| Section 11.1 | Guarantees |
| Section 11.2 | Execution and Delivery of Guarantees |
| Section 11.3 | Guarantors May Consolidate, etc., on Certain Terms |
| Section 11.4 | Guarantee by Future Subsidiaries |
| Section 11.5 | Release of Guarantors |
| Section 11.6 | Limitation of Guarantor's Liability; Certain Bankruptcy Events |
| Section 11.7 | Application of Certain Terms and Provisions to the Guarantors |

iv

## ARTICLE XII MISCELLANEOUS

| | |
|---|---|
| Section 12.1 | Trust Indenture Act Controls |
| Section 12.2 | Notices |
| Section 12.3 | Communication by Holders of Notes with Other Holders of Notes |
| Section 12.4 | Certificate and Opinion as to Conditions Precedent |
| Section 12.5 | Statements Required in Certificate or Opinion |
| Section 12.6 | Rules by Trustee and Agents |
| Section 12.7 | No Personal Liability of Directors, Officers, Employees and Stockholders |
| Section 12.8 | GOVERNING LAW; WAIVER OF JURY TRIAL |
| Section 12.9 | No Adverse Interpretation of Other Agreements |
| Section 12.10 | Successors |
| Section 12.11 | Severability |
| Section 12.12 | Counterpart Originals |
| Section 12.13 | Table of Contents, Headings, Etc. |
| Section 12.14 | Intercreditor Agreement |
| Section 12.15 | Force Majeure |
| Section 12.16 | Applicable Gaming Laws |

v

## EXHIBITS

| | |
|---|---|
| **EXHIBIT A** | **FORM OF NOTE** |
| **EXHIBIT B** | **FORM OF CERTIFICATE OF TRANSFER** |
| **EXHIBIT C** | **FORM OF CERTIFICATE OF EXCHANGE** |
| **EXHIBIT D** | **FORM OF CERTIFICATE FROM ACQUIRING INSTITUTIONAL ACCREDITED INVESTOR** |
| **EXHIBIT E** | **FORM OF SUPPLEMENTAL INDENTURE TO BE DELIVERED BY SUBSEQUENT GUARANTORS** |
| **EXHIBIT F** | **FORM OF INTERCREDITOR AGREEMENT** |

## CROSS-REFERENCE TABLE*

| TIA Section | Indenture Section |
| --- | --- |
| 310(a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (a)(5) | 7.8; 7.10 |
| (b) | 7.8; 7.10; 12.2 |
| (c) | N.A. |
| 311(a) | 7.11 |
| (b) | 7.11 |
| (c) | N.A. |
| 312(a) | 2.5 |
| (b) | 12.3 |
| (c) | 12.3 |
| 313(a) | 7.6 |
| (b) | 7.6, 7.7 |
| (c) | 7.5, 7.6; 12.2 |
| (d) | 7.6 |
| 314(a) | 4.3; 4.4; 12.2 |
| (b) | 10.3 |
| (c)(1) | 12.4 |
| (c)(2) | 12.4 |
| (c)(3) | N.A. |
| (d) | 10.5 |
| (e) | 12.5 |
| (f) | N.A. |
| 315(a) | 7.1(b) |
| (b) | 7.5; 12.2 |
| (c) | 7.1(a) |
| (d) | 7.1(c) |
| (e) | 6.11 |
| 316(a)(last sentence) | 2.9 |
| (a)(1)(A) | 6.5 |
| (a)(1)(B) | 6.4 |
| (a)(2) | N.A. |
| (b) | 6.7 |
| (c) | 9.5 |
| 317(a)(1) | 6.8 |
| (a)(2) | 6.9 |
| (b) | 2.4 |
| 318(a) | 12.1 |
| (c) | 12.1 |

---

\*    This Cross-Reference table shall not, for any purpose, be deemed to be part of this Indenture.

vii

http://www.sec.gov/Archives/edgar/data/1326686/000104746905014761...

---

\* N.A. means not applicable

viii

http://www.sec.gov/Archives/edgar/data/1326686/000104746905014761...

INDENTURE, dated as of March 29, 2005, among 155 East Tropicana, LLC, a Nevada limited-liability company (the "*Company*"), and 155 East Tropicana Finance Corp., a Nevada corporation ("*Finance Corp.*" and, together with the Company, the "*Issuers*," which term includes any successors to any of such persons under this Indenture), the Guarantors (as defined herein), and The Bank of New York Trust Company, N.A., a national banking association (the "*Trustee*").

Each party agrees as follows for the benefit of each other and for the equal and ratable benefit of the Holders of the 8¾% Series A Senior Secured Notes due 2012 (the "*Series A Notes*") and the 8¾% Series B Senior Secured Notes due 2012 (the "*Series B Notes*," and together with the Series A Notes, the "*Notes*"):

## ARTICLE I
## DEFINITIONS AND INCORPORATION BY REFERENCE

**Section 1.1    Definitions**

"*144A Global Note*" means one or more Global Notes bearing the Private Placement Legend that shall be issued in an aggregate amount of denominations equal in total to the outstanding principal amount of the Notes sold in reliance on Rule 144A.

"*501 Global Note*" means one or more Global Notes bearing the Private Placement Legend that shall be issued in an aggregate amount of denominations equal in total to the outstanding principal amount of the Notes sold to institutional "accredited investors" within the meaning of Rule 501(a)(1), (2), (3), or (7) under the Securities Act.

"*Accrued Bankruptcy Interest*" means, with respect to any Indebtedness, all interest accruing thereon after the filing of a petition by or against the Issuers or any of the Subsidiaries or any parent under any Bankruptcy Law, in accordance with and at the rate (including any rate applicable upon any default or event of default, to the extent lawful) specified in the documents evidencing or governing such Indebtedness, whether or not the claim for such interest is allowed as a claim after such filing in any proceeding under such Bankruptcy Law.

"*Acquired Indebtedness*" means Indebtedness of any Person existing at the time such Person becomes a Subsidiary, including by designation, or is merged or consolidated into or with one of the Issuers or one of the Subsidiaries.

"*Acquisition*" means the purchase or other acquisition of any Person or all or substantially all the assets of any Person by any other Person, whether by purchase, merger, consolidation, or other transfer, and whether or not for consideration.

"*Additional Notes*" means additional Notes which may be issued after the Issue Date pursuant to this Indenture (other than pursuant to an Exchange Offer or otherwise in exchange for or in replacement of outstanding Notes). All references herein to "Notes" shall be deemed to include Additional Notes.

1

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, shall mean (a) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise or (b) beneficial ownership of 10% or more of the voting securities of such Person. Notwithstanding the foregoing, "Affiliate" shall not include Wholly Owned Subsidiaries.

"*Agent*" means any Registrar, Paying Agent or co-registrar.

"*Applicable Capital Gain Tax Rate*" means, for any taxable period, the highest effective combined individual United States federal, Nevada or Florida state and local income tax applicable to net capital gain during such period.

"*Applicable Income Tax Rate*" means, for any taxable period, the highest effective combined individual United States federal, Nevada or Florida state and local income tax applicable during such period.

"*Applicable Procedures*" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depositary, Euroclear and Clearstream that apply to such transfer or exchange at the relevant time.

"*Average Life*" means, as of the date of determination, with respect to any security or instrument, the quotient obtained by dividing (1) the sum of the products (a) of the number of years from the date of determination to the date or dates of each successive scheduled principal (or redemption) payment of such security or instrument and (b) the amount of each such respective principal (or redemption) payment by (2) the sum of all such principal (or redemption) payments.

"*Bankruptcy Code*" means the United States Bankruptcy Code, codified at 11 U.S.C. § 101-1330, as amended.

"*Bankruptcy Law*" means Title 11, U.S. Code, or any similar federal, state or foreign law for the relief of debtors.

"*Beneficial Owner*" or "*beneficial owner*" for purposes of the definitions of "Change of Control" and "Affiliate" has the meaning attributed to it in Rules 13d-3 and 13d-5 under the Exchange Act (as in effect on the Issue Date).

"*Board of Directors*" means, with respect to any Person, the board of directors of such Person (or if such Person is not a corporation, the equivalent board of managers or members or body performing similar functions for such Person) or any committee of the board of directors of such Person (or if such Person is not a corporation, any committee of the equivalent board of managers or members or body performing similar functions for such Person) authorized, with respect to any particular matter, to exercise the power of the

2

http://www.sec.gov/Archives/edgar/data/1326686/000104746905014761...

board
of directors of such Person (or if such Person is not a corporation, the equivalent board of managers or members or body performing similar functions for such Person).

"*Broker-Dealer*" means any broker-dealer that receives Exchange Notes for its own account in the Exchange Offer in exchange for Notes that were acquired by such broker-dealer as a result of market-making or other trading activities.

"*Business Day*" means each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions in New York, New York are authorized or obligated by law or other government action to close.

"*Capital Contribution*" means any contribution to the Issuers' equity from one of the Issuers' direct or indirect parents for which no consideration has been given other than the issuance of Qualified Capital Stock.

"*Capital Stock*" means, (i) with respect to any Person that is a corporation, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock issued by such Person, (ii) with respect to a Person that is a limited liability company, any and all membership interests in such Person, and (iii) with respect to any other Person, any and all partnership, joint venture or other equity interests of such Person.

"*Capitalized Lease Obligation*" means, as to any Person, the obligations of such Person under a lease that are required to be classified and accounted for as capital lease obligations under GAAP and, for purposes of this definition, the amount of such obligations at any date shall be the capitalized amount of such obligations at such date, determined in accordance with GAAP.

"*Cash Collateral and Disbursement Agreement*" means the Cash Collateral and Disbursement Agreement, dated as of the date of Indenture, among the Issuers, the Trustee and the Disbursement Agent, as in effect on the Issue Date or as amended in accordance with Article IX.

"*Cash Equivalent*" means:

(1)
securities issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof (*provided*, that the full faith and credit of the United States of America is pledged in support thereof),

(2)
time deposits, certificates of deposit, bankers' acceptances and commercial paper issued by the parent corporation of any domestic commercial bank of recognized standing having capital and surplus in excess of $500,000,000,

(3)    commercial
paper issued by others rated at least A-2 or the equivalent thereof by S&P or at least P-2 or the equivalent thereof by Moody's,

(4)    repurchase
obligations with a term of not more than seven days for underlying securities of the types described in (1) and (2) above entered into

3

---

with any financial institution meeting the qualifications specified in (2) above, or

(5)    money
market funds, substantially all of the assets of which constitute Cash Equivalents of the kinds described in (1) through (4) of this definition,

and in the case of each of (1), (2), and (3) of this definition maturing within one year after the date of acquisition.

"*Casino*" means, collectively, those portions of the Casino/Hotel Property containing the showroom, gaming and liquor servicing areas of the Casino/Hotel Property, including, without limitation, the areas of the Casino/Hotel Property containing and immediately adjacent the slot machines, video machines, all gaming devices, table games, poker room, keno area, baccarat areas, and any other areas which are subject to direct supervision by the Nevada Gaming Authorities, together with all surveillance areas, counting rooms, cashier cages and other areas ancillary to casino gaming.

"*Casino Lease*" means the Amended and Restated Casino Lease, dated March 9, 2005, by and between the Company and E&W, as in effect on the Issue Date, without giving effect to any amendment or supplement thereto or modification thereof, except such amendments, supplements and modifications that are not, individually or in the aggregate (together with any other amendments, supplements or modifications to any of the Lease-Related Agreements or License Agreements), adverse to Noteholders.

"*Casino/Hotel Property*" means that certain resort hotel and all restaurants therein and other facilities, related assets and real and personal property used in connection therewith commonly known as the San Remo Las Vegas Casino Casino/Hotel Property (and, after the completion of the Renovation, the Hooters Casino, Casino/Hotel Property and Entertainment Center) and located at 115 and 155 East Tropicana Avenue, Las Vegas, Nevada.

"*Clearstream*" means Clearstream Banking Luxembourg, Société Anonyme, or any successor securities clearing agency.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Collateral*" means all assets and other property, whether now owned or hereafter acquired, upon which a Lien securing the Obligations is granted or purported to be granted under any Collateral Agreement.

"*Collateral Accounts*" means the Renovation Disbursement Account and the Interest Reserve Account.

"*Collateral Agreements*" means, collectively, the Cash Collateral and Disbursement Agreement, the E&W Collateral Agreements, the Parent Pledge Agreements, and all other mortgages, deeds of trust, security agreements, pledge agreements, control agreements, collateral assignment agreements and other agreements, instruments, financing statements and other documents evidencing, creating, setting forth

4

or
limiting any Lien on Collateral in favor of the Trustee (or, in the case of mortgages, deeds of trust or similar agreements, in favor of the Trustee or another trustee thereunder), for the benefit of the Holders.  For the avoidance of doubt, "*Collateral Agreements*" shall not include the Intercreditor Agreement.

"*Commission*" means the Securities and Exchange Commission.

"*consolidated*"
means, with respect to the Issuers, the combination of the Company's accounts and the consolidation of the accounts of Finance Corp. and the Subsidiaries with the Company's accounts, all in accordance with GAAP; *provided,* that "*consolidated*" will not include consolidation of the accounts of any Unrestricted Subsidiary with the Issuers' accounts.

"*Consolidated Coverage Ratio*" of any specified Person or Persons on any specified date of determination (the "*Transaction Date*") means the ratio, on a *pro forma* basis, of (a) the aggregate amount of Consolidated EBITDA of such Person attributable to continuing operations and businesses (exclusive of amounts attributable to operations and businesses permanently discontinued or disposed of) for the Reference Period to (b) the aggregate Consolidated Fixed Charges of such Person (exclusive of amounts attributable to operations and businesses permanently discontinued or disposed of, but only to the extent that the obligations giving rise to such Consolidated Fixed Charges would no longer be obligations contributing to such Person's Consolidated Fixed Charges subsequent to the Transaction Date) during the Reference Period; *provided,* that for purposes of such calculation:

(1)     Acquisitions which occurred during the Reference Period or subsequent to the Reference Period and on or prior to the Transaction Date shall be given *pro forma* effect as if they had occurred on the first day of the Reference Period,

(2)     transactions
giving rise to the need to calculate the Consolidated Coverage Ratio shall be assumed to have occurred on the first day of the Reference Period,

(3)     the incurrence of any Indebtedness (including issuance of any Disqualified Capital Stock) during the Reference Period or subsequent to the Reference Period and on or prior to the Transaction Date (and the application of the proceeds therefrom to the extent used to refinance or retire other Indebtedness (other than Indebtedness incurred under any revolving credit agreement or similar facility)) shall be given *pro forma* effect as if it had occurred on the first day of the Reference Period,

(4)     the Consolidated Fixed Charges of such Person attributable to interest on any Indebtedness or dividends on any Disqualified Capital Stock bearing a floating interest (or dividend) rate shall be computed on a *pro forma* basis as if the average rate in effect from the beginning of the Reference Period to the Transaction Date had been the applicable rate for the entire period,

5

*provided*, that if such Person or any of the Subsidiaries is a party to an Interest Swap or Hedging Obligation (which shall remain in effect for the 12-month period immediately following the Transaction Date) that has the effect of fixing the interest rate on the date of computation, then such rate (whether higher or lower) shall be used, and

(5)

Consolidated EBITDA and Consolidated Fixed Charges, respectively, of such Person for the following Reference Periods shall be deemed to be equal to the actual Consolidated EBITDA and actual Consolidated Fixed Charges of such Person during such Reference Period multiplied by: (x) for the First Reference Period, four; (y) for the Second Reference Period, two; and (z) for the Third Reference Period, 4/3.

"*Consolidated EBITDA*" means, with respect to any specified Person or Persons for any specified period, the Consolidated Net Income of such Person for such period adjusted to add thereto (to the extent deducted for purposes of determining Consolidated Net Income), without duplication, the sum of:

(1)     consolidated
income tax expense and the amount of Permitted Tax Distributions subtracted from net income in the determination of the Consolidated Net Income of such Person for such period,

(2)     consolidated depreciation and amortization expense,

(3)     Consolidated Fixed Charges, and

(4)
all other non-cash charges reducing Consolidated Net Income for such period but excluding non-cash charges that require an accrual of or a reserve for cash charges for any future periods and normally occurring accruals such as reserves for accounts receivable, and

<u>less</u>

(x) the amount of all cash payments made by such Person or any of the Subsidiaries during such period to the extent such payments relate to non-cash charges that were added back in determining Consolidated EBITDA for such period or any prior period; provided, that consolidated income tax expense and depreciation and amortization of a Subsidiary that is a less than Wholly Owned Subsidiary shall only be added to the extent of the Issuers' equity interest in such Subsidiary, and

(y)     all Management/Royalty Payments and EW Preferred Return for such period, in each case, to the extent not already deducted for purposes of determining Consolidated Net Income for such period.

"*Consolidated Fixed Charges*" means, with respect to any specified Person or Persons for any specified period, the aggregate amount (without duplication and determined in each case in accordance with GAAP) of:

6

(a)
    interest expensed or capitalized, paid, accrued, or scheduled to be paid or accrued (including, in accordance with the following sentence, interest attributable to Capitalized Lease Obligations) of such Person and its Consolidated Subsidiaries during such period (without duplication), including (1) original issue discount and non-cash interest payments or accruals on any Indebtedness, (2) the interest portion of all deferred payment obligations, and (3) all commissions, discounts and other fees and charges owed with respect to bankers' acceptances and letters of credit financings and currency and Interest Swap and Hedging Obligations, in each case to the extent attributable to such period, and

(b)
    the product of (i) the amount of dividends and distributions (excluding the EW Preferred Return) accrued or payable (or guaranteed) by such Person or any of its Consolidated Subsidiaries in respect of Preferred Stock (other than by Subsidiaries to the Issuers or to the Wholly Owned Subsidiaries) times (ii) a fraction, the numerator of which is one and the denominator of which is one minus the then current effective consolidated United States federal, state and local income tax rate of such Person, expressed as a decimal (as estimated in good faith by the Issuers).

For purposes of this definition, (x) interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined in reasonable good faith by the Issuers to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP and (y) interest expense attributable to any Indebtedness represented by the guarantee by such Person or a Subsidiary of such Person of an obligation of another Person shall be deemed to be the interest expense attributable to the Indebtedness guaranteed.

"*Consolidated Net Income*" means, with respect to any specified Person or Persons for any specified period, the net income (or loss) of such specified Person and its Consolidated Subsidiaries (determined on a consolidated basis in accordance with GAAP) for such period reduced by the maximum amount of Permitted Tax Distributions attributable to such net income for such period, adjusted to exclude (only to the extent included in computing such net income (or loss) and without duplication):

(a)
    all gains and losses which are either extraordinary (as determined in accordance with GAAP) or are unusual and nonrecurring (including any gain or loss from the sale or other disposition of assets outside the ordinary course of business or from the issuance or sale of any Capital Stock),

(b)
    the net income, if positive, of any Person, other than a Consolidated Subsidiary, in which such specified Person or any of its Consolidated Subsidiaries has an interest, except to the extent of the amount of any dividends or distributions actually paid in cash to such Person or a Consolidated Subsidiary of such Person during such period, but in any case not in excess of such specified Person's *pro rata* share of such specified Person's net income for such period,

7

(c)   the net income, if positive, of any of such specified Person's Consolidated Subsidiaries to the extent that the declaration or payment of dividends or similar distributions is not at the time permitted by operation of the terms of its charter or bylaws or any other agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such Consolidated Subsidiary, and

(d)   the net income of, and all dividends and distributions from, any Unrestricted Subsidiary.

"*Consolidated Net Worth*" of any Person at any date means the aggregate consolidated stockholders' equity of such Person (including amounts of equity attributable to Preferred Stock) and its Consolidated Subsidiaries, as would be shown on the consolidated balance sheet of such Person prepared in accordance with GAAP, adjusted to exclude (to the extent included in calculating such equity) the amount of any such stockholders' equity attributable to Disqualified Capital Stock or treasury stock of such Person and its Consolidated Subsidiaries

"*Consolidated Subsidiary*" means, for any Person, each Subsidiary of such Person (whether now existing or hereafter created or acquired) the financial statements of which are consolidated for financial statement reporting purposes with the financial statements of such Person in accordance with GAAP.

"*Continuing Director*" means during any period of 24 consecutive months after the Issue Date, individuals who at the beginning of any such 24-month period constituted the applicable Issuer's Board of Directors (together with any new directors whose election by such Issuer's Board of Directors or whose nomination for election by such Issuer's shareholders was approved by a vote of a majority of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved, including new directors designated in or provided for in an agreement regarding the merger, consolidation or sale, transfer or other conveyance, of all or substantially all of such Issuer's assets, if such agreement was approved by a vote of such majority of directors).

"*contractually subordinated*" means subordinated in right of payment by its terms or the terms of any document or instrument or instrument relating thereto.  For the avoidance of doubt, unsecured Indebtedness is not "contractually subordinated" to secured Indebtedness and a junior Lien on any assets securing Indebtedness does not render such Indebtedness "contractually subordinated" to Indebtedness that is secured by a senior Lien on such assets.

"*Corporate Trust Office*" means the principal office of the Trustee at which at any time its corporate trust business shall be principally administered, which office at the date hereof is located at The Bank of New York Trust Company, N.A., 700 South Flower Street, Suite 500, Los Angeles, California 90017, Attention:  Corporate Trust Administration, or such other address as the Trustee may designate from time to time by notice to the Holders and the Issuers, or the principal corporate trust office of any

8

http://www.sec.gov/Archives/edgar/data/1326686/000104746905014761...

successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Holders and the Issuers).

"*Credit Agreement*" means
the Credit Agreement to be entered into, as of the Issue Date, by the Issuers with Wells Fargo Foothill, including any related notes, guarantees, collateral documents, instruments and agreements executed in connection therewith, as such credit agreement and/or related documents may be amended, restated, supplemented, renewed, replaced or otherwise modified from time to time whether or not with the same agent, trustee, representative lenders or holders, and, subject to the proviso to the next succeeding sentence, irrespective of any changes in the terms and conditions thereof.  Without limiting the generality of the foregoing, the term "Credit Agreement" shall include any amendment, amendment and restatement, renewal, extension, restructuring, supplement or modification to any Credit Agreement and all refundings, refinancings and replacements of any Credit Agreement with another credit agreement, including any credit agreement:

(1)      extending the maturity of any Indebtedness incurred thereunder or contemplated thereby,

(2)      adding
or deleting borrowers or guarantors thereunder, so long as borrowers and issuers include one or more of the Issuers and the Subsidiaries and their respective successors and assigns,

(3)      increasing the amount of Indebtedness incurred thereunder or available to be borrowed thereunder; *provided*, that on the date such Indebtedness is incurred it would not be prohibited by Section 4.7 hereof, or

(4)      otherwise altering the terms and conditions thereof in a manner not prohibited by the terms of this Indenture.

"*Credit Facility Basket*" has the meaning set forth in Section 4.7(b) hereof.

"*Debt Incurrence Ratio Test*" has the meaning set forth in Section 4.7(a) hereof.

"*Default*" means any event that is or with the passage of time or the giving of notice or both would be an Event of Default.

"*Definitive Note*" means one or more certificated Notes registered in the name of the Holder thereof and issued in accordance with Section 2.6 hereof, substantially in the form of Exhibit A hereto except that such Note shall not include the information called for by footnotes 3 and 4 thereof.

"*Depositary*" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.3 hereof as the Depositary with respect to the Notes, until a successor will have been appointed and become such pursuant to the applicable provisions of this Indenture, and thereafter "Depositary" will mean or include such successor.

9

"*Disbursement Agent*" means The Bank of New York Trust Company, N.A., or the then acting Disbursement Agent under the Cash Collateral and Disbursement Agreement.

"*Disqualified Capital Stock*" means with respect to any Person, any Equity Interest of such Person that, by its terms or by the terms of any security into which it is convertible, exercisable or exchangeable, is, or upon the happening of an event or the passage of time or both would be, required to be redeemed or repurchased, including at the option of the holder thereof, by such Person or any of the Subsidiaries, in whole or in part, on or prior to 91 days following the Stated Maturity of the Notes. Notwithstanding the foregoing, any Equity Interests that would constitute Disqualified Capital Stock solely because the holders thereof have the right to require the Issuers to repurchase such Equity Interests upon the occurrence of a change of control or an asset sale shall not constitute Disqualified Capital Stock if the terms of such Equity Interests provide that the Issuers may not repurchase or redeem any such Equity Interests pursuant to such provisions prior to the Issuers' purchase of the Notes as are required to be purchased pursuant to the provisions of this Indenture as described in Sections 4.13 and 4.14 hereof.

"*Distribution Compliance Period*" means the 40-day restricted period as defined in Regulation S.

"*DTC*" means The Depository Trust Company and any successor thereto.

"*E&W*" means Eastern & Western Hotel Corporation, a Nevada corporation.

"*E&W Collateral Agreemnts*" mean (i) the E&W Guarantee & Pledge Agreement and (ii) the Leasehold Deed of Trust, Security Agreement and Fixtures Filing with Assignment of Rents, dated as of the Issue Date, by and between E&W and The Bank of New York Trust Company, N.A., as Collateral Agent for the Holders of the Notes.

"*E&W Guarantee and Pledge Agreement*" means the Guarantee and Pledge Agreement, dated as of the Issue Date, between E&W and The Bank of New York Trust Company, N.A., as Collateral Agent (as defined therein) for the Holders of Notes.

"*EW Common*" means EW Common LLC, a Nevada limited-liability company.

"*EW Preferred Note Loan*" means the unsecured loan into which the EW Preferred Account is converted, pursuant to Section 12.5c(ii) of the Operating Agreement (as in effect on the Issue Date, without giving effect to any amendment or supplement thereto or modification thereof), in the event that EW Common fails to obtain the requisite approvals of the Gaming Authorities to own an interest in the Company as a gaming licensee on or prior to January 31, 2006, which loan has the following terms:

(a)    accrues interest at the rate of the EW Preferred Return, which interest is payable in the same manner and in the same relative priority as the EW Preferred Return;

10

(b)    matures on the later of (i) the occurrence of a sale of the Casino/Hotel and (ii) the date that is 91 days after the date on which all the Notes cease to be outstanding; and

(c)    payments on the EW Preferred Note Loan shall be subordinated to the Notes as provided in the Operating Agreement in the same manner as the EW Preferred Return, meaning that (i) cash flow from operations goes to make any payments then due under the Notes, before any payments are made on the EW Preferred Note Loan from such cash flow, and cash flow from capital events goes to pay off the Notes before any payments are made on the EW Preferred Note Loan from such cash flow.

"*EW Preferred Return*" means a return, calculated as set forth in the Operating Agreement, of 4% per annum, cumulative, on the EW Preferred Account (as defined in the Operating Agreement); *provided, however*, that solely for purposes of clause (f) of the covenant "Limitation on Restricted Payments," the EW Preferred Return shall not exceed an amount equal to 4% per annum of (a) the sum of (x) $20,000,000, which represents the balance of the EW Preferred Account as of the Issue Date, and (y) upon the contribution by E&W or EW Common of gaming assets to the Company pursuant to Section 5.1 of the Operating Agreement following the occurrence of the Operator Licensing Event, $5,000,000, less (b) the amount of any reductions in, or repayments or returns of, the EW Preferred Account on and after the Issue Date.

"*Equity Holder*"
means (a) with respect to a corporation, each holder of stock of such corporation, (b) with respect to a limited liability company or similar entity, each member of such limited liability company or similar entity, (c) with respect to a partnership, each partner of such partnership, (d) with respect to any entity described in clause (a)(iv) of the definition of "Flow Through Entity," the owner of such entity, and (e) with respect to a trust described in clause (a)(v) of the definition of "Flow Through Entity," an owner thereof.

"*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"*Euroclear*" means Euroclear Bank S.A./N.V., as operator of the Euroclear system, or any successor securities clearing agency.

"*Event of Loss*" means, with respect to any property or asset, (1) any loss, destruction or damage of such property or asset, (2) any condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such property or asset, or confiscation or requisition of the use of such property or asset or (3) any settlement in lieu of clause (2) above.

"*Excess Cash Distribution Amount for Taxes*"
means the excess of (x) the aggregate actual cash distributions received by the Issuers or a Subsidiary from all Flow Through Entities that are not Subsidiaries during the period commencing with the Issue Date and continuing to and including the date on which a proposed Permitted Tax

11

Distribution is to be made under Section 4.9(b)(7) hereof over (y) the aggregate amount of such cash distributions described in the immediately preceding clause (x) that have already been taken into account for purposes of making (I) Permitted Tax Distributions previously made and which was attributable to a Flow Through Entity that was not a Subsidiary at the time such Permitted Tax Distribution was made plus (II) Restricted Payments permitted by clause (A) or (C) of Section 4.9(a)(4) hereof (treating such cash distributions described in this clause (y)(II) as used to make a Restricted Payment during such period only to the extent that in such period, the total amount of Restricted Payments actually made during such period exceeded the excess of (m) the total amount of Restricted Payments permitted to be made in such period over (n) the amount of such cash distributions described in the immediately preceding clause (x) that were actually received by the Issuers or a Subsidiary during such period and that were not previously used to make a Permitted Tax Distribution.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission promulgated thereunder.

"*Exchange Notes*" means the Series B Notes, issued pursuant to an Exchange Offer and identical in all respects to the Series A Notes (including with respect to the Guarantees), except (i) that such securities shall have been registered pursuant to an effective registration statement under the Securities Act, (ii) that such securities shall not contain a restrictive legend thereon, (iii) that such securities shall not contain provisions relating to the accrual or payment of Liquidated Damages and (iv) Interest on each Exchange Note shall accrue from the last Interest Payment Date on which Interest was paid on the Notes surrendered in exchange therefor or, if no Interest has been paid on the Notes, from the Issue Date of the Notes.

"*Exchange Offer*" means an offer that may be made by the Issuers pursuant to the Registration Rights Agreement to exchange Exchange Notes for Series A Notes.

"*Exchange Offer Registration Statement*" shall have the meaning set forth in the Registration Rights Agreement.

"*Excluded Assets*" means:

(a)      assets
securing FF&E Financing, Purchase Money Indebtedness or Capitalized Lease Obligations permitted to be incurred under this Indenture;

(b)
any additional leasehold estates in real property acquired by the Issuers or the Subsidiaries after the Issue Date, unless the Trustee, as collateral agent (upon request of the Holders of a majority of the outstanding Notes), in its reasonable discretion requests that the Issuers provide the Trustee, as collateral agent, with a lien upon and security interest in such leasehold estate so that such leasehold estate shall become additional Collateral (and in the Collateral Agreements the Issuers will agree to notify the Trustee of the acquisition by it or any of the Subsidiaries of any leasehold estate in real property);

12

(c)     any leases, permits, licenses (including without limitation Gaming Licenses) or other contracts or agreements or other assets or property to the extent that a grant of a Lien thereon under the Collateral Agreements (i) is prohibited by law or would constitute or result in the abandonment, invalidation or unenforceability of any right, title or interest of the grantor therein pursuant to the applicable law, or (ii) would require the consent of third parties and such consent has not been obtained after the Issuers have used commercially reasonable efforts to try to obtain such consent, or (iii) other than as a result of requiring a consent of third parties that has not been obtained, would result in a breach of the provisions thereof, or constitute a default under or result in a termination of, such lease, permit, license, contract or agreement (other than to the extent that any such provisions thereof would be rendered ineffective pursuant to Section 9-406, 9-407 or 9-408 of the UCC or any other applicable law); *provided*, that, immediately upon the uneffectiveness, lapse or termination of such prohibition, the provisions that would be so breached or such breach, default or termination or immediately upon the obtaining of any such consent, the Excluded Assets shall not include, and the Issuers or the applicable Guarantor, as the case may be, shall be deemed to have granted a security interest in, all such leases, permits, licenses, other contracts and agreements and such other assets and property as if such prohibition, the provisions that would be so breached or such breach, default or termination had never been in effect and as if such consent had not been required;

(d)     cash and Cash Equivalents to the extent that a Lien thereon may not be perfected through the filing of a UCC financing statement or that, after the Issuers have used commercially reasonable efforts, the Issuers are unable to cause the Trustee to obtain "control" (as defined in the UCC) for the benefit of the Holders; and

(e)     any Capital Stock of an Excluded Foreign Subsidiary, if any, other than a pledge of 65% of the Voting Equity Interests of such Excluded Foreign Subsidiary held directly by the Issuers or any domestic Subsidiary, 100% of the nonvoting Equity Interests of such Excluded Foreign Subsidiary held directly by the Issuers or any domestic Subsidiary and 100% of any intercompany Indebtedness owed by such Excluded Foreign Subsidiary to any of the Issuers or any of the Guarantors;

*provided, however,* that "Excluded Assets" shall not include any proceeds or products of any of the foregoing unless those proceeds or products are a type of asset that would constitute an Excluded Asset.

"*Excluded Foreign Subsidiary*" means any Foreign Subsidiary that is either (i) treated for United States federal tax purposes as a corporation or (ii) any entity owned directly or indirectly by another Foreign Subsidiary that is treated for United States federal tax purposes as a corporation.

13

---

"*Exempted Affiliate Transaction*" means:

(a)

reasonable and customary compensation arrangements provided for the benefit of any director, officer or employee of the Issuers or any Subsidiary, in each case entered into in the ordinary course of business and for services provided to the Issuer or such Subsidiary, respectively, as determined in good faith by the disinterested members of the Board of Directors of the applicable Issuer,

(b)

dividends or distributions not prohibited under the terms of Section 4.9 hereof and payable, in form and amount, (i) on a *pro rata*
basis to all holders of the Issuers' common stock or membership interests, as the case may be or (ii) otherwise pursuant to the Operating Agreement,

(c)        transactions
solely between or among the Issuers and any of the Consolidated Subsidiaries that are Guarantors or solely among the Consolidated Subsidiaries that are Guarantors,

(d)        payments permitted by Section 4.9(b)(6), (7) and (8) hereof,

(e)        payments and other transactions pursuant to the Lease Related Agreements, and

(f)        payments and other transactions pursuant to the License Agreements.

"*Existing Indebtedness*" means the Indebtedness of the Issuers and the Subsidiaries (other than Indebtedness under the Credit Agreement) in existence on the Issue Date (after giving effect to the transactions contemplated hereby), reduced to the extent such amounts are repaid, refinanced or retired.

"*Existing Stockholders*"
means (i) Florida Hooters., (ii) any trust, corporation, partnership or other entity controlled by Florida Hooters and (iii) any partnership the sole general partners of which consist solely of Florida Hooters or any entity referred to in clause (ii) above.

"*FF&E*" means furniture, fixtures and equipment (including Gaming Equipment) acquired by the Issuers and the Subsidiaries in the ordinary course of business for use in the Issuers' or the Subsidiaries' business operations.

"*FF&E Financing*" means Indebtedness of the Issuers and the Subsidiaries (and concurrently with the incurrence of such Indebtedness) to acquire or lease or improve or refinance, respectively, FF&E (including FF&E Financings assumed from E&W in connection with the contribution by E&W or EW Common of gaming assets to the Company in accordance with Section 5.1 of the Operating Agreement following the occurrence of the Operator Licensing Event); *provided*, that (x) the principal amount of such FF&E Financing does not exceed the cost (including sales and excise taxes, installation and delivery charges, capitalized interest and other direct fees, costs and expenses) of the FF&E purchased or leased or refinanced

14

with the proceeds thereof or the cost of such improvements, as the case may be, and (y) such FF&E Financing is secured only by the assets so financed and assets which, immediately prior to the incurrence of such FF&E Financing, secured other Indebtedness of the Issuers and the Subsidiaries (to the extent such other Indebtedness and the Liens securing such other Indebtedness are permitted under this Indenture) to the lender of such FF&E Financing.

"*Financing Difference Payment*" means the difference between the New Financing and the Existing Indebtedness plus the closing costs of the New Financing, as the foregoing capitalized terms are defined in the Operating Agreement, pursuant to Section 5.1.b. of the Operating Agreement, upon the Company's receipt of the proceeds from the offering of the Initial Notes.

"*Florida Hooters*" means Florida Hooters LLC, a Nevada limited-liability company.

"*Flow Through Entity*" means an entity that (a) for United States federal income tax purposes constitutes (i) an "S" corporation (as defined in section 1361(a) of the Code), (ii) a "qualified subchapter S subsidiary" (as defined in section 1361(b)(3)(B) of the Code), (iii) a "partnership" (within the meaning of section 7701(a)(2) of the Code) other than a "publicly traded partnership" (as defined in section 7704 of the Code), (iv) an entity that is disregarded as an entity separate from its owner under the Code, the Treasury regulations or any published administrative guidance of the Internal Revenue Service, or (v) a trust, the income of which is includible in the taxable income of the grantor or another person under sections 671 through 679 of the Code (the entities described in the immediately preceding clauses (i), (ii), (iii), (iv) and (v), a "*Federal Flow Through Entity*") and (b) for state and local jurisdictions in respect of which Permitted Tax Distributions are being made, is subject to treatment on a basis under applicable state or local income tax law substantially similar to a Federal Flow Through Entity.

"*Foreign Subsidiary*" means any Subsidiary which (i) is not organized under the laws of the United States, any state thereof or the District of Columbia and (ii) conducts substantially all of its business operations outside the United States of America.

"*GAAP*" means United States generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as approved by a significant segment of the accounting profession in the United States as in effect from time to time.

"*Gaming Authorities*"
means any agency, authority, board, bureau, commission, department, office or instrumentality of any nature whatsoever of the United States federal government, any foreign government, any state, province or city or other political subdivision or otherwise, whether now or hereafter existing, or any officer or official thereof, including, without limitation, the Nevada Gaming Commission, the Nevada State Gaming Control Board, the Clark County Liquor and Gaming Licensing Board, the City of

15

Las Vegas and any other agency, in each case, with authority to regulate any gaming operation (or proposed gaming operation) owned, managed or operated by the Issuers or any of the Subsidiaries.

"*Gaming Equipment*" means slot machines, video poker machines, and all other gaming equipment and related signage, accessories and peripheral equipment.

"*Gaming FF&E Financing*" means FF&E Financing, the proceeds of which are used solely by the Issuers and the Subsidiaries to acquire or lease FF&E that constitutes Gaming Equipment.

"*Gaming Laws*" means the gaming laws of a jurisdiction or jurisdictions to which the Issuer or any of the Subsidiaries are, or may at any time after the date of this Indenture be, subject.

"*Gaming Licenses*" means every material license, material franchise, material registration, material qualification, findings of suitability or other material approval or authorization required to own, lease, operate or otherwise conduct or manage gaming activities in any state or jurisdiction in which the Issuers or any of the Subsidiaries conducts business (including, without limitation, all such licenses granted by the Gaming Authorities), and all applicable liquor and tobacco licenses.

"*Global Notes*" means one or more Notes in the form of Exhibit A hereto that includes the information referred to in footnotes 3 and 4 to the form of Note, attached hereto as Exhibit A, issued under this Indenture, that is deposited with or on behalf of and registered in the name of the Depositary or its nominee.

"*Global Note Legend*" means the legend set forth in Section 2.6(g)(2) hereof, which is required to be placed on all Global Notes issued under this Indenture.

"*Guarantor*" means each of the Subsidiaries that at the time are guarantors of the Notes in accordance with this Indenture.

"*guaranty*" or "*guarantee*," used as a noun, means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including, without limitation, letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness. The term "guarantee" or "guaranty," used as a verb, has a corresponding meaning. When used with respect to the Notes, a "*Guarantee*" means a guarantee by any of the Guarantors of the Notes, in accordance with Article XI hereof.

"*HGC*" means Hooters Gaming Corporation, a Nevada corporation.

"*HI Limited*" means HI Limited Partnership, a Florida limited partnership.

"*Holder*" means the Person in whose name a Note is registered in the register of the Notes.

16

http://www.sec.gov/Archives/edgar/data/1326686/000104746905014761...

"*Hotel Lease*" means the Amended and Restated Hotel Lease, dated March 9, 2005, by and between the Company and E&W, as in effect on the Issue Date, without giving effect to any amendment or supplement thereto or modification thereof, except such amendments, supplements and modifications that are not, individually or in the aggregate (together with any other amendments, supplements or modifications to any of the Lease-Related Agreements or License Agreements), adverse to Noteholders.

"*Indebtedness*" of any specified Person means, without duplication,

(a)      all liabilities and obligations, contingent or otherwise, of such specified Person, to the extent such liabilities and obligations would appear as a liability upon the consolidated balance sheet of such specified Person in accordance with GAAP, (1) in respect of borrowed money (whether or not the recourse of the lender is to the whole of the assets of such specified Person or only to a portion thereof), (2) evidenced by bonds, notes, debentures or similar instruments, (3) representing the balance deferred and unpaid of the purchase price of any property or services (which, for the avoidance of doubt, shall not include the obligation of the Company to increase the EW Preferred Account (as defined in the Operating Agreement) by up to $5,000,000 upon the contribution by E&W or EW Common of gaming assets to the Company in accordance with Section 5.1 of the Operating Agreement following the occurrence of the Operator Licensing Event), except (other than accounts payable or other obligations to trade creditors which have remained unpaid for greater than 60 days past their original due date) those incurred in the ordinary course of its business that would constitute ordinarily a trade payable to trade creditors;

(b)
all liabilities and obligations, contingent or otherwise, of such specified Person (1) evidenced by bankers' acceptances or similar instruments issued or accepted by banks, (2) relating to any Capitalized Lease Obligation, or (3) evidenced by a letter of credit or a reimbursement obligation of such specified Person with respect to any letter of credit;

(c)      all net obligations of such specified Person under Interest Swap and Hedging Obligations;

(d)
all liabilities and obligations of others of the kind described in any of the preceding clauses (a), (b) and (c) that such specified Person has guaranteed or provided credit support or that are otherwise its legal liability or that are secured by any assets or property of such specified Person;

(e)
any and all deferrals, renewals, extensions, refinancing and refundings (whether direct or indirect) of, or amendments, modifications or supplements to, any liability of the kind described in any of the preceding clauses (a), (b), (c) or (d), or this clause (e), whether or not between or among the same parties; and

17

(f)       all
Disqualified Capital Stock of such specified Person (measured at the greater of its voluntary or involuntary maximum fixed repurchase price, including accrued and unpaid dividends).

For purposes hereof, the "maximum fixed repurchase price" of any Disqualified Capital Stock which does not have a fixed repurchase price shall be calculated in accordance with the terms of such Disqualified Capital Stock as if such Disqualified Capital Stock were purchased on any date on which Indebtedness shall be required to be determined pursuant to this Indenture, and if such price is based upon, or measured by, the fair market value of such Disqualified Capital Stock, such fair market value shall be determined in reasonable good faith by the Board of Directors of the issuer of such Disqualified Capital Stock.

The amount of any Indebtedness outstanding as of any date shall be (1) the accreted value thereof, in the case of any Indebtedness issued with original issue discount, but the accretion of original issue discount in accordance with the original terms of Indebtedness issued with an original issue discount will not be deemed to be an incurrence and (2) the principal amount thereof, together with any interest thereon that is more than 30 days past due, in the case of any other Indebtedness.

"*Indenture*" means this Indenture, as amended or supplemented from time to time in accordance with the terms hereof.

"*Indirect Participant*" means an entity that, with respect to DTC, clears through or maintains a direct or indirect, custodial relationship with a Participant.

"*Initial Notes*" means $130,000,000 aggregate principal amount of 8 ¾% Senior Secured Notes due 2012 issued on the Issue Date.

"*Initial Public Offering*" means an initial underwritten public offering of (a) the Issuers' common stock or (b) common stock of a holding company that wholly owns each of the Issuers, in each case for cash pursuant to an effective registration statement under the Securities Act following which the Issuers' or such holding company's, as the case may be, common stock is listed on a national securities exchange or quoted on the national market system of the Nasdaq Stock Market, Inc.

"*Initial Purchasers*" means Jefferies & Company, Inc. and Wells Fargo Securities, LLC, the initial purchasers of the Series A Notes under the Purchase Agreement.

"*Institutional Accredited Investor*" means an institution that is an "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act, which is not also a QIB.

"*Intercreditor Agreement*" means that certain Intercreditor Agreement among the Trustee and the lender or agent, as applicable, under the Credit Agreement to be dated as of the Issue Date and any amended or supplemented agreement or any replacement or

18

substitute agreement in accordance with this Indenture, in each case substantially in the form of Exhibit F attached hereto.

"*Interest*" means the interest payable on the Notes.

"*Interest Payment Date*" means the stated due date of an installment of Interest on the Notes.

"*Interest Record Date*" means a Interest Record Date specified in the Notes, whether or not such date is a Business Day.

"*Interest Reserve Account*" means the interest reserve account to be maintained by the Disbursement Agent and pledged to the Trustee pursuant to the terms of the Cash Collateral and Disbursement Agreement into which an amount, together with interest earned on such amount, sufficient to pay the first two interest payments on the Notes will be deposited on the date of the Indenture.

"*Interest Swap and Hedging Obligation*" means any obligation of any Person pursuant to any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate exchange agreement, currency exchange agreement, or any other agreement or arrangement designed to protect against fluctuations in interest rates, or currency values, including, without limitation, any arrangement whereby, directly or indirectly, such Person is entitled to receive from time to time periodic payments calculated by applying either a fixed or floating rate of interest on a stated notional amount in exchange for periodic payments made by such Person calculated by applying a fixed or floating rate of interest on the same notional amount.

"*Investment*" by any specified Person in any other Person (including an Affiliate) means (without duplication):

(a)      the acquisition (whether by purchase, merger, consolidation or otherwise) by such specified Person (whether for cash, property, services, securities or otherwise) of Equity Interests, Capital Stock, bonds, notes, debentures, partnership or other ownership interests or other securities, including any options or warrants, of such other Person or any agreement to make any such acquisition;

(b)      the making by such specified Person of any deposit with, or advance, loan or other extension of credit to, such other Person (including the purchase of property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such property to such other Person) or any commitment to make any such advance, loan or extension (but excluding accounts receivable, endorsements for collection or deposits arising in the ordinary course of business);

(c)      other than guarantees of the Issuers' Indebtedness or the Indebtedness of any Guarantor to the extent permitted by Section 4.7 hereof, the entering into by such specified Person of any guarantee of, or other credit support or

19

contingent obligation with respect to, Indebtedness or other liability of such other Person;

(d)      the making of any capital contribution by such specified Person to such other Person; and

(e)      Investments described in the immediately following paragraph.

The Issuers shall be deemed to make an Investment in an amount equal to the fair market value of the net assets of any subsidiary of the Issuers (or, if neither the Issuers nor any of the Subsidiaries has theretofore made an Investment in such subsidiary, in an amount equal to the Investments being made), at the time that such subsidiary is designated an Unrestricted Subsidiary, and any property transferred to an Unrestricted Subsidiary from the Issuers or a Subsidiary shall be deemed an Investment valued at its fair market value at the time of such transfer.  The Issuers or any of the Subsidiaries shall be deemed to have made an Investment in a Person that is or was a Subsidiary or a Guarantor if, upon the issuance, sale or other disposition of any portion of the Issuers' or any of the Subsidiary's ownership in the Capital Stock of such Person, such Person ceases to be a Subsidiary or Guarantor, as applicable.  The fair market value of each Investment shall be measured at the time made or returned, as applicable.

"*Issue Date*" means the date of first issuance of the Notes under this Indenture.

"*Issuers*" means the Company and Finance Corp.

"*Joint Venture Agreement*" means the Amended and Restated Joint Venture Agreement, dated March 9, 2005, by and between EW Common (as successor in interest to E&W), E&W (to the extent that E&W has remaining obligations under the original Joint Venture Agreement, dated June 29, 2004, by and between E&W (as successor in interest to I and P Corporation, Colorado) and Florida Hooters), and Florida Hooters, as in effect on the Issue Date, without giving effect to any amendment or supplement thereto or modification thereof, except such amendments, supplements and modifications that are not, individually or in the aggregate (together with any other amendments, supplements or modifications to any of the Lease-Related Agreements or License Agreements), adverse to Noteholders.

"*Lags*" means Lags Ventures, Inc., a Florida corporation.

"*Lease Related Agreements*" means, collectively, the Leases, the Joint Venture Agreement and the Operating Agreement.

"*Leases*" mean, together, the Casino Lease and the Hotel Lease.

"*Letter of Transmittal*" means the letter of transmittal to be prepared by the Issuers and sent to all Holders of the Notes for use by such Holders in connection with the Exchange Offer.

20

"*License Agreements*" means the following agreements, as in effect on the Issue Date, without giving effect to any amendment or supplement thereto or modification thereof, except such amendments, supplements and modifications that are not, individually or in the aggregate (together with any other amendments, supplements or modifications to any of the Lease-Related Agreements or License Agreements), adverse to Noteholders:

(i)    License Agreement, dated March 21, 2001, as amended, between HI Limited, as licensor, and HGC, as licensee, granting an exclusive license to use the Hooters brand in connection with gaming, casino and/or combined hotel, gaming and casino operations, including the right to operate a Hooters restaurant subject to the consent of LVW;

(ii)    Consent Agreement, dated July 30, 2004, between LVW and HGC, providing consent to HGC for operation of a Hooters restaurant at the Casino/Hotel Property;

(iii)    Amended and Restated Mark License Agreement, dated March 9, 2005, between Lags, as licensor, and Florida Hooters, as licensee, granting licensee a license to use the Dan Marino's Fine Food & Spirits and/or Martini Bar brands at the Casino/Hotel Property;

(iv)    Amended and Restated Assignment Agreement, dated March 9, 2005, between HGC and Florida Hooters, pursuant to which HGC assigned to Florida Hooters all of its rights under the License Agreement (referred to in clause (i) of this definition), and the Consent Agreement (referred to in clause (ii) of this definition) solely for use at the Casino/Hotel Property;

(v)    Amended and Restated Assignment Agreement, dated March 9, 2005, between Florida Hooters and the Company, pursuant to which Florida Hooters assigned to the Company all of the rights that it has, pursuant to the Assignment Agreement (referred to in clause (iv) of this definition), under the License Agreement (referred to in clause (i) of this definition) and the Consent Agreement (referred to in clause (ii) of this definition), and the Mark License Agreement (referred to in clause (iii) of this definition);

(vi)    License Agreement dated March 11, 2005, between Pete & Shorty's, Inc., a Florida corporation, as licensor, and the Company, as licensee granting a nonexclusive, nontransferable license to use the Pete & Shorty's mark in connection with a restaurant, bar, and lounge in the Hooters Casino Hotel in Las Vegas and affiliated merchandise, entertainment and casino services; and

(vii)    Affirmation and Acknowledgement, dated March 9, 2005, by HGC to the Company, pursuant to which HGC agreed not to operate, license or assign its rights under the License Agreement (referred to in clause (i) of this definition) to any other person for operation of a casino (x) in Clark County, Nevada, for a period of four (4) years commencing on the date of the Indenture or such earlier time as the

21

Notes are no longer outstanding or (y) on the Las Vegas Strip from the date thereof until the Notes are no longer outstanding.

"*Lien*" means, with respect to any asset, any mortgage, charge, pledge, lien (statutory or otherwise), privilege, security interest, hypothecation or other encumbrance upon or with respect to such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in any filing of or agreement to give any financing statement under the UCC (or equivalent statutes) of any jurisdiction, real or personal, movable or immovable, now owned or hereafter acquired.

"*Liquidated Damages*" means all liquidated damages then owing pursuant to the Registration Rights Agreement.

"*LVW*" means Las Vegas Wings, Inc., a Nevada corporation.

"*Management/Royalty Payments*" has the meaning set forth in Section 4.9(b)(6)(i).

"*Moody's*" means Moody's Investors Service, Inc. and its successors.

"*Net Cash Proceeds*" means the aggregate amount of cash or Cash Equivalents received (a) by the Issuers in the case of a sale of Qualified Capital Stock and (b) by the Issuers and the Subsidiaries in respect of an Asset Sale or an Event of Loss (including, in the case of an Event of Loss, the insurance proceeds, but excluding any liability insurance proceeds payable to the Trustee for any loss, liability or expense incurred by it),

(1)  *plus*
(without duplication), in the case of an issuance of Qualified Capital Stock upon any exercise, exchange or conversion of securities (including options, warrants, rights and convertible or exchangeable debt) of the Issuers that were issued for cash after the Issue Date, the amount of cash originally received by the Issuers upon the issuance of such securities (including options, warrants, rights and convertible or exchangeable debt),

(2)  *less*, in each case, the sum of all payments, fees and commissions and reasonable and customary expenses (including, without limitation, legal counsel, accounting and investment banking fees and expenses but excluding costs and expenses payable to an Affiliate of the Issuers) incurred in connection with such Asset Sale or sale of Qualified Capital Stock or Event of Loss, and

(3)  *less*, in the case of an Asset Sale or Event of Loss only, the sum of

(i)
the amount (estimated reasonably and in good faith by the Issuers) of income, franchise, sales and other applicable taxes required to be paid by the Issuer or any of the Subsidiaries in connection with such Asset Sale or Event of Loss in the taxable year that such sale is

22

consummated or such loss is incurred or in the immediately succeeding taxable year, the computation of which shall take into account the reduction in tax liability resulting from any available operating losses and net operating loss carryovers, tax credits and tax credit carryforwards, and similar tax attributes, plus

(ii)        the
amount of the marginal increase, if any, of the Permitted Tax Distribution directly attributable to such Asset Sale.

"*Net Revenue*" means, with respect to any Person for any period, the net revenues of such Person and its consolidated subsidiaries determined on a consolidated basis in accordance with GAAP for such period.

"*Non-U.S. Person*" means any Person other than a U.S. Person.

"*Notes Custodian*"
means the Trustee, as custodian with respect to the Notes in global form, or any successor entity thereto.

"*Obligation*" means any principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities and obligations payable under the documentation governing any Indebtedness, including, without limitation, interest after the commencement of any bankruptcy proceeding at the rate specified in the applicable instrument governing or evidencing such Indebtedness and including, with respect to the Registration Rights Agreement, Liquidated Damages, if any.

"*Officer*" means, with respect to any Person, the Chairman of the Board, the Chief Executive Officer, the President, the Chief Operating Officer, the Chief Financial Officer, the Treasurer, any Assistant Treasurer, the Controller, the Secretary, any Assistant Secretary or any Vice President of such Person or any other Person designated by the Board of Directors of such Person and serving in a similar capacity.

"*Officers' Certificate*" means the officers' certificate to be delivered upon the occurrence of certain events as set forth in this Indenture, and to be executed by two Officers of each Issuer, one of whom shall be the principal executive officer, the principal financial officer or the principal accounting officer.

"*Operating Agreement*" means the Amended and Restated Operating Agreement, dated March 9, 2005, of the Company, between Florida Hooters and EW Common, as in effect on the Issue Date, without giving effect to any amendment or supplement thereto or modification thereof, except such amendments, supplements and modifications that are not, individually or in the aggregate (together with any other amendments, supplements or modifications to any of the Lease-Related Agreements or License Agreements), adverse to Noteholders.

"*Operator*" means the person(s) engaged, hired and/or retained by the Company to manage and/or operate the Casino.

23

"*Operator Licensing Event*" means the receipt by the Company of all licenses from the Gaming Authorities to conduct gaming and liquor sales and other operations at the Casino/Hotel Property.

"*Opinion of Counsel*" means the opinion of counsel (subject to certain customary exceptions and assumptions) to be delivered upon the occurrence of certain events set forth in this Indenture (which Opinion of Counsel shall be an opinion from legal counsel who is reasonably acceptable to the Trustee). Such counsel may be an employee of or counsel to any of the Issuers, any Subsidiary or the Trustee.

"*Parcel 2*" means that certain parcel of real property on which a parking lot and a single story convention hall, which is currently used as executive office space, are located, as more particularly described on that certain ALTA Land Title Survey by M.S. Surveying, dated August 2, 2004, Job Number 04-07-012.

"*Parcel 2 Contribution*" means the contribution by the Issuers of Parcel 2 to a Permitted Entity in a transaction that satisfies each of the following: (a) the Licensing and Re-Opening shall have occurred prior to such contribution; (b) such contribution shall have been approved by a majority of the members of the Board of Directors of the Company that are disinterested in such transaction (if there are any directors who are so disinterested or, if none, a disinterested committee appointed by the Board of Directors of the Company for such purpose), (c) the Board of Directors of the Company shall have determined in

reasonable good faith that the Company will receive fair market value for such contribution in the form of Equity Interests in such Permitted Entity; (d) no Default or Event of Default shall have occurred and be continuing at the time of, or would occur after giving effect on a *pro forma* basis to, such contribution; and (e) immediately after giving effect to such contribution, on a *pro forma* basis, the Issuers could incur at least $1.00 of Indebtedness pursuant to the Debt Incurrence Ratio Test.

"*Parent Pledge Agreement*" means the Pledge Agreements, dated March 29, 2005, among the Parent Pledgors and The Bank of New York Trust Company, N.A., in its capacity as collateral agent.

"*Parent Pledgors*" means Florida Hooters and EW Common.

"*Participant*" means, with respect to the Depositary, Euroclear or Clearstream, a Person who has an account with the Depositary, Euroclear or Clearstream, respectively (and, with respect to The Depository Trust Company, shall include Euroclear and Clearstream).

"*Permitted C-Corp Conversion*" means a transaction resulting in an Issuer becoming subject to tax under the Code as a corporation (a "*C Corporation*"); *provided*, that:

    (1)

        the C Corporation resulting from such transaction, if a successor to such Issuer, (a) is a corporation, limited liability company or other entity organized and existing under the laws of any state of the United States or the District of Columbia, (b) assumes all of the obligations of such Issuer

24

under the Notes, the Collateral Agreements and this Indenture pursuant to a supplemental indenture in form reasonably satisfactory to the Trustee and (c) will have Consolidated Net Worth immediately after the transaction equal to or greater than the Consolidated Net Worth of such Issuer immediately preceding the transaction;

(2)     after giving effect to such transaction no Default or Event of Default exists;

(3)     prior to the consummation of such transaction, such Issuer shall have delivered to the Trustee (a) an Opinion of Counsel reasonably acceptable to the Trustee to the effect that the holders of the outstanding Notes will not recognize income gain or loss for United States federal income tax purposes as a result of such Permitted C-Corp Conversion and will be subject to United States federal income tax on the same amounts, in the same manner, and at the same times as would have been the case if such Permitted C-Corp Conversion had not occurred and (b) an Officers' Certificate as to compliance with all of the conditions set forth in paragraphs (1), (2) and (3)(a) above; and

(4)     such transaction would not (a) result in the loss or suspension or material impairment of any Gaming License unless a comparable replacement Gaming License is effective prior to or simultaneously with such loss, suspension or material impairment or (b) require any holder or beneficial owner of Notes to obtain a Gaming License or be qualified or found suitable under any applicable gaming laws.

"*Permitted Entity*" means a joint venture or Unrestricted Subsidiary that satisfies each of the following: (a) the Company owns directly or indirectly in the aggregate at least 50% of the Voting Equity Interests of such entity; (b) no Affiliate of the Company is a direct or indirect obligor, contingently or otherwise, of any Indebtedness of such entity or a direct or indirect holder of any Equity Interests of such entity or otherwise has an interest in such entity, other than through its direct or indirect ownership interests in the Company; (c) such entity satisfies each of the requirements of clauses (a) through (d) of the proviso of paragraph (1) of the definition of Unrestricted Subsidiary; (d) such entity was formed for the sole purpose of owning and developing Parcel 2; (e) the Trustee, on behalf of the Noteholders, has a perfected security interest in all of the Equity Interests owned, directly or indirectly, by the Company in such entity; and (f) unless the Company owns directly or indirectly in the aggregate 100% of the Equity Interests of such entity, such entity does not own, operate or manage any gaming facilities or Gaming Equipment or otherwise engage in or conduct any other gaming or racing activities.

"*Permitted Indebtedness*" means:

(a)     Indebtedness evidenced by the Notes and the Guarantees issued pursuant to this Indenture up to the amounts being issued on the original Issue Date less any amounts repaid or retired;

25

(b)

Permitted Refinancing Indebtedness with respect to any Indebtedness (including Disqualified Capital Stock) described in clause (a) or (c) or incurred pursuant to the Debt Incurrence Ratio Test, or which was refinanced pursuant to this clause (b);

(c)

FF&E Financing and Indebtedness represented by Capitalized Lease Obligations, mortgage financings or other Purchase Money Obligations; *provided*, that (1) no Indebtedness incurred under the Notes is utilized for the purchase or lease of assets financed with such FF&E Financing or such other Indebtedness, and (2) the aggregate principal amount of such Indebtedness (including any Permitted Refinancing Indebtedness and any other Indebtedness incurred to repay, redeem, discharge, retire, defease, refund, refinance or replace any Indebtedness incurred pursuant to this clause (c)) outstanding at any time pursuant to this clause (c), other than any Gaming FF&E Financing, does not exceed $2.5 million;

(d)   (i)     Indebtedness incurred by any Issuer that is owed to (borrowed from) any Guarantor, *provided*, that (x) such Indebtedness shall be unsecured and contractually subordinated in all respects to such Issuer's obligations pursuant to the Notes and (y) any event that causes such Guarantor no longer to be a Guarantor (including by designation as an Unrestricted Subsidiary) shall be deemed to be a new incurrence by such Issuer of such Indebtedness and any guarantor thereof subject to Section 4.7 hereof,

(ii)

Indebtedness incurred by any Guarantor that is owed to (borrowed from) any other Guarantor or any Issuer, *provided*, that (x) such Indebtedness shall be unsecured and contractually subordinated in all respects to such Guarantor's obligations pursuant to such Guarantor's Guarantee and (y) any event that causes the Guarantor lender no longer to be a Guarantor (including a designation as an Unrestricted Subsidiary) shall be deemed to be a new incurrence by such Guarantor borrower of such Indebtedness and any guarantor thereof subject to Section 4.7 hereof, and

(iii)

Indebtedness incurred by any Subsidiary (other than a Guarantor) and owed to (borrowed from) any Issuer, any Guarantor or any other Subsidiary; *provided*, that (x) such Indebtedness shall be unsecured and contractually subordinated in all respects to such Issuer's obligations pursuant to the Notes and such Guarantor's obligations pursuant to such Guarantor's Guarantee, as applicable, (y) any event that causes the Subsidiary borrower or the Subsidiary or Guarantor lender to no longer be a Subsidiary (including a designation as an Unrestricted Subsidiary), shall be deemed to be a new incurrence of such Indebtedness subject to Section 4.7 hereof, and (z) the Investment in the form of the loan is a "Permitted Investment" (other than pursuant to clause (c) of the definition

26

thereof) or is otherwise not prohibited at the time of incurrence by Section 4.9 hereof;

(e)

Indebtedness solely in respect of bankers acceptances, letters of credit and performance bonds (to the extent that such incurrence does not result in the incurrence of any obligation to repay any obligation relating to borrowed money or other Indebtedness), all in the ordinary course of business in accordance with customary industry practices, in amounts and for the purposes customary in the Issuers' industry;

(f)

Interest Swap and Hedging Obligations that are incurred in the ordinary course of business for the purpose of fixing or hedging interest rate or currency risk with respect to any fixed or floating rate Indebtedness that is permitted by this Indenture to be outstanding or any receivable or liability the payment of which is determined by reference to a foreign currency; *provided*, that the notional amount of any such Interest Swap and Hedging Obligation does not exceed the principal amount of Indebtedness or other obligations to which such Interest Swap and Hedging Obligation relates;

(g)

Indebtedness not otherwise permitted by clauses (a) through (f) above in an aggregate principal amount (or accreted value, as applicable) at any time outstanding pursuant to this clause (g), including all Permitted Refinancing Indebtedness incurred to repay, redeem, discharge, retire, defease, refund, refinance or replace any Indebtedness incurred pursuant to this clause (g), not to exceed $2.5 million;

(h)        the EW Preferred Note Loan; and

(i)        Existing Indebtedness.

"*Permitted Investment*" means:

(a)        any Investment in any of the Notes or the Guarantees;

(b)        any Investment in cash or Cash Equivalents;

(c)

intercompany notes to the extent permitted under clause (i) or (ii) of clause (e) of the definition of "Permitted Indebtedness;"

(d)

any Investment by the Issuers or any Guarantor in a Person in a Related Business if as a result of such Investment such Person becomes a Guarantor or such Person is merged with or into the Issuers or a Guarantor;

(e)        Investments in existence on the Issue Date;

(f)

any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with Section 4.13 hereof.

27

(g)    credit extensions to gaming customers in the ordinary course of business, consistent with industry practice;

(h)    loans or advances to employees of the Issuers and the Subsidiaries made in the ordinary course of business in an aggregate amount not to exceed $500,000 at any one time outstanding; and

(i)    the Parcel 2 Contribution and the interest in the Permitted Entity received pursuant thereto; *provided*, that if the entity to which the Parcel 2 Contribution was made either (x) ceases to qualify as a "Permitted Entity" or (y) disposes of or otherwise ceases to own Parcel 2, then the Issuers will be deemed to have made an Investment equal to the value of the Issuers' Investment in such entity at such time (valued in each case as provided in the definition of "Investment") and the value of such Investment at such time will, for the period such Investment does not so qualify, be included in the calculation of the aggregate amount of Restricted Payments referenced in Section 4.9(a)(4).

"*Permitted Liens*" means:

(a)    Liens existing on the Issue Date;

(b)    Liens imposed by governmental authorities for taxes, assessments or other charges not yet subject to penalty or which are being contested in good faith and by appropriate proceedings, if adequate reserves with respect thereto are maintained on the Issuers' books in accordance with GAAP;

(c)    statutory liens of carriers, warehousemen, mechanics, materialmen, landlords, repairmen or other like Liens arising by operation of law in the ordinary course of business provided that (1) the underlying obligations are not overdue for a period of more than 30 days, or (2)(i) such Liens are being contested in good faith and either by appropriate proceedings or in accordance with applicable law and (ii) adequate reserves with respect thereto are maintained on the Issuers' books in accordance with GAAP;

(d)    Liens securing the performance of bids, trade contracts (other than borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)    easements, rights-of-way, zoning and similar restrictions and other similar encumbrances or title defects incurred in the ordinary course of business consistent with industry practices which, singly or in the aggregate, do not in any case materially detract from the value of the property subject thereto (as such property is used by the Issuers or any of the Subsidiaries) or interfere with the ordinary conduct of the business of the Issuers or any of the Subsidiaries;

28

(f)     pledges or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security legislation;

(g)     Liens securing Indebtedness of a Person existing at the time such Person becomes a Subsidiary or is merged with or into the Issuers or a Subsidiary or any Lien securing Indebtedness incurred in connection with an Acquisition, *provided*, that such Liens were in existence prior to the date of such acquisition, merger or consolidation, were not incurred in anticipation thereof, and do not extend to any other assets;

(h)     Liens that secure FF&E Financing, Purchase Money Indebtedness or Capitalized Lease Obligations permitted to be incurred pursuant to clause (c) of the definition of "Permitted Indebtedness;" *provided* such Liens do not extend to or cover any property or assets other than those being acquired, leased or developed with the proceeds of such Indebtedness;

(i)     leases or subleases granted to other Persons in the ordinary course of business not materially interfering with the conduct of the business of the Issuers or any of the Subsidiaries or materially detracting from the value of the relative assets of the Issuers or any Subsidiary;

(j)     Liens arising from precautionary UCC financing statement filings regarding operating leases entered into by the Issuers or any of the Subsidiaries in the ordinary course of business;

(k)     Liens securing Permitted Refinancing Indebtedness incurred to refinance any Indebtedness that was previously so secured in a manner no more adverse to the Holders of the Notes than the terms of the Liens securing such refinanced Indebtedness, *provided*
        that the Indebtedness secured is not increased and the Lien is not extended to any additional assets or property that would not have been security for the Indebtedness refinanced;

(l)     Liens securing Indebtedness incurred under the Credit Agreement pursuant to the Credit Facility Basket;

(m)     Liens securing the Notes and the Guarantees; and

(n)     Liens in favor of the Issuers or any Guarantor, which are assigned to the Trustee to secure the payment of the Notes or a Guarantee, as applicable.

"*Permitted Refinancing Indebtedness*" means Indebtedness (including Disqualified Capital Stock):

(a)     issued in exchange for, or the proceeds from the issuance and sale of which are used substantially concurrently to repay, redeem, defease, refund, refinance, discharge or otherwise retire for value, in whole or in part, or

29

(b)        constituting an amendment, modification or supplement to, or a deferral or renewal of ((a) and (b) above are, collectively, a "*Refinancing*"),

any Indebtedness (including Disqualified Capital Stock) in a principal amount or, in the case of Disqualified Capital Stock, liquidation preference, not to exceed (after deduction of reasonable and customary fees and expenses incurred in connection with the Refinancing plus the amount of any premium paid in connection with such Refinancing) the lesser of (1) the principal amount or, in the case of Disqualified Capital Stock, liquidation preference, of the Indebtedness (including Disqualified Capital Stock) so Refinanced and (2) if such Indebtedness being Refinanced was issued with an original issue discount, the accreted value thereof (as determined in accordance with GAAP) at the time of such Refinancing;

*provided*, that:

(A)        such Permitted Refinancing Indebtedness shall only be used to refinance outstanding Indebtedness (including Disqualified Capital Stock) of such Person issuing such Permitted Refinancing Indebtedness,

(B)        such Permitted Refinancing Indebtedness shall (x) not have an Average Life shorter than the Indebtedness (including Disqualified Capital Stock) to be so refinanced at the time of such Refinancing and (y) in all respects, be no less contractually subordinated or junior, if applicable, to the rights of Holders of the Notes than was the Indebtedness (including Disqualified Capital Stock) to be refinanced,

(C)        such Permitted Refinancing Indebtedness shall have a final stated maturity or redemption date, as applicable, no earlier than the final stated maturity or redemption date, as applicable, of the Indebtedness (including Disqualified Capital Stock) to be so refinanced or, if sooner, 91 days after the Stated Maturity of the Notes, and

(D)        such Permitted Refinancing Indebtedness shall be secured (if secured) in a manner no more adverse to the Holders of the Notes than the terms of the Liens (if any) securing such refinanced Indebtedness, including, without limitation, the amount of Indebtedness secured shall not be increased.

"*Permitted Tax Distributions*"

in respect of an Issuer means, with respect to any taxable year or portion thereof commencing with the Issue Date in which such Issuer is a Flow Through Entity, the sum of: (i) the product of (a) the excess of (1) all items of taxable income or gain (other than capital gain) of such Issuer for such year or portion thereof over (2) all items of taxable deduction or loss (other than capital loss) of such Issuer for such year or portion thereof and (b) the Applicable Income Tax Rate, plus (ii) the product of (a) the net capital gain (i.e., the excess of net long-term capital gain over net short-term capital loss), if any, of such Issuer for such year or portion thereof and (b) the Applicable Capital Gain Tax Rate, plus (iii) the product of (a) the net short-term capital gain (i.e., the

30

excess of net short-term capital gain over net long-term capital loss), if any, of such Issuer for such year or portion thereof and (b) the Applicable Income Tax Rate, minus (iv) the aggregate Tax Loss Benefit Amount for such Issuer for such year or portion thereof; *provided*, that in no event shall the Applicable Income Tax Rate or the Applicable Capital Gain Tax Rate exceed the greater of (i) the highest aggregate applicable effective marginal rate of United States federal, state, and local income tax to which a corporation doing business in the State of Nevada would be subject to in the relevant year of determination (as certified to the Trustee by a nationally recognized tax accounting firm) plus 5% and (ii) 60%. For purposes of calculating the amount of the Permitted Tax Distributions the items of taxable income, gain, deduction or loss (including capital gain or loss) of any Flow Through Entity that is a subsidiary of which such Issuer is treated for United States federal income tax purposes as a member (but only for periods for which such Flow Through Entity is treated as a Flow Through Entity), which items of income, gain, deduction or loss are allocated to or otherwise treated as items of income, gain, deduction or loss of such Issuer for United States federal income tax purposes, shall be included in determining the taxable income, gain, deduction or loss (including capital gain or loss) of such Issuer.

Estimated tax distributions may be made within thirty days following March 15, May 15, August 15, and December 15 based upon an estimate of the excess of (x) the tax distributions that would be payable for the period beginning on January 1 of such year and ending on March 31, May 31, August 31, and December 31 if such period were a taxable year (computed as provided above) over (y) distributions attributable to all prior periods during such taxable year.

The amount of the Permitted Tax Distribution for a taxable year shall be re-computed promptly after (i) the filing by such Issuer and each subsidiary of such Issuer that is treated as a Flow Through Entity of their respective annual income tax returns and (ii) United States federal or state taxing authority finally determines that the amount of the items of taxable income, gain, deduction, or loss of such Issuer or any such subsidiary that is treated as a Flow Through Entity for such taxable year or the aggregate Tax Loss Benefit Amount carried forward to such taxable year should be adjusted (each of clauses (i) and (ii) a "*Tax Calculation Event*"). To the extent that the Permitted Tax Distributions previously distributed in respect of any taxable year are either greater than (a "*Tax Distribution Overage*") or less than (a "*Tax Distribution Shortfall*") the Permitted Tax Distributions with respect to such taxable year, as determined by reference to the computation of the amount of the items of income, gain, deduction, or loss of such Issuer and each such subsidiary in connection with a Tax Calculation Event, the amount of the estimated Permitted Tax Distributions that may be made on the estimated tax distribution date immediately following such Tax Calculation Event shall be reduced or increased as appropriate to the extent of the Tax Distribution Overage or the Tax Distribution Shortfall. To the extent that a Tax Distribution Overage remains after the estimated tax distribution date immediately following such Tax Calculation Event, the amount of the estimated Permitted Tax Distribution that may be made on the subsequent estimated tax distribution date shall be reduced to the extent of such Tax Distribution Overage.

Prior to making any Permitted Tax Distributions, such Issuer shall require each Equity Holder to agree that promptly after the second estimated tax distribution date

31

following a Tax Calculation Event, such Equity Holder shall reimburse such Issuer to the extent of its *pro rata* share (based on the portion of Permitted Tax Distributions distributed to such Equity Holder for the taxable year) of any remaining Tax Distribution Overage.

"*Person*" or "*person*" means any individual, corporation, limited liability company, joint stock company, joint venture, partnership, limited liability partnership, association, unincorporated organization, trust, governmental regulatory entity, country, state, agency or political subdivision thereof, municipality, county, parish or other entity.

"*Preferred Stock*" means any Equity Interest of any class or classes of a Person (however designated) which is preferred as to payments of dividends or distributions, or as to distributions upon any liquidation or dissolution, over Equity Interests of any other class of such Person.

"*Private Placement Legend*" means the legend set forth in Section 2.6(g)(i)(A) hereof to be placed on all Notes issued under this Indenture except where specifically stated otherwise by the provisions of this Indenture.

"*Pro forma*" or "*pro forma*" shall have the meaning set forth in Regulation S-X under the Securities Act, unless otherwise specifically stated herein.

"*Property*" means the real property located at 115 and 155 East Tropicana Avenue, Law Vegas, Nevada.

"*Purchase Agreement*" means the Purchase Agreement, dated as of March 23, 2005, by and among the Issuers, the Parent Pledgors (solely with respect to Sections 5(i), 6(c), 6(g), 6(h), 6(n), 6(o), 6(p), 6(q), 6(r), and 6(z) thereof to the extent applicable to each of the Parent Pledgors) and the Initial Purchasers.

"*Purchase Money Indebtedness*" of any Person means any Indebtedness of such Person to any seller or other Person incurred solely to finance the acquisition (including, in the case of a Capitalized Lease Obligation, the lease), construction, installation or improvement of any after-acquired real or personal tangible property which, in the reasonable good faith judgment of the applicable Issuer's Board of Directors, is directly related to a Related Business of the Issuers or any of the Subsidiaries and which is incurred concurrently with such acquisition, construction, installation or improvement and is secured only by the assets so financed.

"*QIB*" means a "qualified institutional buyer" as defined in Rule 144A.

"*Qualified Capital Stock*" means, with respect to any Person, any Capital Stock of such Person that is not Disqualified Capital Stock.

"*Qualified Equity Offering*" means an underwritten public offering for cash pursuant to a registration statement filed with the Commission in accordance with the Securities Act of (a) Qualified Capital Stock of the Issuers or (b) Qualified Capital Stock of a holding company that wholly owns each of the Issuers; *provided* that in the case of

32

this clause (b), such holding company contributes to the capital of the Issuers the portion of the net cash proceeds of such offering necessary to pay the aggregate redemption price, together with accrued and unpaid Interest (and Liquidated Damages, if any) to the Redemption Date, of the Notes to be redeemed pursuant to the provisions described in Section 3.7(b) hereof.

"*Qualified Exchange*" means:

(1)

any legal defeasance, redemption, retirement, repurchase or other acquisition of Capital Stock, or Indebtedness of the Issuer issued on or after the Issue Date with the Net Cash Proceeds received by the Issuer from the substantially concurrent sale of its Qualified Capital Stock (other than to a Subsidiary); or

(2)

any issuance of Qualified Capital Stock of the Issuer in exchange for any Capital Stock or Indebtedness of the Issuer issued on or after the Issue Date.

"*Re-opening*" means the time when the Renovation shall have been substantially completed and the facilities of the Hooters Hotel Casino have been opened to the general public, are receiving customers in the ordinary course of business and are operating in accordance with applicable laws in all material respects.

"*Recourse Indebtedness*" means Indebtedness (a) as to which the Issuers or one of the Subsidiaries (1) provides credit support of any kind (including any undertaking, guarantee agreement or instrument that would constitute Indebtedness), (2) is directly or indirectly liable (as a guarantor or otherwise), or (3) constitutes the lender, or (b) a default with respect to which (including any rights that the holders thereof may have to take enforcement action against an Unrestricted Subsidiary) would permit (upon notice, lapse of time or both) a holder of any other Indebtedness of the Issuers or any of the Subsidiaries (other than the Notes and Guarantees) to declare a default on such other Indebtedness or cause the payment thereof to be accelerated or payable prior to its stated maturity.

"*Reference Period*" with regard to any Person means the four full fiscal quarters (or such lesser number of full fiscal quarters following the Re-opening) ended immediately preceding any date upon which any determination is to be made pursuant to the terms of the Notes or this Indenture. For any date of determination that is during the second, third or fourth fiscal quarters following the Re-opening, the Reference Period shall be determined as follows: (x) for any date of determination that is during the second full fiscal quarter following the Re-opening, the Reference Period shall be the first full fiscal quarter following the Re-opening (the "*First Reference Period*"), (y) for any date of determination that is during the third full fiscal quarter following the Re-opening, the Reference Period shall be the first and second full fiscal quarters following the Re-opening (the "*Second Reference Period*"), (z) for any date of determination that is during the fourth full fiscal quarter following the Re-opening, the Reference Period shall be the first three full fiscal quarters following the Re-opening (the "*Third Reference Period*").

33

"*Reg S Permanent Global Note*" means one or more permanent Global Notes bearing the Private Placement Legend, that will be issued in an aggregate amount of denominations equal in total to the outstanding principal amount of the Reg S Temporary Global Note upon expiration of the Distribution Compliance Period.

"*Reg S Temporary Global Note*" means one or more temporary Global Notes bearing the Private Placement Legend and the Reg S Temporary Global Note Legend, issued in an aggregate amount of denominations equal in total to the outstanding principal amount of the Notes initially sold in reliance on Rule 903 of Regulation S.

"*Reg S Temporary Global Note Legend*" means the legend set forth in Section 2.6(g)(3) hereof, which is required to be placed on all Reg S Temporary Global Notes issued under this Indenture.

"*Registration Rights Agreement*" means the Registration Rights Agreement, dated as of the Issue Date, by and among the Issuers and the other parties named on the signature pages thereof, and any substantially identical registration rights agreement with respect to any Additional Notes as such agreement may be amended, modified or supplemented from time to time.

"*Regulation S*" means Regulation S promulgated under the Securities Act, as it may be amended from time to time, and any successor provision thereto.

"*Regulation S Global Note*" means a Reg S Temporary Global Note or a Reg S Permanent Global Note, as the case may be.

"*Related Business*" means the business conducted (or proposed to be conducted) by the Issuer and the Subsidiaries as of the Issue Date and any and all businesses that in the reasonable good faith judgment of the applicable Issuer's Board of Directors are materially related businesses.

"*Renovation*" means the redesign and renovation of the Hotel San Remo Casino & Casino/Hotel Property as a Hooters Casino, Casino/Hotel Property and Entertainment Center having and using the Hooters Brand and concept. As part of the Renovation, the Hotel San Remo Casino & Casino/Hotel Property shall be re-themed and re-named, shall include a Hooters Restaurant and may include such concepts as a Dan Marino Town Tavern and Martini Bar.

"*Renovation Disbursement Account*" means the construction disbursement account to be maintained by the Disbursement Agent and pledged to the Trustee pursuant to the terms of the Cash Collateral and Disbursement Agreement.

"*Renovation Documents*" has the meaning set forth in the Cash Collateral and Disbursement Agreement.

"*Representative*" means the Trustee or any trustee, agent or representative for any Senior Debt.

34

"*Responsible Officer*" shall mean, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"*Restricted Definitive Note*" means one or more Definitive Notes bearing the Private Placement Legend, issued under this Indenture.

"*Restricted Global Note*" means one or more Global Notes bearing the Private Placement Legend, issued under this Indenture; *provided*, that in no case shall an Exchange Note issued in accordance with this Indenture and the terms of the Registration Rights Agreement be a Restricted Global Note.

"*Restricted Investment*" means, in one or a series of related transactions, any Investment, other than a Permitted Investment.

"*Restricted Payment*" means, with respect to any Person:

(a)     the declaration or payment of any dividend or other distribution in respect of Equity Interests of such Person,

(b)
any payment (except to the extent with Qualified Capital Stock) on account of the purchase, redemption or other acquisition or retirement for value of Equity Interests of such Person,

(c)
other than with the proceeds from the substantially concurrent sale of, or in exchange for, Permitted Refinancing Indebtedness any purchase, redemption, or other acquisition or retirement for value of, any payment in respect of, any amendment of the terms of or any defeasance of, any Subordinated Indebtedness, directly or indirectly, by such Person or a Subsidiary of such Person prior to the scheduled maturity, any scheduled repayment of principal, or scheduled sinking fund payment, as the case may be, of such Indebtedness and

(d)     any Restricted Investment by such Person;

*provided, however*, that the term "Restricted Payment" does not include (1) any dividend, distribution or other payment on or with respect to Equity Interests of an issuer to the extent payable solely in shares of Qualified Capital Stock of such issuer, or (2) any dividend, distribution or other payment to the Issuers, or to any of the Guarantors, by the Issuers or any of the Subsidiaries and any Investment in any Guarantor by the Issuers or any Subsidiary.

"*Rule 144*" means Rule 144 promulgated under the Securities Act, as it may be amended from time to time, and any successor provision thereto.

35