and the Trustee, may rescind, on behalf of all Holders, any such declaration of acceleration and its consequences if all existing Events of Default (other than the non-payment of the principal of, premium, if any, and Interest (and Liquidated Damages, if any) on the Notes which have become due solely by such declaration of acceleration) have been cured or waived as provided in Section 6.4 hereof.

(c)     No such waiver shall cure or waive any subsequent Default or impair any right consequent thereon.

**Section 6.3          Other Remedies**

If an Event of Default occurs and is continuing, subject to compliance with any applicable Gaming Laws and to the terms of the Intercreditor Agreement, the Trustee, may pursue any available remedy to collect the payment of principal, premium, if any, and Interest (and Liquidated Damages, if any) on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies are cumulative to the extent permitted by law.

**Section 6.4          Waiver of Defaults**

Subject to Section 6.7 hereof, and prior to the declaration of acceleration of the maturity of the Notes, the Holders of a majority in aggregate principal amount of the outstanding Notes, by written notice to the Issuers and to the Trustee, may, on behalf of all Holders, waive any existing or past Default or Event of Default hereunder and its consequences under this Indenture, except (i) a Default in the payment of principal of or premium, if any, or Interest (or Liquidated Damages, if any) on any Note not yet cured as specified in clauses (1) and (2) of Section 6.1 hereof , (ii) a Default with respect to any covenant or provision hereof which, under Article IX, cannot be modified or amended without the consent of the Holder of each outstanding Note affected, which Default or Event of Default may be waived only with consent of the Holder of each outstanding Note affected, and (iii) a Default with respect to any provision requiring a supermajority approval to amend, which Default may only be waived by such a supermajority.

Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or impair any right arising therefrom.

**Section 6.5          Control by Majority**

Subject to all provisions of this Indenture and applicable law, including Gaming Laws, the Holders of a majority in aggregate principal amount of the then outstanding Notes may direct the time, method and place of conducting any proceeding

90

for exercising any remedy available to the Trustee or exercising any trust or power conferred on the Trustee. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture, that the Trustee determines in good faith may be unduly prejudicial to the rights of other Holders not joining in the giving of such direction or that may involve the Trustee in personal liability, and the Trustee may take any other action it deems proper that is not inconsistent with any such direction received from Holders. Subject to Section 7.1 hereof, the Trustee shall be under no obligation to exercise any of its rights or powers under this Indenture at the request, order or direction of any of the Holders, unless such Holders have offered to the Trustee security or indemnity satisfactory to it.

**Section 6.6**      **Limitation on Suits**

A Holder may pursue a remedy with respect to this Indenture or the Notes only if:

(a)      such Holder gives to the Trustee written notice of a continuing Event of Default;

(b)      the Holders of at least 25% in aggregate principal amount of the then outstanding Notes make a written request to the Trustee to pursue the remedy;

(c)      such Holder or Holders offer and, if requested, provide to the Trustee indemnity satisfactory to the Trustee against any costs, liability or expense;

(d)      the Trustee does not comply with the request within 60 days after receipt of the request and the offer and, if requested, the provision of indemnity; and

(e)      during such 60-day period the Holders of a majority in aggregate principal amount of the then outstanding Notes do not give the Trustee a direction inconsistent with the request.

A Holder may not use this Indenture to affect, disturb or prejudice the rights of another Holder or to obtain a preference or priority over another Holder (it being understood that the Trustee does not have an affirmative duty to ascertain whether or not such actions or forbearances are unduly prejudicial to such Holders).

**Section 6.7**      **Rights of Holders of Notes to Receive Payment**

Notwithstanding any other provision of this Indenture, except for restrictions imposed by Gaming Laws or Gaming Authorities on payments by entities holding Gaming Licenses and except as permitted by Section 9.2 hereof, the right of any Holder to receive payment of the principal of, premium and Interest (and Liquidated Damages, if any) on a Note, on or after the respective due dates expressed in the Note (including in connection with an offer to purchase) or to bring suit for the enforcement of

91

any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder.

**Section 6.8    Collection Suit by Trustee**

If an Event of Default specified in Section 6.1(1) or (2) hereof occurs and is continuing, the Trustee is authorized to recover judgment in its own name and as trustee of an express trust against the Issuers for the whole amount of principal of, premium and Interest (and Liquidated Damages, if any) remaining unpaid on the Notes and Interest on overdue principal, premium, if any, and, to the extent lawful, Interest (and Liquidated Damages, if any), and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

**Section 6.9    Trustee May File Proofs of Claim**

The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and the Holders allowed in any judicial proceedings relative to the Issuers (or any other obligor upon the Notes), its creditors or its property and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.7 hereof.  To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.7 hereof out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.  Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding; *provided, however,*
that the Trustee may, on behalf of the Holders, vote for the election of a trustee in bankruptcy or similar official and may be a member of the creditor's committee.

**Section 6.10    Priorities**

Subject to the terms of the Intercreditor Agreement, if the Trustee collects any money pursuant to this Article, it shall pay out the money in the following order:

92

*First*: to the Trustee, its agents and attorneys for amounts due under Section 7.7 hereof, including payment of all compensation, expense and liabilities incurred, and all advances made, by the Trustee and the costs and expenses of collection (including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel);

*Second*: to Holders for amounts due and unpaid on the Notes for principal, premium, if any, and Interest (and Liquidated Damages, if any), ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium and Interest (and Liquidated Damages, if any), respectively;

*Third*: without duplication, to the Holders for any other Obligations owing to the Holders under the Notes or this Indenture; and

*Fourth*: to the Issuers or to such party as a court of competent jurisdiction shall direct.

The Trustee may fix a record date and payment date for any payment to Holders pursuant to this Section 6.10.

**Section 6.11**     **Undertaking for Costs**

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.11 does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.7 hereof, or a suit by Holders of more than 10% in aggregate principal amount of the then outstanding Notes.

**Section 6.12**     **Disqualified Holders**

To the extent required by applicable Gaming Laws, Notes held by a Disqualified Holder shall, so long as held by such Person, be disregarded for purposes of providing notices, directions, waivers or other actions and determining the sufficiency of such notices, directions, waivers or action under this Article VI.

**ARTICLE VII**
**TRUSTEE**

**Section 7.1**     **Duties of Trustee**

(a)     If an Event of Default of which the Trustee has knowledge has occurred and is continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as

93

a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)        Except during the continuance of an Event of Default of which the Trustee has knowledge:

(i)        the duties of the Trustee shall be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)        in the absence of bad faith on its part, the Trustee may conclusively rely, without investigation, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; but in the case of any such certificates or opinions which are specifically required by any provision hereof to be furnished to the Trustee, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but the Trustee need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c)        The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)        this paragraph (c) does not limit the effect of paragraph (b) of this Section 7.1;

(ii)        the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer of the Trustee, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts;

(iii)        the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.5 hereof; and

(iv)        no provision of this Indenture shall require the Trustee to expend or risk its own funds or incur any liability. The Trustee shall be under no obligation to exercise any of its rights and powers under this Indenture at the request of any Holders, unless such Holder shall have offered to the Trustee security and indemnity satisfactory to it against any loss, liability or expense.

(d)        Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to Sections 7.1 and 7.2 hereof.

(e)        The Trustee is hereby authorized and directed to and shall enter into the Intercreditor Agreement.

94

http://www.sec.gov/Archives/edgar/data/1326686/0001047469050147461...

(f)        The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the

Issuer. Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(g)        The Trustee shall cooperate and comply with any order or directive of a Gaming Authority in connection with this Indenture, including that the Trustee submit an application for any license, finding of suitability or other approval pursuant to any Gaming Laws (unless the Trustee tenders its resignation) and will cooperate fully and completely in any proceeding related to such application; *provided*

the Issuers agree to prepare (or cause the Guarantors to prepare) all documentation in connection with any such order, directive, application and proceeding and to reimburse the Trustee for all costs and expenses incurred by it in connection therewith.

## Section 7.2    Rights of Trustee

(a)        In connection with the Trustee's rights and duties under this Indenture, the Trustee may conclusively rely upon any document believed by it to be genuine and to have been signed or presented by the proper Person. The Trustee need not investigate any fact or matter stated in the document.

(b)        Before the Trustee acts or refrains from acting under this Indenture, it shall require an Officers' Certificate or an Opinion of Counsel or both. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on such Officers' Certificate or Opinion of Counsel. The Trustee may consult with counsel of its selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)        The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder by or through its attorneys and agents and shall not be responsible for the misconduct or negligence of any agent or attorney appointed with due care.

(d)        The Trustee shall not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture.

(e)        Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Issuers shall be sufficient if signed by an Officer of the Issuer.

(f)        The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders unless such Holders shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities that might be incurred by it in compliance with such request or direction.

95

(g)        Except with respect to Section 4.1 hereof, the Trustee shall have no duty to inquire as to the performance of the Issuers' covenants in Article IV hereof.  In addition, the Trustee shall not be deemed to have knowledge of any Default or Event of Default except (i) any Event of Default occurring pursuant to Sections 6.1(1) or 6.1(2) hereof or (ii) any Default or Event of Default of which the Trustee shall have received written notification in the manner set forth in this Indenture or a Responsible Officer of the Trustee shall have obtained actual knowledge.  Delivery of reports, information and documents to the Trustee under Section 4.3 hereof is for informational purposes only and the Trustee's receipt of the foregoing shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Issuers' compliance with any of their covenants thereunder (as to which the Trustee is entitled to rely exclusively on an Officers' Certificate).

(h)        The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document, but the Trustee may, in its discretion, make such further inquiry or investigation into such facts or matters as it may see fit.

(i)        The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities (including as Collateral Agent) hereunder and under each of the Collateral Agreements, and each agent, custodian and other Person employed to act hereunder and under each of the Collateral Agreements.

(j)        In no event shall the Trustee be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(k)        The Trustee may request that the Issuer deliver an Officers' Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any person authorized to sign an Officers' Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

**Section 7.3        <u>Individual Rights of Trustee</u>**

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the
Issuers or any Affiliate of the Issuers with the same rights it would have if it were not Trustee.  However, in the event that the Trustee acquires any conflicting interest (as defined in the TIA) it must eliminate such conflict within 90 days, apply to the Commission for permission to continue as trustee or resign.  Any Agent may do the same with like rights and duties.  The Trustee is also subject to Sections 7.10 and 7.11 hereof.

96

10/15/2007 11:13 AM

**Section 7.4**        **Trustee's Disclaimer**

The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, it shall not be accountable for the Issuers' use of the proceeds from the Notes or any money paid to the Issuers or upon the Issuers' direction under any provision of this Indenture, it shall not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and it shall not be responsible for any statement or recital herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication.

**Section 7.5**        **Notice of Defaults**

If a Default or Event of Default occurs and is continuing and if it is known to the Trustee, the Trustee shall mail to Holders a notice in the manner and to the extent provided by TIA § 313(c) of the TIA of the Default or Event of Default within 90 days after it occurs. Except in the case of a Default or Event of Default in payment of principal of, premium, if any, or Interest (or Liquidated Damages, if any) on any Note, the Trustee may withhold the notice if and so long as a committee of its Responsible Officers in good faith determines that withholding the notice is in the interests of the Holders.

**Section 7.6**        **Reports by Trustee to Holders of the Notes and to Gaming Authorities**

(a)        Within 60 days after each March 15 beginning with the March 15 following the date of this Indenture, and for so long as Notes remain outstanding, the Trustee shall mail to the Holders a brief report dated as of such reporting date that complies with TIA § 313(a) (but if no event described in TIA § 313(a) has occurred within the 12 months preceding the reporting date, no report need be transmitted). The Trustee also shall comply with TIA § 313(b). The Trustee shall also transmit by mail all reports as required by TIA § 313(c).

A copy of each report at the time of its mailing to the Holders of Notes shall be mailed by the Trustee to the Issuers and filed by the Trustee with the Commission and each stock exchange on which the Notes are listed in accordance with TIA § 313(d). The Issuers shall promptly notify the Trustee in writing when the Notes are listed on any stock exchange and of any delisting thereof.

(b)        To the extent required by Gaming Laws, the Trustee shall provide any applicable Gaming Authority upon such Gaming Authority or the Issuers' written request with:

(1)        copies of all notices, reports and other written communications which the Trustee gives to Holders of Notes;

(2)        a list of Holders of Notes promptly after the original issuance of the Notes and upon demand;

97

(3)   notice of any Event of Default under this Indenture or of any Default, any acceleration of the indebtedness evidenced or secured hereby, the institution of any legal actions or proceedings before any court or governmental authority in respect of this Indenture and any rescission, annulment or waiver in respect of an Event of Default;

(4)   notice of the removal or resignation of the Trustee within five Business Days thereof;

(5)   notice of any transfer or assignment of rights under this Indenture (but not transfers or assignments of the Notes) within five Business Days thereof; and

(6)   a copy of any amendment to the Notes or this Indenture within five Business Days of the effectiveness thereof.

The notice specified in clause (b)(3) above shall be in writing and, except as set forth below, shall be given within five Business Days after the Trustee has transmitted the notice required by Section 7.5.  In the case of any notice in respect of any Event of Default, such notice shall be accompanied by a copy of any notice from the Holders of the Notes, or a representative thereof or the Trustee, to the Issuers and, if accompanied by any such notice to the Issuers, shall be given simultaneously with the giving of any such notice to the Issuers.  In the case of any legal actions or proceedings, such notice shall be accompanied by a copy of the complaint or other initial pleading or document.

The Trustee shall in accordance with the limitations set forth herein cooperate with any applicable Gaming Authority in order to provide such Gaming Authority with information and documentation relevant to compliance with clause (b)(3) above and as otherwise required by any applicable Gaming Laws.

Section 7.7        **Compensation and Indemnity**

The Issuers shall pay to the Trustee from time to time such compensation as the parties shall agree in writing from time to time for its acceptance of this Indenture and services hereunder.  The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.  The Issuers shall reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services.  Such expenses shall include the reasonable compensation, disbursements and expenses of the Trustee's agents and counsel.

The Issuers and the Guarantors, jointly and severally, shall indemnify the Trustee against any and all losses, liabilities or expenses (including reasonable attorneys' fees and expenses) incurred by it arising out of or in connection with the acceptance or administration of its duties under this Indenture, including the costs and expenses of enforcing this Indenture against the Issuers (including this Section 7.7) and defending itself against any claim (whether asserted by the Issuers or any Holder or any Guarantor or any other Person) or liability in connection with the exercise or performance of any of

98

its powers or duties hereunder, except, in each case, to the extent any such loss, liability or expense may be attributable to its negligence, bad faith or willful misconduct. The Trustee shall notify the Issuers promptly of any claim for which it may seek indemnity. Failure by the Trustee to so notify the Issuers shall not relieve the Issuers of their obligations hereunder. The Issuers shall defend the claim and the Trustee shall cooperate in the defense. The Trustee may have separate counsel and the Issuers shall pay the reasonable fees and expenses of such counsel. The Issuers need not pay for any settlement made without their consent, which consent shall not be unreasonably withheld.

The obligations of the Issuers under this Section 7.7 shall survive the satisfaction and discharge of this Indenture.

To secure the Issuers' payment obligations in this Section 7.7, the Trustee shall have a Lien prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal of and premium, if any, and Interest (and Liquidated Damages, if any) on particular Notes. Such Lien shall survive the satisfaction and discharge of this Indenture.

When the Trustee incurs expenses or renders services after an Event of Default specified in Sections 6.1(11) or 6.1(12) hereof occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law.

The Trustee shall comply with the provisions of TIA § 313(b)(2) to the extent applicable.

**Section 7.8**      **Replacement of Trustee**

Subject to compliance with any applicable Gaming Laws, a resignation or removal of the Trustee and appointment of a successor Trustee shall become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.8.

The Trustee may resign in writing at any time and be discharged from the trust hereby created by so notifying the Issuer. The Holders of a majority in principal amount of the then outstanding Notes may remove the Trustee by so notifying the Trustee and the Issuers in writing. The Issuers may remove the Trustee if:

(a)      the Trustee fails to comply with Section 7.10 hereof;

(b)      the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Bankruptcy Law;

(c)      a custodian or public officer takes charge of the Trustee or its property; or

(d)      the Trustee becomes incapable of acting.

If the Trustee resigns or is removed or if a vacancy exists in the office of the Trustee for any reason, the Issuers shall promptly appoint a successor Trustee. Within one year after the successor Trustee takes office, the Holders of a majority in principal amount of the then outstanding Notes may appoint a successor Trustee to replace the successor Trustee appointed by the Issuer.

If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee, the
Issuer, or the Holders of at least 10% in principal amount of the then outstanding Notes may petition any court of competent jurisdiction (not at the expense of the Trustee) for the appointment of a successor Trustee.

If the Trustee, after written request by any Holder who has been a Holder for at least six months, fails to comply with Section 7.10 hereof, such Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer. Thereupon, the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture and the Intercreditor Agreement. The successor Trustee shall mail a notice of its succession to Holders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee; provided all sums owing to the Trustee hereunder have been paid and subject to the Lien provided for in Section 7.7 hereof. Notwithstanding replacement of the Trustee pursuant to this Section 7.8, the Issuers' obligations under Section 7.7 hereof shall continue for the benefit of the retiring Trustee.

**Section 7.9**      **Successor Trustee by Merger, etc.**

Subject to compliance with any applicable Gaming Laws, if the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation or national association, the successor corporation or national association without any further act shall be the successor Trustee.

**Section 7.10**      **Eligibility; Disqualification**

There shall at all times be a Trustee hereunder that is a corporation, national association or trust company (or a member of a bank holding company) organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has (or the bank holding company of which it is a member has) a combined capital and surplus of at least $50,000,000 as set forth in its most recent published annual report of condition.

This Indenture shall always have a Trustee who satisfies the requirements of TIA § 310(a)(1), (2) and (5). The Trustee is subject to TIA § 310(b).

100

**Section 7.11**      <u>Preferential Collection of Claims Against Issuer</u>

The Trustee is subject to TIA § 311(a), excluding any creditor relationship listed in TIA § 311(b).  A Trustee who has resigned or been removed shall be subject to TIA § 311(a) to the extent indicated therein.

**ARTICLE VIII**
**LEGAL DEFEASANCE AND COVENANT DEFEASANCE**

**Section 8.1**      <u>Option to Effect Legal Defeasance or Covenant Defeasance</u>

The Issuers may, at the option of each of the Issuer's Board of Directors evidenced by a resolution set forth in an Officers' Certificate, elect to have either Section 8.2 or 8.3 hereof be applied to all outstanding Notes and Guarantees upon compliance with the conditions set forth below in this Article VIII.

**Section 8.2**      <u>Legal Defeasance</u>

Upon the Issuers' exercise under Section 8.1 hereof of the option applicable to this Section 8.2, the Issuers and the Guarantors, as applicable, shall, subject to the satisfaction of the applicable conditions set forth in Section 8.4 hereof, be deemed to have been discharged from the Issuers' and the Guarantor's obligations with respect to all outstanding Notes and Guarantees, as applicable, on the date the conditions set forth below are satisfied (hereinafter, "*Legal Defeasance*").  For this purpose, Legal Defeasance means that the Issuers shall be deemed to have paid and discharged all amounts owed under the outstanding Notes and the Guarantors shall be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Guarantees, which shall thereafter be deemed to be "outstanding" only for the purposes of Section 8.5 hereof and the other Sections of this Indenture referred to in clauses (a) and (b) below of this Section 8.2, and to have satisfied all the Issuers' and the Guarantor's other obligations under the Notes, the Guarantees and this Indenture (and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging the same, including instruments releasing the Collateral as security for the Notes and the Guarantees), except for the following provisions which shall survive until otherwise terminated or discharged hereunder: (a) the rights of Holders to receive solely from the trust fund described in Section 8.4 hereof, and as more fully set forth in Section 8.4 hereof, payments in respect of the principal of and premium, if any, and Interest (and Liquidated Damages, if any) on the Notes when such payments are due, (b) the Issuers' obligations with respect to the Notes under Article II and Sections 4.2, 4.6, 4.16 and 4.18 hereof, (c) the rights, powers, trusts, duties and immunities of the Trustee under this Indenture and the Issuers' and the Guarantors' obligations in connection therewith and (d) this Article VIII.  Subject to compliance with this Article VIII, the Issuers may exercise their option under this Section 8.2 notwithstanding the prior exercise of their option under Section 8.3 hereof.

101

**Section 8.3**        **Covenant Defeasance**

Upon the Issuers' exercise under Section 8.1 hereof of the option applicable to this Section 8.3, subject to the satisfaction of the applicable conditions set forth in Section 8.4 hereof, the Issuers and the Guarantors shall be released from their respective obligations under Sections 4.3, 4.4, 4.5, 4.7, 4.8, 4.9, 4.10, 4.11, 4.12, 4.13, 4.14, 4.15, 4.17, 4.19, 4.20, 4.21, 4.22, 4.23, 4.24, 4.25 and 4.26 and Article V hereof on and after the date the conditions set forth below are satisfied (hereinafter, "*Covenant Defeasance*"), and the Notes and the Guarantees shall thereafter be deemed not "outstanding" for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but shall continue to be deemed "outstanding" for all other purposes hereunder (it being understood that such Notes shall not be deemed outstanding for accounting purposes). For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes and Guarantees, the Issuers and the Guarantors may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply shall not constitute a Default or an Event of Default under Section 6.1 hereof, but, except as specified above, the remainder of this Indenture and the Notes and Guarantees shall be unaffected thereby. In addition, upon the Issuers' exercise under Section 8.1 hereof of the option applicable to this Section 8.3, subject to the satisfaction of the applicable conditions set forth in Section 8.4 hereof, (x) none of Sections 6.1(3) through 6.1(10) or 6.1(13) or 6.1(14) hereof shall constitute an Event of Default to the extent any such events occur thereafter and (y) neither Section 6.1(11) nor Section 6.1(l2) hereof shall constitute an Event of Default to the extent any such events occur after the 91st day following the occurrence of the Issuers' exercise of Covenant Defeasance; *provided, however,*
that for all other purposes as set forth herein, such Covenant Defeasance provisions shall be effective.

**Section 8.4**        **Conditions to Legal or Covenant Defeasance**

The following shall be the conditions to the application of either Section 8.2 or 8.3 hereof to the outstanding Notes:

(a)        in the case of an election under Section 8.2 or 8.3 hereof, the Issuers must irrevocably deposit or cause to be irrevocably deposited with the Trustee, in trust, for the benefit of Holders of the Notes, United States legal tender, U.S. Government Obligations or a combination thereof, in an aggregate amount that will be sufficient, in the written opinion of a nationally recognized firm of independent public accountants, to pay the principal of and premium, if any, and Interest (and Liquidated Damages, if any), on the Notes on the stated date for payment or any redemption date thereof (and the Issuers must specify whether the Notes are being defeased to Stated Maturity or a particular Redemption Date), and the Trustee must have, for the benefit of Holders of the Notes, a valid, perfected, exclusive security interest in the trust;

102

(b)      in the case of an election under Section 8.2 hereof, the Issuers must deliver to the Trustee an Opinion of Counsel reasonably satisfactory to the Trustee confirming that:

(1)      the Issuers have received from, or there has been published by the Internal Revenue Service, a ruling, or

(2)      since the date of this Indenture, there has been a change in the applicable United States federal income tax law,

in either case to the effect that Holders of Notes will not recognize income, gain or loss for United States federal income tax purposes as a result of such Legal Defeasance and will be subject to United States federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(c)      in the case of an election under Section 8.3 hereof, the Issuers must deliver to the Trustee an Opinion of Counsel reasonably satisfactory to the Trustee confirming that Holders of Notes will not recognize income, gain or loss for United States federal income tax purposes as a result of such Covenant Defeasance and will be subject to United States federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(d)      in the case of an election under Section 8.2 or 8.3 hereof, no Default or Event of Default shall have occurred and be continuing on the date of the deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit);

(e)      in the case of an election under Section 8.2 hereof, no Event of Default relating to bankruptcy or insolvency may occur at any time from the date of the deposit to the 91st calendar day thereafter (it being understood that the condition shall not be deemed satisfied until the expiration of such period);

(f)      in the case of an election under Section 8.2 or 8.3 hereof, the Legal Defeasance or Covenant Defeasance, as applicable, shall not result in a breach or violation of, or constitute a default under, any other material agreement or instrument (other than this Indenture) to which the Issuers or any of the Subsidiaries are a party or by which the Issuers or any of the Subsidiaries are bound;

(g)      in the case of an election under Section 8.2 or 8.3 hereof, the Issuers must deliver to the Trustee an Officers' Certificate stating that the deposit was not made by the Issuers with the intent to hinder, delay or defraud any other of the Issuers' creditors; and

(h)      in the case of an election under Section 8.2 or 8.3 hereof, the Issuers must deliver to the Trustee an Officers' Certificate confirming the satisfaction of conditions in clauses (a) through (g) above, and an Opinion of Counsel confirming the

103

satisfaction of the applicable conditions in clauses (a) (with respect to the validity and perfection of the security interest), (d), (e) and (f) above.

Legal Defeasance and Covenant Defeasance, as the case may be, shall be effective on the date on which all of the applicable conditions set forth in this Section 8.4 have been satisfied.

**Section 8.5**          **Deposited Money and Government Securities to be Held in Trust; Other Miscellaneous Provisions**

Subject to Section 8.6 hereof, all money and U.S. Government Obligations (including the proceeds thereof) deposited with the Trustee (or other qualifying trustee, collectively for purposes of this Section 8.5, the "*Trustee*") pursuant to Section 8.4 hereof in respect of the outstanding Notes shall be held in trust and applied by the Trustee, in accordance with the provisions of the outstanding Notes and this Indenture, to the payment, either directly or through any Paying Agent (including one of the Issuers or one of the Subsidiaries acting as Paying Agent) as the Trustee may determine, to the Holders of the outstanding Notes of all sums due and to become due thereon in respect of principal, premium, if any, and Interest (and Liquidated Damages, if any), but such money need not be segregated from other funds except to the extent required by law; *provided, however,* that any trust account established pursuant to this Article VIII shall not constitute Collateral.

The Issuers and the Guarantors, jointly and severally, shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the cash or U.S. Government Obligations deposited pursuant to Section 8.4 hereof or the principal and interest received in respect thereof, other than any such tax, fee or other charge which by law is for the account of the Holders.

Anything in this Article VIII to the contrary notwithstanding, the Trustee shall deliver or pay to the Issuers from time to time upon the request of the Issuers any money or U.S. Government Obligations held by it as provided in Section 8.4 hereof which, in the opinion of a firm of independent public accountants nationally recognized in the United States expressed in a written certification thereof delivered to the Trustee (not at the Trustee's expense) (which may be the opinion delivered under Section 8.4(a) hereof), are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

**Section 8.6**          **Repayment to Issuers**

Any money deposited with the Trustee or any Paying Agent, or then held by the Issuers, in trust for the payment of the principal of or premium, if any, or Interest (or Liquidated Damages, if any) on any Note and remaining unclaimed for two years after such principal, premium, Interest or Liquidated Damages has become due and payable shall be paid to the Issuers on their written request or (if then held by the Issuers) shall be discharged from such trust; and the Holder of such Note shall thereafter, as a creditor, look only to the Issuers for payment thereof, and all liability of the Trustee or

104

such Paying Agent with respect to such trust money, and all liability of the Issuers as trustee thereof, shall thereupon cease; *provided,*

that the Trustee or such Paying Agent, before being required to make any such repayment, shall at the expense of the Issuers cause to be published once, in The New York Times and The Wall Street Journal (national edition), notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such notification or publication, any unclaimed balance of such money then remaining shall be repaid to the Issuers.

**Section 8.7**      **Reinstatement**

If the Trustee or Paying Agent is unable to apply any United States legal tender or U.S. Government Obligations in accordance with Section 8.2 or 8.3 hereof, as the case may be, by reason of any order directing the repayment of the deposited money to the Issuers or otherwise making the deposit unavailable to make payments under the Notes when due, or if any court enters an order avoiding the deposit of money with the Trustee or Paying Agent or otherwise requires the payment of the money so deposited to the Issuers or to a fund for the benefit of the Issuers' creditors, then (so long as the insufficiency exists or the order remains in effect) the Issuers' and the Guarantors' obligations under this Indenture, the Notes, the Guarantees and the Collateral Agreements shall be revived and reinstated, as though no deposit had occurred pursuant to Section 8.3 or 8.4 hereof, until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Section 8.3 or 8.4 hereof, as the case may be; *provided, however,* that, if the Issuers makes any payment of principal of or premium, if any, or Interest (or Liquidated Damages, if any) on any Note following the reinstatement of the Issuers' obligations, the Issuers shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

**Section 8.8**      **Satisfaction and Discharge**

The Issuers may terminate their obligations and the obligations of the Guarantors under this Indenture, the Notes and the Guarantees (except as described below) when:

(a)

all the Notes previously authenticated and delivered (except lost, stolen or destroyed Notes which have been replaced and Notes for whose payment money has theretofore been deposited with the Trustee or the paying agent in trust or segregated and held in trust by the Issuers and thereafter repaid to the Issuers or a Guarantor) have been delivered to the Trustee for cancellation, or

(b)

(1)      all Notes have been called for redemption pursuant to Section 3.7 hereof by mailing to Holders a notice of redemption or all Notes otherwise have become due and payable,

(2)

the Issuers have irrevocably deposited or caused to be irrevocably deposited with the Trustee, in trust, for the benefit of Holders of the

105

Notes, United States legal tender, U.S. Government Obligations or a combination thereof in an aggregate amount that will be sufficient to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal of and premium, if any, and Interest (and Liquidated Damages, if any) on the Notes to the Redemption Date together with irrevocable instructions from the Issuers directing the Trustee to apply such funds to the payment thereof at such redemption,

(3)

each of the Issuers and the Guarantors has paid all other sums payable by it under this Indenture, the Notes and the Guarantees,

(4)

no Default or Event of Default shall have occurred and be continuing on the date of such deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit),

(5)

such deposit shall not result in a breach or violation of, or constitute a default under, any material agreement or instrument (other than this Indenture) to which the Issuers or any of the Subsidiaries are a party or by which the Issuers or any of the Subsidiaries are bound, and

(6)

the Issuers shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel confirming the satisfaction of all conditions set forth in clauses (1) through (5) above.

**ARTICLE IX**
**AMENDMENT, SUPPLEMENT AND WAIVER**

**Section 9.1**    **With Consent of Holders of a Majority**

Except as expressly stated otherwise in Section 9.2 or 9.3 hereof, and subject to Sections 6.4 and 6.7 hereof, with the consent of the Holders of not less than a majority in aggregate principal amount of the Notes then outstanding (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, the Notes), (a) this Indenture, the Notes, the Guarantees, the Intercreditor Agreement (subject to any required approval of the lenders under the Credit Agreement party thereto) and the Collateral Agreements may be amended, supplemented or otherwise modified, and (b) any existing Default or Event of Default (other than a Default or Event of Default in the payment of the principal of or premium, if any, or Interest (or Liquidated Damages, if any) on the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of this Indenture, the Notes, the Guarantees, the Intercreditor Agreement (subject to any required approval of the lenders under the Credit Agreement party thereto) and the Collateral Agreements may be waived.

106

It is understood that, except as expressly stated otherwise in Section 9.2 or 9.3 hereof, Sections 4.13 and 4.14 hereof may be amended, waived or modified in accordance with this Section 9.1.

The terms of any document entered into pursuant to this Section 9.1 shall be subject to prior approval, if required, of any applicable Gaming Authority. To the extent required by applicable Gaming Laws, Notes held by a Disqualified Holder shall, so long as held by such a Person, be disregarded for purposes of providing consents and determining the sufficiency of consents under this Section 9.1.

**Section 9.2**      **With Consent of All Affected Holders of Notes or Supermajority**

(a)      Without the consent of the Holder of each outstanding Note affected, an amendment, supplement, modification or waiver may not (with respect to Notes held by a non-consenting Holder):

(1)      reduce the principal amount of Notes the Holders of which must consent to an amendment, supplement, modification or waiver,

(2)      change the Stated Maturity on any Note,

(3)      reduce the principal of or any premium (including redemption premium but not including any redemption premium payable pursuant to Section 4.13 or 4.14 hereof) on any Note,

(4)      reduce the rate of or change the time for payment of Interest (or Liquidated Damages, if any) on any Note,

(5)      waive a Default or Event of Default in the payment of principal of or premium, if any, or Interest (or Liquidated Damages, if any) on any Note (except a rescission of acceleration of the Notes by the Holders of a majority in aggregate principal amount of the Notes and a waiver of the payment default that resulted from such acceleration),

(6)      waive any redemption payment with respect to any Note (other than provisions relating to or payments required by Section 4.13 or 4.14 hereof),

(7)      after the corresponding Asset Sale or Change of Control has occurred, reduce the Change of Control Purchase Price or the Asset Sale Offer Price or alter any other provisions with respect to the redemption of the Notes required by Section 4.13 or 4.14 hereof, respectively,

(8)      change the coin or currency in which, the principal of or premium, if any, or Interest (or Liquidated Damages, if any) on any Note is payable,

107

(9)    impair the right to institute suit for the enforcement of payment of the principal of or premium, if any, or Interest (or Liquidated Damages, if any) on any Note on or after the Stated Maturity (or on or after the Redemption Date),

(10)    make any change in the provisions of this Indenture relating to waivers of past Defaults with respect to, or the rights of Holders to receive, scheduled payments of principal of or premium, if any, or Interest (or Liquidated Damages, if any) on the Notes,

(11)    modify or change any provision of this Indenture affecting the ranking of the Notes or any Guarantee in a manner adverse to the Holders of the Notes,

(12)    release any Guarantor from any of its obligations under its Guarantee or this Indenture other than in compliance with this Indenture, or

(13)    make any changes in the foregoing amendment, supplement and waiver provisions.

(b)    Notwithstanding Section 9.1, 9.2(a) or 9.3 hereof, and subject to the Intercreditor Agreement, no portion of the Collateral may be released from the Lien of the Collateral Agreements (except in accordance with the provisions of this Indenture and the Collateral Agreements), and none of the Collateral Agreements or the provisions of this Indenture relating to the Collateral may be amended or supplemented, and the rights of any Holders may not be waived or modified, without, in each case, the consent of the Holders of at least $66^2/_3$% in aggregate principal amount of the then outstanding Notes.

(c)    The terms of any document entered into pursuant to this Section 9.2 shall be subject to prior approval, if required, of any applicable Gaming Authority.

**Section 9.3    Without Consent of Holders of Notes**

Notwithstanding Section 9.1 or 9.2 hereof, without the consent of the Holders, the Issuer, the Guarantors and the Trustee may amend, modify or supplement this Indenture, the Notes, the Guarantees, the Intercreditor Agreement and the Collateral Agreements:

(1)    to cure any ambiguity, defect or inconsistency,

(2)    to provide for uncertificated Notes in addition to or in place of certificated Notes,

(3)    to provide for the assumption of any of the Issuers' or the Guarantors' obligations to Holders in the case of a merger or consolidation or a sale of all or substantially all of the Issuers' assets in accordance with this Indenture,

108

        (4)      to evidence the release of any Guarantor permitted to be released under the terms of this Indenture or to evidence the addition of any new Guarantor,

        (5)      to comply with requirements of the Commission in order to effect or maintain the qualification of this Indenture under the Trust Indenture Act,

        (6)      to comply with applicable Gaming Laws, to the extent not materially adverse to holders of Notes,

        (7)      to comply with the provisions of DTC or the Trustee with respect to the provisions of this Indenture and the Notes relating to transfers and exchanges of Notes or beneficial interests therein,

        (8)      to make any change that would provide any additional rights or benefits to the Holders or that does not adversely affect the rights of any Holder of Notes under this Indenture, the Notes, the Guarantees, the Intercreditor Agreement, the Collateral Agreements or the Registration Rights Agreement, or

        (9)      to provide for the issuance of Additional Notes in accordance with the limitations set forth in this Indenture as of the date thereof, including Section 4.7 hereof.

        The terms of any document entered into pursuant to this Section 9.3 shall be subject to prior approval, if required, of any applicable Gaming Authority.

**Section 9.4**        <u>**Consent Payment; Supplemental Indentures**</u>

        In connection with any amendment, supplement, modification or waiver under this Article IX, the Issuers may, but shall not be obligated to, offer to any Holder who consents to such amendment, supplement or waiver, or to all Holders, consideration for such Holder's consent to such amendment, supplement, modification or waiver.

        It shall not be necessary for the consent of the Holders under Section 9.1 or 9.2 hereof to approve the particular form of any proposed amendment or waiver, but it shall be sufficient if such consent approves the substance thereof.

        The Issuers may not sign an amendment or supplemental indenture until its respective Boards of Directors approve it.

        After an amendment, supplement, modification or waiver under Section 9.1 or 9.2 hereof becomes effective, the Issuers shall mail to the Holders affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure of the Issuers to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such amended or supplemental Indenture or waiver.

109

**Section 9.5**          **Revocation and Effect of Consents**

        Until an amendment, supplement or waiver becomes effective (as determined by the Issuers and which may be prior to any such amendment, supplement or waiver becoming operative), a consent to it by a Holder is a continuing consent by the Holder and every subsequent Holder of a Note or a portion of a Note that evidences the same Indebtedness as the consenting Holder's Note, even if notation of the consent is not made on any Note.  However, any such Holder or subsequent Holder may revoke the consent as to its Note if the Trustee receives written notice of revocation before the date the waiver, supplement or amendment becomes effective (as determined by the Issuers and which may be prior to any such amendment, supplement or waiver becoming operative).

        The Issuers may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to consent to any amendment, supplement or waiver, which record date shall be the date so fixed by the Issuers notwithstanding the provisions of the TIA.  If a record date is fixed, then notwithstanding the last sentence of the immediately preceding paragraph, those Persons who were Holders at such record date, and only those Persons (or their duly designated proxies), shall be entitled to revoke any consent previously given, whether or not such Persons continue to be Holders after such record date.

        After an amendment, supplement or waiver becomes effective, it shall bind every Holder unless it makes a change described in any of paragraphs (1) through (13) of Section 9.2 hereof, in which case, the amendment, supplement or waiver shall bind only each Holder who has consented to it and every subsequent Holder of a Note or a portion of a Note that evidences the same Indebtedness as the consenting Holder's Note; *provided*, that any such waiver shall not impair or affect the right of any Holder to receive payment of principal of and premium, if any, and Interest (and Liquidated Damages, if any) on a Note, on or after the respective dates set for such amounts to become due and payable expressed in such Note, or to bring suit for the enforcement of any such payment on or after such respective dates.

**Section 9.6**          **Notation on or Exchange of Notes**

        The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated.  The Issuers in exchange for all Notes may issue and the Trustee shall authenticate new Notes that reflect the amendment, supplement or waiver.

        Failure to make the appropriate notation or issue a new Note shall not affect the validity and effect of such amendment, supplement or waiver.

**Section 9.7**          **Trustee to Sign Amendments, etc.**

        Upon the request of the Issuers accompanied by a resolution of their respective Boards of Directors authorizing the execution of any such amended or supplemental indenture, and upon the filing with the Trustee of evidence satisfactory to

110

the Trustee of the consent of the Holders as aforesaid, and upon receipt by the Trustee of the documents described in this Section 9.7, the Trustee shall join with the Issuers in the execution of such amended or supplemental indenture unless such amended or supplemental indenture adversely affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but shall not be obligated to, enter into such amended or supplemental indenture. In executing any amendment or supplemental indenture, the Trustee shall receive indemnity satisfactory to it and shall receive and (subject to Section 7.1 hereof) be fully protected in relying upon, an Officers' Certificate and an Opinion of Counsel stating that the execution of such amendment or supplemental indenture is authorized and permitted by this Indenture.

**Section 9.8    Compliance with Trust Indenture Act**

Every amendment or supplement to this Indenture or the Notes shall be set forth in an amended or supplemental Indenture that complies with the TIA as then in effect.

**ARTICLE X**
**COLLATERAL AND SECURITY**

**Section 10.1    Collateral Agreements; Security Interests.**

(a)    The due and punctual payment of the principal of and premium, if any, and Interest (and Liquidated Damages, if any) on the Notes (including Interest on the overdue principal of and premium, if any, on the Notes and Interest (to the extent permitted by law) on overdue Interest, if any (and Liquidated Damages, if any), on the Notes) when and as the same shall be due and payable, whether on an Interest Payment Date, at maturity, by acceleration, repurchase, redemption or otherwise, and performance of all other Obligations of the Issuers and the Guarantors under this Indenture, the Notes, the Collateral Agreements and the Registration Rights Agreement, shall be secured as provided in the Collateral Agreements.

(b)    After the Issue Date, the Issuers and the Guarantors shall, and shall cause each of the Subsidiaries to, use commercially reasonable efforts to grant a perfected security interest in all of the Issuers' and the Subsidiaries' assets, including assets acquired after the Issue Date in accordance with the Collateral Agreements, but in any event excluding the Excluded Assets.

(c)    The Issuers and the Guarantors shall, and shall cause each of the Subsidiaries to, do or cause to be done all such acts and things as may be reasonably necessary or proper, or as may be required by the provisions of the Collateral Agreements, to assure and confirm to the Trustee the security interest in the Collateral contemplated hereby and by the Collateral Agreements, as from time to time constituted, so as to render the same available for the security and benefit of this Indenture and of the Notes secured hereby, according to the intent and purposes herein and therein expressed, including (1) using all commercially reasonable efforts to obtain customary consents and

111

waivers from landlords of premises where any of the Collateral is located, and (2) taking all commercially reasonable efforts to grant a perfected Lien on all real property owned by the Issuers and the Subsidiaries and to provide customary title insurance for the benefit of the Trustee with respect thereto, including, without limitation, commercially reasonable efforts to cause the removal of record of all existing monetary encumbrances (other than as provided in the Collateral Agreements) such that the Collateral Agreements shall constitute a first priority Lien on all such real property, subject to Liens permitted by the Collateral Agreements. The Issuers and the Guarantors shall, and shall cause each of the Subsidiaries to, take any and all actions required to cause the Collateral Agreements to create and maintain, as security for the Obligations of the Issuers and the Guarantors under this Indenture, the Notes, the Collateral Agreements and the Registration Rights Agreement, valid and enforceable, perfected (except as expressly provided herein or therein) Liens in and on all the Collateral, in favor of the Trustee, superior to and prior to the rights of all third Persons (other than holders of Purchase Money Indebtedness that was incurred in accordance with the provisions of Section 4.7 hereof), and subject to no other Liens, other than as provided herein and therein; *provided*, that the Trustee's Lien securing the Collateral may be subordinated pursuant to the terms of the Intercreditor Agreement to a Lien securing Indebtedness outstanding pursuant to Section 4.7 hereof, but only to the extent provided in the Intercreditor Agreement.

(d)      Each of the Issuers and each of the Guarantors represents and warrants and covenants that it (and each of the Subsidiaries) has executed and delivered, filed and recorded and/or shall execute and deliver, file and record, all instruments and documents, and has done or shall do or cause to be done all such acts and other things as are necessary to subject the Collateral to the Lien of Trustee under the Collateral Agreements. The Issuers and the Guarantors shall, and shall cause each of the Subsidiaries to, execute and deliver, file and record all instruments and do all acts and other things as may be reasonably necessary to perfect, maintain and protect the security interests created by the Collateral Agreements and pay all filing, recording, mortgage or other taxes or fees incidental thereto.

(e)      The security interests in the Collateral created by the Collateral Agreements as now or hereafter in effect shall be held by the Trustee for the equal and ratable benefit and security of the Notes without preference, priority or distinction of any thereof over any other by reason, or difference in time, of issuance, sale or otherwise, and for the enforcement of the payment of principal of and premium, if any, and Interest (and Liquidated Damages, if any) on the Notes in accordance with their terms.

(f)      Each Holder, by its acceptance of a Note, consents and agrees to the terms of the Collateral Agreements and the Intercreditor Agreement (including, without limitation, the provisions providing for foreclosure and release of the Collateral) as the same may be in effect or may be amended from time to time in accordance with their terms and authorizes and directs the Trustee to enter into the Collateral Agreements and to perform its obligations and exercise its rights thereunder in accordance therewith. The Issuers initially appoint the Trustee as the "Secured Party" and/or

112

Trustee under the Collateral Agreements. Any successor Trustee will act as the "Secured Party" and/or Trustee under the Collateral Agreements or appoint another Person to act in such capacity.

**Section 10.2**     <u>Further Assurances and Security</u>.

Each of the Issuers and each of the Guarantors represents and warrants that at the time the Collateral Agreements and this Indenture are executed, such Issuer or Guarantor (and each of the Subsidiaries) (a) shall have full right, power and lawful authority to grant, bargain, sell, release, convey, hypothecate, assign, mortgage, pledge, transfer and confirm, absolutely, the Collateral, in the manner and form done, or intended to be done, in the Collateral Agreements, free and clear of all Liens, except for Permitted Liens, and will forever warrant and defend the title to the same against the claims of all Persons whatsoever, subject to the terms of the Intercreditor Agreement; (b) shall execute, acknowledge and deliver to the Trustee, at the Issuers' expense, at any time and from time to time such further assignments, transfer, assurances or other instruments as may be necessary or as may be reasonably required by the Trustee to effectuate the terms of this Indenture or the Collateral Agreements; and (c) shall at any time and from time to time do or cause to be done all such acts and things as may be necessary or proper, or as may be required by the Trustee, to assure and confirm to the Trustee the security interest in the Collateral contemplated hereby and by the Collateral Agreements, subject to the terms of the Intercreditor Agreement.

**Section 10.3**     <u>Opinions</u>.

(a)     The Issuers shall furnish to the Trustee promptly after the recording or filing, or re-recording or re-filing of the Collateral Agreements and other security filings, an Opinion of Counsel (who may be counsel for the Issuers) stating that in the opinion of such counsel the Collateral Agreements and other security filings have been properly recorded, filed, re-recorded or re-filed so as to make effective and perfect the security interest intended to be created thereby and reciting the details of such action.

(b)     The Issuers shall furnish to the Trustee within three months after each anniversary of the Issue Date, an Opinion of Counsel, dated as of such date, stating either that (i) in the opinion of such counsel, all action has been taken with respect to the recording, registering, filing, re-recording, re-registering and refiling of all supplemental indentures, financing statements, continuation statements or other instruments of further assurance as is necessary to maintain the Liens of the Collateral Agreements, subject to the terms of the Intercreditor Agreement, and reciting the details of such action or (ii) in the opinion of such counsel, no such action is necessary to maintain such Liens.

(c)     All Opinions of Counsel required by this Section 10.3 may contain qualifications, assumptions, exceptions and limitations as are appropriate for similar opinions relating to the nature of the Collateral and as are reasonably acceptable to the Trustee.

113

http://www.sec.gov/Archives/edgar/data/1326686/000104746905014761...

**Section 10.4**    **Release of Collateral.**

(a)    Upon the full and final payment and performance of all the Issuers' and the Guarantors' Obligations under this Indenture, the Notes, the Guarantees and the Collateral Agreements shall terminate, and the Liens granted thereunder on the Collateral shall be released.

(b)    In addition, the Trustee shall release from the Lien created by this Indenture and the Collateral Agreements at the sole cost and expense of the Issuers:

(1)    Collateral that is sold, transferred, disbursed or otherwise disposed of in accordance with the provisions of this Indenture, the Collateral Agreements and the Intercreditor Agreement; *provided* that the Trustee shall not release such liens in the event that the transaction is subject to Section 5.1 hereof and *provided further* that all products and proceeds of the Collateral so sold, transferred, disbursed or otherwise disposed of shall continue to constitute Collateral;

(2)    Collateral that is released with the consent of the Holders of $66^2/_3$% of the aggregate principal amount of the outstanding Notes as provided under Article IX hereof;

(3)    all Collateral upon defeasance of this Indenture in accordance with Section 8.2 or 8.3 hereof or discharge of this Indenture in accordance with Section 8.8 hereof; *provided* that the funds deposited with the Trustee, in trust, for the benefit of the Holders as required by such provisions shall not be released; and

(4)    Collateral of a Guarantor whose Guarantee is released in accordance with this Indenture and the Collateral Agreements;

*provided*, in each case, that the Trustee has received all documentation required by the TIA in connection therewith.  Upon compliance with the above provisions, the Trustee shall execute, deliver or acknowledge any necessary or proper instruments of termination, satisfaction or release to evidence the release of any Collateral permitted to be released pursuant to this Indenture or the Collateral Agreements.

(b)    The release of any Collateral from the terms of the Collateral Agreements shall not be deemed to impair the security under this Indenture in contravention of the provisions hereof and of the Collateral Agreements if and to the extent the Collateral is released pursuant to the terms of this Indenture and the Collateral Agreements.

(c)    For purposes of Section 10.4(a) hereof, any certificate or opinion required by TIA § 314(d) may be made by an Officer of the Issuer, except in cases where TIA § 314(d) requires that such certificate or opinion be made by an independent person, which person shall be an independent engineer, appraiser or other expert selected or approved by the Trustee in the exercise of reasonable care.  A person is "independent" if such person (i) is in fact independent, (ii) does not have any direct financial interest or any material indirect financial interest in the Issuers or in any Affiliate of the Issuers and

114

10/15/2007 11:13 AM

(iii) is not an officer, employee, promoter, underwriter, trustee, partner or director or person performing similar functions to any of the foregoing for the Issuer. The Trustee shall be entitled to receive and conclusively rely upon a certificate provided by any such person confirming that such person is independent within the foregoing definition.

(d)    Notwithstanding anything contained in this Indenture to the contrary, (i) the proviso of Section 10.4(a) of this Indenture shall not be applicable to any release or withdrawal of inventory, receivables and cash from the Issuers' deposit accounts in the ordinary course of the Issuers' business pursuant to the terms of the Collateral Agreements and (ii) the fair value of inventory, receivables and cash from the Issuers' deposit accounts released pursuant to this Section 10.4 need not be considered in determining whether the aggregate fair value of inventory, receivables and cash from the Issuers' deposit accounts released in any calendar year exceeds the 10% threshold specified in TIA § 314(d)(1).

**Section 10.5    Certificates of the Issuer.**

The Issuers shall furnish to the Trustee, prior to each proposed release of Collateral, all documents required by TIA § 314(d). The Trustee may, to the extent permitted by Sections 7.1 and 7.2 hereof, accept as conclusive evidence of compliance with the foregoing provisions the appropriate statements contained in such instruments. Any certificate or opinion required by TIA § 314(d) may be made by an Officer of each of the Issuers, except in cases where TIA § 314(d) requires that such certificate or opinion be made by an independent engineer, appraiser or other expert within the meaning of TIA § 314(d).

**Section 10.6    Authorization of Actions to be Taken by the Trustee Under the Collateral Agreements**

Subject to compliance with any applicable Gaming Laws and to the terms of the Intercreditor Agreement, the Trustee may, in its sole discretion and without the consent of the Holders, on behalf of the Holders, take all actions it deems reasonably necessary or appropriate in order to (a) enforce any of the terms of the Collateral Agreements and (b) collect and receive any and all amounts payable in respect of the Obligations of the Issuers and the Guarantors under this Indenture, the Notes, the Guarantees, the Collateral Agreements and the Registration Rights Agreement. Subject to the terms of the Intercreditor Agreement, and to the extent permitted by this Indenture or the Collateral Agreements, the Trustee shall have the power to institute and to maintain such suits and proceedings as it may reasonably deem expedient to prevent any impairment of the Collateral by any acts that may be unlawful or in violation of the Collateral Agreements or this Indenture, and such suits and proceedings as the Trustee may reasonably deem expedient to preserve or protect its interest and the interests of the Holders in the Collateral (including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of the Holders or the Trustee).

115

**Section 10.7**      <u>Authorization of Receipt of Funds by the Trustee Under the Collateral Agreements</u>.

     The Trustee is authorized to receive any funds for the benefit of the Holders distributed under the Collateral Agreements, and to make further distributions of such funds to the Holders according to the provisions of this Indenture and the Collateral Agreements, subject to the terms of the Intercreditor Agreement.

**ARTICLE XI**
**GUARANTEES**

**Section 11.1**      <u>Guarantees</u>

     By its execution hereof, each of the Guarantors acknowledges and agrees that it receives substantial benefits from the Issuers and that such Guarantor is providing its Guarantee for good and valuable consideration, including, without limitation, such substantial benefits and services. Accordingly, subject to the provisions of this Article XI, each Guarantor, including present and future Subsidiaries (other than any Excluded Foreign Subsidiaries, except to the extent required by Section 4.15 hereof) hereby jointly and severally, irrevocably and unconditionally guarantees on a senior secured basis to the Trustee for the benefit of the Holders and to each Holder of a Note authenticated and delivered by the Trustee and its successors and assigns that: (i) (A) the principal of and premium, if any, and Interest (and Liquidated Damages, if any) on the Notes shall be duly and punctually paid in full when due, whether at maturity, by acceleration, call for redemption, upon a Change of Control Offer, an Asset Sale Offer or otherwise, (B) Interest on overdue principal of and premium, if any, and (to the extent permitted by law) Interest on any Interest, if any (and Liquidated Damages, if any), on the Notes shall be promptly paid in full, and (C) all other Obligations of the Issuers to the Holders or the Trustee under the Notes, this Indenture, the Collateral Agreements and the Registration Rights Agreement (including fees, expenses or otherwise) shall be duly and punctually paid in full when due and performed, all in accordance with the terms hereof and thereof; and (ii) in case of any extension of time of payment or renewal of any Notes or any of such other Obligations, the same shall be duly and punctually paid in full when due and performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, call for redemption, upon a Change of Control Offer, an Asset Sale Offer or otherwise, subject, however, in the case of clauses (i) and (ii) above, to the limitations set forth in Section 11.6 hereof (such Obligations guaranteed by the Guarantors, collectively, the "*Guarantee Obligations*").

     Subject to the provisions of this Article XI, each Guarantor hereby agrees that its Guarantee hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Notes, this Indenture, the Collateral Agreements or the Registration Rights Agreement or the absence of any action to enforce the same, any waiver or consent by any Holder with respect to any thereof, any releases of the Collateral, the entry of any judgment against any of the Issuers, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a Guarantor. Each Guarantor hereby waives and relinquishes

116

with respect to its Guarantee Obligations: (a) any right to require the Trustee, the Holders or the Issuers (each, a "*Benefited Party*") to proceed against the Issuers, the Subsidiaries or any other Person or to proceed against or exhaust any security held by a Benefited Party at any time or to pursue any other remedy in the Trustee's power before proceeding against the Guarantors; (b) any defense that may arise by reason of the incapacity, lack of authority, death or disability of any other Person or Persons or the failure of a Benefited Party to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of any other Person or Persons; (c) demand, protest and notice of any kind (except as expressly required by this Indenture); (d) any defense based upon an election of remedies by a Benefited Party, including but not limited to an election to proceed against the Guarantors for reimbursement; (e) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (f) any defense arising because of a Benefited Party's election, in any proceeding instituted under the Bankruptcy Law, of the application of Section 1111(b)(2) of the Bankruptcy Code; and (g) any defense based on any borrowing or grant of a security interest under Section 364 of the Bankruptcy Code. The Guarantors hereby covenant that, except as otherwise provided in the Guarantees, the Guarantees shall not be discharged except by payment in full of all Guarantee Obligations, including the principal of and premium, if any, and Interest (and Liquidated Damages, if any) on the Notes and all other costs provided for under this Indenture or as provided in Article VIII.

If any Holder or the Trustee is required by any court or otherwise to return to either the Issuers or the Guarantors, or any trustee or similar official acting in relation to either the Issuers or the Guarantors, any amount paid by the Issuers or the Guarantors to the Trustee or such Holder, the Guarantees, to the extent theretofore discharged, shall be reinstated in full force and effect. Each of the Guarantors agrees that it shall not be entitled to any right of subrogation in relation to the Holders in respect of any Guarantee Obligations hereby until payment in full of all such Guarantee Obligations. Each Guarantor agrees that, as between it, on the one hand, and the Holders and the Trustee, on the other hand, (x) the maturity of the Obligations may be accelerated as provided in Article VI hereof for the purposes hereof, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Guarantee Obligations, and (y) in the event of any acceleration of the Obligations as provided in Article VI hereof, such Guarantee Obligations (whether or not due and payable) shall forthwith become due and payable by such Guarantor for the purpose of the Guarantee.

## Section 11.2    Execution and Delivery of Guarantees

To evidence the Guarantees set forth in Section 11.1 hereof, each of the Guarantors agrees that (a) a notation of the Guarantees substantially in the form included in Exhibit A hereto shall be endorsed on each Note authenticated and delivered by the Trustee and (b) a supplemental indenture substantially in the form of Exhibit E hereto shall be executed on behalf of each of the Guarantors by an Officer thereof in accordance with Section 11.4 hereof.

117

Each of the Guarantors agrees that the Guarantees set forth in this Article XI shall remain in full force and effect and shall apply to all of the Notes notwithstanding any failure to endorse on each Note a notation of the Guarantees.

If an Officer whose signature is on a Note or a notation of Guarantee no longer holds that office at the time the Trustee authenticates the Note on which the Guarantees are endorsed, the Guarantees shall be valid nevertheless.

The delivery of any Note by the Trustee, after the authentication thereof, shall constitute due delivery of the Guarantees set forth in this Indenture on behalf of the Guarantors.

## Section 11.3    Guarantors May Consolidate, etc., on Certain Terms

(a)

Nothing contained in this Section 11.3 shall prevent any consolidation or merger of any Guarantor with or into any other Guarantor or with or into any Issuer; *provided, however*, that such consolidation or merger shall otherwise comply with this Indenture. Upon any such consolidation or merger, the Guarantee of the Guarantor that does not survive the consolidation or merger shall no longer be of any force or effect.

(b)

Except for a transaction in which a Guarantor is sold and its Guarantee is released in compliance with the provisions of Section 11.5 hereof or any consolidation or merger of any Guarantor with or into any other Guarantor or with or into any Issuer, no Guarantor shall consolidate or merge with or into (whether or not such Guarantor is the surviving Person) another Person unless, subject to the provisions of the following paragraph and the other provisions of this Indenture and the Collateral Agreements:

(1)

the Person formed by, resulting from or surviving any such consolidation or merger (if other than such Guarantor):

(A)

expressly assumes all the obligations of such Guarantor pursuant to a supplemental indenture in form reasonably satisfactory to the Trustee, pursuant to which such Person shall unconditionally guarantee, on a senior secured basis, all of such Guarantor's Obligations under such Guarantor's Guarantee, this Indenture and the Registration Rights Agreement on the terms set forth in this Indenture and grants a security interest in and/or pledges the collateral owned by such Person to secure such Obligations on the terms set forth in the Collateral Agreements, and

(B)

delivers to the Trustee an Opinion of Counsel that such supplemental indenture and Guarantee and the Collateral Agreements have been duly authorized, executed and delivered and that each of the supplemental indenture, the Guarantee, this Indenture, the Registration Rights Agreement and the Collateral Agreements constitutes a legal, valid, binding and enforceable obligation of such Person, in each case subject to customary qualifications; and

118

(2)      immediately before and immediately after giving effect to such transaction on a *pro forma* basis, no Default or Event of Default shall have occurred or be continuing.

(c)

In case of any such consolidation or merger and upon the assumption by the successor corporation, by supplemental indenture, executed and delivered to the Trustee and reasonably satisfactory in form to the Trustee, of the Guarantees endorsed upon the Notes and the due and punctual performance of all of the covenants and conditions of this Indenture to be performed by such Guarantor, such successor corporation shall succeed to and be substituted for such Guarantor with the same effect as if it had been named herein as a Guarantor.  Such successor corporation thereupon may cause to be signed any or all of the Guarantees to be endorsed upon all of the Notes issuable hereunder which theretofore shall not have been signed by the Issuers and delivered to the Trustee.  All the Guarantees so issued shall in all respects have the same legal rank and benefit under this Indenture as the Guarantees theretofore and thereafter issued in accordance with the terms of this Indenture as though all of such Guarantees had been issued at the date of the execution hereof.

(d)

The Trustee, subject to the provisions of Section 12.4 hereof, shall receive an Officers' Certificate as conclusive evidence that any such consolidation or merger, and any such assumption of Guarantee Obligations, comply with the provisions of this Section 11.3.  Such Officers' Certificate shall comply with the provisions of Section 12.5 hereof.

**Section 11.4      Guarantee by Future Subsidiaries**

The Issuers shall cause each of the existing and future Subsidiaries to:

(i)

execute and deliver to the Trustee a supplemental indenture substantially in the form of Exhibit E hereto and a guarantee substantially in the form included in Exhibit A hereto, pursuant to which such Subsidiary shall unconditionally guarantee on a senior secured basis, all of the Issuers' Obligations under the Notes and this Indenture on the terms set forth in this Indenture,

(ii)

execute a security agreement and other Collateral Agreements necessary or reasonably requested by the Trustee to grant, and grant, the Trustee a valid, enforceable, perfected Lien on the Collateral described therein,

(iii)      execute a signature page to the Registration Rights Agreement, and

(iv)

deliver to the Trustee an Opinion of Counsel that such supplemental indenture, guarantee, Collateral Agreements and the Registration Rights Agreement have been duly authorized, executed and delivered by such Subsidiary and that each of such supplemental Indenture, such Guarantee, this Indenture, the Registration Rights Agreement and such Collateral Agreements constitutes a legal, valid, binding and enforceable obligation of such Subsidiary, in each case subject to customary qualifications including exceptions for bankruptcy, fraudulent transfer and equitable principles.

119

Thereafter, such Subsidiary shall be a Guarantor for all purposes of this Indenture.

**Section 11.5**    **Release of Guarantors**

Notwithstanding Section 11.3(b) hereof, upon:

(a)

the sale or disposition (including by merger or sale or transfer of all of the Equity Interests, except as provided in Article V) of a Guarantor (as an entirety) to a Person which is not and is not required to become a Guarantor,

(b)        the designation of a Subsidiary that is a Guarantor as an Unrestricted Subsidiary, or

(c)

the liquidation or dissolution of a Guarantor, which transaction is otherwise in compliance with this Indenture (including, without limitation, Section 4.13 hereof),

such Guarantor shall be deemed released from its Obligations under its Guarantee, the Registration Rights Agreement and the Collateral Agreements; *provided, however,* that any such termination shall occur only to the extent that (i) all obligations of such Guarantor under all of its guarantees of, and under all of its pledges of assets or other security interests which secure, any of the Indebtedness of the Issuers or any Indebtedness of any other Subsidiaries shall also terminate upon such release, sale or transfer, and (ii) none of the Equity Interests of such Guarantor are pledged for the benefit of any holder of any of the Issuers' Indebtedness or any Indebtedness of any of the Subsidiaries.

The Trustee, subject to the provisions of Section 12.4 hereof, shall receive an Officers' Certificate as conclusive evidence that such sale or other disposition or that such designation was made by the Issuers in accordance with the provisions of this Indenture.  Except as provided in Section 11.3(a) hereof, any Guarantor not released from its obligations under its Guarantee shall remain liable for the full amount of principal of and premium, if any, and Interest (and Liquidated Damages, if any) on the Notes and for the other Guarantee Obligations as provided in this Article XI.

Notwithstanding the foregoing provisions of this Article XI, (i) any Guarantor whose Guarantee would otherwise be released pursuant to the provisions of this Section 11.5 may elect, at its sole discretion, by written notice to the Trustee, to maintain such Guarantee in effect notwithstanding the event or events that otherwise would cause the release of such Guarantee (which election to maintain such Guarantee in effect may be conditional or for a limited period of time), and (ii) any Subsidiary which is not a Guarantor may elect, at its sole discretion, by written notice to the Trustee, to become a Guarantor (which election may be conditional or for a limited period of time).

120

**Section 11.6      Limitation of Guarantor's Liability; Certain Bankruptcy Events**

(a)

Each Guarantor, and by its acceptance of Notes each Holder, hereby confirms that it is the intention of all such parties that the Guarantee Obligation of such Guarantor pursuant to its Guarantee not constitute a fraudulent transfer or conveyance for purposes of any Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law.  To effectuate the foregoing intention, the Holders and such Guarantor hereby irrevocably agree that the Guarantee Obligations of such Guarantor under this Article XI shall be limited to the maximum amount as will, after giving effect to all other contingent and fixed liabilities of such Guarantor and after giving effect to any collections from or payments made by or on behalf of any other Guarantor in respect of the Guarantee Obligations of such other Guarantor under this Article XI, result in the Guarantee Obligations of such Guarantor under the Guarantee of such Guarantor not constituting a fraudulent transfer or conveyance.

(b)

Each Guarantor hereby covenants and agrees, to the fullest extent that it may do so under applicable law, that in the event of the insolvency, bankruptcy, dissolution, liquidation or reorganization of any of the Issuers, such Guarantor shall not file (or join in any filing of), or otherwise seek to participate in the filing of, any motion or request seeking to stay or to prohibit (even temporarily) execution on the Guarantee and hereby waives and agrees not to take the benefit of any such stay of execution, whether under Section 362 or 105 of the Bankruptcy Law or otherwise.

**Section 11.7      Application of Certain Terms and Provisions to the Guarantors**

(a)

For purposes of any provision of this Indenture which provides for the delivery by any Guarantor of an Officers' Certificate and/or an Opinion of Counsel, the definitions of such terms in Section 1.1 hereof shall apply to such Guarantor as if references therein to the Issuers were references to such Guarantor.

(b)

Any request, direction, order or demand which by any provision of this Indenture is to be made by any Guarantor, shall be sufficient if evidenced as described in Section 12.2 hereof as if references therein to the Issuers were references to such Guarantor.

(c)

Any notice or demand which by any provision of this Indenture is required or permitted to be given or served by the Trustee or by the Holders to or on any Guarantor may be given or served as described in Section 12.2 hereof as if references therein to the Issuers were references to such Guarantor.

(d)

Upon any demand, request or application by any Guarantor to the Trustee to take any action under this Indenture, such Guarantor shall furnish to the Trustee such certificates and opinions as are required in Section 12.4 hereof as if all references therein to the Issuers were references to such Guarantor.

121

## ARTICLE XII
## MISCELLANEOUS

**Section 12.1** **Trust Indenture Act Controls**

      If any provision of this Indenture limits, qualifies or conflicts with the duties imposed by the TIA § 318(c), the imposed duties shall control.

**Section 12.2** **Notices**

      Any notice or communication by the Issuers or the Trustee to the other is duly given if in writing and (a) delivered in Person, (b) mailed by first class mail (registered or certified, return receipt requested), (c) transmitted by facsimile or telecopy mechanism (providing confirmation of transmission) or (d) sent by overnight courier guaranteeing next day delivery (and providing proof of delivery), to the others' address:

If to any of the Issuers
or the Guarantors:

                155 East Tropicana, LLC
                115 East Tropicana Avenue
                Las Vegas, Nevada 89109
                Attention:  Chief Executive Officer
                Facsimile No.: (702) 739-7783

with copies (which
shall not constitute
notice) to:

                Kummer Kaempfer Bonner & Renshaw
                3800 Howard Hughes Parkway
                7th Floor
                Las Vegas, Nevada 89109
                Attn: Michael Bonner, Esq.
                Facsimile No.: (702) 796-7181

If to the Trustee:

                The Bank of New York Trust Company, N.A.
                700 South Flower Street, Suite 500
                Los Angeles, California 90017
                Attention: Corporate Trust Administration
                Facsimile No.:  (213) 630-6298

      The Issuers or the Trustee, by notice to the other, may designate additional or different addresses for subsequent notices or communications.

      All notices and communications (other than those sent to Holders) shall be deemed to have been duly given: (i) at the time delivered, if personally delivered; (ii) five Business Days after being deposited in the mail, postage prepaid; (iii) when transmission

122

is confirmed, if sent by facsimile or telecopy mechanism; and (iv) the next Business Day after timely delivery to the courier, if sent by overnight courier guaranteeing next day delivery.

Any notice or communication to a Holder shall be (a) mailed by first class mail, certified or registered, return receipt requested, or (b) sent by overnight courier guaranteeing next day delivery (and providing proof of delivery) to its address shown on the register kept by the Registrar. Any notice or communication shall also be so mailed or sent to any Person described in TIA § 313(c), to the extent required by the TIA. Failure to give a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.

If a notice or communication is given in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

If the Issuers give a notice or communication to Holders, they shall give a copy to the Trustee and each Agent at the same time.

### Section 12.3    Communication by Holders of Notes with Other Holders of Notes

Holders may communicate pursuant to TIA § 312(b) with other Holders with respect to their rights under this Indenture or the Notes. The Issuers, the Trustee, the Registrar and anyone else shall have the protection of TIA § 312(c).

### Section 12.4    Certificate and Opinion as to Conditions Precedent

Upon any request or application by the Issuers to the Trustee to take any action under this Indenture, the Issuers shall furnish to the Trustee:

(a)
an Officers' Certificate in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 12.5 hereof) stating that, in the opinion of the signers, all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been satisfied; and

(b)
an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 12.5 hereof) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been satisfied.

### Section 12.5    Statements Required in Certificate or Opinion

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture (other than a certificate provided pursuant to TIA § 314(a)(4)) shall include:

123

(a)        a statement that the Person making such certificate or opinion has read such covenant or condition;

(b)

a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c)

a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been satisfied; and

(d)

a statement as to whether or not, in the opinion of such Person, such condition or covenant has been satisfied;

*provided, however,* that with respect to matters of fact, an Opinion of Counsel may rely on an Officers' Certificate or certificate of public officials.

**Section 12.6        Rules by Trustee and Agents**

The Trustee may make reasonable rules for action by or at a meeting of Holders.  The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

**Section 12.7        No Personal Liability of Directors, Officers, Employees and Stockholders**

No direct or indirect stockholder, employee, member, manager, officer or director, as such, past, present or future of the Issuers, the Guarantors or any successor entity shall have any personal liability in respect of the Issuers' obligations or the obligations of the Guarantors under this Indenture, the Notes, the Guarantees, the Registration Rights Agreement, the Intercreditor Agreement or the Collateral Agreements solely by reason of his, her or its status as such stockholder, member, manager, employee, officer or director, except that this provision shall in no way limit the obligation of the Issuers or the obligation of any Guarantor pursuant to any Guarantee.

**Section 12.8        GOVERNING LAW; WAIVER OF JURY TRIAL**

THIS INDENTURE, THE NOTES AND THE GUARANTEES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK, INCLUDING, WITHOUT LIMITATION, SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND NEW YORK CIVIL PRACTICE LAWS AND RULES 327(B); PROVIDED, THAT WITH RESPECT TO THE CREATION, ATTACHMENT, PERFECTION,  PRIORITY, ENFORCEMENT OF AND REMEDIES RELATING TO THE SECURITY INTEREST IN ANY REAL PROPERTY COLLATERAL, THE GOVERNING LAW MAY BE THE LAWS OF THE JURISDICTIONS WHERE SUCH

124

COLLATERAL IS LOCATED WITHOUT REGARD TO THE CONFLICT OF LAW PROVISIONS THEREOF.

EACH OF THE ISSUERS, THE GUARANTORS AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES OR THE TRANSACTION CONTEMPLATED HEREBY.

**Section 12.9**     **No Adverse Interpretation of Other Agreements**

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Issuers or the Subsidiaries or of any other Person. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

**Section 12.10**     **Successors**

Except as otherwise provided in Section 11.5 hereof, all agreements of the Issuers and the Guarantors in this Indenture and the Notes shall bind their successors. All agreements of the Trustee in this Indenture shall bind its successors.

**Section 12.11**     **Severability**

In case any one or more of the provisions of this Indenture or in the Notes or in the Guarantees shall be held invalid, illegal or unenforceable, in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions shall not in any way be affected or impaired thereby, it being intended that all of the provisions hereof shall be enforceable to the full extent permitted by law.

**Section 12.12**     **Counterpart Originals**

The parties may sign any number of copies of this Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

**Section 12.13**     **Table of Contents, Headings, Etc.**

The Table of Contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and shall in no way modify or restrict any of the terms or provisions hereof.

**Section 12.14**     **Intercreditor Agreement**

So long as the Intercreditor Agreement is in effect, the rights, obligations and remedies of the parties shall be subject thereto. This Indenture shall not impose any obligation or grant any right to any party to the extent that such obligation or right is inconsistent or conflicts with the Intercreditor Agreement. This Section 12.14 is for the

125

benefit of the Holders and the Trustee, and none of the Issuers or Guarantors shall be third party beneficiaries hereof.

**Section 12.15**     **Force Majeure**

In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

**Section 12.16**     **Applicable Gaming Laws**

Notwithstanding any provisions of this Indenture to the contrary, each of the Issuers, the Trustee and the Holders of the Notes shall be subject to compliance with, and the restrictions and requirements of, applicable Gaming Laws.

*[signature pages follow]*

126

## SIGNATURES

IN WITNESS WHEREOF, the parties hereto have executed this Indenture as of the date first written above.

### Issuers:

**155 East Tropicana, LLC**

By:  /s/ Neil G. Kiefer _____
      Name: Neil G. Kiefer
      Title: Chief Executive Officer

**155 East Tropicana Finance Corp.**

By:  /s/ Neil G. Kiefer _____
      Name: Neil G. Kiefer
      Title: President

**Trustee:**

**The Bank of New York Trust Company, N.A.**

By:  /s/ Sandee Parks
     Name: Sandee Parks
     Title: Vice President

**EXHIBIT A**

**[FORM OF NOTE]**

**155 East Tropicana, LLC**
**and**
**155 East Tropicana Finance Corp.**

**8¾% [Series A] [Series B](1) Senior Secured Note due 2012**

CUSIP:                                                                                       ISIN:
No.                                                                                          $

      155 East Tropicana, LLC, a Nevada limited-liability company (the "*Company*"), and 155 East Tropicana Finance Corp., a Nevada corporation ("*Finance Corp.*" and, together with the Company, the "*Issuers,*" which term includes any successors to any of such persons under the Indenture), for value received, hereby promise to pay to Cede & Co., or registered assigns, the principal sum of       Dollars, on April 1, 2012.

      **Interest Payment Dates**: April 1 and October 1, commencing October 1, 2005.

      **Interest Record Dates**:  March 15 and September 15.

      Reference is made to the further provisions of this Note on the reverse side, which shall, for all purposes, have the same effect as if set forth at this place.

      Upon request, the Issuers shall promptly make available to a Holder of this Note information regarding the issue price, the amount of original issue discount, if any, the issue date, and the yield to maturity of this Note.  Holders should contact 155 East Tropicana, LLC, 115 East Tropicana Avenue, Las Vegas, Nevada 89109 Attention: Secretary.

---

(1)      Series A should be replaced with Series B in the Exchange Notes.

A-1

IN WITNESS WHEREOF, each of the Issuers has caused this instrument to be duly executed.

**155 East Tropicana, LLC,**
**a Nevada limited-liability company**

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**155 East Tropicana Finance Corp.,**
**a Nevada corporation**

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

http://www.sec.gov/Archives/edgar/data/1526686/000104746905014761...

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This is one of the Notes described in the within-mentioned Indenture.

**The Bank of New York Trust Company, N.A.**

By: _____
       Authorized Signatory

Dated: _____

(Reverse of Note)

**8 ¾% [Series A] [Series B](2) Senior Secured Note due 2012**

[THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (I) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.6 OF THE INDENTURE, (II) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.6(a) OF THE INDENTURE, (III) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (IV) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE ISSUERS.](3)

[UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY, OR BY A NOMINEE OF THE DEPOSITARY, TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC"), TO THE ISSUERS OR THEIR AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.](4)

[THE RIGHTS ATTACHING TO THIS REGULATION S TEMPORARY GLOBAL NOTE AND THE CONDITIONS AND PROCEDURES GOVERNING ITS EXCHANGE FOR DEFINITIVE NOTES, ARE AS SPECIFIED IN THE INDENTURE (AS DEFINED HEREIN). NEITHER THE HOLDER NOR THE BENEFICIAL OWNERS OF THIS REGULATION S TEMPORARY GLOBAL NOTE SHALL BE

---

(2)    Series A should be replaced with Series B in the Exchange Notes.

(3)    To be included only on Global Notes deposited with DTC as Depositary.

(4)    To be included only on Global Notes deposited with DTC as Depositary.

1

ENTITLED TO RECEIVE CASH PAYMENTS OF INTEREST DURING THE PERIOD WHICH SUCH HOLDER HOLDS THIS NOTE. NOTHING IN THIS LEGEND SHALL BE DEEMED TO PREVENT INTEREST FROM ACCRUING ON THIS NOTE.](5)

[THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, REGISTRATION. THE HOLDER OF THIS SECURITY BY ITS ACCEPTANCE HEREOF (1) REPRESENTS THAT (X) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT), (Y) IT IS A NON-U.S. PURCHASER AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, OR (Z) IT IS AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF SUBPARAGRAPH (a)(1), (2), (3) OR (7) OF RULE 501 UNDER THE SECURITIES ACT, AND (2) AGREES TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE THAT IS TWO YEARS (OR SUCH OTHER PERIOD THAT MAY HEREAFTER BE PROVIDED UNDER RULE 144(k) UNDER THE SECURITIES ACT AS PERMITTING RESALES OF RESTRICTED SECURITIES BY NON-AFFILIATES WITHOUT RESTRICTION) AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE ISSUERS OR ANY AFFILIATE OF THE ISSUERS WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF SUCH SECURITY), ONLY (A) TO THE ISSUERS OR ANY SUBSIDIARIES OF THE ISSUERS, (B) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THIS SECURITY IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A UNDER THE SECURITIES ACT, (D) PURSUANT TO OFFERS AND SALES TO NON-U.S. PERSONS THAT OCCUR OUTSIDE THE UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, (E) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF SUBPARAGRAPH (a)(1), (2), (3) OR (7) OF RULE 501 UNDER THE SECURITIES ACT THAT IS ACQUIRING THIS SECURITY FOR ITS OWN ACCOUNT, OR FOR THE ACCOUNT OF SUCH AN INSTITUTIONAL "ACCREDITED INVESTOR," FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO, OR FOR OFFER OR SALE

---

(5)    To be included only on Reg S Temporary Global Notes.

---

IN CONNECTION WITH, ANY DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT, OR (F) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE ISSUERS' AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSE (D), (E), OR (F) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATIONS AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM, AND IN EACH OF THE FOREGOING CASES, A CERTIFICATE OF TRANSFER IN THE FORM APPEARING ON THIS SECURITY IS COMPLETED AND DELIVERED BY THE TRANSFEROR TO THE TRUSTEE AND IN EACH CASE IN ACCORDANCE WITH APPLICABLE SECURITIES LAWS OF ANY U.S. STATE OR ANY OTHER APPLICABLE JURISDICTION.](6)

Capitalized terms used herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1.    *Interest.* 155 East Tropicana, LLC, a Nevada limited-liability company (the "*Company*"), and 155 East Tropicana Finance Corp., a Nevada corporation ("*Finance Corp.*" and, together with the Company, the "*Issuers,*" which term includes any successors to any of such persons under the Indenture), promises to pay Interest on the principal amount of this Note at 8¾% per annum from the Issue Date until maturity and shall pay the Liquidated Damages, if any, payable pursuant to Section 4 of the Registration Rights Agreement referred to below.  The Issuers shall pay Interest and Liquidated Damages, if any, semi-annually on April 1 and October 1 of each year, or if any such day is not a Business Day, on the next succeeding Business Day (each an "*Interest Payment Date*").  The first Interest Payment Date shall be October 1, 2005.  Interest on the Notes shall accrue from the most recent date to which Interest has been paid or, if no Interest has been paid, from the Issue Date; *provided* that if there is no existing Default in the payment of Interest, and if this Note is authenticated between an Interest Record Date (as defined below) referred to on the face hereof and the next succeeding Interest Payment Date, Interest shall accrue from such next succeeding Interest Payment Date.  The Issuers shall pay Interest (including Accrued Bankruptcy Interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at the interest rate on the Notes then in effect, and shall pay Interest (including Accrued Bankruptcy Interest in any proceeding under any Bankruptcy Law) on overdue installments of Interest (and Liquidated Damages, if any) without regard to any applicable grace periods from time to time on demand at the same rate to the extent lawful.  Interest shall be calculated on the basis of a 360-day year consisting of twelve 30-day months.

2.    *Method of Payment.*  The Issuers shall pay Interest and Liquidated Damages, if any, on the Notes to the Persons who are registered Holders of Notes at the close of business on the March 15 or September 15 next preceding the Interest Payment Date (each an "*Interest Record Date*"), even if such Notes are cancelled after such

---

(6)    To be included only on Transfer Restricted Notes.

3

10/15/2007 11:13 AM

Interest Record Date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to Defaulted Interest. The Notes will be payable as to principal, premium, if any, Interest and Liquidated Damages, if any, at the office or agency of the Issuers maintained within the City and State of New York for such purpose, or, at the option of the Issuers, payment of Interest and Liquidated Damages, if any, may be made by check mailed to the Holders at their addresses set forth in the register of Holders, *provided,*
that payment by wire transfer of immediately available funds to an account within the United States shall be required with respect to principal of and premium, if any, Interest and Liquidated Damages, if any, on all Global Notes. Such payment shall be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

      3.    *Paying Agent and Registrar.* Initially, The Bank of New York Trust Company, N.A., the Trustee under the Indenture, shall act as Paying Agent and Registrar. The Issuers may change any Paying Agent or Registrar without notice to any Holder. The Issuers or any of the Subsidiaries may act in any such capacity.

      4.    *Indenture.* The Issuers issued the Notes under an Indenture, dated as of the Issue Date (as it may be amended or supplemented from time to time, the "*Indenture*"), by and among the Issuers, the Guarantors party thereto and the Trustee. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as amended (15 U.S. Code §§ 77aaa-77bbbb) (the "*TIA*"). The Notes are subject to all such terms, and Holders are referred to the Indenture and the TIA for a statement of such terms.

      The Obligations under the Indenture, the Notes and the Guarantees thereof are secured by the Collateral described in the Collateral Agreements, subject to the provisions of such agreements. Holders are referred to the Collateral Agreements for a statement of such terms.

      5.    *Optional Redemption.*

      (a)

The Issuers shall not have the right to redeem any Notes prior to April 1, 2009 (other than with the Net Cash Proceeds of a Qualified Equity Offering, as provided in Section 5(b) hereof). The Notes shall be redeemable for cash at the Issuers' option, in whole or in part, at any time and from time to time, on or after April 1, 2009 at the following redemption prices (expressed as percentages of the principal amount) if redeemed during the 12-month period commencing April 1 of the years indicated below, in each case together with accrued and unpaid Interest (and Liquidated Damages, if any) to the date of redemption of the Notes (the "*Redemption Date*"):

4

---

| Year | Percentage |
|------|-----------|
| 2009 | 104.375% |
| 2010 | 102.188% |
| 2011 and thereafter | 100.000% |

(b)

At any time on or prior to April 1, 2008, upon a Qualified Equity Offering, up to 35% of the aggregate principal amount of the Notes originally issued pursuant to the Indenture may be redeemed at the Issuers' option within 90 days of such Qualified Equity Offering, with cash received by the Issuers from the Net Cash Proceeds of such Qualified Equity Offering, at a redemption price equal to 108¾% of principal amount thereof, together with accrued and unpaid Interest (and Liquidated Damages, if any) to the Redemption Date; *provided, however*, that immediately following such redemption not less than 65% of the aggregate principal amount of the Notes originally issued pursuant to the Indenture on the Issue Date remain outstanding.

(c)

Notice of redemption shall be mailed, by first class mail, at least 30 days but not more than 60 days before the Redemption Date pursuant to Sections 5(a) and 5(b) to each Holder whose Notes are to be redeemed at its registered address, and any such redemption shall be made pursuant to the procedures required by the Indenture. Notes in denominations larger than $1,000 may be redeemed in part but only in integral multiples of $1,000, unless all of the Notes held by a Holder are to be redeemed. On and after the Redemption Date, Interest (and Liquidated Damages, if any) cease to accrue on Notes or portions thereof called for redemption unless the Issuers default in such payments due on the Redemption Date.

6.    *Mandatory Redemption.*  The Issuers shall not be required to make any mandatory redemption payments with respect to the Notes (except for any offer to repurchase Notes that the Issuers are required to make as described in Section 8 hereof). The Notes shall not have the benefit of any sinking fund.

7.    *Regulatory Redemption.*  Notwithstanding any other provisions hereof, if any Gaming Authority requires that a Holder or beneficial owner of Notes must be licensed, qualified or found suitable under any applicable Gaming Law and such Holder or beneficial owner fails to apply for a license, qualification or a finding of suitability within 30 days after being requested to do so by the Gaming Authority (or such lesser period that may be required by such Gaming Authority), or if such Holder or such beneficial owner is not so licensed, qualified or found suitable, the Issuers shall have the right, at the Issuers' option, (1) to require such Holder or beneficial owner to dispose of such Holder's or beneficial owner's Notes within 30 days of receipt of notice of such finding by the applicable Gaming Authority or such earlier date as may be ordered by such Gaming Authority or (2) to call for the redemption (a "*Regulatory Redemption*") of the Notes of such Holder or beneficial owner at the principal amount thereof or, if required by such Gaming Authority, the lesser of (a) the price at which such Holder or beneficial owner acquired the Notes, and (b) the fair market value of such Notes on the date of redemption, together with, in either case, accrued and unpaid Interest (and, if

5

permitted by such Gaming Authority, Liquidated Damages) to the earlier of the date of redemption or such earlier date as may be required by such Gaming Authority or the date of the finding of unsuitability by such Gaming Authority, which may be less than 30 days following the notice of redemption, if so ordered by such Gaming Authority. The Issuers are not required to pay or reimburse any Holder or beneficial owner of the Notes for the expenses of any such Holder or beneficial owner related to the application for any license, qualification or finding of suitability in connection with a Regulatory Redemption. Such expenses of any such Holder or beneficial owner shall, therefore, be the obligation of such Holder or beneficial owner.

Immediately upon the imposition of a requirement to dispose of the Notes by a Gaming Authority, such Holder or beneficial owner shall, to the extent required by applicable Gaming Laws, have no further right (i) to exercise, directly or indirectly, through any trustee, nominee or any other person or entity, any right conferred by the Notes, or (ii) to receive any remuneration in any form with respect to the Notes from the Issuers or the Trustee, except the redemption price.

8.    *Offers to Purchase.*

(a)    *Change of Control.*  In the event that a Change of Control has occurred, each Holder of Notes shall have the right, at such Holder's option, pursuant to an offer by the Issuers (subject only to conditions required by applicable law, if any) (the "*Change of Control Offer*"), to require the Issuers to repurchase all or any part of such Holder's Notes (*provided*, that the principal amount of such Notes must be $1,000 or an integral multiple thereof), at a cash price equal to 101% of the principal amount thereof (the "*Change of Control Purchase Price*"), together with accrued and unpaid Interest (and Liquidated Damages, if any) to the Change of Control Purchase Date (as defined below).

In order to effect the Change of Control Offer, the Issuers shall, not later than the 30th day after the occurrence of the Change of Control, mail to each Holder of Notes notice of the Change of Control Offer (the "*Change of Control Notice*"), describing the transaction or transactions that constitute the Change of Control and offering to repurchase the Notes on a date (the "*Change of Control Purchase Date*") that is no earlier than 30 days and no later than 60 days after the date the Change of Control Notice is mailed, pursuant to the procedures required by the Indenture and described in the Change of Control Notice.

On or before the Change of Control Purchase Date, the Issuers shall: (i) accept for payment Notes or portions thereof properly tendered pursuant to the Change of Control Offer, (ii) deposit with the Paying Agent cash in an amount sufficient to pay the Change of Control Purchase Price, together with accrued and unpaid Interest (and Liquidated Damages, if any) to the Change of Control Purchase Date of all Notes so tendered, and (iii) deliver to the Trustee the Notes so accepted together with an Officers' Certificate listing the Notes or portions thereof being purchased by the Issuers.  The Paying Agent promptly shall pay each Holder of Notes so accepted an amount equal to the Change of Control Purchase Price, together with accrued and unpaid Interest (and Liquidated Damages, if any) to the Change of Control Purchase Date, and the Trustee

6

http://www.sec.gov/Archives/edgar/data/1326686/000104746905014761...

promptly shall authenticate and deliver to each such Holder a new Note equal in principal amount to any unpurchased portion of the Note surrendered. Any Notes not so accepted shall be delivered promptly by the Issuers to the Holder thereof. The Issuers shall publicly announce the results of the Change of Control Offer on or as soon as practicable after the Change of Control Purchase Date.

(b)    *Asset Sale.* Subject to certain exceptions set forth in the Indenture, the Issuers shall not and the Guarantors shall not, and neither the Issuers nor the Guarantors shall permit any of the Subsidiaries to, in one or a series of related transactions, make any Asset Sale unless: (i) at least 75% of the total consideration for such Asset Sale or series of related Asset Sales consists of cash or Cash Equivalents, and (ii) the Board of Directors of the applicable Issuer determines in reasonable good faith that such Issuer or such Subsidiary shall receive, as applicable, fair market value for such Asset Sale. For purposes of clause (i) of the preceding sentence the following shall be deemed to constitute cash or Cash Equivalents: (a) the amount of any Indebtedness or other liabilities (other than Indebtedness or liabilities that are by their terms subordinated to the Notes and the Guarantees) of the Issuers or such Subsidiary that are assumed by the transferee of any such assets so long as the documents governing such liabilities provide that there is no further recourse to the Issuers or any of the Subsidiaries with respect to such liabilities and (b) fair market value of any marketable securities, currencies, notes or other obligations received by the Issuers or any such Subsidiary in exchange for any such assets that are converted into cash or Cash Equivalents within 30 days after the consummation of such Asset Sale, *provided*, that such cash and Cash Equivalents shall be treated as Net Cash Proceeds attributable to the original Asset Sale for which such property was received.

Within 360 days following such Asset Sale, the Net Cash Proceeds therefrom (the "*Asset Sale Amount*"), if used, shall be: (a) (i) used to retire Purchase Money Indebtedness secured by the asset which was the subject of the Asset Sale, or (ii) used to retire and permanently reduce Indebtedness incurred under the Credit Agreement; *provided*, that in the case of a revolver or similar arrangement that makes credit available, such commitment is permanently reduced by such amount; or (b) invested in assets and property (other than notes, bonds, obligations and securities, except in connection with the acquisition of a Person in a Related Business which immediately following such acquisition becomes a Guarantor) which in the reasonable good faith judgment of the applicable Issuer's Board of Directors will immediately constitute or be a part of a Related Business of the Issuers or such Guarantor (if it continues to be a Guarantor) immediately following such transaction (such assets or property the "*Related Business Assets*"); or (c) any combination of (a) or (b). All Net Cash Proceeds from an Event of Loss shall be used as follows: (1) first, to the extent not prohibited by the Credit Agreement, the Issuers shall use such Net Cash Proceeds to the extent necessary to rebuild, repair, replace or restore the assets subject to such Event of Loss with comparable assets; and (2) then, to the extent any Net Cash Proceeds from an Event of Loss are not used as described in the preceding clause (1), all such remaining Net Cash Proceeds shall be reinvested or used as provided in the immediately preceding clause (a), (b) or (c).

7

The accumulated Net Cash Proceeds from Asset Sales not applied as set forth in clause (a), (b) or (c) of the immediately preceding paragraph and the accumulated Net Cash Proceeds from any Event of Loss not applied as set forth in clause (1) or (2) of the immediately preceding paragraph shall constitute *"Excess Proceeds."* Pending the final application of any Net Cash Proceeds, the Issuers may temporarily reduce revolving credit borrowings or otherwise invest or use for general corporate purposes the Net Cash Proceeds in any manner that is not prohibited by the Indenture; *provided, however,* that the Issuers may not use the Net Cash Proceeds (x) to make Restricted Payments other than Restricted Payments that are solely Restricted Investments or (y) to make Permitted Investments pursuant to clause (a) of the definition thereof. When the Excess Proceeds equal or exceed $5,000,000, the Issuers shall offer to repurchase the Notes, together with any other Indebtedness ranking on a parity with the Notes and with similar provisions requiring the Issuers to make an offer to purchase such Indebtedness with the proceeds from such Asset Sale pursuant to a cash offer (subject only to conditions required by applicable law, if any) (the *"Asset Sale Offer"*) at a purchase price of 100% of the principal amount (or accreted value in the case of Indebtedness issued with an original issue discount) (the *"Asset Sale Offer Price"*) together with accrued and unpaid interest (and Liquidated Damages, if any) to the Asset Sale Purchase Date. In order to effect the Asset Sale Offer, the Issuers shall promptly after expiration of the 360-day period following the Asset Sale that produced such Excess Proceeds mail to each Holder of Notes notice of the Asset Sale Offer (the *"Asset Sale Notice"*), offering to purchase the Notes on a date (the *"Asset Sale Purchase Date"*) that is no earlier than 30 days and no later than 60 days after the date that the Asset Sale Notice is mailed, pursuant to the procedures required by the Indenture and described in the Asset Sale Notice. On the Asset Sale Purchase Date, the Issuers shall apply an amount equal to the Excess Proceeds (the *"Asset Sale Offer Amount"*) plus an amount equal to accrued and unpaid interest (and Liquidated Damages, if any) to the purchase of all Indebtedness properly tendered in the Asset Sale Offer (on a *pro rata* basis if the Asset Sale Offer Amount is insufficient to purchase all Indebtedness so tendered) at the Asset Sale Offer Price, together with accrued and unpaid interest (and Liquidated Damages, if any) to the Asset Sale Purchase Date. To the extent that the aggregate amount of Notes and such other *pari passu* Indebtedness tendered pursuant to an Asset Sale Offer is less than the Asset Sale Offer Amount, the Issuers may use any remaining Net Cash Proceeds as otherwise permitted by the Indenture. Following the consummation of each Asset Sale Offer in accordance with the provisions of the Indenture, the Excess Proceeds amount shall be reset to zero.

         9.     *Denominations, Transfer, Exchange*. The Notes are in registered form without coupons in denominations of $1,000 and integral multiples of $1,000. The transfer of Notes may be registered, and Notes may be exchanged, as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents, and the Issuers may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Issuers need not exchange or register the transfer of any Note or a portion of a Note selected for redemption, except for the unredeemed portion of any Note being redeemed in part. Also, the Issuers need not exchange or register the transfer of any Notes for a period of 15 days before any mailing of a notice of redemption of Notes to be redeemed

8

or during the period between an Interest Record Date and the corresponding Interest Payment Date.

      10.     *Persons Deemed Owners.* The registered Holder of a Note may be treated as its owner for all purposes.

      11.     *Amendment, Supplement, Modification and Waiver.*

      (a)

Subject to certain exceptions, with the consent of the Holders of not less than a majority in aggregate principal amount of the Notes then outstanding (including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, the Notes), (i) the Indenture, the Notes, the Guarantees, the Intercreditor Agreement (subject to any required approval of the lenders under the Credit Agreement party thereto) and the Collateral Agreements may be amended, supplemented or otherwise modified, and (ii) any existing Default or Event of Default (other than a Default or Event of Default in the payment of the principal of or premium, if any, or Interest (or Liquidated Damages, if any) on the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of the Indenture, the Notes, the Guarantees, the Intercreditor Agreement (subject to any required approval of the lenders under the Credit Agreement party thereto) and the Collateral Agreements may be waived.

      (b)

Without the consent of the Holders, the Issuers, the Guarantors and the Trustee may amend, modify or supplement the Indenture, the Notes, the Guarantees, the Intercreditor Agreement and the Collateral Agreements to cure any ambiguity, defect or inconsistency; to provide for uncertificated Notes in addition to or in place of certificated Notes; to provide for the assumption of any of the Issuers' or the Guarantors' obligations to Holders in the case of a merger or consolidation or a sale of all or substantially all of the Issuers' assets in accordance with the Indenture; to evidence the release of any Guarantor permitted to be released under the terms of the Indenture or to evidence the addition of any new Guarantor; to comply with requirements of the Commission in order to effect or maintain the qualification of the Indenture under the TIA; to comply with applicable Gaming Laws, to the extent not materially adverse to holders of Notes; to comply with the provisions of DTC or the Trustee with respect to the provisions of the Indenture and the Notes relating to transfers and exchanges of Notes or beneficial interests therein; to make any change that would provide any additional rights or benefits to the Holders or that does not adversely affect the rights of any Holder of Notes under the Indenture, the Notes, the Guarantees, the Intercreditor Agreement, the Collateral Agreements or the Registration Rights Agreement; or to provide for the issuance of Additional Notes in accordance with the limitations set forth in the Indenture as of the date thereof, including Section 4.7 thereof.

      (c)

Notwithstanding the foregoing, and subject to the Intercreditor Agreement, no portion of the Collateral may be released from the Lien of the Collateral Agreements (except in accordance with the provisions of the Indenture and the Collateral Agreements), and none of the Collateral Agreements or the provisions of this Indenture relating to the Collateral may be amended or supplemented, and the rights of any Holders

9

may not be waived or modified, without, in each case, the consent of the Holders of at least 66$^2$/$_3$% in aggregate principal amount of the then outstanding Notes.

12.    *Defaults and Remedies.*   Each of the following constitutes an Event of Default: (a) the Issuers' failure to pay any installment of Interest (or Liquidated Damages, if any) on the Notes as and when the same becomes due and payable and the continuance of any such failure for 30 days, (b) the Issuers' failure to pay all or any part of the principal of or premium, if any, on the Notes when and as the same becomes due and payable at maturity, redemption, by acceleration or otherwise, including, without limitation, payment of the Change of Control Purchase Price, or the Asset Sale Offer Price, on Notes validly tendered and not properly withdrawn pursuant to a Change of Control Offer or Asset Sale Offer, as applicable, (c) the Issuers' failure or the failure by any of the Guarantors or any of the Subsidiaries to observe or perform any other covenant or agreement contained in the Notes or the Indenture and, except for the provisions under Sections 4.9, 4.13, 4.14 and Article V of the Indenture, the continuance of such failure for a period of 30 days after the earlier of written notice to the Issuers by the Trustee or written notice to the Issuers and the Trustee by the Holders of at least 25% in aggregate principal amount of the Notes outstanding, (d) the cessation of substantially all gaming operations of the Issuers and the Subsidiaries, taken as a whole, for more than 90 days, except as a result of an Event of Loss, (e) any revocation, suspension, expiration (without previous or concurrent renewal) or loss of any Gaming License of any of the Issuers or any Subsidiary for more than 90 days, (f) a default occurs (after giving effect to any waivers, amendments, applicable grace periods or any extension of any maturity date) in the Issuers' Indebtedness or the Indebtedness of any of the Subsidiaries with an aggregate amount outstanding in excess of $5,000,000 (x) resulting from the failure to pay principal of such Indebtedness at maturity, or (y) if as a result of such default, the maturity of such Indebtedness has been accelerated prior to its stated maturity, (g) final unsatisfied judgments not covered by insurance aggregating in excess of $5,000,000 at any one time rendered against the Issuers or any of the Subsidiaries and not stayed, bonded or discharged within 60 days after their entry, (h) any Guarantee of a Guarantor ceases to be in full force and effect or becomes unenforceable or invalid or is declared null and void (other than in accordance with the terms of the Guarantee and the Indenture) or any Guarantor denies or disaffirms its Obligations under its Guarantee or the Collateral Agreements, (i) any failure to comply with any material agreement or material covenant in, or any breach of a material representation under, the Collateral Agreements and such failure or breach shall continue for a period of 30 days, (j) any of the Collateral Agreements at any time for any reason ceases to be in full force and effect, or is declared null and void, or shall cease to be effective in all material respects to give the Trustee the Liens with the priority purported to be created thereby (subject to the Intercreditor Agreement) subject to no other Liens (in each case, other than as expressly permitted by the Indenture and the applicable Collateral Agreement, or by reason of the termination of the Indenture or the applicable Collateral Agreement in accordance with its terms), (k) a court having jurisdiction in the premises enters a decree or order for (A) relief in respect of any of the Issuers, any of the Guarantors or any of their Significant Subsidiaries in an involuntary case under any applicable Bankruptcy Law now or hereafter in effect, (B) appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of any of the Issuers, any of the Guarantors or any of their Significant

10

Subsidiaries or for all or substantially all of the property and assets of any of the Issuers, any of the Guarantors or any of their Significant Subsidiaries or (C) the winding up or liquidation of the affairs of any of the Issuers, any of the Guarantors or any of their Significant Subsidiaries and, in each case, such decree or order shall remain unstayed and in effect for a period of 60 consecutive days, (l) any of the

Issuers, any of the Guarantors or any of their Significant Subsidiaries of the Issuers (A) commences a voluntary case under any applicable Bankruptcy Law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such law, (B) consents to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of any of the

Issuers, any of the Guarantors or any of their Significant Subsidiaries or for all or substantially all of the property and assets of any of the

Issuers, any of the Guarantors or any of their Significant Subsidiaries or (C) effects any general assignment for the benefit of creditors, (m) the occurrence of a Tenant Event of Default (as defined in the Leases) or a Landlord Event of Default (as defined in the Leases), or the termination of either of the Leases (other than in accordance with their terms following the occurrence of the Operator Licensing Event), or (n) except in connection with a merger, consolidation or sale, lease, conveyance or transfer of all or substantially all of the Issuers' assets in accordance with Article V, the abandonment by the Issuers of the Hooters Renovation or the cessation by the Issuers (or, prior to the occurrence of the Operator Licensing Event, E&W) to operate the Property or the Casino/Hotel Property or the sale or disposition by the Issuers of all or substantially all of their interest in the Property or the Casino/Hotel Property.

   13. *Trustee Dealings with Issuers*.  The Trustee, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Issuers or their Affiliates, and may otherwise deal with the Issuers or their Affiliates, as if it were not the Trustee.

   14. *No Recourse Against Others*.  No direct or indirect stockholder, member, manager, employee, officer or director, as such, past, present or future of the Issuers, the Guarantors or any successor entity shall have any personal liability in respect of the Issuers' obligations or the obligations of the Guarantors under the Indenture, the Notes, the Guarantees, the Registration Rights Agreement or the Collateral Agreements, solely by reason of his, her or its status as such stockholder, member, manager, employee, officer or director, except that this provision shall in no way limit the obligation of the Issuers or the obligation of any Guarantor pursuant to any Guarantee.

   15. *Authentication*.  This Note shall not be valid until authenticated by the manual signature of the Trustee or an authenticating agent.

   16. *Abbreviations*.  Customary abbreviations may be used in the name of a Holder or an assignee, such as:  TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

   17. *CUSIP Numbers*.  Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuers have caused

11

CUSIP numbers to be printed on the Notes, and the Trustee may use CUSIP numbers in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption, and reliance may be placed only on the other identification numbers placed thereon, and any such redemption shall not be affected by any defect in or omission of such numbers.

       18.    *Guarantees*. As more fully set forth in the Indenture, to the extent permitted by law, each of the Guarantors from time to time, in accordance with Article XI of the Indenture, jointly and severally, irrevocably and unconditionally guarantees on a senior secured basis to the Trustee for the benefit of the Holders and to each Holder of a Note authenticated and delivered by the Trustee and its successors and assigns that: (i) (A) the principal of and premium, if any, and Interest (and Liquidated Damages, if any) on the Notes shall be duly and punctually paid in full when due, whether at maturity, by acceleration, call for redemption, upon a Change of Control Offer, an Asset Sale Offer or otherwise, (B) Interest on overdue principal of and premium, if any, and (to the extent permitted by law) Interest on any Interest, if any (and Liquidated Damages, if any) on the Notes shall be promptly paid in full and (C) all other Obligations of the Issuers to the Holders or the Trustee under the Notes, the Indenture, the Collateral Agreements and the Registration Rights Agreement (including fees, expenses or otherwise) shall be duly and punctually paid in full when due and performed, all in accordance with the terms hereof and thereof; and (ii) in case of any extension of time of payment or renewal of any Notes or any of such other Obligations, the same shall be duly and punctually paid in full when due and performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, call for redemption, upon a Change of Control Offer, an Asset Sale Offer or otherwise, subject, however, in the case of clauses (i) and (ii) above, to the limitations set forth in Section 11.6 the Indenture.

      When a successor Guarantor assumes all the obligations of its predecessor Guarantor under the Notes and the Indenture, the predecessor Guarantor may be released from those obligations.

      The obligations described in clauses (i) and (ii) above also shall be guaranteed on a senior secured basis by Eastern & Western Hotel Corporation, a Nevada corporation, to the extent of the funds in the "Cash Account" (as defined in the E&W Guarantee and Pledge Agreement), subject to the limitations set forth therein.

       19.    *Governing Law*. THE INDENTURE, THE NOTES AND THE GUARANTEES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK, INCLUDING, WITHOUT LIMITATION, SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND NEW YORK CIVIL PRACTICE LAWS AND RULES 327(B); PROVIDED, THAT WITH RESPECT TO THE CREATION, ATTACHMENT, PERFECTION, PRIORITY, ENFORCEMENT OF AND REMEDIES RELATING TO THE SECURITY INTEREST IN ANY REAL PROPERTY COLLATERAL, THE GOVERNING LAW MAY BE THE LAWS OF

12

THE JURISDICTIONS WHERE SUCH COLLATERAL IS LOCATED WITHOUT REGARD TO THE CONFLICT OF LAW PROVISIONS THEREOF.

20.    *Security.*  This Note is secured by substantially all of the assets of the Issuers and the Guarantors, the Equity Interests in the Issuers and the Guarantors, and the "Cash Account" (as defined in the E&W Guarantee & Pledge Agreement), in each case, subject to certain exceptions and limitations more fully set forth in the Indenture and Collateral Agreements.

21.    *Certificate And Opinion As To Conditions Precedent.*  Upon any request or application by the Issuers to the Trustee to take any action under the Indenture, the Issuers shall furnish to the Trustee (i) an Officers' Certificate in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 12.5 of the Indenture) stating that, in the opinion of the signers, all conditions precedent and covenants, if any, provided for in the Indenture relating to the proposed action have been satisfied; and (ii) an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 12.5 of the Indenture) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been satisfied.

22.    *Additional Rights of Holders of Transfer Restricted Notes.*(7)  In addition to the rights provided to Holders of Notes under the Indenture, Holders of Transfer Restricted Notes shall have all the rights set forth in the Registration Rights Agreement.

The Issuers shall furnish to any Holder upon written request and without charge a copy of the Indenture and/or the Registration Rights Agreement.  Requests may be made to:

155 East Tropicana, LLC
115 East Tropicana Avenue
Las Vegas, Nevada 89109
Attention: Secretary

---

(7)    To be included only on Transfer Restricted Notes.

13

http://www.sec.gov/Archives/edgar/data/1326686/000104746905014761...

**Assignment Form**

To assign this Note, fill in the form below

(I) or (We) assign and transfer this Note to:

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____
_____
_____
_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Note on the books of the Issuers. The agent may substitute another to act for it.

Date:  _____

Your Signature: _____
(Sign exactly as your name appears on the face of this Note)
Signature Guarantee*

_____

*NOTICE:  The Signature must be guaranteed by an Institution which is a member of one of the following recognized signature Guarantee Programs: (i) The Securities Transfer Agent Medallion Program (STAMP); (ii) The New York Stock Exchange Medallion Program (MNSP); (iii) The Stock Exchange Medallion Program (SEMP); or (iv) such other guarantee program acceptable to the Trustee.

14

**Option of Holder to Elect Purchase**

If you want to elect to have this Note purchased by the Issuers pursuant to Section 4.13 or 4.14 of the Indenture, check the box below:

Section 4.13 ☐                    Section 4.14 ☐

If you want to elect to have only part of the Note purchased by the Issuers pursuant to Section 4.13 or 4.14 of the Indenture, state the aggregate principal amount you elect to have purchased (in denominations of $1,000 only, except if you have elected to have all of your Notes purchased): $

Date: _____                    Your Signature: _____
(Sign exactly as your name appears on the Note)

Social Security or Tax Identification No.: _____
Signature Guarantee*

_____

*NOTICE:  The Signature must be guaranteed by an Institution which is a member of one of the following recognized signature Guarantee Programs: (i) The Securities Transfer Agent Medallion Program (STAMP); (ii) The New York Stock Exchange Medallion Program (MNSP); (iii) The Stock Exchange Medallion Program (SEMP); or (iv)  such other guarantee program acceptable to the Trustee.

15

## Schedule of Exchanges of Interests in the Global Note(8)

The following exchanges of an interest in this Global Note for an interest in another Global Notes or for a Definitive Note, or exchanges of an interest in another Global Note or a Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of Decrease in Principal Amount of this Global Note | Amount of Increase in Principal Amount of this Global Note | Principal Amount of this Global Note Following Such Decrease or Increase | Signature of Authorized Signatory of Trustee or Note Custodian |
|---|---|---|---|---|
| | | | | |

---

(8)      This should be included only if the Note is issued in global form.

16

---

## GUARANTEE

Each entity listed on the signature page hereto (hereafter referred to as a "*Guarantor*," which term includes any successors or assigns under the Indenture, dated as of March 29, 2005, among the Issuers (as defined below), the Guarantors (as defined therein) and The Bank of New York Trust Company, N.A., as trustee (the "*Indenture*"), as amended or supplemented by any amendments or supplemental indentures thereto), has executed either the Indenture or a supplemental indenture in substantially the form attached as Exhibit E to the Indenture and has irrevocably and unconditionally guaranteed on a senior secured basis the Guarantee Obligations (as defined in Section 11.1 of the Indenture), which include: (i) (A) the due and punctual payment in full of the principal of and premium, if any, and Interest and Liquidated Damages, if any, on the 8¾% Senior Secured Notes due 2012 (the "*Notes*") of 155 East Tropicana, LLC, a Nevada limited-liability company (the "*Company*"), and 155 East Tropicana Finance Corp., a Nevada corporation ("*Finance Corp.*" and, together with the Company, the "*Issuers*," which term includes any successors to any of such persons under the Indenture), whether at maturity, by acceleration, call for redemption, upon a Change of Control Offer, an Asset Sale Offer or otherwise, (B) the prompt payment in full of all Interest on overdue principal of and premium, if any, and (to the extent permitted by law) Interest on any Interest, if any (and Liquidated Damages, if any), on the Notes, and (C) the due and punctual payment when due and performance of all other Obligations of the Issuers to the Holders or the Trustee under the Notes, the Indenture, the Collateral Agreements and the Registration Rights Agreement (including fees, expenses or otherwise), all in accordance with the terms thereof; and (ii) in case of any extension of time of payment or renewal of any Notes or any of such other Obligations, the due and punctual payment or renewal of the same in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, call for redemption, upon a Change of Control Offer, an Asset Sale Offer or otherwise, *provided, however*, that the obligations of each Guarantor under this Guarantee shall be limited to the extent necessary to insure that it does not constitute a fraudulent conveyance under applicable law.

This Guarantee is secured by substantially all of the assets of the Guarantors, subject to certain exceptions and limitations more fully set forth in the Indenture and Collateral Agreements.

The obligations of each Guarantor to the Holders and to the Trustee pursuant to this Guarantee and the Indenture are expressly set forth in Article XI of the Indenture and reference is hereby made to the Indenture for the precise terms of this Guarantee.

No direct or indirect stockholder, member, manager, employee, officer or director, as such, past, present or future of the Issuers, the Guarantors or any successor entity shall have any personal liability in respect of the Issuers' obligations or the obligations of the Guarantors under the Indenture, the Notes, the Guarantees, the Registration Rights Agreement, the Intercreditor Agreement or the Collateral Agreements solely by reason of his, her or its status as such stockholder, member, manager, employee,

17

---

officer or director, except that this provision shall in no way limit the obligation of the Issuers of the obligation of any Guarantor pursuant to any Guarantee.

This is a continuing Guarantee and shall remain in full force and effect and shall be binding upon each Guarantor and its successors and assigns until full and final payment of all of the Issuers' obligations under the Notes and Indenture or until released or defeased in accordance with the Indenture and shall inure to the benefit of the successors and assigns of the Trustee and the Holders, and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges herein conferred upon that party shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions hereof.  This is a Guarantee of payment and performance and not of collectibility.

This Guarantee shall not be valid or obligatory for any purpose until the certificate of authentication on the Note upon which this Guarantee is noted shall have been executed by the Trustee under the Indenture by the manual signature of one of its authorized officers.

THE TERMS OF ARTICLE XI OF THE INDENTURE ARE INCORPORATED HEREIN BY REFERENCE.

THIS GUARANTEE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK, INCLUDING, WITHOUT LIMITATION, SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND NEW YORK CIVIL PRACTICE LAWS AND RULES 327(B); PROVIDED, THAT WITH RESPECT TO THE CREATION, ATTACHMENT, PERFECTION, PRIORITY, ENFORCEMENT OF AND REMEDIES RELATING TO THE SECURITY INTEREST IN ANY REAL PROPERTY COLLATERAL, THE GOVERNING LAW MAY BE THE LAWS OF THE JURISDICTIONS WHERE SUCH COLLATERAL IS LOCATED WITHOUT REGARD TO THE CONFLICT OF LAW PROVISIONS THEREOF.

Capitalized terms used herein have the same meanings given in the Indenture unless otherwise indicated.

*[signature pages follow]*

18

http://www.sec.gov/Archives/edgar/data/1326686/000104746905014761...

IN WITNESS WHEREOF, each Guarantor has caused this instrument to be duly executed.

Dated: _____

**[Guarantor]**

By: _____
      Name:
      Title:

EXHIBIT B

FORM OF CERTIFICATE OF TRANSFER

155 East Tropicana, LLC
155 East Tropicana Finance Corp.
c/o 155 East Tropicana, LLC
115 East Tropicana Avenue
Las Vegas, Nevada 89109

The Bank of New York Trust Company, N.A.
700 South Flower Street, Suite 500
Los Angeles, California 90017
Attention: Corporate Trust Administration

Re:      $8^3/_4\%$ Senior Secured Notes due 2012 (the "*Notes*")

Dear Sir or Madam:

      Reference is hereby made to the Indenture, dated as of March 29, 2005 (as it may be amended or supplemented from time to time, the "*Indenture*"), among 155 East Tropicana, LLC, a Nevada limited-liability company (the "*Company*"), and 155 East Tropicana Finance Corp., a Nevada corporation ("*Finance Corp.*" and, together with the Company, the "*Issuers,*" which term includes any successors to any of such persons under the Indenture), the Guarantors party thereto and The Bank of New York Trust Company, N.A., as trustee, relating to the Notes. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

      , (the "*Transferor*") owns and proposes to transfer the Note[s] or interest in such Note[s] specified in Annex A hereto, in the principal amount of $     in such Note[s] or interests (the "*Transfer*"), to     (the "*Transferee*"), as further specified in Annex A hereto. In connection with the Transfer, the Transferor hereby certifies that:

**[CHECK ALL THAT APPLY]**

1. ☐
*Check if Transferee will take delivery of a beneficial interest in the 144A Global Note or of a Definitive Note Pursuant to Rule 144A.* The Transfer is being effected pursuant to and in accordance with Rule 144A under the United States Securities Act of 1933, as amended (the "*Securities Act*"), and, accordingly, the Transferor hereby further certifies that the beneficial interest or Definitive Note is being transferred to a Person that the Transferor reasonably believed and believes is purchasing the beneficial interest or Definitive Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A and such Transfer is in compliance

B-1

---

with

any applicable blue sky securities laws of any State of the United States. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the 144A Global Note and/or the Definitive Note and in the Indenture and the Securities Act.

2. ☐

*Check if Transferee will take delivery of a beneficial interest in the Regulation S Global Note or of a Definitive Note pursuant to Regulation S.* The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and, accordingly, the Transferor hereby further certifies that (i) the Transfer is not being made to a Person in the United States and (x) at the time the buy order was originated, the Transferee was outside the United States or such Transferor and any Person acting on its behalf reasonably believed and believes that the Transferee was outside the United States or (y) the transaction was executed in, on or through the facilities of a designated offshore securities market and neither such Transferor nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States, (ii) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S under the Securities Act, (iii) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act and (iv) if the proposed transfer is being made prior to the expiration of the Distribution Compliance Period, the transfer is not being made to a U.S. Person or for the account or benefit of a U.S. Person (other than an Initial Purchaser) and the interest transferred will be held immediately thereafter through Euroclear or Clearstream. Upon consummation of the proposed transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on Transfer enumerated in the Private Placement Legend printed on the Regulation S Global Note and/or the Definitive Note and in the Indenture and the Securities Act.

3. ☐

*Check if Transferee will take delivery of a beneficial interest in a Global Note or of a Definitive Note pursuant to any provision of the Securities Act other than Rule 144A or Regulation S.* The Transfer is being effected in compliance with the transfer restrictions applicable to beneficial interests in Restricted Global Notes and Restricted Definitive Notes and pursuant to and in accordance with the Securities Act and any applicable blue sky securities laws of any State of the United States, and accordingly the Transferor hereby further certifies that **(check one)**:

(a)   ☐
Such Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act; or

(b)   ☐   Such Transfer is being effected to the Issuers or a subsidiary thereof; or

(c)   ☐
Such Transfer is being effected pursuant to an effective registration statement under the Securities Act and in compliance with the prospectus delivery requirements of the Securities Act; or

B-2

(d)    ☐

such Transfer is being effected to an Institutional Accredited Investor and pursuant to an exemption from the registration requirements of the Securities Act other than Rule 144A, Rule 144 or Rule 904, and the Transferor hereby further certifies that it has not engaged in any general solicitation within the meaning of Regulation D under the Securities Act and the Transfer complies with the transfer restrictions applicable to beneficial interests in a Restricted Global Note or Restricted Definitive Notes and the requirements of the exemption claimed, which certification is supported by (1) a certificate executed by the Transferee in a form of Exhibit D to the Indenture and (2) an Opinion of Counsel provided by the Transferor or the Transferee (a copy of which the Transferor has attached to this certification and provided to the Issuers, which has confirmed its acceptability), to the effect that such Transfer is in compliance with the Securities Act.

Upon consummation of the proposed transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Global Note and/or Definitive Notes and in the Indenture and the Securities Act.

4.    ☐

*Check if Transferee will take delivery of a beneficial interest in an Unrestricted Global Note or of an Unrestricted Definitive Note.*

(a)    ☐    ***Check if Transfer is Pursuant to Rule 144.*** (i) The Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any State of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture and the Securities Act.

(b)    ☐    ***Check if Transfer is Pursuant to Regulation S.*** (i) The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any State of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture and the Securities Act.

(c)    ☐    ***Check if Transfer is Pursuant to Other Exemption.*** (i) The Transfer is being effected pursuant to and in compliance with an exemption from the registration requirements of the Securities Act other than Rule 144, Rule 903 or Rule 904

B-3

and

in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any State of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act.  Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will not be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes or Restricted Definitive Notes and in the Indenture.

*[signature page follows]*

B-4

http://www.sec.gov/Archives/edgar/data/1326686/00010474690501476l...

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuers.

Dated: _____

_____
[Insert Name of Transferor]

By: _____
   Name:
   Title:

## ANNEX A TO CERTIFICATE OF TRANSFER

1.  The Transferor owns and proposes to transfer the following:

**[[CHECK ONE OF (a) OR (b)]**

| | | |
|---|---|---|
| (a) | ☐ | a beneficial interest in |
| (i) | ☐ | 144A Global Note, or |
| (ii) | ☐ | 501 Global Note, or |
| (iii) | ☐ | Reg S Global Note; or |
| (b) | ☐ | a Restricted Definitive Note. |

2.  After the Transfer the Transferee will hold:

**[CHECK ONE]**

| | | |
|---|---|---|
| (a) | ☐ | a beneficial interest in the: |
| (i) | ☐ | 144A Global Note, or |
| (ii) | ☐ | 501 Global Note, or |
| (iii) | ☐ | Reg S Global Note, |
| (iv) | ☐ | Unrestricted Global Note; or |
| (b) | ☐ | a Restricted Definitive Note; or |
| (c) | ☐ | an Unrestricted Definitive Note, |

in accordance with the terms of the Indenture.

---

EXHIBIT C

**FORM OF CERTIFICATE OF EXCHANGE**

155 East Tropicana, LLC
155 East Tropicana Finance Corp.
c/o 155 East Tropicana, LLC
115 East Tropicana Avenue
Las Vegas, Nevada 89109

The Bank of New York Trust Company, N.A.
700 South Flower Street, Suite 500
Los Angeles, California 90017
Attention: Corporate Trust Administration

**Re:** $8\frac{3}{4}$% Senior Secured Notes due 2012 (the "*Notes*")

Dear Sir or Madam:

Reference is hereby made to the Indenture, dated as of March 29, 2005 (as it may be amended and supplemented from time to time, the "*Indenture*"), among 155 East Tropicana, LLC, a Nevada limited-liability company (the "*Company*"), and 155 East Tropicana Finance Corp., a Nevada corporation ("*Finance Corp.*" and, together with the Company, the "*Issuers*," which term includes any successors to any of such persons under the Indenture), the Guarantors party thereto and The Bank of New York Trust Company, N.A., as trustee, relating to the Notes. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____ , (the "*Owner*") owns and proposes to exchange the Note[s] or interest in such Note[s] specified herein, in the principal amount of $ _____ in such Note[s] or interests (the "*Exchange*"). In connection with the Exchange, the Owner hereby certifies that:

1.        *Exchange of Restricted Definitive Notes or Beneficial Interests in a Restricted Global Note for Unrestricted Definitive Notes or Beneficial Interests in an Unrestricted Global Note.*

(a)        ☐        *Check if Exchange is from beneficial interest in a Restricted Global Note to beneficial interest in an Unrestricted Global Note.* In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a beneficial interest in an Unrestricted Global Note in an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the United States Securities Act of 1933, as amended (the "*Securities Act*"), (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities

C-1

Act and (iv) the beneficial interest in an Unrestricted Global Note is being acquired in compliance with any applicable blue sky securities laws of any State of the United States.

(b)    ☐    ***Check if Exchange is from beneficial interest in a Restricted Global Note to Unrestricted Definitive Note.*** In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Unrestricted Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any State of the United States.

(c)    ☐    ***Check if Exchange is from Restricted Definitive Note to beneficial interest in an Unrestricted Global Note.*** In connection with the Owner's Exchange of a Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest is being acquired in compliance with any applicable blue sky securities laws of any State of the United States.

(d)    ☐    ***Check if Exchange is from Restricted Definitive Note to Unrestricted Definitive Note.*** In connection with the Owner's Exchange of a Restricted Definitive Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Unrestricted Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Unrestricted Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any State of the United States.

2.

***Exchange of Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes for Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes.***

(a)    ☐    ***Check if Exchange is from beneficial interest in a Restricted Global Note to Restricted Definitive Note.*** In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a Restricted Definitive Note with an equal principal amount, the Owner hereby certifies that (i) the Restricted Definitive Note is being acquired for the Owner's own account without transfer and

C-2

(ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, and in compliance with any applicable blue sky securities laws of any State of the United States.  Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the Restricted Definitive Note issued will continue to be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Definitive Note and in the Indenture and the Securities Act.

(b)  ☐  *Check if Exchange is from Restricted Definitive Note to beneficial interest in a Restricted Global Note.*  In connection with the Exchange of the Owner's Restricted Definitive Note for a beneficial interest in the:  [CHECK ONE]  ☐ 144A Global Note,  ☐ Reg S Global Note, or  ☐ 501 Global Note

with an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer and (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, and in compliance with any applicable blue sky securities laws of any State of the United States.  Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the beneficial interest issued will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the relevant Restricted Global Note and in the Indenture and the Securities Act.

*[signature page follows]*

C-3

http://www.sec.gov/Archives/edgar/data/1326686/000104746905014761...

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuers.

_____

[Insert Name of Owner]


By: _____
  Name:
  Title:


Dated: _____

_____

**EXHIBIT D**

**FORM OF CERTIFICATE FROM ACQUIRING
INSTITUTIONAL ACCREDITED INVESTOR**

Jefferies & Company, Inc.
11100 Santa Monica Boulevard
10th Floor
Los Angeles, California 90025

155 East Tropicana, LLC
155 East Tropicana Finance Corp.
c/o 155 East Tropicana, LLC
115 East Tropicana Avenue
Las Vegas, Nevada 89109

      Re:   <u>$8^3/_4\%$ Senior Secured Notes due 2012 (the "*Notes*")</u>

Ladies and Gentlemen:

      Reference is hereby made to the Indenture, dated as of March 29, 2005 (the "*Indenture*"), among 155 East Tropicana, LLC, a Nevada limited-liability company ("*RBG*"), and 155 East Tropicana Finance Corp., a Nevada corporation ("*Finance Corp.*" and, together with the Company, the "*Issuers,*" which term includes any successors to any of such persons under the Indenture), the Guarantors party thereto and The Bank of New York Trust Company, N.A., as trustee (the "*Trustee*"), relating to the Notes. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

      In connection with our proposed purchase of $            aggregate principal amount of: (a) a beneficial interest in a Global Note, or (b) a Definitive Note, we confirm that:

      1.

We understand and acknowledge that the Notes have not been registered under the Securities Act of 1933, as amended (the "*Securities Act*"), or any other applicable securities law, are being offered for resale in transactions not requiring registration under the Securities Act or any other securities law, including resales pursuant to Rule 144A under the Securities Act ("*Rule 144A*"), and may not be offered, sold or otherwise transferred except in compliance with the registration requirements of the Securities Act or any other applicable securities law, pursuant to an exemption therefrom and in each case in compliance with the conditions for transfer set forth below.

      2.

We are not an affiliate (as defined in Rule 144 under the Securities Act) of the Issuers or acting on behalf of the Issuers, and we are an institutional "accredited investor" under the Securities Act within the meaning of subparagraph (a) (1), (2), (3) or (7) of Rule 501 under the Securities Act ("*Rule 501*") and, if the Notes are to be purchased

D-1

for one or more accounts ("*investor accounts*") for which we are acting as fiduciary or agent, each such investor account is an institutional "accredited investor" on a like basis. We have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of purchasing the Notes and invest in or purchase securities similar to the Notes in the normal course of our business. We and any investor accounts for which we are acting are each aware that we may be required, and are each able, to bear the economic risk of our or its investment in the Notes for an indefinite period of time, including the risk of an entire loss of our or such investor account's investment in the Notes.

3.

We acknowledge that: (a) neither the Issuers nor the Initial Purchaser, nor any person representing the Issuers or the Initial Purchaser, has made any representation to us with respect to the Issuers or the offering or sale of any Notes, and (b) we have had access to such financial and other information concerning the Issuers and the Notes as we have deemed necessary in connection with our decision to purchase the Notes, including an opportunity to ask questions of and request information from the Issuers.

4.

We are purchasing the Notes for our own account, or for one or more investor accounts for which we are acting as a fiduciary or agent, in each case for investment, and not with a view to, or for offer or sale in connection with, any distribution thereof in violation of the Securities Act, subject to any requirement of law that the disposition of our property or the property of such investor account or accounts be at all times within our or their control and subject to our or their ability to resell such Notes pursuant to Rule 144A, Regulation S or any exemption from registration available under the Securities Act.

5.

We agree on our own behalf and on behalf of any investor account for which we are purchasing Notes to offer, sell or otherwise transfer such Notes prior to the date which is two years (or such other period that may hereafter be provided under Rule 144(k) under the Securities Act as permitting resales of restricted securities by non-affiliates without restriction) after the later of the date of original issue and the last date on which the Issuers or any affiliate of the Issuers was the owner of such Notes (or any predecessor thereto) (the "*Resale Restriction Termination Date*") only (a) to the Issuers or any subsidiary of the Issuers, (b) pursuant to a registration statement that has been declared effective under the Securities Act, (c) for so long as the Notes are eligible for resale pursuant to Rule 144A, to a person we reasonably believe is a "*qualified institutional buyer*" as defined in Rule 144A (a "*QIB*") that purchases for its own account or for the account of a QIB and to whom notice is given that the transfer is being made in reliance on Rule 144A, (d) pursuant to offers and sales to non-U.S. persons that occur outside the United States in accordance with Regulation S under the Securities Act, (e) to an institutional "accredited investor" within the meaning of subparagraph (a) (1), (2), (3) or (7) of Rule 501 that is acquiring the Notes for its own account, or for the account of such an institutional "accredited investor," for investment purposes, and not with a view to, or for offer or sale in connection with, any distribution in violation of the Securities Act, or (f) pursuant to another available exemption from the registration requirements of the Securities Act, subject in each of the foregoing cases to any requirement of law that the

D-2

disposition of our property or the property of such investor account or accounts be at all times within our or their control and in each case in compliance with applicable securities laws of any U.S. state or any other applicable jurisdiction. The foregoing restrictions on resale will not apply subsequent to the Resale Restriction Termination Date. If any resale or other transfer of the Notes is proposed to be made pursuant to clause (e) or (f) above prior to the Resale Restriction Termination Date, the transferor shall deliver a letter from the transferee substantially in the form of this letter to the Issuers and the Trustee, which shall provide, among other things, that the transferee is an institutional "accredited investor" within the meaning of subparagraph (a) (1), (2), (3) or (7) of Rule 501 and that it is acquiring such Notes for investment purposes and not for distribution in violation of the Securities Act. Each purchaser acknowledges that the Issuers and the Trustee reserve the right prior to the offer, sale or other transfer made prior to the Resale Termination Date pursuant to clause (d), (e) or (f) above to require the delivery of an opinion of counsel, certifications and/or other information satisfactory to each of them.

6.

We are not acquiring the Notes for or on behalf of any pension or welfare plan (as defined in Section 3 of the Employee Retirement Income Security Act of 1974, as amended ("*ERISA*")) or other arrangement that is subject to ERISA or Section 4975 of the Internal Revenue Code (a "plan") or any entity whose underlying assets include assets of a plan pursuant to 29 C.F.R. Section 2510.3-101 or otherwise, except that such a purchase for or on behalf of a pension or welfare plan shall be permitted to the extent:

(a)

such purchase is being made by or on behalf of a bank collective investment fund maintained by the purchaser in which no plan (together with any other plans maintained by the same employer or employee organization) has an interest in excess of 10% of the total assets in such collective investment fund and the conditions of Section III of Prohibited Transaction Class Exemption 91-38 issued by the Department of Labor are satisfied;

(b)

such purchase is made by or on behalf of an insurance company pooled separate account maintained by the purchaser in which, at any time while the Notes are outstanding, no plan (together with any other plans maintained by the same employer or employee organization) has an interest in excess of 10% of the total of all assets in such pooled separate account and the conditions of Section III of Prohibited Transaction Class Exemption 90-1 issued by the Department of Labor are satisfied;

(c)

such purchase is made on behalf of a plan by (1) an investment advisor registered under the Investment Advisers Act of 1940 that had as of the last day of its most recent year total assets under its management and control in excess of $50,000,000 and had stockholders' or partners' equity in excess of $750,000, as shown in its most recent balance sheet prepared in accordance with generally accepted accounting principles, or (2) a bank as defined in

D-3

10/15/2007 11:13 AM

Section 202 (a) (2) of the Investment Advisers Act of 1940 with equity capital in excess of $1,000,000 as of the last day of its most recent year, or (3) an insurance company which is qualified under the laws of more than one state to manage, acquire or dispose of any assets of a plan, which insurance company has as of the last day of its most recent year, net worth in excess of $1,000,000 and which is subject to supervision and examination by state authority having supervision over insurance companies and, in any case, such investment advisor, bank or insurance company is otherwise a qualified professional asset manager, as such term is used in Prohibited Transaction Class Exemption 84-14 issued by the Department of Labor, and the assets of such plan when combined with the assets of other plans established or maintained by the same employer (or affiliate thereof) or employee organization and managed by such investment advisor, bank or insurance company, do not represent more than 20% of the total client assets managed by such investment advisor, bank or insurance company, and the conditions of Section I of such exemption are otherwise satisfied;

(d)  to the extent such plan is a governmental plan (as defined in Section 3 of ERISA) which is not subject to the provisions of Title I of ERISA or Section 401 of the Internal Revenue Code;

(e)  to the extent such purchase is made by or on behalf of an insurance company with assets in its insurance company general account, and the conditions of Prohibited Transaction Class Exemption 95-60 issued by the Department of Labor are satisfied;

(f)  to the extent such purchase is made on behalf of a plan by an in-house asset manager and the conditions of Part I of Prohibited Transactions Class Exemption 96-23 issued by the Department of Labor are satisfied; or

(g)  such purchase would not otherwise constitute a non-exempt prohibited transaction.

7.
We understand that the Notes will be delivered in registered form only and that the certificates delivered to us in respect of the Notes will contain a legend substantially to the following effect:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS

D-4

EXEMPT FROM, OR NOT SUBJECT TO, REGISTRATION. THE HOLDER OF THIS SECURITY BY ITS ACCEPTANCE HEREOF (1) REPRESENTS THAT (X) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT), (Y) IT IS A NON-U.S. PURCHASER AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, OR (Z) IT IS AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF SUBPARAGRAPH (a)(1), (2), (3) OR (7) OF RULE 501 UNDER THE SECURITIES ACT, AND (2) AGREES TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE THAT IS TWO YEARS (OR SUCH OTHER PERIOD THAT MAY HEREAFTER BE PROVIDED UNDER RULE 144(k) UNDER THE SECURITIES ACT AS PERMITTING RESALES OF RESTRICTED SECURITIES BY NON-AFFILIATES WITHOUT RESTRICTION) AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE ISSUERS OR ANY AFFILIATE OF THE ISSUERS WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF SUCH SECURITY), ONLY (A) TO THE ISSUERS OR ANY SUBSIDIARIES OF THE ISSUERS, (B) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THIS SECURITY IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A UNDER THE SECURITIES ACT, (D) PURSUANT TO OFFERS AND SALES TO NON-U.S. PERSONS THAT OCCUR OUTSIDE THE UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, (E) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF SUBPARAGRAPH (a)(1), (2), (3) OR (7) OF RULE 501 UNDER THE SECURITIES ACT THAT IS ACQUIRING THIS SECURITY FOR ITS OWN ACCOUNT, OR FOR THE ACCOUNT OF SUCH AN INSTITUTIONAL "ACCREDITED INVESTOR," FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO, OR FOR OFFER OR SALE IN CONNECTION WITH, ANY DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT, OR (F) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE ISSUERS' AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSE (D), (E), OR (F) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATIONS AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM, AND IN EACH OF THE FOREGOING CASES, A CERTIFICATE OF TRANSFER IN THE FORM APPEARING ON THIS SECURITY IS COMPLETED AND DELIVERED BY THE TRANSFEROR TO THE TRUSTEE AND IN EACH CASE IN ACCORDANCE WITH APPLICABLE SECURITIES LAWS OF ANY U.S. STATE OR ANY OTHER APPLICABLE JURISDICTION.

D-5

8.

We acknowledge that the Issuers and others will rely upon the truth and accuracy of the foregoing representations, warranties, acknowledgements and agreements and agrees that, if any representations, warranties, acknowledgements and agreements deemed to have been made by us are no longer accurate, we shall promptly notify the Issuers.

9.

If we are acquiring any of the Notes as a fiduciary or agent for one or more investor accounts, we represent that we have sole investment discretion with respect to each such account and we have full power to make the foregoing representations, warranties, acknowledgements and agreements on behalf of each such investor account.

10.      Upon purchase, the Notes would be registered in the name of the undersigned:

Name:
Address:
Taxpayer ID Number

**THIS LETTER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN NEW YORK, INCLUDING, WITHOUT LIMITATION, SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND NEW YORK CIVIL PRACTICE LAWS AND RULES 327(B).**

*[signature page follows]*

D-6

http://www.sec.gov/Archives/edgar/data/1326686/000104746905014761...

You are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.

_____

Name of Accredited Investor

By: _____

     Name:
     Title:

Dated: _____ , 20[   ]

http://www.sec.gov/Archives/edgar/data/1326680/000104746905014761...

**EXHIBIT E**
**FORM OF SUPPLEMENTAL INDENTURE**
**TO BE DELIVERED BY SUBSEQUENT**
**GUARANTORS**

Supplemental Indenture (this "*Supplemental Indenture*"), dated as of      , among (i) 155 East Tropicana, LLC, a Nevada limited-liability company ("*RBG*"), and 155 East Tropicana Finance Corp., a Nevada corporation ("*Finance Corp.*" and, together with the Company, the "*Issuers,*" which term includes any successors to any of such persons under the Indenture), (ii)      , a subsidiary of the Issuers (the "*Guaranteeing Subsidiary*"), and (iii) The Bank of New York Trust Company, N.A., as trustee under the Indenture (the "*Trustee*").

W I T N E S S E T H

WHEREAS, the Issuers have heretofore executed and delivered to the Trustee an indenture (as it may be amended or supplemented from time to time, the "*Indenture*"), dated as of March 29, 2005, providing for the issuance of 8¾% Senior Secured Notes due 2012 (the "*Notes*");

WHEREAS, Section 11.4 of the Indenture provides that under certain circumstances the Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture and a Guarantee pursuant to which any newly-acquired or created Guarantor shall unconditionally guarantee all of the Issuers' obligations under the Notes and the Indenture on the terms and conditions set forth herein and in such Guarantee; and

WHEREAS, pursuant to Section 9.3 of the Indenture, the Trustee is authorized to execute and deliver this Supplemental Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Guaranteeing Subsidiary and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

1.      *Capitalized Terms*.  Capitalized terms used herein without definition shall have the respective meanings set forth in the Indenture.

2.      *Joinder to Indenture*.  Each of the parties hereto hereby agrees to become bound by the terms, conditions and other provisions of the Indenture with all attendant rights, duties and obligations stated therein, with the same force and effect as if originally named as a Guarantor therein and as if such party executed the Indenture on the date thereof.

3.      *Agreement to Guarantee*.  The Guaranteeing Subsidiary jointly and severally, irrevocably and unconditionally guarantees on a senior secured basis to each Holder of a Note authenticated and delivered by the Trustee and its successors and assigns that:  (i) (A) the principal of and premium, if any, and Interest (and Liquidated Damages, if any) on the Notes shall be duly and punctually paid in full when due,

E-1

whether at maturity, by acceleration, call for redemption, upon a Change of Control Offer, an Asset Sale Offer or otherwise, (B) Interest on overdue principal of and premium, if any, and (to the extent permitted by law) Interest on any Interest, if any (and Liquidated Damages, if any), on the Notes shall be promptly paid in full, and (C) all other Obligations of the Issuers to the Holders or the Trustee under the Notes, the Indenture, the Collateral Agreements and the Registration Rights Agreement (including fees, expenses or otherwise) shall be duly and punctually paid in full when due and performed, all in accordance with the terms thereof; and (ii) in case of any extension of time of payment or renewal of any Notes or any of such other Obligations, the same shall be duly and punctually paid in full when due and performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, call for redemption, upon a Change of Control Offer, an Asset Sale Offer or otherwise; *provided, however*, that the obligations of the Guaranteeing Subsidiary to the Holders and to the Trustee pursuant to this Supplemental Indenture and the Indenture are expressly set forth in Article XI of the Indenture and reference is hereby made to the Indenture for the precise terms of the Guarantee.

This Guarantee is secured by substantially all of the assets of the Guaranteeing Subsidiary, subject to certain exceptions and limitations more fully set forth in the Indenture and Collateral Agreements.

No direct or indirect stockholder, member, manager, employee, officer or director, as such, past, present or future of the Issuers, the Guarantors or any successor entity shall have any personal liability in respect of the Issuers' obligations or the obligations of the Guarantors under the Indenture, the Notes, the Guarantees, the Registration Rights Agreement, the Intercreditor Agreement or the Collateral Agreements solely by reason of his, her or its status as such stockholder, member, manager, employee, officer or director, except that this provision shall in no way limit the obligation of the Issuers or the obligation any Guarantor pursuant to any Guarantee.

This is a continuing Guarantee and shall remain in full force and effect and shall be binding upon each Guarantor and its successors and assigns until full and final payment of all of the Issuers' obligations under the Notes and Indenture or until released or defeased in accordance with the Indenture and shall inure to the benefit of the successors and assigns of the Trustee and the Holders, and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges herein conferred upon that party shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions hereof.  This is a Guarantee of payment and performance and not of collectibility.

The obligations of the Guaranteeing Subsidiary under its Guarantee shall be limited to the extent necessary to insure that it does not constitute a fraudulent conveyance under applicable law.

THE TERMS OF ARTICLE XI OF THE INDENTURE ARE INCORPORATED HEREIN BY REFERENCE.

E-2

http://www.sec.gov/Archives/edgar/data/1326686/000104746905014761...

4.    *NEW YORK LAW TO GOVERN*. THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK, INCLUDING, WITHOUT LIMITATION, SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND NEW YORK CIVIL PRACTICE LAWS AND RULES 327(B); PROVIDED, THAT WITH RESPECT TO THE CREATION, ATTACHMENT, PERFECTION, PRIORITY, ENFORCEMENT OF AND REMEDIES RELATING TO THE SECURITY INTEREST IN ANY REAL PROPERTY COLLATERAL, THE GOVERNING LAW MAY BE THE LAWS OF THE JURISDICTIONS WHERE SUCH COLLATERAL IS LOCATED WITHOUT REGARD TO THE CONFLICT OF LAW PROVISIONS THEREOF.

5.    *Counterparts*. The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

6.    *Effect of Headings*. The Section headings herein are for convenience only and shall not affect the construction hereof.

*[signature pages follow]*

E-3

http://www.sec.gov/Archives/edgar/data/1326686/000104746905014761...

     IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed and attested, all as of the date first above written.

**Issuers:**

**155 East Tropicana, LLC**

By: _____
    Name:
    Title:

**155 East Tropicana Finance Corp.**

By: _____
    Name:
    Title:

**Guaranteeing Subsidiary:**

> [Name]

> By: _____
>     Name:
>     Title:

**Trustee:**

> **The Bank of New York Trust Company, N.A.**

> By: _____
>     Name:
>     Title:

**EXHIBIT F**

**FORM OF INTERCREDITOR AGREEMENT**

[attached]

F-1