# EXHIBIT 15

U.S. BANK NATIONAL ASSOCIATION
CORPORATE TRUST SERVICES
60 LIVINGSTON AVENUE
ST. PAUL, MN 55107-2292

FEB 0 1 2011

VIA FACSIMILE AND OVERNIGHT COURIER

155 East Tropicana, LLC
155 East Tropicana Avenue
Las Vegas, Nevada 89109
Attention: Chief Operating Officer
Facsimile No.: (702) 739-7783

Re:    NOTICE OF ACCELERATION AND RESERVATION OF RIGHTS

Ladies and Gentlemen:

Reference is hereby made to that certain Indenture, dated as of March 29, 2005 (as amended, restated, supplemented, or otherwise modified from time to time, the "Indenture") made by 155 East Tropicana, LLC, a Nevada limited liability company ("Company") and 155 East Tropicana Finance Corp., a Nevada corporation ("Finance Corp.", collectively with Company, the "Issuer"), and U.S. Bank National Association, a national banking association (as the successor in interest to The Bank of New York Mellon Trust Company, N.A., which was the successor in interest to The Bank of New York Trust Company, N.A., the "Trustee"). Capitalized terms used herein but not specifically defined herein shall have the meanings ascribed to them in the Indenture.

On April 1, 2009, and on each scheduled payment date under the Notes thereafter, through and including December 1, 2010, the Issuer failed to make the scheduled interest payment under the Notes due on such scheduled payment date and failed to cure such failure during the 30-day grace period provided for under Section 6.1(1) of the Indenture. As a consequence, Events of Default have occurred with respect to each such scheduled payment date. Because such Events of Default remain uncured and outstanding, Trustee hereby declares the principal of, premium, if any, and accrued and unpaid Interest (and Liquidated Damages, if any) on the Notes to be immediately due and payable in accordance with Section 6.2(a) of the Indenture. In addition, Trustee retains all other rights and remedies available under the Indenture, the Notes, and applicable law, including, without limitation, the remedies provided in Section 6.3 of the Indenture and under the Collateral Agreements.

This letter is delivered under reservation of rights and remedies and shall not constitute a waiver by the Trustee of any default or Event of Default that may now or hereafter exist or occur under the Indenture, the Notes, or any other document, instrument, or agreement evidencing the Indebtedness.

[Signature Page Immediately Follows]

LA1 1954974v.2

155 East Tropicana LLC / 155 East Tropicana Finance Corp.

FEB 0 1 2011
Page 2 of 2

U.S. BANK NATIONAL ASSOCIATION,
a national banking association

By: _____
Name: ___T. J. S._____
Its: _____

cc:    Via Facsimile and Overnight Courier

Kummer Kaempfer Bonner & Renshaw
3800 Howard Hughes Parkway
7th Floor
Las Vegas, Nevada 89109
Attn.: Michael Bonner, Esq.
Fax No.: (702)-796-7181

Greenberg Traurig, LLP
3773 Howard Hughes Parkway
Suite 400 North
Las Vegas, Nevada 89169
Attn: John N. Brewer
Fax No. (702)-792.9002

Patrick J. McLaughlin, Esq.
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402-1498

# EXHIBIT 16

155 EAST TROPICANA, LLC
155 EAST TROPICANA FINANCE CORP.
(as Grantors)

---

SENIOR SECURED NOTE
SECURITY AGREEMENT

Dated as of March 29, 2005

---

THE BANK OF NEW YORK TRUST COMPANY, N.A.
(as Collateral Agent)

## TABLE OF CONTENTS

SECTION 1    DEFINITIONS AND INTERPRETATION ...................................................1
    1.1    Definitions ................................................................................................1
    1.2    Interpretation ...........................................................................................1

SECTION 2    GRANT OF SECURITY, SECURED OBLIGATIONS, AND RELATED
                    PROVISIONS ...........................................................................................1
    2.1    Grant of Security .....................................................................................1
    2.2    Secured Obligations .................................................................................1
    2.3    Continuing Liability Under Collateral .....................................................1
    2.4    Continuing Security Interest ....................................................................1

SECTION 3    REPRESENTATIONS AND WARRANTIES ...........................................1
    3.1    Title; Accurate Information .....................................................................1
    3.2    Organizational Matters ............................................................................1
    3.3    Authority and Enforceability ...................................................................1
    3.4    Third-Party Authorizations and Approvals ..............................................1
    3.5    Attachment and Perfection ......................................................................1
    3.6    No Encumbrances .....................................................................................1
    3.7    Accounts ...................................................................................................1
    3.8    Deposit Accounts .....................................................................................1
    3.9    Investment Property .................................................................................1
    3.10    Intellectual Property ................................................................................1
    3.11    Commercial Tort Claims .........................................................................1

SECTION 4    COVENANTS AND AGREEMENTS .......................................................1
    4.1    Encumbrances ..........................................................................................1
    4.2    Use of Collateral ......................................................................................1
    4.3    Taxes and Claims .....................................................................................1
    4.4    Materially Adverse Changes ....................................................................1
    4.5    Inventory ..................................................................................................1
    4.6    Bailees; Landlords ...................................................................................1
    4.7    Accounts ...................................................................................................1
    4.8    Limitations on Issuers of Pledged Capital Stock .....................................1
    4.9    Deposit Accounts and Securities Accounts. .............................................1
    4.10    After-Acquired Collateral .......................................................................1
    4.11    Certain Proceeds ......................................................................................1
    4.12    Certain Non-U.S. Collateral ....................................................................1
    4.13    Certificated Collateral .............................................................................1
    4.14    Voting and Distributions .........................................................................1
    4.15    Intellectual Property ................................................................................1
    4.16    Commercial Tort Claims .........................................................................1
    4.17    Insurance ..................................................................................................1
    4.18    Additional Grantors .................................................................................1
    4.19    Further Assurances ..................................................................................1

SECTION 5    REMEDIES .............................................................................................1
    5.1    Generally ..................................................................................................1
    5.2    Sale of Collateral .....................................................................................1

i

| | | |
|---|---|---|
| 5.3 | Marshalling; Payments Set Aside | 1 |
| 5.4 | Application of Proceeds | 1 |
| 5.5 | Accounts | 1 |
| 5.6 | Investment Property | 1 |
| 5.7 | Deposit Accounts | 1 |
| 5.8 | Intellectual Property | 1 |
| 5.9 | Cash Proceeds | 1 |
| 5.10 | Certain Rights Respecting Contracts | 1 |
| | | |
| SECTION 6 | RIGHTS AND OBLIGATIONS OF COLLATERAL AGENT | 1 |
| 6.1 | Appointment, Resignation and Removal | 1 |
| 6.2 | Standard of Care; Collateral Agent May Perform | 1 |
| 6.3 | Attorney-In-Fact | 1 |
| 6.4 | Access; Right of Inspection | 1 |
| 6.5 | Authorizations | 1 |
| 6.6 | Expenses | 1 |
| 6.7 | Indemnity | 1 |
| 6.8 | Release of Collateral | 1 |
| | | |
| SECTION 7 | MISCELLANEOUS | 1 |
| 7.1 | Notices | 1 |
| 7.2 | Amendment and Waivers | 1 |
| 7.3 | No Waiver; Remedies Cumulative | 1 |
| 7.4 | Successors and Assigns | 1 |
| 7.5 | Independence of Covenants | 1 |
| 7.6 | Survival of Representations, Warranties and Agreements | 1 |
| 7.7 | Severability | 1 |
| 7.8 | Governing Law | 1 |
| 7.9 | Counterparts | 1 |
| 7.10 | Effectiveness | 1 |
| 7.11 | Entire Agreement | 1 |
| 7.12 | Limitation on Collateral Agent's Liability | 1 |
| 7.13 | Rights and Obligations Subject to Intercreditor | 1 |

SCHEDULES

| | |
|---|---|
| 3.2 | Organizational Matters |
| 3.5 | UCC Filing Offices |
| 3.8 | Deposit Accounts |
| 3.9 | Investment Property |
| 3.10 | Intellectual Property |
| 3.11 | Commercial Tort Claims |
| 7.1 | Addresses for Notices; Contact Information |

EXHIBITS

| | |
|---|---|
| A | Security Agreement Supplement |

This SENIOR SECURED NOTE SECURITY AGREEMENT, dated as of March 29, 2005 (this "**Agreement**"), is among (i) 155 East Tropicana, LLC, a Nevada limited-liability company ("**155 East Tropicana**") and 155 East Tropicana Finance Corp., a Nevada corporation ("**155 East Tropicana Finance**", and together with 155 East Tropicana, the "**Issuers**"), (ii) each Additional Grantor that from time to time becomes a party by executing a Security Agreement Supplement (together with the Issuers, the "**Grantors**"), and (iii) The Bank of New York Trust Company, N.A., as collateral agent for the Secured Parties (in such capacity, the "**Collateral Agent**").

RECITALS

WHEREAS, reference is made to that certain Senior Secured Note Indenture, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "**Indenture**"), by and among the Grantors and The Bank of New York Trust Company, N.A., as trustee (in such capacity, the "**Trustee**") and Collateral Agent; and

WHEREAS, in consideration of the extension of credit set forth in the Indenture, each Grantor has agreed to secure all obligations under the Indenture and the 8¾% Senior Secured Notes due 2012 (the "**Notes**") issued in connection therewith.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, each Grantor and the Collateral Agent agree as follows, intending to be legally bound:

**SECTION 1**      **DEFINITIONS AND INTERPRETATION**

    **1.1**      **Definitions**. Undefined capitalized terms used herein have the meanings assigned to them in the Indenture, or, if not defined therein, in the UCC. The following terms have the meanings assigned to them in Article 9 of the UCC: "**Account**," "**Account Debtor**," "**Authenticate**," "**Cash Proceeds**," "**Chattel Paper**," "**Commercial Tort Claim**," "**Deposit Account**," "**Document**," "**Equipment**," "**Fixtures**," "**General Intangible**," "**Goods**," "**Instruments**," "**Inventory**," "**Letter-of-Credit Right**," "**Proceeds**," "**Record**," and "**Supporting Obligation**."

In addition to the foregoing terms and the terms defined in the preamble and recitals hereto, in this Agreement:

"**Additional Grantors**" has the meaning set forth in <u>Section 4.18</u>.

"**Collateral**" has the meaning set forth in <u>Section 2.1</u>.

"**Collateral Agreements**" means this Agreement and all other instruments, documents and agreements delivered by any of the parties to the Indenture Documents pursuant to this Agreement or any other Indenture Document to grant or perfect a Lien in favor of the Collateral Agent on any real, personal or mixed property of such party as security for the Secured Obligations.

"**Collateral Records**" means books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks and other electronic storage media and related data processing software and similar items that at any time evidence or contain information relating to any of the Collateral or are otherwise necessary or helpful in the collection thereof or realization thereon.

"**Collateral Support**" means all property (real or personal) assigned, hypothecated or otherwise securing any Collateral and includes any security agreement or other agreement granting a lien or security interest in such real or personal property.

"**Copyrights**" means all United States, state and foreign copyrights, including copyrights in software and databases, and all Mask Works (as defined under 17 U.S.C. 901 of the U.S. Copyright Act), whether registered or unregistered, and, with respect to the foregoing, (i) all registrations and applications therefor, (ii) all extensions and renewals thereof, (iii) all rights corresponding thereto throughout the world, (iv) all rights to sue for past, present and future infringements thereof, (v) all licenses, claims, damages and proceeds of suit arising therefrom, and (vi) all payments and rights to payments arising out of the sale, lease, license, assignment, or other disposition thereof.

"**Credit Agreement**" means the Loan Agreement, dated as of the date hereof, among the Grantors and Wells Fargo Foothill, as amended, restated, refinanced, supplemented or otherwise modified from time to time.

"**Excluded Assets**" means:

(a)     assets securing FF&E Financing, Purchase Money Indebtedness or Capitalized Lease Obligations permitted to be incurred under the Indenture;

(b)     leasehold estates in real property existing on the Issue Date and any additional leasehold estates in real property acquired by the Issuers or the Subsidiaries after the Issue Date, unless the Trustee, as collateral agent (upon request of the Holders of a majority of the outstanding Notes), requests that the Issuers provide the Trustee, as collateral agent, with a lien upon and security interest in such leasehold estate so that such leasehold estate shall become additional Collateral (and in the Collateral Agreements the Issuers will agree to notify the Trustee of the acquisition by it or any of the Subsidiaries of any leasehold estate in real property);

(c)     any leases, permits, licenses (including without limitation Gaming Licenses) or other contracts or agreements or other assets or property to the extent that a grant of a Lien thereon under the Collateral Agreements (i) is prohibited by law or would constitute or result in the abandonment, invalidation or unenforceability of any right, title or interest of the grantor therein pursuant to the applicable law, or (ii) would require the consent of third parties and such consent has not been obtained after the Issuers have used commercially reasonable efforts to try to obtain such consent, or (iii) other than as a result of requiring a consent of third parties that has not been obtained, would result in a breach of the provisions thereof, or constitute a default under or result in a termination of, such lease, permit, license, contract or agreement (other than to the extent that any such provisions thereof would be rendered ineffective pursuant to Section 9-406, 9-407 or 9-408 of the Uniform Commercial Code (or any successor provision or provisions) of any relevant jurisdiction (the "**Applicable UCC**") or any other applicable law); *provided*, that, immediately upon the uneffectiveness, lapse or termination of such prohibition, the provisions that would be so breached or such breach, default or termination or immediately upon the obtaining of any such consent, the Excluded Assets shall not include, and the Issuers or the applicable Guarantor, as the case may be, shall be deemed to have granted a security interest in, all such leases, permits, licenses, other contracts and agreements and such other

2

assets and property as if such prohibition, the provisions that would be so breached or such breach, default or termination had never been in effect and as if such consent had not been required;

(d)     cash and Cash Equivalents to the extent that a Lien thereon may not be perfected through the filing of an Applicable UCC financing statement or that, after the Issuers have used commercially reasonable efforts, the Issuers are unable to cause the Trustee to obtain "control" (as defined in the Applicable UCC) for the benefit of the Holders; and

(e)     any Capital Stock of an Excluded Foreign Subsidiary, if any, other than a pledge of 65% of the Voting Equity Interests of such Excluded Foreign Subsidiary held directly by the Issuers or any domestic Subsidiary, 100% of the nonvoting Equity Interests of such Excluded Foreign Subsidiary held directly by the Issuers or any domestic Subsidiary and 100% of any intercompany Indebtedness owed by such Excluded Foreign Subsidiary to any of the Issuers or any of the Guarantors.

"**Indemnitee**" means any of the Collateral Agent and its Affiliates' officers, partners, directors, trustees, employees and agents.

"**Indenture Document**" means any of the Indenture, the Notes, the Guarantees, the Collateral Agreements, and any other agreement, document or instrument entered into or issued in connection with any of the foregoing.

"**Insurance**" means (i) all insurance policies covering any portion of the Collateral (regardless of whether the Collateral Agent is the loss payee thereof) and (ii) any key man life insurance policies.

"**Intellectual Property**" means, collectively, any Grantor's Copyrights, Patents, Trademarks, and Trade Secrets, and any agreement granting any right in, to or under Copyrights, Patents, Trademarks or Trade Secrets, where such Grantor is licensee or licensor under such agreement.

"**Intercreditor**" means that certain Intercreditor Agreement, dated as of the date hereof, among the Collateral Agent and Wells Fargo Foothill (and acknowledged by the Grantors), as amended, restated, supplemented or otherwise modified from time to time.

"**Investment Property**" has the meaning assigned to the term "investment property" in Article 9 of the UCC, and also means Instruments, Pledged Debt, and Pledged Capital Stock.

"**IP Security Agreement**" means an IP Security Agreement, in form and substance reasonably satisfactory to the Collateral Agent.

"**Patents**" means all United States and foreign patents and certificates of invention, or similar industrial property rights, (i) all applications therefore, (ii) all reissues, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof, (ii) all rights corresponding thereto throughout the world, (ii) all inventions and improvements described therein, (iv) all rights to sue for past, present and future infringements thereof, (v) all licenses, claims, damages, and proceeds of suit arising therefrom, and (v) all payments and rights to payments arising out of the sale, lease, license, assignment, or other disposition thereof.

3

"**Pledged Debt**" means, with respect to any Grantor, Indebtedness for borrowed money owed to such Grantor, whether or not evidenced by any instrument or promissory note, all monetary obligations owing to such Grantor from any other Person, the Instruments evidencing any of the foregoing, and all interest, cash, Instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any of the foregoing.

"**Pledged Capital Stock**" means, with respect to any Grantor, the Capital Stock of any other Person owned by such Grantor, and the certificates, if any, representing such Capital Stock and any interest of such Grantor in the entries on the books of the Person issuing such Capital Stock or on the books of any securities intermediary pertaining to such Capital Stock, and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any such Capital Stock, and any other warrant, right or option to acquire any of the foregoing.

"**Secured Obligations**" means "Obligations" (as defined in the Indenture) under the Indenture, the Notes, the Guarantees and the Registration Rights Agreement, and also means (i) all interest that, but for the filing of a petition in bankruptcy with respect to any Grantor, would have accrued on any Obligation, whether or not a claim is allowed against such Grantor for such interest in the related bankruptcy proceeding, and (ii) the payment and indemnification obligations in favor of the Collateral Agent under Section 6.6 and 6.7 hereof.

"**Secured Parties**" means the Trustee, the Collateral Agent, the Holders, and any future party to which Secured Obligations are owed under the Indenture Documents.

"**Security Agreement Supplement**" means a supplement to this agreement substantially in the form of Exhibit A, whereby an Additional Grantor becomes a party hereto.

"**Trade Secrets**" means all trade secrets and all other confidential or proprietary information and know-how, whether or not reduced to a writing or other tangible form, including with respect to the foregoing, (i) all documents and things embodying or incorporating the foregoing, (ii) all rights to sue for past, present and future infringement thereof, and (iii) all licenses, claims, damages, and proceeds of suit arising therefrom, and (iv) all payments and rights to payments arising out of the sale, lease, license, assignment, or other dispositions thereof.

"**Trademarks**" means all United States, state and foreign trademarks, service marks, certification marks, collective marks, trade names, corporate names, d/b/as, business names, fictitious business names, Internet domain names, trade styles, logos, other source or business identifiers, designs and General Intangibles of a like nature, rights of publicity and privacy pertaining to the names, likeness, signature and biographical data of natural persons, and, with respect to the foregoing, (i) all registrations and applications therefor, (ii) the goodwill of the business symbolized thereby, (iii) all rights corresponding thereto throughout the world, (iv) all rights to sue for past, present and future infringement or dilution thereof or for any injury to goodwill, (v) all licenses, claims, damages, and proceeds of suit arising therefrom, and (vi) all payments and rights to payments arising out of the sale, lease, license assignment or other disposition thereof.

4

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; *provided* that, if by reason of mandatory provisions of law, the perfection or the effect of perfection or nonperfection of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" also means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or nonperfection.

       **1.2**    **Interpretation.** Unless otherwise specifically provided, references to "Sections," "Exhibits" and "Schedules" are to sections, exhibits and schedules, as the case may be, of this Agreement. Section headings in this Agreement are included for convenience only and do not constitute a part of this Agreement for any other purpose or be given any substantive effect. Unless the context otherwise requires, defined terms may be used in the singular or the plural. The use of the word "include" or any derivative thereof is not limiting or restrictive. If any conflict or inconsistency exists between this Agreement and the Indenture, the Indenture governs. All references to provisions of the UCC include all successor provisions under any subsequent version or amendment to any Article of the UCC.

## SECTION 2     GRANT OF SECURITY, SECURED OBLIGATIONS, AND RELATED PROVISIONS

       **2.1**    **Grant of Security.** Each Grantor hereby grants to the Collateral Agent for the benefit of the Secured Parties a security interest in and continuing lien on all of such Grantor's right, title and interest in, to and under all personal property of such Grantor (except for the Excluded Assets), including the following, in each case whether now owned or existing or hereafter acquired or arising and wherever located (collectively, the "**Collateral**"):

           (i)    all Accounts,

           (ii)    all Chattel Paper,

           (iii)    all Commercial Tort Claims,

           (iv)    all Deposit Accounts (and any money, cash or cash equivalents, checks or other property credited thereto),

           (v)    all Documents,

           (vi)    all General Intangibles,

           (vii)    all Goods (including all Equipment, Fixtures (but specifically excluding FF&E securing the FF&E Financing) and Inventory),

           (viii)    all Insurance,

           (ix)    all Investment Property (including the Investment Property listed on Schedule 3.9),

           (x)    all Intellectual Property (including the Intellectual Property listed on Schedule 3.10),

           (xi)    all Letter-of-Credit Rights, and

5

(xii)    to the extent not otherwise included above, all tangible and intangible personal property, and all Collateral Records, Collateral Support, Records, Supporting Obligations, Proceeds, products, accessions, rents and profits of or relating to any of the foregoing.

**2.2    Secured Obligations.** This Agreement secures, and the Collateral is collateral security for, the prompt and complete payment or performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise including the payment of amounts that would become due but for the operation of the automatic stay under the Bankruptcy Code, 11 U.S.C. §362(a) (and any successor provision thereof), of all the Secured Obligations.

**2.3    Continuing Liability Under Collateral.** Notwithstanding anything herein to the contrary, (a) each Grantor remains liable for its obligations under the Collateral and nothing contained herein is intended to or constitutes a delegation of duties to the Collateral Agent or any Secured Party, (b) each Grantor remains liable under each of the agreements to which it is a party included in the Collateral, including any agreements relating to any Investment Property, to perform all of the obligations undertaken by it thereunder in accordance with and pursuant to the terms and provisions thereof, and neither the Collateral Agent nor any Secured Party has any obligation or liability under any of such agreements by reason of or arising out of this Agreement or any other document related hereto, and neither the Collateral Agent nor any Secured Party has any obligation to make any inquiry as to the nature or sufficiency of any payment received by it or have any obligation to take any action to collect or enforce any rights under any agreement included in the Collateral, including any agreements relating to any Investment Property, and (c) the exercise by the Collateral Agent of any of its rights hereunder will not release any Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral.

**2.4    Continuing Security Interest.** This Agreement creates a continuing security interest in the Collateral and will remain in full force and effect until the payment in full of all of the Secured Obligations, be binding on each Grantor, its successors and assigns, and inure, together with the rights and remedies of the Collateral Agent hereunder, to the benefit of the Collateral Agent and its successors, transferees and assigns. Upon the payment in full of all of the Secured Obligations, the security interest granted hereby will terminate and all rights to the Collateral will revert and be deemed reassigned to the Grantors. Upon any such termination, the Collateral Agent will, at the Grantors' request and expense, execute and deliver to Grantors such documents as the Grantors will reasonably request to evidence such termination reversions or reassignment, without recourse, representation, or warranty of any kind.

**SECTION 3        REPRESENTATIONS AND WARRANTIES**

Each Grantor hereby represents and warrants as follows:

**3.1    Title; Accurate Information.** Each Grantor owns the Collateral purported to be owned by it or otherwise has the rights it purports to have in each item of Collateral and, as to all Collateral whether now existing or hereafter acquired, will continue to own or have such rights in each item of Collateral, in each case free and clear of all Liens, rights or claims of any Person, other than Permitted Liens. All information supplied by or on behalf of any of the Grantors with respect to any of the Collateral (in each case taken as a whole with respect to any particular Collateral) is accurate and complete in all material respects.

6

3.2    **Organizational Matters.** Each Grantor is duly organized and validly existing under the laws of the jurisdiction of its organization and has not filed any certificates of domestication, transfer or continuance in any other jurisdiction. The full legal name of each Grantor is set forth on Schedule 3.2, and such Grantor has not done in the last five years, and does not do, business under any other name (including any trade-name or fictitious business name) except for those names set forth on such schedule. Each Grantor has further indicated on Schedule 3.2 the type of organization of such Grantor, its mailing address, its jurisdiction of organization, and its organizational identification number. Except as provided on Schedule 3.2, it has not changed its name or jurisdiction of organization, or its corporate structure in any way (*e.g.*, by merger, consolidation, change in corporate form or otherwise) within the past five years.

3.3    **Authority and Enforceability.** Each Grantor has all requisite power and authority to enter into this Agreement and to carry out its obligations hereunder, and has duly executed and delivered this Agreement. This Agreement and each other document, statement, or instrument relating hereto, when executed and delivered by the Grantors, will constitute legal, valid and binding obligations of each Grantor, enforceable in accordance with their terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and general principles of equity.

3.4    **Third-Party Authorizations and Approvals.** No authorization, approval or other action by, and no notice to or filing, registration or recording with, any governmental authority or regulatory body (in each case that has not been obtained as of the date hereof) is required for either (i) the grant by each Grantor of the Liens purported to be created in favor of the Collateral Agent hereunder, or (ii) the exercise by the Collateral Agent of any rights or remedies in respect of any Collateral (whether specifically granted or created hereunder or created or provided for by applicable law), except for the filings contemplated hereunder, as may be required in connection with the disposition of any Investment Property, and as may be required under federal laws pertaining to Intellectual Property.

3.5    **Attachment and Perfection.** This Agreement is effective to create a valid and continuing security interest in all of the Collateral in favor of the Collateral Agent for the benefit of the Secured Parties. With respect to each Grantor, upon the filing of all UCC financing statements describing the Collateral and naming such Grantor as debtor and the Collateral Agent as secured party in the filing offices set forth opposite such Grantor's name on Schedule 3.5, the security interests granted to the Collateral Agent hereunder will constitute perfected Liens with respect to that portion of the Collateral on which a Lien can be perfected by such methods, subject in the case of priority only to Permitted Liens.

3.6    **No Encumbrances.** No effective UCC financing statement, fixture filing or other instrument similar in effect under any applicable law covering all or any part of the Collateral is on file in any filing or recording office except for (x) financing statements for which proper termination statements have been delivered to the Collateral Agent and (y) financing statements, fixture filings and other instruments similar in effect filed in connection with Permitted Liens.

3.7    **Accounts.** Each Account is the legal, valid and binding obligation of the Account Debtor in respect thereof, representing an unsatisfied obligation of such Account Debtor, is enforceable in accordance with its terms, to the knowledge of the applicable Grantor, is not subject to any set-offs, defenses, taxes, or counterclaims (except with respect to refunds, returns and allowances in the ordinary course of business with respect to damaged merchandise), and is

7

in compliance in all material respects with all applicable laws, whether federal, state, local or foreign.

**3.8    Deposit Accounts**. Schedule 3.8 sets forth under the heading "Deposit Accounts" all of the Deposit Accounts in which the Grantors have an interest and each Grantor listed thereunder is the sole account holder of the Deposit Accounts listed next to its name.  No such Grantor has consented to or is otherwise aware of, any Person (other than the Collateral Agent or Wells Fargo Foothill (or its successor or assign)) having either sole dominion and control (within the meaning of common law) or "control" (within the meaning of Section 9-104 of the UCC) over, or any other interest in, any such Deposit Account or any money or other property deposited therein.

**3.9    Investment Property**.

(a)    Pledged Capital Stock. Schedule 3.9 sets forth under the heading "Pledged Capital Stock" all of the Pledged Capital Stock owned by the Grantors and such Pledged Capital Stock constitutes the percentage of issued and outstanding Capital Stock of the respective issuers thereof indicated on such schedule.  Each Grantor listed thereunder is the record and beneficial owner of such Pledged Capital Stock listed next to its name on such schedule, free and clear of all Liens, rights or claims of any Person, other than Permitted Liens, and there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, such Pledged Capital Stock.

(b)    Pledged Debt. Schedule 3.9 sets forth under the heading "Pledged Debt" all of the Pledged Debt owned by the Grantors and all of such Pledged Debt has been duly authorized, Authenticated or issued, and delivered, is the legal, valid and binding obligation of the issuers thereof, and is not in default, and Schedule 3.9 includes all of the issued and outstanding intercompany Indebtedness evidenced by an Instrument or certificated security of the respective issuers thereof owing to the Grantors.

(c)    Securities Accounts. Schedule 3.9 sets forth under the heading "Securities Accounts," all of the Securities Accounts in which any Grantor has an interest.  Such Grantor is the sole entitlement holder of each such Securities Account, and such Grantor has not consented to, and is not otherwise aware of, any Person (other than the Collateral Agent or Wells Fargo Foothill (or its successor or assign)) having "control" (within the meanings of Sections 8-106 and 9-106 of the UCC) over, or any other interest in, any such Securities Account or any securities or other property credited thereto.

**3.10    Intellectual Property**. Schedule 3.10 sets forth a true and complete list of all United States, state and foreign registrations of and applications for Patents, Trademarks, and Copyrights owned by each Grantor.  With respect to each Grantor listed on Schedule 3.10, such Grantor (i) is the sole and exclusive owner of the entire right, title, and interest in and to all Intellectual Property on Schedule 3.10, and (ii) owns or has the right to use all other Intellectual Property used in the conduct of its business free and clear of all Liens, claims, encumbrances, and material licenses granted by such Grantor, in each case except for Permitted Liens and such licenses set forth on Schedule 3.10.  To each Grantor's knowledge, the conduct of such Grantor's business does not infringe on any Trademark, Patent, Copyright, Trade Secret or other intellectual property right of any third party; no claim is pending, or to such Grantor's knowledge, threatened or has been made that the conduct of such Grantor's business or the use of any Intellectual Property owned or used by such Grantor violates the intellectual property rights of any third party.

8

There is no effective financing statement or other document or instrument now executed, or on file or recorded in any public office, granting a security interest in or otherwise encumbering any part of the Intellectual Property owned by any Grantor, other than in favor of the Collateral Agent or Wells Fargo Foothill (or its successor or assign).

**3.11    Commercial Tort Claims.**  Schedule 3.11 sets forth all Commercial Tort Claims of the Grantors.

**SECTION 4        COVENANTS AND AGREEMENTS**

Each Grantor hereby covenants and agrees as follows:

**4.1    Encumbrances.**  Except for the security interest created by this Agreement, no Grantor will create or suffer to exist any Lien on or with respect to any of the Collateral, except Permitted Liens, and such Grantor will defend the Collateral against all Persons at any time claiming any such interest therein.

**4.2    Use of Collateral.**  Except where any such actions, individually or in the aggregate, would not have a material adverse effect on the Collateral as a whole, no Grantor will produce, use or permit any Collateral to be used in violation of any provision of this Agreement, or to be knowingly used unlawfully or in violation of any applicable statute, regulation or ordinance or any policy of insurance covering the Collateral.

**4.3    Taxes and Claims.**  Each Grantor will promptly pay when due all property and other taxes, assessments and governmental charges or levies imposed on, and all claims (including claims for labor, materials and supplies) against, the Collateral, except to the extent the validity thereof is being contested in good faith; *provided* that, such Grantor will in any event pay such taxes, assessments, charges, levies or claims not later than five days prior to the date of any proposed sale under any judgment, writ or warrant of attachment entered or filed against such Grantor or any of the Collateral as a result of the failure to make such payment.

**4.4    Materially Adverse Changes.**  Upon any Grantor or any officer of any Grantor obtaining knowledge thereof, such Grantor will promptly notify the Collateral Agent in writing of any event that may materially adversely affect the value of the Collateral, the ability of any Grantor or the Collateral Agent to dispose of the Collateral or any portion thereof, or the rights and remedies of the Collateral Agent in relation thereto, including the levy of any legal process against the Collateral or any portion thereof. Subject to the Intercreditor, no Grantor will take or permit any action that could impair the Collateral Agent's rights in the Collateral. No Grantor will sell, transfer or assign (by operation of law or otherwise) any Collateral except as permitted under the Indenture and the Intercreditor.

**4.5    Inventory.**  Each applicable Grantor will keep correct and accurate records of its Inventory as are customarily maintained under similar circumstances by Persons of established reputation engaged in similar business, and in any event in conformity with GAAP.

**4.6    Bailees; Landlords.**  If material Equipment or Inventory is in possession or control of any third party, including any warehouseman, bailee or agent, the applicable Grantor will notify the third party of the Collateral Agent's security interest and will use commercially reasonable efforts to obtain an Authenticated acknowledgment from such third party that it is holding the Equipment and Inventory for the benefit of the Collateral Agent. With respect to any material Collateral located on real property that is not owned by any Grantor, the applicable

9

Grantor will use commercially reasonable efforts to obtain and deliver to the Collateral Agent a landlord waiver in form and substance reasonably satisfactory to the Collateral Agent.

      **4.7**     **Accounts.** Except as otherwise provided in this Section 4.7, each Grantor will continue to collect all amounts due or to become due to such Grantor under the Accounts and any Supporting Obligation and, in the exercise of its reasonable business judgment, diligently exercise each material right it may have under any Account, Supporting Obligation or Collateral Support. Upon the occurrence and during the continuance of an Event of Default, at such Grantor's expense and in connection with the foregoing collections and exercises, such Grantor will take such action as the Collateral Agent may deem necessary or advisable. Notwithstanding the foregoing, the Collateral Agent will have the right at any time, subject to the Intercreditor, to notify or require any Grantor to notify any Account Debtor of the Collateral Agent's security interest in the Accounts and any Supporting Obligation.

      **4.8**     **Limitations on Issuers of Pledged Capital Stock.** No Grantor will permit any issuer of any Pledged Capital Stock to merge or consolidate, *unless* (i) such merger or consolidation is permitted under the Indenture, (ii) such issuer creates a security interest that is perfected by a filed financing statement (that is not effective solely under Section 9-508 of the UCC) in collateral in which such new debtor has or acquires rights, and (iii) all the outstanding Capital Stock of the surviving or resulting Person that is owned by such Grantor (except any such Capital Stock constituting Excluded Assets) is, upon such merger or consolidation, pledged hereunder.

      **4.9**     **Deposit Accounts and Securities Accounts.**

          (a)     With respect to any Investment Property consisting of Securities Accounts or Securities Entitlements having a value (with respect to each such account) in excess of $100,000, each Grantor will, subject to the Intercreditor, cause the securities intermediary maintaining such Securities Account or Securities Entitlement to enter into an agreement pursuant to which, upon the occurrence and during the continuance of an Event of Default, it will agree to comply with the Collateral Agent's "entitlement orders" without further consent by such Grantor or any other Person. With respect to each Deposit Account (subject to Section 4.9(b)), such Grantor will, subject to the Intercreditor, cause the depositary institution maintaining such account to enter into an agreement pursuant to which, upon the occurrence and during the continuance of an Event of Default, the Collateral Agent will have "control" (within the meaning of Section 9-104 of the UCC) over such Deposit Account.

          (b)     Deposit Accounts may be maintained at any bank without having to obtain a control agreement as provided in the foregoing Section 4.9(a) so long as the balances of such Deposit Accounts are used exclusively for (i) petty cash needs, or (ii) employee payroll, employee benefits, or taxes. All control agreements required pursuant to this Section 4.9 shall be effective with respect to the applicable Deposit Accounts within 30 days after the date hereof or after the date established, if later.

      **4.10**     **After-Acquired Collateral.** Subject to the Intercreditor, if any Grantor acquires rights in any Investment Property, Letter-of-Credit Rights or Deposit Accounts after the date hereof, such Grantor will deliver to the Collateral Agent a completed Security Agreement Supplement, together with all supplements to schedules thereto, reflecting such newly acquired rights. Notwithstanding the foregoing, it is understood and agreed that the security interest of the Collateral Agent will attach to all after-acquired property immediately upon any Grantor's

acquisition of rights therein and will not be affected by the failure of any Grantor to deliver a Security Agreement Supplement as required hereby.

        **4.11    Certain Proceeds**. Except as provided in the next sentence, in the event any Grantor receives any dividends, interest or distributions on any Investment Property, or any securities or other property upon the merger, consolidation, liquidation or dissolution of any issuer of any such Proceeds, then (a) such dividends, interest or distributions and securities or other property will be included in the definition of Collateral without further action, and (b) subject to the Intercreditor, such Grantor will immediately take all steps, if any, reasonably necessary or advisable to ensure the validity, perfection, priority and, if applicable, control of the Collateral Agent over such Proceeds (including delivery thereof to the Collateral Agent) and pending any such action such Grantor will be deemed to hold such dividends, interest, distributions, securities or other property in trust for the benefit of the Collateral Agent and will be segregated from all other property of such Grantor.  Notwithstanding the foregoing, so long as no Event of Default will have occurred and be continuing, the Collateral Agent authorizes each Grantor to retain all ordinary cash dividends and distributions paid in the normal course of the business of the issuer and consistent with the past practice of the issuer and all scheduled payments of principal and interest.

        **4.12    Certain Non-U.S. Collateral**. If any issuer of any Investment Property is located in a jurisdiction outside of the United States, the applicable Grantor will, to the extent commercially reasonable, take such additional actions, including causing the issuer to register the grant of security hereunder on its books and records or making such filings or recordings, in each case as may be necessary or advisable, under the laws of such issuer's jurisdiction to insure the validity, perfection and priority of the security interest of the Collateral Agent, subject to the Intercreditor.  Upon the occurrence and continuation of an Event of Default, the Collateral Agent will have the right, subject to the Intercreditor and without notice to any Grantor, to transfer all or any portion of such Collateral to its name or the name of its nominee or agent.  In addition, the Collateral Agent will have the right at any time, without notice to any Grantor, to exchange any certificates or instruments representing any of such Collateral for certificates or instruments of smaller or larger denominations.

        **4.13    Certificated Collateral**. With respect to any Collateral that is represented by a certificate or that is an Instrument (other than any such Collateral credited to a Securities Account) and subject to the Intercreditor, the applicable Grantor will cause such certificate or instrument to be delivered to the Collateral Agent, indorsed in blank by an "effective indorsement" (as defined in Section 8-107 of the UCC), regardless of whether such certificate constitutes a "certificated security" for purposes of the UCC. With respect to any such Collateral that is an "uncertificated security" for purposes of the UCC (other than any "uncertificated securities" credited to a Securities Account) and subject to the Intercreditor, the applicable Grantor will cause the issuer of such uncertificated security to either (i) register the Collateral Agent as the registered owner thereof on the books and records of the issuer or (ii) execute an agreement reasonably acceptable to the Collateral Agent, pursuant to which, upon the occurrence and continuation of an Event of Default, such issuer agrees to comply with the Collateral Agent's instructions with respect to such uncertificated security without further consent by such Grantor or any other Person.

        **4.14    Voting and Distributions**. So long as no Event of Default has occurred and is continuing, (a) except as otherwise provided under the covenants and agreements relating to Investment Property in this Agreement or elsewhere herein or in the Indenture, each Grantor will be entitled to exercise or refrain from exercising its voting and other consensual rights

pertaining to such Collateral or any part thereof for any purpose not inconsistent with the terms of this Agreement, the Indenture and the Intercreditor; *provided* that, no Grantor will exercise or refrain from exercising any such right if such action would have a material adverse effect on the value of such Collateral; and (b) the Collateral Agent will promptly execute and deliver (or cause to be executed and delivered) to each Grantor all proxies and other instruments as such Grantor may from time to time reasonably request for the purpose of enabling such Grantor to exercise the voting and other consensual rights when and to the extent that it is entitled to exercise pursuant to clause (a) above.

**4.15    Intellectual Property.**  Each Grantor will promptly report to the Collateral Agent all of the following:  (i) the filing by such Grantor or on its behalf of any application to register any Intellectual Property owned by such Grantor in whole or in part with the United States Patent and Trademark Office, the United States Copyright Office, or any foreign counterpart of the foregoing, (ii) the registration of any Intellectual Property owned by such Grantor in whole or in part by any such office, and (iii) the acquisition by such Grantor of any issued Patent, or application or registration of any other Patent, Copyright, Trademark, or Trade Secret.  In each event, such Grantor will execute and deliver to the Collateral Agent a completed Security Agreement Supplement, together with all supplements to schedules thereto, and, if requested, signed counterparts of an IP Security Agreement, as applicable, or any other agreement reasonably acceptable to the Collateral Agent having the same operative effect, together with all supplements to the schedules thereto.

**4.16    Commercial Tort Claims.**  With respect to all Commercial Tort Claims hereafter arising, each Grantor will deliver to the Collateral Agent a completed Security Agreement Supplement, together with all supplements to schedules thereto, identifying such new Commercial Tort Claims.

**4.17    Insurance.**  Each Grantor will maintain, with financially sound and reputable companies, insurance policies (i) insuring the Inventory and Equipment against loss by fire, explosion, theft and such other casualties as may be commercially reasonable, and (ii) insuring such Grantor and the Collateral Agent against liability for personal injury and property damage relating to such Inventory and Equipment, such policies to be in such amounts and covering such risks as is commercially reasonable and prudent with respect to the business and properties of the Grantors and that are usually carried by companies engaged in similar businesses and owning similar properties in the same general areas in which the Grantors operate.  All such insurance shall (i) provide that no cancellation, material reduction in amount or material change in coverage thereof will be effective until at least 30 days after notice to the Collateral Agent thereof, (ii) name the Collateral Agent as an additional insured party or loss payee, as its interests may appear, and, (iii) include a breach of warranty clause.

**4.18    Additional Grantors.**  From time to time subsequent to the date hereof, additional Persons may become parties hereto as additional grantors (each, an "**Additional Grantor**") by executing a Security Agreement Supplement, together with all supplements to schedules thereto.  Upon delivery of any such Security Agreement Supplement to the Collateral Agent, notice of which is hereby waived by each of the Grantors, each Additional Grantor will be a grantor and will be as fully a party hereto as if such Additional Grantor were an original signatory hereto.  Each Grantor expressly agrees that its obligations arising hereunder will not be affected or diminished by the addition or release of any other Grantor, nor by any election of the Collateral Agent not to cause any subsidiary of any Grantor to become an Additional Grantor. This Agreement will be fully effective as to any Grantor that is or becomes a party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Grantor.

**4.19    Further Assurances.**  Each Grantor agrees that from time to time, at the expense of such Grantor, it will promptly authenticate, execute and deliver all further agreements, instruments, certificates and documents, and take all further action, that may be necessary or desirable, or that the Collateral Agent may reasonably request, to create or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Collateral Agent to exercise and enforce its rights and remedies hereunder with respect to any Collateral.  Without limiting the generality of the foregoing, each Grantor shall:

(a)    file such financing or continuation statements, or amendments thereto, and execute and deliver such other agreements, instruments, endorsements, powers of attorney or notices, as may be necessary or desirable, or as the Collateral Agent may reasonably request, to perfect and preserve the security interests granted or purported to be granted hereby;

(b)    take all actions necessary to ensure the recordation of appropriate evidence of the Liens and security interest granted hereunder in Intellectual Property with any intellectual property registry in which such Intellectual Property is registered or in which an application for registration of such Intellectual Property is pending;

(c)    at any reasonable time, upon request by the Collateral Agent, allow inspection of the Collateral by the Collateral Agent, or Persons designated by the Collateral Agent; and

(d)    at the Collateral Agent's reasonable request, appear in and defend any action or proceeding that may affect such Grantor's title to or the Collateral Agent's security interest in all or any part of the Collateral.

## SECTION 5    REMEDIES

**5.1    Generally.**  If any Event of Default will have occurred and be continuing, the Collateral Agent may exercise in respect of the Collateral, subject to the Intercreditor and in addition to all other rights and remedies provided for herein or otherwise available to it at law or in equity, all the rights and remedies of the Collateral Agent on default under the UCC (whether or not the UCC applies to the affected Collateral) to collect, enforce or satisfy any Secured Obligations then owing, whether by acceleration or otherwise, and also may pursue any of the following separately, successively or simultaneously:

(a)    require any Grantor to, and each Grantor hereby agrees that it will at its expense and promptly upon request of the Collateral Agent, forthwith assemble all or part of the Collateral as directed by the Collateral Agent and make it available to the Collateral Agent at a place to be designated by the Collateral Agent that is reasonably convenient to both parties;

(b)    enter onto the property where any Collateral is located and take possession thereof with or without judicial process;

(c)    prior to the disposition of the Collateral, store, process, repair or recondition the Collateral or otherwise prepare the Collateral for disposition in any manner to the extent the Collateral Agent deems appropriate; and

(d)    without notice, except as specified below or under the UCC, sell, assign, lease, license (on an exclusive or nonexclusive basis, to the extent the Grantor has the

13

lawful right to do so), or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Collateral Agent's offices or elsewhere, for cash, on credit or for future delivery, at such time or times and at such price or prices and on such other terms as the Collateral Agent may deem commercially reasonable.

      **5.2**    **Sale of Collateral**. The Collateral Agent or any Secured Party may be the purchaser of any portion of the Collateral at any public or private (to the extent that the portion of the Collateral being privately sold is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations) sale in accordance with the UCC, and the Collateral Agent, as collateral agent for and representative of the Secured Parties, will be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price for any Collateral payable by the Collateral Agent at such sale. Each purchaser at any such sale will hold the property sold absolutely free from any claim or right on the part of any Grantor, and each Grantor hereby waives (to the extent permitted by applicable law) all rights of redemption, stay or appraisal that it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. Each Grantor agrees that, to the extent notice of sale will be required by law, at least ten days notice to such Grantor of the time and place of any public sale or the time after which any private sale is to be made will constitute reasonable notification. The Collateral Agent will not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Each Grantor agrees that it would not be commercially unreasonable for the Collateral Agent to dispose of the Collateral or any portion thereof by using Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets. The Collateral Agent may sell the Collateral without giving any warranties as to the Collateral, and may specifically disclaim or modify any warranties of title or the like, which procedure will not be considered to adversely effect the commercial reasonableness of any sale of the Collateral. Each Grantor hereby waives any claims against the Collateral Agent arising by reason of the fact that the price at which any Collateral may have been sold at such a private sale was less than the price that might have been obtained at a public sale, even if the Collateral Agent accepts the first offer received and does not offer such Collateral to more than one offeree. If the proceeds of any sale or other disposition of the Collateral are insufficient to pay all the Secured Obligations, each Grantor will be liable for the deficiency and the fees of any attorneys employed by the Collateral Agent to collect such deficiency. Each Grantor further agrees that a breach of any of the covenants contained in this Section 5.2 will cause irreparable injury to the Collateral Agent, that the Collateral Agent has no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section will be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no default has occurred giving rise to the Secured Obligations becoming due and payable prior to their stated maturities. If the Collateral Agent sells any of the Collateral on credit, the applicable Grantors will be credited only with payments actually made by purchaser and received by the Collateral Agent and applied to indebtedness of the purchaser. In the event the purchaser fails to pay for the Collateral, the Collateral Agent may resell the Collateral and the applicable Grantors will be credited with proceeds of the sale. Nothing in this Section 5.2 will in any way alter the rights of the Collateral Agent hereunder.

**5.3    Marshalling; Payments Set Aside.**  Subject to the Intercreditor, the Collateral Agent will have no obligation to marshall any assets in favor of any Grantor or any other Person or against or in payment of any of the Secured Obligations.

**5.4    Application of Proceeds.**  Except as expressly provided elsewhere in this Agreement or in the Intercreditor, all proceeds received by the Collateral Agent in respect of any sale, collection from, or other realization on all or any part of the Collateral shall be applied in full or in part by the Collateral Agent against the Secured Obligations in the following order of priority:  *first*, to the payment of all costs and expenses of such sale, collection or other realization, including reasonable compensation to the Collateral Agent and its agents and counsel, and all other reasonable expenses, liabilities and advances made or incurred by the Collateral Agent in connection therewith, and all amounts for which the Collateral Agent is entitled to indemnification hereunder and all advances made by the Collateral Agent hereunder for the account of the applicable Grantor, and to the payment of all costs and expenses paid or incurred by the Collateral Agent in connection with the exercise of any right or remedy hereunder or under any Indenture Document, all in accordance with the terms hereof or thereof; and *second*, to the extent of any excess of such proceeds, in accordance with Section 6.10 of the Indenture.

**5.5    Accounts.**  Subject to the Intercreditor, at any time following the occurrence and during the continuation of an Event of Default, the Collateral Agent may:  (a) direct the Account Debtors under any Accounts to make payment of all amounts due or to become due to such Grantor thereunder directly to the Collateral Agent, (b) notify, or require any Grantor to notify, each Person maintaining a lockbox or similar arrangement to which Account Debtors under any Accounts have been directed to make payment to remit all amounts representing collections on checks and other payment items from time to time sent to or deposited in such lockbox or other arrangement directly to the Collateral Agent, or (c) enforce collection, at the Grantors' expense, of any such Accounts and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as any applicable Grantor might have done.  If the Collateral Agent notifies any Grantor that it has elected to collect the Accounts in accordance with the preceding sentence, any payments of Accounts received by such Grantor will be forthwith (and in any event within two Business Days) deposited by such Grantor in the exact form received, duly indorsed by such Grantor to the Collateral Agent if required, in a collateral account maintained under the sole dominion and control of the Collateral Agent, and until so turned over, all amounts and proceeds (including checks and other instruments) received by such Grantor in respect of the Accounts, any Supporting Obligation or Collateral Support will be received in trust for the benefit of the Collateral Agent hereunder and will be segregated from other funds of such Grantor and such Grantor will not adjust, settle or compromise the amount or payment of any Account, or release wholly or partly any Account Debtor or obligor thereof, or allow any credit or discount thereon.

**5.6    Investment Property.**

(a)    Each Grantor recognizes that, by reason of certain prohibitions contained in the Securities Act and applicable state securities laws, the Collateral Agent may be compelled, with respect to any sale of all or any part of the Investment Property conducted without prior registration or qualification of such Investment Property under the Securities Act or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Investment Related Property for their own account, for investment and not with a view to the distribution or resale thereof.  Each Grantor acknowledges that any such private sale may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the

15

Securities Act) and, notwithstanding such circumstances, each Grantor agrees that any such private sale will be deemed to have been made in a commercially reasonable manner and that the Collateral Agent will have no obligation to engage in public sales and no obligation to delay the sale of any Investment Property for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the Securities Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it. If the Collateral Agent determines to exercise its right to sell any of the Investment Property, upon written request, each Grantor will and will use commercially reasonable efforts to cause each issuer of any Pledged Capital Stock or Pledged Debt to be sold hereunder from time to time to furnish to the Collateral Agent all such information as the Collateral Agent may request to determine the number and nature of interest, shares or other instruments included in the Investment Property that may be sold by the Collateral Agent in exempt transactions under the Securities Act and the rules and regulations of the SEC thereunder, as the same are from time to time in effect.

(b)    Upon the occurrence and during the continuation of an Event of Default and subject to the Intercreditor, (i) all rights of each Grantor to exercise or refrain from exercising the voting and other consensual rights that it would otherwise be entitled to exercise pursuant hereto will cease and all such rights will thereupon become vested in the Collateral Agent, who will thereupon have the sole right to exercise such voting and other consensual rights; (ii) all rights of each Grantor to receive dividends and other distributions that it would otherwise be entitled to receive pursuant hereto will cease and all such rights will thereupon become vested in the Collateral Agent, who will thereupon have the sole right to receive such dividends and other distributions; and (iii) to permit the Collateral Agent to exercise the voting and other consensual rights that the Grantors would otherwise be entitled to exercise pursuant hereto and to receive all dividends and other distributions that the Grantors would otherwise be entitled to receive, each Grantor will promptly execute and deliver (or cause to be executed and delivered) to the Collateral Agent all proxies, dividend payment orders and other instruments as the Collateral Agent may from time to time reasonably request, and each Grantor acknowledges that the Collateral Agent may utilize the power of attorney set forth in Section 6.3.

5.7    **Deposit Accounts.**  Upon the occurrence and during the continuation of an Event of Default and subject to the Intercreditor, the Collateral Agent will have the right to apply the balance from any Deposit Account or instruct the bank at which any Deposit Account is maintained to pay the balance of any Deposit Account to or for the benefit of the Collateral Agent.

5.8    **Intellectual Property.**

(a)    Upon the occurrence and during the continuation of an Event of Default and subject to the Intercreditor:

(i)    the Collateral Agent will have the right (but not the obligation) to bring suit or otherwise commence any action or proceeding in the name of any Grantor, the Collateral Agent or otherwise, in the Collateral Agent's sole discretion, to enforce any Intellectual Property included in the Collateral, in which event, such Grantor will, at the request of the Collateral Agent, do all lawful acts and execute all documents reasonably required by the Collateral Agent in aid of such enforcement, and such Grantor will promptly, upon demand, reimburse and indemnify the Collateral Agent as provided in Sections 6.6 and 6.7 in connection therewith;

16

(ii)    upon written demand from the Collateral Agent, each Grantor will assign, convey or otherwise transfer to the Collateral Agent or its designee all of such Grantor's right, title and interest in and to the Intellectual Property included in the Collateral, and will execute and deliver to the Collateral Agent such documents as are necessary to effectuate and record such assignment, conveyance, or transfer of, or other evidence of foreclosure on, such Intellectual Property;

(iii)    in the event of any assignment, conveyance or other transfer of any of the Trademarks included in the Collateral, the goodwill symbolized by any such Trademarks will be included in such sale or transfer, and the applicable Grantor will supply to the Collateral Agent or its designee such Grantor's manufacturing, advertising, and distribution know-how, and copies of records embodying such know-how, relating to products and services theretofore sold under such Trademarks;

(iv)    each Grantor agrees that an assignment, conveyance, or transfer of any Intellectual Property included in the Collateral will be applied to reduce the Secured Obligations outstanding only to the extent that the Collateral Agent receives cash proceeds in respect of such assignment, conveyance, or other transfer of the Intellectual Property; and

(v)    the Collateral Agent will have the right to notify, or require each Grantor to notify, any obligors with respect to payments due or to become due to such Grantor in respect of the Intellectual Property, of the existence of the security interest created herein, to direct such obligors to make payment of all such amounts directly to the Collateral Agent, and, upon such notification and at the expense of such Grantor, to enforce collection of any such amounts and to adjust, settle or compromise the amount of such payment, to the same extent as such Grantor could have done.

(b)    Solely for the purpose of enabling the Collateral Agent to exercise rights and remedies under this Section 5.8, at such time as the Collateral Agent will be lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to the Collateral Agent, to the extent it has the lawful right to do so, an irrevocable, nonexclusive worldwide license (exercisable without payment of royalty or other compensation to such Grantor), to use, operate under, or sublicense any Intellectual Property now or hereafter owned by such Grantor, subject, in the case of Trademarks, to the maintenance by or on behalf of the Collateral Agent of quality standards with respect to the products and services sold under such Trademarks at a level at least substantially comparable to that prevailing at the time of Event of Default. The foregoing license grant to the Collateral Agent is in addition to, and not in limitation of, the Collateral Agent's rights under Section 6.

5.9    **Cash Proceeds.** In addition to the rights of the Collateral Agent specified in Section 5.5, upon the occurrence and during the continuation of an Event of Default and subject to the Intercreditor, Cash Proceeds will be held by such Grantor in trust for the Collateral Agent, segregated from other funds of such Grantor, and will, forthwith upon receipt by such Grantor, unless otherwise provided in Section 5.5 or in the Intercreditor, be turned over to the Collateral Agent in the exact form received by such Grantor (duly indorsed by such Grantor to the Collateral Agent, if required) and held by the Collateral Agent in a designated collateral account. Any Cash Proceeds received by the Collateral Agent (whether from a Grantor or

17

otherwise), if an Event of Default has occurred and is continuing, may, in the sole discretion of the Collateral Agent, (A) be held by the Collateral Agent for the ratable benefit of the Secured Parties, as collateral security for the Secured Obligations (whether matured or unmatured), or (B) then or at any time thereafter may be applied by the Collateral Agent against the Secured Obligations then due and owing.

           **5.10    Certain Rights Respecting Contracts**. Upon the occurrence and during the continuation of an Event of Default and subject to the Intercreditor, the Collateral Agent may assume any Grantor's rights under any or all contracts of such Grantor, it being in the Collateral Agent's sole discretion whether to do so and which Contracts are to be assumed. Without limiting the generality of the foregoing, in such event the Collateral Agent may notify (or require the applicable Grantor to notify) other parties to any such contract that it has assumed the applicable Grantor's rights thereunder, may perform and discharge any or all such Grantor's obligations thereunder, and, in the exercise of such rights, may pay any costs and expenses and employ agents and legal counsel, all at the sole cost and expense of the Grantors. The Collateral Agent will not be obligated to perform or discharge any obligation or duty to be performed or discharged by any Grantor under any contract, and each Grantor hereby agrees to indemnify the Collateral Agent, its nominee and each other principal for, and hold each such Person harmless from, any and all liability arising from such contracts, except to the extent that such liability results from such Person's gross negligence or willful misconduct. Nothing herein shall be construed to place responsibility for the control, care, management, or repair of any property to which any Grantor has rights under the contracts on the Collateral Agent or make it liable for any negligence in the management, operation, upkeep, repair or control of such property.

## SECTION 6       RIGHTS AND OBLIGATIONS OF COLLATERAL AGENT

           **6.1    Appointment, Resignation and Removal**. The Collateral Agent has been appointed to act as Collateral Agent hereunder by each Secured Party pursuant to the Indenture. The Collateral Agent will be obligated, and will have the right hereunder, to make demands, to give notices, to exercise or refrain from exercising any rights, and to take or refrain from taking any action (including the release or substitution of Collateral), solely in accordance with this Agreement, the Indenture and the Intercreditor. The Collateral Agent may resign and a successor Collateral Agent may be appointed in the manner provided in the Indenture. Upon the acceptance of any appointment as Collateral Agent under the terms of the Indenture by a successor Collateral Agent, that successor Collateral Agent will thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Collateral Agent under this Agreement, and the retiring or removed Collateral Agent under this Agreement will be discharged from its duties and obligations hereunder. After any retiring or removed Collateral Agent's resignation or removal, the provisions of this Agreement will inure to its benefit as to any actions taken or omitted to be taken by it under this Agreement while it was the Collateral Agent hereunder.

           **6.2    Standard of Care; Collateral Agent May Perform**. The powers conferred on the Collateral Agent hereunder are solely to protect the Secured Parties' interest and does not impose any duty on it to exercise any such powers. Except for the exercise of reasonable care in the custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Collateral Agent will have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties, subject to the Intercreditor, or any other rights pertaining to any Collateral. The Collateral Agent will be deemed to have exercised reasonable care in the custody and preservation of Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Collateral

Agent accords its own property. Neither the Collateral Agent nor any of its directors, officers, employees or agents will be liable for failure to demand, collect or realize on all or any part of the Collateral or for any delay in doing so or will be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or otherwise. If any Grantor fails to perform any agreement contained herein, the Collateral Agent may itself perform, or cause performance of, such agreement, and the expenses of the Collateral Agent incurred in connection therewith will be payable by each Grantor pursuant to Section 6.6.

6.3    **Attorney-In-Fact.** Each Grantor hereby irrevocably appoints the Collateral Agent (such appointment being coupled with an interest), subject to the Intercreditor, as such Grantor's attorney-in-fact, with full authority in the place and stead of such Grantor and in the name of such Grantor, the Collateral Agent or otherwise, from time to time to take any action and to execute any instrument reasonably necessary or advisable or that the Collateral Agent may deem reasonably necessary or advisable to accomplish the purposes of this Agreement, including the following:

(a)    to prepare, sign, and file for recordation in any Intellectual Property registry, appropriate evidence of the lien and security interest granted herein in the Intellectual Property in the name of such Grantor as assignor or pledgor;

(b)    to take or cause to be taken all actions necessary to perform or comply or cause performance or compliance with the terms of this Agreement, including access to pay or discharge taxes or Liens (other than Permitted Liens) levied or placed on or threatened against the Collateral, any such payments made by the Collateral Agent to become part of the Secured Obligations of such Grantor (Collateral Agent agrees to give reasonable notice to such Grantor of such payments) to the Collateral Agent, due and payable immediately without demand; and

(c)    Upon the occurrence and during the continuance of any Event of Default and subject to the Intercreditor:

(i)    to obtain and adjust insurance required to be maintained by such Grantor or paid to the Collateral Agent pursuant to the Indenture Documents;

(ii)    to ask for, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

(iii)    to receive, endorse and collect any drafts or other Instruments, Documents and Chattel Paper in connection with Section 6.3(b);

(iv)    to file any claims or take any action or institute any proceedings that the Collateral Agent may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Collateral Agent with respect to any of the Collateral;

(v)    to sell, transfer, assign, lease, license, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Collateral Agent were the absolute owner thereof for all purposes, and to do, at the Collateral Agent's option and such

19

Grantor's expense, at any time or from time-to-time, all acts and things reasonably necessary or advisable or that the Collateral Agent reasonably deems necessary to protect, preserve, or realize on the Collateral and the Collateral Agent's security interest therein as fully and effectively as such Grantor might do.

**6.4     Access; Right of Inspection.**  The Collateral Agent will at all times upon reasonable prior notice have full and free access during normal business hours to all the books, correspondence and records of each Grantor, and the Collateral Agent and its representatives may examine the same, take extracts therefrom and make photocopies thereof, and each Grantor agrees to render to the Collateral Agent, at such Grantor's cost and expense, such clerical and other assistance as may be reasonably requested with regard thereto. The Collateral Agent and its representatives will during normal business hours upon reasonable prior notice also have the right to enter any premises of each Grantor and inspect any property of each Grantor where any of such Grantor's Collateral is located for the purpose of inspecting the same, observing its use or otherwise protecting its interests therein.

**6.5     Authorizations.**  Each Grantor hereby authorizes the Collateral Agent to take all steps reasonably necessary or that it deems reasonably necessary to maintain and preserve the Collateral, consistent with the Grantor's obligations to do so hereunder and under the Intercreditor, all at the Grantor's expense. Without limiting the foregoing, each Grantor hereby authorizes the filing of any financing statements or continuation statements, and amendments to financing statements, or any similar document in any jurisdictions and with any filing offices as are necessary or advisable to perfect the security interest granted to the Collateral Agent hereunder. Such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of collateral that describes such property in any other manner as is necessary, advisable or prudent to ensure the perfection of the security interest in the Collateral granted to the Collateral Agent hereunder, including describing such property as "all assets, whether now owned or hereafter acquired." Each Grantor will from time to time furnish to the Collateral Agent statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Collateral Agent may reasonably request, all in reasonable detail. Notwithstanding the foregoing, the Collateral Agent shall be under no obligation to prepare or file any financing statements.

**6.6     Expenses.**  Each Grantor, jointly and severally, will promptly pay to the Collateral Agent the amount of any and all costs and expenses, including the reasonable fees and expenses of its counsel and the fees and expenses of any experts and agents, that the Collateral Agent may incur in connection with this Agreement, including all costs and expenses relating to (a) any and all filings and other actions taken to ensure the attachment, perfection and priority of, and the ability of the Collateral Agent to enforce, the Collateral Agent's security interest in the Collateral; (b) any action, suit or other proceeding affecting the Collateral or any part thereof commenced, in which action, suit or proceeding the Collateral Agent is made a party or participates or in which the right to use the Collateral or any part thereof is threatened, or in which it becomes necessary or in the reasonable judgment of the Collateral Agent becomes reasonably necessary to defend or uphold the Lien hereof (including any action, suit or proceeding to establish or uphold the compliance of the Collateral with any requirements of any governmental authority or law); (c) the collection of the Secured Obligations; (d) the enforcement and administration hereof; (e) the custody or preservation of, or the sale of, collection from, or other realization on, any of the Collateral; (f) the exercise or enforcement of any of the rights of the Collateral Agent or any Secured Party hereunder; or (g) the failure by any Grantor to perform or observe any of the provisions hereof. All amounts expended by the Collateral Agent and payable by any Grantor under this Section 6.6 will be due upon demand (together with interest

20

thereon accruing at the applicable default rate during the period from and including the date on which such funds were so expended to the date of repayment) and will be part of the Secured Obligations. Each Grantor's obligations under this <u>Section 6.6</u> will survive the termination hereof and the discharge of such Grantor's other obligations under this Agreement, the Indenture and the Notes.

      **6.7**     **Indemnity.** Each Grantor jointly and severally agrees to (a) defend (subject to Indemnitees' selection of counsel), indemnify, pay and hold harmless each Indemnitee, from and against all claims, losses and liabilities in any way relating to, growing out of or resulting from this Agreement and the transactions contemplated hereby (including enforcement of this Agreement), except to the extent such claims, losses or liabilities result from such Indemnitee's gross negligence or willful misconduct; and (b) to pay to the Collateral Agent promptly following written demand the amount of all reasonable costs and reasonable expenses, including the reasonable fees and expenses of its counsel and of any experts and agents in accordance with the terms and conditions of the Indenture. The obligations of each Grantor under this <u>Section 6.7</u> will survive the termination of this Agreement and the discharge of such Grantor's other obligations under this Agreement, the Indenture and Notes, and will be a part of the Secured Obligations.

      **6.8**     **Release of Collateral.** Upon the payment in full of all Secured Obligations (other than contingent indemnification obligations to the extent any unsatisfied claims giving rise thereto have not been asserted), and in connection with any sale or other disposition of any portion of the Collateral permitted by the Indenture, the security interests granted hereunder in such Collateral will terminate and all rights to such Collateral will revert to the applicable Grantor (or other Person entitled thereto) in accordance with Section 10.4 of the Indenture. Upon such termination, the Collateral Agent will, at the Grantors' expense, execute and deliver to the applicable Grantor such documents, including any termination statements, as such Grantor may reasonably request to evidence such termination and release of such security interest.

## SECTION 7    MISCELLANEOUS

      **7.1**     **Notices.** Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to any Grantor shall be sent to such Grantor's address as set forth on <u>Schedule 7.1</u>. Any notice or other communication herein required or permitted to the Collateral Agent shall be sent to the Collateral Agent's address set forth in Section 12.2 of the Indenture. Each notice hereunder shall be in writing and may be personally served or sent by facsimile, United States mail or courier service and will be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of facsimile, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed; *provided* that, no notice to the Collateral Agent will be effective until received by the Collateral Agent.

      **7.2**     **Amendment and Waivers.** No amendment, modification, termination or waiver of any provision of this Agreement, or consent to any departure by any Grantor therefrom, will in any event be effective without the written concurrence of the Collateral Agent and each Grantor.

      **7.3**     **No Waiver; Remedies Cumulative.** No failure or delay on the part of the Collateral Agent in the exercise of any power, right or privilege hereunder or under any other Indenture Document will impair such power, right or privilege or be construed to be a waiver of

any default or acquiescence therein, nor will any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege. All rights, powers and remedies existing under this Agreement and the other Indenture Documents are cumulative, and not exclusive of, any rights or remedies otherwise available. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder will not impair any such right, power or remedy or be construed to be a waiver thereof, nor will it preclude the further exercise of any such right, power or remedy.

       **7.4**     **Successors and Assigns.** This Agreement will be binding on the parties hereto and their respective successors and assigns including all persons who become bound as debtor to this Agreement. No Grantor may, without the prior written consent of the Collateral Agent, assign any right, duty or obligation hereunder.

       **7.5**     **Independence of Covenants.** All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant will not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

       **7.6**     **Survival of Representations, Warranties and Agreements.** All representations, warranties and agreements made herein will survive the execution and delivery hereof. Notwithstanding anything herein or implied by law to the contrary, the agreements of each Grantor set forth in <u>Sections 6.6</u> and <u>6.7</u> will survive the payment of the Secured Obligations and the termination hereof.

       **7.7**     **Severability.** If any provision in or obligation hereunder will be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, will not in any way be affected or impaired thereby.

       **7.8**     **Governing Law.** THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK, INCLUDING, WITHOUT LIMITATION, SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND NEW YORK CIVIL PRACTICE LAWS AND RULES 327(B).

       **7.9**     **Counterparts.** This Agreement may be executed in any number of counterparts (including via facsimile), each of which when so executed and delivered will be deemed an original, but all such counterparts together will constitute but one and the same instrument.

       **7.10**     **Effectiveness.** This Agreement will become effective upon the execution of a counterpart hereof by each of the parties and receipt by the Grantors and the Collateral Agent of written or telephonic notification of such execution and authorization of delivery thereof.

       **7.11**     **Entire Agreement.** This Agreement and the other Indenture Documents embody the entire agreement and understanding between the Grantors and the Collateral Agent, and supersede all prior agreements and understandings between such parties relating to the subject matter hereof and thereof. Accordingly, the Indenture Documents may not be

contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

**7.12    Limitation on Collateral Agent's Liability.**  Notwithstanding anything to the contrary contained herein, the Collateral Agent shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral, nor shall the Collateral Agent be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Collateral Agent in good faith.  The Collateral Agent shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Collateral Agent.  Nor shall the Collateral Agent be responsible for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of any Grantor to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens on the Collateral or otherwise as to the maintenance of the Collateral.

**7.13    Rights and Obligations Subject to Intercreditor.**  All rights and remedies provided herein to the Collateral Agent, and all obligations of the Grantors hereunder, are subject to the applicable terms and provisions of the Intercreditor.  So long as the Intercreditor is effective, if any inconsistency exists or arises between the terms hereof and the Intercreditor, the Intercreditor controls.

*[signature pages follow]*

23

IN WITNESS WHEREOF, each Grantor and the Collateral Agent have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

<u>Grantors:</u>

**155 East Tropicana, LLC**

By: _____
    Name:  Neil G. Kiefer
    Title:   Chief Executive Officer


**155 East Tropicana Finance Corp.**

By: _____
    Name:  Neil G. Kiefer
    Title:   President

367177

Collateral Agent:

**The Bank of New York Trust Company, N.A.**

By: _____

Name: SANDEE PARKS

Title: VICE PRESIDENT

**EXHIBIT A**

[Form of]
## SECURITY AGREEMENT SUPPLEMENT

This SECURITY AGREEMENT SUPPLEMENT, dated as of [_____], 200[_] (this "**Supplement**"), is made by the Persons listed on the signature pages hereof (collectively, the "**[Additional] Grantors**") in favor of The Bank of New York Trust Company, N.A., as collateral agent for the Secured Parties (in such capacity, the "**Collateral Agent**"). Undefined capitalized terms used in this Agreement have the meanings assigned to them in that certain Senior Secured Note Security Agreement, dated as of March 29, 2005 (as amended, restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), among the Issuers, the other Grantors party thereto and the Collateral Agent.

**Section 1.   Affirmation and Grant of Security.**  Each [Additional] Grantor hereby [*For existing Grantors add*:  affirms its grant to the Collateral Agent for the benefit of the Secured Parties set forth in the Security Agreement of, and] grants to the Collateral Agent for the benefit of the Secured Parties, a security interest in and continuing lien on all of such [Additional] Grantor's right, title and interest in, to and under the Collateral to secure the Secured Obligations.

**Section 2.   Representation and Warranties.**  Each [Additional] Grantor represents and warrants that the attached schedules supplement the schedules to the Security Agreement, and that each such supplemental schedule accurately and completely sets forth all additional information required pursuant to the Security Agreement, and such Grantor hereby agrees that such supplemental schedules constitutes part of the schedules to the Security Agreement.

[*The following bracketed section is for Additional Grantors only*:]

[**Section 3.   Additional Grantor Provisions.**  Pursuant to Section 4.18 of the Security Agreement, each Additional Grantor hereby:

(a)      agrees that by the execution and delivery hereof, such Additional Grantor becomes a Grantor under the Security Agreement and agrees to be bound by all of the terms thereof as if it were an original signatory thereto, and all of the property pledged hereby shall be deemed to be part of the Collateral and hereafter subject to each of the terms and conditions of the Security Agreement;

(b)      represents and warrants that, except as set forth on the schedules hereto, each of the representations and warranties set forth in the Security Agreement and applicable to such Additional Grantor is true and correct both before and after giving effect to this Supplement, except to the extent that any such representation and warranty relates solely to any earlier date, in which case such representation and warranty is true and correct as of such earlier date;

(c)      agrees that from time to time, at such Additional Grantor's expense, it will promptly authenticate, execute and deliver all further agreements, instruments, certificates and documents, and take all further action, that may be necessary or desirable, or that the Collateral Agent may reasonably request, to create or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Collateral Agent to exercise and enforce its rights and remedies hereunder with respect to any Collateral; and

A-1

EXHIBIT A

d)    agrees that any notice or other communication herein required or permitted to be given shall be given in accordance with Section 7.1 of the Security Agreement, and all for purposes thereof, the notice address of the undersigned shall be the address as set forth on the applicable schedule hereto.]

**Section [3][4].  Miscellaneous.**  Each [Additional] Grantor agrees that neither this Supplement nor any term hereof may be changed, waived, discharged or terminated, except by an instrument in writing signed by the party (including, if applicable, any party required to evidence its consent to or acceptance of this Supplement) against whom enforcement of such change, waiver, discharge or termination is sought.  If any provision in or obligation hereunder will be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, will not in any way be affected or impaired thereby.  This Supplement may be executed in any number of counterparts (including via facsimile), each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

**Section [4][5].  Governing Law.**  THIS SUPPLEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK, INCLUDING, WITHOUT LIMITATION, SECTIONS 5-1401 AND 5-1402 OF *THE NEW YORK GENERAL OBLIGATIONS LAW* AND NEW YORK CIVIL PRACTICE LAWS AND RULES 327(B).

IN WITNESS WHEREOF, each [Additional] Grantor has caused this Supplement to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

[Name of Subsidiary],
as a[n Additional] Grantor


By:_____
     Name:
     Title:


Acknowledged and Accepted:

**The Bank of New York Trust Company, N.A.,**
as Collateral Agent


By:_____
     Name:
     Title:

A-2

**Schedule 3.2 Organizational Matters**

| Full Legal Name | Type and Jurisdiction of Organization | Organizational Identification Number | Chief Executive Offices |
|---|---|---|---|
| 155 East Tropicana, LLC | Nevada Limited-Liability Company | LLC13428-2004 | 155 East Tropicana Avenue Las Vegas, NV 89109 |
| 155 East Tropicana Finance Corp. | Nevada Corporation | E0079092005-1 | |

## Schedule 3.5 UCC Filing Offices

| Debtor | Jurisdictions |
|---|---|
| 155 East Tropicana, LLC | Nevada Secretary of State<br>Clark County, Nevada |
| 155 East Tropicana Finance Corp. | Nevada Secretary of State<br>Clark County, Nevada |

**Schedule 3.8 Deposit Accounts**

**155 East Tropicana, LLC** currently has accounts at the following banks.

City National Bank
555 South Flower Street
12th Floor
Los Angeles, CA 90071

| Account Name | Account Number |
| --- | --- |
| Cash Collateral | 210-065-113 |
| Debt Service | 210-065-121 |
| Operating Cash Flow | 210-065-148 |
| Tax/Insurance | 210-065-156 |
| Borrower Operating Account | 210-065-164 |

Wells Fargo Brokerage Services, LLC

| Account Name | Account Number |
| --- | --- |
| 155 East Tropicana, LLC | 11552783 |

The Bank of New York

| Account Name | Account Number |
| --- | --- |
| Renovation Disbursement | 171098 |
| Interest Reserve | 171097 |

**Schedule 3.9 Investment Property**

**Pledged Stock:**

| Issuer | Name of Pledgor | Number of Shares/Units | Class of Interests | Percentage of Class Owned | Certificate Nos. |
|--------|-----------------|------------------------|--------------------|--------------------------|------------------|
| 155 East Tropicana, LLC | Florida Hooters LLC | 66.67 Units | Membership Interests | 66⅔% | — |
| 155 East Tropicana, LLC | EW Common LLC | 33.33 Units | Membership Interests | 33⅓% | — |
| 155 East Tropicana Finance Corp. | 155 East Tropicana, LLC | 100 | Common | 100 | [  ] |

**Pledged Notes:**

None.

**Securities Accounts:**

None.

### Schedule 3.10 Intellectual Property

**A. Copyrights:**

None

**B. Copyright Licenses:**

None

**C. Patents:**

None

**D. Patent Licenses:**

None

**E. Trademarks:**

Parent has filed the following Intent-To-Use Applications with the United States Trademark Office:

| Mark | Class | Serial Number |
|------|-------|---------------|
| Nippers | 43<br>Restaurant, bar and cocktail lounge services | 78/549,527 |
| The Bait Shop | 43<br>Restaurant, bar and cocktail lounge services | 78/569,441 |
| The Bait Shop | 35<br>Retail store services | 78/569,446 |
| Owl's Nest | 43<br>Restaurant, bar and cocktail lounge services | 78/569,436 |

<u>Domain Names</u>

The following domain names have been reserved by 155 East Tropicana, LLC and are currently in use:
- www.hooterscasinohotel.com
- www.hootershotelcasino.com

157553_1

— 5 —

- www.hooterslasvegas.com
- www.hooterslv.com

The following domain names have been reserved by 155 East Tropicana, LLC and are not currently in use, but such reservations will expire on August 2, 2005, unless otherwise indicated:

- www.hooterscasinolasvegas.com
- www.hooterscasinolv.com
- www.hootershotelcasinolasvegas.com
- www.hootershotelcasinolv.com
- www.hootershotellasvegas.com
- www.hootershotellv.com
- www.hooterslasvegascasino.com
- www.hootersresortcasino.com
- www.lasvegashooters.com
- www.lasvegashooterscasino.com
- www.lasvegashootershotel.com
- www.playhooters.com
- www.vegashooters.com
- www.hootersresort.com (September 17, 2005)

## F. Trademark Licenses:

**Hooters**. 155 East Tropicana, LLC has entered into an assignment agreement with Florida Hooters, LLC which grants 155 East Tropicana, LLC the right to use certain intellectual property in connection with the operation of a Hooters Casino Hotel. The intellectual property covered by this agreement is described as follows:

- *Hooters Trademark.* 155 East Tropicana, LLC has an exclusive license to use the Hooters brand in connection with gaming, casino or combined hotel, gaming and casino operations solely at the property located at 155 East Tropicana Avenue, Las Vegas, Nevada.

- *Hooters Restaurant Concept.* Pursuant to a consent from Las Vegas Wings, Inc., 155 East Tropicana, LLC has the right to use the Hooters restaurant concept at the hotel casino located at 155 East Tropicana Avenue, Las Vegas, Nevada. The consent permits worldwide promotion, marketing and advertising of the hotel casino (located at 155 East Tropicana Avenue, Las Vegas, Nevada) and its services.

**Marino's**. 155 East Tropicana, LLC has an exclusive license to use certain intellectual property to operate and promote restaurants, taverns, lounges and bars using the marks "Dan Marino's Fine Food & Spirits" and "Martini Bar," which is operated in conjunction with Dan Marino's Fine Food & Spirits, at the hotel casino (located at 155 East Tropicana Avenue, Las Vegas, Nevada).

**Pete & Shorty's, Inc.**. Pete & Shorty's, Inc has granted to 155 East Tropicana, LLC a nonexclusive, royalty-free license to use the Pete & Shorty's mark in connection with a restaurant, bar and lounge at the Hooters Casino Hotel (to be located at 155 East Tropicana Avenue, Las Vegas, Nevada). Pursuant to the license agreement, 155 East Tropicana, LLC can also use the mark in connection with affiliated merchandise, entertainment and casino services. However, Pete & Shorty's, Inc. has maintained the right to obtain federal and/or state registrations for any and all additional services, other than restaurant, bar and cocktail lounge services, which will be provided at the Hooters Casino Hotel (to be located at 155

East Tropicana Avenue, Las Vegas, Nevada).

**G. Trade Secret Licenses:**

None

**H. Intellectual Property Matters:**

None

**Schedule 7.1 Addresses for Notices; Contact Information**

115 East Tropicana Avenue
Las Vegas, Nevada 89109
(702) 739-7783 (facsimile)

# EXHIBIT 17

APNS: 162-28-101-002 and 162-28-102-001

WHEN RECORDED MAIL TO:
    Skadden Arps Slate Meagher & Flom LLP
    300 South Grand Avenue
    Los Angeles, California 90071
    Attention: Manny Ejercito, Esq.

Send Tax Bills to:
    155 East Tropicana, LLC
    c/o 115 East Tropicana Avenue
    Las Vegas, Nevada 89109
    Attn: Michael Hessling

Receipt/Conformed Copy
Requestor:
LAWYERS TITLE OF NEVADA
03/29/2005 11:41:59    T20050055655
Book/Instr: 20050329-0002531
Trust Deed      Page Count: 35
Fees: $48.00     N/C Fee: $0.00

Frances Deane
Clark County Recorder

## DEED OF TRUST, FIXTURE FILING WITH ASSIGNMENT OF RENTS AND LEASES, AND SECURITY AGREEMENT

### by and from

**155 EAST TROPICANA, LLC, as "Grantor"**
to
**LAWYERS TITLE OF NEVADA, INC., as "Trustee"**
for the benefit of
**THE BANK OF NEW YORK TRUST COMPANY, N.A.,**
in its capacity as collateral agent, its successors and assigns, as its interests may appear,
as "Beneficiary"

### Dated as of March 29, 2005

THIS INSTRUMENT IS TO BE FILED AND INDEXED IN THE REAL ESTATE RECORDS AND IS ALSO TO BE INDEXED IN THE INDEX OF FINANCING STATEMENTS OF CLARK COUNTY, NEVADA UNDER THE NAME OF 155 EAST TROPICANA, LLC AS "DEBTOR" AND THE BANK OF NEW YORK TRUST COMPANY, N.A. AS "SECURED PARTY." THE ORGANIZATIONAL NUMBER FOR 155 EAST TROPICANA, LLC IS NEVADA FILE NUMBER LLC13428-2004. INFORMATION CONCERNING THE SECURITY INTEREST MAY BE OBTAINED FROM BENEFICIARY AT THE ADDRESS SET FORTH BELOW.

THIS INSTRUMENT IS A "CONSTRUCTION MORTGAGE" AS THAT TERM IS DEFINED IN SECTION 104.9334(8) OF THE NEVADA REVISED STATUTES ("NRS") AND SECURES AN OBLIGATION INCURRED FOR THE CONSTRUCTION OF AN IMPROVEMENT UPON LAND.

368884.06-Los Angeles Server 1A - MSW

## DEED OF TRUST, FIXTURE FILING WITH ASSIGNMENT OF RENTS AND LEASES, AND SECURITY AGREEMENT
### (Nevada)

THIS DEED OF TRUST, FIXTURE FILING WITH ASSIGNMENT OF RENTS AND LEASES, AND SECURITY AGREEMENT (this "**Deed of Trust**") is dated as of March 29, 2005, by and from 155 EAST TROPICANA, LLC, a Nevada limited liability company ("**Grantor**"), whose address is c/o 115 East Tropicana Avenue, Las Vegas, Nevada 89109, Attention: Michael Hessling, to LAWYERS TITLE OF NEVADA INC. ("**Trustee**"), whose address is 1210 South Valley View, Las Vegas, Nevada 89102 for the benefit of THE BANK OF NEW YORK TRUST COMPANY, N.A., a national banking association, in its capacity as collateral agent, its successors and assigns, as its interests may appear ("**Agent**") pursuant to the Indenture and the Security Agreement (each as defined below), whose address is 700 South Flower Street, Suite 500, Los Angeles, California 90017, Attention Corporate Trust Administration (Agent, together with its successors and assigns, is referred to herein as "**Beneficiary**").

THIS INSTRUMENT SECURES FUTURE ADVANCES. THE MAXIMUM AMOUNT OF PRINCIPAL TO BE SECURED HEREBY IS $130,000,000.00. THIS INSTRUMENT IS TO BE GOVERNED BY THE PROVISIONS OF NRS 106.300 THROUGH NRS 106.400 INCLUSIVE. WITHOUT LIMITING THE FOREGOING, ANY AND ALL FUTURE ADVANCES BY BENEFICIARY, THE INDENTURE TRUSTEE OR THE HOLDERS TO ISSUERS (EACH AS DEFINED BELOW) MADE FOR THE IMPROVEMENT, PROTECTION OR PRESERVATION OF THE TRUST PROPERTY (AS DEFINED HEREIN), TOGETHER WITH INTEREST AT THE RATE APPLICABLE TO OVERDUE PRINCIPAL SET FORTH IN THE INDENTURE, SHALL BE AUTOMATICALLY SECURED HEREBY UNLESS SUCH A DOCUMENT EVIDENCING SUCH ADVANCES SPECIFICALLY RECITES THAT IT IS NOT INTENDED TO BE SECURED HEREBY AND THE PAYMENT OF ALL SUMS EXPENDED OR ADVANCED BY BENEFICIARY, THE INDENTURE TRUSTEE OR THE HOLDERS UNDER OR PURSUANT TO THE TERMS HEREOF OR THE INDENTURE OR TO PROTECT THE SECURITY HEREOF, TOGETHER WITH INTEREST THEREON AS HEREIN PROVIDED (WITHOUT LIMITING THE GENERALITY OF THE PROTECTIONS AFFORDED BY NRS CHAPTER 106) FUNDS DISBURSED THAT, IN THE REASONABLE EXERCISE OF BENEFICIARY'S JUDGMENT, ARE NEEDED FOR IMPROVING PROPERTY OR TO PROTECT SECURITY OF THE BENEFICIARY, THE INDENTURE TRUSTEE OR THE HOLDERS IN THE TRUST PROPERTY ARE TO BE DEEMED OBLIGATORY ADVANCES HEREUNDER AND WILL BE ADDED TO THE TOTAL INDEBTEDNESS BY THIS DEED OF TRUST AND SUCH INDEBTEDNESS SHALL BE INCREASED ACCORDINGLY.

2

Certain provisions of this Deed of Trust may be subject to the laws, rules and regulations of the Gaming Authorities (as defined herein).

## RECITALS:

WHEREAS, reference is made to that certain Indenture dated as of the date hereof (as it may be amended, supplemented or otherwise modified heretofore or hereafter from time to time, the "**Indenture**"), is being entered into by and among Grantor, 155 East Tropicana Finance Corp., a Nevada corporation ("**155 East Tropicana Finance**", and together with Grantor, the "**Issuers,**" which term includes any successors to any such persons thereunder), The Bank of New York Trust Company, N.A., a national banking association, in its capacity as trustee thereunder (the "**Indenture Trustee**"), and the Guarantors, pursuant to which the Issuers have issued or will issue the Notes to the respective Holders thereof. All capitalized terms which are used but not otherwise defined herein shall have the respective meanings and be construed herein as provided in the Indenture, and any reference to a provision of the Indenture shall be deemed to incorporate that provision as a part hereof in the same manner and with the same effect as if the same were fully set forth herein;

WHEREAS, in connection with the Indenture, Grantor, 155 East Tropicana Finance and each additional grantor from time to time a party thereto, collectively, as grantors, and The Bank of New York Trust Company, N.A., as collateral agent for the Indenture Trustee, the Holders and any future party to which any Secured Obligations (as defined below) are owed under the Indenture Documents (as defined below), have entered into that certain Senior Secured Note Security Agreement dated as of the date hereof (as it may be amended, supplemented or otherwise modified heretofore or hereafter from time to time, the "**Security Agreement**");

WHEREAS, it is a condition to the consummation of the transactions contemplated by the Indenture that Grantor, among other things, secures the Secured Obligations of Issuers under the Indenture and the Indenture Documents by delivering this Deed of Trust; and

WHEREAS, Grantor is receiving a good and valuable benefit, the sufficiency and receipt of which is hereby acknowledged, from consummation of the transactions contemplated by the Indenture.

## ARTICLE 1
## DEFINITIONS

**Section 1.1    Definitions**.  As used herein, the following terms shall have the following meanings:

368884.06-Los Angeles Server 1A - MSW

(a)      **"Event of Default"**: shall have the meaning ascribed to such term in Article 5 hereof.

(b)      **"Gaming Authorities"**: means any agency, authority, board, bureau, commission, department, office or instrumentality of any nature whatsoever of the United States federal government, any foreign government, any state, province or city or other political subdivision or otherwise, whether now or hereafter existing, or any officer or official thereof, including, without limitation, the Nevada Gaming Commission, the Nevada State Gaming Control Board, the Clark County Liquor and Gaming Licensing Board, and any other agency, in each case, with authority to regulate any gaming operation (or proposed gaming operation) owned, managed or operated by any of the Issuers.

(c)      **"Indenture Document"** means any of the Indenture, the Notes, the Guarantees, the Collateral Agreements, the Registration Rights Agreement and any other agreement, document or instrument entered into or issued in connection with any of the foregoing.

(d)      **"Intangible Property"**: means any and all intangible personal property, including, without limitation, (a) the rights to use all names and all derivations thereof now or hereafter used by Grantor in connection with the Land (as defined herein), or the Improvements (as defined herein), including, without limitation, the names ["Hotel San Remo Casino and Resort," and "Hooters Casino Hotel" (or other similar name using the Hooters Brand)] and any variations thereof, together with the goodwill associated therewith, and all names, logos, and designs used by Grantor, or in connection with the Land or the Improvements or in which Grantor has rights, with the exclusive right to use such names, logos and designs wherever they are now or hereafter used in connection with the Land or the Improvements, and any and all other trade names, trademarks or service marks, whether or not registered, now or hereafter used in the operation of the Land or the Improvements, including, without limitation, any interest as a licensee or franchisee, and, in each case, together with the goodwill associated therewith; (b) maps, plans, specifications, surveys, studies, tests, reports, data and drawings relating to the development of the Land or the Improvements and the construction of the Improvements, including, without limitation, all marketing plans, feasibility studies, soil tests, design contracts and all contracts and agreements of Grantor relating thereto and all architectural, structural, mechanical and engineering plans and specifications, studies, data and drawings prepared for or relating to the development of the Land or the Trust Property (as defined herein) or the construction, renovation or restoration of any of the Improvements or the extraction of minerals, sand, gravel or other valuable substances from the Land; (c) any and all books, records, customer lists (including lists or information derived from or related to the Player Tracking System described within the definition of **"Tangible Property"**), concession agreements, supply or service contracts, licenses, permits, governmental approvals (to the extent such licenses, permits and approvals may be pledged under applicable law), signs, goodwill, casino and hotel credit and charge records, supplier lists, checking accounts, safe deposit boxes

4

(excluding the contents of such deposit boxes owned by persons other than the Issuer), cash, instruments, any and all "chattel paper" as such term is defined in Section 9-102 of the UCC, documents, unearned premiums, deposits, refunds, including, but not limited to, income tax refunds, prepaid expenses, rebates, tax and insurance escrow and impound accounts, if any, actions and rights in action, and all other claims, and all other contract rights and general intangibles resulting from or used in connection with the operation of the Trust Property and in which Grantor now or hereafter has rights; (d) all of Grantor's documents, instruments, contract rights, and general intangibles including, without limitation, all insurance policies, permits, licenses, franchises and agreements required for the use, occupancy or operation of the Land, or any of the Improvements; (e) general intangibles, vacation license resort agreements or other time share license or right to use agreements with respect to the Land, the Improvements and/or the business being conducted thereon, including, without limitation, all rents, issues, profits, income and maintenance fees resulting therefrom; whether any of the foregoing is now owned or hereafter acquired and (f) any and all licenses, permits, approvals (to the extent such licenses, permits and approvals are not prohibited from being pledged under applicable law), variances, special permits, franchises, certificates, rulings, certifications, validations, exemptions, filings, registrations, authorizations, consents, approvals, waivers, orders, rights and agreements (including options, option rights and contract rights) now or hereafter obtained by Grantor from any governmental, administrative or regulatory agency, authority, department, commission, board, bureau or instrumentality of the United States, any state of the United States, or any political subdivision thereof, including, without limitation, any Gaming Authority, or any court, arbitrator or quasi-judicial authority having or claiming jurisdiction over the Land, the Tangible Property, or any other element of the Trust Property or providing access thereto, or the operation of any business on, at, or from the Land, including, without limitation, any gaming licenses.

        (e)     **"Inventory"**: as such term is defined in Section 9-102 of the UCC, including, without limitation, and in any event, all goods (whether such goods are in the possession of the Grantor or a lessee, bailee or other person for sale, lease, storage, transit, processing, use or otherwise and whether consisting of whole goods, spare parts, components, supplies, materials or consigned or returned or repossessed goods) which are held for sale or lease or are to be furnished (or which have been furnished) under any contract of service or which are raw materials or work in progress or materials used or consumed in any of Grantor's businesses;

        (f)     **"Obligations"**: shall have the meaning ascribed to such term in the Indenture.

        (g)     **"Permitted Liens"**: shall have the meaning ascribed to such term in the Indenture.

        (h)     **"Personalty"**: means the Intangible Property and the Tangible Property.

5

368884.06-Los Angeles Server 1A - MSW

(i)    **"Secured Obligations"**: shall have the meaning ascribed to such term in Article 2 hereof.

(j)    **"Tangible Property"**:  means any and all tangible personal property, including, without limitation, all goods, equipment, supplies, building and other materials of every nature whatsoever and all other tangible personal property constituting a part or portion of the Trust Property and/or used in the operation of any hotel, casino, restaurant, store, parking facility, special events arena, theme park, and any other commercial operations on the Trust Property, including, but not limited to, Inventory, communication systems, visual and electronic surveillance systems and transportation systems and not constituting a part of the real property subject to the lien of this Deed of Trust and including all property and materials stored on all or any portion of the Trust Property in which Grantor has an interest and all tools, utensils, food and beverage, liquor, uniforms, linens, housekeeping and maintenance supplies, vehicles, fuel, advertising and promotional material, blueprints, surveys, plans and other documents relating to the Land or the Improvements, and all construction materials and all Fixtures (as defined herein), including, but not limited to, all gaming equipment and devices which are used in connection with the operation of the Trust Property and those items of Fixtures which are purchased or leased by Grantor, machinery and any other item of personal property in which Grantor now or hereafter owns or acquires an interest or right, and which are used or useful in the construction, operation, use and occupancy of the Trust Property; to the extent permitted by the applicable contract or Applicable Law (as defined herein), all financial equipment, computer equipment, player tracking systems (including all computer hardware, operating software programs and all right, title and interest in and to any applicable license therefore, the **"Player Tracking Systems"**), calculators, adding machines, video game and slot machines, and any other electronic equipment of every nature used or located on any part of the Trust Property, and all present and future right, title and interest of Grantor in and to any casino operator's agreement, license agreement or sublease agreement used in connection with the Trust Property.

(k)    **"Trust Property"**:  All of Grantor's right, title and interest in and to (1) the fee interest in the real property described on Exhibit A attached hereto and incorporated herein by this reference, together with any greater estate therein now owned or as hereafter may be acquired by Grantor (the **"Land"**), (2) all improvements now owned or hereafter acquired by Grantor, now or at any time situated, placed or constructed upon the Land (the **"Improvements"**; the Land and Improvements are collectively referred to herein as the **"Premises"**), (3) all materials, supplies, equipment, apparatus and other items of personal property now owned or hereafter acquired by Grantor and now or hereafter attached to or installed in any of the Improvements or the Land, and water, gas, electrical, telephone, storm and sanitary sewer facilities and all other utilities whether or not situated in easements (the **"Fixtures"**), (4) all reserves, escrows or impounds required under the Indenture and all deposit accounts maintained by Grantor with respect to the Trust Property (the **"Deposit Accounts"**), (5) those certain lease agreements described in Exhibit B-1 attached hereto and by this reference incorporated herein, as they may be amended, modified and extended thereof

6

368884.06-Los Angeles Server 1A - MSW

(collectively, the "**Ground Leases**") by and between Eastern and Western Hotel Corporation, as lessee, and Grantor, as lessor, as the same may be amended, restated, renewed or extended from time to time, (6) all existing and future leases, subleases, licenses, concessions, occupancy agreements, lease guarantees or other agreements (written or oral, now or at any time in effect) which grant to any Person a possessory interest in, or the right to use or occupy, all or any part of the Trust Property, whether made before or after the filing by or against Grantor of any petition for relief under the Bankruptcy Code, together with any extension, renewal or replacement of the same and together with all related security and other deposits (and together with the Ground Leases, the "**Leases**"), (7) all of the rents, additional rents, revenues, royalties, income, proceeds, profits, early termination fees or payments, security and other types of deposits, and other benefits paid or payable by parties to the Leases for using, leasing, licensing, possessing, operating from, residing in, selling or otherwise enjoying the Trust Property or any part thereof, whether paid or accruing before or after the filing by or against Grantor of any petition for relief under the Bankruptcy Code, including, without limitation, all rights to payment for hotel room occupancy by hotel guests, which includes any payment or monies received or to be received in whole or in part, whether actual or deemed to be, for the sale of services or products in connection therewith and/or in connection with such occupancy, advance registration fees by hotel guests, tour or junket proceeds and deposits for conventions and/or party reservations (collectively, the "**Rents**"), (8) all other agreements, such as construction contracts, architects' agreements, engineers' contracts, utility contracts, maintenance agreements, management agreements, service contracts, listing agreements, guaranties, warranties, permits, licenses, certificates and entitlements in any way relating to the construction, use, occupancy, operation, maintenance, enjoyment or ownership of the Trust Property (the "**Property Agreements**"), (9) all rights, privileges, tenements, hereditaments, rights-of-way, easements, appendages and appurtenances appertaining to the foregoing, (10) all property tax refunds, utility refunds and rebates, earned or received at any time (the "**Tax Refunds**"), (11) all accessions, replacements and substitutions for any of the foregoing and all proceeds thereof (the "**Proceeds**"), (12) all insurance policies, unearned premiums therefor and proceeds from such policies covering any of the above property now or hereafter acquired by Grantor (the "**Insurance**"), (13) any awards, damages, remunerations, reimbursements, settlements or compensation heretofore made or hereafter to be made by any governmental authority pertaining to the Land, Improvements or Fixtures (the "**Condemnation Awards**"), (14) all of Grantor's rights to appear and defend any action or proceeding brought with respect to the Trust Property and to commence any action or proceeding to protect the interest of Grantor in the Trust Property, (15) all rights, powers, privileges, options and other benefits of Grantor as lessor under the Leases, including, without limitation, the immediate and continuing right to claim for, collect and receive all Rents payable or receivable under the Leases or pursuant thereto (and to apply the same to the payment of the Secured Obligations), and to do all other things which Grantor or any lessor is or may become entitled to do under the Leases, (16) all water rights, water stock, water permits and other rights to the use of water that are now or that may be hereinafter used in connection with the said Trust Property, or any part thereof, or any improvements or appurtenances thereto, (17) all oil and gas and other mineral rights, if

7

any, in or pertaining to the Land and all royalty, leasehold and other rights of Grantor pertaining thereto, and (18) all right, title and interest of Grantor in and to all other Tangible Property and Intangible Property (except, with respect to Gaming Licenses, as prohibited by the Gaming Laws) now or at any time hereafter located on or appurtenant to the Trust Property and used or useful in connection with the ownership, management or operation of the Trust Property, including, without limitations, the Personalty.  As used in this Deed of Trust, the term "Trust Property" shall mean all or, where the context permits or requires, any portion of the above or any interest therein.   THE TERM "TRUST PROPERTY" IS INTENDED TO EXCLUDE (I) ALL ITEMS OF PERSONAL PROPERTY IN WHICH BENEFICIARY HAS OBTAINED AND/OR PERFECTED A SECURITY INTEREST UNDER SEPARATE INSTRUMENTS AND (II) THE EXCLUDED ASSETS, AS SUCH TERM IS DEFINED IN THE INDENTURE.

          (I)    "UCC":  The Uniform Commercial Code of the State of Nevada or, if the creation, perfection and enforcement of any security interest herein granted is governed by the laws of a state other than the State of Nevada, then, as to the matter in question, the Uniform Commercial Code in effect in that state.

## ARTICLE 2
## GRANT

       **Section 2.1**   **Grant**.   For and in consideration of good and valuable consideration, the receipt and sufficiency whereof are hereby acknowledged, and in order to secure the indebtedness and other obligations of Grantor herein set forth, FOR THE PURPOSE OF SECURING:

       (a).    the due and punctual payment and performance of all present and future Obligations (including, without limitation, Guarantee Obligations) of every type or description arising under or in connection with the Indenture Documents, including, without limitation, all interest that, but for the filing of a petition in bankruptcy with respect to Grantor or any other obligor with respect thereto, would have accrued on any such Obligation, whether or not a claim is allowed against Grantor or such obligor for such interest in the related bankruptcy proceeding); and

       (b).    the due and punctual payment and performance of all present and future obligations and liabilities of Grantor of every type or description arising under or in connection with this Deed of Trust or any other Indenture Document, including for reimbursement of amounts permitted to be advanced or expended by Beneficiary (i) to satisfy amounts required to be paid by Grantor under this Deed of Trust or any other Indenture Documents, together with interest thereon to the extent provided, or (ii) to protect the Trust Property, together with interest thereon to the extent provided; and

8

(c).    all future advances pursuant to the Indenture or any other of the Indenture Documents, as future advances is defined by NRS Section 106.320; this Deed of Trust is intended to secure future advances;  the maximum amount of principal to be secured is $130,000,000; this instrument is to be governed by the provisions of NRS Section 106.300 et. seq.; in each case whether due or not due, direct or indirect, joint and/or several, absolute or contingent, voluntary or involuntary, liquidated or unliquidated, determined or undetermined, now or hereafter existing, renewed or restructured, whether or not from time to time decreased or extinguished and later increased, created or incurred, whether or not arising after the commencement of a proceeding under the Bankruptcy Code (including post-petition interest) and whether or not allowed or allowable as a claim in any such proceeding (all liabilities and other Obligations described in the foregoing clauses (a), (b) and (c) are collectively referred to herein as the **"Secured Obligations"**);

Grantor hereby GRANTS, BARGAINS, ASSIGNS, TRANSFERS, SELLS, WARRANTS and CONVEYS, the Trust Property to Trustee, subject, however, to the Permitted Liens, TO HAVE AND TO HOLD the Trust Property and all parts, rights and appurtenances thereof to Trustee, IN TRUST, WITH POWER OF SALE, and Grantor does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND the title to the Trust Property unto Trustee.

TO HAVE AND TO HOLD the Trust Property, together with all and singular the parts, rights, privileges, hereditaments, and appurtenances thereto in any ways belonging or appertaining, to the use, benefit, and behoof of Trustee, its successors and assigns, in trust for the benefit of Beneficiary, as agent and representative for the equal and ratable benefit of the Holders, in fee simple forever.

## ARTICLE 3
## WARRANTIES, REPRESENTATIONS AND COVENANTS

Grantor warrants, represents and covenants to Beneficiary as follows:

**Section 3.1    Title to Trust Property and Lien of this Instrument**. Grantor has (i) good, marketable and insurable fee simple title to the Land and owns all Improvements located thereon, and (ii) good title to the balance of the Trust Property owned by it, each of the foregoing free and clear of all Liens whatsoever except the Permitted Liens. Grantor, subject to the Gaming Laws, has the full power and lawful authority to encumber the Trust Property in the manner and form set forth in this Deed of Trust. This Deed of Trust creates valid, enforceable liens and security interests against the Trust Property, second in priority only to the lien and security interest of any deed of trust or other security instrument securing the obligations owing under that certain Credit Agreement dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time) by and among Wells Fargo Foothill, Inc. a California corporation, in its capacity as the arranger and administrative agent, its successors and assigns, as its interests may appear, the Lenders (as

9

defined in the Credit Agreement), Grantor, and each of Grantor's Subsidiaries (as defined in the Credit Agreement) identified on the signature pages therein (collectively, the "**Credit Agreement Security Documents**").

Section 3.2     **Lien Status**.   Grantor shall preserve and protect the lien and security interest status of this Deed of Trust and the other Indenture Documents in priority second only to the lien and security interest of the Credit Agreement Security Documents.   If any lien or security interest, other than the Permitted Liens, is asserted against the Trust Property, Grantor shall promptly, and at its expense, (a) give Beneficiary a detailed written notice of such lien or security interest (including origin, amount and other terms), and (b) pay the underlying claim in full or take such other action so as to cause it to be released or contest the same in compliance with the requirements of the Indenture (including the requirement of providing a bond or other security satisfactory to Beneficiary).

Section 3.3     **Payment and Performance**.   Grantor shall pay the Secured Obligations when due under the Note, the Indenture and the Indenture Documents and shall perform or cause the Issuers to perform the Secured Obligations in full when they are required to be performed.

Section 3.4     **Replacement of Fixtures**.   Grantor shall not, without the prior written consent of Beneficiary, permit any of the Fixtures to be removed at any time from the Land or Improvements, unless the removed item is removed temporarily for maintenance and repair or, if removed permanently, is obsolete and is replaced by an article of equal or better suitability and value, owned by Grantor subject to the liens and security interests of this Deed of Trust and the other Indenture Documents, and free and clear of any other lien or security interest except such as may be permitted under the Indenture or first approved in writing by Beneficiary.

Section 3.5     **Inspection**.   Grantor shall permit Beneficiary and its agents, representatives and employees to inspect the Trust Property and all books and records of Grantor located thereon, and to conduct such environmental and engineering studies as Beneficiary may require.   Provided that no Event of Default exists, all such testing and investigation shall be conducted at reasonable times and upon reasonable prior notice to Grantor.  Beneficiary shall restore the Trust Property to the condition it was in immediately prior to such testing and investigation.

Section 3.6     **Contracts**.   Each material contract which is part of the Trust Property (each, a "**Contract**"), (i) is the genuine, legal, valid, and binding obligation of Grantor, (ii) is enforceable against Grantor in accordance with its terms, (iii) is in full force and effect and is, to the best knowledge of Grantor, not subject to any setoffs, defenses, overdue taxes, counterclaims or other claims, nor have any of the foregoing been asserted or alleged as to any Contract, and (iv) is, to the best knowledge of Grantor, in all material respects, in compliance with all applicable laws, including, without limitation, Gaming Laws,

10

whether federal, state, local or foreign ("**Applicable Laws**").  No Grantor nor, to the best knowledge of Grantor, any other party to any Contract is in default in the performance or observance of any of the terms thereof.  No party to any Contract is the United States government or an instrumentality thereof.

        **Section 3.7    Leases**.  Grantor has delivered to Beneficiary true, correct and complete copies of all Leases, including all amendments thereof and modifications thereto.  Each Lease (i) is the genuine, legal, valid and binding obligation of Grantor, (ii) is enforceable against Grantor and, to the best knowledge of Grantor, each other party thereto, in accordance with its terms, (iii) is in full force and effect and, to the best knowledge of Grantor, is not subject to any setoffs, defenses, taxes, counterclaims or other claims, nor have any of the foregoing been asserted or alleged as to any Lease, and (iv) is, to the best knowledge of Grantor, in compliance with all Applicable Laws.  Subject to the provisions of Article 7 hereof, Grantor covenants and agrees as follows:

        (a)      Grantor shall pay all sums to be paid by Grantor under any Lease and shall diligently perform and observe all covenants, agreements and obligations of the lessee set forth in each Lease, and not to commit, suffer or permit any material breach thereof.  Any default by Grantor as lessor under any of the Leases or breach of an obligation thereunder shall be a default hereunder, provided that such shall not constitute a default hereunder until the expiration of any applicable notice and grace period under the applicable Lease and the failure of Grantor to cure such default or breach under the applicable Lease within such grace period.

        (b)      Grantor shall give prompt notice to Beneficiary of the actual receipt by it of written notice of default served on Grantor by lessee, and shall promptly furnish to Beneficiary all information that it may reasonably request concerning the performance by Grantor of the covenants contained in any Lease, including, without limitation, evidence of payment of rent, taxes, insurance premiums and operating expenses.

        (c)      Grantor shall not surrender any Lease (except a surrender upon the expiration of the term of the applicable Lease or upon the termination by the lessee thereunder pursuant to the provisions thereof), or any portion thereof or of any interest therein, and no termination of any Lease, by Grantor as lessor thereunder, shall be valid or effective, and subject to the terms of the applicable Lease, such Lease shall not be surrendered or canceled, amended, other than in immaterial respects, or subordinated to any fee mortgage (except as set forth in the Indenture), to any lease, or to any other interest, either orally or in writing, without the prior written consent of Beneficiary so long as this Deed of Trust is in effect.  Any attempted surrender, amendment (except in immaterial respects) cancellation or termination of any Lease other than as expressly permitted pursuant to the terms thereof by Grantor without obtaining the prior written consent of Beneficiary shall be null and void and without force and effect on the Lease, and such attempt shall constitute a default hereunder.

11

(d)     Grantor hereby warrants the quiet and peaceful possession of the Trust Property to Beneficiary for so long as the Deed of Trust is in effect and further warrants and agrees to defend the leasehold estate created under each Lease for the remainder of the term set forth therein against each and every person claiming the same or any part thereof.

(e)     Grantor shall use its commercially reasonable efforts (not including the payment of any money or other consideration to any third party) to obtain from time to time, promptly after request by Beneficiary and at no cost to Beneficiary, a tenant's estoppel certificate thereunder in such form as may reasonably be requested by Beneficiary.

(f)     If at any time Grantor fails to comply in any material respect with any of Grantor's material obligations under any Lease and the lessee notifies Beneficiary thereof, then Beneficiary or Trustee may, but without obligation to do so and after providing reasonable notice to Grantor (provided that no notice shall be required in the event of an emergency or if the Lease is in danger of being terminated) and without releasing Grantor from any obligation hereunder or removing or waiving any default hereunder, perform on behalf of the applicable Grantor any such obligations, and any and all costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by Beneficiary or Trustee in connection therewith shall be repayable upon demand by Grantor, with interest thereon as set forth in the Indenture, and shall be secured hereby; provided that the foregoing shall not be construed to require Beneficiary or Trustee to incur any expense or take any action with respect to Grantor's failure to comply with any of Grantor's obligations under any Lease.

(g)     Grantor, promptly upon receiving written notice of a breach by lessee (or by any receiver, trustee, custodian, or other party that succeeds the rights of lessee) or of any inability of lessee to perform the terms and provisions of any Lease (including, without limitation, by reason of a termination, rejection, or disaffirmance by lessee pursuant to any Bankruptcy Laws), which would materially impair the value of any Lease, shall notify Beneficiary in writing of any such breach or inability. Grantor hereby assigns to Beneficiary the proceeds of any claims that Grantor may have against lessee for any such breach or inability by lessee. So long as no Event of Default has occurred and is continuing, Grantor shall have the sole right to proceed against lessee on Grantor's and Beneficiary's behalf and to receive and retain all proceeds of such claims except as otherwise provided in the Indenture; during the continuance of an Event of Default, Beneficiary shall have the sole right to proceed against lessee, and Grantor shall cooperate with Beneficiary in such endeavor. Grantor shall, at its expense, diligently prosecute any such proceedings, shall deliver to Beneficiary copies of all papers served in connection therewith, and shall consult and cooperate with Beneficiary and its attorneys and agents, in the carrying on and defense of any such proceedings.

(h)     Notwithstanding anything to the contrary in this paragraph, if there is an Event of Default which remains uncured, then Beneficiary shall have the right, but not the obligation, to conduct and control, through counsel of Beneficiary's choosing, all

12

litigation and other proceedings under the Bankruptcy Laws relating to lessee; and any reasonable expenses incurred by Beneficiary in such litigation and proceedings shall be additional Secured Obligations of Grantor secured by this Deed of Trust, shall bear interest as set forth in the Indenture and shall be payable by Grantor upon demand. No settlement of any such proceeding shall be made by Grantor without Beneficiary's prior written consent.

(i)     In addition to any and all other assignments contained in this Deed of Trust, Grantor hereby absolutely, presently and unconditionally assigns, transfers, and set over to Beneficiary all of Grantor's claims and rights to the payment of damages, and any other remedies available to Grantor, arising from any rejection of any Lease by lessee thereunder pursuant to any Bankruptcy Law. This assignment constitutes a present, absolute, irrevocable, and unconditional assignment of the foregoing claims, rights and remedies, and shall continue in effect until all the Secured Obligations secured by this Deed of Trust shall have been satisfied and discharged in full.

Notwithstanding the foregoing, so long as no Event of Default has occurred and is continuing, Grantor shall have an absolute license to assert and settle any and all such claims, and to receive and apply all proceeds thereof as Grantor shall determine in its discretion.

Section 3.8     **Construction of Improvements**. All Improvements have been and will be constructed in all material respects in accordance with Applicable Laws and all requirements of governmental authorities and governmental approvals. To the best knowledge of Grantor, the Improvements are free from latent and patent defects, and do not require any material repairs, reconstruction or replacement on the date hereof (except for any material repairs, reconstruction or replacement that do not have a material adverse effect on the value of the Improvements and do not materially and adversely affect Grantor's use and operation of the Improvements).

Section 3.9     **Other Covenants**. All of the covenants in the Indenture are incorporated herein by reference and, together with covenants in this Article 3, shall, to the extent applicable, be covenants running with the land.

Section 3.10     **Condemnation Awards and Insurance Proceeds**.

(a)     Condemnation Awards. There are no pending or, to the best knowledge of Grantor, threatened condemnation or eminent domain proceedings against the Trust Property or any part thereof. Grantor, immediately upon obtaining knowledge of the institution of any proceedings for the condemnation of the Trust Property or any portion thereof, will notify Beneficiary of the pendency of such proceedings. Except as set forth in the Indenture, Beneficiary may participate in any such proceedings and Grantor from time to time will deliver to Beneficiary all instruments requested by it to permit such participation. Grantor assigns all awards and compensation to which it is entitled for any condemnation or

13

other taking, or any purchase in lieu thereof, to Beneficiary and authorizes Beneficiary to collect and receive such awards and compensation and to give proper receipts and acquittances therefor, subject to the terms of the Indenture. Grantor hereby waives all rights to such awards and compensation described in the foregoing sentence. Grantor, upon request by Beneficiary, shall make, execute and deliver any and all instruments requested for the purpose of confirming the assignment of the aforesaid awards and compensation to Beneficiary free and clear of any liens, charges or encumbrances of any kind or nature whatsoever.

(b)    Insurance Proceeds. Grantor assigns to Beneficiary all proceeds of any insurance policies insuring against loss or damage to the Trust Property.  Except as set forth in the Indenture, Grantor authorizes Beneficiary to collect and receive such proceeds and authorizes and directs the issuer of each of such insurance policies to make payment for all such losses directly to Beneficiary, instead of to Grantor and Beneficiary jointly, as more specifically described in the Indenture.  In the event that the issuer of such insurance policy fails to disburse directly or solely to Beneficiary but disburses instead either solely to Grantor or to Grantor and Beneficiary, jointly, Grantor shall immediately endorse and transfer such proceeds to Beneficiary.  Upon Grantor's failure to do so, Beneficiary may execute such endorsements or transfers from and in the name of Grantor, and Grantor hereby irrevocably appoints Beneficiary as Grantor's agent and attorney-in-fact so to do.

Section 3.11    **Costs of Defending and Upholding the Lien**.  If any action or proceeding is commenced to which action or proceeding Trustee or Beneficiary is made a party or in which it becomes necessary for Trustee or Beneficiary to defend or uphold the lien of this Deed of Trust including any extensions, renewals, amendments or modifications thereof, Grantor shall, on demand, reimburse Trustee and Beneficiary for all expenses (including, without limitation, reasonable attorneys' fees and reasonable appellate attorneys' fees) incurred by Trustee or Beneficiary in any such action or proceeding and all such expenses shall be secured by this Deed of Trust.  In any action or proceeding to foreclose this Deed of Trust or to recover or collect the Secured Obligations, the provisions of law relating to the recovering of costs, disbursements and allowances shall prevail unaffected by this covenant.

Section 3.12    **TRANSFER OF THE SECURED PROPERTY**.  EXCEPT AS EXPRESSLY PERMITTED PURSUANT TO THE TERMS OF THE INDENTURE, GRANTOR SHALL NOT SELL, TRANSFER, PLEDGE, ENCUMBER, CREATE A SECURITY INTEREST IN, LEASE, OR OTHERWISE HYPOTHECATE, ALL OR ANY PORTION OF THE TRUST PROPERTY WITHOUT THE PRIOR WRITTEN CONSENT OF BENEFICIARY.  THE CONSENT BY BENEFICIARY TO ANY SALE, TRANSFER, PLEDGE, ENCUMBRANCE, CREATION OF A SECURITY INTEREST IN, LEASE, OR OTHER HYPOTHECATION OF, ANY PORTION OF THE TRUST PROPERTY SHALL NOT BE DEEMED TO CONSTITUTE A NOVATION OR A CONSENT TO ANY FURTHER SALE, TRANSFER, PLEDGE, ENCUMBRANCE, CREATION OF A SECURITY INTEREST IN, LEASE, OR OTHER HYPOTHECATION, OR TO WAIVE

14

THE RIGHT OF BENEFICIARY, AT ITS OPTION, TO DECLARE THE INDEBTEDNESS SECURED HEREBY IMMEDIATELY DUE AND PAYABLE, WITHOUT NOTICE TO GRANTOR OR ANY OTHER PERSON OR ENTITY, EXCEPT AS MAY BE REQUIRED PURSUANT TO THE TERMS OF ANY APPLICABLE LEASE, UPON ANY SUCH SALE, TRANSFER, PLEDGE, ENCUMBRANCE, CREATION OF A SECURITY INTEREST, LEASE, OR OTHER HYPOTHECATION TO WHICH BENEFICIARY SHALL NOT HAVE CONSENTED.

   **Section 3.13**   **Security Deposits**. To the extent required by law, or after an Event of Default has occurred and during its continuance, if required by Beneficiary, all security deposits of tenants of the Trust Property shall be treated as trust funds not to be commingled with any other funds of Grantor. Within twenty (20) days after request by Beneficiary, Grantor shall furnish satisfactory evidence of compliance with this Section 3.13, as necessary, together with a statement of all security deposits deposited by the tenants and copies of all Leases not theretofore delivered to Beneficiary, as requested thereby, certified by Grantor.

**ARTICLE 4**

Intentionally Deleted.


**ARTICLE 5**
**DEFAULT**

   **Section 5.1**   **Events of Default**. The occurrence of any of the following events shall constitute an event of default under this Deed of Trust (each an "**Event of Default**"):

     (a) an "Event of Default" (as such term is defined in the Indenture) shall have occurred;

     (b) Grantor's material breach of any of its covenants and/or obligations set forth in this Deed of Trust;

     (c) if any material misstatement or misrepresentation exists now or hereafter in any warranty or representation set forth in Article 3 hereof; or

     (d) an "Event of Default" (as such term is defined in that certain Leasehold Deed of Trust, Fixture Filing with Assignment of Rents and Leases, and Security Agreement dated as of the date hereof by and from Eastern & Western Hotel Corporation to Trustee for the benefit of Beneficiary).

15

## ARTICLE 6
## REMEDIES AND FORECLOSURE

      **Section 6.1**    **Remedies**. If an Event of Default occurs and is continuing beyond any applicable notice and cure period, Beneficiary may, at Beneficiary's election and by or through Trustee or otherwise, exercise any or all of the following rights, remedies and recourses, subject to the Gaming Laws:

      (a)    To the extent permitted under the Indenture or the Notes, declare the Secured Obligations to be immediately due and payable, without further notice, presentment, protest, notice of intent to accelerate, notice of acceleration, demand or action of any nature whatsoever (each of which hereby is expressly waived by Grantor), whereupon the same shall become immediately due and payable.

      (b)    Notify all tenants of the Premises and all others obligated on leases of any part of the Premises that all rents and other sums owing on leases have been assigned to Beneficiary and are to be paid directly to Beneficiary, and to enforce payment of all obligations owing on leases, by suit, ejectment, cancellation, releasing, reletting or otherwise, whether or not Beneficiary has taken possession of the Premises, and to exercise whatever rights and remedies Beneficiary may have under any assignment of rents and leases. Upon the occurrence of an Event of Default continuing beyond any applicable notice and cure period, Beneficiary shall be the attorney-in-fact of Grantor with respect to any and all matters pertaining to the Trust Property with full power and authority to give instructions with respect to the collection and remittance of payments, to endorse checks, to enforce the rights and remedies of Grantor, and to execute on behalf of Grantor and in Grantor's name any instruction, agreement or other writing required therefor. This power shall be irrevocable and deemed to be a power coupled with an interest.

      (c)    As and to the extent permitted by Applicable Law, enter the Trust Property, either personally or by its agents, nominees or attorneys, and take exclusive possession thereof and thereupon, Beneficiary may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Premises and conduct business thereat; (ii) complete any construction on the Premises in such manner and form as Beneficiary deems advisable in the reasonable exercise of its judgment; (iii) exercise all rights and power of Grantor with respect to the Premises, whether in the name of Grantor, or otherwise, including, without limitation, the right to make, cancel, enforce or modify leases, obtain and evict tenants, and demand, sue for, collect and receive all earnings, revenues, rents, issues, profits and other income of the Premises and every part thereof, which rights shall not be in limitation of Beneficiary's rights under any assignment of rents and leases securing the Secured Obligations; and (iv) pursuant to the provisions of the Indenture or the Notes, apply the receipts from the Premises to the payment of the Secured Obligations, after deducting therefrom all expenses (including, without limitation, reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay

16

the taxes, assessments, insurance and other charges in connection with the Trust Property, as well as just and reasonable compensation for the services of Beneficiary, its counsel, agents and employees.

(d)    Hold, lease, develop, manage, operate or otherwise use the Trust Property upon such terms and conditions as Beneficiary may deem reasonable under the circumstances (making such repairs, alterations, additions and improvements and taking other actions, from time to time, as Beneficiary deems necessary or desirable), and apply all Rents and other amounts collected by Trustee in connection therewith in accordance with the provisions of Section 6.7 hereof.

(e)    Require Grantor to assemble any collateral under the UCC and make it available to Beneficiary, at Grantor's sole risk and expense, at a place or places to be designated by Beneficiary, in its sole discretion.  Beneficiary may, in its sole discretion, appoint Trustee as the agent of Beneficiary for the purpose of disposition of any personal property in accordance with the Uniform Commercial Code.

(f)    Institute proceedings for the complete foreclosure of this Deed of Trust, either by judicial action or by power of sale, in which case the Trust Property may be sold for cash or credit in accordance with Applicable Law in one or more parcels as Beneficiary may determine.  Except as otherwise required by Applicable Law, with respect to any notices required or permitted under the UCC, Grantor agrees that five (5) days' prior written notice shall be deemed commercially reasonable.  At any such sale by virtue of any judicial proceedings, power of sale, or any other legal right, remedy or recourse, the title to and right of possession of any such property shall pass to the purchaser thereof, and to the fullest extent permitted by law, Grantor shall be completely and irrevocably divested of all of its right, title, interest, claim, equity, equity of redemption, and demand whatsoever, either at law or in equity, in and to the property sold and such sale shall be a perpetual bar both at law and in equity against Grantor, and against all other Persons claiming or to claim the property sold or any part thereof, by, through or under Grantor.  Beneficiary or the Indenture Trustee may be a purchaser at such sale.  As provided in Section 11.2 below, if Beneficiary is the highest bidder, Beneficiary may credit the portion of the purchase price that would be distributed to Beneficiary against the Secured Obligations in lieu of paying cash.  In the event this Deed of Trust is foreclosed by judicial action, appraisement and valuation of the Trust Property is waived. In the event of any sale made under or by virtue of this Article 6 (whether made by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale) the entire Secured Obligations, if not previously due and payable, immediately thereupon shall become due and payable. The failure to make any such tenants of the Premises party to any such foreclosure proceedings and to foreclose their rights will  not be, nor be asserted to be by Grantor, a defense to any proceedings instituted by Beneficiary to collect the sums secured hereby.

17

(g)     With or without entry, to the extent permitted and pursuant to the procedures provided by Applicable Law, institute proceedings for the partial foreclosure of this Deed of Trust for the portion of the Secured Obligations then due and payable (if Beneficiary shall have elected not to declare the entire Secured Obligations to be immediately due and owing), subject to the continuing lien of this Deed of Trust for the balance of the Secured Obligations not then due; or (1) as and to the extent permitted by Applicable Law, sell for cash or upon credit the Trust Property or any part thereof and all estate, claim, demand, right, title and interest of Grantor therein, pursuant to power of sale or otherwise, at one or more sales, as an entity or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by Applicable Law, and in the event of a sale, by foreclosure or otherwise, of less than all of the Trust Property, this Deed of Trust shall continue as a lien on the remaining portion of the Trust Property; or (2) institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein or in any Indenture Document; or (3) to the extent permitted by Applicable Law, recover judgment on the Indenture either before, during or after any proceedings for the enforcement of this Deed of Trust.

(h)     Make application to a court of competent jurisdiction for, and obtain from such court as a matter of strict right and without notice to Grantor or regard to the adequacy of the Trust Property for the repayment of the Secured Obligations, the appointment of a receiver of the Trust Property, and Grantor irrevocably consents to such appointment. Any such receiver shall have all the usual powers and duties of receivers in similar cases, including the full power to rent, maintain and otherwise operate the Trust Property upon such terms as may be approved by the court, and shall apply such Rents in accordance with the provisions of Section 6.7 hereof.

(i)     Beneficiary shall have the right, but not the obligation, to cure such default for the account of Grantor and to make any payment or take any action necessary to effect such cure. Without limiting the generality of the foregoing, Grantor hereby authorizes Beneficiary to pay all taxes, sewer use fees, water rates and assessments, with interest, costs and charges accrued thereon, which may at any time be a lien (other than a Permitted Lien) upon the Land, or any part thereof; to pay the premiums for any insurance required under the Indenture; to incur and pay reasonable expenses in protecting its rights hereunder and the security hereby granted; and to pay any balance due under any security agreement on any fixtures and equipment included as a part of the Premises; and the payment of all amounts so incurred shall be secured hereby as fully and effectually as any other obligation of Grantor secured hereby. If Beneficiary shall make any payment or take action in accordance with this section, Beneficiary will give to Grantor written notice of the making of any such payment or the taking of any such action. In any such event, Beneficiary and any person designated by Beneficiary shall have, and is hereby granted, the right to enter upon the Premises at reasonable times and from any time and from time to time for the purpose of taking any such action, and all monies expended by Beneficiary in connection therewith (including, but not limited to, reasonable legal expenses and disbursements), together with

18

interest thereon at an annual rate of interest provided for in the Indenture (or the highest rate permitted by law, whichever shall be less), from the date of each such expenditure, shall be paid by Grantor to Beneficiary forthwith upon demand by Beneficiary, and shall be secured by this Deed of Trust, and Beneficiary shall have, in addition to any other right or remedy of Beneficiary, the same rights and remedies in the event of non-payment of any such sums by Grantor as in the case of a default by any of the Issuers in the payment of any installment of principal or interest due and payable under the Indenture or the Notes.

(j)    Exercise all other rights, remedies and recourses granted under the Indenture Documents or otherwise available at law or in equity.

**Section 6.2    Separate Sales.**  The Trust Property may be sold in one or more parcels and in such manner and order as Trustee in its sole discretion may elect; the right of sale arising out of any Event of Default shall not be exhausted by any one or more sales.

**Section 6.3    Remedies Cumulative, Concurrent and Nonexclusive.**  Beneficiary and Trustee shall have all rights, remedies and recourses granted in the Indenture Documents and available at law or in equity (including the UCC), which rights (a) shall be cumulated and concurrent, (b) may be pursued separately, successively or concurrently against Grantor or others obligated under the Indenture Documents, or against the Trust Property, or against any one or more of them, at the sole discretion of Beneficiary or Trustee, as the case may be, (c) may be exercised as often as occasion therefor shall arise, and the exercise or failure to exercise any of them shall not be construed as a waiver or release thereof or of any other right, remedy or recourse, and (d) are intended to be, and shall be, nonexclusive. No action by Beneficiary or Trustee in the enforcement of any rights, remedies or recourses under the Indenture Documents or otherwise at law or in equity shall be deemed to cure any Event of Default.

**Section 6.4    Release of and Resort to Collateral.**  Beneficiary may release, regardless of consideration and without the necessity for any notice to or consent by the holder of any subordinate lien on the Trust Property, any part of the Trust Property without, as to the remainder, in any way impairing, affecting, subordinating or releasing the lien or security interest created in or evidenced by this Deed of Trust or the Collateral Agreements or the lien priority thereof.  For payment of the Secured Obligations, Beneficiary may resort to any other security in such order and manner as Beneficiary may elect.

**Section 6.5    Waiver of Redemption, Notice and Marshalling of Assets.**  To the fullest extent permitted by law, Grantor hereby irrevocably and unconditionally waives and releases (a) all benefit that might accrue to Grantor by virtue of any present or future statute of limitations or law or judicial decision exempting the Trust Property from attachment, levy or sale on execution or providing for any stay of execution, exemption from civil process, redemption or extension of time for payment, (b) all notices of any Event of Default or of any election by Trustee or Beneficiary to exercise or the actual exercise of any

19

right, remedy or recourse provided for under the Indenture Documents, and (c) any right to a marshalling of assets or a sale in inverse order of alienation.

Section 6.6    **Discontinuance of Proceedings.**  If Beneficiary or Trustee shall have proceeded to invoke any right, remedy or recourse permitted under the Indenture Documents or otherwise available to either of them at law or in equity and shall thereafter elect to discontinue or abandon it for any reason, Beneficiary or Trustee, as the case may be, shall have the unqualified right to do so and, in such an event, Grantor, Beneficiary and Trustee shall be restored to their former positions with respect to the Secured Obligations, the Indenture Documents, the Trust Property and otherwise, and the rights, remedies, recourses and powers of Beneficiary and Trustee shall continue as if such right, remedy or recourse had never been invoked, but no such discontinuance or abandonment shall waive any Event of Default which may then exist or the right of Beneficiary or Trustee thereafter to exercise any right, remedy or recourse under the Indenture Documents or otherwise available to either of them at law or in equity for such Event of Default.

Section 6.7    **Application of Proceeds.**  The proceeds of any sale made under or by virtue of this Article 6, together with any Rents and other amounts generated by the holding, leasing, management, operation or other use of the Trust Property, shall be applied by Beneficiary or Trustee (or the receiver, if one is appointed) in the following order unless otherwise required by Applicable Law:

(a)    to the payment of the costs and expenses of taking possession of the Trust Property and of holding, using, leasing, repairing, improving and selling the same, including, without limitation (1) trustee's and receiver's fees and expenses, including the repayment of the amounts evidenced by any receiver's certificates, (2) court costs, (3) attorneys' and accountants' fees and expenses, and (4) costs of advertisement;

(b)    to the payment and performance of the Secured Obligations in such manner and order of preference as set forth in the Indenture and the Notes; and

(c)    the balance, if any, to the payment of the Persons legally entitled thereto.

Section 6.8    **Occupancy After Foreclosure.**  Except as otherwise required by Applicable Law, any sale of the Trust Property or any part thereof in accordance with Section 6.1(e) or Section 6.1(f) hereof will divest all right, title and interest of Grantor in and to the property sold. Subject to Applicable Law, any purchaser at a foreclosure sale will receive immediate possession of the property purchased. If Grantor retains possession of such property or any part thereof subsequent to such sale, Grantor will be considered a tenant at sufferance of the purchaser, and will, if Grantor remains in possession after demand to remove, be subject to eviction and removal, forcible or otherwise, with or without process of law.

20

368884.06-Los Angeles Server 1A - MSW

**Section 6.9    Additional    Advances    and    Disbursements;    Costs    of Enforcement.**

(a)    If any Event of Default exists, Beneficiary shall have the right, but not the obligation, to cure such Event of Default in the name and on behalf of Grantor. All sums advanced and expenses incurred at any time by Beneficiary under this Section 6.9, or otherwise under this Deed of Trust or any of the other Indenture Documents or Applicable Law, shall bear interest from the date that such sum is advanced or expense incurred, to and including the date of reimbursement, computed at the rate or rates at which interest is then computed on the Secured Obligations, and all such sums, together with interest thereon, shall be secured by this Deed of Trust.

(b)    Grantor shall pay all expenses (including, without limitation, reasonable attorneys' fees and expenses and all reasonable costs and expenses related to legal work, research and litigation) of or incidental to the perfection and enforcement of this Deed of Trust and the other Indenture Documents, or the enforcement, compromise or settlement of the Secured Obligations or any claim under this Deed of Trust and the other Indenture Documents, and for the curing thereof, or for defending or asserting the rights and claims of Beneficiary in respect thereof, by litigation or otherwise.

**Section 6.10    No Mortgagee in Possession.**  Neither the enforcement of any of the remedies under this Article 6, the assignment of the Rents and Leases under Article 7, the security interests under Article 8, nor any other remedies afforded to Beneficiary under the Indenture Documents, at law or in equity shall cause Beneficiary or Trustee to be deemed or construed to be a mortgagee in possession of the Trust Property, to obligate Beneficiary or Trustee to lease the Trust Property or attempt to do so, or to take any action, incur any expense, or perform or discharge any obligation, duty or liability whatsoever under any of the Leases or otherwise.

**Section 6.11    WAIVER OF GRANTOR'S RIGHTS.  BY EXECUTION OF THIS DEED OF TRUST, GRANTOR EXPRESSLY: (A) ACKNOWLEDGES THE RIGHT OF BENEFICIARY TO ACCELERATE THE INDEBTEDNESS EVIDENCED BY THE INDENTURE OR OTHER INDENTURE DOCUMENTS UPON THE OCCURRENCE OF AN EVENT OF DEFAULT; (B) TO THE EXTENT ALLOWED BY APPLICABLE LAW, WAIVES ANY AND ALL RIGHTS WHICH GRANTOR MAY HAVE UNDER THE CONSTITUTION OF THE UNITED STATES, THE VARIOUS PROVISIONS OF THE CONSTITUTIONS FOR THE SEVERAL STATES, OR BY REASON OF ANY OTHER APPLICABLE LAW, TO NOTICE (OTHER THAN AS PROVIDED FOR IN THE INDENTURE DOCUMENTS) AND TO JUDICIAL HEARING PRIOR TO THE EXERCISE BY BENEFICIARY OF ANY RIGHT    OR    REMEDY    HEREIN    PROVIDED    TO    BENEFICIARY; (C) ACKNOWLEDGES THAT GRANTOR HAS READ THIS DEED OF TRUST AND ITS PROVISIONS HAVE BEEN EXPLAINED FULLY TO GRANTOR AND**

21

**GRANTOR HAS CONSULTED WITH LEGAL COUNSEL OF GRANTOR'S CHOICE PRIOR TO EXECUTING THIS DEED OF TRUST;  AND (D) ACKNOWLEDGES THAT ALL WAIVERS OF THE AFORESAID RIGHTS OF GRANTOR HAS BEEN MADE KNOWINGLY, INTENTIONALLY AND WILLINGLY BY GRANTOR AS PART OF A BARGAINED FOR LOAN TRANSACTION.**

## ARTICLE 7
## ASSIGNMENT OF RENTS AND LEASES

**Section 7.1    Assignment.**    In furtherance of and in addition to the assignment made by Grantor in Section 2.1 of this Deed of Trust, subject to the Gaming Laws, Grantor hereby absolutely and unconditionally assigns, sells, transfers and conveys to Trustee (for the benefit of Beneficiary) and to Beneficiary all of its right, title and interest in and to all Leases, whether now existing or hereafter entered into, and all of its right, title and interest in and to all Rents. This assignment is an absolute assignment and not an assignment for additional security only.  So long as no Event of Default shall have occurred and be continuing and to the extent not prohibited by the Indenture, Grantor shall have a revocable license from Trustee and Beneficiary to exercise all rights extended to the landlord under the Leases, including the right to receive and collect all Rents and to hold the Rents in trust for use in the payment and performance of the Secured Obligations and to otherwise use the same. The foregoing license is granted subject to the conditional limitation that no Event of Default shall have occurred and be continuing.  Upon the occurrence and during the continuance of an Event of Default beyond any applicable cure period, whether or not legal proceedings have commenced, and without regard to waste, adequacy of security for the Secured Obligations or solvency of Grantor, the license herein granted shall automatically expire and terminate, without notice by Trustee or Beneficiary (any such notice being hereby expressly waived by Grantor).

**Section 7.2    Perfection Upon Recordation.**    Grantor acknowledges that Beneficiary and Trustee have taken all actions necessary to obtain, and that upon recordation of this Deed of Trust, Beneficiary and Trustee shall have, to the extent permitted under Applicable Law, a valid and fully perfected, present assignment of the Rents arising out of the Leases and all security for such Leases, second in priority only to the liens and security interests of the Credit Agreement Security Documents. Grantor acknowledges and agrees that upon recordation of this Deed of Trust Trustee's and Beneficiary's interest in the Rents shall be deemed to be fully perfected, "choate" and enforced as to Grantor and all third parties, including, without limitation, any subsequently appointed trustee in any case under Title 11 of the United States Code (the "**Bankruptcy Code**"), without the necessity of commencing a foreclosure action with respect to this Deed of Trust, making formal demand for the Rents, obtaining the appointment of a receiver or taking any other affirmative action.

22

**Section 7.3** **Bankruptcy Provisions.** Without limitation of the absolute nature of the assignment of the Rents hereunder, Grantor, Trustee and Beneficiary agree that (a) this Deed of Trust shall constitute a "security agreement" for purposes of Section 552(b) of the Bankruptcy Code, (b) the security interest created by this Deed of Trust extends to property of Grantor acquired before the commencement of a case in bankruptcy and to all amounts paid as Rents and (c) such security interest shall extend to all Rents acquired by the estate after the commencement of any case in bankruptcy.

**Section 7.4** **No Merger of Estates.** So long as part of the Secured Obligations secured hereby remain unpaid and undischarged, the fee and leasehold estates to the Trust Property shall not merge, but shall remain separate and distinct, notwithstanding the union of such estates either in Grantor, Beneficiary, any tenant or any third party by purchase or otherwise.

## ARTICLE 8
## SECURITY AGREEMENT

**Section 8.1** **Security Interest.** This Deed of Trust constitutes a "security agreement" on personal property within the meaning of the UCC and other applicable law and with respect to the Fixtures, Leases, Rents, Deposit Accounts, Property Agreements, Tax Refunds, Proceeds, Insurance and Condemnation Awards. To this end, Grantor grants to Beneficiary a first and prior security interest in the Fixtures, Leases, Rents, Deposit Accounts, Property Agreements, Tax Refunds, Proceeds, Insurance and Condemnation Awards and all other Trust Property which is personal property to secure the payment and performance of the Secured Obligations, and agrees that Beneficiary shall have all the rights and remedies of a secured party under the UCC with respect to such property. Any notice of sale, disposition or other intended action by Beneficiary with respect to the Fixtures, Leases, Rents, Deposit Accounts, Property Agreements, Tax Refunds, Proceeds, Insurance and Condemnation Awards sent to Grantor at least five (5) days prior to any action under the UCC shall constitute reasonable notice to Grantor. THE TERM "TRUST PROPERTY" IS INTENDED TO EXCLUDE (I) ALL ITEMS OF PERSONAL PROPERTY IN WHICH BENEFICIARY HAS OBTAINED AND/OR PERFECTED A SECURITY INTEREST UNDER SEPARATE INSTRUMENTS; AND (II) THE EXCLUDED ASSETS.

**Section 8.2** **Financing Statements.** Grantor authorizes Beneficiary to file, in form and substance satisfactory to Beneficiary, such financing statements and such further assurances as Beneficiary may, from time to time, reasonably consider necessary to create, perfect and preserve Beneficiary's security interest hereunder and Beneficiary may cause such statements and assurances to be recorded and filed, at such times and places as may be required or permitted by law to so create, perfect and preserve such security interest. Grantor's state of organization is the State of Nevada.

23

Section 8.3    <u>Fixture Filing</u>.  This Deed of Trust shall also constitute a financing statement filed as a "fixture filing" for the purposes of the UCC against all of the Trust Property which is or is to become fixtures.

Section 8.4    <u>Information</u>.  Information concerning the security interest herein granted may be obtained at the address of Debtor (Grantor) and Secured Party (Beneficiary) as set forth in the first paragraph of this Deed of Trust.  Grantor hereby authorizes Beneficiary to file any and all financing statements and amendments thereto in such form and in such locations as it deems necessary or appropriate in connection herewith.

## ARTICLE 9
## CONCERNING THE TRUSTEE

Section 9.1    <u>Certain Rights</u>.  With the approval of Beneficiary, Trustee shall have the right to select, employ and consult with counsel.  Trustee shall have the right to rely on any instrument, document or signature authorizing or supporting any action taken or proposed to be taken by it hereunder, believed by it in good faith to be genuine.  Trustee shall be entitled to reimbursement for actual, reasonable expenses incurred by it in the performance of its duties and to reasonable compensation for Trustee's services hereunder as shall be rendered.  Grantor shall, from time to time, pay the compensation due to Trustee hereunder and reimburse Trustee for, and indemnify, defend and save Trustee harmless against, all liability and reasonable expenses which may be incurred by it in the performance of its duties, including those arising from joint, concurrent, or comparative negligence of Trustee; however, Grantor shall not be liable under such indemnification to the extent such liability or expenses result solely from Trustee's or Beneficiary's gross negligence or willful misconduct.  Grantor's obligations under this <u>Section 9.1</u> shall not be reduced or impaired by principles of comparative or contributory negligence.

Section 9.2    <u>Retention of Money</u>.  All moneys received by Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by law), and Trustee shall be under no liability for interest on any moneys received by him hereunder.

Section 9.3    <u>Successor Trustees</u>.  If Trustee or any successor Trustee shall die, resign or become disqualified from acting in the execution of this trust, or Beneficiary shall desire to appoint a substitute Trustee, subject to the Gaming Laws, Beneficiary shall have full power to appoint one or more substitute Trustees and, if preferred, several substitute Trustees in succession who shall succeed to all the estates, rights, powers and duties of Trustee by an instrument in writing, executed and acknowledged by Beneficiary, and recorded in the Office of the County Recorder, Clark County, Nevada.  Such appointment may be executed by any authorized agent of Beneficiary and as so executed, such appointment shall

24

be conclusively presumed to be executed with authority, valid and sufficient, without further proof of any action.

Section 9.4    Perfection of Appointment.    Should any deed, conveyance or instrument of any nature be required from Grantor by any successor Trustee to more fully and certainly vest in and confirm to such successor Trustee such estates, rights, powers and duties, then, upon request by such Trustee, all such deeds, conveyances and instruments shall be made, executed, acknowledged and delivered and shall be caused to be recorded and/or filed by Grantor.

Section 9.5    Trustee Liability.    In no event or circumstance shall Trustee or any substitute Trustee hereunder be personally liable under or as a result of this Deed of Trust, either as a result of any action by Trustee (or any substitute Trustee) in the exercise of the powers hereby granted or otherwise.

## ARTICLE 10
## MISCELLANEOUS

Section 10.1    Notices.    Any notice required or permitted to be given under this Deed of Trust shall be given in accordance with Section 12.2 of the Indenture.

Section 10.2    Covenants Running with the Land.    All Secured Obligations contained in this Deed of Trust are intended by Grantor, Beneficiary and Trustee to be, and shall be construed as, covenants running with the Trust Property.  As used herein, "Grantor" shall refer to the party named in the first paragraph of this Deed of Trust and to any subsequent owner of all or any portion of the Trust Property.  All Persons who may have or acquire an interest in the Trust Property shall be deemed to have notice of, and be bound by, the terms of the Indenture and the other Indenture Documents; however, no such party shall be entitled to any rights thereunder without the prior written consent of Beneficiary.

Section 10.3    Attorney-in-Fact.    Grantor hereby irrevocably appoints Beneficiary and its successors and assigns, as its attorney-in-fact, which agency is coupled with an interest and with full power of substitution, (a) to execute and/or record any notices of completion, cessation of labor or any other notices that Beneficiary deems appropriate to protect Beneficiary's interest, if Grantor shall fail to do so within ten (10) days after written request by Beneficiary, (b) upon the issuance of a deed pursuant to the foreclosure of this Deed of Trust or the delivery of a deed in lieu of foreclosure, to execute all instruments of assignment, conveyance or further assurance with respect to the Leases, Rents, Deposit Accounts, Property Agreements, Tax Refunds, Proceeds, Insurance and Condemnation Awards or any other Trust Property in favor of the grantee of any such deed and as may be necessary or desirable for such purpose, (c) to prepare, execute and file or record financing statements, continuation statements, applications for registration and like papers necessary to create, perfect or preserve Beneficiary's security interests and rights in or to any of the Trust

25

Property, and (d) while any Event of Default continues after any applicable cure period, to perform any obligation of Grantor hereunder, however: (1) Beneficiary shall not under any circumstances be obligated to perform any obligation of Grantor; (2) any sums advanced by Beneficiary in such performance shall be added to and included in the Secured Obligations and shall bear interest at the rate or rates at which interest is then computed on the Secured Obligations; (3) Beneficiary as such attorney-in-fact shall only be accountable for such funds as are actually received by Beneficiary; and (4) Beneficiary shall not be liable to Grantor or any other person or entity for any failure to take any action which it is empowered to take under this Section 10.3. Notwithstanding the foregoing, Beneficiary shall be liable for its gross negligence, willful misconduct, and bad faith in connection with exercising its rights hereunder.

Section 10.4    **Successors and Assigns**. This Deed of Trust shall be binding upon and inure to the benefit of Beneficiary, the Holders, Trustee and Grantor and their respective successors and assigns. Grantor shall not, without the prior written consent of Beneficiary, assign any rights, duties or obligations hereunder.

Section 10.5    **No Waiver**. Any failure by Beneficiary or the Indenture Trustee or the Trustee to insist upon strict performance of any of the terms, provisions or conditions of the Indenture Documents shall not be deemed to be a waiver of same, and Beneficiary, the Indenture Trustee or Trustee shall have the right at any time to insist upon strict performance of all such terms, provisions and conditions.

Section 10.6    **Indenture**. If any conflict or inconsistency exists between this Deed of Trust and the Indenture, the Indenture shall govern.

Section 10.7    **Release or Reconveyance**. Upon payment and performance in full of the Secured Obligations, Beneficiary, at Grantor's expense, shall release the liens and security interests created by this Deed of Trust and reconvey the Trust Property to Grantor.

Section 10.8    **Waiver of Stay, Moratorium and Similar Rights**. Grantor agrees, to the full extent that it may lawfully do so, that it will not at any time insist upon or plead or in any way take advantage of any stay, marshalling of assets, extension, redemption or moratorium law now or hereafter in force and effect so as to prevent or hinder the enforcement of the provisions of this Deed of Trust or the Secured Obligations secured hereby, or any agreement between Grantor and Beneficiary or any rights or remedies of Beneficiary or Trustee. Grantor, for itself and for all Persons hereafter claiming through or under it who may at any time hereafter become holders of liens junior to the lien of this Deed of Trust, hereby expressly waives and releases all rights to direct the order in which any of the Trust Property or any interest therein shall be sold in the event of any sale or sales pursuant hereto.

26

368884.06-Los Angeles Server 1A - MSW

**Section 10.9  Governing Law**.  THIS DEED OF TRUST SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK, INCLUDING, WITHOUT LIMITATION, SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND NEW YORK CIVIL PRACTICE LAWS AND RULES 327(B), EXCEPT THAT (A) WITH RESPECT TO THE EXERCISE OF REMEDIES HEREUNDER AND THE CREATION, PRIORITY, PERFECTION AND ENFORCEMENT OF THE LIEN CREATED BY THIS DEED OF TRUST, THE LAWS OF THE JURISDICTION IN WHICH THE PROPERTY IS LOCATED SHALL GOVERN, WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OF SUCH JURISDICTION, AND (B) FOR PERSONALTY, THE PERFECTION EFFECT OF PERFECTION OR NON-PERFECTION AND PRIORITY OF THE SECURITY INTEREST SHALL BE SUBJECT TO ANY MANDATORY CHOICE OF LAW RULES IN THE UCC.

**Section 10.10  Choice of Forum**.

(a)       Subject to Section 10.10(b) and Section 10.10(c), all actions or proceedings arising in connection with this Deed of Trust shall be tried and litigated in state or Federal courts located in the County of Clark, State of Nevada, unless such actions or proceedings are required to be brought in another court to obtain subject matter jurisdiction over the matter in controversy.  GRANTOR WAIVES ANY RIGHT IT MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS, TO ASSERT THAT IT IS NOT SUBJECT TO THE JURISDICTION OF SUCH COURTS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 10.10.

(b)       Nothing contained in this Section shall preclude Beneficiary from bringing any action or proceeding arising out of or relating to this Deed of Trust in any court not referred to in Section 10.10(a).   SERVICE OF PROCESS, SUFFICIENT FOR PERSONAL JURISDICTION IN ANY ACTION AGAINST GRANTOR, MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ITS ADDRESS INDICATED IN SECTION 12.2 OF THE INDENTURE.

(c)       Notwithstanding Section 10.10(a) and subject to Section 10.9, in the sole and absolute discretion of Beneficiary, all actions or proceedings relating to the Collateral (as defined in the Indenture), other than the Premises and the Fixtures, which are the subject of the Indenture Documents shall be governed by and construed in accordance with the laws of the State of New York, as applied to contracts made and performed within the State of New York.  Grantor hereby irrevocably submits to the jurisdiction of any New York state court sitting in the Borough of Manhattan in the City of New York or any federal court sitting in the Borough of Manhattan in the City of New York in respect of any suit, action or proceeding arising out of or relating to the subject of the Indenture Documents, and

27

irrevocably accepts for itself and in respect of its property, generally and unconditionally, jurisdiction of the aforesaid courts.

(d)      Grantor irrevocably waives, to the fullest extent it may effectively do so under Applicable Law, trial by jury and any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.   Grantor irrevocably consents, to the fullest extent it may effectively do so under Applicable Law, to the service of process of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to Grantor at its said address, such service to become effective thirty (30) days after such mailing.   Nothing shall affect the right of Beneficiary to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against Grantor in any other jurisdiction.

**Section 10.11 Headings**.  The Article, Section and Subsection titles hereof are inserted for convenience of reference only and shall in no way alter, modify or define, or be used in construing, the text of such Articles, Sections or Subsections.

**Section 10.12 Entire Agreement**.  This Deed of Trust and the other Indenture Documents embody the entire agreement and understanding between Grantor and Beneficiary and supersede all prior agreements and understandings between such parties relating to the subject matter hereof and thereof.   Accordingly, the Indenture Documents may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties.  There are no unwritten oral agreements between the parties.

**Section 10.13 Beneficiary as Agent; Successor Agents**.

(a)      The Agent has been appointed to act as Agent hereunder on behalf of the Indenture Trustee and the Holders pursuant to the Indenture and the Security Agreement.  The Agent may resign and a successor Agent may be appointed in the manner provided in the Indenture. Upon the acceptance of any appointment as Agent under the terms of the Indenture by a successor Agent, that successor Agent will thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Agent as Beneficiary under this Deed of Trust, and the retiring or removed Agent under this Deed of Trust will be discharged from its duties and obligations hereunder.

(b)      Each reference herein to any right granted to, benefit conferred upon or power exercisable, exercised or action taken by the "Beneficiary" shall be deemed to be a reference to or be deemed to have been so taken, as the case may be, by Beneficiary in its capacity as Agent pursuant to the Indenture and the Security Agreement for the benefit of the Indenture Trustee and the Holders, all as more fully set forth in the Indenture and the Security Agreement.

28

## ARTICLE 11
## LOCAL LAW PROVISIONS

**Section 11.1  Power of Sale**.  (a)  Should default be made by Grantor in payment or performance of any Secured Obligations or other Obligation or agreement secured hereby and/or in performance of any agreement herein, or should Grantor otherwise be in default hereunder, Beneficiary may, subject to NRS 107.080, declare all sums secured hereby immediately due by delivery to Trustee of a written notice of breach and election to sell (which notice Trustee shall cause to be recorded and mailed as required by law) and shall surrender to Trustee this Deed of Trust.

(b)  After three (3) months shall have elapsed following recordation of any such notice of breach, Trustee shall sell the property subject hereto at such time and at such place in the State of Nevada as Trustee, in its sole discretion, shall deem best to accomplish the objects of these trusts, having first given notice of such sale as then required by law.  In the conduct of any such sale Trustee may act itself or through any auctioneer, agent or attorney.  The place of sale may be either in the county in which the property to be sold, or any part thereof, is situated, or at an office of the Trustee located in the State of Nevada.

(c)  Upon the request of Beneficiary or if required by law Trustee shall postpone sale of all or any portion of said property or interest therein by public announcement at the time fixed by said notice of sale, and shall thereafter postpone said sale from time to time by public announcement at the time previously appointed.

(d)  At the time of sale so fixed, Trustee shall sell the property so advertised or any part thereof or interest therein either as a whole or in separate parcels, as Beneficiary may determine in its sole and absolute discretion, to the highest bidder for cash in lawful money of the United States, payable at time of sale, and shall deliver to such purchaser a deed or deeds or other appropriate instruments conveying the property so sold, but without covenant or warranty, express or implied.  Beneficiary and Trustee may bid and purchase at such sale.  To the extent of the Secured Obligations secured hereby, Beneficiary need not bid for cash at any sale of all or any portion of the Trust Property pursuant hereto, but the amount of any successful bid by Beneficiary shall be applied in reduction of said Secured Obligations. Trustee hereby agrees, if it is then still in possession, to surrender, immediately and without demand, possession of said property to any purchaser.

(e)  Trustee shall apply the proceeds of any such sale to payment of expenses of sale and all charges and expenses of Trustee and of these trusts, including cost of evidence of title and Trustee's fee in connection with sale; all sums expended under the terms hereof, not then repaid, with accrued interest at the default rate determined by the Indenture; all other sums then secured hereby, and the remainder, if any, to the person or persons legally entitled thereto.

368884.06-Los Angeles Server 1A - MSW

(f)    Beneficiary, from time to time before Trustee's sale, may rescind any notice of breach and election to sell by executing, delivering and causing Trustee to record a written notice of such rescission. The exercise by Beneficiary of such right of rescission shall not constitute a waiver of any breach or default then existing or subsequently occurring, or impair the right of Beneficiary to execute and deliver to Trustee, as above provided, other notices of breach and election to sell, nor otherwise affect any term, covenant or condition hereof or under any obligation secured hereby, or any of the rights, obligations or remedies of the parties thereunder.

Section 11.2   **Credit Bids**.  At any foreclosure sale, any person, including Grantor, Trustee or Beneficiary, may bid for and acquire the Trust Property or any part thereof to the extent permitted by then Applicable Law.

Section 11.3   **Nevada Law**.  Where not inconsistent with the above, the following covenants, Nos. 1; 2 (full replacement value); 3; 4 (the rate or rates at which interest is computed upon default of the Secured Obligations in the Indenture); 5; 6; 7 (reasonable percentage); 8 and 9 of NRS 107.030 are hereby included herein by this reference and made a part of this Deed of Trust.

Section 11.4   **Filing and Indexing**.  This Deed of Trust is to be filed and indexed in the real estate records and is also to be indexed in the index of UCC Financing Statements of Clark County, Nevada under the name of 155 EAST TROPICANA, LLC, a Nevada limited liability company, as debtor, and THE BANK OF NEW YORK TRUST COMPANY, N.A., in its capacity as collateral agent, its successors and assigns, as its interests may appear, as secured party. Grantor's organizational number is LLC13428-2004. Information concerning the security interest may be obtained from Beneficiary at the following address 700 South Flower Street, Suite 500, Los Angeles, California 90017, Attention Corporate Trust Administration.

*[The remainder of this page has been intentionally left blank]*

30

**IN WITNESS WHEREOF,** Grantor has on the date set forth in the acknowledgement hereto, effective as of the date first above written, caused this instrument to be duly EXECUTED AND DELIVERED by authority duly given.

GRANTOR:   **155 EAST TROPICANA, LLC,**
a Nevada limited liability company

By: _____
Neil G. Keifer
Its: Chief Executive Officer

**ACKNOWLEDGEMENT**

STATE OF _Florida_ )
                              ) ss.
COUNTY OF _Pinellas_ )

This instrument was acknowledged before me on March _25_, 2005 by

_Neil G. Kiefer_ as _Chief Executive Officer_ of

155 EAST TROPICANA, LLC.

_Lucille Grinnell_

NOTARY PUBLIC

My commission expires

LUCILLE GRINNELL
MY COMMISSION # DD 346184
EXPIRES: August 29, 2008
Bonded Thru Notary Public Underwriters

## Exhibit A

Description of Land

All that certain real property situated in the County of Clark, State of Nevada, described as follows:

PARCEL I:

That portion of the West Half (W 1/2) of the Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of Section 28, Township 21 South, Range 51 East, M.D.M., described as follows:

COMMENCING at the North Quarter (N 1/4) corner of said Section 28;
THENCE South 89`50'14" west, along the North line of the Northwest Quarter (NW 1/4) of said Section 28, a distance of 1,318.16 feet to a point;
THENCE South 02`54'50" East, a distance of 101.41 feet to a point on the South right of way line of Tropicana Avenue (100 feet wide) said point also being the Northwest (NW) corner of Tropicana Park, as shown by map thereof on file in Book 8 of Plats, Page 37 and reverted to acreage by map thereon on file in Book 15 of Plats, Page 11, Clark County Records said point being the TRUE POINT OF BEGINNING;
THENCE North 87`11'36" East, along said South right of way line, a distance of 452.59 feet to a point of tangency of a curve concave to the Southwest and having a radius of 15.00 feet;
THENCE along said curve through a central angle of 89`50'04" an arc length of 23.52 feet to a point on the Westerly right of way line of Scott Street, as shown on said plats;
THENCE South 02`58'20" East, along said right of way line, a distance of 631.04 feet to a point on the centerline of Mona Avenue, as shown on the aforementioned plat of Tropicana Park;
THENCE South 87`01'40" West, along said centerline, and the Westerly extension thereof, a distance of 468.21 feet to a point on the West line of said Tropicana Park;
THENCE North 02`54'50" West, along said line to the TRUE POINT OF BEGINNING.

EXCEPTING THEREFROM that portion of said land conveyed to the State of Nevada by deed recorded June 23, 1999 in Book 990623, Doc/Inst. No. 02544, Official Records, Clark County, Nevada.

PARCEL II:

(Hotel San Remo Convention Center)

The Easterly 150 feet of the West Half (W 1/2) of the Northeast Quarter (NE

1/4) of the Northwest Quarter (NW 1/4) of Section 28, Township 21 South, Range 61 East, M.D.M.

EXCEPT the portion thereof conveyed to the State of Nevada by Deed recorded May 29, 1959 as Document No. 162200 of Official Records, Clark County, Nevada Records.

FURTHER EXCEPTING the interest in the South 30 feet and the West 20 feet conveyed to Clark County for roads, utilities and other public and incidental purposes by Deed recorded September 13, 1971 as Document No. 128706.

FURTHER EXCEPTING that portion of said land conveyed to Ben Hur Hotel, Inc. described as follows:

COMMENCING at the Southeast (SE) corner of the Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of said Section 28;
THENCE North 88`43'17" West along the South line thereof a distance of 658.98 feet to the Southwest (SW) corner of the East Half (E 1/2) of the Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of Section 28, said point being the TRUE POINT OF BEGINNING;
THENCE continuing North 88`43'17" West  a distance of 148.90 feet to the Southeast (SE) corner of the Tropicana Park Subdivision as shown in Book 8 of Plats, Page 37, Clark County Records, Nevada; thence North 00`26'17" West along the East line of said Tropicana Park a distance of 571.77 feet;
THENCE North 89`38'50" East a distance of 149.91 feet to a point in the West line of the East Half (E 1/2) of the Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of Section 28;
THENCE South 00`19'51" East a distance of 576.01 feet to the TRUE POINT OF BEGINNING.

FURTHER EXCEPTING that certain spandrel area conveyed to Clark County for road purposes by Deed recorded May 4, 1987 as Document No. 870504/00953 and re-recorded May 20, 1987 as Document No. 870520/00620 of Official Records.

368884.06-Los Angeles Server 1A - MSW

**Exhibit B-1**

Ground Leases

1.  Amended and Restated Casino Lease dated as of March 9, 2005 by and between 155 East Tropicana, LLC, as lessor, and Eastern & Western Hotel Corporation, as lessee, conveying a leasehold interest to lessee in Parcel I (as more particularly described on Exhibit A hereto).

2.  Amended and Restated Hotel Lease dated as of March 9, 2005 by and between 155 East Tropicana, LLC, as lessor, and Eastern & Western Hotel Corporation, as lessee, conveying a leasehold interest to lessee in Parcel I & II (as more particularly described on Exhibit A hereto).