# EXHIBIT 18

Assessor's Parcel Numbers:
162-28-101-002
162-28-102-001

Receipt/Conformed Copy

Requestor:
LAWYERS TITLE OF NEVADA
03/29/2005 11:41:59    T20050055655
Book/Instr: 20050329-0002533
Assignment        Page Count: 16
Fees: $29.00    N/C Fee: $0.00

Frances Deane
Clark County Recorder

When recorded mail to:

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Attn: Brandi Ehlers, Esq.

## ASSIGNMENT OF ENTITLEMENTS AND CONTRACTS

THIS ASSIGNMENT OF ENTITLEMENTS AND CONTRACTS ("Assignment") is made and entered into as of March 29, 2005, by and among 155 East Tropicana, LLC, a Nevada limited-liability company ("Tropicana LLC"), Eastern & Western Hotel Corporation, a Nevada corporation ("Eastern," and together with Tropicana LLC, each an Assignor, and collectively, the "Assignors," which term includes any successors), and The Bank of New York Trust Company, N.A., a national banking association, as collateral agent, hereinafter referred to, together with its successors and assigns, in such capacity, as "Agent."

### R E C I T A L S:

WHEREAS:

A.    Tropicana LLC is the fee owner of certain parcels of real property which are situate in the County of Clark, State of Nevada and which are more particularly described on "Exhibit A" attached hereto (the "Land"), and Eastern is the lessee of a certain parcel of real property which is situate in the County of Clark, State of Nevada and which is more particularly described on "Exhibit B" attached hereto (the "Leased Land"). All references herein to the "Real Property" shall be to: (i) the Land; (ii) the Leased Land; (iii) all real property which is adjacent to, or used in connection with, the Land or the Leased Land, and in which either of the Assignors now owns, or hereafter acquires, an interest (the "Adjacent Property"); and (iv) all tenements, hereditaments and appurtenances to the Land or the Adjacent Property.

B.    Reference is also made to that certain Indenture dated as of the date hereof (as it may be amended, supplemented or otherwise modified heretofore or hereafter from time to time, the "Indenture"), by and among Tropicana LLC, 155 Tropicana Finance Corp., a Nevada corporation (collectively, the "Issuers," which term includes any successors to any such persons thereunder), The Bank of New York Trust

Company, N.A., a national banking association, in its capacity as trustee thereunder, and the Guarantors, pursuant to which the Issuers have issued or will issue the Notes to the respective Holders thereof.  All capitalized terms which are used but not otherwise defined herein shall have the respective meanings and be construed herein as provided in the Indenture, and any reference to a provision of the Indenture shall be deemed to incorporate that provision as a part hereof in the same manner and with the same effect as if the same were fully set forth herein.

      C.     The Indenture provides, among other things, that the Issuers may issue up to the aggregate principal amount of One Hundred Thirty Million and No/100 Dollars ($130,000,000.00) in Notes.

      D.     It is a condition of the Notes that all the Assignors' present and future right, title and interest in and to:

          (i)     all assignable personal property leases, purchase contracts and construction related equipment contracts which are now existing or are hereafter entered into, are used in connection with, or which relate to: (aa) the Real Property; (bb) any hotel, casino and/or resort business and related activities which are now, or are hereafter, conducted by, or on behalf of, the Assignors on the Real Property (collectively, the "Hotel/Casino Facilities"); or (cc) any other business activity now, or hereafter, conducted by, or on behalf of, the Assignors on, or in connection with, the Real Property (collectively, the "Additional Business(es)"); all together with any and all amendments, modifications, extensions, or renewals thereof (collectively, the "Equipment Agreements"); and

          (ii)     all present and future assignable permits, construction related agreements, licenses, warranties, contracts and other entitlements, if any, which are issued, granted, agreed to, or entered into in connection with, or relating to, the Real Property, the Hotel/Casino Facilities or any Additional Business, together with any and all amendments, modifications, extensions or renewals thereof (collectively, the "Entitlements");

in each and every case excluding all Excluded Assets (and in the case of Eastern, excluding all items of collateral not owned, used or maintained exclusively in connection with the operation of any hotel, casino, restaurant, store, parking facility, special events arena, theme park or any other commercial operations on the Real Property), be presently assigned to Agent for the benefit of Holders in consideration of the Notes upon the terms and conditions set forth below.

      NOW, THEREFORE, in consideration of the Notes, each Assignor does hereby presently, absolutely and unconditionally assign to Agent for the benefit of the Holders all of its right, title and interest in and to the Equipment Agreements and the Entitlements, in each and every case excluding all Excluded Assets (and in the case of Eastern, excluding all items of collateral not owned, used or maintained exclusively in connection with the operation of any hotel, casino, restaurant, store, parking facility,

391013.04-Los Angeles Server 2A - MSW

special events arena, theme park or any other commercial operations on the Real Property), as follows:

1.      Each Assignor does hereby grant, assign and convey unto Agent all the right, title, interest and privilege which each Assignor has or may hereafter acquire, in or to all assignable Equipment Agreements and/or Entitlements.  Without limiting the generality of the foregoing, and subject to the provisions of Section 5  below, Agent shall have the present and continuing right with full power and authority, in its own name, or in the name of an Assignor, or otherwise to do any and all things which an Assignor may be or may become entitled to do under the Equipment Agreements and/or Entitlements and the right to make all waivers and agreements, give all notices, consents and releases and other instruments and to do any and all other things whatsoever which an Assignor may be or may become entitled to do under said Equipment Agreements and/or Entitlements.

2.      The acceptance of this Assignment and the payment or performance under the Equipment Agreements and/or Entitlements hereby assigned shall not constitute a waiver of any rights of Agent or the Holders under the terms of the Indenture or any other Collateral Agreements for the benefit of any of Agent or the Holders.

3.      Each Assignor will promptly notify Agent of the occurrence of any default under any of the Equipment Agreements Entitlements, which, if left uncured, would be reasonably likely to materially and adversely affect either the Hotel/Casino Facilities or any Additional Business.

4.      Each Assignor will not, without the prior written consent of Agent:

(a)      cause, or consent to, any cancellation, termination or surrender of any Equipment Agreement or Entitlement if such cancellation, termination or surrender would be reasonably likely to materially and adversely affect either the Hotel/Casino Facilities or any Additional Business (except for any cancellation or termination of an Equipment Agreement or Entitlement which is caused by a default thereunder on the part of a party other than an Assignor or one of its Affiliates);

(b)      permit any event to occur which would entitle any party to an Equipment Agreement or Entitlement to terminate or cancel said Equipment Agreement or Entitlement if such cancellation or termination would be reasonably likely to materially and adversely affect either the Hotel/Casino Facilities or any Additional Business (except any cancellation or termination of an Equipment Agreement or Entitlement which is caused by a default thereunder on the part of a party other than an Assignor or one of its Affiliates);

(c)      amend or modify any of the Equipment Agreements or any of the Entitlements if such amendment or modification would be reasonably likely to materially and adversely affect either the Hotel/Casino Facilities or any Additional Business;

(d)      waive any default under or breach of any Equipment Agreements or any Entitlements except for any waiver that would not be reasonably likely to result in any material adverse affect on either the Hotel/Casino Facilities or any Additional Business; or

(e)      give any consent, waiver or approval which would impair Assignor's interest in any of the Equipment Agreements or any of the Entitlements if such consent, waiver or approval would be reasonably likely to materially and adversely affect either the Hotel/Casino Facilities or any Additional Business.

5.      Notwithstanding anything to the contrary contained in this Assignment, it is understood and agreed that so long as there shall exist no Event of Default under the Indenture there is reserved to each Assignor a revocable license to retain, use and enjoy the Equipment Agreements the Entitlements and the properties and entitlements which are the subject thereof.  Upon the occurrence of an Event of Default, such license granted to an Assignor may be immediately revoked by Agent without further demand or notice and Agent is hereby empowered to enter and take possession of the Real Property and to use, manage and operate the same and to do all acts required or permitted by the Equipment Agreements and/or the Entitlements, and perform such other acts in connection with the use, management and operation of the properties and entitlements, which are the subject of the Equipment Agreements and the Entitlements as Agent, in its sole discretion, may deem proper (including, without limitation, such acts as are otherwise authorized under this Assignment).  Agent agrees that, until such license granted to an Assignor has been revoked, as set forth above, Agent shall refrain from exercising its rights and remedies which are granted with respect to the Equipment Agreements the Entitlements and/or the properties they concern under Section 1 of this Assignment or under this Section 5.  Should the Event of Default which resulted in any such revocation (and all other Events of Default that may then exist) be cured prior to foreclosure, deed-in-lieu of foreclosure, or a similar conveyance under the Collateral Agreements, then such license granted to an Assignor shall be immediately reinstated without further demand or notice and Agent shall, as soon as reasonably possible, redeliver to such Assignor possession of the Equipment Agreements and of the Entitlements (and, at the expense of such Assignor, shall execute such notices to third parties as such Assignor may reasonably request) and the parties hereto shall each be restored to, and be reinstated in, their respective rights and positions hereunder as if the Event of Default had not occurred (without impairment of or limitation on Agent's right to proceed hereunder upon any other Events of Default).

6.      Agent shall not be obligated to perform or discharge any obligation or duty to be performed or discharged by an Assignor under the Equipment Agreements and/or the Entitlements.  This Assignment shall not place responsibility for the management, control, care, operation or repair of the Real Property, the Hotel/Casino Facilities or any Additional Business upon any of the Agent or the Holders, or upon any of their respective trustees, officers, directors, employees, agents, attorneys, stockholders, members or partners (collectively, the "Indemnified Parties"); nor shall this Assignment cause any of the Indemnified Parties to be responsible or liable for any negligence in the management, control, care, operation or repair of the Real Property, the Hotel/Casino

391013.04-Los Angeles Server 2A - MSW

Facilities or any Additional Business, which results in loss, injury or death to any tenant, guest, licensee, employee or stranger (provided that this Section 6 shall not act to relieve any Indemnified Party from liability which results from such Indemnified Party's own gross negligence or willful misconduct).

7.      Each Assignor agrees to indemnify, protect, defend and hold harmless the Indemnified Parties from and against any and all losses, damages, expenses or liabilities of any kind or nature from any suits, claims, demands or other proceedings, including reasonable counsel fees incurred in investigating or defending such claim, suffered by any of them and caused by, relating to, arising out of, resulting from, or in any way connected with: (i) this Assignment; (ii) any of the Equipment Agreements or the Entitlements; or (iii) the management, control, care, operation or repair of the Real Property, the Hotel/Casino Facilities and/or any Additional Business; all in accordance with the Joint Venture Agreement, Operating Agreement and all applicable Collateral Agreements.

8.      Except as may be permitted in the Indenture, an Assignor will not further assign any interest in the Equipment Agreements or in the Entitlements, or create or permit any lien, charge, or encumbrance upon their interests in the Equipment Agreements or in the Entitlements.

9.      Each Assignor agrees that this Assignment and the designation and directions herein set forth are irrevocable. Until all Indebtedness and Obligations of the Issuers have been paid and performed in full (or, with respect to Eastern, upon (i) the occurrence of the Operator Licensing Event, (ii) the termination of the Ground Leases, and (iii) the consummation of the Third Closing Date Transactions), Assignor will not make any other assignment, designation or direction inconsistent herewith (except as otherwise permitted in the Indenture), and any such assignment, designation or direction which is inconsistent herewith shall be void. Each Assignor will, from time to time, execute all such instruments of further assurance and all such supplemental instruments as may be reasonably requested by Agent. As used herein, the term "Third Closing Date Transactions" means the transactions that are to occur as a condition to the Third Closing Date (as defined in, and as provided in, the Amended and Restated Joint Venture Agreement, dated as of March 9, 2005, by and between EW Common LLC, a Nevada limited liability company, Florida Hooters LLC, a Nevada limited liability company, and Eastern).

10.     No action or inaction on the part of Agent, or any Holder, shall constitute an assumption on the part of Agent, or any Holder, of any obligations or duties under the Equipment Agreements and/or the Entitlements. No action or inaction on the part of an Assignor shall adversely affect or limit in any way the rights of Agent under this Assignment or, through this Assignment, under the Equipment Agreements and/or the Entitlements.

11.     Each Assignor covenants and represents that no other assignments of their interests in the Equipment Agreements and/or the Entitlements have been made; that no notice of termination has been served on each respective Assignor with respect to

391013.04-Los Angeles Server 2A - MSW

any Equipment Agreements or the Entitlements, the termination of which would be reasonably likely to materially and adversely affect either the Hotel/Casino Facilities or any Additional Business; and that there are presently no defaults existing under any of the Equipment Agreements or the Entitlements, which defaults would be reasonably likely to materially and adversely affect either the Hotel/Casino Facilities or any Additional Business if left uncured.

12.  Upon the payment of all Indebtedness and performance of all Obligations of the Issuers under the Indenture in full (or, with respect to Eastern, upon (i) the occurrence of the Operator Licensing Event, (ii) the termination of the Ground Leases, and (iii) the consummation of the Third Closing Date Transactions), Agent, at the request and the expense of the Assignors, will deliver either an instrument canceling this Assignment or assigning the rights of the Agent hereunder, as Assignor shall direct.

13.  Each Assignor and Agent intend that this Assignment shall be a present, absolute and unconditional assignment, subject to the license granted above, and not merely the passing of a security interest. During the term of this Assignment, neither the Equipment Agreements nor the Entitlements shall constitute property of any Assignor (or any estate of Assignor) within the meaning of 11 U.S.C. § 541 (as it may be amended or recodified from time to time).

14.  This Assignment, the Collateral Agreements, the security interests granted thereunder and the exercise of rights, powers and remedies thereunder are subject to all applicable provisions of the Nevada Gaming Control Act, as codified in Chapter 463 of Nevada Revised Statutes, as amended from time to time, and the regulations of the Nevada Gaming Commission promulgated thereunder, as amended from time to time, and shall be limited to the extent necessary to not render such documents invalid or unenforceable, in whole or in part.

15.  This Assignment applies to, binds and inures to the benefit of, the parties hereto and their respective heirs, administrators, executors, successors and assigns. This Assignment may not be modified or terminated orally.

16.  All of the rights and remedies of Agent hereunder are cumulative and not exclusive of any other right or remedy which may be provided for hereunder or under any other Collateral Agreements. Nothing contained in this Assignment and no act done or omitted by Agent, or any Holder, pursuant to its terms shall be deemed a waiver by Agent, or any Holder, of any rights or remedies under the Collateral Agreements, and this Assignment is made and accepted without prejudice to any rights or remedies possessed by Agent, or any Holder, under the terms of the Collateral Agreements. The right of the Agent and the Holders to collect the secured principal, interest, and other Indebtedness, and to enforce any security may be exercised by Agent prior to, simultaneous with, or subsequent to any action taken under this Assignment.

17.  Upon the occurrence of an Event of Default, each Assignor shall be deemed to have appointed and does hereby appoint Agent the attorney-in-fact of an Assignor to prepare, sign, file and/or record such documents or instruments, or take such

391013.04-Los Angeles Server 2A - MSW

other actions, as may be reasonably necessary to perfect and preserve, against third parties, the interest in the Equipment Agreements, the Leases, the Entitlements and Rents and Revenues which is granted to Agent hereunder.

18.     This Assignment shall be governed by the internal laws of the State of New York, without regard to principles of conflict of law.

19.     This Assignment may be executed in any number of separate counterparts with the same effect as if the signatures hereto and hereby were upon the same instrument. All such counterparts shall together constitute one and the same document.

*[The remainder of this page has been intentionally left blank]*

IN WITNESS WHEREOF, the parties have executed the foregoing instrument as of the day and year first above written.

ASSIGNOR:

155 EAST TROPICANA, LLC,
a Nevada limited-liability company

By: _____
    Neil G. Kieffer
    Its:  Chief Executive Officer

ASSIGNOR:

EASTERN & WESTERN HOTEL CORPORATION,
a Nevada corporation

By: _____
    Michael J. Hessling
    Its:  Executive Vice President and Assistant Secretary

AGENT:

THE BANK OF NEW YORK TRUST COMPANY, N.A.,
a national banking association,
as collateral agent

By: _____
    Name:
    Its:

IN WITNESS WHEREOF, the parties have executed the foregoing instrument as of the day and year first above written.

ASSIGNOR:

155 EAST TROPICANA, LLC,
a Nevada limited-liability company

By: _____
    Neil G. Keifer
    Its:  Chief Executive Officer

ASSIGNOR:

EASTERN & WESTERN HOTEL CORPORATION,
a Nevada corporation

By: _____
    Michael J. Hessling
    Its:  Executive Vice President and Assistant Secretary

AGENT:

THE BANK OF NEW YORK TRUST COMPANY, N.A.,
a national banking association,
as collateral agent

By: _____
    Name:  SANDEE PARKS
    Its:

**ACKNOWLEDGMENT**

STATE OF _Florida_ )
) ss.
COUNTY OF _Pinellas_ )

This instrument was acknowledged before me on March _25_, 2005 by _Neil G. Kiefer_ as _Chief Executive Officer_ of 155 EAST TROPICANA, LLC.

_Lucille Grinnell_

NOTARY PUBLIC

My commission expires:

LUCILLE GRINNELL
MY COMMISSION # DD 346184
EXPIRES: August 28, 2008
Bonded Thru Notary Public Underwriters

## ACKNOWLEDGMENT

STATE OF <u>NEVADA</u>                )

                                                    ) ss.

COUNTY OF <u>CLARK</u>            )


This instrument was acknowledged before me on March <u>26</u>, 2005 by

<u>Michael J. Hessling</u>  as  <u>Executive Vice President and Assistant</u>  of
<u>                                        Secretary                                        </u>

EASTERN & WESTERN HOTEL CORPORATION.



NOTARY PUBLIC

My commission expires: <u>4/21/2007</u>

SAUNDRA JACKSON
Notary Public State of Nevada
No. 99-55929-1
My appt. exp. Apr. 21, 2007

## ACKNOWLEDGMENT

STATE OF CALIFORNIA      )
                               ) ss.

COUNTY OF LOS ANGELES    )

On _3|24|2005_, before me, _Dona L Bergstrom, Notary Public_
     Date                                 Name and Title of Officer (e.g., Jane Doe, Notary Public)

personally appeared _Saldige Parks_
                                      Name(s) of Signer(s)

         ☐ personally known to me
         ☒ proved to me on the basis of satisfactory evidence

to be the person whose name is subscribed to the within instrument and acknowledged that he executed the same in his authorized capacity, and that by his signature on the instrument, the person, or the entity on behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

                           _Dona L Bergstrom_
                               Signature of Notary Public

(SEAL)

DONA L. BERGSTROM
COMM. #1408462
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
MY COMM. EXPIRES MARCH 21, 2007

**EXHIBIT "A"**

**THE LAND**
**LEGAL DESCRIPTION**

All that certain real property situated in the County of Clark, State of Nevada, described as follows:

PARCEL I:

That portion of the West Half (W 1/2) of the Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of Section 28, Township 21 South, Range 51 East, M.D.M., described as follows:

COMMENCING at the North Quarter (N 1/4) corner of said Section 28;
THENCE South 89`50'14" west, along the North line of the Northwest Quarter (NW 1/4) of said Section 28, a distance of 1,318.16 feet to a point;
THENCE South 02`54'50" East, a distance of 101.41 feet to a point on the South right of way line of Tropicana Avenue (100 feet wide) said point also being the Northwest (NW) corner of Tropicana Park, as shown by map thereof on file in Book 8 of Plats, Page 37 and reverted to acreage by map thereon on file in Book 15 of Plats, Page 11, Clark County Records said point being the TRUE POINT OF BEGINNING;
THENCE North 87`11'36" East, along said South right of way line, a distance of 452.59 feet to a point of tangency of a curve concave to the Southwest and having a radius of 15.00 feet;
THENCE along said curve through a central angle of 89`50'04" an arc length of 23.52 feet to a point on the Westerly right of way line of Scott Street, as shown on said plats;
THENCE South 02`58'20" East, along said right of way line, a distance of 631.04 feet to a point on the centerline of Mona Avenue, as shown on the aforementioned plat of Tropicana Park;
THENCE South 87`01'40" West, along said centerline, and the Westerly extension thereof, a distance of 468.21 feet to a point on the West line of said Tropicana Park;
THENCE North 02`54'50" West, along said line to the TRUE POINT OF BEGINNING.

EXCEPTING THEREFROM that portion of said land conveyed to the State of Nevada by deed recorded June 23, 1999 in Book 990623, Doc/Inst. No. 02544, Official Records, Clark County, Nevada.

PARCEL II:

(Hotel San Remo Convention Center)

The Easterly 150 feet of the West Half (W 1/2) of the Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of Section 28, Township 21 South, Range 61 East, M.D.M.

12

391013.04-Los Angeles Server 2A - MSW

EXCEPT the portion thereof conveyed to the State of Nevada by Deed recorded May 29, 1959 as Document No. 162200 of Official Records, Clark County, Nevada Records.

FURTHER EXCEPTING the interest in the South 30 feet and the West 20 feet conveyed to Clark County for roads, utilities and other public and incidental purposes by Deed recorded September 13, 1971 as Document No. 128706.

FURTHER EXCEPTING that portion of said land conveyed to Ben Hur Hotel, Inc. described as follows:

COMMENCING at the Southeast (SE) corner of the Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of said Section 28;
THENCE North 88`43'17" West along the South line thereof a distance of 658.98 feet to the Southwest (SW) corner of the East Half (E 1/2) of the Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of Section 28, said point being the TRUE POINT OF BEGINNING;
THENCE continuing North 88`43'17" West  a distance of 148.90 feet to the Southeast (SE) corner of the Tropicana Park Subdivision as shown in Book 8 of Plats, Page 37, Clark County Records, Nevada; thence North 00`26'17" West along the East line of said Tropicana Park a distance of 571.77 feet;
THENCE North 89`38'50" East a distance of 149.91 feet to a point in the West line of the East Half (E 1/2) of the Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of Section 28;
THENCE South 00`19'51" East a distance of 576.01 feet to the TRUE POINT OF BEGINNING.

FURTHER EXCEPTING that certain spandrel area conveyed to Clark County for road purposes by Deed recorded May 4, 1987 as Document No. 870504/00953 and re-recorded May 20, 1987 as Document No. 870520/00620 of Official Records.

## EXHIBIT "B"

### THE LEASED LAND
### LEGAL DESCRIPTION

All that certain real property situated in the County of Clark, State of Nevada, described as follows:

PARCEL I:

That portion of the West Half (W 1/2) of the Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of Section 28, Township 21 South, Range 51 East, M.D.M., described as follows:

COMMENCING at the North Quarter (N 1/4) corner of said Section 28;
THENCE South 89`50'14" west, along the North line of the Northwest Quarter (NW 1/4) of said Section 28, a distance of 1,318.16 feet to a point;
THENCE South 02`54'50" East, a distance of 101.41 feet to a point on the South right of way line of Tropicana Avenue (100 feet wide) said point also being the Northwest (NW) corner of Tropicana Park, as shown by map thereof on file in Book 8 of Plats, Page 37 and reverted to acreage by map thereon on file in Book 15 of Plats, Page 11, Clark County Records said point being the TRUE POINT OF BEGINNING;
THENCE North 87`11'36" East, along said South right of way line, a distance of 452.59 feet to a point of tangency of a curve concave to the Southwest and having a radius of 15.00 feet;
THENCE along said curve through a central angle of 89`50'04" an arc length of 23.52 feet to a point on the Westerly right of way line of Scott Street, as shown on said plats;
THENCE South 02`58'20" East, along said right of way line, a distance of 631.04 feet to a point on the centerline of Mona Avenue, as shown on the aforementioned plat of Tropicana Park;
THENCE South 87`01'40" West, along said centerline, and the Westerly extension thereof, a distance of 468.21 feet to a point on the West line of said Tropicana Park;
THENCE North 02`54'50" West, along said line to the TRUE POINT OF BEGINNING.

EXCEPTING THEREFROM that portion of said land conveyed to the State of Nevada by deed recorded June 23, 1999 in Book 990623, Doc/Inst. No. 02544, Official Records, Clark County, Nevada.

PARCEL II:

(Hotel San Remo Convention Center)

The Easterly 150 feet of the West Half (W 1/2) of the Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of Section 28, Township 21 South, Range

14

61 East, M.D.M.

EXCEPT the portion thereof conveyed to the State of Nevada by Deed recorded May 29, 1959 as Document No. 162200 of Official Records, Clark County, Nevada Records.

FURTHER EXCEPTING the interest in the South 30 feet and the West 20 feet conveyed to Clark County for roads, utilities and other public and incidental purposes by Deed recorded September 13, 1971 as Document No. 128706.

FURTHER EXCEPTING that portion of said land conveyed to Ben Hur Hotel, Inc. described as follows:

COMMENCING at the Southeast (SE) corner of the Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of said Section 28;
THENCE North 88`43'17" West along the South line thereof a distance of 658.98 feet to the Southwest (SW) corner of the East Half (E 1/2) of the Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of Section 28, said point being the TRUE POINT OF BEGINNING;
THENCE continuing North 88`43'17" West a distance of 148.90 feet to the Southeast (SE) corner of the Tropicana Park Subdivision as shown in Book 8 of Plats, Page 37, Clark County Records, Nevada; thence North 00`26'17" West along the East line of said Tropicana Park a distance of 571.77 feet;
THENCE North 89`38'50" East a distance of 149.91 feet to a point in the West line of the East Half (E 1/2) of the Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of Section 28;
THENCE South 00`19'51" East a distance of 576.01 feet to the TRUE POINT OF BEGINNING.

FURTHER EXCEPTING that certain spandrel area conveyed to Clark County for road purposes by Deed recorded May 4, 1987 as Document No. 870504/00953 and re-recorded May 20, 1987 as Document No. 870520/00620 of Official Records.

15

# EXHIBIT 19

## TRADEMARK SECURITY AGREEMENT

This TRADEMARK SECURITY AGREEMENT (this "Trademark Security Agreement") is made this 29th day of March, 2005, among Grantors listed on the signature pages hereof (collectively, jointly and severally, "Grantors" and each individually "Grantor"), and THE BANK OF NEW YORK TRUST COMPANY, N.A., in its capacity as Collateral Agent (together with its successors, "Agent").

WITNESSETH:

WHEREAS, pursuant to that certain Senior Secured Note Indenture, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "Indenture"), by and among 155 East Tropicana, LLC, a Nevada limited-liability company ("155 East Tropicana") and 155 East Tropicana Finance Corp., a Nevada corporation ("155 East Tropicana Finance", and together with 155 East Tropicana, the "Grantors") and The Bank of New York Trust Company, N.A., as trustee (in such capacity, the "Trustee") and Collateral Agent;

WHEREAS, the Grantors shall have executed and delivered to Agent, for the benefit of the Agent, the Trustee and the Holders, that certain Security Agreement dated of even date herewith (including all annexes, exhibits or schedules thereto, as from time to time amended, restated, supplemented or otherwise modified, the "Security Agreement");

WHEREAS, in order to induce the Trustee to enter into the Indenture and the other Indenture Documents (as hereinafter defined), Grantors have agreed to grant a continuing security interest in and to the Trademark Collateral (as hereinafter defined) in order to secure the due and punctual, prompt and complete payment, observance and performance of, among other things, (a) the Obligations of Grantors arising from this Agreement, (b) all present and future liabilities and Obligations (including, without limitation, Guarantee Obligations) of each of the Grantors of every type or description, arising under or in connection with the Notes, the Guarantees and the other Indenture Documents, whether for principal of or premium, if any, or Interest (or Liquidated Damages, if any) on the Notes, expenses, indemnities or other amounts (including attorneys' fees and expenses), and (c) all other Obligations of Grantors arising from the Indenture and the other Indenture Documents, plus reasonable attorneys fees and expenses if the obligations represented thereunder are collected by law, through an attorney-at-law, or under advice therefrom (clauses (a), (b), and (c) being hereinafter referred to as the "Secured Obligations"), by the granting of the security interests contemplated by this Agreement, and

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor hereby agrees as follows:

1.      DEFINED TERMS.  All capitalized terms used but not otherwise defined herein have the meanings given to them in the Security Agreement.

2.      GRANT OF SECURITY INTEREST IN TRADEMARK COLLATERAL.  Each Grantor hereby grants to Agent, for the benefit Agent, the Trustee and the Holders, a continuing first priority security interest in all of such Grantor's right, title and interest in, to and under the following, whether presently existing or hereafter created or acquired (collectively, the "Trademark Collateral"):

(a)      all of its Trademarks to which it is a party including those referred to on Schedule I hereto;

(b)      all reissues, continuations or extensions of the foregoing;

    (c)  all goodwill of the business connected with the use of, and symbolized by, each Trademark and each Trademark Intellectual Property License; and

    (d)  all products and proceeds of the foregoing, including, without limitation, any claim by such Grantor against third parties for past, present or future (i) infringement or dilution of any Trademark or any Trademark licensed under any Intellectual Property License or (ii) injury to the goodwill associated with any Trademark or any Trademark licensed under any Intellectual Property License.

    3.  <u>SECURITY AGREEMENT</u>.  The security interests granted pursuant to this Trademark Security Agreement are granted in conjunction with the security interests granted to Agent, for the benefit Agent, the Trustee and the Holders, pursuant to the Security Agreement.  Each Grantor hereby acknowledges and affirms that the rights and remedies of Agent with respect to the security interest in the Trademark Collateral made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.

    4.  <u>AUTHORIZATION TO SUPPLEMENT</u>.  If any Grantor shall obtain rights to any new trademarks, the provisions of this Trademark Security Agreement shall automatically apply thereto. Grantors shall give prompt notice in writing to Agent with respect to any such new trademarks or renewal or extension of any trademark registration.  Without limiting Grantors' obligations under this <u>Section 4</u>, Grantors hereby authorize Agent unilaterally to modify this Agreement by amending <u>Schedule I</u> to include any such new trademark rights of Grantors.  Notwithstanding the foregoing, no failure to so modify this Trademark Security Agreement or amend <u>Schedule I</u> shall in any way affect, invalidate or detract from Agent's continuing security interest in all Collateral, whether or not listed on <u>Schedule I</u>.

    5.  <u>COUNTERPARTS</u>.  This Trademark Security Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such separate counterparts shall together constitute but one and the same instrument.  In proving this Trademark Security Agreement or any other Loan Document in any judicial proceedings, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom such enforcement is sought.  Any signatures delivered by a party by facsimile transmission or by e-mail transmission shall be deemed an original signature hereto.

[signature page follows]

IN WITNESS WHEREOF, each Grantor has caused this Trademark Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

<u>Grantors:</u>

**155 East Tropicana, LLC**

By: _____
Name:  Neil G. Kiefer
Title:    Chief Executive Officer


**155 East Tropicana Finance Corp.**

By: _____
Name:  Neil G. Kiefer
Title:    President


<u>Collateral Agent:</u>

**The Bank of New York Trust Company, N.A.**

By: _____
Name:
Title:


TRADEMARK SECURITY AGREEMENT

368504

IN WITNESS WHEREOF, each Grantor has caused this Trademark Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

<u>Grantors:</u>

**155 East Tropicana, LLC**

By: _____
    Name:
    Title:

**155 East Tropicana Finance Corp.**

By: _____
    Name:
    Title:

<u>Collateral Agent:</u>

**The Bank of New York Trust Company, N.A.**

By: _____
    Name: *SANDEE PARKES*
    Title: *VICE PRESIDENT*

TRADEMARK SECURITY AGREEMENT

368504

**SCHEDULE I**
to
**Trademark Security Agreement**

Trademark Registrations/Applications

Parent has filed the following Intent-To-Use Applications with the United States Trademark Office:

| Mark | Class | Serial Number |
|---|---|---|
| Nippers | 43<br>Restaurant, bar and cocktail lounge services | 78/549,527 |
| The Bait Shop | 43<br>Restaurant, bar and cocktail lounge services | 78/569,441 |
| The Bait Shop | 35<br>Retail store services | 78/569,446 |
| Owl's Nest | 43<br>Restaurant, bar and cocktail lounge services | 78/569,436 |

Trade Names

Hotel San Remo Casino and Resort
Hooters Casino Hotel (upon re-opening after renovations and re-branding)

Common Law Trademarks and Internet Domain Names

The following domain names have been reserved by 155 East Tropicana, LLC and are currently in use:
- www.hooterscasinohotel.com
- www.hootershotelcasino.com
- www.hooterslasvegas.com
- www.hooterslv.com

The following domain names have been reserved by 155 East Tropicana, LLC and are not currently in use, but such reservations will expire on August 2, 2005, unless otherwise indicated:
- www.hooterscasinolasvegas.com
- www.hooterscasinolv.com
- www.hootershotelcasinolasvegas.com
- www.hootershotelcasinolv.com
- www.hootershotellasvegas.com

- www.hootershotellv.com
- www.hooterslasvegascasino.com
- www.hootersresortcasino.com
- www.lasvegashooters.com
- www.lasvegashooterscasino.com
- www.lasvegashootershotel.com
- www.playhooters.com
- www.vegashooters.com
- www.hootersresort.com (September 17, 2005)

Trademarks Not Currently in Use

None.

Trademark Licenses

**Hooters.** 155 East Tropicana, LLC has entered into an assignment agreement with Florida Hooters, LLC which grants 155 East Tropicana, LLC the right to use certain intellectual property in connection with the operation of a Hooters Casino Hotel. The intellectual property covered by this agreement is described as follows:

- *Hooters Trademark.* 155 East Tropicana, LLC has an exclusive license to use the Hooters brand in connection with gaming, casino or combined hotel, gaming and casino operations solely at the property located at 155 East Tropicana Avenue, Las Vegas, Nevada.

- *Hooters Restaurant Concept.* Pursuant to a consent from Las Vegas Wings, Inc., 155 East Tropicana, LLC has the right to use the Hooters restaurant concept at the hotel casino located at 155 East Tropicana Avenue, Las Vegas, Nevada. The consent permits worldwide promotion, marketing and advertising of the hotel casino (located at 155 East Tropicana Avenue, Las Vegas, Nevada) and its services.

**Marino's.** 155 East Tropicana, LLC has an exclusive license to use certain intellectual property to operate and promote restaurants, taverns, lounges and bars using the marks "Dan Marino's Fine Food & Spirits" and "Martini Bar," which is operated in conjunction with Dan Marino's Fine Food & Spirits, at the hotel casino (located at 155 East Tropicana Avenue, Las Vegas, Nevada).

**Pete & Shorty's.** Pete & Shorty's, Inc has granted to 155 East Tropicana, LLC a nonexclusive, royalty-free license to use the Pete & Shorty's mark in connection with a restaurant, bar and lounge at the Hooters Casino Hotel (to be located at 155 East Tropicana Avenue, Las Vegas, Nevada). Pursuant to the license agreement, 155 East Tropicana, LLC can also use the mark in connection with affiliated merchandise, entertainment and casino services. However, Pete & Shorty's, Inc. has maintained the right to obtain federal and/or state registrations for any and all additional services, other than restaurant, bar and cocktail lounge services, which will be provided at the Hooters Casino Hotel (to be located at 155 East Tropicana Avenue, Las Vegas, Nevada).

SCHEDULES TO TRADEMARK SECURITY AGREEMENT

# CONTROL AGREEMENT

This Collateral Account Control Agreement (this "Control Agreement") dated as of March 29, 2005 among 155 East Tropicana, LLC (the "Grantor"), The Bank of New York Trust Company, N.A. as Trustee for the benefit of the Holders, in such capacity, (the "Secured Party") and The Bank of New York Trust Company, N.A. in its capacity as both a "securities intermediary" as defined in Section 8-102 of the UCC and a "bank" as defined in Section 9-102 of the UCC (in such capacities , the "Financial Institution"). Capitalized terms used but not defined herein shall have the meaning assigned in the Senior Secured Note Security Agreement, dated as of March 29, 2005, between the Grantor and the Secured Party (the "Security Agreement"). All references herein to the "UCC" shall mean the Uniform Commercial Code as in effect in the State of New York.

**Section 1.** **Establishment of Collateral Account.** The Financial Institution hereby confirms and agrees that:

(a) **Description of Account.** The Financial Institution has established the following account:

"[155 East Tropicana, LLC – Renovation Disbursement Account]" with account number 171098.

The account is referred to herein as a "Collateral Account".

(b) **Account Modifications.** Neither the Financial Institution nor the Grantor shall change the name or account number of the Collateral Account without the prior written consent of the Secured Party;

(c) **Type of Account.** The Collateral Account is, and will be maintained as, either (i) a "securities account" (as defined in Section 8-501 of the UCC) or (ii) a "deposit account" as defined in Section 9-102(a)(29) of the UCC).

(d) **Securities Account Provisions.** If and to the extent the Collateral Account is a securities account (within the meaning of Section 8-501 of the UCC):

(i)  all securities, financial assets or other property credited to the Collateral Account shall be registered in the name of the Financial Institution, indorsed to the Financial Institution or in blank or credited to another securities account maintained in the name of the Financial Institution. In no case will any financial asset credited to the Collateral Account be registered in the name of the Grantor, payable to the order of the Grantor or specially indorsed to the Grantor unless the foregoing have been specially indorsed to the Financial Institution or in blank;

(ii)  all financial assets delivered to the Financial

Institution pursuant to the Security Agreement will be promptly credited to the Collateral Account; and

(iii)   the Financial Institution hereby agrees that each item of property (whether investment property, financial asset, security, instrument or cash) credited to the Collateral Account shall be treated as a "financial asset" within the meaning of Section 8-102(a)(9) of the UCC.

**Section 2.   Secured Party Control.**

(a)   **Control for Purposes of UCC.**   The Financial Institution agrees that if at any time it shall receive any order from the Secured Party (i) directing disposition of funds in the Collateral Account or (ii) directing transfer or redemption of the financial assets relating to the Collateral Account (such order, the "Secured Party Order"), the Financial Institution shall comply with such entitlement order or instruction without further consent by the Grantor or any other person; and

(b)   **Conflicting Orders or Instructions.**   Notwithstanding anything to the contrary contained herein, if at any time the Financial Institution shall receive conflicting orders or instructions from the Secured Party and the Grantor, the Financial Institution shall follow the orders or instructions of the Secured Party and not the Grantor; provided, further, that the Financial Institution shall specifically follow the instructions of the Secured Party (identified as the "Disbursement Agent" in the Cash Collateral and Disbursement Agreement, dated as of March 29, 2005, by and among the Secured Party, the Grantor and 155 East Tropicana Finance Corp. (the "Cash Collateral Agreement")) pursuant to the terms of the Cash Collateral Agreement.

**Section 3.   Waiver of Financial Institution's Lien; Waiver of Set-Off.**

(a)   **Security Interest.**   In the event that the Financial Institution has, or subsequently obtains, by agreement, by operation of law or otherwise a security interest in the Collateral Account (or any portion thereof), the Financial Institution hereby releases and terminates such security interest.

(b)   **Set-off and Recoupment.**   The financial assets, money and other items credited to the Collateral Account will not be subject to deduction, set-off, recoupment, banker's lien, or any other right in favor of any person other than the Secured Party; provided, however, that the Financial Institution may set off (i) all amounts due to the Financial Institution in respect of customary fees and expenses for the routine maintenance and operation of the Collateral Account and (ii) the face amount of any checks which have been credited to the Collateral Account but are subsequently returned unpaid because of uncollected or insufficient funds).

**Section 4.   Governing Law.**

2

368551

(a)    **Location of Financial Institution.**  Regardless of any provision in any other agreement, for purposes of the UCC, New York shall be the location of the bank for purposes of Sections 9-301, 9-304 and 9-305 of the UCC and the securities intermediary for purposes of Sections 9-301 and 9-305 and Section 8-110 of the UCC.

(b)    **Law Governing This Control Agreement.**  This Control Agreement shall be governed by the laws of the State of New York.

(c)    **Law Governing Collateral Account.**  The Collateral Account shall be governed by the laws of the State of New York.

**Section 5.    Possible Conflict with Other Agreements.**

(a)    **Conflict With Other Agreement.**  In the event of any conflict between this Control Agreement (or any portion thereof) and any other agreement now existing or hereafter entered into, the terms of this Control Agreement shall prevail.

(b)    **Amendment.**  No amendment or modification of this Control Agreement or waiver of any right hereunder shall be binding on any party hereto unless it is in writing and is signed by all of the parties hereto.

(c)    **Existence of Other Agreements.**  The Financial Institution hereby confirms and agrees that (other than the Cash Collateral Agreement):

(i)    There are no other agreements entered into between the Financial Institution and the Grantor with respect to the Collateral Account **[except for [identify other agreements];**

(ii)    The Financial Institution has not entered into, and until the termination of this Control Agreement will not enter into, any Agreement with any other person relating the Collateral Account pursuant to which it has agreed to comply with entitlement orders (as defined in Section 8-102(a)(8) of the UCC) or instructions (within the meaning of Section 9-104 of the UCC) of such other person; and

(iii)    The Financial Institution has not entered into, and until the termination of this Control Agreement will not enter into, any Agreement purporting to limit or condition the obligation of the Financial Institution to comply with entitlement orders or instructions.

**Section 6.    Adverse Claims.**

(a)    **Adverse Claim.**  Except for the claims and interests of the Secured Party and the Grantor, the Financial Institution does not, to its knowledge without independent investigation, know of any lien on, or claim to, or interest in, the Collateral Account or in any "financial asset" (as defined in Section 8-102(a) of the UCC), cash or funds credited thereto.

368551

(b)    <u>Notice</u>. If any person asserts any lien, encumbrance or adverse claim (including any writ, garnishment, judgment, warrant of attachment, execution or similar process) against the Collateral Account (or in any financial asset, cash or funds carried therein), the Financial Institution will promptly notify the Secured Party.

Section 7.    <u>Grantor Management Rights</u>.

(a)    <u>Timing</u>. In addition to, and not in lieu of, the obligation of the Financial Institution to honor a Secured Party Order as set forth in Section 2 hereof, the Secured Party agrees that the Grantor may exercise the management rights described below in this Section with respect to the Collateral Account until such time as the earlier of the time: the Financial Institution receives either (i) a Notice of Termination of Grantor Management Rights pursuant to subsection (b) below or (ii) a Secured Party Order pursuant to Section 2 hereof; <u>provided</u>, <u>however</u>, that the Grantor shall not take any actions in violation of the terms of the Cash Collateral Agreement.

(b)    <u>Notice of Termination of Grantor Management Rights</u>. The Secured Party may at any time deliver a notice to the Financial Institution in substantially the form set forth in the Exhibit A (the "Notice of Termination of Grantor Management Rights") and subsequent to receipt of such Notice of Termination of Grantor Management Rights, the Financial Institution will honor instructions and orders of only the Secured Party (including any Secured Party Order pursuant to Section 2 hereof) and shall no longer honor any instructions or orders of the Grantor as set forth below.

(c)    <u>Withdrawal Requests</u>. The Grantor may request withdrawal of, or transfer of, funds or property from the Collateral Account (each request, a "Withdrawal Request"), and the Financial Institution shall honor any Withdrawal Request provided that the Financial Institution has not received either (i) a Notice of Termination of Grantor Management Rights pursuant to subsection (b) of this Section or (ii) a Secured Party Order pursuant to Section 2.

(d)    <u>Voting Rights</u>. The Grantor may instruct the Financial Institution with respect to any voting rights with respect to any financial asset and the Financial Institution shall honor such instructions of the Grantor with respect to the voting of any financial asset provided that the Financial Institution has not received either (i) a Notice of Termination of Grantor Management Rights pursuant to subsection (b) of this Section or (ii) a Secured Party Order pursuant to Section 2.

(e)    <u>Investments by Grantor</u>. The Grantor may direct the Financial Institution with respect to the selection of investments; provided that the Financial Institution has not received either (i) a Notice of Termination of Grantor Management Rights pursuant to subsection (b) of this Section or (ii) a Secured Party Order pursuant to Section 2.

Section 8.    <u>Maintenance of Account</u>.

4

368551

(a)    **Correspondence, Statements and Confirmations.** The Financial Institution shall promptly send copies of all statements, confirmations and other correspondence concerning the Collateral Account and, if applicable, any financial assets credited thereto, simultaneously to the Grantor and the Secured Party at the address for each set forth in Section 12 of this Control Agreement.

(b)    **Tax Reporting.** All items of income, gain, expense and loss, if any, recognized in the Collateral Account and all interest, if any, relating to the Collateral Account, shall be reported to the Internal Revenue Service and all state and local taxing authorities under the name and taxpayer identification number of the Grantor.

**Section 9.    Representations of the Financial Institution.** The Financial Institution hereby represents:

(a)    This Control Agreement is the valid and legally binding obligation of the Financial Institution; and

(b)    The Collateral Account has each been established as set forth in Section 1 hereof and the Collateral Account will be maintained in the manner set forth herein until termination of this Control Agreement.

**Section 10.    Indemnification of Financial Institution.**

(a)    **Release.** The Grantor and the Secured Party hereby agree that the Financial Institution and the Secured Party are released from any and all liabilities to the Grantor and the Secured Party arising from the terms of this Control Agreement and the compliance of the Financial Institution with the terms hereof, except to the extent that such liabilities are determined to have been caused by the Financial Institution's own negligence.

(b)    **Indemnification.** The Grantor shall at all times indemnify and save harmless the Financial Institution and the Secured Party from and against any and all claims, actions and suits of others arising out of the terms of this Control Agreement or the compliance of the Financial Institution with the terms hereof, except to the extent that such are determined to have been caused by the Financial Institution's own negligence, and from and against any and all liabilities, losses, damages, costs, charges, counsel fees and other expenses of every nature and character arising by reason of the same, until the termination of this Control Agreement.

**Section 11.    Successors; Assignment.**

(a)    **Successors.** The terms of this Control Agreement shall be binding upon, and shall be for the benefit of, the parties hereto and their respective corporate successors or heirs and personal representatives who obtain such rights solely by operation of law.

(b)    **Assignment by Secured Party.** The Secured Party may assign its rights hereunder only with the express written consent of the Financial Institution and by sending prior written notice of such assignment to the Grantor.

368551

      (c)  **Assignment by Grantor.**  The Grantor shall not assign any right, title or interest hereunder.

      (d)  **Successor Account.**  The terms of this Control Agreement shall be binding on and shall apply to any successor account to the Collateral Account.

      **Section 12.  Notices.**  Any notice, request or other communication required or permitted to be given under this Control Agreement shall be in writing and deemed to have been properly given when delivered in person, or when sent by telecopy or other electronic means and electronic confirmation of error free receipt is received or two days after being sent by certified or registered United States mail, return receipt requested, postage prepaid, addressed to the party at the address set forth below.

Grantor:

      155 East Tropicana, LLC
      115 East Tropicana Avenue
      Las Vegas, Nevada 89109
      Attn: Michael Hessling

Secured Party:

      The Bank of New York Trust Company, N.A.
      700 South Flower Street, Suite 500
      Los Angeles, CA 90017
      Attention: Corporate Trust Administration

Financial Institution:

      The Bank of New York Trust Company, N.A.
      700 South Flower Street, Suite 500
      Los Angeles, CA 90017
      Attention: Corporate Trust Administration

      Any party may change its address for notices in the manner set forth above.

      **Section 13.  Termination.**  The obligations of the Financial Institution to the Secured Party pursuant to this Control Agreement shall continue in effect until the security interests of the Secured Party in the Collateral Account have been terminated pursuant to the terms of the Security Agreement and the Secured Party has notified the Financial Institution of such termination in writing.  The Secured Party agrees to provide a Notice of Termination in substantially the form of Exhibit B hereto to the Financial Institution upon the request of the Grantor on or after the termination of the Secured Party's security interest in the Collateral Account pursuant to the terms of the Security Agreement.  The termination of this Control Agreement shall not terminate the Collateral Account or alter the obligations of the Financial Institution to the Grantor pursuant to other agreement with respect to the Collateral Account.

      **Section 14.  Counterparts.**  This Control Agreement may be executed in any number of counterparts, all of which shall constitute one and the same instrument, and any party

6

368551

hereto may execute this Control Agreement by signing and delivering one or more counterparts.

       **Section 15.**   **Incorporation by Reference.**  In connection with its appointment and acting hereunder, each of the Secured Party and Financial Institution are entitled to all rights, privileges, benefits, immunities and indemnities provided to the Secured Party under the Security Agreement.

7

368551

**GRANTOR:**

**155 East Tropicana, LLC**

By: _____
      Name: _____
      Title: _____

**SECURED PARTY:**

**The Bank of New York Trust Company, N.A.**

By: _____
      Name: _____
      Title: _____

**FINANCIAL INSTITUTION:**

**The Bank of New York Trust Company, N.A.**

By: _____
      Name: _____
      Title: _____

7

368551

**GRANTOR:**

**155 East Tropicana, LLC**

By: _____
       Name:
       Title:

**SECURED PARTY:**

**The Bank of New York Trust Company, N.A.**

By: _____
       Name: SANDEE PARKS
       Title: VICE PRESIDENT

**FINANCIAL INSTITUTION:**

**The Bank of New York Trust Company, N.A.**

By: _____
       Name: SANDEE PARKS
       Title: VICE PRESIDENT

7

368551

<u>Exhibit A</u>

*[Letterhead of [The Bank of New York Trust Company, N.A.]]*

***[Date]***

The Bank of New York Trust Company, N.A.
700 South Flower Street, Suite 500
Los Angeles, CA 90017
Attention: Corporate Trust Administration

Re:  <u>Notice of Termination of Grantor Management Rights</u>

Ladies and Gentlemen:

Reference is made to the Collateral Account Control Agreement, dated March 29, 2005, among 155 East Tropicana, LLC, you and the undersigned (a copy of which is attached) (the "Collateral Account Control Agreement").   You are hereby notified pursuant to Section 7 of the Collateral Account Control Agreement not to honor any further orders and/or instructions of the Grantor delivered pursuant to Section 7 of the Collateral Account Control Agreement with respect to the Collateral Account unless otherwise ordered by a court of competent jurisdiction.

You are hereby further instructed to accept instructions and orders from no other person except the undersigned unless otherwise ordered by a court of competent jurisdiction.

Very truly yours,

The Bank of New York Trust Company, N.A.

By: _____
    Name:
    Title:

cc:    155 East Tropicana, LLC

Exhibit B

*[Letterhead of [The Bank of New York Trust Company, N.A.]]*

*[Date]*

The Bank of New York Trust Company, N.A.
700 South Flower Street, Suite 500
Los Angeles, CA 90017
Attention: Corporate Trust Administration

Re:    Termination of Collateral Account
Control Agreement

You are hereby notified that the Collateral Account Control Agreement among you, 155 East Tropicana, LLC  and the undersigned (a copy of which is attached) is terminated and you have no further obligations to the undersigned pursuant to such agreement.  Notwithstanding any previous instructions to you, you are hereby instructed to accept all future directions with respect to the Collateral Account identified in such agreement solely from the Grantor.  This notice terminates any obligations you may have to the undersigned with respect to the Collateral Account; however nothing contained in this notice shall alter any obligations which you may otherwise owe to the Grantor pursuant to any other agreement.

Very truly yours,

The Bank of New York Trust Company, N.A.

By: _____
      Name:
      Title:

cc:    155 East Tropicana, LLC

368551.02-Los Angeles Server 1A - MSW

# CONTROL AGREEMENT

This Collateral Account Control Agreement (this "Control Agreement") dated as of March 29, 2005 among 155 East Tropicana, LLC (the "Grantor"), The Bank of New York Trust Company, N.A. as Trustee for the benefit of the Holders, in such capacity, (the "Secured Party") and The Bank of New York Trust Company, N.A. in its capacity as both a "securities intermediary" as defined in Section 8-102 of the UCC and a "bank" as defined in Section 9-102 of the UCC (in such capacities , the "Financial Institution"). Capitalized terms used but not defined herein shall have the meaning assigned in the Senior Secured Note Security Agreement, dated as of March 29, 2005, between the Grantor and the Secured Party (the "Security Agreement"). All references herein to the "UCC" shall mean the Uniform Commercial Code as in effect in the State of New York.

**Section 1.    Establishment of Collateral Account.**  The Financial Institution hereby confirms and agrees that:

(a)   **Description of Account.**   The Financial Institution has established the following account:

"[155 East Tropicana, LLC – Interest Reserve Account]" with account number 171097.

The account is referred to herein as a "Collateral Account".

(b)   **Account Modifications.**   Neither the Financial Institution nor the Grantor shall change the name or account number of the Collateral Account without the prior written consent of the Secured Party;

(c)   **Type of Account.**   The Collateral Account is, and will be maintained as, either (i) a "securities account" (as defined in Section 8-501 of the UCC) or (ii) a "deposit account" as defined in Section 9-102(a)(29) of the UCC.

(d)   **Securities Account Provisions.**   If and to the extent the Collateral Account is a securities account (within the meaning of Section 8-501 of the UCC):

(i)    all securities, financial assets or other property credited to the Collateral Account shall be registered in the name of the Financial Institution, indorsed to the Financial Institution or in blank or credited to another securities account maintained in the name of the Financial Institution. In no case will any financial asset credited to the Collateral Account be registered in the name of the Grantor, payable to the order of the Grantor or specially indorsed to the Grantor unless the foregoing have been specially indorsed to the Financial Institution or in blank;

(ii)   all financial assets delivered to the Financial

Institution pursuant to the Security Agreement will be promptly credited to the Collateral Account; and

(iii)    the Financial Institution hereby agrees that each item of property (whether investment property, financial asset, security, instrument or cash) credited to the Collateral Account shall be treated as a "financial asset" within the meaning of Section 8-102(a)(9) of the UCC.

**Section 2.    Secured Party Control.**

(a)    **Control for Purposes of UCC.**    The Financial Institution agrees that if at any time it shall receive any order from the Secured Party (i) directing disposition of funds in the Collateral Account or (ii) directing transfer or redemption of the financial assets relating to the Collateral Account (such order,  the "Secured Party Order"), the Financial Institution shall comply with such entitlement order or instruction without further consent by the Grantor or any other person; and

(b)    **Conflicting Orders or Instructions.**    Notwithstanding anything to the contrary contained herein, if at any time the Financial Institution shall receive conflicting orders or instructions from the Secured Party and the Grantor, the Financial Institution shall follow the orders or instructions of the Secured Party and not the Grantor; provided, further, that the Financial Institution shall specifically follow the instructions of the Secured Party (identified as the "Disbursement Agent" in the Cash Collateral and Disbursement Agreement, dated as of March 29, 2005, by and among the Secured Party, the Grantor and 155 East Tropicana Finance Corp. (the "Cash Collateral Agreement")) pursuant to the terms of the Cash Collateral Agreement.

**Section 3.    Waiver of Financial Institution's Lien; Waiver of Set-Off.**

(a)    **Security Interest.**    In the event that the Financial Institution has, or subsequently obtains, by agreement, by operation of law or otherwise a security interest in the Collateral Account (or any portion thereof), the Financial Institution hereby  releases and terminates such security interest.

(b)    **Set-off and Recoupment.**    The financial assets, money and other items credited to the Collateral Account will not be subject to deduction, set-off, recoupment, banker's lien, or any other right in favor of any person other than the Secured Party; provided, however, the Financial Institution may set off (i) all amounts due to the Financial Institution in respect of customary fees and expenses for the routine maintenance and operation of the Collateral Account and (ii) the face amount of any checks which have been credited to the Collateral Account but are subsequently returned unpaid because of uncollected or insufficient funds).

**Section 4.    Governing Law.**

368551

(a) **Location of Financial Institution**. Regardless of any provision in any other agreement, for purposes of the UCC, New York shall be the location of the bank for purposes of Sections 9-301, 9-304 and 9-305 of the UCC and the securities intermediary for purposes of Sections 9-301 and 9-305 and Section 8-110 of the UCC.

(b) **Law Governing This Control Agreement**. This Control Agreement shall be governed by the laws of the State of New York.

(c) **Law Governing Collateral Account**. The Collateral Account shall be governed by the laws of the State of New York.

**Section 5.    Possible Conflict with Other Agreements.**

(a) **Conflict With Other Agreement**. In the event of any conflict between this Control Agreement (or any portion thereof) and any other agreement now existing or hereafter entered into, the terms of this Control Agreement shall prevail.

(b) **Amendment**. No amendment or modification of this Control Agreement or waiver of any right hereunder shall be binding on any party hereto unless it is in writing and is signed by all of the parties hereto.

(c) **Existence of Other Agreements**. The Financial Institution hereby confirms and agrees that (other than the Cash Collateral Agreement):

(i) There are no other agreements entered into between the Financial Institution and the Grantor with respect to the Collateral Account **[except for [identify other agreements];**

(ii) The Financial Institution has not entered into, and until the termination of this Control Agreement will not enter into, any Agreement with any other person relating the Collateral Account pursuant to which it has agreed to comply with entitlement orders (as defined in Section 8-102(a)(8) of the UCC) or instructions (within the meaning of Section 9-104 of the UCC) of such other person; and

(iii) The Financial Institution has not entered into, and until the termination of this Control Agreement will not enter into, any Agreement purporting to limit or condition the obligation of the Financial Institution to comply with entitlement orders or instructions.

**Section 6.    Adverse Claims.**

(a) **Adverse Claim**. Except for the claims and interests of the Secured Party and the Grantor, the Financial Institution does not, to its knowledge without independent investigation, know of any lien on, or claim to, or interest in, the Collateral Account or in any "financial asset" (as defined in Section 8-102(a) of the UCC), cash or funds credited thereto.

3

368551

(b)    **Notice.**  If any person asserts any lien, encumbrance or adverse claim (including any writ, garnishment, judgment, warrant of attachment, execution or similar process) against the Collateral Account (or in any financial asset, cash or funds carried therein), the Financial Institution will promptly notify the Secured Party.

Section 7.    **Grantor Management Rights.**

(a)    **Timing.**  In addition to, and not in lieu of, the obligation of the Financial Institution to honor a Secured Party Order as set forth in Section 2 hereof, the Secured Party agrees that the Grantor may exercise the management rights described below in this Section with respect to the Collateral Account until such time as the earlier of the time: the Financial Institution receives either (i) a Notice of Termination of Grantor Management Rights pursuant to subsection (b) below or (ii) a Secured Party Order pursuant to Section 2 hereof; provided, however, that the Grantor shall not take any actions in violation of the terms of the Cash Collateral Agreement.

(b)    **Notice of Termination of Grantor Management Rights.**  The Secured Party may at any time deliver a notice to the Financial Institution in substantially the form set forth in the Exhibit A (the "Notice of Termination of Grantor Management Rights") and subsequent to receipt of such Notice of Termination of Grantor Management Rights, the Financial Institution will honor instructions and orders of only the Secured Party (including any Secured Party Order pursuant to Section 2 hereof) and shall no longer honor any instructions or orders of the Grantor as set forth below.

(c)    **Withdrawal Requests.**  The Grantor may request withdrawal of, or transfer of, funds or property from the Collateral Account (each request, a "Withdrawal Request"), and the Financial Institution shall honor any Withdrawal Request provided that the Financial Institution has not received either (i) a Notice of Termination of Grantor Management Rights pursuant to subsection (b) of this Section or (ii) a Secured Party Order pursuant to Section 2.

(d)    **Voting Rights.**  The Grantor may instruct the Financial Institution with respect to any voting rights with respect to any financial asset and the Financial Institution shall honor such instructions of the Grantor with respect to the voting of any financial asset provided that the Financial Institution has not received either (i) a Notice of Termination of Grantor Management Rights pursuant to subsection (b) of this Section or (ii) a Secured Party Order pursuant to Section 2.

(e)    **Investments by Grantor.**  The Grantor may direct the Financial Institution with respect to the selection of investments; provided that the Financial Institution has not received either (i) a Notice of Termination of Grantor Management Rights pursuant to subsection (b) of this Section or (ii) a Secured Party Order pursuant to Section 2.

Section 8.    **Maintenance of Account.**

4

368551

(a)  **Correspondence, Statements and Confirmations.**  The Financial Institution shall promptly send copies of all statements, confirmations and other correspondence concerning the Collateral Account and, if applicable, any financial assets credited thereto, simultaneously to the Grantor and the Secured Party at the address for each set forth in Section 12 of this Control Agreement.

(b)  **Tax Reporting.**  All items of income, gain, expense and loss, if any, recognized in the Collateral Account and all interest, if any, relating to the Collateral Account, shall be reported to the Internal Revenue Service and all state and local taxing authorities under the name and taxpayer identification number of the Grantor.

Section 9.    **Representations of the Financial Institution.**  The Financial Institution hereby represents:

(a)  This Control Agreement is the valid and legally binding obligation of the Financial Institution; and

(b)  The Collateral Account has each been established as set forth in Section 1  hereof and the Collateral Account will be maintained in the manner set forth herein until termination of this Control Agreement.

Section 10.  **Indemnification of Financial Institution.**

(a)  **Release.**  The Grantor and the Secured Party hereby agree that the Financial Institution and the Secured Party are released from any and all liabilities to the Grantor and the Secured Party arising from the terms of this Control Agreement and the compliance of the Financial Institution with the terms hereof, except to the extent that such liabilities are determined to have been caused by the Financial Institution's own negligence.

(b)  **Indemnification.**  The Grantor shall at all times indemnify and save harmless the Financial Institution and the Secured Party from and against any and all claims, actions and suits of others arising out of the terms of this Control Agreement or the compliance of the Financial Institution with the terms hereof, except to the extent that such are determined to have been caused by the Financial Institution's own negligence, and from and against any and all liabilities, losses, damages, costs, charges, counsel fees and other expenses of every nature and character arising by reason of the same, until the termination of this Control Agreement.

Section 11.  **Successors; Assignment.**

(a)  **Successors.**  The terms of this Control Agreement shall be binding upon, and shall be for the benefit of, the parties hereto and their respective corporate successors or heirs and personal representatives who obtain such rights solely by operation of law.

(b)  **Assignment by Secured Party.**  The Secured Party may assign its rights hereunder only with the express written consent of the Financial Institution and by sending prior written notice of such assignment to the Grantor.

5

368551

        (c)   **Assignment by Grantor.**  The Grantor shall not assign any right, title or interest hereunder.

        (d)   **Successor Account.**  The terms of this Control Agreement shall be binding on and shall apply to any successor account to the Collateral Account.

        **Section 12.**  **Notices.**  Any notice, request or other communication required or permitted to be given under this Control Agreement shall be in writing and deemed to have been properly given when delivered in person, or when sent by telecopy or other electronic means and electronic confirmation of error free receipt is received or two days after being sent by certified or registered United States mail, return receipt requested, postage prepaid, addressed to the party at the address set forth below.

Grantor:

        155 East Tropicana, LLC
        115 East Tropicana Avenue
        Las Vegas, Nevada 89109
        Attn: Michael Hessling

Secured Party:

        The Bank of New York Trust Company, N.A.
        700 South Flower Street, Suite 500
        Los Angeles, CA 90017
        Attention: Corporate Trust Administration

Financial Institution:

        The Bank of New York Trust Company, N.A.
        700 South Flower Street, Suite 500
        Los Angeles, CA 90017
        Attention: Corporate Trust Administration

        Any party may change its address for notices in the manner set forth above.

        **Section 13.**  **Termination.**  The obligations of the Financial Institution to the Secured Party pursuant to this Control Agreement shall continue in effect until the security interests of the Secured Party in the Collateral Account have been terminated pursuant to the terms of the Security Agreement and the Secured Party has notified the Financial Institution of such termination in writing.  The Secured Party agrees to provide a Notice of Termination in substantially the form of Exhibit B hereto to the Financial Institution upon the request of the Grantor on or after the termination of the Secured Party's security interest in the Collateral Account pursuant to the terms of the Security Agreement.  The termination of this Control Agreement shall not terminate the Collateral Account or alter the obligations of the Financial Institution to the Grantor pursuant to other agreement with respect to the Collateral Account.

        **Section 14.**  **Counterparts.**  This Control Agreement may be executed in any number of counterparts, all of which shall constitute one and the same instrument, and any party

6

368551

hereto may execute this Control Agreement by signing and delivering one or more counterparts.

        **Section 15.   Incorporation by Reference.**  In connection with its appointment and acting hereunder, each of the Secured Party and Financial Institution are entitled to all rights, privileges, benefits, immunities and indemnities provided to the Secured Party under the Security Agreement.

368551

**GRANTOR:**

**155 East Tropicana, LLC**

By: _____
    Name: NEIL G. KIRESON
    Title: PRES

**SECURED PARTY:**

**The Bank of New York Trust Company, N.A.**

By: _____
    Name:
    Title:

**FINANCIAL INSTITUTION:**

**The Bank of New York Trust Company, N.A.**

By: _____
    Name:
    Title:

7

**GRANTOR:**

**155 East Tropicana, LLC**

By: _____
      Name:
      Title:

**SECURED PARTY:**

**The Bank of New York Trust Company, N.A.**

By: _____
      Name: SANDEE PARKS
      Title: VICE PRESIDENT

**FINANCIAL INSTITUTION:**

**The Bank of New York Trust Company, N.A.**

By: _____
      Name: SANDEE PARKS
      Title: VICE PRESIDENT

7

368765

<u>Exhibit A</u>

*[Letterhead of [The Bank of New York Trust Company, N.A.]]*

*[Date]*

The Bank of New York Trust Company, N.A.
700 South Flower Street, Suite 500
Los Angeles, CA 90017
Attention: Corporate Trust Administration

Re:  <u>Notice of Termination of Grantor Management Rights</u>

Ladies and Gentlemen:

Reference is made to the Collateral Account Control Agreement, dated March 29, 2005, among 155 East Tropicana, LLC, you and the undersigned (a copy of which is attached) (the "Collateral Account Control Agreement").  You are hereby notified pursuant to Section 7 of the Collateral Account Control Agreement not to honor any further orders and/or instructions of the Grantor delivered pursuant to Section 7 of the Collateral Account Control Agreement with respect to the Collateral Account unless otherwise ordered by a court of competent jurisdiction.

You are hereby further instructed to accept instructions and orders from no other person except the undersigned unless otherwise ordered by a court of competent jurisdiction.

Very truly yours,

The Bank of New York Trust Company, N.A.

By: _____
     Name:
     Title:

cc:    155 East Tropicana, LLC

Exhibit B

**_[Letterhead of [The Bank of New York Trust Company, N.A.]]_**

**_[Date]_**

The Bank of New York Trust Company, N.A.
700 South Flower Street, Suite 500
Los Angeles, CA 90017
Attention: Corporate Trust Administration

Re:     Termination of Collateral Account
Control Agreement

You are hereby notified that the Collateral Account Control Agreement among you, 155 East Tropicana, LLC  and the undersigned (a copy of which is attached) is terminated and you have no further obligations to the undersigned pursuant to such agreement.  Notwithstanding any previous instructions to you, you are hereby instructed to accept all future directions with respect to the Collateral Account identified in such agreement solely from the Grantor.  This notice terminates any obligations you may have to the undersigned with respect to the Collateral Account; however nothing contained in this notice shall alter any obligations which you may otherwise owe to the Grantor pursuant to any other agreement.

Very truly yours,

The Bank of New York Trust Company, N.A.

By: _____
     Name:
     Title:

cc:     155 East Tropicana, LLC

368765.02-Los Angeles Server 1A - MSW