# EXHIBIT 20

## PARENT PLEDGE AGREEMENT

This PARENT PLEDGE AGREEMENT (this "Agreement") is made this 29th day of March, 2005, among Florida Hooters LLC, a Nevada limited-liability company ("Florida Hooters"), and EW Common LLC, a Nevada limited-liability company ("EW Common" and, together with Florida Hooters, the "Pledgors" and each individually "Pledgor"), and The Bank of New York Trust Company, N.A., in its capacity as Collateral Agent (together with its successors, "Agent").

### W I T N E S S E T H:

WHEREAS, pursuant to that certain Senior Secured Note Indenture, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "Indenture"), by and among 155 East Tropicana, LLC, a Nevada limited-liability company ("155 East Tropicana") and 155 East Tropicana Finance Corp., a Nevada corporation ("155 East Tropicana Finance", and together with 155 East Tropicana, the "Grantors") and The Bank of New York Trust Company, N.A., as trustee (in such capacity, the "Trustee") and Collateral Agent; and

WHEREAS, Pledgors own the Investment Related Property (as hereinafter defined and listed on Schedule 1 attached hereto), and

WHEREAS, in order to induce the Trustee to enter into the Indenture and the other Indenture Documents (as hereinafter defined), Pledgors have agreed to grant a continuing security interest in and to the Collateral (as hereinafter defined) in order to secure the due and punctual, prompt and complete payment, observance and performance of, among other things, (a) the Obligations of Pledgors arising from this Agreement, (b) all present and future liabilities and Obligations (including, without limitation, Guarantee Obligations) of each of the Grantors of every type or description, arising under or in connection with the Notes, the Guarantees and the other Indenture Documents, whether for principal of or premium, if any, or Interest (or Liquidated Damages, if any) on the Notes, expenses, indemnities or other amounts (including attorneys' fees and expenses), and (c) all other Obligations of Grantors arising from the Indenture and the other Indenture Documents, plus reasonable attorneys fees and expenses if the obligations represented thereunder are collected by law, through an attorney-at-law, or under advice therefrom (clauses (a), (b), and (c) being hereinafter referred to as the "Secured Obligations"), by the granting of the security interests contemplated by this Agreement, and

NOW, THEREFORE, for and in consideration of the recitals made above and other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1. <u>Defined Terms</u>. All capitalized terms used herein (including, without limitation, in the preamble and recitals hereof) without definition shall have the meanings ascribed thereto in the Indenture. In addition to those terms defined elsewhere in this Agreement, as used in this Agreement, the following terms shall have the following meanings:

     (a) "Books" has the meaning specified therefor in Section 2 hereof.

     (b) "Closing Date" means March 29, 2005.

(c) "Collateral" has the meaning specified therefor in Section 2 hereof.

(d) "Equity Interests" has the meaning specified therefor in the Indenture.

(e) "Event of Default" has the meaning specified therefor in the Indenture.

(f) "Gaming Authorities" has the meaning specified therefor in the Indenture.

(g) "Gaming Laws" means all applicable federal, state and local laws, rules and regulations pursuant to which the Nevada Gaming Authorities possess regulatory, licensing or permit authority over the ownership or operation of gaming facilities within the State of Nevada, including, the Nevada Gaming Control Act, as codified in Chapter 463 of the Nevada Revised Statutes, as amended from time to time, and the regulations of the NGC promulgated thereunder.

(h) "Governing Documents" means, with respect to any Person, the certificate or articles of incorporation, by-laws, certificate of formation or operating agreement, or other organizational documents of such Person.

(i) "Governmental Authority" means any governmental, administrative or regulatory agency, authority, department, commission, board, bureau or instrumentality of the United States, any state of the United States, or any political subdivision thereof, including, without limitation, any Gaming Authority, or any court, arbitrator or quasi-judicial authority.

(j) "Holder" has the meaning specified therefor in the Indenture.

(k) "Indenture Documents" means any of the Indenture, the Notes, the Guarantees, the Collateral Agreements, the Registration Rights Agreement and any other agreement, document or instrument entered into or issued in connection with any of the foregoing.

(l) "Intercreditor Agreement" means the Intercreditor Agreement, dated as of the date hereof, by and among the Trustee and Agent and Wells Fargo Foothill.

(m) "Investment Related Property" means (i) investment property (as that term is defined in the UCC) in the Pledged Companies, and (ii) all of the following regardless of whether classified as investment property under the UCC: all Pledged Interests, Pledged Operating Agreements, and Pledged Partnership Agreements.

(n) "Nevada Gaming Authorities" means the NGC, the NGCB and applicable county, city and municipal authorities within the State of Nevada possessing regulatory, licensing or permit authority over the ownership or operation of gaming activities in the State of Nevada (or any such county, city or municipality therein).

(o) "NGC" means the Nevada Gaming Commission.

(p) "NGCB" means the Nevada State Gaming Control Board.

(q) "Obligations" has the meaning specified therefor in the Indenture.

(r) "Permitted Liens" means the Wells Fargo Liens.

2

(s) "Permitted Reorganization Transactions" means (a) the merger of one Grantor with and into another Grantor, (b) the dissolution and transfer of assets or properties by a Grantor to another Grantor, (c) the merger of one Guarantor with and into another Guarantor or into a Grantor, (d) the dissolution and transfer of assets or properties by a Guarantor to another Guarantor or a Grantor, or (e) the formation of a holding company ("Holdco") that owns the Equity Interests of the Grantors so long as (i) the Equity Interests of Holdco is owned by the same Persons who own the Issuers as of the Closing Date, (ii) no Default or Event of Default shall have occurred and be continuing, (iii) the Equity Interests of Holdco owned directly or indirectly by the Pledgors is pledged to the Agent on terms and conditions satisfactory to Agent and Agent has a perfected Lien on the Equity Interests of Holdco subject only to the Permitted Liens, (iv) Holdco executes a joinder to the Security Agreement, (v) Holdco owns, directly or indirectly, all of the Equity Interests of Borrowers, (vi) Agent has a perfected Lien on the Equity Interests owned by Holdco, (vii) Agent receives opinions of Holdco's and Grantors' counsel in form and substance satisfactory to Agent, and (vii) Holdco, Pledgors and Borrowers shall have received all approvals or other consents by any Governmental Authority in connection with the transfer of the Equity Interests to Holdco and the pledge of such Equity Interests to Agent.

(t) "Person" has the meaning specified therefor in the Indenture.

(u) "Pledged Companies" means, each Person listed on Schedule 1 hereto as a "Pledged Company", together with each other Person, all or a portion of whose Equity Interests, is acquired or otherwise owned by a Pledgor after the Closing Date.

(v) "Pledged Interests" means all of each Pledgor's right, title and interest in and to all of the Equity Interests now or hereafter owned by such Pledgor, regardless of class or designation, including, without limitation, in each of the Pledged Companies, and all substitutions therefor and replacements thereof, all proceeds thereof and all rights relating thereto, including, without limitation, any certificates representing the Equity Interests, the right to request after the occurrence and during the continuation of an Event of Default that such Equity Interests be registered in the name of Agent or any of its nominees, the right to receive any certificates representing any of the Equity Interests and the right to require that such certificates be delivered to Agent together with undated powers or assignments of investment securities with respect thereto, duly endorsed in blank by such Pledgor, all warrants, options, share appreciation rights and other rights, contractual or otherwise, in respect thereof and of all dividends, distributions of income, profits, surplus, or other compensation by way of income or liquidating distributions, in cash or in kind, and cash, instruments, and other property from time to time received, receivable, or otherwise distributed in respect of or in addition to, in substitution of, on account of, or in exchange for any or all of the foregoing.

(w) "Pledged Interests Addendum" means a Pledged Interests Addendum substantially in the form of Exhibit A to this Agreement.

(x) "Pledged Operating Agreements" means all of each Pledgor's rights, powers, and remedies under the limited-liability company operating agreements of the Pledged Companies that are limited liability companies.

(y) "Pledged Partnership Agreements" means all of each Pledgor's rights, powers, and remedies under the partnership agreements of each of the Pledged Companies that are partnerships.

(z) "Proceeds" has the meaning specified therefore in Section 2 hereof.

(aa) "Subsidiary" has the meaning specified therefor in the Indenture.

3

(bb) "UCC" means the New York Uniform Commercial Code, as in effect from time to time; provided, however, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, priority, or remedies with respect to Agent's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies.

(cc) "Wells Fargo Foothill" means Wells Fargo Foothill, Inc., in its capacity as administrative agent under the Wells Fargo Credit Agreement.

(dd) "Wells Fargo Credit Agreement" means that certain Credit Agreement, dated as of the date hereof, by and among the Grantors, as Borrowers, and Wells Fargo Foothill, as administrative agent, and as amended, restated, supplemented or otherwise modified from time to time.

(ee) "Wells Fargo Liens" means the Liens granted by Pledgors to Wells Fargo Foothill pursuant to the Wells Fargo Pledge Agreement, to secure the Wells Fargo Credit Agreement, only so long as the Grantor's obligations to Wells Fargo Foothill remain outstanding thereunder and only to the extent provided in the Intercreditor Agreement.

(ff) "Wells Fargo Pledge Agreement" means that certain Pledge Agreement, dated as of the date hereof, by and among the Pledgors and Wells Fargo Foothill.

2.    Grant of Security. Each Pledgor hereby unconditionally grants, assigns and pledges to Agent, for the benefit of Agent, the Trustee and the Holders, a continuing security interest in (hereinafter referred to as the "Security Interest") such Pledgor's right, title, and interest in and to the following personal property, whether now owned or hereafter acquired or arising and wherever located (the "Collateral"):

(a) all of such Pledgor's Investment Related Property in the Pledged Companies;

(b) all of such Pledgor's books and records indicating, summarizing, or evidencing its Investment Related Property ("Books");

(c) all of the proceeds and products, whether tangible or intangible, of the foregoing, including proceeds of insurance or commercial tort claims covering or relating to the foregoing, and any and all Investment Related Property, money, or other tangible or intangible property resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to the foregoing Collateral (the "Proceeds"). Without limiting the generality of the foregoing, the term "Proceeds" includes whatever is receivable or received when Investment Related Property or proceeds are sold, exchanged, collected, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, proceeds of any indemnity or guaranty payable to any Pledgor or Agent from time to time with respect to any of the Investment Related Property.

3.    Security for Obligations.  This Agreement and the Security Interest created hereby secures the payment and performance of all the Secured Obligations, whether now existing or arising hereafter. Without limiting the generality of the foregoing, this Agreement secures the payment of all amounts

4

which constitute part of the Secured Obligations and would be owed by Grantors, or any of them, to Agent, the Trustee, the Holders or any of them, but for the fact that they are unenforceable or not allowable due to the existence of an insolvency proceeding involving any Grantor.

4.   **Pledgors Remain Liable.**  Anything herein to the contrary notwithstanding, (a) each of the Pledgors shall remain liable under the contracts and agreements included in the Collateral, including, without limitation, the Pledged Operating Agreements and the Pledged Partnership Agreements, to perform all of the duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by Agent or any of the Holders of any of the rights hereunder shall not release any Pledgor from any of its duties or obligations under such contracts and agreements included in the Collateral, and (c) none of the  Agent, the Trustee or the Holders shall have any obligation or liability under such contracts and agreements included in the Collateral by reason of this Agreement, nor shall any of Agent, the Trustee or the Holders be obligated to perform any of the obligations or duties of any Pledgor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder. Without limiting the generality of the foregoing, it is the intention of the parties hereto that record and beneficial ownership of the Pledged Interests, including, without limitation, all voting, consensual, and dividend rights, shall remain in the applicable Pledgor until the occurrence and continuation of an Event of Default and until Agent shall notify the applicable Pledgor of Agent's exercise of voting, consensual, and/or dividend rights with respect to the Pledged Interests pursuant to Section 10 hereof.

5.   **Representations and Warranties.**  Each Pledgor, jointly and severally, hereby represents and warrants as follows:

(a) The exact legal name of each of the Pledgors is set forth on the signature pages of this Agreement.

(b) This Agreement creates a valid security interest in the Collateral of each of the Pledgors, to the extent a security interest therein can be created under the UCC, securing the payment of the Secured Obligations.  Except to the extent a security interest in the Collateral cannot be perfected by the filing of a financing statement under the UCC,  all filings and other actions necessary or desirable to perfect and protect such security interest have been duly taken or will have been taken upon the filing of financing statements listing each applicable Pledgor, as a debtor, and Agent, as secured party, in the jurisdictions listed next to such Pledgor's name on Schedule 2 attached hereto. Upon the making of such filings, Agent shall have a first priority (subject to the Permitted Liens) perfected security interest in the Collateral of each Pledgor to the extent such security interest can be perfected by the filing of a financing statement.

(c) (i) Except for the Security Interest created hereby, each Pledgor is and will ar all times be  the sole holder of record and the legal and beneficial owner, free and clear of all Liens other than Permitted Liens, of the Pledged Interests indicated on Schedule 1 as being owned by such Pledgor and, when acquired by such Pledgor, any Pledged Interests acquired after the Closing Date; (ii) all of the Pledged Interests are duly authorized, validly issued, fully paid and nonassessable and the Pledged Interests constitute or will constitute the percentage of the issued and outstanding Equity Interests of the Pledged Companies of such Pledgor identified on Schedule 1 hereto as supplemented or modified by any Pledged Interests Addendum; (iii) such Pledgor has the right and requisite authority to pledge, the Investment Related Property pledged by such Pledgor to Agent as provided herein; (iv) all actions necessary or desirable to perfect, establish (subject to the Permitted Liens) the first priority of, or otherwise protect, Agent's Liens in the Investment Related Property, and the proceeds thereof, will have been duly taken, (A) upon the execution and delivery of this Agreement; (B) upon the taking of possession by Agent of any certificates constituting the Pledged Interests, to the extent such Pledged

5

Interests are represented by certificates, together with undated powers endorsed in blank by the applicable Pledgor; and (C) upon the filing by the applicable Pledgor of financing statements in the applicable jurisdiction set forth on Schedule 2 attached hereto for such Pledgor with respect to the Pledged Interests of such Pledgor that are not represented by certificates, and (iv) upon the termination of the Wells Fargo Liens, each Pledgor will deliver and deposit in accordance with Sections 6(a) and 8 hereof all certificates representing the Pledged Interests owned by such Pledgor to the extent such Pledged Interests are represented by certificates, and undated powers endorsed in blank with respect to such certificates.

(d) Except for such authorizations, consents and other actions as those described in Section 23 hereof and as shall have been obtained and shall be in effect, no authorization, consent, approval or other action by, and no notice to or registration, recordation or filing with, any Governmental Authority is required for (i) the due execution, delivery and performance by each Pledgor of this Agreement, (ii) the grant by each Pledgor of the Security Interest granted by this Agreement, (iii) the perfection of such Security Interest (except for the filing of any appropriate financing statements) or (iv) the exercise by Agent and the Holders of their rights and remedies under this Agreement; in each case under clauses (i) through (iv) above, except as may be required by applicable Gaming Laws or except as may be required in connection with such disposition of Investment Related Property by laws affecting the offering and sale of securities generally.

6.   Covenants.  Each Pledgor, jointly and severally, covenants and agrees with Agent and the Holders that from and after the date of this Agreement and until the date of termination of this Agreement in accordance with Section 21 hereof:

(a)  Possession of Collateral.  Upon the termination of the Wells Fargo Liens, in the event that any Collateral, including proceeds, is evidenced by or consists of Negotiable Collateral, Investment Related Property, or Chattel Paper (as such terms may be defined in the UCC), and if and to the extent that perfection or priority of Agent's Security Interest is dependent on or enhanced by possession, the applicable Pledgor shall execute such other documents as shall be reasonably requested by Agent or as necessary to effect perfection or transfer or, if applicable, endorse and deliver physical possession of such Negotiable Collateral, Investment Related Property, or Chattel Paper (as such terms may be defined in the UCC) to Agent, together with such undated powers endorsed in blank as shall be requested by Agent.

(b)  Investment Related Property.

(i)      If any Pledgor shall receive or become entitled to receive any Pledged Interests after the Closing Date, it shall promptly (and in any event within 2 Business Days of receipt thereof) deliver to Agent a duly executed Pledged Interests Addendum identifying such Pledged Interests;

(ii)      All sums of money and property paid or distributed in respect of the Investment Related Property which are received by any Pledgor shall be held by the Pledgors in trust for the benefit of Agent segregated from such Pledgor's other property, and such Pledgor shall deliver it forthwith to Agent's in the exact form received; provided, however, that cash dividends received by any Pledgor, if and to the extent they are not prohibited by the Indenture, may be retained by such Pledgor so long as no Event of Default has occurred or is continuing;

(iii)      Each Pledgor shall promptly deliver to Agent a copy of each notice or other communication received by it in respect of any Pledged Interests;

(iv)      No Pledgor shall make or consent to any amendment or other modification or waiver with respect to any Pledged Interests, Pledged Operating Agreement, or Pledged

6

Partnership Agreement, or enter into any agreement or permit to exist any restriction with respect to any Pledged Interests other than pursuant to the Indenture Documents and the Wells Fargo Pledge Agreement and other documents in connection with the Wells Fargo Credit Agreement;

(v)        Each Pledgor agrees that it will cooperate with Agent in obtaining all necessary approvals and making all necessary filings under federal, state, local, or foreign law in connection with the Security Interest on the Investment Related Property or any sale or transfer thereof;

(vi)        As to all limited liability company or partnership interests, issued under any Pledged Operating Agreement or Pledged Partnership Agreement, all limited liability company or partnership interests, issued each Pledgor, jointly and severally, hereby represents, warrants and covenants that the Pledged Interests issued pursuant to such agreement (A) are not and shall not be dealt in or traded on securities exchanges or in securities markets, (B) do not and will not constitute investment company securities, and (C) are not and will not be held by such Pledgor in a securities account. In addition, none of the Pledged Operating Agreements, the Pledged Partnership Agreements, or any other agreements governing any of the Pledged Interests issued under any Pledged Operating Agreement or Pledged Partnership Agreement, provide or shall provide that such Pledged Interests are securities governed by Article 8 of the Uniform Commercial Code as in effect in any relevant jurisdiction;

(c) <u>Transfers and Other Liens</u>. Pledgors shall not (i) sell, assign (by operation of law or otherwise) or otherwise dispose of, or grant any option with respect to, any of the Collateral, except in connection with a Permitted Reorganization Transaction, or (ii) create or permit to exist any Lien upon or with respect to any of the Collateral of any of Pledgors, except for Permitted Liens and Permitted Reorganization Transactions. The inclusion of Proceeds in the Collateral shall not be deemed to constitute Agent's consent to any sale or other disposition of any of the Collateral except as expressly permitted in this Agreement or the other Indenture Documents; and

(d) <u>Other Actions as to Any and All Collateral</u>. Each Pledgor shall promptly (and in any event within 2 Business Days of acquiring or obtaining such Collateral) notify Agent in writing upon acquiring or otherwise obtaining any Collateral after the date hereof consisting of Investment Related Property and promptly execute such other documents, or if applicable, deliver certificates evidencing any Investment Related Property in accordance with <u>Section 6</u> hereof and do such other acts or things deemed necessary or desirable to protect Agent's Security Interest therein.

(e) <u>Restrictions on Fundamental Changes</u>. No Pledgor shall (i) enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its Equity Interests, (ii) liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), (iii) convey, sell, lease, license, assign, transfer, or otherwise dispose of, in one transaction or a series of transactions, all or any substantial part of any of the Collateral of any of Pledgors, or (iv) suspend or go out of a substantial portion of its or their business except in connection with a Permitted Reorganization Transaction.

(f) <u>Change Name</u>. No Pledgor shall change, and no Pledgor shall cause any Grantors or any of its subsidiaries to change, its name, organizational identification number, state of organization, or organizational identity; <u>provided, however</u>, that a Grantor or any of its subsidiaries may change its name upon at least 30 days prior written notice by such party to Agent of such change, and so long as, at the time of such written notification, such Grantor or such subsidiary provides any financing statements necessary to perfect and continue perfected the Agent's Liens.

(g) Records. Each Pledgor shall at all times keep at least one complete set of its records concerning substantially all of the Collateral at the location set forth on Schedule 3 hereto, and not change such location or such records without giving Agent at least thirty (30) days prior written notice thereof.

(h) Additional Equity Interests. Each Pledgor shall, to the extent it may lawfully do so, and unless otherwise permitted under the terms of the Indenture, use its best efforts to prevent the Pledged Companies from issuing additional Equity Interests or Proceeds, except for cash dividends or other distributions, if any, that are not prohibited by the terms of the Indenture to be paid by the Pledged Companies to Pledgors.

(i) Amendment of Governing Documents. Pledgors shall not permit the Pledged Companies to (i) authorize the amendment of or amend the Governing Documents of the Pledged Companies to provide that the Equity Interests of such Pledged Company is governed by Article 8 of the UCC, or (ii) authorize the issuance of or issue certificates evidencing the Equity Interests of the Pledged Companies which have been pledged under this Agreement.

(j) Gaming Laws. Each Pledgor shall obtain, as promptly as practicable following the date hereof, the applicable approvals of the Nevada Gaming Authorities, as referred to in Section 23 hereof, required to authorize or continue the pledge of the Investment Related Property in this Agreement and shall promptly execute any and all such instruments and documents, deliver any certificates and do all such other acts or things deemed necessary, appropriate or desirable by the Nevada Gaming Authorities to obtain such approvals. Furthermore, in connection with the Operator Licensing Event, each Pledgor shall obtain all necessary consents or approvals of the Nevada Gaming Authorities for the continued effect of the pledge of the Investment Related Property pursuant to this Agreement.

7. Relation to Other Security Documents. The provisions of this Agreement shall be read and construed with the other Indenture Documents referred to below in the manner so indicated.

(a) Indenture. In the event of any conflict between any provision in this Agreement and a provision in the Indenture, such provision of the Indenture shall control.

8. Further Assurances.

(a) Each Pledgor agrees that from time to time, at its own expense, such Pledgor will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or that Agent may reasonably request, in order to perfect and protect any Security Interest granted or purported to be granted hereby or to enable Agent to exercise and enforce its rights and remedies hereunder with respect to any of the Collateral.

(b) Each Pledgor authorizes the filing of such financing or continuation statements, or amendments thereto, and such Pledgor will execute and deliver to Agent such other instruments or notices, as may be necessary or as Agent may reasonably request, in order to perfect and preserve the Security Interest granted or purported to be granted hereby.

(c) Each Pledgor authorizes Agent to file, transmit, or communicate, as applicable, financing statements and amendments describing the Collateral in order to perfect Agent's security interest in the Collateral without such Pledgor's signature. Each Pledgor also hereby ratifies its authorization for Agent to have filed in any appropriate jurisdiction any financing statements filed prior to the date hereof. Notwithstanding the foregoing the Agent shall have no obligations whatsoever to file any financing statements.

8

(d) Each Pledgor acknowledges that it is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement filed in connection with this Agreement without the prior written consent of Agent, subject to such Pledgor 's rights under Section 9-509(d)(2) of the UCC.

9.    Agent's Right to Perform Contracts.    Upon the occurrence of an Event of Default, Agent (or its designee) may proceed to perform any and all of the obligations of any Pledgor contained in any contract, lease, or other agreement and exercise any and all rights of any Pledgor therein contained as fully as such Pledgor itself could.

10.    Agent Appointed Attorney-in-Fact.    Each Pledgor hereby irrevocably appoints Agent its attorney-in-fact, with full authority in the place and stead of such Pledgor and in the name of such Pledgor or otherwise, at such time as an Event of Default has occurred and is continuing under the Indenture, to take any action and to execute any instrument which Agent may reasonably deem necessary or advisable to accomplish the purposes of this Agreement.

11.    Agent May Perform.    If any of Pledgors fails to perform any agreement contained herein, Agent may itself perform, or cause performance of, such agreement, and the reasonable and documented expenses of Agent incurred in connection therewith shall be payable, jointly and severally, by Pledgors.

12.    Agent's Duties.    The powers conferred on Agent hereunder are solely to protect Agent's interest in the Collateral, for the benefit of the Trustee and the Holders, and shall not impose any duty upon Agent to exercise any such powers.    Except for the safe custody of any Collateral in its actual possession and the accounting for moneys actually received by it hereunder, Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.    Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its actual possession if such Collateral is accorded treatment substantially equal to that which Agent accords its own property.    In no event shall Agent be responsible for the preparation of filing of any financing statements or for otherwise perfecting or maintaining the perfection of any lien or security interests on any of the Collateral hereunder.

13.    Disposition of Pledged Interests by Agent.    None of the Pledged Interests existing as of the date of this Agreement are, and none of the Pledged Interests hereafter acquired on the date of acquisition thereof will be, registered or qualified under the various federal or state securities laws of the United States and disposition thereof after the occurrence and continuation of an Event of Default may be restricted to one or more private (instead of public) sales in view of the lack of such registration.    Each Pledgor understands that in connection with such disposition, Agent may approach only a restricted number of potential purchasers and further understands that a sale under such circumstances may yield a lower price for the Pledged Interests than if the Pledged Interests were registered and qualified pursuant to federal and state securities laws and sold on the open market.    Each Pledgor, therefore, agrees that: (a) if Agent shall, pursuant to the terms of this Agreement, sell or cause the Pledged Interests or any portion thereof to be sold at a private sale, Agent shall have the right to rely upon the advice and opinion of any nationally recognized brokerage or investment firm (but shall not be obligated to seek such advice and the failure to do so shall not be considered in determining the commercial reasonableness of such action) as to the best manner in which to offer the Pledged Interest for sale and as to the best price reasonably obtainable at the private sale thereof; and (b) such reliance shall be conclusive evidence that Agent has handled the disposition in a commercially reasonable manner.

14.    Voting Rights.

9

(a) Subject to the approval of the Nevada Gaming Authorities, after the termination of the Wells Fargo Liens, upon the occurrence and during the continuation of an Event of Default, (i) Agent may, at its option, and with prior notice to any Pledgor, and in addition to all rights and remedies available to Agent under any other agreement, at law, in equity, or otherwise, exercise all voting rights, and all other ownership or consensual rights in respect of the Pledged Interests owned by such Pledgor, but under no circumstances is Agent obligated by the terms of this Agreement to exercise such rights, and (ii) if Agent duly exercises its right to vote any of such Pledged Interests, each Pledgor hereby appoints Agent, such Pledgor 's true and lawful attorney-in-fact and IRREVOCABLE PROXY to vote such Pledged Interests in any manner Agent deems advisable for or against all matters submitted or which may be submitted to a vote of shareholders, partners or members, as the case may be.  The power-of-attorney granted hereby is coupled with an interest and shall be irrevocable.

(b) For so long as any Pledgor shall have the right to vote the Pledged Interests owned by it, such Pledgor covenants and agrees that it will not, without the prior written consent of Agent, vote or take any consensual action with respect to such Pledged Interests which would materially adversely affect the rights of Agent and the Holders or the value of the Pledged Interests.

15. <u>Remedies</u>.  Subject to the limitations described in Section 23, upon the occurrence and during the continuance of an Event of Default, and subject to the Intercreditor Agreement:

(a) Agent may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein, in the other Indenture Documents, or otherwise available to it, all the rights and remedies of a secured party on default under the UCC or any other applicable law.

(b) Without limiting the generality of the foregoing, each Pledgor expressly agrees that, in any such event, Agent without demand of performance or other demand, advertisement or notice of any kind (except a notice specified below of time and place of public or private sale) to or upon any of Pledgors or any other Person (all and each of which demands, advertisements and notices are hereby expressly waived to the maximum extent permitted by the UCC or any other applicable law), may take immediate possession of all or any portion of the Collateral and (i) require Pledgors to, and each Pledgor hereby agrees that it will at its own expense and upon request of Agent forthwith, assemble all or part of the Collateral as directed by Agent and make it available to Agent at one or more locations where such Pledgor regularly maintains Inventory, and (ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of Agent's offices or elsewhere, for cash, on credit, and upon such other terms as Agent may deem commercially reasonable. Each Pledgor agrees that, to the extent notice of sale shall be required by law, at least 10 days notice to any of Pledgors of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification and specifically such notice shall constitute a reasonable "authenticated notification of disposition" within the meaning of Section 9-611 of the UCC.  Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given.  Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

16. <u>Remedies Cumulative</u>.  Each right, power, and remedy of Agent as provided for in this Agreement or in the other Indenture Documents or now or hereafter existing at law or in equity or by statute or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power, or remedy provided for in this Agreement or in the other Indenture Documents or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by Agent, of any one or more of such rights, powers, or remedies shall not preclude the simultaneous or later exercise by Agent of any or all such other rights, powers, or remedies.

17. Marshaling. Agent shall not be required to marshal any present or future collateral security (including but not limited to the Collateral) for, or other assurances of payment of, the Secured Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising. To the extent that it lawfully may, each Pledgor hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of Agent's rights and remedies under this Agreement or under any other instrument creating or evidencing any of the Secured Obligations or under which any of the Secured Obligations is outstanding or by which any of the Secured Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, each Pledgor hereby irrevocably waives the benefits of all such laws.

18. Indemnity and Expenses.

(a) Each Pledgor jointly and severally agrees to indemnify Agent, the Trustee and the Holders from and against all claims, lawsuits and liabilities (including reasonable attorneys fees) growing out of or resulting from this Agreement (including, without limitation, enforcement of this Agreement) or any other Indenture Document to which such Pledgor is a party, except claims, losses or liabilities resulting from the gross negligence or willful misconduct of the party seeking indemnification as determined by a final non-appealable order of a court of competent jurisdiction. This provision shall survive the termination of this Agreement and the Indenture and the repayment of the Secured Obligations.

(b) Pledgors, jointly and severally, shall, upon demand, pay to Agent all expenses which Agent may incur in connection with (i) the administration of this Agreement, (ii) the custody, preservation, use or operation of, or, upon the occurrence and continuation of an Event of Default, the sale of, collection from, or other realization upon, any of the Collateral in accordance with this Agreement and the other Indenture Documents, (iii) the exercise or enforcement of any of the rights of Agent hereunder or (iv) the failure by any of Pledgors to perform or observe any of the provisions hereof.

19. Merger, Amendments; Etc. THIS WRITTEN AGREEMENT, TOGETHER WITH THE OTHER INDENTURE DOCUMENTS, REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES. No waiver of any provision of this Agreement, and no consent to any departure by any of Pledgors herefrom, shall in any event be effective unless the same shall be in writing and signed by Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No amendment of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Agent and each of Pledgors to which such amendment applies.

20. Addresses for Notices. All notices and other communications provided for hereunder shall be given in the form and manner and delivered to Agent at its address specified in the Indenture, and to Pledgors at the address set forth below, or, as to any party, at such other address as shall be designated by such party in a written notice to the other party.

If to Florida Hooters:

If to EW Common:

11

**21.** Continuing Security Interest: Assignments under Indenture. This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until the Secured Obligations have been paid in full in cash in accordance with the provisions of the Indenture, (b) be binding upon each of Pledgors, and their respective successors and assigns, and (c) inure to the benefit of, and be enforceable by, Agent, the Trustees and the Holders and their respective successors, transferees and assigns. Upon payment in full in cash of the Secured Obligations in accordance with the provisions of the Indenture, the Security Interest granted hereby and this Agreement shall terminate (without prejudice to the Agent's obligation to fulfill its duties in connection with the termination and release of the security interests over the Collateral and return of Collateral, as referenced below, which obligation shall survive the termination of this Agreement), and all rights to the Collateral shall revert to Pledgors or any other Person entitled thereto. At such time, Agent will authorize the filing of appropriate termination statements to terminate such Security Interests, and execute and deliver to the Pledgors such documents as the Pledgors shall request to evidence the termination of the security interests or this Agreement or the release of the pledged Collateral, and will duly reassign, transfer and deliver to the Pledgors free from any interest of the Agent or Lien granted under this Agreement such of the Pledged Collateral as may have been previously delivered by the Pledgors to the Agent, including any certificates or instruments representing or evidencing such collateral. No transfer or renewal, extension, assignment, or termination of this Agreement or of the Indenture, any other Indenture Document, or any other instrument or document executed and delivered by any Pledgor to Agent, nor the taking of further security, nor the retaking or re-delivery of the Collateral to Pledgors, or any of them, by Agent, nor any other act of Agent, the Trustee and the Holders, or any of them, shall release any of Pledgors from any obligation, except a release or discharge executed in writing by Agent in accordance with the provisions of the Indenture. Agent shall not by any act, delay, omission or otherwise, be deemed to have waived any of its rights or remedies hereunder, unless such waiver is in writing and signed by Agent and then only to the extent therein set forth. A waiver by Agent of any right or remedy on any occasion shall not be construed as a bar to the exercise of any such right or remedy which Agent would otherwise have had on any other occasion.

**22.** Governing Law.

(a) THE VALIDITY OF THIS AGREEMENT AND THE OTHER INDENTURE DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER INDENTURE DOCUMENT IN RESPECT OF SUCH OTHER INDENTURE DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK, INCLUDING, WITHOUT LIMITATION, SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND NEW YORK CIVIL PRACTICE LAWS AND RULES 327(B).

(b) THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER INDENTURE DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH

PLEDGOR AND AGENT WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 22(b).

(c) EACH PLEDGOR AND AGENT HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE INDENTURE DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. EACH PLEDGOR AND AGENT REPRESENTS THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

23. Compliance with Gaming Laws. Notwithstanding anything to the contrary contained herein or in any other Indenture Documents, Agent expressly acknowledges and agrees that the exercise of its rights and remedies under this Agreement is subject to the mandatory provisions of the Gaming Laws. Specifically, Agent acknowledges and agrees that once Pledgors have been licensed or found suitable by the Nevada Gaming Authorities:

(a) The pledge of the Investment Related Property of any Pledged Company that is a licensee of or registered with the Nevada Gaming Authorities by Pledgors, and any restrictions on the transfer of and agreements not to encumber such Investment Related Property of corporations or limited liability company that is a holding company contained in this Agreement or in any other Loan Document, shall not be effective without the prior approval of the NGC upon the recommendation of the NGCB. The certificates or instruments representing or evidencing such Investment Related Property may not continue to be held by Agent unless such approval has been obtained by a Pledgor. The approval of the pledge of the Investment Related Property may require amendment of this Agreement to include additional references to regulatory requirements under the Gaming Laws. In addition, no amendment of this Agreement shall be effective until applicable approvals of the Nevada Gaming Authorities have been obtained.

(b) In the event that Agent exercises one or more of the remedies set forth in this Agreement with respect to any Investment Related Property, including without limitation, foreclosure or transfer of any interest in the Investment Related Property (except back to Pledgors), the exercise of voting and consensual rights, and any other resort to or enforcement of the security interest in the Investment Related Property, such action shall require the separate and prior approval of the Nevada Gaming Authorities and the licensing of Agent or its designee, unless such licensing requirement is waived by the Nevada Gaming Authorities.

(c) Agent and any custodial agent of Agent in the State of Nevada shall be required to comply with the conditions, if any, imposed by the Nevada Gaming Authorities in connection with its approval of the pledge granted hereunder by Pledgors, including, without limitation, the requirement that Agent or its agent maintain the certificates evidencing the Investment Related Property at a location in Nevada designated to the NGCB, and that Agent or its agent permit agents or employees of the NGCB to inspect such certificates immediately upon request during normal business hours.

(d) Neither Agent nor any agent of Agent shall surrender possession of any Investment Related Property to any Person other than Pledgors without the prior approval of the Nevada Gaming Authorities or as otherwise permitted by the Gaming Laws.

(e)  The approval by the Nevada Gaming Authorities of this Agreement, or any amendment hereto, is not, and shall not be construed as, the approval, either express or implied, of Agent to take any actions provided for in this Agreement for which approval by the Nevada Gaming Authorities is required, without first obtaining such prior and separate approval, to the extent required by the Gaming Laws.

24.  <u>Agent</u>.  Each reference herein to any right granted to, benefit conferred upon or power exercisable by the "Agent" shall be a reference to Agent, for the benefit of the Holders.

25.  <u>Limited Recourse</u>.  Notwithstanding anything contained in this Agreement to the contrary Pledgors shall not have any personal liability under this Agreement for the Secured Obligations to Agent, the Trustee and/or the Holders and any claim based on or in respect of any of the Secured Obligations shall be enforced only against the Collateral pledged hereunder and not against any other assets, properties or funds of Pledgors or against any officer, director, manager, member or shareholder of Pledgors, except in accordance with Section 18.

26.  <u>Waivers</u>.

(a)  Each Pledgor hereby waives:  (i) notice of acceptance hereof; (ii) notice of the creation or existence of any Secured Obligations; (iii) notice of the amount of the Secured Obligations, subject, however, to such Pledgor's right to make inquiry of Agent to ascertain the amount of the Secured Obligations at any reasonable time; (iv) notice of any adverse change in the financial condition of Grantors or of any other fact that might increase such Pledgor's risk hereunder; (v) notice of presentment for payment, demand, protest, and notice thereof as to any instrument among the Indenture Documents; (vi) notice of any Default or Event of Default under the Indenture; and (vii) all other notices and demands to which such Pledgor might otherwise be entitled.

(b)  Each Pledgor hereby waives the right by statute or otherwise to require Agent, the Trustee or any Holder to institute suit against any Grantor or to exhaust any rights and remedies which Agent, the Trustee or such Holder, has or may have against such Grantor.  Each Pledgor further waives any defense arising by reason of any disability or other defense (other than the defense that the Secured Obligations shall have been performed and indefeasibly paid in cash, to the extent of any such payment) of any Grantor or by reason of the cessation from any cause whatsoever of the liability of any Grantor in respect thereof.

(c)  Each Pledgor hereby waives:  (i) any rights to assert against Agent, the Trustee or the Holders any defense (legal or equitable), set-off, counterclaim, or claim which such Pledgor may now or at any time hereafter have against any Grantor or any other party liable to Agent, the Trustee or the Holders; (ii) any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Secured Obligations or any security therefor; (iii) any defense arising by reason of any claim or defense based upon an election of remedies by Agent, the Trustee or the Holders; (iv) the benefit of any statute of limitations affecting such Pledgor's liability hereunder or the enforcement thereof, and any act which shall defer or delay the operation of any statute of limitations applicable to the Secured Obligations shall similarly operate to defer or delay the operation of such statute of limitations applicable to such Pledgor's liability hereunder.

(d)  Until such time as all of the Secured Obligations have been fully, finally and indefeasibly paid in full in cash:  (i) each Pledgor hereby waives and postpones any right of subrogation such Pledgor has or may have as against Grantors with respect to the Secured Obligations, including,

14

without limitation, under any one or more of California Civil Code §§ 2847, 2848, and 2849 or any similar law of any other jurisdiction; (ii) in addition, each Pledgor hereby waives and postpones any right to proceed against Grantors or any other Person, now or hereafter, for contribution, indemnity, reimbursement, or any other suretyship rights and claims (irrespective of whether direct or indirect, liquidated or contingent), with respect to the Secured Obligations; and (iii) in addition, each Pledgor also hereby waives and postpones any right to proceed or to seek recourse against or with respect to any property or asset of Grantors.

(e)  If any of the Secured Obligations at any time are secured by a mortgage or deed of trust upon real property, Agent, the Trustee or any Holder may elect, in such Person's sole discretion, upon a default with respect to the Secured Obligations, to foreclose such mortgage or deed of trust judicially or nonjudicially in any manner permitted by law, before or after enforcing this Agreement, without diminishing or affecting the liability of Pledgors hereunder. Each Pledgor understands that (a) by virtue of the operation of antideficiency laws that may be applicable to nonjudicial foreclosures, an election by Agent, the Trustee or the Holders nonjudicially to foreclose such a mortgage or deed of trust probably may have the effect of impairing or destroying rights of subrogation, reimbursement, contribution, or indemnity of such Pledgor against Grantors or other guarantors or sureties, and (b) absent the waiver given by such Pledgor herein, such an election may estop Agent, the Trustee or the Holders from enforcing this Agreement against such Pledgor. Understanding the foregoing, and understanding that each Pledgor hereby is relinquishing a defense to the enforceability of this Agreement, each Pledgor hereby waives any right to assert against Agent, the Trustee or any Holder any defense to the enforcement of this Agreement, whether denominated "estoppel" or otherwise, based on or arising from an election by Agent, the Trustee or any Holder nonjudicially to foreclose any such mortgage or deed of trust. Each Pledgor understands that the effect of the foregoing waiver may be that such Pledgor may have liability hereunder for amounts with respect to which such Pledgor may be left without rights of subrogation, reimbursement, contribution, or indemnity against Grantors or other guarantors or sureties. Each Pledgor also agrees that the "fair market value" provisions of applicable state law, to the extent such law exists, shall have no applicability with respect to the determination of such Pledgor's liability under this Agreement.

(f)  Without limiting the generality of any other waiver or other provision set forth in this Agreement, each Pledgor waives all rights and defenses that such Pledgor may have if Grantors' debt is secured by real property. This means, among other things:

(i)    Agent, the Trustee or any Holder may collect from any Pledgor without first foreclosing on any real or personal property collateral that may be pledged by Grantors.

(ii)    If Agent, the Trustee or any Holder foreclose(s) on any real property collateral that may be pledged by Grantors:

(iii)    the amount of the debt may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price.

(iv)    Agent may collect from any Pledgor even if Agent, the Trustee or the Holders, by foreclosing on the real property collateral, has/have destroyed any right such Pledgor may have to collect from Grantors.

This is an unconditional and irrevocable waiver of any rights and defenses Pledgors may have if Grantors' debt is secured by real property.

(g) [Intentionally Omitted]

(h) WITHOUT LIMITING THE GENERALITY OF ANY OTHER WAIVER OR OTHER PROVISION SET FORTH IN THIS AGREEMENT, EACH PLEDGOR WAIVES ALL RIGHTS AND DEFENSES ARISING OUT OF AN ELECTION OF REMEDIES BY AGENT, THE TRUSTEE OR THE HOLDERS, EVEN THOUGH THAT ELECTION OF REMEDIES, SUCH AS A NONJUDICIAL FORECLOSURE WITH RESPECT TO SECURITY FOR A SECURED OBLIGATION, HAS DESTROYED SUCH PLEDGOR'S RIGHTS OF SUBROGATION AND REIMBURSEMENT AGAINST GRANTORS.

(i) Without affecting the generality of this Section, each Pledgor hereby also agrees to the following waivers:

(i) Each Pledgor agrees that Agent's right to enforce this Agreement is absolute and is not contingent upon the genuineness, validity or enforceability of any of the Indenture Documents. Each Pledgor waives all benefits and defenses it may have under California Civil Code Section 2810 or any similar law of any other jurisdiction and agrees that Agent's rights under this Agreement shall be enforceable even if any of the Grantors had no liability at the time of execution of the Indenture Documents or later ceases to be liable.

(ii) Each Pledgor agrees that Agent's, the Trustee's and the Holders' rights under the Indenture Documents will remain enforceable even if the amount secured by the Indenture Documents is larger in amount and more burdensome than that for which Grantors are responsible. The enforceability of this Agreement against Pledgors shall continue until all sums due under the Indenture Documents have been paid in full and shall not be limited or affected in any way by any impairment or any diminution or loss of value of any security or collateral for Grantors' obligations under the Indenture Documents, from whatever cause, the failure of any security interest in any such security or collateral or any disability or other defense of Grantors, any other guarantor of Grantors' obligations under the Indenture Documents, any pledgor of collateral for any person's obligations to Agent, the Trustee or any Holder or any other person in connection with the Indenture Documents.

(iii) Each Pledgor waives the right to require Agent to (A) proceed against Grantors, any guarantor of Grantors' obligations under the Indenture Documents, any other pledgor of collateral for any person's obligations to Agent, the Trustee or the Holders or any other person in connection with the Indenture Documents, (B) proceed against or exhaust any other security or collateral Agent may hold for the benefit of Agent, the Trustee or the Holders, or (C) pursue any other right or remedy for such Pledgor's benefit, and agrees that Agent may exercise its right under this Agreement without taking any action against Grantors, any guarantor of Grantors' obligations under the Indenture Documents, any pledgor of collateral for any person's obligations to Agent, the Trustee or any other person in connection with the Indenture Documents, and without proceeding against or exhausting any security or collateral Agent holds for the benefit of Agent, the Trustee or the Holders.

27. Miscellaneous.

(a) This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or other

16

electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Indenture Document *mutatis mutandis*.

(b) Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof in that jurisdiction or affecting the validity or enforceability of such provision in any other jurisdiction.

(c) Headings used in this Agreement are for convenience only and shall not be used in connection with the interpretation of any provision hereof.

(d) The pronouns used herein shall include, when appropriate, either gender and both singular and plural, and the grammatical construction of sentences shall conform thereto.

(e) So long as the Intercreditor Agreement is in effect, the rights, obligations and remedies of the parties shall be subject thereto. This Agreement shall not impose any obligation or grant any right to any party to the extent that such obligation or right is inconsistent or conflicts with the Intercreditor Agreement. This Section 27(e) is for the benefit of Agent, the Trustee and the Holders, and none of the Pledgors or Grantors shall be third party beneficiaries hereof.

IN WITNESS WHEREOF, the undersigned parties hereto have executed this Agreement by and through their duly authorized officers, as of the day and year first above written.

**Florida Hooters LLC**

By: Hooters Gaming LLC
Its: Member

By: HG Casino Management, Inc.
Its: Manager

By: _____
Name: Neil G. Kiefer
Title: President

By: Lags Ventures, LLC
Its: Member

By: _____
Name: David L. Lageschulte
Title: Sole Member

**EW Common LLC**

By: Eastern & Western Hotel Corporation
Its: Manager

By: _____
Name: Michael J. Hessling
Title: Executive Vice President and Assistant Secretary

**The Bank of New York Trust Company, N.A., as Agent**

By: _____
Name: _____
Title: _____

367197

IN WITNESS WHEREOF, the undersigned parties hereto have executed this Agreement by and through their duly authorized officers, as of the day and year first above written.

**Florida Hooters LLC**

By: Hooters Gaming LLC
Its: Member

By: HG Casino Management, Inc.
Its: Manager

By: _____
      Name:  Neil G. Kiefer
      Title:  President

By: Lags Ventures, LLC
Its: Member

By: _____
Name:  David L. Lageschulte
Title:  Sole Member


**EW Common LLC**

By: Eastern & Western Hotel Corporation
Its: Manager

By: _____
Name: Michael J. Hessling
Title:  Executive Vice President and Assistant Secretary


**The Bank of New York Trust Company, N.A., as Agent**

By: _____
Name: _____
Title: _____

367197

IN WITNESS WHEREOF, the undersigned parties hereto have executed this Agreement by and through their duly authorized officers, as of the day and year first above written.

**Florida Hooters LLC**

By: Hooters Gaming LLC
Its: Member

By: HG Casino Management, Inc.
Its: Manager

By: _____
     Name: Neil G. Kiefer
     Title:  President

By: Lags Ventures, LLC
Its: Member

By: _____
Name:  David L. Lageschulte
Title:  Sole Member

**EW Common LLC**

By: Eastern & Western Hotel Corporation
Its: Manager

By: _____
Name: Michael J. Hessling
Title:  Executive Vice President and Assistant Secretary

**The Bank of New York Trust Company, N.A.**, as Agent

By: _____
Name: SANDEE' PARKS
Title: VICE PRESIDENT

367197

# EXHIBIT 21

http://www.sec.gov/~~hives/edgar/data/1326686/00010474690501...

EX-2.19 18 a2157764zex-2_19.htm EXHIBIT 2.19

Exhibit 2.19

Execution Version

---

### INTERCREDITOR AND LIEN SUBORDINATION AGREEMENT

among

**WELLS FARGO FOOTHILL, INC.,**
as Agent,

**THE BANK OF NEW YORK TRUST COMPANY, N.A.,**
as Collateral Agent,

**155 EAST TROPICANA, LLC**

and

**155 EAST TROPICANA FINANCE CORP.,**

as Borrowers

Dated as of March 29, 2005

---

## INTERCREDITOR AND LIEN SUBORDINATION AGREEMENT

THIS INTERCREDITOR AND LIEN SUBORDINATION AGREEMENT dated as of March 29, 2005 (this "Agreement") is made by and among WELLS FARGO FOOTHILL, INC., in its capacity as the arranger and administrative agent (in such capacity, together with it successors and assigns (if any) in such capacity, the "Original Agent") under and pursuant to the Loan Agreement (as hereinafter defined), THE BANK OF NEW YORK TRUST COMPANY, N.A. ("BNY"), solely in its capacity as collateral agent under the Indenture Loan Documents (as hereinafter defined) (in such capacity, the "Collateral Agent"), 155 EAST TROPICANA, LLC, a Nevada limited liability company ("Tropicana"), and 155 EAST TROPICANA FINANCE CORP., a Nevada corporation ("Tropicana Finance"; Tropicana and Tropicana and Finance, are referred to hereinafter each individually as a "Borrower," and individually and collectively, jointly and severally, as the "Borrowers").

### R E C I T A L S :

A.      Borrowers, Collateral Agent, and BNY, in its capacity as Trustee (in such capacity, the "Trustee"), have entered into an Indenture, dated as of March 29, 2005 (the "Indenture"), pursuant to which the Borrowers incurred indebtedness for certain notes (such notes, together with all other notes issued after the date hereof and exchange notes issued in exchange therefore, the "Notes") in an aggregate principal amount at maturity of $130,000,000. The repayment of the Indenture Secured Obligations (as hereinafter defined) is secured by security interests in and liens on the assets and properties described in (i) the Senior Secured Note Security Agreement, dated as of the date hereof (the "Indenture Security Agreement"), made by the Borrowers in favor of the Collateral Agent for the benefit of the Collateral Agent, the Trustee, and the Noteholders, (ii) the Pledge Agreement, dated as of the date hereof (the "Indenture Pledge Agreement"), made by Florida Hooters LLC, a Nevada limited liability company ("Florida Hooters"), and EW Common LLC, a Nevada limited liability company ("EW Common"), in favor of the Collateral Agent for the benefit of the Collateral Agent, the Trustee, and the Noteholders, (iii) the Guarantee and Pledge Agreement, dated as of the date hereof (the "E&W Note Guarantee and Pledge"), made by Eastern & Western Hotel Corporation, a Nevada corporation ("E&W"), in favor of the Collateral Agent for the benefit of the Collateral Agent, the Trustee, and the Noteholders, and (iv) certain real property mortgages, including the (y) Deed of Trust, Security Agreement and Fixture Filing with Assignment of Rents dated as of the date hereof, made by Tropicana to Lawyers Title of Nevada, Inc., as trustee for the benefit of Collateral Agent, as collateral agent for the "Holders" (as defined in the Indenture), and (z) Leasehold Deed of Trust, Security Agreement and Fixture Filing with Assignment of Rents dated as of the date hereof, made by E&W to Lawyers Title of Nevada, Inc., as trustee for the benefit of Collateral Agent, as collateral agent for the Holders, together with such other mortgages, deeds of trust, assignments and other real property Liens as may be made as of the date hereof and from time to time

1

hereafter (each, an "Indenture Mortgage" and, together with the Indenture, the Indenture Security Agreement, the Indenture Pledge Agreement, the E&W Guarantee and Pledge, all Control Agreements (as defined in the Indenture Security Agreement for the benefit of the Collateral Agent, the Trustee, the Noteholders and, as set forth in Section 3.02 hereof, the Agent and the Lenders), and all other collateral or security documents in favor of Collateral Agent or the Trustee now or hereafter executed and delivered in connection with the Indenture or the Indenture Security Agreement, the "Indenture Agreements"), in each case, by a Borrower, Florida Hooters, EW Common or E&W in favor of the Collateral Agent for the benefit of the Collateral Agent, the Trustee, and the Noteholders.

B.      Borrowers and the Original Agent have entered into a Credit Agreement dated as of March 29, 2005 (the "Original Loan Agreement"), pursuant to which the Original Agent and the lenders from time to time party thereto (the "Original Lenders") agreed, upon the terms and conditions stated therein, to make loans and advances to and to issue letters of credit on account of the Borrower and the Guarantors up to the principal amount of $15,000,000, together with the fees, interest, expenses and other obligations due under the Original Loan Agreement.  The repayment of the Loan Agreement Secured Obligations (as hereinafter defined) is secured by security interests in and liens on the assets and properties described in (i) the Security Agreement, dated as of the date hereof (the "Loan Agreement Security Agreement"), made by the Borrowers in favor of the Agent for the benefit of the Lenders, (ii) the Parent Pledge Agreement, dated as of the date hereof (the "Loan Agreement Pledge Agreement"), made by Florida Hooters and EW Common, in favor of the Agent for the Lenders, (iii) the Guarantee and Pledge Agreement, dated as of the date hereof (the "E&W Loan Guarantee and Pledge"), made by E&W in favor of the Agent for the benefit of the Agent and the Lenders, and (iv) certain real property mortgages, including the (y) Deed of Trust, Fixture Filing with Assignment of Rents and Leases, and Security Agreement dated as of the date hereof, made by Tropicana to Lawyers Title of Nevada, Inc., as trustee for the benefit of Agent (as defined herein), as agent and arranger under the Original Loan Agreement, and (z) Leasehold Deed of Trust, Fixture Filing with Assignment of Rents and Leases, and Security Agreement dated as of the date hereof, made by E&W to Lawyers Title of Nevada, Inc., as trustee for the benefit of Agent, as agent and arranger under the Credit Agreement, together with such other mortgages, deeds of trust, assignments and other real property Liens as may be made as of the date hereof and from time to time hereafter (each, a "Loan Agreement Mortgage" and, together with the Loan Agreement, Loan Agreement Security Agreement, the Loan Agreement Parent Pledge Agreement, all Control Agreements (as defined in the Loan Agreement), and all other collateral or security documents in favor of Agent now or hereafter executed and delivered in connection with the Original Loan Agreement or the Loan Agreement Security Agreement, the "Loan Agreements"), in each case, by a Borrower Florida Hooters, EW Common or E&W in favor of the Agent for the benefit of the Lenders.

C.      One of the conditions of the Original Loan Agreement is that the priority of the security interests in and liens on the Lender Priority Collateral to secure the Loan

2

Agreement Secured Obligations be senior to the security interests in and liens on the Lender Priority Collateral to secure the Indenture Secured Obligations (as hereinafter defined), in the manner and to the extent provided in this Agreement. One of the conditions of the Indenture is that the priority of the security interests and liens on the Indenture Priority Collateral to secure the Indenture Secured Obligations be senior to the security interests in and liens on the Indenture Priority Collateral to secure the Loan Agreement Secured Obligations and that the Interest Reserve Account (as hereinafter defined) be security for the Indenture Secured Obligations but not for the Loan Agreement Secured Obligations.

       D.       The Agent and the Collateral Agent desire to enter into this Agreement concerning the respective rights of the Agent and the Collateral Agent with respect to the priority of their respective security interests in and liens on the Collateral.

       E.       The terms of the Indenture permit the Borrowers to enter into the Original Loan Documents, subject to compliance with certain conditions, and in connection therewith authorize and direct the Collateral Agent to enter into an intercreditor agreement substantially in the form of this Agreement.

       F.       In order to induce the Agent and Lenders to extend credit to the Borrowers and for purposes of certain conditions precedent and covenants of the Original Loan Agreement, the Agent and the Collateral Agent hereby agree as follows:

## ARTICLE I.
### DEFINITIONS

      Section 1.01      <u>Terms Defined Above and in the Recitals</u>. As used in this Agreement, the following terms shall have the respective meanings indicated in the opening paragraph hereof and in the above Recitals:

> "Agreement"
> "Borrowers"
> "Collateral Agent"
> "E&W"
> "E&W Loan Guarantee and Pledge"
> "E&W Note Guarantee and Pledge"
> "EW Common"
> "Florida Hooters"
> "Indenture"
> "Indenture Agreements"
> "Indenture Mortgage"
> "Indenture Pledge Agreement"
> "Indenture Security Agreement"
> "Loan Agreement Mortgage"
> "Loan Agreement Pledge Agreement"

3

http://www.sec.gov/' ' ives/edgar/data/1326686/00010474690501...

"Loan Agreement Security Agreement"
"Loan Agreements"
"Notes"
"Original Agent"
"Original Lenders"
"Original Loan Agreement"
"Original Loan Documents"
"Tropicana"
"Tropicana Finance"
"Trustee"

Section 1.02    Loan Agreement Definitions. All capitalized terms which are used but not defined herein shall have the same meaning as in the Original Loan Agreement, as in effect on the date hereof.

Section 1.03    Other Definitions. As used in this Agreement, the following terms shall have the meanings set forth below:

"Agent" means the Original Agent, together with its successors, assigns, transferees, and any Person that has a similar title (such as "Agent" or "Administrative Agent") under any Loan Agreement.

"Bankruptcy Code" means title 11 of the United States Code, as in effect from time to time.

"Capital Stock" means (a) in the case of a corporation, corporate stock, (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock, (c) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited) and (d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of property of, the issuing Person.

"Cash Collateral" means any Collateral consisting of cash or cash equivalents, any security entitlement (as defined in the New York Commercial Code) and any financial assets (as defined in the New York Commercial Code).

"Casino Lease" means that certain "Amended and Restated Casino Lease" by and between the Borrower and E&W dated as of March 9, 2005, as the same may be amended from time to time in accordance to the extent permitted under the Loan Agreement and the Indenture.

"Closing Date" means March 29, 2005.

4

"Collateral" means all assets and properties and all interests in assets or properties now owned or hereafter acquired by any Borrower, any Guarantor or any other Person (including the Cash Collateral deposited in Account No. 11553005 maintained at Wells Fargo Brokerage Services, LLC by E&W pursuant to the Casino Lease) in or upon which a Lien is granted or purported to be granted under any of the Loan Documents or the Indenture Loan Documents or to secure the Loan Agreement Secured Obligations or the Indenture Secured Obligations and all products and proceeds of any of the foregoing, provided that the term "Collateral" shall not include the Indenture Exclusive Collateral.

"Control Collateral" means any Collateral consisting of a certificated security (as defined in the New York Commercial Code), investment property (as defined in the New York Commercial Code), a deposit account (as defined in the New York Commercial Code and any other Collateral as to which a Lien may be perfected through possession or control by the secured party, or any agent therefor.

"Default Notice" has the meaning set forth in Section 2.03.

"DIP Financing" has the meaning set forth in Section 6.01.

"Discharge of Loan Agreement Secured Obligations" means payment in full in cash of the Loan Agreement Secured Obligations (other than Loan Agreement Secured Obligations consisting of contingent indemnification obligations under the Lender Loan Documents) up to (but not in excess of) the Maximum Priority Debt Amount including, with respect to amounts available to be drawn under outstanding letters of credit issued thereunder (or indemnities issued pursuant thereto in respect of outstanding letters of credit), delivery of cash collateral or backstop letters of credit in respect thereof in compliance with the terms of the Loan Agreement, in each case, after or concurrently with termination of all commitments to extend credit thereunder.

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"Guarantor" means any Person that guarantees or pledges Collateral to secure the Loan Agreement Secured Obligations or the Indenture Secured Obligations, including E&W.

"Indenture Exclusive Collateral" means the Cash Collateral maintained in the Interest Reserve Account as of the Closing Date, together with interest and earnings thereon.

"Indenture Loan Documents" means the Indenture, the Notes, the Indenture Mortgages, the Indenture Agreements, the Notes, the Guarantees (as defined in the Indenture) of the Notes, the Registration Rights Agreement (as defined in the

5

http://www.sec.gov/ ʌ ʌ ᵗ ives/edgar/data/1326686/00010474690501...

Indenture) and such other agreements, instruments and certificates as defined or referred to in the Indenture.

"Indenture Priority Collateral" means the Cash Collateral maintained in the Renovation Reserve Account as of the Closing Date, together with interest and earnings thereon; provided that it is understood and agreed that such Cash Collateral is intended to be utilized in the renovation of the real and personal property constituting Lender Priority Collateral and once so utilized and withdrawn from the Renovation Reserve Account, whether before or after the commencement of an Insolvency Proceeding, shall constitute Lender Priority Collateral.

"Indenture Secured Obligations" means all indebtedness represented by the Notes, together with interest, premiums, fees, costs and expenses in respect thereof (including, without limitation, attorneys fees and disbursements and including interest accrued after the initiation of any Insolvency Proceeding, whether or not allowed or allowable in any Insolvency Proceeding), and all other Obligations (as such term is defined in the Indenture) under any of the Indenture Loan Documents.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Interest Reserve Account" means that certain Account No. 171097 maintained at The Bank of New York Trust Company, N.A.

"Lease" and "Leases" means, individually and collectively, that certain Amended and Restated Hotel Lease and that certain Amended and Restated Casino Lease, each by and between the Borrower and E&W and each dated as of March 9, 2005, as either may be amended from time to time with the written consent of the Agent and the Collateral Agent.

"Lender Loan Documents" means any Loan Agreement, the "Loan Documents" as defined in the Original Loan Agreement, the collateral documents and instruments executed and delivered in connection therewith or in connection with any other Loan Agreement hereunder, and such other agreements, instruments and certificates as defined in a Loan Agreement.

"Lender Priority Collateral" means all Collateral other than the Indenture Exclusive Collateral and the Indenture Priority Collateral.

6

"Lenders" means the Original Lenders, together with all successors, assigns, transferees, participants, replacement or refinancing lenders, of the Original Lenders, including any Person designated as a Lender under any Loan Agreement.

"Lien" means any interest in an asset securing an obligation owed to, or a claim by, any Person other than the owner of the asset, irrespective of whether (a) such interest is based on the common law, statute, or contract, (b) such interest is recorded or perfected, and (c) such interest is contingent upon the occurrence of some future event or events or the existence of some future circumstance or circumstances. Without limiting the generality of the foregoing, the term "Lien" includes the lien or security interest arising from a mortgage, deed of trust, encumbrance, pledge, hypothecation, assignment, deposit arrangement, security agreement, conditional sale or trust receipt, or from a lease, consignment, or bailment for security purposes and also includes reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases, and other title exceptions and encumbrances affecting Real Property.

"Lien Priority" means with respect to any Lien of the Agent or the Collateral Agent in the Collateral, the order of priority of such Lien as specified in Section 2.01.

"Loan Agreement" means the Original Loan Agreement as amended, restated, modified, renewed, refunded, replaced, or refinanced in whole or in part from time to time, including any agreement extending the maturity of, consolidating, otherwise restructuring (including adding Subsidiaries or affiliates of any Borrower or any other Persons as parties thereto) or refinancing all or any portion of the Obligations or Commitments as those terms are defined in the Original Loan Agreement (or in any other agreement that itself is a Loan Agreement hereunder) and whether by the same or any other agent, lender, or group of lenders and whether or not increasing the amount of indebtedness that may be incurred thereunder.

"Loan Agreement Secured Obligations" means all Obligations and all other amounts owing or due under the terms of the Loan Agreement and the other Lender Loan Documents, including any and all amounts payable under or in respect of the Lender Loan Documents, as amended, restated, modified, renewed, refunded, replaced, or refinanced in whole or in part from time to time, including principal, premium, interest, fees, attorneys' fees, costs, charges, expenses, reimbursement obligations, any obligation to post cash collateral in respect of letters of credit or indemnities in respect thereof, indemnities, guarantees, and all other amounts payable thereunder or in respect thereof (including, in each case, all amounts accruing on or after the commencement of any Insolvency Proceeding relating to any Borrower, any other Person irrespective of whether a claim for all or any portion of such amounts is allowable or allowed in any Insolvency Proceeding).

"Loan Documents" means the Lender Loan Documents and the Indenture Loan Documents.

7

"Maximum Priority Debt Amount" means, as of any date of determination, (a) the principal amount (including the undrawn amount of Letters of Credit) of Loan Agreement Secured Obligations as of such date up to, but not in excess of, $15,000,000, plus (b) any premium, interest, fees, attorneys' fees, costs, charges, expenses and indemnities, owed under the Loan Agreement or the other Lender Loan Documents or in respect of the Loan Agreement Secured Obligations and including, for each amount specified in clauses (a) and (b), all amounts accruing on or after the commencement of any Insolvency Proceeding relating to any Borrower or any other Person irrespective of whether a claim for all or any portion of such amount is allowable or allowed in any Insolvency Proceeding.

"Noteholders" means each of the holders of the Notes.

"Original Loan Agreement" shall have the meaning assigned to such term in the recitals to this Agreement.

"Party" means Agent and Collateral Agent.

"Person" means any natural person, corporation, limited liability company, limited partnership, general partnership, limited liability partnership, joint venture, trust, land trust, business trust, or other organization, irrespective of whether such organization is a legal entity, and shall include a government and any agency or political subdivision thereof.

"Proceeds" means (i) all "proceeds" as defined in Article 9 of the New York Commercial Code with respect to the Collateral, and (ii) whatever is recoverable or recovered when Collateral is sold, exchanged, collected, or disposed of, whether voluntarily or involuntarily.

"Recovery" has the meaning set forth in Section 5.03.

"Renovation Reserve Account" means that certain Account No. 171098 maintained at The Bank of New York Trust Company, N.A., subject to a control agreement in favor of the Collateral Agent for the benefit of the Noteholders, the Agent and the Lenders as their respective interests may appear.

"Standstill Notice" means a written notice from or on behalf of (a) the Agent to the Collateral Agent regarding the Lender Priority Collateral stating that an Event of Default has occurred under the Loan Agreement and stating that such written notice is a "Standstill Notice," or (b) the Collateral Agent to the Agent regarding the Indenture Priority Collateral stating that an Event of Default has occurred under the Indenture and stating that such written notice is a "Standstill Notice."

"Standstill Period" has the meaning set forth in Section 2.03.

8

Rules of Construction. Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the term "including" is not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Article, section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). Any reference herein to any Person shall be construed to include such Person's successors and assigns.

ARTICLE II.

LIEN PRIORITY

Section 2.01    Agreement to Subordinate. Notwithstanding the date, time, method, manner or order of grant, attachment, or perfection of any Liens granted to the Collateral Agent, the Trustee, or the Noteholders in respect of all or any portion of the Collateral or of any Liens granted to the Agent or any Lender in respect of all or any portion of the Collateral, or the order or time of filing or recordation of any document or instrument for perfecting the Liens in favor of Agent or any Lender or the Collateral Agent (or the Trustee or any Noteholder) in any Collateral or any provision of the Uniform Commercial Code, any other applicable law, the Indenture, the Loan Documents or any other circumstance whatsoever:

(a)    the Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, hereby agrees that (i) any Lien in respect of all or any portion of the Lender Priority Collateral now or hereafter held by or on behalf of the Collateral Agent, the Trustee, or any Noteholder that secures all or any portion of the Indenture Secured Obligations, shall in all respects be junior and subordinate to all Liens granted to the Agent or any Lender in the Lender Priority Collateral to secure all or any portion of the Loan Agreement Secured Obligations up to (but not in excess of) the Maximum Priority Debt Amount, and (ii) any Lien in respect of all or any portion of the Lender Priority Collateral now or hereafter held by or on behalf of the Agent that secures all or any portion of the Loan Agreement Secured Obligations in excess of the Maximum Priority Debt Amount, shall in all respects be junior and subordinate to all Liens granted to the Collateral Agent, the Trustee or any Noteholder in the Lender Priority Collateral to secure all or any portion of the Indenture Secured Obligations, and

(b)    the Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, hereby agrees that (i) any Lien in respect of all or any portion of the Lender

9

http://www.sec.gov/ ' ' ives/edgar/data/1326686/00010474690501...

Priority Collateral now or hereafter held by or on behalf of the Agent or any Lender that secures all or any portion of the Loan Agreement Secured Obligations up to (but not in excess of) the Maximum Priority Debt Amount, shall in all respects be senior and prior to all Liens granted to the Collateral Agent (or the Trustee or any Noteholder) in the Lender Priority Collateral to secure all or any portion of the Indenture Secured Obligations, and (ii) any Lien in respect of all or any portion of the Lender Priority Collateral now or hereafter held by or on behalf of the Collateral Agent, the Trustee, or any Noteholder that secures all or any portion of the Indenture Secured Obligations, shall in all respects be senior and prior to all Liens granted to the Agent in the Lender Priority Collateral to secure all or any portion of the Loan Agreement Secured Obligations in excess of the Maximum Priority Debt Amount,

(c)    the Agent, on behalf of itself and the Lenders, hereby agrees that (i) any Lien in respect of all or any portion of the Indenture Priority Collateral now or hereafter held by or on behalf of the Agent or any Lender that secures all or any portion of the Loan Agreement Secured Obligations, shall in all respects be junior and subordinate to all Liens granted to the Collateral Agent in the Indenture Priority Collateral to secure all or any portion of the Indenture Secured Obligations, and (ii) any Lien in respect of all or any portion of the Indenture Priority Collateral now or hereafter held by or on behalf of the Collateral Agent that secures all or any portion of the Indenture Secured Obligations, shall in all respects be senior and prior to all Liens granted to the Agent in the Indenture Priority Collateral to secure all or any portion of the Loan Agreement Secured Obligations, and

(d)    the Agent, on behalf of itself and the Lenders, hereby agrees that the Indenture Exclusive Collateral does not and shall not secure any Loan Agreement Secured Obligations.

The Collateral Agent, for and on behalf of itself, the Trustee and the Noteholders, acknowledges and agrees that, concurrently herewith, the Agent and the Lenders have been granted Liens upon all of the Collateral in which the Collateral Agent has been granted Liens (other than the Indenture Exclusive Collateral) and the Collateral Agent hereby consents thereto. The Agent, for and on behalf of itself and the Lenders, acknowledges and agrees that the Collateral Agent, for the benefit of itself, the Trustee, and the Noteholders, has been granted Liens upon all of the Collateral in which the Agent has been granted Liens and, in addition, the Indenture Exclusive Collateral and the Agent hereby consents thereto. The subordination of Liens in the Lender Priority Collateral (up to but not in excess of) the Maximum Priority Debt Amount) by the Collateral Agent, on behalf of itself, the Trustee, and the Noteholders in favor of the Agent herein shall not be deemed to subordinate the Collateral Agent's Liens to the Liens of any other Person. The subordination of Liens (in excess of the Maximum Priority Debt Amount) and otherwise in the Indenture Priority Collateral in favor of the Collateral Agent, for the benefit of itself, the Trustee and the Noteholders herein shall not be deemed to subordinate such Agent's Liens to the Liens of any other Person.

10

Section 2.02    Waiver of Right to Contest Liens. The Collateral Agent agrees, on behalf of itself, the Trustee, and the Noteholders, that it and they shall not (and hereby waives, on behalf of itself, the Trustee and the Noteholders any right to) take any action to contest or challenge (or assist or support any other Person in contesting or challenging), directly or indirectly, whether or not in any proceeding (including in any Insolvency Proceeding), the validity, priority, enforceability, or perfection of the Liens of the Agent or Lenders in respect of the Collateral. Prior to Discharge of the Loan Agreement Secured Obligations, the Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, agrees that none of the Collateral Agent, the Trustee, or the Noteholders will take any action that would hinder any exercise of remedies undertaken by the Agent or Lenders under the Lender Loan Documents with respect to the Lender Priority Collateral, including any public or private sale, lease, exchange, transfer, or other disposition of the Lender Priority Collateral, whether by foreclosure or otherwise. Prior to Discharge of the Loan Agreement Secured Obligations, the Collateral Agent, for itself, the Trustee, and on behalf of the Noteholders, hereby waives any and all rights it, the Trustee, or the Noteholders may have as a junior lien creditor or otherwise to contest, protest, object to, interfere with the manner in which the Agent or Lenders seek to enforce the Liens in any portion of the Lender Priority Collateral (it being understood and agreed that the terms of this Agreement shall govern with respect to such Collateral even if any portion of the Liens securing the Loan Agreement Secured Obligations are avoided, disallowed, set aside, or otherwise invalidated in any judicial proceeding or otherwise). The Agent, for and on behalf of itself and the Lenders, agrees that it shall not (and hereby waives any right to) take any action to contest or challenge (or assist or support any other Person in contesting or challenging), directly or indirectly, whether or not in any proceeding (including in any Insolvency Proceeding), the validity, priority, enforceability, or perfection of the Liens of the Collateral Agent in respect of the Collateral. Following the Discharge of Loan Agreement Secured Obligations or solely with respect to the Indenture Priority Collateral at any time prior thereto, the Agent, for and on behalf of itself and the Lenders, agrees that it will not take any action that would hinder any exercise of remedies undertaken by the Collateral Agent, the Trustee, or any Noteholder under the Indenture Loan Documents, including any public or private sale, lease, exchange, transfer, or other disposition of the Collateral, whether by foreclosure or otherwise. Following the Discharge of Loan Agreement Secured Obligations or solely with respect to the Indenture Priority Collateral at any time prior thereto, the Agent hereby waives any and all rights it may have as a junior lien creditor or otherwise to contest, protest, object to, interfere with the manner in which the Collateral Agent, the Trustee or any Noteholder seeks to enforce the Liens in any portion of the Collateral (it being understood and agreed that the terms of this Agreement shall govern with respect to such Collateral even if any portion of the Liens securing the Indenture Secured Obligations are avoided, disallowed, set aside, or otherwise invalidated in any judicial proceeding or otherwise).

Section 2.03    Remedies Standstill. At any time after the occurrence and during the continuation of an Event of Default under any of the Loan Documents, the Agent may

11

send a Standstill Notice to the Collateral Agent with respect to the Lender Priority Collateral or the Collateral Agent may send a Standstill Notice to the Agent with respect to the Indenture Priority Collateral.

(a)       The Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, agrees that from and after the date of its receipt of any Standstill Notice, none of the Collateral Agent, the Trustee, or any Noteholder will exercise any of its rights or remedies in respect of the collection on, set off against, marshalling of, or foreclosure on the Lender Priority Collateral or any other right relating to any Lender Priority Collateral (including the exercise of any voting rights relating to any Capital Stock constituting Collateral) under the Loan Documents, applicable law or otherwise as a secured creditor and will not take or receive any Lender Priority Collateral in connection with the exercise of any such right or remedy (including recoupment or set-off), whether under the Indenture Loan Documents, applicable law, in an Insolvency Proceeding or otherwise unless and until (a) the Agent has expressly waived or acknowledged the cure of the applicable Event of Default in writing or the Discharge of the Loan Agreement Secured Obligations shall have occurred, or (b) 90 days shall have elapsed from the date of the Collateral Agent's receipt of such Standstill Notice, except with respect to any Lender Priority Collateral which the Agent is pursuing its rights or remedies as a secured creditor to effect the collection, foreclosure, sale, or other realization upon or disposition of such Lender Priority Collateral.  From and after the earlier to occur of (i) the Collateral Agent's receipt of such waiver or cure notice, or (ii) the elapsing of such 90  day period, any of the Collateral Agent, the Trustee, or any Noteholder may commence to exercise any of its rights and remedies as a secured creditor under the Loan Documents, applicable law or otherwise (subject to the provisions of this Agreement, including Section 4.02 hereof and except with respect to any Lender Priority Collateral as to which the Agent or any Lender is effecting the collection, foreclosure, sale or other realization upon or disposition of).  So long as the Agent has not sent a Standstill Notice to the Collateral Agent, the Collateral Agent may exercise its rights or remedies in respect of the Lender Priority Collateral under the Loan Documents after the 10th Business Day following receipt by the Agent of a Notice of Intent to Exercise (as defined below).  The Agent may only send 3 Standstill Notices following the date hereof (it being understood and agreed as clarification to the foregoing that no more than 3 Standstill Notices may be provided whether delivered hereunder or under any corresponding provision of any other agreement similar hereto that may be delivered pursuant to Section 7.16) and no Event of Default may serve as the basis for any subsequent Standstill Notice unless 90 consecutive days shall have elapsed from the date that such Event of Default was cured or waived by the Agent, and no more than one Standstill Notice may be given by the Agent in any consecutive 365-day period.

(b)       The Agent, on behalf of itself and the Lenders, agrees that from and after the date of its receipt of any Standstill Notice, neither the Agent nor any Lender will exercise any of its rights or remedies in respect of the collection on, set off against, marshalling of, or foreclosure on the Indenture Priority Collateral or any other right

12

relating to any Indenture Priority Collateral under the Loan Documents, applicable law or otherwise as a secured creditor and will not take or receive any Indenture Priority Collateral in connection with the exercise of any such right or remedy (including recoupment or set-off), whether under the Loan Documents, applicable law, in an Insolvency Proceeding or otherwise unless and until (a) the Collateral Agent has expressly waived or acknowledged the cure of the applicable Event of Default in writing or the Indenture Secured Obligations shall have been paid in full in cash, or (b) 90 days shall have elapsed from the date of the Agent's receipt of such Standstill Notice, except with respect to any Indenture Priority Collateral which the Collateral Agent is pursuing its rights or remedies as a secured creditor to effect the collection, foreclosure, sale, or other realization upon or disposition of such Indenture Priority Collateral. From and after the earlier to occur of (i) the Agent's receipt of such waiver or cure notice, or (ii) the elapsing of such 90 day period, the Agent or any Lender may commence to exercise any of its rights and remedies as a secured creditor under the Loan Documents, applicable law or otherwise (subject to the provisions of this Agreement, including Section 4.02 hereof and except with respect to any Indenture Priority Collateral as to which the Collateral Agent, the Trustee or any Noteholder is effecting the collection, foreclosure, sale or other realization upon or disposition of). So long as the Collateral Agent has not sent a Standstill Notice to the Agent, the Agent may exercise its rights or remedies in respect of the Indenture Priority Collateral under the Loan Documents after the 10th Business Day following receipt by the Collateral Agent of a Notice of Intent to Exercise (as defined below). The Collateral Agent may only send 3 Standstill Notices following the date hereof (it being understood and agreed as clarification to the foregoing that no more than 3 Standstill Notices may be provided whether delivered hereunder or under any corresponding provision of any other agreement similar hereto that may be delivered pursuant to Section 7.16) and no Event of Default may serve as the basis for any subsequent Standstill Notice unless 90 consecutive days shall have elapsed from the date that such Event of Default was cured or waived by the Collateral Agent , and no more than one Standstill Notice may be given by the Collateral Agent in any consecutive 365-day period.

(c)     The time period during which the Collateral Agent with respect to the Lender Priority Collateral or the Agent with respect to the Indenture Priority Collateral is not permitted to exercise rights or remedies under this Section 2.03 is referred to herein as the "Standstill Period." If at any time other than during any Standstill Period an "Event of Default" (as defined in the Indenture or the Loan Agreement as applicable) has occurred and is continuing under the Loan Documents, and the Collateral Agent with respect to the Lender Priority Collateral or the Agent with respect to the Indenture Priority Collateral intends to exercise its rights or remedies under the Loan Documents, the Collateral Agent with respect to the Lender Priority Collateral or the Agent with respect to the Indenture Priority Collateral may do so only after sending a written notice ("Notice of Intent to Exercise") no less than 10 Business Days and no more than 20 Business Days prior to the exercise of any such rights or remedies to the Agent.

13

Section 2.04          Exercise of Rights.

(a)          No Other Restrictions. Except as expressly set forth in this Agreement, each of the Collateral Agent, the Trustee, the Noteholders, the Agent and the Lenders shall have any and all rights and remedies it may have as a creditor under applicable law, including the rights to exercise all rights and remedies in foreclosure or otherwise with respect to any of the Collateral; provided, however, that any such exercise, and any collection or sale of all or any portion of the Collateral, shall be subject to the prior Liens of the Agent on the Lender Priority Collateral and the prior Liens of the Collateral Agent on the Indenture Priority Collateral, in each case to the extent provided in Section 2.01, and to the provisions of this Agreement including Section 4.02 hereof. In exercising rights and remedies with respect to the Collateral, the Agent may enforce the provisions of the Lender Loan Documents and exercise remedies thereunder, all in such order and in such manner as it may determine in the exercise of its sole discretion. Such exercise and enforcement shall include the sale, lease, license, or other disposition of all or any portion of the Collateral by private or public sale or any other means permissible under applicable law; provided, that the Agent agrees to provide copies of any notices that it is required under applicable law to deliver to the Borrowers to the Collateral Agent; provided further, that the failure to provide any such copies to the Collateral Agent shall not impair any of the Agent's rights hereunder.

(b)          Release of Liens. In the event of any such private or public sale of any Lender Priority Collateral, Collateral Agent agrees, on behalf of itself, the Trustee, and the Noteholders, that such sale will be free and clear of the Liens securing the Indenture Secured Obligations and, if the sale or other disposition includes the Equity Interests in any Borrower, agrees to release the entities whose Equity Interests are sold from all Indenture Secured Obligations so long as Agent also releases the entities whose Equity Interests are sold from all Loan Agreement Secured Obligations, in each case, so long as the proceeds from such sale or other disposition of the Lender Priority Collateral are applied in accordance with the terms of this Agreement. In furtherance thereof, Collateral Agent agrees that it will execute any and all Lien releases or other documents reasonably requested by Agent in connection therewith, so long as the proceeds from such sale or other disposition of the Lender Priority Collateral are applied in accordance with the terms of this Agreement.

(c)          Subject to Section 3.01, the Collateral Agent, the Trustee and the Noteholders may exercise, and nothing herein shall constitute a waiver of, any right it may have at law or equity to receive notice of, or to commence or join with any creditor in commencing any Insolvency Proceeding or to join or participate in, any action or proceeding or other activity described in Section 3.01; provided, however, that exercise of any such right by the Collateral Agent shall be subject to all of the terms and conditions of this Agreement, including the obligation to turn over all Lender Priority Collateral and Proceeds thereof to the Agent for application to the Discharge of the Loan Agreement Secured Obligations as provided in Section 4.02.

14

http://www.sec.gov/A    ives/edgar/data/1326686/0001047469050l...

(d)    The Collateral Agent may make such demands or file such claims in respect of the Indenture Secured Obligations as may be necessary to prevent the waiver or bar of such claims under applicable statutes of limitations or other statutes, court orders or rules of procedure, but except as provided in this <u>Section 2.04</u>, the Collateral Agent shall not take any actions restricted by this Agreement until the Discharge of Loan Agreement Secured Obligations shall have occurred.

(e)    Following the Discharge of Loan Agreement Secured Obligations, the other provisions of this <u>Section 2.04</u> shall apply to the Collateral Agent, for the benefit of itself, the Trustee and the Noteholders as if it was the Agent and the Agent was the Collateral Agent, <u>mutatis mutandis</u>.

## ARTICLE III.
## ACTIONS OF THE PARTIES

Section 3.01    <u>Limitation on Certain Actions</u>. Notwithstanding any other provision hereof, during any Standstill Period prior to the date that the Discharge of Loan Agreement Secured Obligations occurs, the Collateral Agent will not:

(a)    commence receivership or foreclosure proceedings against Borrower, any Guarantor, or any Lender Priority Collateral;

(b)    sell, collect, transfer or dispose of any Lender Priority Collateral or Proceeds; or

(c)    notify third party account debtors to make payment directly to it or any of its agents or other Persons acting on its behalf.

Section 3.02    <u>Agent for Perfection</u>. Each of the Agent, for and on behalf of itself and the Lenders, and the Collateral Agent, for and on behalf of itself, the Trustee, and each Noteholder, as applicable, agree to hold all Control Collateral and Cash Collateral that is part of the Collateral in its respective possession, custody, or control (or in the possession, custody, or control of agents or bailees for either, as applicable) as agent for the other solely for the purpose of perfecting the security interest granted to each in such Control Collateral or Cash Collateral subject to the terms and conditions of this <u>Section 3.02</u>. None of the Agent, the Lenders, the Collateral Agent, the Trustee, or the Noteholders, as applicable, shall have any obligation whatsoever to the others to assure that the Control Collateral is genuine or owned by any Borrower, or any other Person or to preserve rights or benefits of any Person. The duties or responsibilities of the Agent and the Collateral Agent under this <u>Section 3.02</u> are and shall be limited solely to holding or maintaining control of the Control Collateral and the Cash Collateral as agent for the other for purposes of perfecting the Lien held by the Collateral Agent or the Agent, as applicable. The Agent is not and shall not be deemed to be a fiduciary of any kind for the

15

http://www.sec.gov/ ˙ ˙ ˙ves/edgar/data/1326686/00010474690501...

Collateral Agent, the Trustee, the Noteholders or any other Person. The Collateral Agent is not and shall not be deemed to be a fiduciary of any kind for the Agent or any other Person. In the event that (a) any of the Collateral Agent, the Trustee, or any Noteholder receives any Proceeds or Collateral in contravention of the Lien Priority, or (b) the Agent receives any Proceeds or Collateral in contravention of the Lien Priority, it shall promptly pay over such Proceeds or Collateral to (i) in the case of clause (a), the Agent, or (ii) in the case of clause (b), the Collateral Agent, in the same form as received with any necessary endorsements, for application in accordance with the provisions of <u>Section 4.02</u> of this Agreement.

ARTICLE IV.
NOTICES AND APPLICATION OF PROCEEDS

Section 4.01     <u>Notices of Exercise</u>. Concurrently with any exercise by the Collateral Agent of any of its rights and remedies under the Indenture Loan Documents following the occurrence of any default under any of the Indenture Loan Documents, the Collateral Agent shall give notice of such exercise to the Agent and shall only exercise such rights or remedies in a manner consistent with the terms of this Agreement. Concurrently with any exercise by the Agent of any of its rights and remedies under the Lender Loan Documents following the occurrence of any default under any of the Lender Loan Documents, the Agent shall give notice of such exercise to the Collateral Agent and shall only exercise such rights or remedies in a manner consistent with the terms of this Agreement.

Section 4.02     Application of Proceeds.

(a)     <u>Revolving Nature of Loan Agreement Secured Obligations</u>. As long as the Agent is not exercising any of its remedies as a secured creditor under the Lender Loan Documents and including during any Standstill Period, the Agent may apply any and all of the proceeds of the Collateral consisting of accounts receivable, rental payments under the Leases, other rights to payment or Cash Collateral in accordance with the provisions of the Lender Loan Documents, subject to the provisions of this Agreement, including <u>Sections 3.02</u> and <u>4.02</u> hereof. The Collateral Agent, for and on behalf of itself, the Trustee, and the Noteholders, expressly acknowledges and agrees that (a) any such application of the proceeds of accounts receivable, rental payments under the Leases, other rights to payment or Cash Collateral or the release of any Lien by the Agent upon any portion of the Collateral in connection with a Permitted Disposition (as that term is defined in the Loan Agreement) shall not be considered to be the exercise of remedies under this Agreement; and (b) all Proceeds or Cash Collateral received by Agent in connection therewith may be applied, reversed, reapplied, credited or reborrowed, in whole or in part, as Loan Agreement Secured Obligations without reducing the Maximum Priority Debt Amount, except to the extent that such amounts are applied to permanently reduce the aggregate revolver commitments in accordance with

16

the Loan Agreement, in which case the Maximum Priority Debt Amount shall be automatically reduced by such amount.

(b)    Turnover of Cash Collateral After Payment.  Upon the Discharge of the Loan Agreement Secured Obligations, the Agent shall deliver to the Collateral Agent or execute such documents as the Collateral Agent may reasonably request to cause the Collateral Agent to have control over any Cash Collateral or Control Collateral still in Agent's possession, custody or control in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct, to be applied by the Collateral Agent to the Indenture Secured Obligations.  In the event that the Indenture Secured Obligations are paid in full and the Loan Agreement Secured Obligations have not been, the Collateral Agent shall deliver to the Agent or execute such documents as the Agent may reasonably request to cause the Agent to have control over any Cash Collateral or Control Collateral still in Collateral Agent's possession, custody or control in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct, to be applied by the Agent to the Loan Agreement Secured Obligations.  Proceeds of any exercise by the Agent or the Collateral Agent, as applicable, of any of their respective secured creditor rights or remedies under any of the Loan Documents, under applicable law, or otherwise with respect to any Lender Priority Collateral or Proceeds thereof, shall be (a) until the Discharge of the Loan Agreement Secured Obligations, retained by the Agent or promptly turned over by the Collateral Agent, the Trustee, or any Noteholder, as the case may be, to the Agent in the same form as received, with any necessary endorsements, (b) after the Discharge of the Loan Agreement Secured Obligations and until all Indenture Secured Obligations have been paid in full in cash, retained by the Collateral Agent or promptly turned over by the Agent to the Collateral Agent in the same form as received, with any necessary endorsements, and (c) if there are any amounts still due or any Loan Agreement Priority Obligations outstanding to the Agent or the Lenders under the Lender Loan Documents in excess of the Maximum Priority Debt Amount after the payment in full in cash of all Indenture Secured Obligations, retained by the Agent or promptly turned over by the Collateral Agent to the Agent in the same form as received, with any necessary endorsements.  Proceeds of any exercise by the Agent or the Collateral Agent, as applicable, of any of their respective secured creditor rights or remedies under any of the Loan Documents, under applicable law, or otherwise with respect to any Indenture Priority Collateral or Proceeds thereof, shall be (a) until all Indenture Secured Obligations have been paid in full in cash, retained by the Collateral Agent or promptly turned over by the Agent to the Collateral Agent in the same form as received, with any necessary endorsements for application to the repayment of the Indenture Secured Obligations, and (b) thereafter, retained by the Agent or promptly turned over by the Collateral Agent to the Agent in the same form as received, with any necessary endorsements for application to the repayment of the Loan Agreement Secured Obligations.

17

(c)     <u>Application of Proceeds.</u>  The Agent and the Collateral Agent hereby agree that all Collateral and all Proceeds received by either of them upon the exercise of any their secured creditor rights or remedies under any of the Loan Documents, applicable law, or otherwise shall be applied,

<u>first</u>, to the payment of costs and expenses of the Agent, the Lenders, or of the Collateral Agent, the Trustee, and the Noteholders, as applicable, in connection with such exercise,

<u>second</u>, in the case of all Lender Priority Collateral or Proceeds thereof, to the payment of the Loan Agreement Secured Obligations up to (but not in excess of) the Maximum Priority Debt Amount and in the case of all Indenture Priority Collateral and Indenture Exclusive Collateral or Proceeds thereof, to the payment of the Indenture Secured Obligations,

<u>third</u>, to the payment of the Indenture Secured Obligations, and

<u>fourth</u>, to the payment of any Loan Agreement Secured Obligations still outstanding.

In exercising remedies, whether as a secured creditor or otherwise, the Agent shall have no obligation or liability to the Collateral Agent, the Trustee, or to any Noteholder and the Collateral Agent shall have no obligation or liability to the Agent or any Lender regarding the adequacy of any Proceeds or for any action or omission save and except solely an action or omission that breaches the express obligations undertaken by each Party under the terms of this Agreement.

Section 4.03     <u>Specific Performance.</u>  Each of the Agent and the Collateral Agent is hereby authorized to demand specific performance of this Agreement, whether or not any Borrower shall have complied with any of the provisions of any of the Loan Documents, at any time when the other shall have failed to comply with any of the provisions of this Agreement applicable to it; <u>provided</u>, <u>however</u>, the remedy of specific performance shall not be available, and the asserting party shall be free to assert any and all legal defenses it may possess, if such remedy would result in, or otherwise constitute, a violation of the Employee Retirement Income Security Act of 1974, as amended.  Each of the Agent and the Collateral Agent hereby irrevocably waives any defense based on the adequacy of a remedy at law, which might be asserted as a bar to such remedy of specific performance.

18

http://www.sec.gov/...ves/edgar/data/1326686/00010474690501...

ARTICLE V.
INTERCREDITOR ACKNOWLEDGEMENTS AND WAIVERS

Section 5.01      Notice of Acceptance and Other Waivers.

(a)       All Loan Agreement Secured Obligations at any time made or incurred by any Borrower or any of its Subsidiaries shall be deemed to have been made or incurred in reliance upon this Agreement, and the Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, hereby waives (i) notice of acceptance, or proof of reliance, by the Agent or any Lender of this Agreement, and (ii) notice of the existence, renewal, extension, accrual, creation, or non-payment of all or any part of the Loan Agreement Secured Obligations. None of the Agent, the Lenders, or any of their respective affiliates, directors, officers, employees, or agents shall be liable for failure to demand, collect, or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral or to take any other action whatsoever with regard to the Collateral or any part thereof, except as specifically provided in this Agreement. If the Agent or any Lender honors (or fails to honor) a request by any Borrower for an extension of credit pursuant to the Loan Agreement or any of the Lender Loan Documents, whether Agent or such Lender has knowledge that the honoring of (or failure to honor) any such request would constitute a default under the terms of the Indenture or any Indenture Loan Document or an act, condition, or event that, with the giving of notice or the passage of time, or both, would constitute such a default, or if Agent or any Lender otherwise should take or fail to take any action under or exercise any of its contractual rights or remedies under the Lender Loan Documents (subject to the express terms and conditions hereof), neither the Agent nor any Lender shall have any liability whatsoever to the Collateral Agent, the Trustee or any Noteholder as a result of such action, omission, or exercise (so long as any such exercise does not breach the express terms and provisions of this Agreement). The Agent and the Lenders will be entitled to manage and supervise its loans and extensions of credit under the Loan Agreement and other Lender Loan Documents as the Agent and Lenders may, in their sole discretion, deem appropriate, and the Agent and the Lenders may manage their loans and extensions of credit without regard to any rights or interests that the Collateral Agent, the Trustee, or any of the Noteholders have in the Collateral or otherwise except as otherwise expressly set forth in this Agreement. The Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, agrees that neither the Agent nor any Lender shall incur any liability as a result of a sale, lease, license, or other disposition of the Collateral, or any part thereof, pursuant to the Lender Loan Documents conducted in accordance with mandatory provisions of applicable law.

(b)       All Indenture Secured Obligations at any time made or incurred by any Borrower or any of its Subsidiaries shall be deemed to have been made or incurred in reliance upon this Agreement, and the Agent and each Lender hereby waives (i) notice of acceptance, or proof of reliance, by the Collateral Agent, on behalf of itself, the Trustee and the Noteholders, of this Agreement, and (ii) notice of the existence, renewal,

19

http://www.sec.gov/ ` ` ives/edgar/data/1326686/00010474690501...

extension, accrual, creation, or non-payment of all or any part of the Indenture Secured Obligations.  None of Collateral Agent, Trustee, or any of the Noteholders nor any of their affiliates, directors, officers, employees, or agents shall be liable for failure to demand, collect, or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral or to take any other action whatsoever with regard to the Collateral or any part thereof, except as specifically provided in this Agreement.  If Collateral Agent, Trustee, or any of the Noteholders should take or fail to take any action under or exercise any of their contractual rights or remedies under the Indenture Agreements (subject to the express terms and conditions hereof), none of Collateral Agent, Trustee, or any of the Noteholders shall have any liability whatsoever to the Agent or the Lenders as a result of such action, omission, or exercise (so long as any such exercise does not breach the express terms and provisions of this Agreement).  The Collateral Agent, Trustee, and Noteholders will be entitled to manage and supervise the Indenture Secured Obligations and their rights under the Indenture Loan Documents as they may, in their sole discretion, deem appropriate, and they may manage without regard to any rights or interests that the Agent has in the Collateral or otherwise except as otherwise expressly set forth in this Agreement.  Subject to Section 2.03, the Agent on behalf of itself and the Lenders, agrees that none of the Collateral Agent, the Trustee, or the Noteholders shall incur any liability as a result of a sale, lease, license, or other disposition of the Collateral, or any part thereof, pursuant to the Indenture Loan Documents conducted in accordance with mandatory provisions of applicable law.

      Section 5.02      <u>Modifications to Lender Loan Documents and Indenture Agreements.</u>

      (a)      The Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, hereby agrees that, without affecting the obligations of the Collateral Agent, the Trustee and the Noteholders hereunder, the Agent and the Lenders may, at any time and from time to time, in its sole discretion without the consent of or notice to the Collateral Agent, the Trustee or any Noteholder (except to the extent such notice or consent is required pursuant to the express provisions of this Agreement), and without incurring any liability to the Collateral Agent, the Trustee or any Noteholder or impairing or releasing the subordination provided for herein, amend, restate, supplement, replace, refinance, extend, consolidate, restructure, or otherwise modify the Loan Agreement or any of the Lender Loan Documents in any manner whatsoever, including, to

      (i)      change the manner, place, time, or terms of payment or renew or alter, all or any of the Loan Agreement Secured Obligations or otherwise amend, restate, supplement, or otherwise modify in any manner, or grant any waiver or release with respect to, all or any part of the Loan Agreement Secured Obligations or any of the Lender Loan Documents,

20

(ii)    retain or obtain a Lien on any property of any Person to secure any of the Loan Agreement Secured Obligations, and in that connection to enter into any additional Lender Loan Documents,

(iii)    amend, or grant any waiver, compromise or release with respect to, or consent to any departure from, any guaranty or other obligations of any Person obligated in any manner under or in respect of the Loan Agreement Secured Obligations,

(iv)    release its Lien on any Collateral or other property,

(v)    exercise or refrain from exercising any rights against any Borrower or any other Person,

(vi)    retain or obtain the primary or secondary obligation of any other Person with respect to any of the Loan Agreement Secured Obligations, and

(vii)    otherwise manage and supervise the Loan Agreement Secured Obligations as the Agent and the Lenders shall deem appropriate.

(b)    The Agent, on behalf of itself and the Lenders, hereby agrees that Collateral Agent, on behalf of itself, the Trustee, and the Noteholders may, at any time and from time to time, in its sole discretion without the consent of or notice to the Agent (except to the extent such notice or consent is required pursuant to the express provisions of this Agreement), and without incurring any liability to the Agent, on behalf of itself and the Lenders, or impairing or releasing the subordination provided for herein, amend, restate, supplement, replace, refinance, extend, consolidate, restructure, or otherwise modify the Indenture Agreements in any manner whatsoever, provided, however, that in no event shall Collateral Agent, the Trustee, or any Noteholder obtain a Lien on any assets of Borrower, any Guarantor or any other Person other than Indenture Exclusive Collateral unless (i) Agent also obtains a Lien on such assets, or (ii) Agent declines in a writing to Collateral Agent to obtain a Lien on such assets.

(c)    Notwithstanding anything to the contrary herein, this Section 5.02 shall not be construed to constitute a waiver by the Collateral Agent, the Trustee, or any Noteholder of Section 4.12 of the Indenture.

(d)    Notwithstanding anything to the contrary herein, until the Discharge of Loan Agreement Secured Obligations shall have occurred, in no event shall the aggregate principal amount of Indebtedness represented by any notes issued pursuant to the Indenture, including any Notes (or represented by any other evidence of indebtedness for borrowed money under the Notes or the Indenture) at any time exceed an aggregate principal amount equal to $130,000,000.

21

http://www.sec.gov/ ' ' ives/edgar/data/1326686/0001047469050 l...

Section 5.03        Reinstatement and Continuation of Agreement.

(a)        If Agent or any Lender is required in any Insolvency Proceeding or otherwise to turn over or otherwise pay to the estate of any Borrower, any of its Subsidiaries or any other Person any amount (a "Recovery"), then the Loan Agreement Secured Obligations shall be reinstated to the extent of such Recovery.  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair, or otherwise affect the obligations of the parties hereto from such date of reinstatement.  All rights, interests, agreements, and obligations of the Collateral Agent, the Trustee, the Agent, the Lenders, and the Noteholders under this Agreement shall remain in full force and effect and shall continue irrespective of the commencement of, or any discharge, confirmation, conversion, or dismissal of any Insolvency Proceeding by or against any Borrower, any of its Subsidiaries or any other circumstance which otherwise might constitute a defense available to, or a discharge of any Borrower, or any Subsidiary in respect of the Loan Agreement Secured Obligations.  No priority or right of the Agent and the Lenders shall at any time be prejudiced or impaired in any way by any act or failure to act on the part of any Borrower, any of its Subsidiaries or by the noncompliance by any Person with the terms, provisions, or covenants of the Loan Agreement, the Indenture or any of the other Loan Documents or Indenture Loan Documents, regardless of any knowledge thereof which the Agent or any Lender may have.

(b)        If Collateral Agent, the Trustee, or any Noteholder is required in any Insolvency Proceeding or otherwise to turn over or otherwise pay to the estate of any Borrower, any of its Subsidiaries or any other Person a Recovery, then the Indenture Secured Obligations shall be reinstated to the extent of such Recovery.  No priority or right of the Collateral Agent, the Trustee, or any Noteholder shall at any time be prejudiced or impaired in any way by any act or failure to act on the part of any Borrower, or any of its Subsidiaries or by the noncompliance by any Person with the terms, provisions, or covenants of the Loan Agreement, the Indenture or any of the other Loan Documents or Indenture Loan Documents, regardless of any knowledge thereof which the Collateral Agent, the Trustee, or any Noteholder may have.

ARTICLE VI.
INSOLVENCY PROCEEDINGS

Section 6.01        DIP Financing.  If any Borrower, any of its Subsidiaries or E&W shall be subject to any Insolvency Proceeding and the Agent or any Lender shall desire, prior to the Discharge of Loan Agreement Secured Obligations, to permit the use of cash collateral that constitutes Lender Priority Collateral or to permit any Borrower, any of its Subsidiaries or E&W to obtain financing under Section 363 or Section 364 of Title 11 of the United States Code or any similar provision under the law applicable to any Insolvency Proceeding ("DIP Financing") to be secured by all or any portion of the Lender Priority Collateral, then the Collateral Agent, on behalf of itself, the Trustee, and

22

the Noteholders, agrees that it will raise no objection to such use of cash collateral or DIP Financing and will not request adequate protection or any other relief in connection with its or their interest in any such Lender Priority Collateral except to the extent specified in this Section 6.01 and in Section 6.02. To the extent the Liens in the Lender Priority Collateral securing the Loan Agreement Secured Obligations are subordinated or *pari passu* with such DIP Financing, the Collateral Agent, for and on behalf of itself, the Trustee, and the Noteholders, hereby agrees that its Liens in the Lender Priority Collateral shall be subordinated to such DIP Financing (and all obligations relating thereto) upon the terms and conditions specified in this Agreement. Until the Discharge of Loan Agreement Secured Obligations has occurred, the Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, agrees that none of them shall seek relief from the automatic stay or any other stay in any Insolvency Proceeding in respect of the Lender Priority Collateral and will not provide or offer to provide any DIP Financing secured by a Lien in the Lender Priority Collateral senior to or *pari passu* with the Liens securing the Loan Agreement Secured Obligations, in each case unless the Agent otherwise has provided its express written consent. Until the Discharge of Loan Agreement Secured Obligations, the Collateral Agent, for and on behalf of itself, the Trustee and the Noteholders, waives any right to seek or obtain a "priming" lien or a lien that would be *pari passu* with the Agent's Liens whether as adequate protection for the use of Collateral or Indenture Exclusive Collateral or otherwise.

Section 6.02    No Contest. The Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, agrees that, prior to the Discharge of Loan Agreement Secured Obligations, none of them shall contest (or support any other Person contesting) (a) any request by the Agent or any Lender for adequate protection, or (b) any objection by the Agent or any Lender to any motion, relief, action, or proceeding based on Agent or any Lender claiming that their interests in the Lender Priority Collateral are not adequately protected or any other similar request under any law applicable to an Insolvency Proceeding. Notwithstanding the foregoing, in any Insolvency Proceeding, if the Agent or any Lender is granted adequate protection in the form of additional collateral in connection with any DIP Financing or use of cash collateral under Section 363 or Section 364 of Title 11 of the United States Code or any similar provision under the law applicable to any Insolvency Proceeding, then the Collateral Agent, on behalf of itself, the Trustee, or any of the Noteholders, may seek or request adequate protection in the form of a Lien on such additional collateral, which Lien hereby is and shall be deemed to be subordinated to the Liens securing the Loan Agreement Secured Obligations up to (but not in excess of) the Maximum Priority Debt Amount and such DIP Financing (and all obligations relating thereto) on the same basis as the Lien Priority. The Agent, on behalf of itself and the Lenders, agrees that until the Indenture Secured Obligations are paid in full in cash, none of them shall contest (or support any other Person contesting) (a) any request by the Collateral Agent or any Noteholder for adequate protection in the Indenture Priority Collateral or the Indenture Exclusive Collateral, or (b) any objection by the Collateral Agent or any Noteholder to any motion, relief, action, or proceeding based on Collateral Agent or any Noteholder claiming that their interests in the Indenture

23

http://www.sec.gov/ ' ' ives/edgar/data/1326686/00010474690501...

Priority Collateral or Indenture Exclusive Collateral are not adequately protected or any other similar request under any law applicable to an Insolvency Proceeding, but only to the extent that such request is consistent with and subject to the other provisions of this Intercreditor Agreement, including Sections 2.01 and 6.01. In the event the Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, seeks or requests adequate protection and such adequate protection is granted in the form of Liens in respect of additional collateral, then the Collateral Agent, on behalf of itself, the Trustee, and each of the Noteholders, agrees that the Agent and Lenders also shall be granted a senior Lien on such additional collateral as security for the Loan Agreement Secured Obligations (and for any such DIP Financing) and that any Lien on such additional collateral securing the Indenture Secured Obligations shall be subordinated to the Liens in respect of such additional collateral securing the Loan Agreement Secured Obligations up to (but not in excess of) the Maximum Priority Debt Amount and any such DIP Financing and any other Liens granted to the Agent as adequate protection on the same basis as the Lien Priority and subject to the other terms and conditions of this Agreement. Nothing contained herein shall prohibit or in any way limit the Agent and the Lenders, prior to the Discharge of Loan Agreement Secured Obligations, from objecting in any Insolvency Proceeding or otherwise to any action taken by the Collateral Agent, the Trustee or any of the Noteholders, including the seeking by the Collateral Agent, the Trustee or any Noteholder of adequate protection or the asserting by the Collateral Agent, the Trustee or any Noteholder of any of its rights and remedies under the Indenture Loan Documents or otherwise except with respect to the Indenture Exclusive Collateral or the Indenture Priority Collateral.

Section 6.03    Asset Sales. The Collateral Agent agrees, on behalf of itself, the Trustee, and the Noteholders, that prior to the Discharge of Loan Agreement Secured Obligations, it will not oppose any sale consented to by Agent or any Lender of any Lender Priority Collateral pursuant to Section 365(f) of Title 11 of the United States Code (or any similar provision in any other applicable Bankruptcy Law) so long as the proceeds of such sale are applied in accordance with this Agreement.

Section 6.04    Enforceability. The provisions of this Agreement are intended to be and shall be enforceable under Section 510 of Title 11 of the United States Code. The Collateral Agent, on behalf of itself, the Trustee, and the Noteholders, agrees that all distributions that the Collateral Agent, the Trustee, or any Noteholder receives in any Insolvency Proceeding on account of the Lender Priority Collateral or Proceeds thereof shall be held in trust by such Person and turned over to the Agent for application in accordance with Section 4.02 of this Agreement. The Agent, on behalf of itself and the Lenders, agrees that all distributions that the Agent or any Lender receives in any Insolvency Proceeding on account of the Indenture Priority Collateral, the Indenture Exclusive Collateral or Proceeds thereof shall be held in trust by such Person and turned over to the Collateral Agent for application in accordance with Section 4.02 of this Agreement. To the extent that any amounts received by any Person are paid over in

24

connection with this provision, the obligations owed by any Borrower to such Person will be deemed to be reinstated to the extent of the amounts so paid over.

## ARTICLE VII.
## MISCELLANEOUS

Section 7.01    Rights of Subrogation.  The Collateral Agent agrees that no payment or distribution to the Agent or any Lender on account of Lender Priority Collateral or Proceeds thereof pursuant to the provisions of this Agreement shall entitle the Collateral Agent, the Trustee, or any Noteholder to exercise any rights of subrogation in respect thereof until the Discharge of Loan Agreement Secured Obligations shall have occurred.  Following the Discharge of Loan Agreement Secured Obligations, the Agent agrees to execute such documents, agreements, and instruments as the Collateral Agent, the Trustee or any Noteholder may reasonably request to evidence the transfer by subrogation to any such Person of an interest in the Loan Agreement Secured Obligations resulting from payments or distributions to the Agent on account of the Lender Priority Collateral or Proceeds thereof by such Person, so long as all costs and expenses (including all reasonable legal fees and disbursements) incurred in connection therewith by the Agent are paid by such Person upon request for payment thereof.

Section 7.02    Further Assurances.  Each Party will, at its own expense (but subject to such Party's reimbursement rights under the Lender Loan Documents or Indenture Loan Documents, as applicable) and at any time and from time to time, promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that either Party may reasonably request, in order to protect any right or interest granted or purported to be granted hereby or to enable the Agent or the Collateral Agent to exercise and enforce its rights and remedies hereunder; provided, however, that no Party shall be required to pay over any payment or distribution, execute any instruments or documents, or take any other action referred to in this Section 7.02 to the extent that such action would contravene any law, order or other legal requirement, and in the event of a controversy or dispute, such Party may interplead any payment or distribution in any court of competent jurisdiction, without further responsibility in respect of such payment or distribution under this Section 7.02.

Section 7.03    Representations.  The Original Agent represents and warrants to the Collateral Agent that it has the requisite power and authority under the Original Loan Agreement to enter into, execute, deliver, and carry out the terms of this Agreement.  The Collateral Agent represents and warrants that it has the requisite power and authority under the Indenture to enter into, execute, deliver, and carry out the terms of this Agreement on behalf of itself, the Trustee, and the Noteholders.

Section 7.04    Amendments.  No amendment or waiver of any provision of this Agreement nor consent to any departure by any Party hereto shall be effective unless it is in a written agreement executed by the Collateral Agent and the Agent, and then such

25

waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 7.05    Addresses for Notices.  All demands, notices and other communications provided for hereunder shall be in writing and, if to the Collateral Agent, mailed or sent by telecopy or delivered to it, addressed to it as follows:

> The Bank of New York Trust Company, N.A.
> One Wall Street
> New York, New York  10286
> Attention:  Corporate Trust Department
> Telephone:  (212) 852-1662
> Facsimile:  (212) 852-1626

With a copy to:

> _____
> _____
> _____
> Attention:    _____
> Facsimile:    _____

and if to the Agent, mailed, sent or delivered thereto, addressed to it as follows:

> Wells Fargo Foothill, Inc.
> 2450 Colorado Avenue
> Suite 3000 West
> Santa Monica, CA  90404
> Attention:  Structured Finance Division Management
> Facsimile:  (310) 453-7442

With a copy to:

> Paul, Hastings, Janofsky & Walker LLP
> 515 South Flower Street, 25th Floor
> Los Angeles, California  90071
> Attention:  Hydee R. Feldstein, Esq.
> Facsimile:  (213) 627-0705

or as to any party at such other address as shall be designated by such party in a written notice to the other parties complying as to delivery with the terms of this Section 7.05.  All such demands, notices and other communications shall be effective, when mailed, two business days after deposit in the mails, postage prepaid, when sent by telecopy, when receipt is acknowledged by the receiving telecopy equipment (or at the opening of

26

the next business day if receipt is after normal business hours), or when delivered, as the case may be, addressed as aforesaid.

Section 7.06     No Waiver, Remedies.  No failure on the part of any Party to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 7.07     Continuing Agreement, Transfer of Priority Obligations.  This Agreement is a continuing agreement and shall (i) remain in full force and effect until the Discharge of the Loan Agreement Secured Obligations shall have occurred and the Indenture Secured Obligations shall have been paid in full, (ii) be binding upon the Parties and their successors and assigns, and (iii) inure to the benefit of and be enforceable by the Parties and their respective successors, transferees and assigns.  Without limiting the generality of the foregoing clause (iii), the Agent or any Lender or the Collateral Agent, the Trustee, or any Noteholder may assign or otherwise transfer all or any portion of the Loan Agreement Secured Obligations or the Indenture Secured Obligations, as applicable, to any other Person (other than Borrower, any Guarantor or any Affiliate of Borrower and any Subsidiary of Borrower or any Guarantor), and such other Person shall thereupon become vested with all the rights and obligations in respect thereof granted to the Agent or any Lender or the Collateral Agent, the Trustee, or any Noteholder, as the case may be, herein or otherwise.

Section 7.08     Governing Law; Entire Agreement.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed in the State of New York, including, without limitation, Sections 5-1401 and 5-1402 of the New York General Obligations Law and New York Civil Practice Laws and Rules 327(b) except as otherwise preempted by applicable federal law.  This Agreement constitutes the entire agreement and understanding among the Parties with respect to the subject matter hereof and supersedes any prior agreements, written or oral, with respect thereto.

Section 7.09     Counterparts.  This Agreement may be executed in any number of counterparts (including via facsimile or electronic mail), and it is not necessary that the signatures of all Parties be contained on any one counterpart hereof, each counterpart will be deemed to be an original, and all together shall constitute one and the same document.

Section 7.10     No Third Party Beneficiary.  This Agreement is solely for the benefit of the Parties (and their permitted assignees).  No other Person (including any Borrower, or any Affiliate of Borrower and any Subsidiary of Borrower) shall be deemed to be a third party beneficiary of this Agreement.

27

Section 7.11     Headings. The headings of the articles and sections of this Agreement are inserted for purposes of convenience only and shall not be construed to affect the meaning or construction of any of the provisions hereof

Section 7.12     Severability. If any of the provisions in this Agreement shall, for any reason, be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement and shall not invalidate the Lien Priority or any other priority set forth in this Agreement.

Section 7.13     Collateral Agent Status. Nothing in this Agreement shall be construed to operate as a waiver by the Collateral Agent, with respect to any Borrower, any of its Subsidiaries, the Trustee, or any Noteholder, of the benefit of any exculpatory rights, privileges, immunities, indemnities, or reliance rights contained in the Indenture or any of the other Indenture Loan Documents. For all purposes of this Agreement, the Collateral Agent may (a) rely in good faith, as to matters of fact, on any representation of fact believed by the Collateral Agent to be true (without any duty of investigation) and that is contained in a written certificate of any authorized representative of the Borrowers or of the Lenders, and (b) assume in good faith (without any duty of investigation), and rely upon, the genuineness, due authority, validity, and accuracy of any certificate, instrument, notice, or other document believed by it in good faith to be genuine and presented by the proper person. Each Borrower and Agent expressly acknowledge that the subordination and related agreements set forth herein by the Collateral Agent are made solely in its capacity as Collateral Agent under the Indenture with respect to the Notes issued thereunder and the other Indenture Loan Documents and are not made by the Collateral Agent in its individual commercial capacity.

Section 7.14     Acknowledgment. Each Borrower hereby acknowledges that it has received a copy of this Agreement and consents thereto, and agrees to recognize all rights granted thereby to the Agent and the Collateral Agent and will not do any act or perform any obligation which is not in accordance with the agreements set forth in this Agreement. Each Borrower further acknowledges and agrees that it is not an intended beneficiary or third party beneficiary under this Agreement.

Section 7.15     VENUE; JURY TRIAL WAIVER.

(a)     THE PARTIES HERETO AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE CITY OF NEW YORK OR THE SOUTHERN DISTRICT OF NEW YORK, PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH PARTY HERETO WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW,

28

ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF <u>FORUM</u> <u>NON</u> <u>CONVENIENS</u> OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS <u>SECTION 7.15</u>.

      (b)      EACH PARTY HERETO HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. EACH PARTY HERETO REPRESENTS THAT IT HAS REVIEWED THIS WAIVER AND IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

      Section 7.16      <u>Intercreditor Agreement</u>. This Agreement is the Intercreditor Agreement referred to in the Indenture. If this Agreement or all or any portion of either Party's rights or obligations hereunder are assigned or otherwise transferred to any other Person, such other Person shall execute and deliver an agreement containing terms substantially identical to those contained in this Agreement.

      Section 7.17      <u>Gaming Laws</u>.

      (a)      Notwithstanding anything in this Agreement to the contrary, the Collateral Agent and the Agent acknowledge, understand and agree that the Gaming Laws may impose certain licensing or transaction approval requirements prior to the exercise of the rights and remedies granted to them under this Agreement and the Loan Documents with respect to the Collateral subject to the Gaming Laws.

      (b)      If any consent under the Gaming Laws is required in connection with the taking of any of the actions which may be taken by either the Collateral Agent or the Agent in the exercise of their rights hereunder, then agrees to use its best efforts to secure such consent and to cooperate with the other party in obtaining any such consent. Upon the occurrence and during the continuation of any event of default under any Loan Document, each party shall promptly execute and/or cause the execution of all applications, certificates, instruments, and other documents and papers that the Collateral Agent or the Agent may be required to file in order to obtain any necessary approvals under the Gaming Laws.

[signature pages follow]

29

http://www.sec.gov/ ` ives/edgar/data/1326686/00010474690501...

IN WITNESS WHEREOF, the Agent, the Collateral Agent, and the Borrowers have caused this Agreement to be duly executed and delivered as of the date first above written.

**AGENT:**                                      **WELLS FARGO FOOTHILL, INC.,**
                                                a California corporation

                                                By: /s/ Jim Farner
                                                    Name: Jim Farner
                                                    Title: Senior Vice President

                                                30

http://www.sec.gov/ ` ives/edgar/data/1326686/00010474690501...

**COLLATERAL AGENT:**

**THE BANK OF NEW YORK TRUST COMPANY, N.A.,**
solely in its capacity as Collateral Agent (and not individually)

By: /s/ _____
     Name:
     Title:

31

http://www.sec.gov/...ves/edgar/data/1326686/00010474690501...

**BORROWERS:**

**155 EAST TROPICANA, LLC,**
a Nevada limited liability company

By: /s/ Neil G. Kiefer
    Name: Neil G. Kiefer
    Title: Chief Executive Officer

**155 EAST TROPICANA FINANCE CORP.,**
a Nevada corporation

By: /s/ Neil G. Kiefer
    Name: Neil G. Kiefer
    Title: President

32

# EXHIBIT 22

162-28-102-001
Apn. 162-28-101-002
WHEN RECORDED MAIL TO AND
RECORDING REQUESTED BY:

Fidelity National Title Insurance Company
135 Main St. Ste.1900
San Francisco , CA 94105

Inst #: 201102020001639
Fees: $216.00
N/C Fee: $0.00
02/02/2011 10:29:02 AM
Receipt #: 662232
Requestor:
FIDELITY NATIONAL TITLE LAS
Recorded By: SUO  Pgs: 3
DEBBIE CONWAY
CLARK COUNTY RECORDER

The undersigned hereby affirms that there is no Social Security number contained in this document.

**Trustee Sale No. 10-01569-4 Fee**          APN: 162-28-101-002; 162-28-102-001

PROPERTY ADDRESS: 115 East Tropicana Avenue, Las Vegas, NV 89109 and
155 East Tropicana Avenue, Las Vegas, NV 89109

## NOTICE OF BREACH AND DEFAULT AND OF ELECTION TO CAUSE
## SALE OF REAL PROPERTY UNDER DEED OF TRUST

**NOTICE IS HEREBY GIVEN THAT:** Fidelity National Title Insurance Company is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary under that certain Deed of Trust, Fixture Filing with Assignment of Rents and Leases, and Security Agreement (together with any modifications thereto, the "Deed of Trust") dated as of March 29, 2005, executed by 115 East Tropicana, LLC, a Nevada limited liability company, as trustor (the "Original Trustor"), to secure certain obligations in favor of The Bank of New York Trust Company, N.A., a national banking association, in its capacity as collateral agent, its successors and assigns, as its interests may appear, as beneficiary (the "Original Beneficiary"), recorded on March 29, 2005, as Instrument No. 0002531, in Book 20050329 of Official Records in the office of the Recorder of Clark County, Nevada and that

The Deed of Trust encumbers certain property more particularly described therein (the "Trust Property") and that

The Deed of Trust secures the payment of and the performance of certain obligations, including, but not limited to, the obligations set forth in the Deed of Trust and in any other Indenture Document, and that term is defined in the Deed of Trust (collectively, and together with any modifications thereto, the "Secured Obligations"), including, without limitation, the payment obligations set forth (a) in those certain 8 3/4% Series A Senior Secured Notes due April 1, 2012, having an aggregate amount of $130,000,000.00; and that

The term "Trustor" as used herein shall mean either the Original Trustor or, if applicable, its successor in interest with respect to the Trust Property, and that

The term "Beneficiary" as used herein shall mean either the Original Beneficiary or, if applicable, its successor in interest with respect to the Trust Property, and that

The term "Trustee" as used herein shall mean either the original trustee set forth in the Deed of Trust or, if applicable, its successor in interest with respect to the Trust Property, and that

Notice is hereby given that a breach of, and default in, the obligations for which said Deed of Trust is security has occurred in that the Trustor has failed to perform obligations pursuant to or under the Note and/or the Deed of Trust, specifically: failed to pay the installment of interest which became due on April 1, 2009, and thereafter; together with interest due thereon; failed to pay attorneys' fees and expenses; permitted defaults to occur under the terms and conditions of obligations secured by a senior deed of trust; and that

The Trustor has failed, or shall hereafter fail, to pay all other and subsequent interest and/or principal together with late charges and/or default interest and/or any and all other obligations and indebtedness as may become due under the terms of or under the Note and/or Deed of Trust and not performed and/or paid including, without limitation, reimbursement to the Beneficiary and/or the Trustee of any of the following fees, costs and expenses heretofore or hereafter incurred, suffered or paid by the Beneficiary and/or the Trustee in connection with the Note and/or Deed of Trust, the Trustor or the Trust Property:

1.    Attorneys' fees and costs including, without limitation, those incurred in connection with foreclosure of the Deed of Trust, appointment of a receiver with respect to the Trust Property, litigation over the amount, validity, enforcement or priority of the Note and/or Deed of Trust, or commencement of an action or proceeding for relief from any bankruptcy court or other judicial or administrative stay, order or injunction, and all other such matters;

2.    Real and/or personal property taxes, or payments under or with respect to prior or junior liens or encumbrances, insurance premiums and all other such matters;.

3.    Protection, preservation, repairs, restoration or completion of the Trust Property, and all other such matters;

4.    Compliance with any applicable laws, regulations or orders, and all other such matters;

5.    Trustee's fees, trustee's sale guarantee premiums, and other foreclosure costs, and all other such matters; and that

It is the intention of the Beneficiary to include herein all delinquent sums or obligations now or hereafter secured by and under the Deed of Trust, whether presently known or unknown, and whether or not specifically set forth herein, and that

That by reason of the breach and default, the present beneficiary under the Deed of Trust, does hereby declare all sums secured by the Deed of Trust are immediately due and payable, and notice is hereby given of the election of the beneficiary to cause the Trustee to sell the property described in the Deed of Trust in the manner provided therein.

NRS Section 107.080 permits certain defaults to be cured upon payment of the amounts required by that section without requiring payment of the portion of the principal and interest which would not be due had not default occurred. Where reinstatement is possible if the default is not cured within 35 days following recording and mailing of the notice to trustor or trustor's successors in interest, the right of reinstatement will terminate and the property may thereafter be sold.

Beneficiary hereby elects to conduct a unified foreclosure sale and to include in the non-judicial foreclosure of the estate described in this Notice of Breach and Default and of Election to Cause Sale of Real Property Under Deed of Trust all of the personal property and fixtures described in the Deed of Trust and in other instruments executed by the Trustor in favor of the Beneficiary. Beneficiary reserves the right to revoke its election as to some or all of said personal property and/or fixtures, or to add additional personal property and/or fixtures to the election herein

expressed, at Beneficiary's sale to be conducted pursuant to the Deed of Trust and this Notice of Breach and Default and of Election to Cause Sale of Real Property Under Deed of Trust.

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, contact:

Sidley Austin LLP
c/o Fidelity National Title Insurance Company
135 Main St. Ste.1900
San Francisco, CA 94105
Phone: 415-247-2450
**T.S. No.:10-01569-4 Fee**

Dated: February 2, 2011

Fidelity National Title Insurance Company, Trustee

By: authorized signature

Michael Gilliam, AVP

State of Nevada
County of Clark

On Feb 2, 2011 _____ before me, C. Chamberlan _____ Notary Public in and for said county, personally appeared Michael Gilliam _____ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _____ the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

NOTARY PUBLIC
County of Clark-State of Nevada
C. CHAMBERLAIN
No. 03-81110-1
My Appointment Expires March 24, 2011

(Seal)

# EXHIBIT 23

162-28-102-001
Apn. 162-28-101-002

WHEN RECORDED MAIL TO AND
RECORDING REQUESTED BY:
**Lawyers Title of Nevada Inc.**
**135 Main Street, Suite 1900**
**San Francisco, CA 94105**

Inst #: 201107140003075
Fees: $20.00
N/C Fee: $25.00
07/14/2011 01:06:02 PM
Receipt #: 844401
Requestor:
FIDELITY NATIONAL TITLE LAS
Recorded By: BRT   Pgs: 7

**DEBBIE CONWAY**
**CLARK COUNTY RECORDER**

APN : 162-28-101-002; 162-28-102-001

The undersigned hereby affirms that there is no Social Security number contained in this
document

**Trustee Sale No. 10-01569-4**                    Client Reference No. 115 East Tropicana

## NOTICE OF TRUSTEE'S SALE

## IMPORTANT NOTICE TO PROPERTY OWNER

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST, FIXTURE FILING WITH
ASSIGNMENT OF RENTS AND LEASES AND SECURITY AGREEMENT
DATED March 29, 2005.   UNLESS YOU TAKE ACTION TO PROTECT YOUR
PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN
EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU,
YOU SHOULD CONTACT A LAWYER.**

On **August 8, 2011, at 10:00 AM,** Lawyers Title of Nevada, Inc., as duly appointed
Trustee **WILL SELL AT PUBLIC AUCTION TO THE HIGHEST BIDDER FOR CASH at
the front entrance to The Nevada Legal News located at 930 So. Fourth St., Las
Vegas, NV 89101,** all right, title and interest conveyed to and now held by it under and
pursuant to Deed of Trust Recorded on March 29, 2005, as Instrument No. 0002531, in
Book 20050329 of the Official Records in the office of the Recorder of Clark County,
Nevada, executed by 155 East Tropicana, LLC, a Nevada limited liability company, as
Trustor, The Bank of New York Trust Company, N.A., a national banking association, in
its capacity as collateral agent, its successors and assigns, as its interests may appear,
as Beneficiary, all that certain property situated in said County and State, and more
commonly described as:

APN: 162-28-101-002; 162-28-102-001

SEE "EXHIBIT A" ATTACHED HERETO AND MADE A PART HEREOF

The property heretofore described is being sold "as is".  The street address and other common designation, if any, of the real property described above is purported to be: 115 East Tropicana Avenue, 155 E. Tropicana Avenue, Las Vegas, NV

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein.  Said will be made, but without covenant or warranty express or implied, regarding title, possession or encumbrances, to pay the remaining unpaid balance of the obligations secured by the property to be sold and reasonably estimated costs, expenses and advances as of the first publication date of this Notice of Trustee's Sale, to wit: $164,975,664.20 estimated.  Accrued interest and additional advances, if any, will increase the figure prior to sale.  The property offered for sale excludes all funds held on account by the property receiver, if applicable.

The Deed of Trust secures the payment of and the performance of certain obligations, including, but not limited to, the obligations set forth in the Deed of Trust and in any other Indenture Document, and that term is defined in the Deed of Trust (collectively, and together with any modifications thereto, the "Secured Obligations"), including, without limitation, the payment obligations set forth (a) in those certain 8 3/4% Series A Senior Secured Notes due April 1, 2012, having an aggregate amount of $130,000,000.00;

Beneficiary's bid at sale may include all or part of said amount.  In addition to cash, the Trustee will accept, all payable at time of sale in lawful money of the United States a Cashier's check drawn by a state or national bank, a check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, savings association, or savings bank specified in the applicable sections of the Nevada Administrative Code and authorized to do business in the State of Nevada, or other such funds acceptable to the Trustee.

Beneficiary has elected and does hereby elects to conduct a unified foreclosure sale pursuant to the provisions of Nevada Revised Statutes 104.9604, et seq., and to include in the nonjudicial foreclosure of the estate described in this Notice of Trustee's Sale all of the personal property and fixtures described in the Deed of Trust and in any other instruments in favor of Beneficiary, which property is more particularly described in "Exhibit B" hereto. Beneficiary reserves the right to revoke its election as to some or all of said personal property and/or fixtures, or to add additional personal property and/or fixtures to the election herein expressed, at Beneficiary's sole election, from time to time and at any time until the consummation of the trustee's sale to be conducted pursuant to the Deed of Trust and this Notice of Trustee's Sale.

The beneficiary under the Deed of Trust heretofore executed and delivered to the undersigned, a written Declaration of Default and Demand for Sale. The undersigned caused said Notice of Breach and Default and of Election to Cause Sale of Real Property Under Deed of Trust to be recorded in the County where the real property is located and more than three months have elapsed since such recordation.

**SALE INFORMATION CAN BE OBTAINED ON LINE AT www.priorityposting.com**
**AUTOMATED SALES INFORMATION PLEASE CALL 714-573-1965**

10-01569-4
Lawyers Title of Nevada Inc., as Trustee  Date: July 12, 2011
135 Main Street, Suite 1900
San Francisco, CA 94105
Phone No.: 415-247-2450

Tamala Dailey, Authorized Signature

State of California          )ss.
County of San Francisco      )ss

On July 12, 2011 before me, Elida Rosado, Notary Public, personally appeared Tamala Dailey, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Elida Rosado # 1882764
My Commission Expires March 14, 2014

ELIDA ROSADO
COMM. #1882764
Notary Public-California
SAN FRANCISCO COUNTY
My Comm. Exp. MAR. 14, 2014

Exhibit "A"

T.S. No.: 10-01569-4
Loan No.: 115 East Tropicana

## LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF CLARK, STATE OF NEVADA, AND IS DESCRIBED AS FOLLOWS:

Parcel One (1):

That portion of the West Half (W 1/2) of the Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of Section 28, Township 21 South, Range 51 East, M.D.M., described as follows:

Commencing at the North Quarter (N 1/4) corner of said Section 28;
Thence South 89°50'14" West, along the North line of the Northwest Quarter (NW 1/4) of said Section 28, a distance of 1,318.16 feet to a point;
Thence South 02°54'50" East, a distance of 101.41 feet to a point on the South right of way line of Tropicana Avenue (100 feet wide) said point also being the Northwest (NW) corner of Tropicana Park, as shown by map thereof on file in Book 8 of Plats, Page 37 and reverted to acreage by map thereon on file in Book 15 of Plats, Page 11, Clark County Records said point being the True Point of Beginning;

Thence North 87°11'36" East, along said South right of way line, a distance of 452.59 feet to a point of tangency of a curve concave to the Southwest and having a radius of 15.00 feet;
Thence along said curve through a central angle of 89°50'04" an arc length of 23.52 feet to a point on the Westerly right of way line of Scott Street, as shown on said plats;
Thence South 02°58'20" East, along said right of way line, a distance of 631.04 feet to a point on the centerline of Mona Avenue, as shown on the aforementioned plat of Tropicana Park;
Thence South 87°01'40" West, along said centerline, and the Westerly extension thereof, a distance of 468.21 feet to a point on the West line of said Tropicana Park;
Thence North 02°54'50" West, along said line to the True Point of Beginning.

Excepting Therefrom that portion of said land conveyed to the State of Nevada by deed recorded June 23, 1999, in Book 990623, Doc/Inst.No. 02544, Official Records, Clark County, Nevada.

Assessor's Parcel Number:  162-28-101-002

Parcel Two (2):

The Easterly 150 feet of the West Half (W 1/2) of the Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of Section 28, Township 21 South, Range 61 East, M.D.M.,

Except the portion thereof conveyed to the State of Nevada by Deed recorded May 29, 1959 as Document No. 162200 of Official Records, Clark County, Nevada Records.

Further Excepting the interest in the South 30 feet and the West 20 feet conveyed to Clark County for roads, utilities and other public and incidental purposes by Deed recorded September 13, 1971 as Document No. 128706.

Further Excepting that portion of said land conveyed to Ben Hur Hotel, Inc., described as follows:
Commencing at the Southeast (SE) corner of the Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of said Section 28;

Thence North 88°43'17" West along the South line thereof a distance of 658.98 feet to the Southwest (SW) corner of the East Half (E 1/2) of the Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of Section 28, said point being the True Point of Beginning;

Thence Continuing North 88°43'17" West, a distance of 148.90 feet to the Southeast (SE) corner of the Tropicana Park Subdivision as shown in Book 8 of Plats, Page 37, Clark County Records, Nevada; Thence North 00°26'17" West along the East line of said Tropicana Park a distance of 571.77 feet; Thence North 89°38'50" East a distance of 149.91 feet to a point in the West line of the East Half (E 1/2) of the Northeast Quarter (NE 1/4) of the Northwest Quarter (NW 1/4) of Section 28; Thence South 00°19'51" East a distance of 576.01 feet to the True Point of Beginning.

Further excepting that certain spandrel area conveyed to Clark County for road purposes by Deed recorded May 4, 1987 in Book 870504, as Document No. 00953 and re-recorded May 20, 1987, in Book 870520, as Document No. 00620, Official Records

Assessor's Parcel Number:  162-28-102-001

APN:  162-28-101-002, 162-28-102-001

Exhibit "B"

T.S. No.: 10-01569-4
Loan No.: 115 East Tropicana

Capitalized terms not defined herein shall have the same meaning as those in the Deed of Trust.

All intangible personal property, including, without  (a) the rights to use all names and all derivations thereof now or hereafter used by Grantor in connection with the Land (as defined below), or the Improvements (as defined below), including, without limitation, the names "Hotel San Remo Casino and Resort", and "Hooters Casino Hotel" (or other similar name using the Hooters Brand) and any variation thereof, together with the goodwill associated therewith, and all names, logos, and designs used by Grantor, or in connection with the Land or the Improvements or in which Grantor has rights, with the exclusive right to such names, logos and designs wherever they are now or hereafter used in connection with the Land or the Improvements, and any and all other trade names, trademarks or service marks, whether or not registered, now or hereafter used in operation of the Land or the Improvements, including, without limitation, any interest as a licensee or franchisee, and, in each case, together with the goodwill associated therewith; (b) maps, plans, specifications, surveys, studies, tests, reports, data, and drawings relating to the development of the Land or the Improvements and the construction of the Improvements, including, without limitation, all marketing plans, feasibility studies, soil tests, design contracts and all contracts and agreements of Grantor relating thereto and all architectural, structural, mechanical, and engineering plans and specifications, studies, data and drawings prepared for or relating to the development of the Land or the Trust Property (as defined below) or the construction, renovation or restoration of any of the Improvements or the extraction of minerals, sand, gravel or other valuable substances from the Land; (c) any and all books, records, customer lists (including lists or information derived from or related to the Player Tracking System (as defined below), described within the definition of "Tangible Property"), concession agreement, supply or service contracts, licenses, permits, governmental approvals (to the extent such licenses, permits and approvals may be pledged under applicable law), signs, goodwill, casino and hotel credit and charge records, supplier lists, checking accounts, safe deposit boxes (excluding the contents of such deposit boxes owned by persons other than the Issuer), cash, instruments, and all "chattel paper" as such term is defined in Section 9-102 of the UCC, documents, unearned premiums, deposits, refunds, including, but not limited to, income tax refunds, prepaid expenses, rebates, tax and insurance escrow and impound accounts, if any, actions and rights in action, and all other claims, and all other contract rights and general intangibles resulting from or used in connection with the operation of the Trust Property and in which Grantor now or hereafter has rights; (d) all of Grantor's documents, instruments, contract rights, and general intangibles including, without limitation, all insurance policies, permits, licenses, franchises and agreements required for the use, occupancy or operation of the Land, or any of the Improvements; (e) general intangibles, vacation license resort agreements or other time share license or right to use agreements with respect to the Land, the Improvements and/or the business being conducted thereon, including, without limitation, all rents, issues, profits, income and maintenance fees resulting therefrom; whether any of the foregoing is now owned or hereafter acquired and (f) any and  all licenses, permits, approvals (to the extent such license, permits, approvals are not prohibited from being pledged under applicable law), variances, special permits, franchises, certificates, rulings, certifications, validations, exemptions, filings, registrations, authorizations, consents, approvals, waivers, orders, rights and agreements (including options, option rights and contract rights) now or hereafter obtained by Grantor from any governmental, administrative or regulatory agency, authority, department, commission, board, bureau, or instrumentality of the United States, any state of the United States, or any political subdivision thereof, including, without limitation, any Gaming Authority, or any court, arbitrator or quasi-judicial authority having or claiming jurisdiction over the Land, the Tangible Property, or any other element of the Trust Property or providing access thereto, or operation of any business on, at, or from the Land, including, without limitation, any gaming licenses;

All goods (whether such goods are in the possession if the Grantor or a lessee, bailee or other person for sale, lease, storage, transit, processing, use or otherwise and whether consisting of whole goods, spare parts, components, supplies, materials or consigned or returned or repossessed goods) which are held for sale or lease or are to be furnished (or which have been furnished) under any contract of service or which are raw materials or work in progress or materials used or consumed in any of Grantor's businesses;

All tangible personal property, including, without limitation, all goods, equipment, supplies, building and other materials of every nature whatsoever and all other tangible personal property constituting a part or portion of the Trust Property and/or used in the operation of any hotel, casino, restaurant, store, parking facility, special events arena, theme park, and other commercial operations on the Trust Property, including, but not limited to, inventory, communication systems, visual and electronic surveillance systems and transportation systems and not constituting a part of the real property subject to the lien of the Deed of Trust and including all property and materials stored on all or any portion of the Trust Property in which Grantor has an interest and all tools, utensils, food and beverage, liquor, uniforms, linens, housekeeping and maintenance supplies, vehicles, fuel, advertising and promotional material, blueprints, surveys, plans and other documents relating to the Land or the Improvements, and all construction materials and all Fixtures, (as defined below) including but not limited to, all gaming equipment and devices which are used in connection with

the operation of the Trust Property and those items of Fixtures which are purchased or leased by Grantor, machinery and any other item of personal property in which Grantor now or hereafter owns or acquires an interest or right, and which are used or useful in the construction, operation, use and occupancy of the Trust Property; to the extent permitted by the applicable contract or Applicable Law, all financial equipment, computer equipment, player tracking systems (including all computer hardware, operating software programs and all right, title and interest in and to any applicable license therefore, the "Player Tracking Systems"), calculators, adding machines, video game and slot machines, and any other electronic equipment of every nature used or located on any part of the Trust Property, and all present and future right, title and interest of Grantor in and to any casino operator's agreement, license agreement or sublease agreement used in connection with the Trust Property;

All of Grantor's right, title, and interest in and to (1) the fee interest in the real property together with any greater estate therein now owned or as hereafter may be acquired by Grantor (the "Land"), (2) all improvements now owned or hereafter acquired by Grantor, now or at any time situated, placed or constructed upon the Land (the "Improvements"; the Land and Improvements are collectively referred to herein as the "Premises"), (3) all materials, supplies, equipment, apparatus and other items of personal property now owned or hereafter acquired by Grantor and now or hereafter attached to or installed in any of the Improvements or the Land, and water, gas, electrical, telephone, storm and sanitary sewer facilities and all other utilities whether or not situated in easements (the "Fixtures"), (4) all reserves, escrows or impounds required under the Indenture and all deposit accounts maintained by Grantor with respect to the Trust Property (the "Deposit Accounts"), (5) those certain lease agreements, as they may be amended, modified and extended thereof (collectively, the "Ground Leases") by and between Eastern and Western Hotel Corporation, as lessee, and Grantor, as lessor, as the same may be amended, restated, renewed or extended from time to time, (6) all existing and future leases, subleases, concessions, occupancy agreements, lease guarantees or other agreements (written or oral, now or at any time in effect) which grant to any Person a possessory interest in, or the right to use or occupy, all or any part of the Trust Property, whether made before or after the filing by or against the Grantor of any petition for relief under the Bankruptcy Code, together with any extension, renewal or replacement of the same and together with all related security and other deposits (and together with the Ground Leases, the "Leases"), (7) all of the rents, additional rents, revenues, royalties, income, proceeds, profits, early termination fees or payments, security and other types of deposits, and other benefits paid or payable by parties to the Leases for using, leasing, licensing, possessing, operation from, residing in, selling or otherwise enjoying the Trust Property or any part thereof, whether paid or accruing before or after the filing by or against Grantor of any petition for relief under the Bankruptcy Code, including without limitation, all rights to payment for hotel room occupancy by hotel guest, which includes any payment or monies received or to be received in whole or in part, whether actual or deemed to be, for the sale of services or products in connection therewith and/or in connection with such occupancy, advance registration fees by hotel guest, tour or junket proceeds and deposits for conventions and/or party reservations (collectively, the "Rents"), (8) all other agreements, such as construction contracts, architects' agreements, engineers' contracts, utility contracts, maintenance agreements, management agreements, service contracts, listing agreements, guaranties, warranties, permits, licenses, certificates, and entitlements in any way relating to the construction, use, occupancy, operation, maintenance, enjoyment or ownership of the Trust Property (the "Property Agreements"), (9) all rights, privileges, tenements, hereditaments, rights-of-way, easements, appendages, and appurtenances appertaining to the foregoing, (10) all property tax refunds, utility refunds and rebates, earned or received at any time (the "Tax Refunds"), (11) all accessions, replacements and substitutions for any the foregoing and all proceeds thereof (the "Proceeds"), (12) all insurance policies, unearned premiums therefor and proceeds from such policies covering any of the property now or hereafter acquired by Grantor (the "Insurance"), (13) any awards, damages, remunerations, reimbursements, settlements or compensation heretofore made or hereafter to be made by any governmental authority pertaining to the Land, Improvements or Fixtures (the "Condemnation Awards"), (14) all of Grantor's rights to appear and defend any action or proceeding brought with respect to the Trust Property and to commence any action or proceeding to protect the interest of Grantor in the Trust Property, (15) all rights, powers, privileges, options and other benefits of Grantor as lessor under the Leases, including, without limitation, the immediate and continuing right to claim for, collect and receive all Rents payable or receivable under the Leases or pursuant thereto (and to apply the same to payment of the Secured Obligation), and to all other things which Grantor or any lessor is or may become entitled to do under the Leases, (16) all water rights, water stock, water permits, and other rights to the use of water that are now or that may be hereinafter used in connection with the said Trust Property, or any part thereof, or any improvements or appurtenances thereto, (17) all oil and gas and other mineral rights, if any, in or pertaining to the Land and all royalty, leasehold and other right of Grantor pertaining thereto, and (18) all right, title and interest of Grantor in and to all other Tangible Property and Intangible Property (except, with respect to Gaming Licenses, as prohibited by the Gaming Laws) now or at any time hereafter located on or appurtenant to the Trust Property and used or useful in connection with the ownership, management or operation of the Trust Property, including, without limitations, the Personalty.

# EXHIBIT 24

## 155 East Tropicana, LLC ("Company")

| Bank | ACCOUNT NO. | Account Name | Purpose |
|---|---|---|---|
| Nevada State Bank | xxxxx8513 | Operating Account | Depository |
| Nevada State Bank | xxxxx9172 | Payroll Account | Disbursement |
| Nevada State Bank | xxxxx9354 | Travel Account | Disbursement |
| Nevada State Bank | xxxxx9339 | 401k Account | Depository |
| Nevada State Bank | xxxxx9347 | Café 125 Account | Depository |
| Nevada State Bank | xxxxx9180 | Credit Card Account | Depository |
| Bank of America | | Merchant Account | Depository |

## 155 East Tropicana Finance Corporation ("Finance Corp.")

| Bank | ACCOUNT NO. | Account Name | Purpose |
|---|---|---|---|
| NONE | | | |